

08 CIV 10934

JUDGE HOLWELL

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     ANNA E. ARREOLA
     HARRY A. CHERNOFF
     ERIC SNYDER
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2218/2481/2534

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA                           :

          -v.-                                     :

ALL RIGHT, TITLE, AND INTEREST OF ASSA             :     08 Civ.
CORPORATION, ASSA COMPANY LIMITED, AND BANK
MELLI IRAN IN 650 FIFTH AVENUE COMPANY,            :
INCLUDING BUT NOT LIMITED TO THE REAL
PROPERTY AND APPURTENANCES LOCATED AT 650          :     **VERIFIED**
FIFTH AVENUE, NEW YORK, NEW YORK, WITH ALL               **COMPLAINT**
IMPROVEMENTS AND ATTACHMENTS THEREON,              :

ALL FUNDS FORMERLY ON DEPOSIT AT CITIBANK,         :
N.A., NEW YORK, NEW YORK, IN ACCOUNT NUMBER
78429712, IN THE NAME OF ASSA CORPORATION,         :
AND ALL FUNDS TRACEABLE THERETO,
                                                   :

ALL FUNDS FORMERLY ON DEPOSIT AT CITIBANK,         :
N.A., NEW YORK, NEW YORK, IN ACCOUNT NUMBER
8881654552, IN THE NAME OF ASSA CORPORATION,       :
AND ALL FUNDS TRACEABLE THERETO,
                                                   :

ALL FUNDS FORMERLY ON DEPOSIT AT JPMORGAN          :
CHASE BANK, N.A., BATON ROUGE, LOUISIANA, IN
ACCOUNT NUMBER 2724409590, IN THE NAME OF          :
ASSA CORPORATION, AND ALL FUNDS TRACEABLE
THERETO, AND                                       :

ALL FUNDS FORMERLY ON DEPOSIT AT JPMORGAN          :
CHASE BANK, N.A., BATON ROUGE, LOUISIANA, IN
ACCOUNT NUMBER 725700280, IN THE NAME OF           :
ASSA CORPORATION, AND ALL FUNDS TRACEABLE
THERETO,                                           :

                    Defendants *in rem*.           :

                                                   :
- - - - - - - - - - - - - - - - - - - - - - - -  x

Plaintiff United States of America, by its attorney, Lev L. Dassin, Acting United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I. <u>NATURE OF THE ACTION</u>

1.    This is an action by the United States of America seeking forfeiture of the properties described below:

   a.   All right, title, and interest of Assa Corporation, Assa Company Limited, and Bank Melli Iran in 650 Fifth Avenue Company, including but not limited to the real property and appurtenances located at 650 Fifth Avenue, New York, New York, with all improvements and attachments thereon, and all property traceable thereto (the "Defendant Real Property");

   b.   All funds formerly on deposit in Account Number 78429712, at Citibank, N.A., New York, New York ("Defendant Account-1");

   c.   All funds formerly on deposit in Account Number 8881654552, at Citibank, N.A., New York, New York ("Defendant Account-2");

   d.   All funds formerly on deposit in Account Number 2724409590, at JPMorgan Chase Bank, N.A., Baton Rouge, Louisiana ("Defendant Account-3");

   e.   All funds formerly on deposit in Account Number 725700280, at JPMorgan Chase Bank, N.A., Baton Rouge, Louisiana ("Defendant Account-4").

(collectively, the "Defendant Properties").

2.    The Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.* In addition, the Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C.

§ 981(a)(1)(A), as property involved in money laundering transactions and attempted money laundering transactions, in violation of 18 U.S.C. §§ 1956 and 1957, and as property traceable to such property.

## II. JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     Venue is proper pursuant to 28 U.S.C. § 1395(b) because the Defendant Properties are located in the Southern District of New York and pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.  The Defendant Accounts are currently in the custody of the United States Marshals Service for the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

### The International Emergency Economic Powers Act ("IEEPA") and the Iranian Transaction Regulations

5.     This civil forfeiture action relates to violations of regulations issued pursuant to IEEPA, codified at 50 U.S.C. § 1701 *et seq*.  This law, which was enacted in 1977, authorizes the President of the United States to regulate financial transactions with foreign countries and foreign nationals in order to deal with threats with respect to which a national emergency has been declared, and prescribes criminal penalties for violations of the statute and the regulations promulgated thereto.

6.     Using the powers conferred by IEEPA, the President

-3-

and the Executive Branch declared a national emergency and issued
orders and regulations prohibiting certain transactions with Iran
and the Government of Iran by United States persons or involving
the export of goods or services from the United States.  Section
1705 of Title 50, United States Code, provides, in part, that
"[i]t shall be unlawful for a person to violate, attempt to
violate, conspire to violate, or cause a violation of any
license, order, regulation, or prohibition issued under this
title."  50 U.S.C. § 1705(a).

    7.    In 1995, in order to implement a series of
executive orders issued pursuant to IEEPA, the Department of
Treasury promulgated the Iranian Transaction Regulations
("ITRs"), Title 31, United States Code of Federal Regulations,
Part 560.  The relevant provisions of the ITRs generally prohibit
(1) the exportation, sale or supply, directly or indirectly, by a
United States person or from the United States, of any goods,
technology, or services to Iran or the Government of Iran, and
(2) the engagement by United States persons in any transaction or
dealing, in or related to goods, technology or services, for
exportation to Iran or the Government of Iran, without having
first obtained a valid license from the United States Department
of Treasury, Office of Foreign Assets Control ("OFAC").

    8.    The ITRs impose the following prohibitions, among
others:

> 31 C.F.R. § 560.204 - Prohibited exportation,
> reexportation, sale or supply of goods, technology, or
> services to Iran.
>
> Except as otherwise authorized pursuant to this part,

-4-

including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995,  the exportation . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .

31 C.F.R. § 560.203 - Evasions; attempts.

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

9.   Courts have recognized that the term "services," as used in the ITRs, includes the performance of something useful for a fee, such as conducting money transfers from the United States to Iran on behalf of others.

10.   Pursuant to 31 C.F.R. § 560.304, the term "Government of Iran" includes: "(a) The state and the Government of Iran . . . (b) [a]ny entity owned or controlled directly or indirectly by the foregoing; (c) [a]ny person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and (d) [a]ny person or entity designated by the Secretary of the Treasury as included within paragraphs (a) through (c) of this section."

-5-

11.   The term "entity owned or controlled by the
Government of Iran" is defined at 31 C.F.R. § 560.313, and
"includes any corporation, partnership, association, or other
entity in which the Government of Iran owns a majority or
controlling interest, and any entity which is otherwise
controlled by that government."

12.   Bank Melli Iran ("Bank Melli") is wholly owned and
controlled by the Government of Iran.  In addition, in 1999, OFAC
identified Bank Melli in Iran, and all of its offices worldwide,
as entities "owned or controlled by the Government of Iran."   31
C.F.R. Part 560, App. A.

13.   The ITRs further impose the following
prohibitions:

> 31 C.F.R. § 560.206 - Prohibited trade-related
> transactions with Iran; goods, technology, or services.
>
> (a) Except as otherwise authorized pursuant to this
> part, and notwithstanding any contract entered into or
> any license or permit granted prior to May 7, 1995, no
> United States person, wherever located, may engage in
> any transaction or dealing in or related to . . .
>
> (2) Goods, technology, or services for exportation,
> reexportation, sale or supply, directly or indirectly,
> to Iran or the Government of Iran.
>
> (b) For purposes of paragraph (a) of this section, the
> term transaction or dealing includes but is not limited
> to purchasing, selling, transporting, swapping,
> brokering, approving, financing, facilitating, or
> guaranteeing.

14.   Pursuant to 31 C.F.R. § 560.314, the term "United
States person" means "any United States citizen, permanent
resident alien, entity organized under the laws of the United
States (including foreign branches), or any person in the United

-6-

States."

## Overview

15.   This civil forfeiture action concerns the ownership of a 36-story office building located at 650 Fifth Avenue, New York, New York (the "Building").

16.   As explained below, the Building is owned by 650 Fifth Avenue Company (the "Fifth Avenue Company), which is a partnership between the Alavi Foundation of New York and Bank Melli.  Bank Melli owns 40% of the Fifth Avenue Company through two shell companies, Assa Corporation ("Assa Corp."), which is a a New York corporate entity, and Assa Company Limited ("Assa Co. Ltd."), which is a corporation domiciled in Jersey, Channel Islands, United Kingdom.  Assa Corp. is wholly owned by Assa Co. Ltd.

17.   As set forth below, Assa Corp. has been providing numerous services to Bank Melli in contravention of the ITRs, including transferring rental income generated from the Fifth Avenue Company to Bank Melli, following Bank Melli's instructions with regard Assa Corp.'s affairs, reporting back to Bank Melli on Assa Corp.'s financial situation and business dealings, and managing the affairs of Assa Corp. for the benefit of Bank Melli.

### The Formation of 650 Fifth Avenue Company and Bank Melli's Straw Companies, Assa Corp. and Assa Co. Ltd.

18.   The Building was constructed in the 1970's by the Pahlavi Foundation, a non-profit organization operated by the Shah of Iran to pursue Iran's charitable interests in the United States.   In the 1970's, Bank Melli loaned the Pahlavi Foundation

-7-

approximately $42 million to be used for the construction and acquisition of the Building.

19.   Following the Iranian revolution of 1979, the Pahlavi Foundation was renamed the Mostazafan Foundation of New York (the "Mostazafan Foundation"), and later renamed the Alavi Foundation of New York (the "Alavi Foundation").  The Alavi Foundation is presently a not-for-profit corporation organized under the laws of New York.  A substantial portion of the Alavi Foundation's funds come from the significant rent roll of the Building.

20.   In 1989, the Mostazafan Foundation entered into a partnership with Bank Melli in order to avoid paying taxes on rental income from the Building.  Under the debt-financed property rules of the federal tax code, the Foundation's rental income was unrelated business income and therefore subject to tax.

21.   In order to remove the debt and avoid paying taxes on income from the Building, the Mostazafan Foundation formed the 650 Fifth Avenue Company (the "Fifth Avenue Company"), a partnership with Bank Melli.  However, Bank Melli disguised its ownership interest by establishing two shell companies, Assa Corp. and Assa Co. Ltd.  Mohammad Behdadfar ("Behdadfar"), a Bank Melli board member, was appointed the President of Assa Corp., and a director of Assa Co. Ltd.

22.   The Mostazafan Foundation and Assa Corp. entered into a written Partnership Agreement on or about July 31, 1989. The Partnership Agreement provided, in part, that the partnership

-8-

would be called 650 Fifth Avenue Company, that the Foundation would contribute the Building to the Partnership, and that Assa Corp. would contribute $44.8 million to the capital of the partnership.  As a result of this partnership, the debt on the Building was removed, permitting the Alavi Foundation to avoid paying U.S. taxes on revenue from the Building.

23.   Today, the two straw owners of Assa Co. Ltd. are Davood Shakeri ("Shakeri") and Fatemeh Aghamiri ("Aghamiri"), who are residents of Iran and represent the interests of Bank Melli. Financial statements for Assa Co. Ltd. state that Shakeri and Aghamiri each own 50% share capital of the company.

24.   Since at least 1990, Assa Corp. has repeatedly transferred rental income from the Fifth Avenue Company to Bank Melli through Assa Co. Ltd.  Assa Corp. has also regularly followed Bank Melli's instructions with regard to Assa Corp.'s business affairs and its management of the investment, and has regularly reported back to Bank Melli on its financial situation.

25.   Assa Corp. and Assa  Co. Ltd. have never received a license from OFAC.  Bank Melli has never received a license from OFAC relating to the Building.

### Tafti's Employment by Assa Corp.

26.   In the United States, Assa Corp. has a single employee working for it, Mohammad Hassan Dehghani Tafti ("Tafti").  Tafti is a naturalized Iranian citizen, born in India.

27.   Tafti first came to the United States in or about 1999 with an L-1 visa, which was issued on the basis of a

petition made on his behalf by his employer, Assa Corp.   An L-1
visa is a visa issued to managers or executives of companies
doing business in the United States.   Assa Corp. submitted a
petition in or about May 1999 in support of Tafti's application
for the L-1 visa.   The petition described Tafti's "proposed
duties in the U.S." as "Treasurer, oversee financial operations
and investments."   The L-1 visa was initially granted to Tafti in
or about July 1999 for three months, and was subsequently renewed
upon further applications in or about September 2000, March 2001,
August 2001, and December 2001.

        28.   In or about November 2002, Tafti applied for an H-
1B visa at the United States Embassy in Ankara, Turkey. An H-1B
visa is a visa issued to employees with specialized knowledge.
In the application, Tafti identified his present employer as
"Assa Corp., 500 Fifth Avenue, NY, NY," and his present
occupation as "financial executive."   However, Tafti stated that
he intended to work in the United States at Optima Mortgage
Company in Santa Ana, California.   Shortly after submitting his
application for an H-1B visa, Tafti submitted another
application.   In this subsequent application, Tafti again stated
that he intended to work for Optima Mortgage.   The H1-B visa was
issued in January 2003, after which Tafti again entered the
United States.

        29.   While living in the United States with his H-1B
visa, Tafti in fact continued to work for Assa Corp., pretending
to work for Optima Mortgage Corporation ("Optima Mortgage") only
for immigration purposes.   To create the image that he worked for

-10-

Optima Mortgage, Tafti moved money from Assa Corp. to Optima Mortgage to cover his payroll from Optima Mortgage.  In order to do this, Tafti transferred monies from Assa Corp. to his personal bank account, and from his personal bank account to Optima Mortgage.  On approximately 23 occasions from in or about May 2003 through in or about September 2005, checks and wire transfers in the approximate amount of $3,800 each were made from Tafti's personal bank account to the president of Optima Mortgage, or his wife, also an employee of Optima Mortgage. Close in time to each of these checks and wire transfers, Tafti was paid approximately $2,800 by Optima Mortgage.  These transactions appeared to be designed to return to Tafti the $3,800 payments, minus requisite payroll taxes.  Additionally, on or about July 27, 2006, Assa Corp. paid Optima Mortgage the sum of $22,500.

          30.  On or about December 31, 2006, Tafti left the United States for Turkey.  In or about May 2007, Tafti applied for an H-1B visa at the United States Embassy in Dubai, United Arab Emirates.  In this application, Tafti stated that he was employed as a "market analyst manager" for Optima Mortgage in Tustin, California, but that he would be living in Tuckahoe, New York.  Initially, no action was taken on the application.  In February 2008, Tafti reactivated this application and an H-1B visa was subsequently granted.  In May 2008, Tafti returned to New York from Dubai.

### Bank Melli's Control of Assa Corp. through Tafti

          31.  Tafti used the email account 

to conduct business on behalf of Assa Corp.  Emails sent to and
from this account show that Tafti regularly provided reports to
Bank Melli about Assa Corp.'s business dealings, and then
followed Bank Melli's instructions with regard to Assa Corp.'s
business affairs.  The following emails, which have been
translated from Farsi, were among the emails sent to or from the
account:

      a.   On or about June 12, 2003, Tafti sent an email to
the email address ███████████████████.  In this
email, Tafti forwarded to Ahmad Azizi ("Azizi")
correspondence from a New York attorney for Assa Corp.
Upon information and belief, Azizi is an official at
Bank Melli in London, England.

      b.   On or about June 19, 2003, Tafti received an email
from the email address ███████████████████.  In
this message, the sender wrote, in part, "I have had
the letter of Intent and the Contract for Sale
reviewed."  The sender of the email identified himself
as "A. Azizi."  Upon information and belief, Azizi sent
this message using the email account of Maria
Chowdhury, a Bank Melli employee in London.  Upon
information and belief, this email was referring to a
proposed deal, which ultimately collapsed, to sell Assa
Corp.'s interest in the Fifth Avenue Company.

      c.   On or about November 20, 2004, Tafti received an
email from the email address ███████████████████  In
this message, the sender wrote, "You are kindly
requested [to] . . . send the monthly expenses of Assa
Corp from April 2004 onward, to please make some
arrangement so that the detailed expenses of this Co.
are available for the use of the auditors."  Upon
information and belief, this email was sent by Ali
Safari, an employee in Bank Melli's Overseas Network
Supervisory Department, known as "ONSD," which is
located in Tehran, Iran.

      d.   On or about December 3, 2004, Tafti received an
email from the email address ███████████████████
containing a list of Assa Corp. expenses.

      e.   On or about February 5, 2005, Tafti sent an email
to the email address ███████████████████ and
wrote, "Dear brother Mr. Ghadimipour: As you are aware
approximately two months ago two sets of minutes

-12-

regarding the ending of the court file and extension of
the loan were sent for the signature of the
shareholders, Mrs. Aghamiri and Mr. Shakeri.
Regretfully, it has not been received yet.  Because the
matter is important, and the lawyer and the secretary
of the Company . . . are anxious, please issue proper
order because any delay will cause doubt and
sensitivity here and God forbid will cause irrevocable
loss. Once more asking an urgent action."  Upon
information and belief, "Mr. Ghadimipour" is Mohsen
Ghadimipour, the current head of ONSD.

f.    On or about March 5, 2005, Tafti sent an email to
▇▇▇▇▇▇▇▇▇▇.  In this email, Tafti wrote, "To
shareholders of Assa Co.: With reference to the message
of 2/28/05, this is to inform you that the financial
statements of both Assa Ltd. Co. and Assa Corp. New
York, were sent to you in the last week via London."
Upon information and belief, this email address belongs
to ONSD.

g.    On or about March 16, 2005, Tafti sent another
email to ▇▇▇▇▇▇▇▇▇▇.  In this email, Tafti
wrote, "To the shareholders of Assa Corp.:  With
reference to today's email, this is to inform you that
the financial statements of Assa Corp up to 3/31/04
were sent to your office addressed to Mr. Ghadimipour."

h.    On June 19, 2005, after Citibank in New York, New
York, had refused to wire $1.3 million from an Assa
Corp. bank account to Assa Ltd., Tafti sent an email
from the email address ▇▇▇▇▇▇▇▇▇ to the
"shareholders of Assa Co. Ltd."  In this email,  Tafti
wrote, "With reference to the email #M-KH of 6/16/2005
this is to inform you that the Company [Assa Corp.] has
made an extended action to remit the monies to banks
outside of the U.S.  In this regard, many meetings were
held with Citibank.  Tomorrow I have a meeting with the
bank because they invited all of the directors of Assa
New York to participate.  The only problem is the
absence of Mr. Shakeri.  I thought I might tell them
that Mr. Shakeri is on a trip or resigned from
directorship, and that [a New York attorney for Assa
Corp.] and I are the directors of Assa in New York now;
however, I will consult with [the New York attorney]
because he will participate in the meeting as the
director and secretary of the Co.  Hoping God will
help.  As you are aware, Citibank has not transferred
the sum of $1,360,800 to the account of Assa Ltd. to
London auditors.  I spoke many times with the bank and
presented evidence such as payment of the tax, and hope
with activity can solve the problem.  I will make a
report to you of the result of tomorrow's session.

Also I believe after solving the above issue, that we should send smaller amounts in the form of monthly, maximum in 3 months payments, to London, so that the amounts would not appear big.  Meanwhile I will try to open an account in another bank, unfortunately owing to special problems here, because the bank wants to know all the directors.  However, the interests of the shareholders will be preserved in the best way.  Thanks. Assa Corp.  Tafti."  By this email, Tafti acknowledged the apparently fictional nature of Shakeri's ownership of Assa Corp. through Assa Co. Ltd., and that Shakeri was apparently unwilling or unable to travel to the United States to attend to his substantial financial concerns here.

i.   On or about July 2, 2005, Tafti sent an email to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  In this email, Tafti wrote, "Mr. Ghadimipour, the director of the branches of Bank Melli, outside of Iran.  As you are aware, the issue of the place of residence of shareholders and the director of the Company in the USA has a special importance.  At present, shareholders are forbidden from having residences in Iran, and as per the view of the legal experts, the American government may freeze the capital of the shareholders.  At the present time, owing to prevention of our Iranian companies, the issues are more sensitive.  Fortunately, Assa Corp. has not had a problem, except for the weakness of residence location of the shareholder which should be removed.  Therefore, please make some arrangement that the residence location of the shareholders of Assa, Mr. Davood Shakeri and Mrs. Aghamiri be changed to another country, and considering my knowledge of the United Arab Emirates, one of the Emirates is proposed.  Please order appropriately."

j.  On or about July 6, 2005, Tafti sent another email to the email address ▓▓▓▓▓▓▓▓▓▓▓▓▓.  In this email, Tafti wrote, "To Mr. Ghadimipour, the director of the branches outside of the country.  With reference to the email and phone conversations of 4/7/2005, this is to inform you the result of my discussions and investigations with the consultants and the lawyers in America and London: changing the shareholder of Assa Ltd. is possible, but the shareholder should reside in a tax free country.  Otherwise, the country of residence will collect a tax from the income of the shareholder."  By this communication proposing to "chang[e]" the shareholders, Tafti acknowledged the fictional nature of ownership of Assa Co. Ltd. by Shakeri and Aghamiri.

k.   On August 9, 2005, Tafti received an email from

the email address ██████████████   In this email,
the sender wrote, "With reference to the email of
7/7/2005, regarding the location of residence of the
shareholders, this is to inform you that, as per the
orders of the Bank Manager, until the appointment of
the qualified individuals, act as before."

l.    On or about February 26, 2006, Tafti sent an email
to the email address ██████████████.   Tafti wrote,
in part, "To the Shareholders of Assa Co.:   With
reference to the today's e-mail this is to inform you
that the financial statements of Assa Corp. of New York
today were sent to you via London.   Please note that
the reason of the delay was the preparing the financial
statements of Sherkate Tazamoni (General Partnership
Co.) of Alavi Foundation Co. Ltd., which is to be
regretted."

m.    On or about May 17, 2006, Tafti sent an email to
the email address ██████████████.   Therein, he
wrote: "Following the email of 4/29/06, this is to
inform you that the financial statements of Assa Co.
Ltd. up to 3/31/05 after auditing . . . have been
dispatched to you via London."

### The Defendant Accounts

32.   Defendant Accounts-1, -2, -3, and -4

(collectively, the "Defendant Accounts") are held in the name of

Assa Corp.   Tafti is the only signatory on the Accounts.

33.   Between January 7, 2000 and December 5, 2007,

approximately $17,083,000 from the Fifth Avenue Company was

deposited into Account-1.   The bank records for Account-1 also

show the following financial activities, among others:

a.    On or about December 3, 2007, Tafti wrote a check
for $10,500, from Account-1, to pay the rent for the
house in which he lived.

b.    On or about December 5, 2007, Account-1 received a
wire transfer of $200,000 from the Fifth Avenue
Company.

c.    On or about April 2, 2008, Tafti wrote a check for
$40,000 to New York State Corporation Tax from
Account-1.

-15-

d.   On or about April 2, 2008, Tafti wrote a check for $1,240 to New York State Corporation Tax from Account-1.

e.   On or about April 2, 2008, Tafti wrote a check for $202 to New York State Corporation Tax from Account-1.

f.   On or about April 3, 2008, Tafti wrote a check for $37,500 to the New York City Department of Finance from Account-1.

34.   Approximately $1.09 million was transferred from Account-1 to Account-3 in November 2006.   In addition, Tafti transferred substantial amounts from Account-1 to Assa Co. Ltd.

35.   In or about October 2008, agents of the Federal Bureau of Investigation ("FBI") executed federal seizure warrants for the funds in the Defendant Accounts.   Approximately $1.9 million was seized from Citibank, and approximately $1.2 was seized from JPMorgan.

## IV. CLAIMS FOR FORFEITURE

### STATUTORY BASES FOR FORFEITURE

36.   The statutory provisions pursuant to which the Defendant Properties are subject to seizure and forfeiture are as follows.

### Proceeds Traceable to Violations of IEEPA

37.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

38.   Under Section 1956(c)(7), the term "specified

-16-

unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]."  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

   39.  Because the Defendant Properties constitute or were derived from proceeds traceable to violations of regulations promulgated under IEEPA (namely, 31 C.F.R. §§ 560.203, 560.204, and 560.206), the Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**Property Involved in Laundering Proceeds of IEEPA Violations**

   40.  Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."

   .41.  Title 18, United States Code, Section 1956(a) provides criminal penalties for:

> (a)(1) [w]hoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (A) (i) with the intent to promote the carrying on of specified unlawful activity; or
>
> . . .

-17-

(B) knowing that the transaction is designed
in whole or in part --

(i) to conceal or disguise the nature, the location,
the source of ownership, or the control of the proceeds
of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under
State or Federal law . . . .

(2) Whoever transports, transmits, or transfers, or
attempts to transport, transmit, or transfer a monetary
instrument or funds from a place in the United States
to or through a place outside the United States or to a
place in the United States from or through a place
outside the United States--

(A) with the intent to promote the carrying on of
specified unlawful activity; or

(B) knowing that the monetary instrument or funds
involved in the transportation represent the proceeds
of some form of unlawful activity and knowing that such
transportation, transmission, or transfer is designed
in whole or in part--

(i) to conceal or disguise the nature, the location,
the source, the ownership, or the control of the
proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under
State or Federal law.

42.   In addition, Section 1956(h) provides, in part,

that "[a]ny person who conspires to commit any offense defined in

this section or section 1957 shall be subject to the same

penalties as those prescribed for the offense the commission of

which was the object of the conspiracy."

43.   18 U.S.C. § 1957 provides in relevant part that:

Whoever . . . knowingly engages or attempts
to engage in a monetary transaction in
criminally derived property of a value
greater than $10,000 and is derived from
specified unlawful activity, shall be
punished as provided in subsection (b).

44.   "Monetary transactions" is defined in 18 U.S.C.

-18-

§ 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

45.   "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

46.   "Specified unlawful activity" is defined in 18 U.S.C. § 1957(f)(3) as having the same meaning as that term has in 18 U.S.C. § 1956.  As noted above, the term "specified unlawful activity," as defined in Section 1956, includes violations of IEEPA.

47.   In addition, the term "financial transaction" is defined in 18 U.S.C. § 1956(c)(4), and includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

48.   Because the Defendant Properties constitute properties involved in transactions or attempted transactions in violation of Sections 1956 and 1957, they are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated:      New York, New York
            December 17, 2008


                        LEV L. DASSIN
                        Acting United States Attorney for
                        Plaintiff United States of America

            By:   _____

                        SHARON COHEN LEVIN
                        ANNA E. ARREOLA
                        HARRY A. CHERNOFF
                        ERIC SNYDER
                        Assistant United States Attorneys
                        One St. Andrew's Plaza
                        New York, New York 10007
                        (212) 637-1060/2218/2481/2534

## VERIFICATION

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                   :
SOUTHERN DISTRICT OF NEW YORK )

      GEORGE J. ENNIS, JR. being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"); that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information and belief.

      The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

 

GEORGE J. ENNIS, JR.
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of December 2008

Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2010