ROSEN, LIVINGSTON & CHOLST LLP
Peter I. Livingston, Esq.
Deborah B. Koplovitz, Esq.
275 Madison Avenue, Suite 500
New York, New York 10016
Telephone: (212) 687-7770
Telefax: (212) 687-8030

Attorneys for Claimants
Assa Corp. and Assa Limited s/h/a Assa Company Limited

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

ALL RIGHT, TITLE, AND INTEREST OF ASSA
CORPORATION, ASSA COMPANY LIMITED, AND BANK
MELLI IRAN IN 650 FIFTH AVENUE COMPANY,
INCLUDING BUT NOT LIMITED TO THE REAL PROPERTY
AND APPURTENANCES LOCATED AT 650 FIFTH AVENUE,
NEW YORK, NEW YORK, WITH ALL IMPROVEMENTS
AND ATTACHMENTS THEREON, *et al.*,

        Defendants *in rem*.

Civil Action No.
08-CV-10934 (RJH)

---

## MEMORANDUM OF CLAIMANTS ASSA CORP. AND ASSA LIMITED S/H/A ASSA COMPANY LIMITED IN SUPPORT OF THEIR MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

LEGAL STANDARD........................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

I.   The Seized Assets Are Not Subject to Forfeiture as the "Proceeds" of Crime........................ 5

   A.  The Minority Interest Cannot Constitute the "Proceeds" of any Alleged
      Violation of IEEPA.................................................................................................. 5

   B.  The Account Funds Were Not the "Proceeds" of any Alleged Violation
      of IEEPA.................................................................................................................. 7

II.  The Seized Assets Were Not "Involved In" Any Alleged Money
    Laundering Offense ....................................................................................................... 10

   A.  The Government Has Not Adequately Alleged a Violation of IEEPA ............................ 12

   B.  The Government Has Not Tied the Seized Assets to Any Alleged
      Violation of IEEPA or Money Laundering Offense ........................................................ 12

      1.  The Minority Interest Was Not Involved in Any Money
         Laundering Transaction ............................................................................................. 12

      2.  The Account Funds Were Not Involved in Any Money
         Laundering Transaction ............................................................................................. 13

III. The Complaint Should Be Dismissed Because Under the Facts as Alleged in the
    Complaint, the Forfeiture Contemplated Will Violate the Treaty of Amity between
    the United States and Iran as Interpreted by the International Court of Justice ..................... 16

IV.  The Taking Contemplated for the Purpose Stated Will Further Violate
    Treaty Article IV.2 and the Takings Clause of the U.S. Constitution Because
    It Is Without Compensation, It Provides a Benefit Rather than Prevents
    a Harm, and the Benefit Is Private Rather Than Public ......................................................... 22

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

## Procedural Rules

Fed. R. Civ. P. 12(b)(6)..................................................................................... 1, 4

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions
Rule E(2)(a) ...........................................................................................................8

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions
Rule G(2)(f) ...........................................................................................................4

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions
Rule G(8)(b)........................................................................................................1, 4

## Federal Statutes

18 U.S.C. § 981 ..............................................................................................1, 2, 10

18 U.S.C. § 981(a)(1)(A) ............................................... 11, 12, 13, 14, 15, 16, 17, 19

18 U.S.C. § 981(a)(2)(A) ......................................................................................5

18 U.S.C. § 981(a)(2)(B) .................................................................................. 5, 6

18 U.S.C. § 981(a)(1)(C) ......................................................................... 5, 6,7, 8, 14

18 U.S.C. § 983(c)(1)........................................................................................ 4

18 U.S.C. § 983(c)(3)................................................................................. 5, 11, 13

18 U.S.C. § 984 ........................................................................................... 8, 9

18 U.S.C. § 984(b) .................................................................................... 8, 9, 11

18 U.S.C. § 1956........................................................................................... 13

18 U.S.C. § 1956(a)(1)....................................................................................12

18 U.S.C. § 1956(a)(1)(7) ...................................................................................5

18 U.S.C. § 1956(a)(1)(B)(i)............................................................................. 15

18 U.S.C. § 1956(a)(2)....................................................................................11

18 U.S.C. § 1956(c)(5)...........................................................................................11

18 U.S.C. § 1957................................................................................................ 13

18 U.S.C. § 1957(a) ...........................................................................................12

18 U.S.C. § 1957(f)(2) ....................................................................................... 11

50 U.S.C. § 1701 ("IEEPA") ........................................................................ *passim*

50 U.S.C. § 1702 ("IEEPA") ........................................................................ *passim*

50 U.S.C. §1702(b)(1) ......................................................................................... 3

## Cases

*Cuellar v. United States,* 128 S.Ct. 1994 (2008) .................................................. 16, 18

*Kelo v. City of New London,* 545 U.S. 469 (2005) ...................................................... 24

*Oil Platforms (Islamic Republic of Iran v. United States of America), Judgment of 6 November 2003,* (2003) ICJ Rep 161 .......................................................................... 21, 22, 23

*Russian Volunteer Fleet v. United States,* 282 U.S. 481 (1931).................................... 23

*United States Diplomatic and Consular Staff in Tehran* (United States of America v. Iran), (1980) ICJ Rep 3 ................................................................................................ 18, 21

*United States v. $49,000 Currency,* 330 F.3d 371 (5th Cir. 2003) .................................... 4

*United States v. All Funds on Deposit in Great Eastern Bank Account No. 11008117,* 804 F.Supp. 444 (E.D.N.Y. 1992) .............................................................................. 17

*United States v. all Funds on Deposit in United Bank of Switzerland,* 188 F.Supp.2d 407 (S.D.N.Y. 2002) .....................................................................................................9

*United States v. All Funds on Deposit in United Bank of Switzerland,* 2003 WL 56999 (S.D.N.Y. 2003)..................................................................................................... 10

*United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Express Bank,* 832 F.Supp. 542 (E.D.N.Y. 1993) ............................ 10

*United States v. Approximately 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others,* 2008 WL 4129814 (S.D.N.Y. Sep. 5, 2008)..................... 6, 7, 13

*United States v. Capoccia,* 503 F.3d 103 (2nd Cir. 2007)............................................. 8

*United States v. Contents in Account No. 059-644190-69*, 253 F.Supp.2d 789 (D. Vt. 2003)..... 17

*United States v. Daccarett*, 6 F.3d 37 (2nd Cir. 1993) ..................................................................... 5

*United States v. Genao*, 343 F.3d 578 (2nd Cir. 2003).................................................................. 14

*United States v. Homa Int'l Trading Corp.*,  387 F.3d 144 (2nd Cir. 2004).................................. 11

*United States v. Napoli*, 54 F.3d 63 (2nd Cir. 1995) ..................................................................... 14

*United States v. Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y. 2009) .................................................. 10

*United States v. Piervinanzi*, 23 F.3d 670 (2nd Cir. 1994)........................................................... 14

*United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636 (1st Cir. 1988).................................. 7, 8

## Administrative Code

31 CFR § 560.203 .............................................................................................................................. 9

31 CFR § 560.204...........................................................................................................................3, 9

31 CFR § 560.206...............................................................................................................................9

31 CFR §560.313 .............................................................................................................................. 19

## Treaties

The Treaty of Amity, Economic Relations and Consular Rights, 8 U.S.T. 899, 284 UNTS 93
(1955)............................................................................................... 2, 17, 18, 19, 20, 21, 22, 23

## Secondary Sources

146 Cong. Rec. H2040-01 ............................................................................................................... 11

Webster's Third New International Dictionary 1807 (1986)...............................................................6

## PRELIMINARY STATEMENT

Claimants Assa Corp. and Assa Company, Ltd., (together, "Claimants"), by their

attorneys Rosen Livingston & Cholst LLP, respectfully submit this Memorandum of Law in

Support of Their Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure

12 (b)(6) and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions Rule G(8)(b).

In an attempt to broaden the scope of the U.S. forfeiture laws beyond Congress' intent,

the Government here seeks to reach back in time and forfeit purported criminal *proceeds* that

existed *before* the alleged crime took place — indeed, before the alleged conduct underlying the

forfeiture was even a crime.

The Government's complaint seeks forfeiture *in rem* pursuant to 18 U.S.C. § 981 of Assa

Corp.'s 40% interest in a partnership that owns real property located at 650 Fifth Avenue (the

"Minority Interest") as well as approximately $3,100,000.00 seized from bank accounts in the

name of Assa Corp. held at Citibank and JP Morgan (the "Account Funds"). With respect to the

Minority Interest, the Government cannot forfeit the property because Assa Corp. owned that

property for almost a decade before the alleged criminal activity purportedly supporting the

forfeiture took place. The Government cannot explain how an asset that existed long before the

alleged crime took place is somehow a "proceed" of that crime or even "substantially connected"

to alleged transactions involving income derived therefrom.

With respect to the Account Funds, the Government's complaint overreaches yet again,

this time by failing to heed, or even cite, the relevant portion of the International Emergency

Economic Powers Act, codified at 50 U.S.C. §§ 1701, 1702 ("IEEPA") that governs Assa

Corp.'s alleged activities. By the clear language of the statute, it only applies to "transfers of

value," in this case between the U.S. and Bank Melli. Phone calls, emails, faxes and other communications that do not involve transfers of value are expressly beyond the scope of the statute. Yet, the Government bases its entire theory of forfeiture on its allegations that such communications violate IEEPA and that funds allegedly discussed in those communications are somehow the "proceeds" of that crime.

Furthermore, the Government has failed to allege that the seized funds bear any connection to the alleged crime that purportedly underlies the forfeiture – the exportation, sale or supply of a service to Iran or an entity controlled by the Government of Iran. The Government acknowledges that the Account Funds represent rental income paid by lawful tenants of a commercial building in mid-town Manhattan to a New York corporation in good standing. The Government does not allege that the specific funds seized were ever transferred to Iran or Bank Melli.

Assuming *arguendo* that the Complaint is not dismissed for failure to state a claim pursuant to 18 U.S.C. § 981, and taking the allegations in the Complaint as true, that the Claimants are "shell companies" of Bank Melli, the case should be dismissed because a United States' court order requiring forfeiture in this case violates numerous provisions of the still in force Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, 8 U.S.T. 899, 284 UNTS 93 (1955) ("Treaty of Amity" or the "Treaty"), attached hereto as Exhibit 1. Finally, if the forfeited property is used for the purpose of providing compensation to victims with judgments against Iran, as counsel for the United States has represented at the April 3, 2009 conference with the Court, the forfeiture is not only in violation of the Treaty of Amity but also the United States Constitution.

The seized property should be returned to Assa Corp. and the Government's Complaint

2

must be dismissed and the Protective Order should be vacated.

## STATEMENT OF FACTS

For purposes of this motion, the following facts alleged by the Government in the Complaint are accepted as true.

In 1989, Assa Corp. entered into a partnership with the Mostazafan Foundation a predecessor to the Alavi Foundation, a non-profit entity organized in New York. ("650 Fifth Avenue Company") Compl. ¶¶ 16, 22. The partnership, of which Assa Corp. owns only a 40% interest, owns real estate located at 650 Fifth Avenue. Compl. ¶¶ 16, 22.

In 1997 after Assa Corp. had been collecting rental income and conducting its affairs for eight years, President Clinton invoked his powers under IEEPA and signed Executive Order 13059[1], which prohibited the exportation, sale or supply of any good, technology or service to Iran or an entity controlled by Iran. *See* 31 CFR §§ 560.204, 560.313. The Executive Order expressly stated that its provisions applied "except to the extent provided in . . . 50 U.S.C. §1702(b)." This key provision, which appears nowhere in the Government's complaint, states that the President lacks the authority to "regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. §1702(b)(1).

Over a decade later, the Government now suggests that by conducting its affairs in the same way it did prior to 1997, Assa Corp. violated the regulations enacted in 1997. In five conclusory words with no factual allegations in support, the Government alleges that Assa Corp. "transferred rental income . . . to Bank Melli." Compl. ¶ 17. The Complaint also includes allegations of several actions that do not purport to involve any transfer of value, including

---

[1] A copy of Executive Order 13059 is annexed hereto as Exhibit 2.

3

following Bank Melli's instructions, reporting back to Bank Melli, managing the affairs of Assa Corp., and communicating with Bank Melli personnel. Compl. ¶¶ 17, 24, 26, 31.

The Government alleges that between January 2000 and December 2007, approximately $17 million of income from 650 Fifth Avenue Company was deposited into Account-1, a Citibank account belonging to Assa Corp. Compl. ¶ 33. Bank records allegedly show that approximately $1,090,000.00 was transferred from Account-1 to Account-3, a JP Morgan account held by Assa Corp. Compl. ¶ 34. The Complaint further alleges that substantial amounts were transferred from Account-1 to Assa Company, Ltd., and that Mohammad Hassan Dehghani Tafti, an Assa Corp. employee, wrote checks from Account-1 to pay taxes. Compl. ¶¶ 33-34.

In or about October 2008, the Government seized Assa Corp.'s Minority Interest in 650 Fifth Avenue Company and approximately $3.1 million from Assa Corp.'s bank accounts (together, the "Seized Assets"). Compl. ¶ 35.

This civil forfeiture action was commenced on December 17, 2008.

## **LEGAL STANDARD**

To survive a motion under Fed. R. Civ. P. 12 (b) (6) and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp. R.") G(8)(b), a plaintiff must "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meets its burden of proof at trial." Supp. R. G(2)(f). This pleading standard is "more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure," *United States. v. Daccarett*, 6 F.3d 37, 47 (2nd Cir. 1993), and requires the Government do "more than simply provide greater detail than it otherwise would be required to do under [F.R.C.P.] Rule 8." *United States. v. $49,000 Currency*, 330 F.3d 371, 376 n.8 (5th Cir. 2003). To meet its burden of proof at trial, the Government must establish by a preponderance of the evidence that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1). If the Government's

basis for forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government must establish "a substantial connection" between the property and the offense. 18 U.S.C. § 983(c)(3).

## ARGUMENT

## I.   The Seized Assets Are Not Subject to Forfeiture as the "Proceeds" of Crime

### A.   The Minority Interest Cannot Constitute the "Proceeds" of any Alleged Violation of IEEPA

The Government first seeks to forfeit the Minority Interest under 18 U.S.C. § 981(a)(1) (C), which subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from *proceeds* traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in §1956(c)(7) of this title, or a conspiracy to commit such offense." A violation of IEEPA, codified at 50 U.S.C. § 1701 *et seq.*, is included among the offenses listed in § 1956(c)(7), the proceeds of which are subject to forfeiture.  Because the services Assa Corp. allegedly performed are lawful, and are only alleged to be committed in an unlawful manner because they were allegedly provided to Bank Melli, the term "proceeds" is defined as "the amount of money acquired through the illegal transactions resulting in forfeiture, less the direct costs incurred in providing the goods or services."[2] 18 U.S.C. § 981(a)(2)(B).

The Government's argument impermissibly broadens the scope of the term "proceeds" in two ways. First, it asserts that the underlying asset which *generated* the funds that were allegedly used in an illegal transaction was somehow the *proceeds* of that illegal transaction. Second, it

---

[2]  Even if the court found that the alleged services Assa Corp. performed were "unlawful services," the Government's argument would still fail. In cases of unlawful services, § 981(a)(2)(A) defines proceeds as "property of any kinds obtained directly or indirectly as the result of the commission of the offense giving rise to the forfeiture." There is no conceivable way the Minority Interest could have been obtained in 1989 "as a result" of an alleged offense that only became a crime in 1997.

5

seeks to reach back in time to seize assets acquired almost a decade before any alleged crime could have even been contemplated.

First, under any definition of "proceeds," there can be no doubt that the term refers to something that comes *after* the alleged crime. Section 981 defines "proceeds" as money "acquired through an illegal transaction." 18 U.S.C. § 981(a)(2)(B). Thus, proceeds only come into one's possession following some transaction. *See* Webster's Third New International Dictionary 1807 (1986) (defining proceeds as "what is produced by or derived from something"). The Minority Interest could not have been "acquired through" the alleged IEEPA violations, as a simple outline of the alleged transactions at issue demonstrates:



The Government apparently argues that the Minority Interest in Box #1 constitutes the proceeds of the alleged IEEPA violation in Box #5. This argument defies logic.

Courts have rejected similar efforts by the Government to expand the definition of "proceeds" by reversing the order of time. For example, in *United States v. Approximately 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others*, 2008 WL 4129814 (S.D.N.Y. Sep. 5, 2008), the Government sought to seize certain forged documents that the defendant had misrepresented as authentic in violation of the mail and wire fraud statutes. The court held that the writings were not the "proceeds" generated from his mail and wire offenses but the means by which those offenses were committed, and therefore they were not subject to forfeiture under 18 U.S.C. § 981(a)(1)(c). *Id.* at *2. Rather, it was the monies

"obtained" by selling the forged documents that were proceeds subject to forfeiture. *Id.* The equivalent in the present action, were any crime committed, would be any alleged fees earned by Assa Corp. for performing the allegedly prohibited services. No such allegation, however, appears anywhere in the Complaint.

Second, the Minority Interest cannot be the "proceeds" of an alleged IEEPA offense because that asset existed before the alleged underlying crime took place. *See, e.g., United States v. Capoccia,* 503 F.3d 103, 116 (2nd Cir. 2007) ("[T]he government has not established (nor logically could it) that the funds involved in the pre-May 2000 transfers were "obtained . . . as a result" of the later, particular transfers of which Capoccia was convicted."); *accord United States. v. Pole No. 3172, Hopkinton,* 852 F.2d 636, 639 (1st Cir. 1988) (noting that an interest in real property acquired two years before the first alleged illegal drug activity could not be proceeds of illegal drug activity subject to forfeiture). Indeed, Assa Corp. could not have "acquired" an asset in 1989 "through…illegal transactions" when none of the regulations at issue were even drafted until eight years later.

## B. The Account Funds Were Not the "Proceeds" of any Alleged Violation of IEEPA

The Government first seeks forfeiture of the Account Funds pursuant to § 981(a)(1)(C) by alleging that they are "proceeds" of an IEEPA offense. In its Complaint, the Government spends much time addressing Mr. Tafti's immigration status and emails with individuals allegedly connected to Bank Melli, but spends little to no time providing factual support to connect the seized assets to any alleged violation of IEEPA. Moreover, the Government has failed as a matter of law to allege that Assa Corp. performed services in violation of IEEPA.

The Government alleges that Assa Corp. provided the following services to Bank Melli in violation of IEEPA: "transferring rental income generated from the Fifth Avenue Company to

Bank Melli, following Bank Melli's instructions with regard to Assa Corp.'s affairs, reporting back to Bank Melli on Assa Corp.'s financial situation and business dealings, and managing the affairs of Assa Corp. for the benefit of Bank Melli." Compl. ¶¶ 17, 24, 31.

First, as to the allegation of transferring rental income to Bank Melli, nowhere in the Government's 20 page Complaint is there one iota of factual evidence of such a transfer. Supplemental Rules G(2)(f) and E(2)(a) require that the complaint must allege both the essential elements of the offense and facts in support of the allegations. This is not a case of the Government failing to provide sufficient factual support. The Government here fails to provide *any* facts to support its claim that any funds were ever transferred to Bank Melli. *See United States v. Pole No. 3172, Hopkinton*, 852 F.2d at 638-39, 641 (dismissing complaint where Government's pleading was so conclusory that it, "in effect, provided no facts whatsoever to support its claim").

Even if the Government could prove that Assa Corp. had, at one time, years before the instant seizure, transferred other funds to an account in a branch of Bank Melli in the Jersey islands, there is absolutely no allegation in the Complaint that it transferred the *seized* funds to Bank Melli, nor could there be. The Account Funds were sitting in an account in New York when they were seized. In order to forfeit *these* funds, the Government must allege facts showing that *these* funds were "acquired through" a violation of IEEPA.[3] The only alleged transaction in

---

[3] The forfeiture laws do have provisions for seizing fungible property but they are inapplicable here. If the Government were proceeding under a fungible property theory, it would have to allege that a violation of IEEPA took place in the year prior to the seizure. *See* 18 U.S.C. § 984; *United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Express Bank*, 832 F.Supp. 542, 560 (E.D.N.Y. 1993) (stating that any cause of action for forfeiture of fungible property under § 984 must be brought within one year of the alleged unlawful transaction). The Complaint, however, does not allege any connection between Assa Corp. and Bank Melli for over two years prior to the seizure. Indeed, there is no allegation of any transfer or even contact between Assa Corp. and

8

which the seized funds were involved was a transfer between 650 Fifth Avenue Co. and Assa Corp., two New York corporate entities. There is no allegation as to any action Assa Corp. took with respect to the seized funds that in any way involved Iran or Bank Melli. The Government has thus failed to meet its burden of tracing the seized property to the commission of a crime. *See, e.g., United States v. Nicolo*, 597 F. Supp. 2d 342, 348 (W.D.N.Y. 2009) ("[P]roperty 'traceable to' means property . . . the acquisition [of which] is attributable to the [crime] rather than from…untainted sources.").

Second, the remaining alleged activities do not constitute the exportation, sale, or supply of services to Iran. Rather, they constitute the internal corporate activities of a New York licensed corporation. In enacting IEEPA, Congress was keenly aware of the potential for abuse of the statute by prosecutors seeking to criminalize any communication between those in the United States and those in sanctioned countries. Congress, therefore, drew a clear line – the President cannot regulate or prohibit any communication that does not involve a transfer of value. 50 U.S.C. § 1702(b). Applying that statutory directive to 31 C.F.R. §§ 560.203, 560.204, and 560.206, those regulations are only applicable where there is some transfer of value to Iran or an entity controlled by the Government of Iran. It is not coincidence, then, that the only reported decisions in the Second Circuit addressing the definition of "service" under these regulations involved the transfer of funds – *i.e.*, something of value – to Iran.[4] *United States v.*

---

Bank Melli during that time. Absent some allegation of a connection to Bank Melli, there can be no IEEPA violation and therefore no money laundering violation.

[4] Like in the instant case, the Government in *United States v. All Funds on Deposit in United Bank of Switzerland*, seized assets located in an account in the United States, 188 F. Supp. 2d 407, 408 (S.D.N.Y. 2002). There are two key differences, however, between that case and the instant one. First, in *All Funds*, the Government alleged that IEEPA was violated when funds were deposited into an account in the United States and, through a system of debits and credits, equivalent funds were paid out to recipients in Iran. *United States v. All Funds on Deposit in United Bank of Switzerland*, 188 F. Supp. 2d at 409. The funds seized from the

*Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2nd Cir. 2004) ("[T]he execution on behalf of others of money transfers from the United States to Iran is a 'service' under the terms of the Embargo."); *United States v. All Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) (holding that offering to exchange a customer's money and deliver it to Iran for a fee is a service within the meaning of 18 U.S.C. § 981).

These cases, both of which related to the same underlying conduct, stand in stark contrast to the instant Complaint where there are no factual allegations that the seized funds were ever sent to Bank Melli. Assa Corp.'s alleged actions of "following instructions," "reporting back" and "managing affairs" did not involve any transfer of value to Bank Melli and therefore, by definition, do not violate IEEPA.

## II.     The Seized Assets Were Not "Involved In" Any Alleged Money Laundering Offense

The Government's second theory for forfeiting the Seized Assets – that they were "involved in" a money laundering offense – suffers from many of the same fatal deficiencies as its first argument. The Government fails to adequately allege an underlying violation of IEEPA and fails to demonstrate how some transaction *following* that purported violation involved either the Minority Interest or the Account Funds.

---

account in New York, therefore, were actually *involved in* the transfer of value to Iran. In the instant case, there is no allegation that the seized funds themselves were involved in a transfer of value to Iran or Bank Melli.

Second, the Complaint in *All Funds* included specific allegations that the Claimant, Sawan Exchange Company, transferred the equivalent of $3,083,376 to Iran. 188 F. Supp. 2d at 410. In most circumstances, once the funds have left an account, they are gone and are no longer subject to forfeiture. The Court in *All Funds* noted, however, that 18 U.S.C. § 984 contains a limited exception to this rule that allows the Government to seize "fungible property" located in the same account as the property involved in the offense. *Id.* at 410-11. While that provision may have been applicable in the *All Funds* case, it is not applicable here, and the Government does not allege that it is. As discussed in footnote 2, the statute expressly provides that the Government may only seize "fungible property" for one year from the date of offense. 18 U.S.C. § 984(b). Here, the Government has not alleged any connection between Assa Corp. and Bank Melli in the one year prior to the seizure, thus rendering § 984 inapplicable.

Under 18 U.S.C. § 981(a)(1)(A), property "involved in a transaction or attempted transaction" in violation of the money laundering statutes, 18 U.S.C. §§ 1956 and 1957, or property traceable to that property, is subject to forfeiture. Because the statute does not require the Government to directly trace the entire forfeited property to the underlying crime, forfeiture under this theory requires a strong showing of the property's involvement in money laundering. See 18 U.S.C. § 983(c)(3) (requiring the Government to prove "a substantial connection between the property and the offense.") By insisting that property bear a substantial connection to illegal activity in order to be subject to forfeiture, Congress intended to create a higher hurdle to forfeiture under § 981(a)(1)(A), one "significantly greater than just 'incidental or fortuitous.'" 146 Cong. Rec. H2040-01 (statement of Rep. Hyde) (critiquing the different approaches of the circuits), a copy of which is attached hereto as Exhibit 3.

In order to meet its burden of pleading that the seized assets were "involved in" money laundering, the Government must first adequately plead the elements of an offense under either § 1956 or § 1957. Both of those Sections require that the Government first prove that an unlawful act occurred and that a subsequent monetary transaction took place involving the proceeds of that act. Specifically, § 1956 only addresses transactions involving "proceeds" of unlawful activities,[5] and § 1957 applies only to monetary transactions in "criminally derived property," meaning the "proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Thus, the money laundering statutes require the government to adequately allege that a defendant "(1) acquire[d] the proceeds of a specified unlawful activity, and then (2) engage[d] in a financial transaction with those proceeds." *United States v. Napoli*, 54 F.3d 63, 68 (2nd Cir. 1995),

---

[5] Section 1956(a)(2) addresses only transfers of "monetary instruments or funds," not interests in real property, and therefore cannot form the basis of forfeiture of the Minority Interest. *See* § 1956(c)(5) (defining "monetary instrument" without reference to any interest in real estate).

*superseded in part on other grounds as recognized in United States v. Genao*, 343 F.3d 578, 584 (2nd Cir. 2003); *United States v. Piervinanzi*, 23 F.3d 670, 680 (2nd Cir. 1994) ("[Section 1956 (a) (1)] requires first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds with the intent to promote specified unlawful activity."). Unless the Government adequately alleges both elements, the Complaint must be dismissed. In fact, the Government has not adequately alleged either element.

## A. The Government Has Not Adequately Alleged a Violation of IEEPA

As discussed in Section I.B above, the Government fails to adequately allege any specific conduct constituting a violation of IEEPA. Its allegation that Assa Corp. transferred rental income to Bank Melli at Bank Melli's instruction is stated only in conclusory terms with no factual support. And the remaining allegations of Assa Corp.'s conduct did not involve transfers of value and, therefore, are beyond the scope of IEEPA. Without an adequately alleged violation of IEEPA, there can be no violation of § 1956(a)(1) or § 1957(a).

## B. The Government Has Not Tied the Seized Assets to Any Alleged Violation of IEEPA or Money Laundering Offense

The Government has not adequately alleged that either the Minority Interest or the Account Funds constituted the "proceeds" of an IEEPA violation that were involved in a transaction in violation of § 1956(a)(1) or § 1957(a).

### 1. The Minority Interest Was Not Involved in Any Money Laundering Transaction

Any argument by the Government that the Minority Interest was "involved in" a money laundering offense would suffer from the same chronological deficiencies as the Government's argument with respect to IEEPA. At most, the Government alleges that the Minority Interest generated funds that were later used as part of an alleged IEEPA violation. Any alleged money

laundering transaction could only have come *after* the alleged violation of IEEPA, depicted in Box #5 of the diagram in Section I. A. above. The Minority Interest, which was relevant only in Boxes ## 1-3 of the diagram, could not have been involved in any transaction that took place after Box #5.

The recent decision by Judge Daniels in *250 Documents* is again instructive here. There, the Government sought to forfeit the forged documents as property "involved in" a money laundering offense. The court held that the documents were "not property that were themselves being laundered nor were they otherwise involved in, derived from, or used to facilitate a money laundering offense." *United States v. Approximately 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others*, 2008 WL 4129814 at *3. The court held that after he sold the documents, the defendant's "subsequent monetary transactions" no longer involved the documents and, therefore, they were not subject to forfeiture under § 981(a)(1)(A). *Id.*

Here, while Assa Corp. does not concede that the transfer of rental income from 650 Fifth Avenue Co. to Assa Corp. violated IEEPA, to the extent the Government alleges that Assa Corp. engaged in a "subsequent monetary transaction" with that income, such alleged transaction would not, in any way, have involved the Minority Interest.

The Minority Interest, therefore, is not subject to forfeiture under § 981(a)(1)(A) as property "involved in" a money laundering offense.

### 2. The Account Funds Were Not Involved in Any Money Laundering Transaction

The Government's Complaint does not explain under what theory the Account Funds were "involved in" a money laundering offense. As discussed above, the seized funds themselves could not have been the proceeds of an IEEPA offense because they were sitting in an account in

New York when they were seized and were not transferred to Bank Melli. If they were not derived from criminal activity, they could not have been laundered.

The only argument left for the Government to support forfeiture of the Account Funds under § 981(a)(1)(A) is to argue that the accounts themselves, rather than the specific funds contained therein, were used to facilitate a money laundering transaction, and therefore are subject to forfeiture regardless how much money was in the accounts at the time of seizure.[6] In this case, however, such an argument would improperly conflate the alleged underlying crime of IEEPA with the alleged money laundering crime.

As an initial matter, as stated above in Section I.B, a violation of IEEPA must involve a transfer of value to or from a sanctioned country. Thus, the Court should not read the Government's Complaint to allege that any transaction that took place solely within the United States' borders, e.g., the transfer of rental income into Account-1, violated IEEPA. In any event, the transfer of funds *out* of that account to Account-3 or anywhere else does not mean that Account-1 "facilitated" a money laundering transaction.

The "facilitation theory" of forfeiture – already an expansive tool because it permits forfeiture of property beyond the actual property being laundered – was intended to allow forfeiture of property that makes the commission of a money laundering offense easier, e.g., clean money used to conceal tainted funds, special purpose vehicles used to hide assets offshore, etc... With respect to bank accounts, the provision is often relied upon where an account is used to "cleanse" tainted funds or shelter them from detection by comingling them with untainted funds, though even in those circumstances, more is required to support forfeiture. *See, e.g.,*

_____

[6] Use of the money laundering statutes in this fashion often allows the Government to do an end-run around the requirement under § 981(a)(1)(C) that the Government trace the assets sought to be seized directly to a criminal offense.

*United States v. All Funds on Deposit in Great Eastern Bank Account No. 11008117*, 804

F.Supp. 444, 447 (E.D.N.Y. 1992) (rejecting facilitation theory where Government did not allege

comingling of tainted and untainted funds); *United States v. Contents in Account No. 059-*

*644190-69*, 253 F.Supp.2d 789, 799 (D. Vt. 2003) (holding that innocent funds are not

forfeitable under facilitation theory simply because they are comingled with tainted funds).

Here, there is no allegation that Account 1 was used to comingle tainted and untainted

funds. As alleged in the Complaint, all of the funds in Account 1 were simply the proceeds of

Assa's partnership interest in 650 Fifth Avenue Co. The fact that other funds were previously

transferred out of Account-1 and years earlier may have been, under the Government's legally

deficient theory, transferred to Bank Melli in violation of IEEPA, does not mean that Account 1

was used to "cleanse" or shelter criminally derived proceeds and subject the account to forfeiture

years later. Such a broad view of the facilitation theory would "erode the one-year statute of

limitations completely." *Id.* (internal citations omitted).

The funds in Account-3 are not subject to forfeiture for similar reasons. First, for the

reasons stated above, the funds transferred into Account-3 were not the proceeds of unlawful

activity and therefore no transaction involving those funds constituted a money laundering

violation under either § 1956 or § 1957.

Second, especially given recent Supreme Court direction in this area, the Government

failed to adequately allege that any transfer of funds by Assa Corp., including any transfer from

Account-1 to Account-3, was designed to "conceal" certain attributes of the alleged proceeds as

required under 18 U.S.C. § 1956 (a)(1)(B)(i). The Supreme Court's recent decision in *Cuellar v.*

*U.S.*, 128 S.Ct. 1994 (2008), was a watershed event that significantly shrunk the scope of the

term "conceal" in §1956. In *Cuellar*, the Court rejected the long-held Government argument that

the purpose of any transaction involving ill-gotten funds is to conceal an attribute of the funds. The Court required that the Government allege and prove that the purpose, and not merely the effect, of the money laundering transaction was to conceal or disguise a listed attribute of the funds. *Cuellar*, 128 S.Ct. at 2002-04. The *Cuellar* Court found that the Government failed to meet its burden there because the only purpose for transporting the funds at issue was to get them into the hands of their alleged owners. *Id.* at 2005-06. Here too, though Assa Corp. does not concede that Bank Melli is the true owner of the seized assets, the only purpose for the transactions alleged in the Complaint would be to transfer the funds to their alleged owner, not to conceal or disguise them.

To drive the point home, as the Government conceded in *Cuellar*, § 1956(a)(1)(B) applies only where one made a "substantial effort" at concealment. *Id.* at 2003. Here, the Government fails to allege that Assa Corp. made "substantial efforts" to conceal any attribute of the funds. Indeed, it has not alleged that Assa Corp. took any actions after 1997 that were different from those it took before 1997. It defies logic to argue that the same actions taken before 1997 constituted regular business activity but after 1997 constitute "substantial efforts" at concealment.

The Seized Assets, therefore, are not subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

## III.    The Complaint Should Be Dismissed Because Under the Facts as Alleged in the Complaint, the Forfeiture Contemplated Will Violate the Treaty of Amity between the United States and Iran as Interpreted by the International Court of Justice

Claimants believe that the Complaint should be dismissed for failure to adequately allege a basis for civil forfeiture, but will nonetheless respond to the Complaint's conclusory allegation that Claimants are "shell companies" for Bank Melli. First, such an allegation is not an element

the Government would have to prove to support its claim for forfeiture. This is not an action to forfeit blocked assets of Iran or an entity controlled by Iran. The inclusion of the "shell company" allegation, without any factual support, is extremely prejudicial. It appears to have been included to comport with the Government's stated objective to forfeit the Seized Assets and distribute them to those with judgments against Iran.

Notwithstanding the Government's reasons for including the allegation, the effect is that as alleged, the Complaint violates the Treaty of Amity. In 1955, more than 20 years before the 1979 Iranian Revolution, the United States and Iran signed and ratified the Treaty of Amity. That Treaty entered into force in 1957 and is one of approximately 20 friendship, commerce, and navigation ("FCN") treaties negotiated by the United States following World War II. Despite strained relations between Iran and the United States, the Treaty of Amity remains in force. *See* Bilateral Treaties in Force as of January 1, 2009, at 129.[1] As the International Court of Justice ("ICJ") wrote in *U.S. Diplomatic and Consular Staff in Tehran* (United States of America v. Iran), (*"Hostages Case"*), (1980) ICJ Rep 3 ¶54, "[i]t is precisely when difficulties arise that the treaty assumes its greatest importance" and despite "impaired" relations following the hostage crisis, it "remain[s] part of the corpus of law applicable between the United States and Iran." A copy of the Hostages Case is annexed hereto as Exhibit 5.

In relevant part, the Treaty provides:

Article I There shall be firm and enduring peace and sincere friendship between the United States of America and Iran.

Article II 1. Nationals of either High Contracting Party shall be permitted, upon terms no less favorable than those accorded to nationals of any third country, to enter and remain in the territories of the other High Contracting Party for the purpose of carrying on trade between their own country and the territories of such other High Contracting Party and

---

[1] Available at http://www.state.gov/documents/organization/123746.pdf, attached hereto as Exhibit 4.

engaging in related commercial activities, and for the purpose of developing and directing the operations of an enterprise in which they have invested, or in which they are actively in the process of investing, a substantial amount of capital.

Article III.1 Companies constituted under the applicable laws and regulations of either High Contracting Party shall have their juridical status recognized within the territories of the other High Contracting Party. . . .As used in the present Treaty, "companies" means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit.

Article IV.1 Each High Contracting Party shall at all times accord fair and equitable treatment to nationals and companies of the other High Contracting Party, and to their property and enterprises; shall refrain from applying unreasonable or discriminatory measures that would impair their legally acquired rights and interests; and shall assure that their lawful contractual rights are afforded effective means of enforcement, in conformity with the applicable laws.

Article IV.2. Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

Article VII.1 Neither High Contracting Party shall apply restrictions on the making of payments, remittances, and other transfers of funds to or from the territories of the other High Contracting Party, except (a) to the extent necessary to assure the availability of foreign exchange for payments for goods and services essential to the health and welfare of its people, or (b) in the case of a member of the International Monetary Fund, restrictions specifically approved by the Fund.

Article VII.2 If either High Contracting Party applies exchange restrictions, it shall promptly make reasonable provision for the withdrawal, in foreign exchange in the currency of the other High Contracting Party, of: (a) the compensation referred to in Article IV, paragraph 2, of the present Treaty, (b) earnings, whether in the form of salaries, interest, dividends, commissions, royalties, payments for technical services, or otherwise, and (c) amounts for amortization of loans, depreciation of direct investments and capital transfers, giving consideration to special needs for other transactions. If more than one rate of exchange is in force, the rate applicable to such withdrawals shall be a rate which is specifically approved by the International Monetary Fund for such transactions or, in the absence of a rate so approved, an effective rate which, inclusive of any taxes or surcharges on exchange transfers, is just and reasonable.

Article X.1 Between the territories of the two High Contracting Parties there shall be freedom of commerce and navigation.

The Government's attempt to forfeit the Seized Assets based upon the allegation that claimants, Assa Corp. and Assa Co. Ltd., are "shell" or "straw" companies "disguis[ing]" the ownership interest of Bank Melli, which in turn is an entity "controlled by the Government of Iran" as defined at 31 C.F.R. § 560.313. (Compl. ¶¶12, 16, 21) violates each of the foregoing provisions of the Treaty.

Forfeiture in this case is inconsistent with "sincere friendship" between the United States and Iran in violation of Article I. Forfeiture violates Bank Melli's right to "carry[] on trade between" Iran and the United States "upon terms no less favorable than those accorded to nationals of any third country" contrary to Article II.1. It violates Article III.1, for it fails to recognize the separate "juridical status" of Bank Melli. It violates Article IV.1's requirement that the United States "refrain from applying. . .discriminatory measures that would impair" Iranian entities' "legally acquired rights and interests," and Article IV.2's requirements that Iranian entities' "property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation," and that "[s]uch compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof." It violates Article VII.1's command, with exceptions not relevant here, that "[n]either High Contracting Party shall apply restrictions on the making of payments, remittances, and other transfers of funds to or from the territories of the other High Contracting Party," and Article VII.2's command that, "[i]f either High Contracting Party applies exchange restrictions, it shall promptly make reasonable provision for the withdrawal, in foreign exchange in the currency of the other High Contracting Party, of: (a) the compensation referred to in

Article IV, paragraph 2, of the present Treaty," (b) earnings," and other "amounts." Finally, forfeiture violates Article X.1, which provides that "[b]etween the territories of the two High Contracting Parties there shall be freedom of commerce and navigation."

The Government may argue that IEEPA provides a national security exception. However, the Treaty, itself, has a national security exception, and the ICJ has interpreted it in a way that rebuts the application of such an exception in this case.

Article XX.1 (d) of the Treaty provides:

> 1. The present Treaty shall not preclude the application of measures:
> ...
> (d) necessary to fulfill the obligations of a High Contracting Party for the maintenance or restoration of international peace and security, or necessary to protect its essential security interests.

Article XXI.2 of the Treaty provides:

> Any dispute between the High Contracting Parties as to the interpretation or application of the present Treaty, not satisfactorily adjusted by diplomacy, shall be submitted to the International Court of Justice, unless the High Contracting Parties agree to settlement by some other pacific means.

The ICJ has interpreted Treaty Article XXI.2 to give it "compulsory" jurisdiction over disputes involving the interpretation or application of the Treaty. *See, Hostages Case*, ICJ Rep 27, ¶52. In consequence, we submit, the ICJ's interpretation of the Treaty is binding on this Court.

The ICJ interpreted Article XX.1 (d) - just six years ago - in the *Oil Platforms (Islamic Republic of Iran v. United States of America), Judgment of 6 November 2003,* (2003) ICJ Rep 161.[2] ("*Oil Platforms Case*") The *Oil Platforms Case* arose out of the attack and destruction of three offshore oil production facilities, owned by the National Iranian Oil Company, by warships of the U.S. Navy on October 1987 and April 1988. *Id.* at 166, ¶1. Iran contended the attacks violated the Treaty of Amity, in particular Article I, the "friendship" provision, and Article X.1,

---

[2] Available at www.icj-cij.org, attached hereto as Exhibit 6.

providing for "freedom of commerce and navigation" "between the territories of the two High Contracting Parties." *Id.* at 169, ¶18. The United States denied that its activities violated Article X.1 and counterclaimed that "in attacking vessels, laying mines in the Gulf and otherwise engaging in military actions in 1987-1988 that were dangerous and detrimental to maritime commerce, the Islamic Republic of Iran breached its obligations to the United States under Article X of the 1955 Treaty." *Id.* at 170, ¶19. The United States contended "that the actions complained of by Iran were measures necessary to protect the essential security interests of the United States, and that accordingly, if those actions would otherwise have been breaches of Article X, paragraph 1, of the Treaty, which [it] denie[d], the effect of Article XX, paragraph 1 (d), is that they are justified under the terms of the Treaty itself, and thus [did] not constitute breaches of it." *Id.* at 178, ¶32.

The ICJ noted that the "friendship" clause "is such as to throw light on the interpretation of the other Treaty provisions," and that pursuant to the 1969 Vienna Convention on the Law of Treaties, interpretation must take into account "any relevant rules of international law applicable in the relations between the parties." *Id.* at 182, ¶41. The Court concluded "its jurisdiction under Article XXI, paragraph 2, of the 1955 Treaty to decide any question of interpretation or application of (inter alia) Article XX, paragraph 1 (d), of that Treaty extends, where appropriate, to the determination whether action alleged to be justified under that paragraph was or was not an unlawful use of force, by reference to international law applicable to this question, that is to say, the provisions of the Charter of the United Nations and customary international law." "[T]he measures taken must not merely be such as tend to protect the essential security interests of the party taking them, but must be 'necessary' for that purpose"; and whether a given measure is

"necessary" is 'not purely a question for the subjective judgment of the party' [citation omitted], and may thus be assessed by the Court." *Id.* at 183, ¶43.

The ICJ then proceeded to assess the evidence, *Id.* at 183-196, ¶¶44-72, placing the burden of proof on the United States to show that "it was the victim of an 'armed attack' by Iran such as to justify it using armed force in self-defence." *Id.* at 189, ¶57. The ICJ concluded that the United States had not borne its burden of proof with respect to either attack. *Id.* at 190-191, 195, 198 ¶¶61, 64, 72, 78.

Returning to the instant case, the United States' forfeiture violates many of the Treaty's terms. The importance of the *Oil Platforms Case* is that it establishes three propositions with respect to any asserted exception. First, any exception must be read together with the rest of the Treaty, especially Article I, the "friendship" clause. Second, the United States has the burden of proof to show that an exception applies. And third, any retaliation must be necessary and proportionate. On the allegations of this case, we submit, the United States cannot bear its burden to show that taking the Minority Interest or the Account Funds is a necessary and proportionate response to any actions of the Claimants. In any event, the United States has not attempted to do so in the Complaint, so, on the current allegations, this action is contrary to the Treaty and should be dismissed.

**IV.    The Taking Contemplated for the Purpose Stated Will Further Violate Treaty Article IV.2 and the Takings Clause of the U.S. Constitution Because It Is Without Compensation, It Provides a Benefit Rather than Prevents a Harm, and the Benefit Is Private Rather Than Public**

At the status hearing of April 3, 2009, the United States represented, in relevant part:

The intent of the government in this action is to – and we haven't determined, since a decision that's going to be made out of main justice in Washington, how – our intent is not to forfeit this building or forfeit the assets of ASSA Corporation and put them in the Treasury or put them in the asset forfeiture fund. The purpose of doing this is ultimately

to provide victims with the proceeds of this IEEPA violation or the property involved in money laundering. . . .

The United States Government should go first on this forfeiture action, and if we prevail we prevail. Then we would propose that there would be some kind of distribution among all of the parties that had judgments against the government of Iran for terrorism.

(Transcript of Hearing held on April 3, 2009, attached hereto as Exhibit 7; page 5, line 21-page 6, line 3; page 28 line 25 - page 29, line 4). The United States has thus made clear that it intends to seek court-ordered forfeiture of Claimants' Minority Interest and Account Assets not to compensate any victims of crimes allegedly committed by Claimants but to compensate private plaintiffs with default judgments against the Government of Iran. Assuming the Government's allegation that Claimants are shell companies of Bank Melli, forfeiture for this purpose will constitute a taking for a private purpose and without compensation, not only in further violation of Treaty Article IV.2, but also the Takings Clause of the U.S. Constitution.

As set forth above, Treaty Article IV.2 provides that the property of Iranian companies, *i.e.* Bank Melli, "shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation." The Takings Clause provides, "nor shall private property be taken for public use, without just compensation," U.S. Const. Amend. V. The Takings Clause applies to takings of the property of aliens, including, as alleged, Bank Melli. *See, Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489 (1931) (upholding right of Soviet corporation to just compensation pursuant to the Fifth Amendment although the United States did not, in 1931, recognize its government); Brief for the United States as Amicus Curiae, attached as Exhibit 8, filed in *McKesson Corp. v. Islamic Republic of Iran,* No. 07-7113 (D.C. Cir.), at 8 n.5 (declining to opine on whether the Treaty of Amity provides a cause of action in a United States' court for a harmed Iranian national but noting that "The pre-existing remedy under the Constitution's Takings Clause comports with the United States' government's

reciprocal treaty obligation," that is, the obligation to provide a remedy in its courts for a harmed Iranian national).

The Supreme Court has said that it is "perfectly clear" that "the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation." *Kelo v. City of New London,* 545 U.S. 469, 477 (2005). Here, because the United States has no intention to secure any benefit for the "public" but rather only for a group of private individuals, the United States is acting "under the mere pretext of a public purpose, when its actual purpose [is] to bestow a private benefit upon a particular class of indentifiable individuals[.]" *Id.* at 478.

In consequence, because the forfeiture seeks to secure a private benefit rather than prevent a public harm and no compensation is provided, it is a taking and is contrary to both the Treaty and the Takings Clause. The Court should thus dismiss the Complaint on this basis.

## CONCLUSION

WHEREFORE, Claimants request that their Motion to Dismiss the Complaint be granted and the Complaint dismissed, and that the Protective Order dated December 17, 2008 be vacated.

Dated: July 8, 2009

ROSEN, LIVINGSTON & CHOLST LLP

By _____
Peter I. Livingston, Esq.
Deborah B. Koplovitz, Esq.
275 Madison Avenue, Suite 500
New York, New York 10016
pil@rosenlivingston.com
dk@rosenlivingston.com
Tel.    (212) 687-7770
Fax    (212) 687-8030

BERLINER, CORCORAN & ROWE, L.L.P.
Thomas G. Corcoran, Jr., Esq.
Laina Lopez, Esq.
1101 Seventeenth Street, N.W., Suite 1100
Washington, D.C. 20036
tgc@bcr-dc.com
lcl@bcr-dc.com
Tel.    (202) 293-5555
Fax    (202) 293-9035
*Attorneys for Claimants Assa Corp. and Assa Limited s/h/a Assa Company Ltd.*