UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :

UNITED STATES OF AMERICA
                :

      -v.-
                :
                       08 Civ. 10934 (RJH)

ALL RIGHT, TITLE, AND INTEREST OF  :
ASSA CORPORATION, ASSA COMPANY
LIMITED, AND BANK MELLI IRAN IN 650  :    ECF Case
FIFTH AVENUE COMPANY, INCLUDING
BUT NOT LIMITED TO THE REAL  :
PROPERTY AND APPURTENANCES
LOCATED AT 650 FIFTH AVENUE, NEW  :
YORK, NEW YORK, WITH ALL
IMPROVEMENTS AND ATTACHMENTS  :
THEREON, ET AL.,  :

            Defendants *in rem*.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION BY CLAIMANTS ASSA CORP. AND ASSA CO. LTD. TO DISMISS THE VERIFIED COMPLAINT

           PREET BHARARA
           United States Attorney for the
           Southern District of New York
           Attorney for the United States of America

SHARON COHEN LEVIN
ANNA E. ARREOLA
MICHAEL D. LOCKARD
Assistant United States Attorneys
- Of Counsel -

One St. Andrew's Plaza
New York, New York
(212) 637-1060/2218/2193

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Formation of 650 Fifth Avenue Company and Bank Melli's
        Straw Companies, Assa Corp. and Assa Co.Ltd.. . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Assa Corp.'s Single Employee, Tafti. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Bank Melli's Control of Assa Corp. through Tafti. . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     LEGAL STANDARD ON A MOTION TO DISMISS. . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    THE COMPLAINT ADEQUATELY PLEADS AN IEEPA VIOLATION. . . . . . . . . . . 7

    A.    The International Emergency Economic Powers Act ("IEEPA")
        and the Iranian Transactions Regulations (the "ITR"). . . . . . . . . . . . . . . . . . . . . . 7

    B.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    Factual Allegations Showing That Bank Melli Owns and
               Controls Assa Corp. and Assa Co. Ltd.. . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Other Factual Allegations Showing That Bank Melli Owns
               and Controls Assa Corp. and Assa Co. Ltd.. . . . . . . . . . . . . . . . . . . . . . . 12

    C.    The Complaint Adequately Pleads That Assa Corp. and Assa Co. Ltd.
        Performed Services for Bank Melli in Violation of IEEPA and the ITR. . . . . . . 13

III.   THE COMPLAINT ADEQUATELY PLEADS THAT THE
      ACCOUNT FUNDS ARE SUA PROCEEDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.    Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.   THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT
      PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN
      MONEY LAUNDERING, IN VIOLATION OF 18 U.S.C. §§ 1956(a)(1) AND (h). . . . 19

    A.    Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       1.      Property Subject to Forfeiture Under 18 U.S.C. § 981(a)(1)(A). . . . . . . 19

       2.      The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(1). . . . . 20

   B.     The Complaint Adequately Pleads
        Violations of 18 U.S.C. §§ 1956(a)(1) and (h). . . . . . . . . . . . . . . . . . . . . . . . . . 21

   C.     The Complaint Adequately Pleads That the Minority Interest
        Was Property Involved in Money Laundering and a
        Conspiracy to Commit Money Laundering. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   D.     The Complaint Adequately Pleads That the Account Funds
        Were Property Involved in Money Laundering and a
        Conspiracy to Commit Money Laundering. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.    THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT
      PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN A
      VIOLATION OF, AND CONSPIRACY TO VIOLATE, THE INTERNATIONAL
      MONEY LAUNDERING STATUTE, 18 U.S.C. § 1956(a)(2). . . . . . . . . . . . . . . . . . . 24

   A.     The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(2). . . . . . . . . . 24

   B.     Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.   THE COMPLAINT IS NOT BARRED BY THE TREATY OF AMITY
      OR THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT. . . . . . . . . . . . . . . . . 26

   A.     The Complaint Is Not Barred by the Treaty of Amity. . . . . . . . . . . . . . . . . . . . 26

   B.     The Complaint Is Not Barred by the Takings Clause. . . . . . . . . . . . . . . . . . . . 29

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acadia Tech., Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 29

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Bennis v. Michigan*, 516 U.S. 442 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Breard v. Greene*, 523 U.S. 371 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974). . . . . . . . . . . . . . . . . . . . . . 29

*Empresa Cubana del Tabaca v. Culbro Corp.*, 399 F.3d 462 (2d Cir. 2005). . . . . . . . . . . . . . . 28

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*,
    375 F.3d 168 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Levitt v. Bear Stearns & Co.*, 340 F.3d 94 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 29

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. $15,270,885.69 Formerly on Deposit in Account No. 8900261137*,
    No. 99 Civ. 10255 (RCC), 2000 WL 1234593 (S.D.N.Y. Aug. 31, 2000). . . . . . . . . . . . 7

*United States v. All Funds on Deposit at Dime Sav. Bank*,
    255 F. Supp. 2d 56 (E.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. All Funds on Deposit in United Bank of Switzerland, New York, New York*,
    No. 01 Civ. 2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003). . . . . . . . . . . . . . . . . 15

*United States v. Baker*, 227 F.3d 955 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Cefaratti*, 221 F.3d 502 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Contents of Account Nos. 208-06070 & 208-06068-1-2*,
847 F. Supp. 329 (S.D.N.Y. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Ehsan*, 163 F.3d 855 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States v. Ghilarducci*, 480 F.3d 542 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. G.P.S. Auto. Corp.*, 66 F.3d 483 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Homa Int'l Trading Corp.*, 387 F.3d 144 (2d Cir. 2004).. . . . . . . . . . . . . . . 15

*United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Krasinski*, 545 F.3d 546 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Maher*, 108 F.3d 1513 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 6, 14

*United States v. One 1997 E35 Ford Van*, 50 F. Supp. 2d 789 (N.D. Ill. 1999). . . . . . . . . . . . 25

*United States v. One Parcel of Real Prop.*, 960 F.2d 200 (1st Cir. 1992). . . . . . . . . . . . . . . . 29

*United States v. Pierce*, 224 F.3d 158 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Piervinanzi*, 23 F.3d 670 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Schlesinger*,
396 F. Supp. 2d 267 (E.D.N.Y. 2005), *aff'd* 514 F.3d 277 (2d Cir. 2008). . . . . . . . . 22, 23

*United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272 (E.D.N.Y. 2009). . . . . . . . . . . 28, 29

## CONSTITUTIONS

U.S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## STATUTES

18 U.S.C. § 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,19,20

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

31 U.S.C. § 5317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

50 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28

50 U.S.C. § 1705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 17

Civil Asset Forfeiture Reform Act of 2000,
 Pub. L. No. 106-185, 114 Stat. 202 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 27, 28

Money Laundering Control Act of 1986,
 99 Pub. L. 570 § 1352, 100 Stat. 3207, (Oct. 27, 1986). . . . . . . . . . . . . . . . . . . . . 28

## FEDERAL RULES

Fed. R. Civ. P. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6

Rule G of the Supplemental Rules for Admiralty or
 Maritime Claims and Asset Forfeiture Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Rule E of the Supplemental Rules for Admiralty or
 Maritime Claims and Asset Forfeiture Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

## REGULATIONS

28 C.F.R. Part 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

31 C.F.R. Part 560. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

31 C.F.R. § 515.201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

31 C.F.R. § 560.203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

31 C.F.R. § 560.204. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 14

31 C.F.R. § 560.206. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10, 14

31 C.F.R. § 560.304. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

31 C.F.R. § 560.313. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

31 C.F.R. § 560.314. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## SECONDARY SOURCES

Herman Walker, Jr., *Modern Treaties of Friendship, Commerce and Navigation*,
42 Minn. L. Rev. 805, 805 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## MISCELLANEOUS

Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995). . . . . . . . . . . . . . . . . . . . . . 8

Exec. Order No. 12959, 60 Fed. Reg. 24757 (May 6, 1995). . . . . . . . . . . . . . . . . . . . . . 8

Message to Congress on Iran, 31 Weekly Comp. Pres. Doc. 1584 (Sept. 25, 1995). . . . . . . . . . 16

Treaty of Amity, Economic Relations, and Consular Rights Between the United States of
America and Iran, Aug. 15, 1955 [June 16, 1957] 8 U.S.T. 899, T.I.A.S. No. 3853. . . . . . . 26-28

The Government respectfully submits this memorandum of law in opposition to the motion by claimants Assa Corp. and Assa Company, Ltd. (together, "Claimants") to dismiss the Government's verified complaint (the "Complaint" or "Comp."), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule G(8)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. For the reasons explained below, the motion should be denied.

## STATEMENT OF FACTS[1]

### A. The Formation of 650 Fifth Avenue Company and Bank Melli's Straw Companies, Assa Corp. and Assa Co. Ltd.

This civil forfeiture action concerns ownership of the 36-story office building located at 650 Fifth Avenue, New York, New York (the "Building"). As explained below, the Building is owned by 650 Fifth Avenue Company, which is a partnership between the Alavi Foundation of New York and Bank Melli Iran ("Bank Melli"). Bank Melli, which is wholly owned and controlled by the Government of Iran, owns 40% of 650 Fifth Avenue Company through two shell companies, Assa Corp. and Assa Company, Ltd. ("Assa Co. Ltd."). (Compl. ¶¶ 12, 16).

The Building was constructed in the 1970's by the Pahlavi Foundation, a non-profit organization operated by the Shah of Iran to pursue Iran's charitable interests in the United States. (Comp. ¶ 18). In the 1970's, Bank Melli loaned the Pahlavi Foundation approximately $42 million to be used for the construction and acquisition of the Building. (*Id.*).

Following the Iranian revolution of 1979, the Pahlavi Foundation was renamed the

---

[1] This Statement of Facts is based upon the allegations in the Complaint, which was filed December 17, 2008 and verified by Special Agent George Ennis of the Federal Bureau of Investigation.

Mostazafan Foundation of New York (the "Mostazafan Foundation"), and later renamed the Alavi Foundation of New York (the "Alavi Foundation"). (Comp. ¶ 19). The Alavi Foundation is presently a not-for-profit corporation organized under the laws of New York. A substantial portion of its funds come from the significant rent roll of the Building. (*Id.*).

In 1989, the Mostazafan Foundation entered into a partnership with Bank Melli in order to avoid paying taxes on rental income from the Building. (Comp. ¶ 20). Under the debt-financed property rules of the federal tax code, the Foundation's rental income was considered unrelated business income because of the debt and therefore subject to tax. (*Id.*).

In order to remove the debt and avoid paying taxes on income from the Building, the Mostazafan Foundation formed 650 Fifth Avenue Company, a partnership with Bank Melli. (Comp. ¶ 21). However, Bank Melli disguised its ownership interest by establishing two shell companies: Assa Corp., a New York corporate entity, and Assa Co. Ltd., a corporation domiciled in Jersey, Channel Islands, United Kingdom. (Comp. ¶¶ 16, 21). Assa Corp. is wholly owned by Assa Co. Ltd. (Comp. ¶ 16). Mohammad Behdadfar ("Behdadfar"), a Bank Melli board member, was appointed Assa Corp.'s president, and a director of Assa Co. Ltd. (Comp. ¶ 21).

The Mostazafan Foundation and Assa Corp. entered into a written Partnership Agreement on or about July 31, 1989. (Comp. ¶ 22). The Partnership Agreement provided, in part, that the partnership would be called 650 Fifth Avenue Company, that the Foundation would contribute the Building to the Partnership, and that Assa Corp. would contribute $44.8 million to the capital of the partnership. (*Id.*). As a result of this partnership, the debt on the Building was removed, permitting the Alavi Foundation to avoid paying U.S. taxes on revenue from the Building. (*Id.*).

Today, the two straw owners of Assa Co. Ltd. are Davood Shakeri ("Shakeri") and Fatemeh

Aghamiri ("Aghamiri"), who are residents of Iran and represent the interests of Bank Melli. (Comp. ¶ 23). Shakeri and Aghamiri each own 50% of Assa Co. Ltd.'s shares. (*Id.*).

Since at least 1990, Assa Corp. has transferred rental income from 650 Fifth Avenue Company to Bank Melli through Assa Co. Ltd. (Comp. ¶¶ 24, 34). Assa Corp. has also followed Bank Melli's instructions with regard to Assa Corp.'s business affairs and its management of the investment, and has regularly reported back to Bank Melli on its financial situation. (*Id.*).

Assa Corp. and Assa Co. Ltd. have never received a license from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), and Bank Melli has never received a license from OFAC relating to the Building. (Comp. ¶ 25).

B.    **Assa Corp.'s Single Employee, Tafti**

In the United States, Assa Corp. has a single employee, Mohammad Hassan Dehghani Tafti ("Tafti"). (Comp. ¶ 26). Tafti is a naturalized Iranian citizen, born in India. (*Id.*).

Tafti first came to the United States in or about 1999 with an L-1 visa, which was issued on the basis of a petition made on his behalf by his employer, Assa Corp. (Comp. ¶ 27). An L-1 visa is a type of visa issued to managers or executives of companies doing business in the United States. (*Id.*). Assa Corp. submitted its petition in support of Tafti's visa application in or about May 1999. (*Id.*). The petition described Tafti's "proposed duties in the U.S." as "Treasurer, oversee financial operations and investments." (*Id.*). Tafti's L-1 visa was granted in or about July 1999 for three months, and was renewed upon further applications in or about September 2000, March 2001, August 2001, and December 2001. (*Id.*).

In subsequent visa applications, Tafti concealed the fact that he worked for Assa Corp. In 2002, Tafti applied for an H-1B visa (a visa issued to employees with specialized knowledge).

(Comp. ¶ 28). The H1-B visa was issued in January 2003. (*Id.*). In his applications, Tafti stated that he intended to work in the United States at Optima Mortgage Company in Santa Ana, California. (*Id.*). However, Tafti in fact continued to work for Assa Corp., pretending to work for Optima Mortgage Corporation ("Optima Mortgage") only for immigration purposes. (Comp. ¶ 29). To create the image that he worked for Optima Mortgage, Tafti moved money from Assa Corp. to Optima Mortgage to cover his payroll from Optima Mortgage. (*Id.*).

**C.      Bank Melli's Control of Assa Corp. through Tafti**

The Complaint describes, in detail, a number of emails between Tafti and Bank Melli employees. (Comp. ¶ 31). These emails, which are summarized *infra* Section II(B), confirm that Assa Corp. is owned and controlled by Bank Melli and that the shareholders of Assa Co. Ltd., Shakeri and Aghameri, are merely straw owners.

## ARGUMENT

**I.      LEGAL STANDARD ON A MOTION TO DISMISS**

A motion to dismiss under Rule 12(b)(6) seeks dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In two recent decisions, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court revisited the pleading requirements necessary to survive a motion to dismiss. Generally speaking, a Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also id.* at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . .") (quoting Fed. R. Civ. P. 1). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949; *accord Twombly*, 550 U.S. at 556. "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

In a civil forfeiture action, the complaint must adhere to the more stringent pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.[2] Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f). Thus, the standard to be applied to a civil forfeiture complaint is more stringent than the general pleading requirements under the Federal Rules of Civil Procedure. *See, e.g.*, *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).

The Government is not, however, required to have sufficient evidence at the time it files its complaint to establish the forfeitability of property. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202 (2000), codified in part at 18 U.S.C. § 983, makes clear that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *see also* Rule G(8)(b)(ii) ("In an action governed by 18 U.S.C. § 983(a)(3)(D) the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.

---

[2]    Supplemental Rule G, which became effective December 1, 2006, provides that, "[t]o the extent that [Rule G] does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply." Rule G(1).

The sufficiency of the complaint is governed by Rule G(2)."); 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture.").

The Government is also not required to show probable cause for forfeiture. *E.g.*, *Daccarett*, 6 F.3d at 47. Instead, the complaint simply needs to establish a "reasonable belief" that the government will be able to meet its burden at trial. *Id*.; *see id.* ( "In other words, the complaint need not allege facts sufficient to show that specific property is tainted, but facts sufficient to support a reasonable belief that the government can demonstrate" the ultimate trial burden "for finding the property tainted."). Stated differently, the Government must plead "the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *United States v. Mondragon*, 313 F.3d 862, 865-67 (4th Cir. 2002) (quoting Supplemental Rule E(2)(a)).[3]

When considering a Rule 12(b)(6) motion to dismiss, the court must "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt*

---

[3]     Prior to the adoption of Rule G, courts applied the pleading standard in Supplemental Rule E(2)(a)—which governs maritime and admiralty actions—to civil forfeiture actions. The Advisory Committee Notes to Rule G state that "application of this standard to civil forfeiture actions has evolved to the standard stated in [Rule G(2)(f)]." Citing the decision in *Mondragon*, the Advisory Committee Notes state that Rule G(2)(f) "carries this forfeiture case law forward without change."

*v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also United States v. $15,270,885.69 Formerly on Deposit in Account No. 8900261137*, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *5 (S.D.N.Y. Aug. 31, 2000) (motion to dismiss may not be used to test the sufficiency or admissibility of the evidence). "[T]he issue is not whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citations omitted).

## II.    THE COMPLAINT ADEQUATELY PLEADS AN IEEPA VIOLATION

Claimants' principal argument is that the Complaint fails to adequately plead that Assa Corp. and Assa Co. Ltd. performed services for Bank Melli in violation of the International Emergency Economic Powers Act ("IEEPA") and the orders and regulations promulgated thereunder. But, as explained below, the Complaint alleges that Assa Corp. and Assa Co. Ltd. are owned and controlled by Bank Melli, that these entities exist in order to provide services to Bank Melli, and that Assa Corp. provided the significant and valuable service of managing Bank Melli's substantial ownership interest in 650 Fifth Avenue Company. The Complaint is replete with factual allegations showing Bank Melli's ownership and control of Assa Corp., as well as the types of services that Assa Corp. performed. Accordingly, the Complaint has satisfied the pleading requirements of Rule G.

## A.    The International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions Regulations (the "ITR")

The IEEPA, enacted in 1977 and codified at 50 U.S.C. § 1701 *et seq*., confers upon the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency. *See* 50 U.S.C. § 1701. Section 1705 provides, in part,

that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Exec. Order No. 12957, 60 Fed. Reg. 14615 (1995). Using the powers conferred by IEEPA, the President declared a national emergency to deal with that threat.  On May 6, 1995, the President issued Executive Order 12959, which, with some exceptions not applicable here, banned the supply or exportation of any service from the United States to Iran. Exec. Order 12959, 60 Fed. Reg. 24757 (1995).

In 1995, in order to implement these Executive Orders, OFAC promulgated the Iranian Transactions Regulations (the "ITR"), 31 C.F.R. Part 560.  The prohibitions relevant to this forfeiture action are set forth in Sections 560.204, 560.206, and 560.203.  Generally speaking, Section 560.204 prohibits the exportation or supply, directly or indirectly, of any service from the United States to Iran or the Government of Iran, without having first obtained a valid license from OFAC.[4]  The relevant text of this provision states:

> Except as otherwise authorized pursuant to this part, including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation . . . sale, or supply of any goods, technology, or services

---

[4]    Sections 560.204 and 560.206, in their original from, became effective on June 6, 1995.  60 Fed. Reg. 47061, 47063 (Sept. 11, 1995).  The current version of these sections became effective on August 20, 1997.  64 Fed. Reg. 20168, 20170 (Apr. 26, 1999).

to a person in a third country undertaken with knowledge or reason to know that:

(a)    Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .

31 C.F.R. § 560.204.  The term "Government of Iran" is defined in the ITR and includes, among things, any "entity owned or controlled directly or indirectly" by the Government of Iran, any person to the extent such person is acting or purporting to act on behalf of the Government of Iran, and any person or entity designated by the Secretary of the Treasury as falling with the definition of "Government of Iran."  31 C.F.R. § 560.304.   The term "entity owned or controlled by the Government of Iran" includes "any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government."  31 C.F.R. § 560.313.

As alleged in the Complaint, Bank Melli is wholly owned and controlled by the Iranian Government.  (Comp. ¶ 12).  In addition, in 1999, OFAC identified Bank Melli in Iran, and all of its offices worldwide, as entities "owned or controlled by the Government of Iran."  31 C.F.R. Part 560, App. A.

The Complaint also alleges forfeiture based upon violations of 31 C.F.R. § 560.206, which prohibits United States persons from engaging in any transaction or dealing, in or related to goods, technology or services, for exportation to Iran or the Government of Iran.  This section states, in part:

(a) Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may engage in any transaction or dealing in or related to . . .

(2) Goods, technology, or services for exportation, reexportation, sale

9

or supply, directly or indirectly, to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

31 C.F.R. § 560.206. The term "United States person" includes, among others, any entity organized under the laws of the United States (including foreign branches). 31 C.F.R. § 560.314.

Finally, the ITR also prohibit "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part . . ." 31 C.F.R. § 560.203.

## B.    Facts

The Complaint describes a series of emails (translated from Farsi) between Tafti and Bank Melli officials which confirm that Assa Corp. and Assa Co. Ltd. are shell companies owned and controlled by Bank Melli, and that Assa Corp. manages and maintains Bank Melli's interest in 650 Fifth Avenue Company. (Comp. ¶ 31). These emails were sent to or from the Hotmail account taftimhd@hotmail.com, which Tafti used to conduct business on behalf of Assa Corp.[5]

1.    Factual Allegations Showing That Bank Melli Owns and Controls Assa Corp. and Assa Co. Ltd.

The Complaint contains a number of emails in which Assa Corp.'s employee, Tafti, acknowledged that the shareholders of Assa Co. Ltd., Shakeri and Aghamiri, are straw owners and that the true owner is Bank Melli. As explained below, in the Summer of 2005, Tafti corresponded with a high-level Bank Melli employee, Mohsen Ghadimipour ("Ghadimipour"), about concerns

---

[5]    The email addresses in the Complaint were redacted for law enforcement purposes. Because law enforcement purposes no longer necessitate the nondisclosure of these email addresses, an unredacted version of the Complaint is being filed on the same day as this brief.

over the fact that Shakeri and Aghamiri reside in Iran. (Comp. ¶¶ 31i-k). Ghadimipour is the head of Bank Melli's Overseas Network Supervisory Department ("ONSD"), which is located in Tehran, Iran. (Comp. ¶¶ 31c, e).

On or about July, 2, 2005, Tafti sent an email to Ghadimipour (whom he addressed as "Mr. Ghadimipour, the director of the branches of Bank Melli, outside of Iran") at the email address overseas2@bankmelli-iran.com (the "Bank Melli Email Address"). Tafti wrote to Ghadimipour about the legal problem created by the fact that Shakeri and Aghamiri reside in Iran. (Comp. ¶ 31i). In the message, Tafti wrote, in part: "As you are aware, the issue of the place of residence of shareholders and the director of the Company in the USA has a special importance. At present, shareholders are forbidden from having residences in Iran, and as per the view of the legal experts, the American government may freeze the capital of the shareholders." (*Id.*). In light of this issue, Tafti asked Ghadimipour to "please make some arrangements" to change the "residence location" of Shakeri and Aghamiri to another country, and he proposed the United Arab Emirates. (*Id.*).

On July 6, 2005, Tafti again wrote to Ghadimipour, this time to the email address onsd_ir@yahoo.com (the "ONSD Email Address"), about the problem of Shakeri's and Aghamiri's residence. (Comp. ¶ 31j). He stated: "this is to inform you [about] the result of my discussions and investigations with the consultants and the lawyers in America and London: changing the shareholder of Assa Ltd. is possible, but the shareholder should reside in a tax free country. Otherwise, the country of residence will collect a tax from the income of the shareholder." (*Id.*). By proposing that Bank Melli change the shareholders of Assa Co. Ltd., Tafti acknowledged the fictional nature of Shakeri's and Aghamiri's ownership. (*Id.*).

Tafti received a response to the concerns he raised about Shakeri's and Aghamiri's residence

in a message sent on or about August 9, 2005. (Comp. ¶ 31k). In this email, sent from the ONSD Email Address, the sender wrote to Tafti: "With reference to the email of 7/7/2005, regarding the location of residence of the shareholders, this is to inform you that, as per the orders of the Bank Manager, until the appointment of the qualified individuals, act as before." (*Id.*).

These emails show that Shakeri and Aghamiri are merely straw owners of Assa Co. Ltd., and that Tafti sought and received direction from the true owner, Bank Melli, on how to resolve issues facing Assa Corp.

2.  Other Factual Allegations Showing That Bank Melli Owns and Controls Assa Corp. and Assa Co. Ltd.

Other emails described in the Complaint also confirm that Bank Melli owns and controls Claimants. For example, on June 19, 2005, Tafti sent an email to the ONSD Email Address about a problem arising from Citibank's refusal to wire $1.3 million from an Assa Corp. bank account to Assa Co. Ltd. (Comp. ¶ 31h). Tafti wrote that Citibank invited the directors of Assa Corp. to a meeting and "wants to know all the directors," but this created a problem because of "the absence of Mr. Shakeri." (*Id.*). Although this email was addressed to the "shareholders of Assa Co. Ltd.," Tafti proposed telling Citibank that Shakeri was on a trip or had resigned, and that Tafti and Assa Corp.'s New York attorney were now the directors. (*Id.*). This email shows that Shakeri was unable or unwilling to travel to the United States to attend to the substantial financial concerns of Assa Corp. and that he could easily be replaced as director.

Similarly, on February 5, 2005, Tafti sent an email to Ghadimipour at the Bank Melli Email Address. (Comp. ¶ 31e). He wrote that documents that had been sent for the signatures of Aghamiri and Shakeri had not yet been received, and he urged Ghadimipour to obtain the signatures because

the "lawyer and the secretary of the Company . . . are anxious." (*Id.*).

Likewise, on June 19, 2003, Tafti received an email message from "A. Azizi," sent from the address m.chowdhury@mellibank.co.uk. (Comp. ¶ 31b). Azizi is an official at Bank Melli in London. In the message, Azizi wrote, "I have had the letter of Intent and the Contract for Sale reviewed." (*Id.*). As alleged in the Complaint, this email was referring to a proposed deal, which ultimately collapsed, to sell Assa Corp.'s interest in 650 Fifth Avenue Company. (*Id.*).

Finally, the emails show that Tafti regularly sent financial statements and other business information about Assa Corp. to Bank Melli.[6]

### C.  The Complaint Adequately Pleads That Assa Corp. and Assa Co. Ltd. Performed Services for Bank Melli in Violation of IEEPA and the ITR

Here, there can be no dispute that the Complaint sufficiently alleges that Assa Corp. and Assa Co. Ltd. performed services for Bank Melli in violation of IEEPA and the ITR. As explained above, Assa Corp. performed the significant and valuable service of managing Bank Melli's substantial investment interest in 650 Fifth Avenue Company. Indeed, Assa Corp. and its parent, Assa Co. Ltd., were created in order to serve Bank Melli. The Complaint sets forth detailed factual allegations describing the breadth of services that Assa Corp. performed for Bank Melli. Among other things, Tafti consulted with New York counsel regarding the legal problems created by Shakeri and Aghamiri's residence; Tafti transferred income to Assa Co. Ltd. and, when a problem arose with

---

[6]  In emails dated March 5 and March 16, 2005, and February 26 and May 17, 2006, sent to the ONSD Email Address, Tafti wrote that the financial statements of Assa Corp. had been sent to the recipient of the email. (Comp. ¶¶ 31f-g, l-m). Likewise, on June 12, 2003, Tafti forwarded correspondence from a New York attorney for Assa Corp. to the email address a.azizi@mellibank.co.uk. (Comp. ¶ 31a). And, on November 20, 2004, Tafti received an email from Ali Safari, an ONSD employee, sent from the address safari_onsd@yahoo.com, in which Safari requested that Tafti send the "detailed expenses" of Assa Corp. so that they "are available for the use of the auditors." (Comp. ¶ 31c).

Citibank about a $1.3 million transfer to Assa Co. Ltd., Tafti worked with Assa Corp.'s legal counsel to address the problem; Tafti paid Assa Corp.'s New York State corporate taxes (Comp. ¶ 33); and Tafti forwarded Assa Corp.'s financial records to Bank Melli. These facts are sufficiently detailed to allow Claimant "to commence an investigation of the facts and to frame a responsive pleading." *Mondragon*, 313 F.3d at 865-67.

Notwithstanding these and other factual allegations in the Complaint, Claimants argue that the Government has not alleged an IEEPA violation because there is no detailed factual evidence showing a transfer of funds to Bank Melli. (Br. at 8). This argument is easily disposed of. First, the transfer of funds from Assa Corp. to Bank Melli is not the only service alleged in the Complaint. Rather, the Complaint alleges that Assa Corp. provided the service of managing Bank Melli's entire investment interest in 650 Fifth Avenue Company. As described above, the Complaint contains a number of detailed factual allegations describing this service.

Second, the Complaint does contain factual allegations showing that rental income was transferred to Bank Melli. As alleged in the Complaint, Assa Corp. and Assa Co. Ltd. *are* Bank Melli. Thus, all of the rental income that went to these two shell companies *ipso facto* went to Bank Melli. (Comp. ¶ 33 (between January 7, 2000 and December 5, 2007, approximately $17 million from 650 Fifth Avenue Company was deposited into one of the Defendant Accounts); *see also* Comp. ¶ 34 (Tafti transferred substantial amounts from Account-1 to Assa Co. Ltd.)). For purposes of the ITR, whether the money ultimately went to Bank Melli's offices in London or Iran or anywhere else in the world is irrelevant. *See* 31 C.F.R. § 560.204; 31 C.F.R. § 560.206. In addition, the Complaint provides a detailed factual example showing an attempt by Tafti to send money to Assa Co. Ltd. in London. On June 19, 2005, Tafti wrote to ONSD about the problem arising from

Citibank's refusal to wire $1.3 million from an Assa Corp. bank account to Assa Co. Ltd. In the email, Tafti proposed changing Assa Corp.'s directors, and sending smaller amounts to London in order to avoid problems with the transfer of money. (Comp. ¶ 31h).

Claimants also argue that the services alleged in the Complaint are merely "the internal corporate activities of a licensed corporation," and that the ITR do not "regulate or prohibit any communication that does not involve a transfer of value." (Br. at 9). This argument is frivolous. Putting aside the fact that keeping Bank Melli abreast of its investment has substantial value, Assa Corp. did not simply communicate with Bank Melli. Instead, Assa Corp. performed the imporant and valuable service of managing Bank Melli's entire investment in 650 Fifth Avenue Company.

Nor can there be any dispute that the ITR prohibit this service (managing Bank Melli's investment ineterest) and the myriad of services it entailed. In its regulations, OFAC used the general terms "*any* goods, technology, or services," indicating an intent to cover as broad an array of conduct as possible. *See United States v. Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998) ("[T]he order is clothed with the most serious of purposes, and it is couched in the broadest of terms"). The Second Circuit has stated that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee." *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004); *accord United States v. All Funds on Deposit in United Bank of Switzerland, New York, New York*, No. 01 Civ. 2091 (JSR), 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) ("[The] term[] 'services,' carries its ordinary legal meaning–see Black's Law Dictionary 1372 (7th ed.1999), defining 'service' as 'the act of doing something useful for a person or company for a fee' . . . "). Thus, by managing Bank Melli's interest in 650 Fifth Avenue Company, Assa Corp. provided "services" in violation of the ITR.

Notwithstanding the broad scope of the ITR, Claimants argue that "following instructions," "reporting back," and "managing affairs" do not involve the transfer of value to Bank Melli. (Br. at 10). This argument should be swiftly rejected. All of these activities are services that have value. By managing Bank Melli's affairs, following its instructions, and reporting back to Bank Melli, Assa Corp. provided services to Bank Melli in the same way that a building management company provides services to its clients. Claimants' interpretation would leave the ITR with a gaping hole, freely permitting entities owned and controlled by the Government of Iran to manage, within the United States, lucrative investments for the benefit of the Government of Iran. It is implausible to believe that the ITR—aimed at isolating Iran economically and denying it access to funds to finance terrorism—freely permit companies in the United States to covertly manage a business enterprise and financial investment belonging to an entity owned and controlled by the Government of Iran. *See Ehsan*, 163 F.3d at 859 ("The obvious purpose of the order is to isolate Iran from trade with the United States. . . . This broad export ban reflected the President's appraisal of the nation's interest in sanctioning Iran's sponsorship of international terrorism, its frustration of the Middle East peace process, and its pursuit of weapons of mass destruction.") (citing Message to Congress on Iran, 31 Weekly Comp. Pres. Doc. 1584 (Sept. 25, 1995)).

Accordingly, the Complaint states sufficiently detailed facts to support a reasonable belief that the Government will be able to show that Claimants provided services to Bank Melli in violation of IEEPA and the ITR.

III.    **THE COMPLAINT ADEQUATELY PLEADS THAT THE ACCOUNT FUNDS ARE SUA PROCEEDS**

A.      **Applicable Law**

Section 981(a)(1)(C) of Title 18, United States Code, provides, in part, that:

The following property, real or personal, is subject to forfeiture to the United States . . . [a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' ((as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 981(a)(1)(C). Under Section 1956(c)(7), the term "specified unlawful activity" ("SUA")

includes, among other things, violations of "section 206 (relating to penalties) of the International

Emergency Economic Powers Act [50 U.S.C. § 1705]." As noted above, 50 U.S.C. § 1705(a)

makes it "unlawful . . . to violate, attempt to violate, conspire to violate, or cause a violation of any

license, order, regulation, or prohibition issued under this title."

B.      **Discussion**[7]

As alleged in the Complaint, the Account Funds were seized from accounts at Citibank and

JPMorgan that are held in the name of Assa Corp. These funds are income from Bank Melli's 40

percent interest in 650 Fifth Avenue Company. (Comp. ¶ 33).

The Complaint adequately alleges that the income that Assa Corp. received from 650 Fifth

Avenue, including the Account Funds, constitutes the proceeds of a number of different services that

Assa Corp. performed for Bank Melli in violation of the ITR. For example, the simple act of

receiving money on behalf of Bank Melli, in order to conceal Bank Melli's interest, was a service

_____

        [7]    As discussed in the next section, the Complaint seeks forfeiture of the Minority Interest on the ground that it is property involved in money laundering. The Account Funds are forfeitable both as SUA proceeds and as property involved in money laundering.

performed in violation of the ITR. Assa Corp. performed this service in the same way that a bill collector performs a service, and the direct proceeds of this service were the funds received from 650 Fifth Avenue Company. This simple service of collecting money was perhaps the most important service that Assa Corp. performed for Bank Melli, because Bank Melli's principal objective in running this money laundering operation was to collect its income from 650 Fifth Avenue Company.

The Complaint also alleges that Assa Corp. performed the service of disguising Bank Melli's interest in 650 Fifth Avenue Company and preventing its detection from law enforcement. By performing this service, Assa Corp. allowed Bank Melli to maintain its interest in 650 Fifth Avenue Company and reap its income from that investment. The direct proceeds of this service (disguising Bank Melli's interest) were the funds that Assa Corp. received from 650 Fifth Avenue Company.

The income that Assa Corp. collected from 650 Fifth Avenue Company also represents the proceeds of the service that Assa Corp. performed by managing Bank Melli's investment interest in 650 Fifth Avenue Company. This overarching service required Assa Corp. to perform a vast array of services, such as opening bank accounts, paying its employee, paying state taxes, and consulting with legal counsel. If Assa Corp. had not performed these services, Bank Melli would not have been able to collect its income from 650 Fifth Avenue. Thus, any income that Assa Corp. received from 650 Fifth Avenue Company constitutes the proceeds of the service that it provided to Bank Melli by managing its investment interest in 650 Fifth Avenue Company.

Claimants argue that the Account Funds do not constitute SUA proceeds because the alleged IEEPA violation could not have occurred until the funds were transferred from the Defendant Accounts to Bank Melli. (Br. at 8-9). However, this argument incorrectly assumes that the transfer of funds from Assa Corp. to Assa Co. Ltd. is the only unlawful service alleged in the Complaint.

The Account Funds represents the proceeds of a number of different services that Assa Corp. supplied, including the simple act of collecting money on behalf of Bank Melli.

Accordingly, the Complaint adequately pleads that the Account Funds are SUA proceeds.

## IV. THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN MONEY LAUNDERING, IN VIOLATION OF 18 U.S.C. §§ 1956(a)(1) AND (h)

As alleged in the Complaint, Assa Corp. and Assa Co. Ltd. are shell companies created by Bank Melli in order to collect its 40% share of income from 650 Fifth Avenue Company and transfer this money overseas, in violation of the ITR. Assa Corp.'s and Assa Co. Ltd.'s interests in 650 Fifth Avenue Company were not simply involved in the money laundering operation—these properties were the principal vehicles used to conceal and run the money laundering operation. Accordingly, the Complaint sufficiently pleads that these properties are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in money laundering and attempted money laundering transactions, as well as a conspiracy to commit money laundering.

### A. **Applicable Law**

1.   Property Subject to Forfeiture Under 18 U.S.C. § 981(a)(1)(A)

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, *involved in a transaction or attempted transaction* in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A) (emphasis added).

Under § 983(c), "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the

property and the offense." 18 U.S.C. § 983(c).

2. The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(1)

The Complaint alleges "promotion money laundering" in violation of 18 U.S.C. § 1956(a)(1)(A)(i), "concealment money laundering" in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

The elements of promotion money laundering under § 1956(a)(1)(A)(i) are: (1) an actual or attempted financial transaction; (2) involving SUA proceeds; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) an "intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i); *see also, e.g.*, *United States v. All Funds on Deposit at Dime Sav. Bank*, 255 F. Supp. 2d 56, 70 (E.D.N.Y. 2003) (internal quotations and citations omitted).[8]

The elements of concealment money laundering under § 1956(a)(1)(B)(i) are the same as the elements of promotion money laundering with one exception; instead of showing an intent to promote an SUA, the Government must show knowledge that the transaction was designed in whole or in part either (a) "to conceal or disguise the nature the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity," or (b) "to avoid a transaction reporting requirement under State or Federal law." 18 U.S.C. § 1956(a)(1)(B)(i); *see also, e.g.*, *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997).

Finally, § 1956(h) makes it unlawful to "conspire[] to commit any offense defined" in Sections 1956 or 1957.

---

[8] The terms "transaction" and "financial transaction" are broadly defined in 18 U.S.C. § 1956(c)(3) and (c)(4). The mere receipt of funds may constitute a financial transacton. *E.g.*, *United States v. Gotti*, 459 F.3d 296, 336-37 (2d Cir. 2006).

**B.** **The Complaint Adequately Pleads Violations of 18 U.S.C. §§ 1956(a)(1) and (h)**

As discussed *supra* Section III(B), the funds that Assa Corp. received on behalf of Bank Melli are SUA proceeds. For the reasons explained below, the Complaint adequately alleges that Assa Corp. and Assa Co. Ltd. conducted financial transactions and attempted financial transactions of these SUA proceeds, with intent to promote an IEEPA violation and/or knowledge that the transactions were designed in whole or in part to conceal and disguise the ownership and control of the funds.

First, the Complaint adequately alleges concealment money laundering. As alleged in the Complaint, Bank Melli's income from 650 Fifth Avenue Company (SUA proceeds) was transferred from 650 Fifth Avenue Company to Assa Corp., and then from Assa Corp. to Assa Co. Ltd. These financial transactions were intended to conceal Bank Melli's ownership and control of the funds. Accordingly, the Government has alleged financial transactions of SUA proceeds, with knowledge that the transactions were "designed in whole or in part . . . to conceal or disguise . . . the ownership, or the control of the proceeds of specified unlawful activity," in violation of § 1956(a)(1)(B)(i).

The Complaint also sufficiently pleads promotion money laundering. As alleged in the Complaint, Tafti used income from 650 Fifth Avenue Company to pay Assa Corp.'s ordinary business expenses, such as his salary and the company's state taxes. (Comp. ¶ 33). Each of these payments was a financial transaction that was intended to promote an IEEPA violation by furthering the the ongoing operations of Assa Corp. Accordingly, the Complaint adequately alleges financial transactions of SUA proceeds "with the intent to promote the carrying on of specified unlawful activity, " in violation of § 1956(a)(1)(A)(i).

## C.   The Complaint Adequately Pleads That the Minority Interest Was Property Involved in Money Laundering and a Conspiracy to Commit Money Laundering

As alleged in the Complaint, Bank Melli disguised its 40 percent interest in 650 Fifth Avenue Company by creating two shell companies, Assa Corp. and Assa Co. Ltd., in order to manage its investment and export its income from the United States.  Thus, Assa Corp. and Assa Co. Ltd. were not merely involved in the money laundering—these two companies were the primary vehicles used to run the money laundering operation, and the Minority Interest was the specific property that allowed Bank Melli to conceal and disguise its ownership in 650 Fifth Avenue Company.

Property "involved in" a money laundering offense includes, among other things, any property that facilitates the offense, including any property used to conceal, disguise, or promote the money laundering.  *E.g.*, *United States v. Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009) (the inventories of two jewelry stores were properly forfeited as facilitating property pursuant to 18 U.S.C. § 982(a)(1)[9] and 31 U.S.C. § 5317, because the inventories made it easier for the defendant to launder drug money by giving customers a variety of jewelry options, and by giving the transactions a facade of legitimacy).[10]  Accordingly, the Complaint adequately alleges that the

---

[9]   18 U.S.C. § 982 contains criminal forfeiture provisions (whereas § 981 relates to civil forfeiture).  Like the civil money laundering provision in § 981(a)(1)(A), the criminal forfeiture provision in § 982(a)(1) authorizes forfeiture of any and all property "involved in" a money laundering offense, and any property traceable to such property.

[10]   *See, also, e.g.*, *United States v. McGauley*, 279 F.3d 62, 77 (1st Cir. 2002) (legitimate funds in a bank account that had been commingled with dirty money were properly forfeited because the clean funds were used to conceal and disguise the tainted funds); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005), *aff'd*, 514 F.3d 277 (2d Cir. 2008) (interpreting language in 18 U.S.C. § 982, and stating that the "term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate" the offense); *United States v. Contents of Account Nos. 208-06070 & 208-06068-1-2*, 847 F. Supp. 329, 334-35 (S.D.N.Y. 1994) (legitimate funds used to disguise the source of illegitimate funds and to make the proceeds of a green card scheme more difficult

Minority Interest was property involved in money laundering.

The allegations in the Complaint show that the Minority Interest is forfeitable for another reason as well. Putting aside the fact that this specific asset was directly involved in money laundering, all of Assa Corp.'s assets are forfeitable to the United States because the entire business was used to run and conceal the money laundering operation. *See, e.g.*, *Seher*, 562 F.3d at 1369; *United States v. Baker*, 227 F.3d 955, 969-70 (7th Cir. 2000) (assets of a massage parlor business that helped bankroll a money laundering conspiracy, and the business premises on which the transactions occurred, are forfeitable as property involved in the money laundering offense); *United States v. G.P.S. Auto. Corp.*, 66 F.3d 483, 487 (2d Cir. 1995) (assets of a business that was used to sell stolen auto parts and launder the crime proceeds are forfeitable as property involved in money laundering); *Schlesinger*, 396 F. Supp. 2d at 273 (factory and business used in furtherance of money laundering offense are forfeitable as property involved in the offense).

Claimants argue that the Minority Interest was not involved in money laundering because, "[a]t most, the Government alleges that the Minority Interest generated funds that were later used as part of an alleged IEEPA violation." (Br. at 12). However, this argument incorrectly assumes that the transfer of funds from Assa Corp. to Assa Co. Ltd. is the only service in violation of the ITR that is alleged in the Complaint. As explained *supra* Section II, the Complaint alleges that Assa Corp. performed the array of services necessary to manage Bank Melli's substantial ownership interest in 650 Fifth Avenue Company.

---

to trace facilitated the money laundering scheme and were forfeitable under § 981).

**D.**     **The Complaint Adequately Pleads That the Account Funds Were Property Involved in Money Laundering and a Conspiracy to Commit Money Laundering**

As alleged in the Complaint, the Account Funds are income that Assa Corp. received, on behalf of Bank Melli, for its 40 percent investment in 650 Fifth Avenue Company.  For the reasons explained *supra* Section III(B), this income is SUA proceeds, and it was involved in money laundering transactions when it was transferred from 650 Fifth Avenue to Assa Corp.[11]

The Complaint alleges that the Account Funds are forfeitable for an additional reason.  As explained *supra* Section IV(C), the allegations in the Complaint show that Assa Corp.'s entire business was involved in the money laundering operation and, therefore, that all of its assets are forfeitable to the United States.

**V.**     **THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN A VIOLATION OF, AND CONSPIRACY TO VIOLATE, THE INTERNATIONAL MONEY LAUNDERING STATUTE, 18 U.S.C. § 1956(a)(2)**

**A.**     **The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(2)**

The Complaint also alleges that the Defendant Properties are forfeitable as property involved in a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2).  To establish a violation of § 1956(a)(2)(A), the Government must show three elements: (1) the transfer (or attempted transfer) of a monetary instrument or funds, (2) from a place in the United States to or through a place outside the United States, and (3) an intent to promote the carrying on of specified unlawful activity.  *E.g.*, *United States v. Pierce*, 224 F.3d 158, 162 (2d Cir. 2000).

---

[11]     In addition, the Acount Funds are forfeitable as property that Assa Corp. and Assa Co. Ltd. conspired to launder.  *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (lawfully obtained proceeds properly included in forfeiture order because the defendant conspired to launder these funds through comingling).

Thus, the elements of § 1956(a)(2)(A) are the same as § 1956(a)(1) with 2 exceptions. First, instead of a "financial transaction," the Government must show that the defendant engaged in the transportation, transfer, or transmission of property into or out of the United States. Second, § 1956(a)(2)(A) does not require proof that the monetary instruments or funds are crime proceeds.[12] Thus, violations of § 1956(a)(2)(A) may be committed with clean money if the funds are transferred into or out of the United States with intent to promote an SUA.[13]

**B.     Discussion**

As alleged in the Complaint, Assa Corp. moved Bank Melli's income from 650 Fifth Avenue Company to accounts overseas, in order to supply money to Bank Melli and perpetuate the ongoing operation of Assa Corp.  Accordingly, the Complaint adequately pleads a violation of § 1956(a)(2)(A) by alleging a transfer of funds from a place inside the United States to a place outside the United States with an intent to promote an IEEPA violation.

As mentioned above, § 1956(a)(2)(A) does not require proof that the funds being transferred

_____

[12]     *E.g.*, *United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994) ("§ 1956(a)(2) contains no requirement that 'proceeds' first be generated by unlawful activity, followed by a financial transaction with those proceeds, for criminal liability to attach."); *United States v. Krasinski*, 545 F.3d 546, 550-51 (7th Cir. 2008) (same); *United States v. One 1997 E35 Ford Van*, 50 F. Supp. 2d 789, 797-803 (N.D. Ill. 1999) (government's forfeiture complaint stated a claim under § 1956(a)(2)(A) by alleging that funds were transferred to the United States by HAMAS, a certified terrorist organization, with the intent of supporting murder and extortion in Israel; § 1956(a)(2)(A) does not require proof that the funds are SUA proceeds).

[13]     The Complaint also alleges a violation of § 1956(a)(2)(B), which occurs when monetary instruments or funds are transferred to or from the United States with knowledge that the property represents SUA proceeds and that the transfer is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  Claimants challenge the Government's § 1956(a)(2)(B) allegations on the same grounds used to challenge the other § 1956 allegations.  Their arguments are meritless for the same reasons discussed above.

from the United States constitute SUA proceeds. Instead, it is sufficient to show that the funds were transferred with the intent to promote an SUA. Thus, even under Claimants' theory—that the IEEPA violation could not have occurred until money was transferred from Assa Corp. to Assa Co. Ltd.—this transfer of funds constituted money laundering under § 1956(a)(2)(A) because it was intended to promote a subsequent IEEPA violation, and the Defendant Properties are forfeitable for the same reasons discussed *supra* Section IV.[14]

## VI. THE COMPLAINT IS NOT BARRED BY THE TREATY OF AMITY OR THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT

Claimants contend that the Government's forfeiture claims are barred by the Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, Aug. 15, 1955 [June 16, 1957] 8 U.S.T. 899, T.I.A.S. No. 3853 (the "Treaty of Amity") and by the Fifth Amendment's Takings Clause. As explained below, neither contention has merit.

### A. The Complaint Is Not Barred by the Treaty of Amity

Claimants assert, in conclusory fashion, that the Government's forfeiture claims are barred by a laundry list of provisions in the Treaty of Amity. (Br. 19-20). Claimants do not offer any analysis or explanation, or cite to any caselaw. As best the Government can discern, Claimants appear to argue that, even if Claimants are in fact owned and controlled by Bank Melli, then the

---

[14]    The Complaint also alleges that the Defendant Properties were involved in money laundering in violation of 18 U.S.C. § 1957. This statute, sometimes referred to as the "money spending statute," provides criminal penalties for any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). It is broader than Section 1956 because the defendant does not need to have any specific intent. *E.g.*, *United States v. Ghilarducci*, 480 F.3d 542, 551 (7th Cir. 2007); *United States v. Cefaratti*, 221 F.3d 502, 506 (3d Cir. 2000). Claimants challenge the Government's § 1957 allegations on the same grounds used to challenge the § 1956 allegations. Their arguments are meritless for the same reasons discussed above.

Treaty prohibits Congress from enacting laws that impede Bank Melli's unfettered ability to carry on business, through Claimants, in the United States. This claim is utterly meritless.

As an initial matter, Claimants cannot claim the benefit of many of the provisions of the Treaty of Amity cited in their brief. Assa Corp., a New York corporation, and Assa Co. Ltd., a Jersey limited liability company, are not Iranian nationals or Iranian companies and, therefore, cannot invoke the provisions of the Treaty that apply to such persons and entities. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 182-83, 189-90 (1982) (a New York corporation, though a wholly-owned subsidiary of a Japanese company, was not a "company of Japan" under the Friendship, Commerce and Navigation Treaty between the United States and Japan); *see* Treaty of Amity, Art. II cl. 1, Art. III cl. 1, Art. IV cl. 1 & 2.

But even assuming *arguendo* that the Treaty of Amity applies to Claimants, it does not bar forfeiture of the Defendant Properties. The Treaty of Amity is an example of several Treaties of Friendship, Commerce, and Navigation negotiated between the United States and various trading partners between the Confederacy and the post-World War II era. *See generally* Herman Walker, Jr., *Modern Treaties of Friendship, Commerce and Navigation*, 42 MINN. L. REV. 805, 805 (1958). Under the Treaty, the United States and Iran agreed to permit each others' nationals and companies to conduct business on the same basis provided to nationals and companies of third countries. Like other friendship treaties of its era, the purpose of the Treaty of Amity "was not to give foreign corporations *greater* rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage." *Sumitomo*, 457 U.S. at 187-88 (emphasis supplied). The Treaty's terms do not exempt Iranian nationals or companies from complying with domestic laws, including IEEPA and CAFRA, as all other domestic

and foreign individuals and companies must. Like any other individual or company, foreign or domestic, Claimants are barred from exporting or supplying goods or services from the United States to Iran or the Government of Iran without an OFAC license under 31 C.F.R. Part 560, Subpart E.

In addition, even if, *arguendo*, provisions in the Treaty of Amity were inconsistent with the forfeiture authorized by CAFRA and IEEPA, the terms of the latter statutes control. A bedrock principle of statutory interpretation is that later-enacted legislation controls over earlier, inconsistent treaties. *E.g.*, *Empresa Cubana del Tabaca v. Culbro Corp.*, 399 F.3d 462, 481 (2d Cir. 2005) (1963 Cuban Asset Control Regulations, 31 C.F.R. § 515.201 et seq., supersede inconsistent provisions of the Paris Convention for the Protection of Industrial Property); *United States v. Yousef*, 327 F.3d 56, 110 (2d Cir. 2003) ("legislative acts trump treaty-made international law") (citing *Breard v. Greene*, 523 U.S. 371, 376 (1998) (provisions of Antiterrorism and Effective Death Penalty Act of 1996 supersede inconsistent provisions of Vienna Convention on Consular Relations)); *Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272, 275-76 (E.D.N.Y. 2009) (Terrorism Risk Insurance Act of 2002 supersedes inconsistent provisions of the Treaty of Amity). IEEPA, the ITR, CAFRA, and the federal money laundering statutes were all enacted after the Treaty of Amity[15] and, to the extent they are inconsistent, the unambiguous terms of these statutes control. Holding otherwise

---

[15] The Treaty of Amity was signed in 1955, ratified by the Senate in 1956, and entered into force in 1957. The provisions of law relied upon in the Complaint were enacted afterwards. IEEPA was enacted in 1977. 95 Pub. L. 223, 91 Stat. 1625 (Dec. 28, 1977) (codified at 50 U.S.C. § 1701 *et seq.*). The ITR became effective in 1995. *See supra* Section II. The money laundering statutes, which include IEEPA violations in the definition of "specified unlawful activity," were enacted in 1986 as part of the Anti-Drug Abuse Act of 1986. *See* Money Laundering Control Act of 1986, 99 Pub. L. 570 § 1352, 100 Stat. 3207 (Oct. 27, 1986). Finally, CAFRA added offenses constituting SUAs (including IEEPA violations) to the offenses giving rise to forfeiture under 18 U.S.C. § 981(a)(1)(C). 106 Pub. L. 185 § 20, 114 Stat. 202 (Apr. 25, 2000).

would cripple IEEPA.  Claimants' arguments based on the Treaty of Amity, accordingly, lack merit.

**B.**     **The Complaint Is Not Barred by the Takings Clause**

The Takings Clause of the Fifth Amendment provides, in relevant part, that "nor shall private property be taken for public use, without just compensation."  However, forfeiture is *not* a taking under the Constitution.  *E.g.*, *Bennis v. Michigan*, 516 U.S. 442, 452-53 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain.").[16]  Nor does the fact that the Government may, consistent with statutory and regulatory authority, apply forfeited property to compensate victims of the underlying offenses for their losses, *see* 18 U.S.C. § 981(d), (e)(1) and 28 C.F.R. Part 9, turn a forfeiture into a taking, any more than a restitution order is a taking.  *Cf.*, *Weinstein*, 624 F. Supp. 2d at 276-77 (attaching Bank Melli's property pursuant to IEEPA and TRIA was not a constitutional "taking") (citing *Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002)).  Thus, Claimants' constitutional argument is meritless.

---

[16]     *See also Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680-88 (1974) (tracing historical origins of forfeiture authority and the forfeiture of property used in violation of law before and after the adoption of the Constitution); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331-32 (Fed. Cir. 2006) ("When property has been seized pursuant to the criminal laws or subjected to in rem forfeiture proceedings, such deprivations are not 'takings' for which the owner is entitled to compensation.") (citing cases); *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 210 (1st Cir. 1992) ("We think it is settled that if the federal government's actions comport, procedurally and substantively, with the terms of a lawfully enacted forfeiture statute, it may seize private property without compensating the owner.") (citing cases).

## CONCLUSION

For the foregoing reasons, Claimants' motion to dismiss the Complaint should be denied in

its entirety.

Dated: October 14, 2009
New York, New York

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____/s/_____
SHARON COHEN LEVIN
ANNA E. ARREOLA
MICHAEL D. LOCKARD
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1060/2218/2193
Fax (212) 637-0421