PREET BHARARA
United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     ANNA E. ARREOLA
     MICHAEL D. LOCKARD
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2218/2193



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

             -v.-                              :   **VERIFIED AMENDED**
                                               :   **COMPLAINT**

ALL RIGHT, TITLE, AND INTEREST OF ASSA
CORPORATION, ASSA COMPANY LIMITED, BANK     :   08 Civ. 10934 (RJH)
MELLI IRAN, AND THE ALAVI FOUNDATION IN
650 FIFTH AVENUE COMPANY, INCLUDING BUT     :
NOT LIMITED TO THE REAL PROPERTY AND
APPURTENANCES LOCATED AT 650 FIFTH          :
AVENUE, NEW YORK, NEW YORK, WITH ALL
IMPROVEMENTS AND ATTACHMENTS THEREON, AND :
ALL PROPERTY TRACEABLE THERETO,
                                               :
ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED     :
AT 650 FIFTH AVENUE, NEW YORK, NEW YORK,
WITH ALL IMPROVEMENTS AND ATTACHMENTS       :
THEREON,
                                               :
ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED     :
AT 2313 SOUTH VOSS ROAD, HOUSTON, TEXAS
77057, WITH ALL IMPROVEMENTS AND            :
ATTACHMENTS THEREON,
                                               :
ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED     :
AT 55-11 QUEENS BOULEVARD, QUEENS, NEW
YORK 11377, BLOCK 1325 LOTS 1, 6, 7, AND    :
8, WITH ALL IMPROVEMENTS AND ATTACHMENTS
THEREON,                                       :

ALL RIGHT, TITLE, AND INTEREST IN THE       :
REAL PROPERTY AND APPURTENANCES LOCATED
AT 4836 MARCONI AVENUE, CARMICHAEL,         :

CALIFORNIA 95608, WITH ALL IMPROVEMENTS    :
AND ATTACHMENTS THEREON,

                                           :

ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED    :
AT 4204 ALDIE ROAD, CATHARPIN, VIRGINIA
20143-1133, WITH ALL IMPROVEMENTS AND      :
ATTACHMENTS THEREON,

                                           :

ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED    :
AT 4300 ALDIE ROAD, CATHARPIN, VIRGINIA
20143-1133, WITH ALL IMPROVEMENTS AND      :
ATTACHMENTS THEREON,

                                           :

ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED    :
AT 7917 MONTROSE ROAD, ROCKVILLE,
MARYLAND 20854, WITH ALL IMPROVEMENTS AND :
ATTACHMENTS THEREON,

                                           :

ALL RIGHT, TITLE, AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES LOCATED    :
AT 8100 JEB STUART ROAD, ROCKVILLE,
MARYLAND 20854, WITH ALL IMPROVEMENTS AND :
ATTACHMENTS THEREON,

                                           :

ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT
NUMBER 78429712, AT CITIBANK, N.A., NEW    :
YORK, NEW YORK,

                                           :

ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT
NUMBER 8881654552, AT CITIBANK, N.A., NEW :
YORK, NEW YORK,

                                           :

ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT
NUMBER 2724409590, AT JPMORGAN CHASE       :
BANK, N.A., BATON ROUGE, LOUISIANA,

                                           :

ALL FUNDS FORMERLY ON DEPOSIT IN ACCOUNT
NUMBER 725700280, AT JPMORGAN CHASE BANK, :
N.A., BATON ROUGE, LOUISIANA,

                                           :

ALL FUNDS ON DEPOSIT AT JPMORGAN CHASE
BANK, N.A., IN ACCOUNT NUMBER 230484468,   :
HELD IN THE NAME OF 650 FIFTH AVENUE
COMPANY, AND ALL FUNDS TRACEABLE THERETO, :

ALL FUNDS ON DEPOSIT AT JPMORGAN CHASE     :

BANK, N.A., IN ACCOUNT NUMBER 230484476,  :
HELD IN THE NAME OF 650 FIFTH AVENUE
COMPANY, AND ALL FUNDS TRACEABLE THERETO, :

ALL FUNDS ON DEPOSIT AT STERLING NATIONAL :
BANK IN ACCOUNT NUMBER 3802032201, HELD
IN THE NAME OF ALAVI FOUNDATION, AND ALL  :
FUNDS TRACEABLE THERETO,
                                          :
ALL FUNDS ON DEPOSIT AT STERLING NATIONAL :
BANK IN ACCOUNT NUMBER 3802032216, HELD
IN THE NAME OF ALAVI FOUNDATION, AND ALL  :
FUNDS TRACEABLE THERETO, AND
                                          :
ALL FUNDS ON DEPOSIT AT STERLING NATIONAL :
BANK IN ACCOUNT NUMBER 3852524414, HELD
IN THE NAME OF ALAVI FOUNDATION, AND ALL  :
FUNDS TRACEABLE THERETO,
                                          :
                   Defendants *in rem*.
                                          :
- - - - - - - - - - - - - - - - - - - - - -x


        Plaintiff United States of America, by its attorney,

Preet Bharara, United States Attorney for the Southern District

of New York, for its verified amended complaint alleges, upon

information and belief, as follows:

### I. NATURE OF THE ACTION

        1.    This is an action by the United States of America

seeking forfeiture of the properties described below:

        a.    All right, title, and interest of Assa
              Corporation, Assa Company Limited, Bank Melli
              Iran, and the Alavi Foundation in 650 Fifth Avenue
              Company, including but not limited to the real
              property and appurtenances located at 650 Fifth
              Avenue, New York, New York, with all improvements
              and attachments thereon, and all property
              traceable thereto;

        b.    All right, title, and interest in the real
              property and appurtenances located at 650 Fifth

Avenue, New York, New York, with all improvements and attachments thereon, and all property traceable thereto (the "Defendant Real Property-1" or the "Building");

c.    All right, title, and interest in the real property and appurtenances located at 2313 South Voss Road, Houston, Texas 77057, with all improvements and attachments thereon (the "Defendant Real Property-2");

d.    All right, title, and interest in the real property and appurtenances located at 55-11 Queens Boulevard, Queens, New York 11377, Block 1325 Lots 1, 6, 7, and 8, with all improvements and attachments thereon (the "Defendant Real Property-3");

e.    All right, title, and interest in the real property and appurtenances located at 4836 Marconi Avenue, Carmichael, California 95608, with all improvements and attachments thereon (the "Defendant Real Property-4");

f.    All right, title, and interest in the real property and appurtenances located at 4204 Aldie Road, Catharpin, Virginia 20143-1133, with all improvements and attachments thereon (the "Defendant Real Property-5");

g.    All right, title, and interest in the real property and appurtenances located at 4300 Aldie Road, Catharpin, Virginia 20143-1133, with all improvements and attachments thereon (the "Defendant Real Property-6");

h.    All right, title, and interest in the real property and appurtenances located at 7917 Montrose Road, Rockville, Maryland 20854, with all improvements and attachments thereon (the "Defendant Real Property-7");

i.    All right, title, and interest in the real property and appurtenances located at 8100 Jeb Stuart Road, Rockville, Maryland 20854, with all improvements and attachments thereon (the "Defendant Real Property-8");

j.   All funds formerly on deposit in Account Number
     78429712, at Citibank, N.A., New York, New York
     ("Defendant Account-1");

k.   All funds formerly on deposit in Account Number
     8881654552, at Citibank, N.A., New York, New York
     ("Defendant Account-2");

l.   All funds formerly on deposit in Account Number
     2724409590, at JPMorgan Chase Bank, N.A., Baton
     Rouge, Louisiana ("Defendant Account-3");

m.   All funds formerly on deposit in Account Number
     725700280, at JPMorgan Chase Bank, N.A., Baton
     Rouge, Louisiana ("Defendant Account-4");

n.   All funds on deposit at JPMorgan Chase Bank, N.A.,
     in account number 230484468, held in the name of
     650 Fifth Avenue Company, and all funds traceable
     thereto ("Defendant Account-5");

o.   All funds on deposit at JPMorgan Chase Bank, N.A.,
     in account number 230484476, held in the name of
     650 Fifth Avenue Company, and all funds traceable
     thereto ("Defendant Account-6");

p.   All funds on deposit at Sterling National Bank in
     account number 3802032216, held in the name of
     Alavi Foundation, and all funds traceable thereto
     ("Defendant Account-7");

q.   All funds on deposit at Sterling National Bank in
     account number 3802032201, held in the name of
     Alavi Foundation, and all funds traceable thereto
     ("Defendant Account-8"); and

r.   All funds on deposit at Sterling National Bank in
     account number 3852524414, held in the name of
     Alavi Foundation, and all funds traceable thereto
     ("Defendant Account-9");

(collectively, the "Defendant Properties").

        2.   The Defendant Properties are subject to seizure

and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property

constituting or derived from proceeds traceable to violations of

-5-

the International Emergency Economic Powers Act ("IEEPA"),

codified at 50 U.S.C. § 1701 et seq.  In addition, the Defendant

Properties are subject to seizure and forfeiture pursuant to 18

U.S.C. § 981(a)(1)(A), as property involved in money laundering

transactions and attempted money laundering transactions, in

violation of 18 U.S.C. §§ 1956 and 1957, and as property

traceable to such property.

## II. JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C.

§§ 1345 and 1355.

4.    Venue is proper pursuant to 28 U.S.C.

§ 1355(b)(1)(A) because acts and omissions giving rise to the

forfeiture took place in the Southern District of New York, and

also pursuant to 28 U.S.C. § 1395(b) because certain of the

Defendant Properties are located in the Southern District of New

York.  The contents of Defendant Accounts-1, -2, -3, and -4 are

currently in the custody of the United States Marshals Service

for the Southern District of New York.

## III. STATUTORY AUTHORITIES

### The International Emergency Economic Powers Act and the Iranian Transactions Regulations

5.    This civil forfeiture action relates to violations

of regulations and Executive Orders issued pursuant to the

International Emergency Economic Powers Act ("IEEPA"), codified

at 50 U.S.C. § 1701 et seq.  This law, enacted in 1977, gives the

President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations.  Section 1705 of Title 50, United States Code, provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

6.    On October 29, 1987, President Ronald Reagan issued Executive Order 12613 based upon his finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations." Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987).  In the Executive Order, the President imposed an import embargo "[t]o ensure that United States imports of Iranian goods and services will not contribute financial support to terrorism or to further aggressive actions against non-belligerent shipping."  Section 1 of this Order provided that: "Except as otherwise provided in regulations issued pursuant to this Order, no goods or services of Iranian origin may be imported into the United States, including its territories and possessions, after the effective date of this Order."  The United States Department of Treasury,

-7-

Office of Foreign Assets Control ("OFAC") subsequently
promulgated the Iranian Transactions Regulations (the "ITR"),
Title 31, United States Code of Federal Regulations, Part 560, to
implement this import ban.  See 52 Fed. Reg. 44076 (Nov. 17,
1987).  As discussed below, the ITR were later amended to reflect
the expanded prohibitions set out in Executive Orders 12957,
12959 and 13059, which were issued in 1995 and 1997 pursuant to
IEEPA and other statutes.

        7.    On March 15, 1995, President Clinton announced
that "the actions and policies of the Government of Iran
constitute an unusual and extraordinary threat to the national
security, foreign policy, and economy of the United
States. . . ."  Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar.
17, 1995).  Using the powers conferred by IEEPA and other
statutes, the President declared a national emergency to deal
with that threat.  On May 6, 1995, the President issued Executive
Order 12959, which, with some exceptions not applicable here,
banned the supply or exportation of any service from the United
States to Iran.  Exec. Order 12959, 60 Fed. Reg. 24757 (May 9,
1995).

        8.    On August 21, 1997, the President issued Executive
Order 13059 to consolidate and clarify Executive Orders 12957 and
12959.  Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997).
Sections 1 and 2 of this Executive Order set forth the following

-8-

prohibitions:

Section 1. Except to the extent provided in section 3 of this order or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, other than information or informational materials within the meaning of section 203(b)(3) of IEEPA [50 U.S.C. § 1702(b)(3)], is hereby prohibited.

Section 2. Except to the extent provided in section 3 of this order, in section 203(b) of IEEPA [50 U.S.C. § 1702(b)], or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the following are prohibited:

(a) the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

(c) any new investment by a United States person in Iran or in property, including entities, owned or controlled by the Government of Iran;

(d) any transaction or dealing by a United States person, wherever located, including purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing, in or related to:

(i) goods or services of Iranian origin or owned or controlled by the Government of Iran; or

-9-

(ii) goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran;

(e) any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this order if performed by a United States person or within the United States; and

(f) any transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order.

9.    In 1995, the Department of Treasury expanded the ITR to implement these executive orders.  The ITR impose the following prohibitions, among others:

31 C.F.R. § 560.204 - Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran.

Except as otherwise authorized pursuant to this part, including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

31 C.F.R. § 560.203 - Evasions; attempts.

Any transaction by any United States person or within the United States that evades or avoids, or has the

-10-

purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

10.   Pursuant to 31 C.F.R. § 560.304, the term "Government of Iran" includes: "(a) The state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof; (b) Any entity owned or controlled directly or indirectly by the foregoing; (c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and (d) Any person or entity designated by the Secretary of the Treasury as included within paragraphs (a) through (c) of this section."

11.   The term "entity owned or controlled by the Government of Iran" is defined at 31 C.F.R. § 560.313, and "includes any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government."

12.   Bank Melli Iran ("Bank Melli") is wholly owned and controlled by the Government of Iran.   In 1999, OFAC identified Bank Melli in Iran, and all of its offices worldwide, as entities "owned or controlled by the Government of Iran."   31 C.F.R. Part

-11-

560, App. A.

13.  The ITR further impose the following prohibitions:

31 C.F.R. § 560.206 - Prohibited trade-related
transactions with Iran; goods, technology, or services.

(a) Except as otherwise authorized pursuant to this
part, and notwithstanding any contract entered into or
any license or permit granted prior to May 7, 1995, no
United States person, wherever located, may engage in
any transaction or dealing in or related to:

(1) Goods or services of Iranian origin or owned or
controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation,
reexportation, sale or supply, directly or indirectly,
to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the
term transaction or dealing includes but is not limited
to purchasing, selling, transporting, swapping,
brokering, approving, financing, facilitating, or
guaranteeing.

31 C.F.R. § 560.207 - Prohibited investment.

Except as otherwise authorized pursuant to this part,
and notwithstanding any contract entered into or any
license or permit granted prior to May 7, 1995, any new
investment by a United States person in Iran or in
property (including entities) owned or controlled by
the Government of Iran is prohibited.

31 C.F.R. § 560.208 - Prohibited facilitation by United
States persons of transactions by foreign persons.

Except as otherwise authorized pursuant to this part,
and notwithstanding any contract entered into or any
license or permit granted prior to May 7, 1995, no
United States person, wherever located, may approve,
finance, facilitate, or guarantee any transaction by a
foreign person where the transaction by that foreign
person would be prohibited by this part if performed by
a United States person or within the United States.

14.  Pursuant to 31 C.F.R. § 560.314, the term "United

States person" means "any United States citizen, permanent
resident alien, entity organized under the laws of the United
States (including foreign branches), or any person in the United
States."

### Weapons of Mass Destruction Proliferation Regulations

15.   On November 14, 1994, President Clinton announced
that the proliferation of weapons of mass destruction ("WMDs")
and of the means of delivering such weapons, constitutes an
unusual and extraordinary threat to the national security,
foreign policy, and economy of the United States.  Using the
powers conferred by IEEPA and other statutes, the President
declared a national emergency to deal with that threat.  Exec.
Order 12938, 59 Fed. Reg. 59099 (Nov. 16, 1994).

16.   On June 28, 2005, President George W. Bush issued
Executive Order 13382, announcing additional steps to address the
national emergency described in Executive Order 12938.  The
additional steps blocked all property and interests in property
of proliferators of weapons of mass destruction and those who
have provided or attempted to provide financial, material,
technological, or other support for the proliferation of weapons
of mass destruction.  Exec. Order 13382, 70 Fed. Reg. 38567 (July
1, 2005).  Section 1 of Executive Order 13382 provides:

> (a) Except to the extent provided in section 203(b)(1),
> (3), and (4) of IEEPA (50 U.S.C. 1702(b)(1), (3), and
> (4)), or in regulations, orders, directives, or
> licenses that may be issued pursuant to this order, and

-13-

notwithstanding any contract entered into or any
license or permit granted prior to the effective date
of this order, all property and interests in property
of the following persons, that are in the United
States, that hereafter come within the United States,
or that are or hereafter come within the possession or
control of United States persons, are blocked and may
not be transferred, paid, exported, withdrawn, or
otherwise dealt in: . . . .

(iii) any person determined by the Secretary of the
Treasury, in consultation with the Secretary of State,
the Attorney General, and other relevant agencies, to
have provided, or attempted to provide, financial,
material, technological or other support for, or goods
or services in support of, any activity or transaction
described in paragraph (a)(ii) of this section, or any
person whose property and interests in property are
blocked pursuant to this order; and

(iv) any person determined by the Secretary of the
Treasury, in consultation with the Secretary of State,
the Attorney General, and other relevant agencies, to
be owned or controlled by, or acting or purporting to
act for or on behalf of, directly or indirectly, any
person whose property and interests in property are
blocked pursuant to this order.

(b) Any transaction or dealing by a United States
person or within the United States in property or
interests in property blocked pursuant to this order is
prohibited, including, but not limited to, (i) the
making of any contribution or provision of funds,
goods, or services by, to, or for the benefit of, any
person whose property and interests in property are
blocked  pursuant to this order, and (ii) the receipt
of any contribution or provision of funds, goods, or
services from any such person.

(c) Any transaction by a United States person or within
the United States that evades or avoids, has the
purpose of evading or avoiding, or attempts to violate
any of the prohibitions set forth in this order is
prohibited.

(d) Any conspiracy formed to violate the prohibitions
set forth in this order is prohibited.

17.    In April 2009, pursuant to Executive Order 13382, OFAC adopted the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. Part 544.    31 C.F.R. § 544.201 provides, in part:

Prohibited transactions involving blocked property.

(a) Except as authorized by regulations, orders, directives, rulings, instructions, licenses or otherwise, and notwithstanding any contracts entered into or any license or permit granted prior to the effective date, all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . . .

(3) Any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and other relevant agencies, to have provided, or attempted to provide, financial, material, technological or other support for, or goods or services in support of, any activity or transaction described in paragraph (a)(2) of this section, or any person whose property and interests in property are blocked pursuant to this section; and

(4) Any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and other relevant agencies, to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this section. . . .

(b) The prohibitions in paragraph (a) of this section include, but are not limited to, prohibitions on the following transactions when engaged in by a United States person or within the United States:

(1) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are

-15-

blocked pursuant to paragraph (a) of this section; and

(2) The receipt of any contribution or provision of funds, goods, or services from any person whose property and interests in property are blocked pursuant to paragraph (a) of this section.

18.   The individuals and entities whose property is blocked pursuant to 31 C.F.R. § 544.201 are listed in OFAC's "Specially Designated Nationals" ("SDN") list.  Bank Melli and all of its offices worldwide were added to the SDN list on or about October 25, 2007.  Assa Corporation and Assa Company Limited were added to the SDN list on or about December 17, 2008.

## IV.   PROBABLE CAUSE FOR FORFEITURE

### A.   Overview

19.   This civil forfeiture action relates to services provided by the Alavi Foundation, Assa Corporation ("Assa Corp."), Assa Company Limited ("Assa Co. Ltd."), and 650 Fifth Avenue Company to the Islamic Republic of Iran, in violation of IEEPA.

20.   As explained below, 650 Fifth Avenue Company is a partnership between the Alavi Foundation (a New York not-for-profit corporation) and Bank Melli.  The principal asset of 650 Fifth Avenue Company is a 36-story office tower located at 650 Fifth Avenue, New York, New York (the "Building").  Bank Melli owns 40% of 650 Fifth Avenue Company through two shell companies, Assa Corp., a New York corporate entity, and Assa Co. Ltd., a corporation domiciled in Jersey, Channel Islands, United Kingdom.

Assa Corp. is wholly owned by Assa Co. Ltd.

21. As set forth below, the Alavi Foundation is controlled by the Islamic Republic of Iran and has been providing numerous services to the Iranian Government, in violation of IEEPA, including managing a commercial building for the Iranian Government, running a charitable organization for the Iranian Government, and transferring funds from 650 Fifth Avenue Company to Bank Melli.

22. Likewise, Assa Corp. has been providing numerous services to Bank Melli in contravention of IEEPA. For example, since at least 1990, Assa Corp. has repeatedly transferred rental income generated from 650 Fifth Avenue Company to Bank Melli through Assa CO. Ltd., has regularly following Bank Melli's instructions with regard to Assa Corp.'s business affairs and its management of the investment, has regularly reported back to Bank Melli on its financial situation and business dealings, and has managed the affairs of Assa Corp. for the benefit of Bank Melli.

23. The Alavi Foundation has never received a license from OFAC to run a commercial building for the Government of Iran, to run a charitable organization for the Government of Iran, or to provide services to Bank Melli through Assa Corp. Prior to the commencement of this forfeiture action on December 17, 2008, Assa Corp. and Assa Co. Ltd. never received a license from OFAC. In addition, Bank Melli has never received a license

from OFAC relating to the Building.

**B.   The Construction of the Building by the Pahlavi Foundation**

24.   In 1973, the former Shah of Iran, Shah Reza
Mohammad Pahlavi, established the Pahlavi Foundation, a not-for-
profit corporation organized under the laws of the State of New
York, to pursue Iran's charitable interests in the United States.
In the 1970s, Iran loaned the Pahlavi Foundation, through Bank
Melli, approximately $42 million to acquire the rights to real
estate and to construct a commercial office building located at
650 Fifth Avenue, New York, New York (the Building).   Bank
Markazi, the Central Bank of Iran, loaned the funds to Bank Melli
Iran, who in turn loaned the funds to the Pahlavi Foundation.

**C.   Following the 1979 Iranian Revolution, the Pahlavi
Foundation Became the Mostazafan Foundation of New York and
a New Slate of Directors Was Installed**

25.   The Iranian revolution broke out in 1978, and in
January 1979, the Shah left the country.   On February 1, 1979,
the exiled religious leader Ayatollah Ruhollah Khomeini returned
from France to assume control of the revolution.   Khomeini
proclaimed the establishment of the Islamic Republic of Iran on
April 1, 1979.

26.   Following the Iranian revolution of 1979, the
Islamic Republic of Iran established the Bonyad Mostazafan, also
known as the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan"),
to centralize, take possession of, and manage property

-18-

expropriated by the revolutionary government.  The Bonyad
Mostazafan was created in or about March 1979 by order of the
Ayatollah Khomeini and approved by the Revolutionary Council of
the Islamic Republic of Iran, and is controlled by the government
of Iran.  The Bonyad Mostazafan sought to take control of the
Shah's property, including the assets of the Pahlavi Foundation.
The Bonyad Mostazafan reports directly to the Ayatollah.

27.   In October 1978, one of the five directors of the
Pahlavi Foundation resigned, and the four remaining directors
resigned between February 1979 and October 1979.  Four new
directors took their places.  On or about February 25, 1980, an
amended Certificate of Incorporation for the Pahlavi Foundation
was filed renaming the Foundation "The Mostazafan Foundation of
New York."  Twelve years later, in 1992, the Mostazafan
Foundation of New York renamed itself the Alavi Foundation.

28.   Soon after the revolution, the Bonyad Mostazafan
held a conference in Tehran for the directors and managers of all
of the offices of the Mostazafan Foundation worldwide.  A letter
dated November 8, 1980, from Mahmood Karimi Nouri ("Nouri"), then
the Supervisor of the Bonyad Mostazafan, to Manoucher Shafie
("Shafie"), the new president of the Mostazafan Foundation of New
York, discussed the upcoming conference.[1]  Nouri wrote that

---

[1]      This letter has been translated from Farsi.  Unless
otherwise noted, the documents discussed in paragraphs 32-40, 50-
60, 83-95, 106, and 117-118 have also been translated from Farsi.

"arrangements for the preliminary preparation of a Mostazafan Foundation seminar for the benefit of Mostazafan Foundation directors and managers of all offices inside and outside the country have been successfully completed." Because of "the difficulties regarding the attendance of our brothers' colleagues serving overseas," Nouri provided Shafie with information about the time of the conference, estimated to last 10 days. Nouri asked for the date of Shafie's and his colleagues' arrival in Tehran so that arrangements could be made "via the Ministry of Foreign Affairs regarding hotel reservations and transportation matters." Nouri concluded by recommending that Shafie "bring with you all information and issues needed to be discussed or debated in the seminar, as well as any other beneficial suggestions you have to discuss the improvement of your unit." This letter was found in a 2008 search of a New York residence owned by Bank Melli Iran. See infra paragraph 82.

29. As discussed infra paragraph 69, law enforcement conducted a search of the Alavi Foundation's offices in December 2008. During the search of the office of the Alavi Foundation's president at the time, agents found two letters, both dated October 2, 1981, from Shafie to two employees, notifying them of their termination. The letterhead at the top of each letter shows the symbol for the Mostazafan Foundation of New York, above which appears a symbol for the Islamic Republic of Iran.

-20-

30.   As discussed below, since the revolution, the
Mostazafan Foundation of New York, and later the Alavi
Foundation, have acted at the direction of, and provided services
to, entities owned and controlled by the Islamic Republic of
Iran.

**D.    In the 1980s, Iranian Government Officials Engineered the
Creation of 650 Fifth Avenue Company to Avoid U.S. Tax
Liability on the Building's Income**

**1.    Iranian Government Officials Authorized the Plan
to Avoid U.S. Taxes**

31.   In the 1980s, the Mostazafan Foundation of New
York faced a substantial tax liability as a result of the Bank
Melli debt on the Building.  The federal tax code imposes income
tax on certain income that charitable organizations earn from
business activity unrelated to their charitable missions.  The
Bank Melli mortgage on the Building caused the Foundation's
rental income from the Building to be treated as unrelated
business debt-financed income, and therefore subject to the
unrelated business income tax ("UBIT").  In order to avoid this
tax, Iranian government officials and directors of the Mostazafan
Foundation of New York devised a plan to create 650 Fifth Avenue
Company in order to remove the mortgage on the Building and free
the rental income from federal income tax.  The correspondence
and meeting minutes described below show that the plan was
discussed and approved by high-level Iranian government
officials.

32.  In 1987, Tahmasb Mazaheri ("Mazaheri") wrote to Mir-hossein Mousavi ("Mousavi") about the tax problem.  At the time, Mazaheri was the head of the Bonyad Mostazafan and Deputy Prime Minister of Iran, and Mousavi was the Prime Minister of Iran.  The letterhead bears a prior symbol for the Bonyad Mostazafan, and the top right corner states, "Bonyad Mostazafan."  Mazaheri said that he was writing "to advise [Mousavi] of a major problem of the Mostazafan Foundation of New York, namely the debt they owe to the New York branch of Bank Melli Iran."  He described the tax problem created by the debt, and described three possible solutions: first, selling the building and using the money to pay off the debt and purchase a smaller building; second, selling part of the building; and third, transferring the shares of Mostazafan Foundation to a new legal entity and creating a European company that would pay off the debt and acquire shares from the legal entity equal to the amount of the debt.  Mazaheri wrote that the third option would "obviate annual taxes and prevent some potential outcomes."  He asked for Mousavi's approval for this third option, writing: "The above circumstances were discussed in the office of brother Ghasemi, the president of the Central Bank, in the presence of brother Najafi Elmi and both promised to cooperate.  Your recommendation of this action, which will surely be beneficial to the Islamic Republic, will expedite processing this by the end of 1987 and

allow new arrangements to be made for 1988." At the time of this letter, Majid Ghasemi ("Ghasemi") was the director of the Central Bank of Iran, Bank Markazi, and Najafi Elmi ("Elmi") was the general director of Bank Melli.

        33.    In a second letter from Mazaheri to Mousavi dated November 26, 1987, Mazaheri sought the Prime Minister's approval for the above-described arrangement to avoid paying taxes. This letter also bears the letterhead for the Bonyad Mostazafan. Mazaheri wrote, "please notify us of your decision about the proposed plan for the New York Foundation's financial problems." He stated that "[t]his plan requires two actions . . . . "1. Your general agreement with the presented plan and your permission for its implementation; 2. The setting aside of $40 million to be controlled by the Foundation for a maximum of 45 days." Mazaheri further advised Mousavi that "[i]f it takes place in this current year, the Foundation will realize a tax savings of $3.5 million."

        34.    The Prime Minister's office responded to Mazaheri's request in a letter dated December 1, 1987, from Hadi Mohajeri ("Mohajeri"). In the letter, Mohajeri provided Mazaheri with the Prime Minister's authorization to go forward with Mazaheri's proposed arrangement, writing: "In reference to your letter . . . dated November 26, 1987, regarding the financial status of the New York Foundation, brother Mousavi the Prime Minister agreed with both suggestions." The letter, written on

letterhead bearing a symbol for the Islamic Republic of Iran and the words "Islamic Republic, Office of the Prime Minster," shows an internal index number of MN 8/2105.

35.   In a letter dated December 5, 1987, from Mazaheri to Ghasemi, Mazaheri requested funding for the arrangement discussed and approved in the earlier letters.   This letter also bears the letterhead for the Bonyad Mostazafan.   Mazaheri wrote: "Following our discussions and correspondences, attached you will receive a copy of the letter MN 8/2105, dated December 1, 1987, which includes the Prime Minister's instructions.   You are kindly requested to allocate $40 million which will be deposited into an account number that will be communicated to you. . . .   I guarantee that the New York Foundation will reimburse the funds within a maximum of 45 days following the initial transaction day. I should stress two important points:   First - The transaction and any communications regarding the matter should be considered confidential at all times.   Second - It has to be finalized before the end of the Christian year (God willing) in order to realize a savings of $3.5 million."

36.   The scheme to avoid United States taxes was further detailed in a letter dated March 22, 1988, from Habib Zobeidi Om-jarideh ("Zobeidi") to Mohammad Badr Taleh ("Badr"). At the time, both individuals were members of the board of directors of the Mostazafan Foundation of New York, and Badr was

-24-

the Foundation's president.  The letter bears the letterhead for
the Mostazafan Foundation of New York.  In the letter, Zobeidi
described the Foundation's tax problem and proposed several ways
to avoid paying the taxes to the United States.  He wrote, in
part, that the deadline for transferring 42 million dollars was
December 1987, but even "[t]hough we prepared everything on time
to implement our plan, and despite the efforts of the Foundation
in Iran, the transfer of money did not happen due to the neglect
of two departments."  Zobeidi further wrote, "the aforementioned
plan was presented for two reasons: 1. To avoid paying an
unnecessary and large amount of taxes to the US government. 2. To
express our concerns about possible interference by the New York
public prosecutor in the Foundation's business."  Zobeidi then
included an analysis of four solutions discussed by the board of
directors.  In his discussion of the fourth option, "Partnership
with Bank Melli Iran," Zobeidi wrote: "The probability of the IRS
agreeing with the exchange of the loan for a proportion of the
partnership share is very weak. The IRS will argue that no real
change has been made except the loan has been changed in name to
capital, with the only result being the payment of no tax. The
IRS will therefore consider it tax evasion."

        37.  In a letter dated March 14, 1989, Badr sought
Mazaheri's approval for the Foundation to enter into a long-term
lease as a solution to its financial problems.  Badr wrote, in

-25-

part: "I am certain that the inevitability of the payment of the
Bank Melli loan and resolving the Foundation's financial problems
are in my respectable brother's mind."  He further stated that
"[t]he inability to find a tax solution through a partnership to
sell the building" was an obstacle "to resolving the Foundation's
tax issue," but that "another solution was realized and a real
estate broker made an offer for the Foundation Building's long-
term rental."  Badr proceeded to outline the benefits of agreeing
to a long-term lease.  He concluded by requesting the Bonyad
Mostazafan's approval: "The above matters and the attached report
have been reviewed thoroughly and agreed upon in the presence of
the Foundation's independent auditor and Zobeidi and Hesami in
Germany.  Therefore, it is requested that the Board of Trustees
advise if this plan's legal protocol may be followed."  At the
time of this letter, Seyed Mojtaba Hesami Kiche ("Hesami") was a
member of the Board of Directors and the board secretary for the
Mostazafan Foundation of New York.

          38.  Badr's long-term lease proposal, however, was
rejected.  The Iranian Government instead approved a partnership
between the Mostazafan Foundation of New York and Bank Melli to
solve the tax problem.  Meeting minutes, dated May 24, 1989, on
letterhead for the Bonyad Mostazafan, describe a joint meeting
held in Tehran that was attended by Eisa Shahsavar Khojasteh
("Khojasteh"), Mohammad Hossein Behdadfar ("Behdadfar"), Mohammad

Reza Moghaddasi ("Moghaddasi"), and Badr.  At the time of this
meeting, Khojasteh was the Assistant Director of Commerce and
International Affairs for the Bonyad Mostazafan, and Behdadfar
was a Bank Melli board member.  The meeting minutes describe
actions to be taken in regard to the scheme to avoid United
States taxes.  The meeting minutes, which were signed by all four
participants, stated, "1- One Bank Melli Iran company will
partner with the New York Foundation.  2- The contribution of
Bank Melli Iran was set at 35% . . . 3-  The price of the
building, considering all factors, was set at $135 million as the
basis of the partnership.  4- As part of the mutual agreement
between the New York Foundation and Bank Melli Iran, the New York
Foundation agrees to pay taxes, if the building is sold or
transferred, up to the amount of $130 million; if more than $130
million, Bank Melli Iran will pay the taxes on the balance.  5-
Bank Melli Iran created two partnerships in Jersey Island . . .
and will cooperate with the New York Foundation through other
partners.  6- All actions to complete to the partnership should
be finalized by the end of June 1989.  In the meantime, a
representative from Bank Melli Iran should supervise the plan."

        39.  In a letter from Khojasteh to Mohammad Bagherian
("Bagherian"), dated August 19, 1989, Khojasteh requested
approval of the partnership agreement between the Mostazafan
Foundation of New York and Bank Melli Iran.  At the time,

Bagherian was the head of the Bonyad Mostazafan.  The letterhead
shows a symbol for the Bonyad Mostazafan and states, "Bonyad
Janbazan." Khojasteh wrote, in part: "As you know, the
partnership agreement between the Mostazafan Foundation of New
York and Bank Melli Iran has been concluded and was sent to the
New York Attorney General for final approval. . . . The board of
trustees of the Mostazafan Foundation support the partnership
agreement, but to avoid any problems in the future, we would like
to ask you to endorse the partnership and notify the trustees so
they can take action . . . . Please note the partnership is based
on prior agreements between the Ministry of Finance, Bank Melli
Iran, and the Bonyad Mostazafan, with the only change being the
building will be valued at two million dollars less than as
previously agreed . . . . [I]t was decided to set the value of
the building at $128 million and the share of Assa Company (Assa
Co., which belongs to Bank Melli, is the partner of the
Mostazafan Foundation) at $44,800,000, thus Bank Melli will earn
$200,000 in cash."  The letter indicates that a copy was sent to
Badr.

        40.  In a telex dated February 2, 1990, which was found
in a search of a residence owned by Bank Melli (see infra
paragraph 82), Mohammad Karjooravary ("Karjooravary") wrote to
Gholamreza Rahi ("Rahi") about the history of the formation of
650 Fifth Avenue Company, and he confirmed that the Bonyad

Mostazafan was involved in the process.  At the time,
Karjooravary was a director of Bank Melli's New York office, and
Rahi was an employee in Bank Melli's Overseas Network Supervisory
Department.  Karjooravary wrote that "the settlement of the
$42,000,000 loan was done for two important reasons," which were
"the delay in payment of the loan installments and inability of
the Foundation to repay the loan," and the "the Foundation's tax
problem, specifically -- because the Foundation's principal was
mortgaged, and from the IRS point of view was not exempt from
paying taxes like other non-profit organizations -- the
Foundation had to pay $3,000,000 annually in property taxes out
of the rental income of the building."  He further wrote:  "[T]o
solve the problem of this loss for the bank and the Foundation,
many plans were considered. The last practical plan was to find a
company who was ready to pay off the bank's loan in exchange for
becoming a partner in the Foundation's building and revenue. In
this context, after ample study at the New York Foundation, the
Central Office of the Foundation, and Bank Melli in Tehran, it
was decided to form a company called Assa Channel Islands which
would be financed by the bank and under direction of Mr.
Behdadfar and Mr. Kakavand."  Based upon information and belief,
Karjooravary's reference, in the February 2, 1990 telex, to "the
Central Office of the Foundation" was a reference to the central
office of the Bonyad Mostazafan.  At the time, Behdadfar was a

-29-

Bank Melli board member and Mohsen Kakavand ("Kakavand") was a manager for Bank Melli, based at Bank Melli's London branch.

### 2.    The Formation of 650 Fifth Avenue Partnership

41.   Having received approval from the Islamic Republic of Iran for the formation of a partnership with Bank Melli, the Mostazafan Foundation of New York entered into a written Partnership Agreement with Assa Corp. on or about July 31, 1989.

42.   The Partnership Agreement provided, in part, that the partnership would be called 650 Fifth Avenue Company, that the Foundation would contribute the Building to the Partnership, and that Assa Corp. would contribute $44.8 million to the capital of the partnership. As a result of this partnership, the debt on the Building was removed, relieving the Alavi Foundation of U.S. taxes on revenue from the Building.

43.   During the formation of the partnership, the Alavi Foundation concealed Bank Melli's control of Assa Corp. from its own counsel and from the New York State Attorney General.   In a letter dated September 21, 1989, an Assistant Attorney General for New York State wrote to an attorney at a New York law firm acting as outside counsel for the Alavi Foundation, to confirm a conversation about the Alavi Foundation's proposed transfer of real property to the partnership.   The Assistant Attorney General asked for additional information, including "documents identifying the officers, directors, and the principals of Assa

-30-

Corp. . . . along with certificates of incorporation and a
statement of any personal or business relationship between those
persons and the foundation."

44.   In a letter dated September 25, 1989, Alavi's
counsel responded that the officers of Assa Corp. were Behdadfar,
President; Kakavand, Treasurer; and Peter Livingston, secretary,
and that the directors were Behdadfar and Kakavand.  The letter
further stated that the sole shareholder of Assa Corp. was Assa
Co. Ltd., and that Behdadfar and Kakavand were the sole
beneficial owners of Assa Co. Ltd.  Alavi's counsel reported
that, to the best of counsel's knowledge, "there were no pre-
existing agreements or understandings between any director,
officer or principal of Assa Corp. and the Foundation."  The
letter did not disclose Behdadfar's and Kakavand's affiliation
with Bank Melli.

45.   On September 29, 1989, the Assistant Attorney
General requested that Alavi's counsel state whether the
transaction was arms-length.  On October 4, 1989, Alavi's counsel
responded that "the formation of the Partnership represents an
arms-length transaction between the Foundation and Assa Corp."

46.   On October 11, 1989, Badr executed a verified
petition, in New York State Supreme Court, for leave to transfer
the Building to the newly created 650 Fifth Avenue Company.  In
the petition, Badr explained that the purpose of the Partnership

was to relieve the Alavi Foundation from the mortgage and to eliminate the unrelated business income tax. Badr stated that the other investor in the partnership was to be Assa Corp., that the sole shareholder of Assa Corp. was Assa Co. Ltd., that Assa Co. Ltd. was beneficially owned by Behdadfar and Kakavand, that neither of these two individuals exercised any control over the Foundation's activities, and that the formation of the partnership represented an arms-length transaction between the Foundation and Assa Corp.

47. Today, the two straw owners of Assa Co. Ltd. are Davood Shakeri ("Shakeri") and Fatemeh Aghamiri ("Aghamiri"), who are residents of Iran and represent the interests of Bank Melli. Financial statements for Assa Co. Ltd. state that Shakeri and Aghamiri each own 50% share capital of the company.

**E.    The Iranian Government Has Continued to Exert Control Over the Mostazafan Foundation of New York/the Alavi Foundation**

**1.    In 1991, the Islamic Republic of Iran Changed the Board of the Mostazafan Foundation of New York**

48. Even after the formation of the Partnership, the Iranian Government continued to control the Alavi Foundation, and the Alavi Foundation continued to serve the Iranian Government.

49. As reflected in the documents described below, in the early 1990s, control over the Mostazafan Foundation of New York shifted from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations. In 1989, Kamal Kharrazi ("Kharrazi")

-32-

became the Iranian Ambassador to the United Nations.  After

assuming his duties as Ambassador, Kharrazi informed Badr that

Kharrazi was the representative of the Supreme Leader and that

all Iranian entities in the United States were under his control.

As a result of tension between Kharrazi and Badr, Kharrazi

eventually demanded Badr's resignation.

       50.  In a letter dated May 7, 1991, Badr, Hooshang

Ahmadi Javadi ("Ahmadi") (Badr's assistant and a member of the

board of directors of the Mostazafan Foundation of New York), and

Hesami (the board's secretary and a member of the board), wrote

to the Ayatollah that they would resign pursuant to his

instructions, which were conveyed through Mohsen Rafighdoost

("Rafighdoost").  At the time, Rafighdoost was the head of the

Bonyad Mostazafan.  The letter, which was signed by Badr, Ahmadi,

and Hesami, stated, in part:

> Your directives regarding the replacement of the
> undersigned - Dr. Seyed Mohamad Badr-Taleh, Executive
> Director and member of Board of Trustees; Doctor
> Hooshang Ahmadi Javadi, Assistant to the Executive
> Director and member of the Board of Trustees; and Seyed
> Mojtaba Hesami Kiche, Secretary and member of the Board
> of Trustees - were submitted through your
> representative, Mr. Haj Mohsen Rafighdoost of the
> Mostazafan and Janbazan Foundation.
>
> In obedience to the Supreme Leader's directives, we
> herewith announce our readiness to resign our posts of
> responsibility at the Mostazafan Foundation of New York
> and our wholehearted willingness to cooperate with
> forthcoming changes in compliance to laws pertaining to
> non-profit organizations in America under legal
> directives of the Attorney General of New York.

> Therefore, in consultation with the honored brother
> Rafighdoost and until the replacement of brothers
> appointed by the Supreme Leader is officially
> announced, we submit our readiness in carrying out our
> responsibilities as before, lest God forbid the
> Foundation's interests suffer a loss. Thankfully in the
> past years, under the worst and most sensitive of
> political conditions between America and Iran, we have
> succeeded in fully protecting and expanding the
> Foundation's interests which in truth belongs to the
> people of Iran. We were also able to successfully carry
> out cultural and Islamic activities in the country of
> the Great Satan which faced an excessive void in the
> area of Islamic teachings due to the non-representation
> of the Islamic Republic of Iran.

51.   The letter proceeded to describe many of the

services that had been carried out by the Mostazafan Foundation

of New York, and concluded by stating, "Our hope is that these

activities will further improve and develop under the supervision

of your Excellency and respected representative in the Mostazafan

and Janbazan Foundation."

52.   On or about May 16, 1991, the board of directors

of the Alavi Foundation held a meeting at a hotel in Zurich,

Switzerland to discuss the composition of the board.   According

to the meeting minutes, the following board members attended:

Badr, Mohammad Pirayandeh ("Pirayandeh"), Ahmadi, and Hesami. The

meeting was also attended by Rafighdoost (head of the Bonyad

Mostazafan), Karim Sobhani ("Sobhani"), and Mahmoud Askari

("Askari").   At the time, Sobhani was Advisor and Director

General of the Regional and International Chairmanship of the

Bonyad Mostazafan, Askari was the supervisor of the Tehran office

-34-

of the Mostazafan Foundation of New York, and Pirayandeh was a
member of the board of directors of the Mostazafan Foundation of
New York.  The minutes reveal that Rafighdoost explained the
changes to be made to the board of directors "as directed by the
Supreme Leader," and that with the exception of Pirayandeh,
"other members . . . are to resign."  The new members were Mehdi
Hodjat ("Hodjat"), Ali Ebrahimi ("Ebrahimi"), Mir-sadegh
Mirakhoor ("Mirakhoor") and Seyed Sadr Hanini ("Hanini").
"[N]oting the length of time taken for new legal nominations and
the transition of new members, brother Rafighdoost directed the
present members to vigilantly continue their duties as before."
The minutes show that other issues, in addition to the board
changes, were addressed, and that "decisions were made
accordingly."  These issues included management of the Building.
The minutes show, for example, the following topics that were
discussed relating to the Building:

> "Building 650 - Report of the Executive Directors
> regarding the status of the building, its office
> floors, and retailers was read.  The Directors very
> much appreciated the way in they have executed their
> duties, in particular regarding the collection of $5.5
> million from one of the [tenants]."

> "Regarding the payment of the income share of Assa
> Corporation . . . the Foundation is to take action in a
> timely manner and the Executive Directors are to settle
> the accounts with the said corporation every three
> months."

In addition, the Board discussed a number of issues relating to
the charitable services of the Foundation.

53.   The Alavi Foundation maintained an English-language version of minutes for a board meeting held at a hotel in Zurich on May 17, 1991.  These minutes reflect the resignations of Badr, Zobeidi, and Hesami, but do not mention the reason for the resignations.  This version also does not reflect the presence of any non-board members, such as Rafighdoost.

54.   A letter dated May 24, 1991, from Badr to Sobhani, describes a meeting in which Kharrazi informed Badr that the Foundation would now receive direction from Kharrazi, rather than the Bonyad Mostazafan.  The letter, which was written on letterhead for the Mostazafan Foundation of New York, stated, in part:

> Yesterday (05/23/1991) at 4:30 p.m. brother Kamal Kharrazi called me and brother Shafie to his office and the following subjects were discussed. The summary of these subjects are being forwarded to you for your review and to obtain your opinion.
>
> He said: "I (Mr. Kharrazi), with the order from Haj Agha in hand, am directly responsible for the Foundation and am the Managing Director of the Board of Trustees," and in accordance with this change all actions taken in direct relation to this subject will be taken under his supervision, Mister Kharrazi's. Therefore, I (Mohammad Badr) have no further need to obtain your or Haj Agha Rafighdoost's permission. Thus, in principal, the Foundation is from here on out is under the oversight of Haj Agha, not Mr. Rafighdoost.
>
> From a legal and administrative point of view, I am employed by the Foundation's Board of Trustees. As the Board of Directors has issued directives for changes to take place as determined, please, inform me of my duties as soon as you can. Should I await your advice, or should I take direction from Mister Kharrazi?

. . . . Brother Kharrazi said to me that from now on, the role of the Managing Director and the role of the Board of Directors will be just a formality and he will be conducting all of its [Foundation's] affairs. You are well aware that it is impossible for a weak executive director – or Mr. Kharrazi himself, who lacks the experience, knowledge, time, or business savvy (as he deals in politics) – to properly carry out the affairs of a $150 million business organization in such an unfriendly and complex atmosphere as America. In any case, these gentlemen are to be held responsible for any breach of the Foundation's business administration; I refuse to be held accountable in this matter.

55. In the letter, Badr warned that "Mr. Kharrazi's involvement poses a great danger to the Foundation." He concluded the letter by asking Sobhani for direction: "Regarding resolving the issue of what to do with the changes under Mr. Kharrazi, please let me know as soon as possible. Am I to wait for your letter and suggestions, or should I follow his directions?"

56. In a letter dated on or about May 30, 1991, on letterhead for the Mostazafan Foundation of New York, Badr wrote to the Ayatollah that he had followed the Ayatollah's "directives concerning [Badr's] resignation from the Mostazafan Foundation of New York, as stated in a letter presented to [the Ayatollah] by . . . Rafighdoost and determined by the minutes composed in the presence of brother Rafighdoost." He wrote that the final meeting of the Mostazafan Foundation's board of directors would be held on August 21st and 22nd. Badr further wrote that, although the decision had been endorsed by Rafighdoost, Kharrazi

-37-

had tried to obtain Badr's resignation and that of other members of the Board "by resorting to a channel unacceptable by the laws and regulations governing non-profit organizations in America." Badr cautioned that Kharrazi's interference posed a threat: "Although brother Kharrazi's appointment to a position of responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader has made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects." Badr wrote that another letter, addressed to Kharrazi, was attached to this letter.

57.   The attachment is a letter from Badr to Kharrazi, and is also dated May 30, 1991 and written on letterhead for the Mostazafan Foundation of New York.   Therein, Badr warned Kharrazi that the pressure he was exerting on board members to immediately resign, without following New York State protocols, may cause problems for the Foundation.   He wrote that, after receiving notification from the Ayatollah through Rafighdoost, three Board members--Badr, Ahmadi, and Hesami--"had immediately submitted [their] resignations to him and brother Rafighdoost."   Badr further wrote that, in order for a "proper and lawful transition" of the board members to occur, a meeting had been scheduled for August 20 and 21, 1991, in Tehran.   Badr advised that Kharrazi's pressure for their immediate resignation posed a risk:

"Unfortunately, your attitude towards the Foundation and my
person during our two meetings - specifically the meeting held on
Wednesday - had suffered changes. Your insistence on my immediate
resignation and that of other members of the Board of Trustees
will result in unfavorable ramifications for the Foundation. Dear
brother, the danger posed by your direct interference in the
affairs of the Foundation, in view of the very dire political and
security atmosphere in America, is not hidden to all; God forbid
it should cause numerous problems for the Foundation. . . .
However, we will all wholly abide by this decision as it was made
through the judgment, wisdom and insight of the Supreme Leader,
and are assured that he arrived at a favorable resolution by
considering all aspects of this matter. . . . I therefore once
more announce my sole obedience of the Supreme Leader's orders,
but will continue to carry out the daily affairs, preparing for
the final transition of the Board of Trustees and the individual
in charge of the Foundation, until the meeting of the Board of
Trustees on August 20th and 21st 1991 in Tehran. I will then, with
the official appointment of the new members per the regulations
of all non-profit companies in America, submit my post. . . .
Once more, I reiterate that I have presented, in written and
verbal form, all the problems and dangers associated with
changing 80 percent of the members of the Board of Trustees and
that dear brother's official and unofficial interference, to you

-39-

and the brothers in charge of the Mostazafan and Janbazan
Foundation, and acquit myself of all responsibility from future
dangers."  The letter indicates that it was copied to the Supreme
Leader, Rafighdoost, Sadegh Kharrazi, and the Mostazafan
Foundation's Board of Trustees.  Sadegh Kharrazi is Kamal
Kharrazi's brother.

   58.  In a letter dated June 3, 1991, Badr updated
Sobhani about issues concerning the change of the board of
directors, stating, "As far as I know, Brother Sadegh Kharrazi
has already interviewed three Iranian employees of the
Foundation; in short, he is trying to make the point that
hereafter he is to be considered the Foundation's employees'
point of contact and the Foundation will operate under the
Iranian Mission office."  In addition, individuals who had
protested Badr's resignation to Sadegh Kharrazi and Kamal
Kharrazi were told that the office of the Ayatollah had made
these changes and that "from this point forward the affairs of
the Foundation . . . will be the responsibility of Messrs. Kamal
and Sadegh Kharrazi."  Badr further wrote that Kamal Kharrazi and
Sadegh Kharrazi had "told almost everyone that they will be
directly responsible for the Mostazafan Foundation of New York
and will not only control its activities, but supervise it as
well. "  He further wrote that, "[i]n any case, if Mr.
Rafighdoost orders my relief and acquits me from future

-40-

ramifications, I will be more than happy to willingly and
immediately comply. Otherwise, please let me know how to
proceed." Badr again warned about the threat posed by Sadegh
Kharrazi and Kamal Kharrazi, stating: "I am afraid that these
gentlemen have knowingly created a situation that will beyond a
doubt jeopardize the Foundation in the future and involve the
security authorities and the Attorney General."

     59. In his letter, Badr warned about the potential
dangers of a connection between the Foundation and the Islamic
Republic of Iran:

> It should be noted that I and members of the
> Foundation's Board of Trustees have frequently signed
> affidavits addressed to American authorities - whether
> the Attorney General, legal courts, tax office, or the
> FBI - stating that the Foundation is independent and
> devoid of any connection to the Government of Iran and
> the Iranian Government's qualified authorities.
>
> If this issue, which has created a connection between
> the Foundation to Government of Iran and is surely
> known to the American authorities, is deemed a
> violation and causes actions to be taken against the
> Foundation, I and the other members of the Board of
> Trustees, in particular brother Hesami, the Secretary
> of the Board of Trustees, will be culpable of a heavy
> offence. Therefore a solution needs to be thought of
> for us.

He concluded the letter by saying that he was awaiting Sobhani's
"directives."

     60. According to meeting minutes dated July 7, 1991,
Rafighdoost, Badr, Shafie, Sobhani, Hesami, Askari, and
Pirayandeh attended a meeting, "[p]er directives of the Supreme

Leader, . . . to discuss changes of a few individuals in charge
of the Mostazafan Foundation of New York." At the meeting, Badr
explained "the possible dangers associated with the . . .
interference of Dr. Kharrazi in the affairs of the Mostazafan
Foundation of New York," and then resigned his post.

61. In or about August 1991, Badr ceased working for
the Mostazafan Foundation of New York and was replaced by
Mohammad Geramian ("Geramian").

### 2. Meetings Between the Iranian Ambassador and Members of the Alavi Foundation's Board of Directors in the 1990s and early 2000s

62. After Badr's resignation, Kharrazi and his
successors continued to direct the affairs of the Mostazafan
Foundation of New York.

63. For example, Kharrazi (Ambassador from in or about
1989 through in or about August 1997) and Seyed Mohammad Hadi
Nejad Hosseinian ("Hosseinian") (Ambassador from in or about 1998
through in or about summer 2002) both attended Board meetings.
Hosseinian originated the idea, which the Alavi Foundation
adopted and continues to follow, of using a "one-third" formula
to fund projects; under this formula, recipients of funding for
building projects obtain one-third of the necessary funds from
the local community, one-third is a grant from the Alavi
Foundation, and the final third is a loan from the Foundation.

64. Bank Melli officials also acknowledged the

-42-

Ambassador's control over the Alavi Foundation.  In the late
1990s, two Bank Melli employees, Ghafour Memarzadeh
("Memarzadeh") and Rahi, met with Kharrazi in his office to
request permission for Assa Corp. to sell its interest in
650 Fifth Avenue Company.  Kharrazi informed them that the
Building would be sold when the real estate market improved.

       65.  In or about 2001, Geramian met with Javad Zarif
("Zarif"), Mazaheri, and other high-level Iranian government
officials in Iran.  Zarif was the Iranian Ambassador to the
United Nations from in or about August 2002 through in or about
July 2007 and, at the time of this meeting, Mazaheri was the
Finance Minister for Iran.  As explained <u>infra</u> paragraphs 78
through 81, Zarif influenced the settlement of a lawsuit brought
against the Foundation in 2004.

> **3.  Meetings Between the Iranian Ambassador and
> Members of the Alavi Foundation's Board of
> <u>Directors in 2007 and 2008</u>**

       66.  The Alavi Foundation eventually became more
discreet when interacting with the Ambassador.  In or about July
2007, Farshi Jahedi ("Jahedi") replaced Geramian as president of
the Alavi Foundation.  That same month, Mohammad Khazaee
("Khazaee"), assumed responsibilities as the new Iranian
Ambassador to the United Nations.

       67.  Jahedi and Khazaee periodically met alone, in a
closed room, at 55-11 Queens Boulevard, in Queens, New York,

after which Jahedi generally met with the Board.

68.   Jahedi and Khazaee also met at the latter's residence in New York.  As explained below, handwritten notes made by Jahedi and Ebrahimi reveal that they participated in a meeting with Khazaee and Mehdi Faridzadeh ("Faridzadeh") at Khazaee's residence on or about October 5, 2007--just a few months after Jahedi became president.  Faridzadeh previously had been the cultural ambassador for the Iranian Mission to the United Nations.  During this meeting, Khazaee addressed issues relating to the Building's management and the Foundation's charitable services.

69.   On December 19, 2008, a United States Magistrate Judge for the Southern District of New York issued a search warrant of the Alavi Foundation's offices at 500 Fifth Avenue in New York, New York.  During the search, federal agents recovered, from Jahedi's office, handwritten notes of the October 5th meeting.  These handwritten notes, translated from the original Farsi, are written in the first person of the speaker.

70.   According to these notes, Khazaee discussed commercial aspects of the Building and the charitable activities of the Foundation.  He stated, among other things, that it was necessary to increase the profit from the Building, that he was worried about Assa Corp.'s 40 percent share, that the Foundation should only allocate grants to Shiites, and that Khazaee would

-44-

determine the composition of the board of directors.  Regarding

the composition of the Board, Khazaee further stated that Jahedi

should "stay at work" and "not resign," that the size of the

Board could go up to seven, and that someone else would be

appointed instead of Ali Afshar ("Afshar").  At the time, Afshar

was on the board of directors of the Alavi Foundation.

71.  In addition, Khazaee ordered the preparation of a

study about the possibility of increasing the Foundation's

revenue and profit, and stated that an economic strategy business

plan and comparative analysis needed to be done.  He further

instructed that, "I have to definitely see the proposed

allocations before a final decision is reached. I have to be kept

informed and I have to be able to state my opinion in order for

you to make a decision . . . ."

72.  Regarding future meetings, Khazaee stated that,

"[m]aybe we will see each other once every three to 6 months,"

that "[c]ontact with him . . . has to be increased" to "[o]nce

every one or 2 months," and that "I don't believe we should

constantly interfere, but we have to be kept informed regarding

the general on goings and allocations because we will be held

responsible."  He further stated that, "[i]f there is an issue

that needs to be conveyed to Tehran, let me know, I will convey

it."

73.  According to Jahedi's notes, Faridzadeh then

spoke, and stated, among other things, that "[t]he lack of firm decision-making has stopped progress in the past," and that "[p]rotecting the foundation is the main objective."

74.   Jahedi's notes consist of eight handwritten pages numbered in the upper right-hand corner.   An English translation is below (italicized words were written in English in the original):

> (*Board Meeting*) *1.5*                    *10/05/07*      *1*
>      *October*
>
> -   Two dimensions of the job are here and there. We
>     have to take it into consideration..
>
> -   Khazaee-The goals are rightfully our
>     responsibility-they should not mar our work.
>
> -   This is the right way for the programs you are
>     currently working on.
>
> -   General debate, I am responsible: I have mentioned
>     Dr. Jahedi
>
> -   Increasing the profit from the building is
>     necessary
>
> -   Not satisfied with the allocations/endowment/
>     Public Treasury
>
> -   If you find it necessary, then only to the point
>     of absolute necessity
>
> -   He was worried about the 40% share
>
> -   Refraining from allocations to bad locations, and
>     supervision, or absolute necessities
>
> -   Should only allocate to Shiites.
>
> -   Cultural Assembly was also mentioned-Act only
>     based on necessity.

\*      The Cultural Assembly should have the Executive
       power under my supervision for whatever is
       practical from the Executive point and we will
       hand it to you.

                                                          *2*

-      The Cultural Assembly cannot give it to you and
       ask you to act on it.

-      I have spoken to a couple of  the gentlemen who
       were there before

-      If acquired I will write a by-laws so the cultural
       assembly will be my cultural guidance and we would
       act based upon the reality of the availability of
       funds while at the same time other people's
       expectations would be lowered.

-      For the IEC programs we may act on two cases as
       pertaining to our own goals.

-      Someone is going to be elected instead of Afshar.

-      The composition of the Board of Trustees =
       Whatever I decide should be approved and it should
       not be otherwise.

-      The esteemed Members of the Board of Trustees are
       experienced, religious, and dedicated. I have no
       doubt about that unless proven otherwise.

                                                          *3*

-      I don't see a need for change- despite the fact
       that the gentlemen are taking a risk and it is not
       an easy thing to do.

-      They never used to receive a penny for attending
       the meetings.

-      I thought that the number of the board members can
       be changed from 5 to 7 if necessary.

-      There is no need for change and it would not be to
       our benefit.

-      Stay at work and do not resign. We will appoint
       someone else instead of Afshar and we can go up to
       7, for now we will not change the composite, if

                        -47-

you are tired stay longer. Follow the same trend
and plan.

- Important point  observe righteousness regarding
  his allocations

------ . ------- . ------ . ------ . ------ . ------

- I see the presence of Jahedi as a privilege /
  Mashad/Kashmar/Rasht/Tehran

* Prepare a study regarding the possibility of
  increasing revenue and profit.

                                                    *4*
- Set aside a budget for the building to bring it up
  to par

- An economic strategy *business plan* and also a
  *comparative analysis* have to be done.

* Transparency of issues/ legal issues should stop
  being a legal monopoly.

- Use the prominent ones- it will definitely result
  in your suggestion.

* The last statement of obligations
( See the ones done in *March* and give my opinion *)
(- some of the obligations have to be adjusted-and
  then reviewed)

- I have to definitely see the proposed allocations
  before a final decision is reached.

  I have to be kept informed and I have to be able
  to state my opinion in order for you to make a
  decision.....

                                                    *5*
- Maybe we will see each other once every three to 6
  months.

- Contact with him-has to be increased
  Once every one or 2 months.

- I don't believe we should constantly interfere,
  but we have to be kept informed regarding the

general on goings and allocations because we will be held responsible.

-   And I will discuss it with the Board of Directors.

-   If I have a personal opinion about something I will discuss it.

-   If there is an issue that needs to be conveyed to Tehran, let me know, I will convey it.

-   A legal format for *ASSA* has to be thought of. *Morgage [sic]* is acceptable.

6

Faridzadeh

1-  Previous problems were slow work progress. The lack of firm decision-making has stopped progress in the past.

-   Cultural priorities

-   The issues we are facing have to be resolved immediately in order to have more time

-   Protecting the foundation is the main objective.

Khazaee - I have made suggestions, you and I will work on it

-   Your *approach* regarding the committees has been mostly in planning.

-   The idea that the members of the Board of Trustees would develop a cultural strategy as the most dedicated
    What is your opinion about providing and using this small amount of money?
    This will help me to submit something to Tehran to benefit Islam.

7

-   We have to mix the Cultural Assembly with the

-49-

religious [Assembly], and forget about who will be
overseeing each one.

- What are you doing to safeguard the interests of
the regime and Islam, if you want to defend them,
what is your opinion?

- We need your opinion in relation to the cultural
strategy

- I will establish a cultural Assembly and it will
operate under my supervision-there should be no
misunderstanding; it does not oversee the members
of the Board of Trustees, and it should not be
overseen by the members of the Board of Trustees
either. Maybe we will have dinner together.

- I have it--you also have it   then we will work
from within- because you are more familiar with
the realities of this job.

8

- A mixture of both will help.

- Because you give your suggestion while being
realistic-the Cultural Assembly gives their
opinion while being impartial.

- The argument between the Assembly and you is my
responsibility.
___

75.  Handwritten notes taken by Ebrahimi reveal that
the meeting took place at the Ambassador's residence and confirm
what was said at the meeting.  Ebrahimi, who has been a member of
Alavi's board of directors since approximately 1992, serves as
the board's secretary, and his responsibilities include keeping
minutes at Alavi board meetings.  On May 11, 2009, a United
States Magistrate Judge sitting in the Eastern District of New
York issued a search warrant pursuant to Rule 41 of the Federal

Rules of Criminal Procedure, authorizing law enforcement agents to seize "any and all journals covering the period of 1992 to the present," at Ebrahimi's residence and office.  Pursuant to this warrant, law enforcement agents seized a number of journals from Ebrahimi's office and residence.

76.  One of the journals is marked on the front "FALL 07."  This journal contains handwritten notes of the October 5th meeting.  These notes confirm that Khazaee spoke at the meeting about, among other issues, increasing profit, Bank Melli's 40 percent interest (written, in Farsi, as "40% shares → [scratched out] → Bank Melli →"), increasing the composition of the Board from 5 to seven members, Afshar's position on the Board, and a cultural council.

77.  On September 8, 2008, federal law enforcement agents observed Jahedi visiting the Ambassador's residence, located at ███████████████████████████.  Jahedi entered the residence at approximately 7:16 p.m., and exited at approximately 10:45 p.m.

### 4.    The Ambassador's Role In Settling The Hanif Partnership Lawsuit

78.  On or about February 18, 2004, Hanif Partnership ("Hanif"), a New York partnership, filed a lawsuit against Assa Corp., Assa Co. Ltd., and the Alavi Foundation, in the Supreme Court of the State of New York, for breach of contract and tortious interference with contract.

-51-

79.  According to Hanif's complaint, in September 2003 Assa Corp. and Assa Co. Ltd. entered into an escrow agreement and a letter of intent with Hanif for the sale of Assa Corp.'s 40 percent interest in 650 Fifth Avenue Company for $41.2 million (which, according to the complaint, was well-below the market price of $73.88 million).

80.  The complaint alleged that, in November 2003, Geramian met with Hanif's principal, Hossein Mahallati ("Mahallati").  (Mahallati was the president of the Mostazafan Foundation of New York from in or about 1983 through in or about 1987.)  According to the complaint, Geramian informed Mahallati that the Alavi Foundation would not accept any new partner.  At a second meeting in December 2003, Alavi, through its counsel, "repeated that it would not allow any entity or person to purchase Assa's Partnership Interest," because the Foundation "was concerned that a new partner might some day inform the Attorney General of the State of New York that Alavi was mismanaging or even wasting its assets and could seek involuntary judicial dissolution of the Alavi Foundation."  <u>Hanif Partnership v. Assa Corp. et al.</u>, Complaint ¶ 33.  The complaint alleged that Assa Corp. and Assa Co. Ltd. breached the letter of intent by failing to execute a purchase and sale agreement, and that Alavi through its conduct tortiously interfered with the agreement.

81.  The Alavi Foundation settled the lawsuit in or

about December 2004.  The Foundation decided to settle because
Mahallati threatened to reveal in open court what he knew about
Assa Corp.'s true ownership, and because Zarif (the Ambassador
from in or about August 2002 through March 2007) told the
Foundation to settle the lawsuit for $4 million.

**F.    After Badr's 1991 Resignation, the Alavi Foundation
       Continued to Handle Issues Relating to Bank Melli's Interest
       in Assa Corp.**

> **1.    Negotiations Between the Alavi Foundation and Bank
>         Melli Over Real Estate Taxes and Moneys Owed to
>         Bank Melli**

82.  On or about February 4, 2008, the New York State
Supreme Court issued a search warrant for a residence owned by
Bank Melli (the "Bank Melli Residence"), located in Forest Hills,
New York.  Law enforcement executed the search on or about
February 6, 2008.

83.  Documents found during the search show that, on or
about August 25, 1992, Geramian (Alavi's president from in or
about 1991 through in or about summer 2007), met with high-level
Bank Melli employees in Tehran to discuss two issues facing the
Partnership: the real estate taxes owed by the Partnership, and
$2.2 million that the Partnership owed to Assa Corp.  The minutes
for this meeting reflect the attendance of Geramian, Rahi,
Karjooravary, Siavash Naghshineh ("Naghshineh"), and Mohsen
Ghadimipour ("Ghadimipour") and contain the signatures for these
attendees.  At the time, Naghshineh was a member of the board of

directors of Bank Melli, and Ghadimipour was in charge of Bank
Melli's foreign affairs.  These minutes state, in part, the
following:

> Due to the fact that the aforementioned partnership is
> in need of a $1.7 million loan - a loan to be financed
> by Bank Saderats, New York Agency - for the payment of
> unpaid real estate taxes, and in order to obtain this
> loan according to the contents of the mutual contract,
> it is necessary for Assa Corp. New York to declare its
> agreement in writing.  On the other hand, the
> partnership owes Assa Corp. New York the amount of $2.2
> million.  This is for the prior collected rentals, and
> the lack of timely distribution of the partner's share,
> a deviation from section 2, article 6 of the below
> contract's contents.  Following negotiations in New
> York between the banks' delegates and the Alavi
> Foundation representatives - and recognizing the
> opportunity created by the presence of Dr. Geramian,
> the Director General of the aforementioned Foundation,
> in Tehran - by prior invitation, a meeting was held in
> the office of Mr. Naghshineh, who is the esteemed
> member of the Board of Directors of the Bank Melli of
> Iran, with Dr. Geramian and Mr. Rahi, the Head of
> Overseas Network Supervisory Department, Mr.
> Karjooravary, the Head of Bank Melli of Iran's New York
> Branch, and Mr. Ghadimipour, in charge of the Bank's
> Foreign Affairs, at 10:00 AM on Tuesday, August 25,
> 1992.  The subject of this meeting was a discussion of
> the above two principal topics and the partnership
> scheduling of repayment of the delayed debt, whose
> exact amount is being calculated and determined, to
> Assa Corp.
>
> Mr. Naghshineh started out the meeting by giving a
> brief history of the partnership, indicating that the
> Bank, in order to save the Foundation and prevent it
> from paying $3 million in annual taxes, despite the
> fact that within the Bank there were individuals
> opposed to the Bank entering this partnership, signed
> the contract . . . .
>
> Dr. Geramian emphasized the advantages of the
> principles of the partnership between the Foundation
> and the Bank and advised that since he had assumed the
> position of the Managing Director, he has tried to set

aside Assa Corp's share every month and from January of
this year to the present he has paid this share . . .

While he understood the Bank's situation as a
financial institution, he indicated that at the
present time there is no possibility of repaying
the unpaid debt; despite the reduction of
expenses, the total income of the Foundation from
the partnership is $375,000 dollars a month and
the current expenses are about $425,000 on a
month. . . . He requested the Bank reduce the
pressure and give a grace period for the repayment
of the unpaid debt.

84.    According to the meetings minutes, "[a]fter
hearing and being informed of each other's view points, both
parties were ethically bound to" follow a list of actions, which
included:  "1 - Within a week of this date, Bank Melli will
announce Assa Corp's approval for the Alavi Foundation of New
York to receive $1.7 million, in a way that won't harm Assa
Corp's rights and any payments in the present or the
future. . . . 3 - Mr. Geramian, mentioning the point that his
signature alone could not obligate the Alavi Foundation New York,
made an ethical commitment to bring the Bank's issues before the
Foundation's Board of Trustees and that within one month of this
date, he will present a specific schedule for the repayment of
the unpaid debt . . . . 5- Both parties have acknowledged that
any tax penalties, apparently calculated at 19 or 20 percent,
must not be imposed on Assa Corp because the reason for imposing
these penalties was the lack of timely payment of taxes by the
Foundation. . . ."

-55-

85.  On or about August 25, 1992, Asadollah Amir Aslani ("Aslani") sent the above meeting minutes to Rafighdoost, "[t]he esteemed Head of Mostazafan Foundation."  At the time, Aslani was the head of the board of directors and the managing director of Bank Melli.  In his cover letter, Aslani wrote, in part:

> With reference to the explanation that was honorably given to you previously, we remind you the Alavi Foundation of New York is in partnership with this Bank in the ownership of the building at 650 5th Ave., New York, and has been in partnership since August of 1989, with the Foundation's share set at 65% and Assa Corp New York's share set at 35%.
>
> The Foundation has deviated from the content of its mutual contract by delaying payment of its partner Assa Corp's share. At the time of this letter, it owes about $2.2 million dollars. In order to establish a clear plan and create a precise framework for repayment of this loan, so as to prevent further delays in paying the share and the rights of the company which is affiliated with this bank at the present time and in the future, and in order to establish specific guidelines to further clarify the obligations and the rights of the both parties, Dr. Geramian, the Director General of this partnership who is currently in Tehran, was invited to attend a meeting with the officers in charge of this Bank. He accepted this invitation and attended the company's meeting on August 25, 1992.  He discussed various aspects of the aid and the cooperation needed to clarify the financial status of the partnership and the preparations which are necessary for strengthening the partnership, establishing the rights of both parties, and determining the penalties in case of noncompliance by either party.
>
> In summary, as a result of the work between the delegates of both parties in New York and the discussions in the aforementioned meeting, there was a complete understanding that the Bank is a financial institution and its accounts are subject to annual government audits, and in order to claim its debts and its retain its financial rights in case of a

> postponement and payment delays, it requires assurances
> and special planning.

Thus, by sending this letter, Bank Melli acknowledged that the

Bonyad Mostazafan controlled the Alavi Foundation.

86.    In the letter, Aslani also identified the

"assurances and associated special plans" that had been decided

at the meeting, stating, in part:

> 1-    Due to the fact that the Alavi Foundation New York
> is in immediate need of $1.7 million in cash for the
> payment of property back taxes, and in accordance with
> the principles of the contract, any borrowing must be
> done with the agreement of the shareholders of the 80%
> of the shares, it is imperative and necessary to obtain
> the consent of the company's shareholder related to
> this Bank for the receipt of this loan granted by Bank
> Saderat, New York Agency.  Despite the lack of
> satisfaction the bank has with the partner actions
> regarding the payment and settling of his share, in the
> spirit of teamwork, cooperation, and coordination, and
> not considering any favoritism between the Foundation
> and the Bank which is one of the pillars of the Islamic
> Republic of Iran, it was agreed that within one week
> the approval required for the receipt of the mentioned
> loan would be sent via an official notice.

> 2-    In exchange for the Bank's goodwill, Dr. Geramian,
> who has been paying his utmost attention to settling
> the claims from the beginning of his tenure and has
> honestly showed compromise, made an honorable promise
> he would cooperate with this Bank's representatives in
> place, within a maximum of 30 days from this date, on a
> review of an amendment securing the rights of both
> parties.

> 3-    It was agreed that after his return to the place
> of assignment and the necessary review, the specific
> schedule for the repayment and the settlement of the
> delayed debts of the partnership would be arranged and
> given immediately to the partner's company. If a delay
> was necessary, its duration, along with any interest on
> the delayed payments, must be specified due to the fact
> that the period of such a delay, from the standpoint of

a financial institution such as a bank, cannot be long-term under the present conditions.

87.  Aslani concluded this August 25th letter by saying: "It is hoped that your firm instructions and the extra attention of the brothers from that esteemed Foundation, who are responsible for the Alavi Foundation of New York, will resolve the partnership's mutual problems quickly; at the same time the two parties are respecting the financial and spiritual rights of each other, they can also help strengthen this partnership for many years to come."  Thus, Bank Melli recognized that the Bonyad Mostazafan is responsible for the Alavi Foundation, and sought its firm instructions and attention with respect to important issues facing the Partnership.

88.  In a memo dated September 7, 1992, from ONSD to Almakaseb, a company owned and controlled by Bank Melli, the author wrote about the issues discussed at the August 25, 1992 meeting, and whether Assa Corp. should have to pay a tax penalty as a result of Alavi Foundation's untimely payment of taxes.  In the letter, the author recognized that the Alavi Foundation is an entity of the Islamic Republic of Iran, stating:

> You should be advised to take into consideration that tax penalties due to a lack of timely allocation of funds by the partnership should not be imposed on Assa Corp. As Mr. Geramian stated, Assa Corp. was not aware of the late payment tax penalty or the exemption from penalty. So because Mr. Geramian reminded them about this, Assa Corp. must participate and be a partner in paying this penalty without any legal or common law justification whatsoever? Now the question arises,

should the two sides of the partnership -- which are
the organs of the Islamic Republic of Iran -- claim
that due to the other side's unfamiliarity with local
laws, try to take advantage of the other side and, God
forbid, impose a financial burden on the other party?

**2.    The Alavi Foundation Did Not Consistently Make
Ownership Distributions to Assa Corp.**

89.  Because the Alavi Foundation knew that Assa Corp.
is owned by Bank Melli and is another arm of the Islamic Republic
of Iran, the Alavi Foundation did not consistently make ownership
distributions to Assa Corp.  For example, in 2005, the Foundation
directed the management company for the Building to make nine
distributions to the Alavi Foundation, but only three
distributions to Assa Corp.

90.  Karjooravary (the head of Bank Melli's New York
office), approached Geramain on at least two occasions about the
missed distribution payments.

**3.    The Alavi Foundation's Board of Directors
Discussed the Risks Created by its Relationship
with Bank Melli**

91.  As explained _supra_ paragraph 75, agents seized a
number of journals kept by Ebrahimi, the Alavi Foundation's
secretary.  The journal marked "SUMMR 2001" and "12/22/03
Revisit," contains handwritten entries about Assa Corp.  The
entries described below have been translated from their original
Farsi, except for the italicized words, which were written in
English in the original.  In an entry dated June 17th, Ebrahimi
wrote, in part, the following:

-59-

```
Owe → Tax

Bank Melli = Conspiracy

40% Assa Corp = Will pay back

Bank Melli's money 60% + 40%
```

92.  On this page, Ebrahimi also wrote, in part,

"Problem - <u>Government separate</u> - <u>Foundation</u> 'Sure death'."

93.  In a journal marked "SUMMER 2003" and "12/22/03 Revisit," an entry dated July 25th contains lengthy notes relating to Assa Corp.  Ebrahimi wrote:

> Assa Corp. Attorney → 42 million → *Copy* → *Paterson* →
> But → Time → Dehghani → Mahallati Hossein → Dr.
> Kharrazi → Assa share → Sell it → 30,000 →
> Aghazadeh-ha → Assa dangerous → Get rid of it → Who
> is going to buy it → Alidoost → Board meeting → 11-
> million → Whatever money you have → harmonious → they
> received it in advance → To tell the truth → Lie →
> Risk → *IEC* → Imam's birthday gathering → 13 million
> in both cases → 10 million *surplus* → You can't → It
> is illegal → Don't borrow → It is illegal → urgent
> situation → talk → Everything → *Mafia* → Duty →
> turned over to → *Contingent liability*

94.  In an entry dated July 27th, he wrote, in part:

> Assa → 40% share → August 8th → The amount of 42
> million → Reputable Company → Half of the real price
> → Tax → Send the letter → Talks → Borrow → Loan →
> Success → 200 million, 42 million → Management
> address → Value → Foundation benefits → Person-in-
> charge → Foundation interests → Collusion and illegal
> arrangement → Another one → They had to → Dr.
> Alidoost → Agreement → Original purchase → Management
> fee → Foundation shares → Public prosecutor →
> Foundation's loss → Insist → Assa Corp → Sale → To
> take out Assa → Interest issue /Interest installment
> → Very little tax → Decide →

95.  He further wrote:

-60-

```
Maneuvering → Assa Corp → selling shares → Share →
Rights of asset → "Freez" [sic] → Assa record →
Problem with payment method → 8 → Regarding interest,
it is not a problem → Mr. Zarif → Assa → Bank Melli
40% share → I cannot sleep at night → The issue of
Board of Trustees will be solved, When? → Transfer
```

**G.    The Alavi Foundation Is the Building's Managing Partner and
Authorized Distributions to Bank Melli's Straw Company, Assa
Corp.**

96.    The 1989 Partnership Agreement (the "Agreement")

between the Mostazafan Foundation of New York and Assa Corp.

provides, in part, that "[s]ubject to Article XII, the Foundation

shall have the obligation of administering the day-to-day

business and affairs of the Partnership consistent with the

provisions of Article XII."  Agreement, Article XIV, Section 1.

Article XII in turn relates to authority of the Partnership and

decisions by the Foundation.  Section 1 of Article XIV provides,

in part, that "[t]he Alavi Foundation "shall have sole authority

to execute instruments on behalf of the Partnership and any third

party may rely on the Foundation's authority to bind the

Partnership."  Agreement, Article XII, Section 1(a).  Section 2

of Article XIV provides, in part, that the "Foundation shall have

the authority to make the following decisions and take the

following actions without obtaining the prior written consent of

any other Partner:  (i) the execution of any lease of space in

the Building having a rentable area of less than twenty-five

thousand (25,000) square fee of rentable floor area and a term of

less than five (5) years . . .; (ii) contracting with vendors of

supplies and services required in the ordinary course of business
of the Partnership and payment of all sums due therefor, provided
that such contract does not provide for the payment, per annum,
of an amount in excess of [$100,000] . . .; (iii) payment of all
taxes that are due; and (iv) prosecuting, defending and/or
resolving by settlement all disputes provided that such
litigation and/or settlement would not require payment by the
Partnership of consideration reasonably valued at more than
[$100,000]. . . ." Agreement, Article XII, Section 2(a).

97.    From at least in or about December 1997 through in
or about June 2007, a real estate management company in New York
("Management Company-1") managed the Building, and another New
York real estate management company ("Management Company-2") has
managed the Building from in or about June 2007 through the
present. Geramian signed the Management and Rental Agreement,
dated May 2, 2007 with Management Company-2, in his capacity as
President of 650 Fifth Avenue Company.

98.    The Alavi Foundation has played a critical role in
managing the Building, acting as the Building's managing partner
and overseeing all of the Building's finances. As payment for
its management services, the Alavi Foundation directed 650 Fifth
Avenue Company to pay the Foundation a management fee. According
to the Alavi Foundation, the management fee was used to pay a
portion of the salaries of the Alavi Foundation's president,

controller and secretary, for their work on behalf of 650 Fifth
Avenue Company.  Information provided by the Alavi Foundation
also shows that the monthly management fee was approximately
$20,000 per month from at least in or about April 2001 through
2002, and increased to approximately $30,000 per month in or
about 2003.  The last management fee was paid on or about
December 1, 2008.

99.  Likewise, the Alavi Foundation's federal tax
returns (for fiscal years ending in March), show that the
Foundation received the following from 650 Fifth Avenue Company
for expenses incurred by the Foundation in connection with the
services rendered to the Partnership by the employees of the
Foundation:

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Compensation of Officers | $39,470 | $51,200 | $55,087 | $65,600 | $74,325 | $76,978 | $77,052 | $240,647 |
| Other Employees' Salaries and Wages | 162,938 | 170,960 | 183,936 | 189,027 | 280,965 | 146,266 | 158,917 | 207,716 |
| Pension Plans and Employees' Benefit | 71,924 | 87,660 | 108,066 | 117,772 | 129,535 | 119,549 | 126,336 | 158,380 |
| Occupancy | 37,945 | 41,442 | 41,030 | 34,569 | 36,356 | 68,366 | 67,268 | 62,319 |
| Office, Stationary and Other Expenses | $9,782 | 8,146 | 8,530 | 5,955 | 6,020 | 4,257 | 3,157 | 18,140 |
| Total | $322,059 | $359,408 | $396,649 | $412,923 | $527,201 | $415,416 | $432,730 | $687,202 |

100. The Alavi Foundation also directed when ownership distributions were made to the partners of 650 Fifth Avenue Company--the Alavi Foundation and Assa Corp. The controller of the Alavi Foundation sent a message to the management company (Management Company-1 and later Management Company-2), on letterhead for the Alavi Foundation, specifying the amount of distribution that was to be made to the Alavi Foundation and Assa Corp. For example, from at least in or about December 2002 through at least in or about August 1, 2007, the Alavi Foundation sent at least 29 letters to Management Company-1 and/or Management Company-2 authorizing a distribution to Assa Corp. The distribution was typically for $200,000, but in some instances was for $158,750.

**H.    In Civil Lawsuits Filed in the 1990s, the Mostazafan Foundation of New York Concealed its Relationship with the Islamic Republic of Iran**

101. In the 1990s, civil lawsuits were filed against the Mostazafan Foundation of New York and the Bonyad Mostazafan by individuals with judgments against the Government of Iran. In the course of these litigations, members of the Board of Directors of the Mostazafan Foundation of New York concealed the relationship between the Foundation and the Islamic Republic of Iran.

102. For example, in 1992, Norman Gabay ("Gabay") filed a civil action against the Bonyad Mostazafan and the Mostazafan

Foundation of New York to recover damages resulting from the Iranian Government's alleged expropriation of several businesses he owned in Iran.

103. During the litigation, in order to avoid an adverse judgment, the Mostazafan Foundation of New York falsely disavowed any relationship with the Bonyad Mostazafan and the Islamic Republic of Iran.  For example, Geramian submitted an affidavit, dated November 5, 1992, in which he wrote, in part: "The New York Foundation conducts no business with the Government of Iran or the Mostazafan Foundation of Iran. . . . The New York Foundation has never been the agent or instrumentality of the Government of Iran or the Mostazafan Foundation of Iran."  As noted supra paragraph 83, in or about August 1992--just two months before signing this affidavit--Geramian participated in a meeting with high-level Bank Melli officials in Iran.

104. Geramian was deposed in the case on November 30, 1995.  In response to the question, "Is there a relationship between . . . the Mostazafan Foundation of Iran, and the Alavi Foundation of New York," Geramian responded: "No, not at all."

105. On January 23, 1996, Ahmadi was deposed.  In response to the question, "Did you ever receive instructions in terms of your role as a director for the New York Foundation from any person or entity in Iran," Ahmadi responded, "No."  As explained supra paragraph 50, Ahmadi was one of the three board

-65-

members (in addition to Badr and Hesami), who wrote that he would

resign pursuant to instructions received through Rafighdoost from

the Ayatollah.

106. Documents obtained from a search of the Alavi

Foundation's offices (see supra paragraph 69) show that the

Mostazafan Foundation of New York and the Bonyad Mostazafan

corresponded in the 1990s about the Gabay litigation.

a.    In a letter dated November 19, 1992, Geramian
      wrote to Askari, an employee at the Alavi
      Foundation's office in Tehran, about the Gabay
      litigation.  He stated, in part: "It is necessary
      to explain that this defense, according to the
      facts, indicates the denial of any relationship as
      well as financial and administrative relations
      between the government of Iran and Mostazafan and
      Janbazan. In consideration of the above mentioned
      circumstances, please take action to cooperate
      with us to resolve any possible worries in this
      regard."

b.    In a letter dated December 7, 1992, from Geramian
      to the legal office of the Bonyad Mostazafan,
      Geramian notified the legal office that written
      responses to the Gabay lawsuit had been forwarded
      to Askari at the Alavi Foundation's office in
      Tehran.  He requested that the Bonyad Mostazafan
      "contact that office immediately and cooperate
      with them to settle the attributed accusations."

c.    In a letter dated February 3, 1993, the legal
      office of the Bonyad Mostazafan wrote to Geramian
      about the litigation, stating, in part: "[I]f that
      office knows a reputable local attorney (except
      the attorney introduced to the court), please give
      instructions to hire him immediately. Also, please
      inform us of the fee structure as well as your
      contract with the selected attorney."

d.    Geramian responded in a letter dated February 4,
      1993, in which he provided a recommendation as to
      legal counsel in the U.S.  He further wrote: "It

> is necessary to remind you the Alavi Foundation of
> New York will not take on any role in these legal
> contracts and the specifics relating to
> them. . . . Obviously, the Alavi Foundation (New
> York) will not withhold from any consultation and
> intellectual assistance in this matter."

107. Gabay's case was eventually dismissed because the
Court determined that he had failed to show that the Bonyad
Mostazafan exercised day-to-day control over the Alavi Foundation
during the relevant time periods.  See Gabay v. Mostazafan
Foundation of Iran, 968 F.Supp. 895 (S.D.N.Y. 1997).

108. In 1998, Stephen M. Flatow ("Flatow") filed a
wrongful death action against the Islamic Republic of Iran and
others, after his daughter was killed in the Gaza strip by the
explosion of a terrorist bomb.  Flatow obtained a default
judgment against the Iranian Government and, later that year,
brought an action against the Alavi Foundation and others in
order to attach and execute the judgment.  In a motion filed in
the case, the Alavi Foundation submitted, among other things,
Geramian's November 5, 1992 declaration and the excerpts from the
Ahmadi and Geramian depositions that are quoted above.  This
civil action was also dismissed as a result of Flatow's failure
to prove that the Iranian Government exercised day-to-day control
over the activities of the Mostazafan Foundation of New York.
See Flatow v. Islamic Republic of Iran et al. 67 F.Supp.2d 535
(D. Md. 1998).

I.    **After Being Served with a Grand Jury Subpoena, Jahedi
      Destroyed Documents**

        109. On December 17, 2008, the United States commenced
this civil forfeiture action by filing a verified complaint (the
"Verified Complaint") against, among other properties, Assa
Corp.'s forty-percent interest in 650 Fifth Avenue Company.   That
same day, at about the same time that the Verified Complaint was
being served, FBI agents and other law enforcement personnel
working with them interviewed Jahedi, who was at the time
president of the Alavi Foundation, at his offices in New York,
New York.   Jahedi was then served, as president of Alavi, with a
grand jury subpoena dated December 17, 2008, directed to Alavi,
attention Jahedi (the "Grand Jury Subpoena").

        110. The Grand Jury Subpoena commanded Alavi to
provide, for the time period from 1989 to the present, "any and
all documents relating or referring to" the following entities:
650 Fifth Avenue Company; the Alavi Foundation of New York; Assa
Corporation; and Assa Company, Ltd.   Following the meeting, on
December 18, 2008, FBI personnel conducting surveillance of
Jahedi observed him throw papers in a public trash bin at a
location near his residence.   FBI personnel subsequently
retrieved the papers from the trash can, and determined that they
were torn documents in English and in Farsi, both handwritten and
typed.   The documents were responsive to the Grand Jury Subpoena.

        111. Jahedi was charged in a criminal complaint and

-68-

arrested on December 19, 2008, in New York, New York.  On May 5,
2009, he was charged in a two-count criminal Indictment, 09 Cr.
460 (SAS), with destroying a document, with the intent to impair
that document's availability for use in an official proceeding,
in violation of 18 U.S.C.  §§ 1512(c)(1) and 2 (Count One), and
obstruction of justice, in violation of 18 U.S.C. §§ 1502 and 2
(Count Two).  See United States v. Farshid Jahedi, 09 Cr. 460
(SAS).

J.    Bank Melli's Control of Assa Corp. through Tafti

          1.    Tafti's Employment by Assa Corp.

          112. In the United States, Assa Corp. has a single
employee working for it, Mohammad Hassan Dehghani Tafti
("Tafti").  Tafti is a naturalized Iranian citizen, born in
India.  He was the only employee of Assa Corp. from in or about
1996 through in or about late 2008.

          113. Tafti first came to the United States in or about
1999 with an L-1 visa, which was issued on the basis of a
petition made on his behalf by his employer, Assa Corp.  An L-1
visa is a visa issued to managers or executives of companies
doing business in the United States.  Assa Corp. submitted a
petition in or about May 1999 in support of Tafti's application
for the L-1 visa.  The petition described Tafti's "proposed
duties in the U.S." as "Treasurer, oversee financial operations
and investments."  The L-1 visa was initially granted to Tafti in

or about July 1999 for three months, and was subsequently renewed
upon further applications in or about September 2000, March 2001,
August 2001, and December 2001.

114. In or about November 2002, Tafti applied for an H-
1B visa at the United States Embassy in Ankara, Turkey. An H-1B
visa is a visa issued to employees with specialized knowledge.
In the application, Tafti identified his present employer as
"Assa Corp., 500 Fifth Avenue, NY, NY," and his present
occupation as "financial executive." However, Tafti stated that
he intended to work in the United States at Optima Mortgage
Company in Santa Ana, California. Shortly after submitting his
application for an H-1B visa, Tafti submitted another
application. In this subsequent application, Tafti again stated
that he intended to work for Optima Mortgage. The H1-B visa was
issued in January 2003, after which Tafti again entered the
United States.

115. While living in the United States with his H-1B
visa, Tafti in fact continued to work for Assa Corp., pretending
to work for Optima Mortgage Corporation ("Optima Mortgage") only
for immigration purposes. To create the image that he worked for
Optima Mortgage, Tafti moved money from Assa Corp. to Optima
Mortgage to cover his payroll from Optima Mortgage. In order to
do this, Tafti transferred monies from Assa Corp. to his personal
bank account, and from his personal bank account to Optima

Mortgage.  On approximately 23 occasions from in or about May 2003 through in or about September 2005, checks and wire transfers in the approximate amount of $3,800 each were made from Tafti's personal bank account to the president of Optima Mortgage, or his wife, also an employee of Optima Mortgage. Close in time to each of these checks and wire transfers, Tafti was paid approximately $2,800 by Optima Mortgage.  These transactions appeared to be designed to return to Tafti the $3,800 payments, minus requisite payroll taxes.  Additionally, on or about July 27, 2006, Assa Corp. paid Optima Mortgage the sum of $22,500.

        116. On or about December 31, 2006, Tafti left the United States for Turkey.  In or about May 2007, Tafti applied for an H-1B visa at the United States Embassy in Dubai, United Arab Emirates.  In this application, Tafti stated that he was employed as a "market analyst manager" for Optima Mortgage in Tustin, California, but that he would be living in Tuckahoe, New York.  Initially, no action was taken on the application.  In February 2008, Tafti reactivated this application and an H-1B visa was subsequently granted.  In May 2008, Tafti returned to New York from Dubai.

        2.   **Bank Melli's Control of Assa Corp. through Tafti**

        117. Tafti used the email account taftimhd@hotmail.com to conduct business on behalf of Assa Corp.  Emails sent to and

from this account show that Tafti regularly provided reports to
Bank Melli about Assa Corp.'s business dealings, and then
followed Bank Melli's instructions with regard to Assa Corp.'s
business affairs.  The following emails, which have been
translated from Farsi, were among the emails sent to or from the
account:

a.    On or about June 12, 2003, Tafti sent an email to
      the email address a.azizi@mellibank.co.uk.  In
      this email, Tafti forwarded to Ahmad Azizi
      ("Azizi") correspondence from a New York attorney
      for Assa Corp.  Upon information and belief, Azizi
      is an official at Bank Melli in London, England.

b.    On or about June 19, 2003, Tafti received an email
      from the email address
      m.chowdhury@mellibank.co.uk.  In this message, the
      sender wrote, in part, "I have had the letter of
      Intent and the Contract for Sale reviewed."  The
      sender of the email identified himself as "A.
      Azizi."  Upon information and belief, Azizi sent
      this message using the email account of Maria
      Chowdhury, a Bank Melli employee in London.  Upon
      information and belief, this email was referring
      to a proposed deal, which ultimately collapsed, to
      sell Assa Corp.'s interest in 650 Fifth Avenue
      Company.

c.    On or about November 20, 2004, Tafti received an
      email from the email address
      safari_onsd@yahoo.com.  In this message, the
      sender wrote, "You are kindly requested [to] . . .
      send the monthly expenses of Assa Corp from April
      2004 onward, to please make some arrangement so
      that the detailed expenses of this Co. are
      available for the use of the auditors."  Upon
      information and belief, this email was sent by ALI
      SAFARI, an employee in Bank Melli's Overseas
      Network Supervisory Department, known as "ONSD,"
      which is located in Tehran, Iran.

d.    On or about December 3, 2004, Tafti received an
      email from the email address safari_onsd@yahoo.com

containing a list of Assa Corp. expenses.

e.   On or about February 5, 2005, Tafti sent an email
     to the email address overseas2@bankmelli-iran.com
     and wrote, "Dear brother Mr. Ghadimipour: As you
     are aware approximately two months ago two sets of
     minutes regarding the ending of the court file and
     extension of the loan were sent for the signature
     of the shareholders, Mrs. Aghamiri and Mr.
     Shakeri.  Regretfully, it has not been received
     yet.  Because the matter is important, and the
     lawyer and the secretary of the Company . . . are
     anxious, please issue proper order because any
     delay will cause doubt and sensitivity here and
     God forbid will cause irrevocable loss. Once more
     asking an urgent action."  Upon information and
     belief, "Mr. Ghadimipour" is Mohsen Ghadimipour,
     the current head of ONSD.

f.   On or about March 5, 2005, Tafti sent an email to
     onsd_ir@yahoo.com.  In this email, Tafti wrote,
     "To shareholders of Assa Co.: With reference to
     the message of 2/28/05, this is to inform you that
     the financial statements of both Assa Ltd. Co. and
     Assa Corp. New York, were sent to you in the last
     week via London."  Upon information and belief,
     this email address belongs to ONSD.

g.   On or about March 16, 2005, Tafti sent another
     email to onsd_ir@yahoo.com.  In this email, Tafti
     wrote, "To the shareholders of Assa Corp.:  With
     reference to today's email, this is to inform you
     that the financial statements of Assa Corp up to
     3/31/04 were sent to your office addressed to Mr.
     Ghadimipour."

h.   On June 19, 2005, after Citibank in New York, New
     York, had refused to wire $1.3 million from an
     Assa Corp. bank account to Assa Ltd., Tafti sent
     an email from the email address onsd_ir@yahoo.com
     to the "shareholders of Assa Co. Ltd."  In this
     email,  Tafti wrote, "With reference to the email
     #M-KH of 6/16/2005 this is to inform you that the
     Company [Assa Corp.] has made an extended action
     to remit the monies to banks outside of the U.S.
     In this regard, many meetings were held with
     Citibank.  Tomorrow I have a meeting with the bank
     because they invited all of the directors of Assa

New York to participate.  The only problem is the
absence of Mr. Shakeri.  I thought I might tell
them that Mr. Shakeri is on a trip or resigned
from directorship, and that [a New York attorney
for Assa Corp.] and I are the directors of Assa in
New York now; however, I will consult with [the
New York attorney] because he will participate in
the meeting as the director and secretary of the
Co.  Hoping God will help.  As you are aware,
Citibank has not transferred the sum of $1,360,800
to the account of Assa Ltd. to London auditors.  I
spoke many times with the bank and presented
evidence such as payment of the tax, and hope with
activity can solve the problem.  I will make a
report to you of the result of tomorrow's session.
Also I believe after solving the above issue, that
we should send smaller amounts in the form of
monthly, maximum in 3 months payments, to London,
so that the amounts would not appear big.
Meanwhile I will try to open an account in another
bank, unfortunately owing to special problems
here, because the bank wants to know all the
directors.  However, the interests of the
shareholders will be preserved in the best way.
Thanks. Assa Corp.  Tafti."  By this email, Tafti
acknowledged the apparently fictional nature of
Shakeri's ownership of Assa Corp. through Assa Co.
Ltd., and that Shakeri was apparently unwilling or
unable to travel to the United States to attend to
his substantial financial concerns here.

i.   On or about July 2, 2005, Tafti sent an email to
overseas2@bankmelli-iran.com.  In this email,
Tafti wrote, "Mr. Ghadimipour, the director of the
branches of Bank Melli, outside of Iran.  As you
are aware, the issue of the place of residence of
shareholders and the director of the Company in
the USA has a special importance.  At present,
shareholders are forbidden from having residences
in Iran, and as per the view of the legal experts,
the American government may freeze the capital of
the shareholders.  At the present time, owing to
prevention of our Iranian companies, the issues
are more sensitive.  Fortunately, Assa Corp. has
not had a problem, except for the weakness of
residence location of the shareholder which should
be removed. Therefore, please make some
arrangement that the residence location of the

-74-

shareholders of Assa, Mr. Davood Shakeri and Mrs.
Aghamiri be changed to another country, and
considering my knowledge of the United Arab
Emirates, one of the Emirates is proposed.  Please
order appropriately."

j.    On or about July 6, 2005, Tafti sent another email
      to the email address onsd_ir@yahoo.com.  In this
      email, Tafti wrote, "To Mr. Ghadimipour, the
      director of the branches outside of the country.
      With reference to the email and phone
      conversations of 4/7/2005, this is to inform you
      the result of my discussions and investigations
      with the consultants and the lawyers in America
      and London: changing the shareholder of Assa Ltd.
      is possible, but the shareholder should reside in
      a tax free country.  Otherwise, the country of
      residence will collect a tax from the income of
      the shareholder."  By this communication proposing
      to "chang[e]" the shareholders, Tafti acknowledged
      the fictional nature of ownership of Assa Co. Ltd.
      by Shakeri and Aghamiri.

k.    On August 9, 2005, Tafti received an email from
      the email address onsd_ir@yahoo.com.  In this
      email, the sender wrote, "With reference to the
      email of 7/7/2005, regarding the location of
      residence of the shareholders, this is to inform
      you that, as per the orders of the Bank Manager,
      until the appointment of the qualified
      individuals, act as before."

l.    On or about February 26, 2006, Tafti sent an email
      to the email address onsd_ir@yahoo.com.  Tafti
      wrote, in part, "To the Shareholders of Assa Co.:
      With reference to the today's e-mail this is to
      inform you that the financial statements of Assa
      Corp. of New York today were sent to you via
      London.  Please note that the reason of the delay
      was the preparing the financial statements of
      Sherkate Tazamoni (General Partnership Co.) of
      Alavi Foundation Co. Ltd., which is to be
      regretted."

m.    On or about May 17, 2006, Tafti sent an email to
      the email address onsd_ir@yahoo.com.  Therein, he
      wrote: "Following the email of 4/29/06, this is to
      inform you that the financial statements of Assa

Co. Ltd. up to 3/31/05 after auditing . . . have
been dispatched to you via London."

**K.    Documents Obtained From Bank Melli's New York Residence
Discuss the Relationship Between Bank Melli and Assa Corp.**

118. Documents recovered from the search of the Bank

Melli Residence discuss the relationship between Bank Melli and

Assa Corp.  These documents include a number of telex

communications to and from "Melliabroad" (a reference to ONSD)

and Bank Melli's New York office.

a.    In  a telex dated August 31, 1990 and bearing
index number 1784, Karjooravary wrote to Rahi
about transferring the shares of Assa Co. Ltd.
from Behdadfar (a Bank Melli director), directly
to Bank Melli.  He wrote:  "[W]e would like to
inform you it appears there will be no problem
transferring the shares of Assa Channel Islands
and/or the mother company to Bank Melli. This
matter was also discussed with Mr. Firoozina and
he didn't see a problem regarding the transfer
because, basically, all that is needed is to
execute a general change of ownership and not
mention the name of the new owner to the lawyers
of Assa Corp of New York.  Of course in this
manner the transfer of the shares to the bank's
name could be done much easier, without mentioning
the bank name, if Assa Channel Islands was
established with other company.  Therefore, we
suggest you ask Mr. Behdadfar to transfer the
related shares to the bank's name, inform the Assa
Corp lawyers about the facts and circumstances of
the transfer without mentioning the bank's name,
and send them the introduction to the new
directors . . ."  Hamid Firoozina ("Firoozina")
was the accountant who prepared the tax returns
for the Alavi Foundation, Assa Corp., and 650
Fifth Avenue Company from at least in or about
1989 through in or about 2004.

b.    In a telex dated September 21, 1990, bearing index
number 1797, Bank Melli's New York office wrote to
Naghshineh: "Following message #1784 dated

-76-

08/31/1990 regarding the transfer of the Assa
Channel Island shares of the mother company to the
bank and the introduction of the new directors: I
beg to inform you that Mr. Firooznia contacted the
bank today and informed them that he has collected
the necessary documents to stabilize Assa
Corporation's situation. . . . The only pressing
items to be completed are those concerning the
mother company, namely the ownership transfer and
the introduction of the new directors as well as a
representative who can receive the Assa Corp
documents; expediting these matters will entail
meeting many requirements. Mr. Badr doesn't see
any problem regarding the transfer of the mother
company's ownership or think it will pose an issue
to the partnership status; his understanding has
always been that the ownership of the mother
company was with Bank Melli. I hope all
arrangements can be made on time in order to
prevent any possible loss for the bank."

c.      In a memo dated December 14, 1990, Karjooravary
and Seyyed Mohammad Shafaat ("Shafaat") wrote to
Rahi about issues relating to Assa Corp.  Shafaat
was Tafti's predecessor at Assa Corp.  They wrote,
in part:

Respectfully, per today's telephone conversation,
and after our meeting and our consulting sessions
in the presence of Messrs. Badr Taleh, Firooznia,
and Livingston, please find the following matters
for the information and guidance of the Bank's
esteemed management. We would respectfully request
to be informed of your opinion by Monday at the
latest.

1-    After a thorough review and comprehensive
negotiations, a rental claim on the partnership's
building is to be resolved in the near future in
favor of the partnership. It will encompass
approximately $5 million, of which Assa's share
will be about $1,800,000; this amount will not be
subject to 30% taxes. . . .

2-    Assa Corp. New York must have an account in
New York for paying expenses, especially so
assessed taxes can be taken out. Therefore, it is
recommended that an account be opened at the Bank

-77-

of New York by Mr. Shafaat and the right of
withdrawal granted to him and the managers who may
be present in New York. . . .

3-   It is suggested that Assa Corp's address and
its office be totally transferred to Dubai; by
doing this, some of the expenses such as
management salary, rental, location, and other
miscellaneous expenses will possibly be deposited
into Assa's account so that it will be deducted
from Assa's taxable income . . . .

4-   Due to the positive actions of Messrs. Badr
Tale and Firooznia, and also the status of the
accounts so far, there doesn't seem to be a reason
to audit the details of the previous accounts.
Nonetheless, it was agreed on Monday that the
partnerships' documents and operations be reviewed
by Mr. Shafaat and Mr. Firooznia.  And from this
date forward, since a person has been designated
directly to oversee Assa's operation, arrangements
could be made so the accounts can be controlled
and reviewed regularly and routinely, and all of
Assa share's funds be deposited into Assa's own
account and that the current expenses be paid out
of the opened account as mentioned in the
paragraph 2 of this fax. . . .

119. In addition, in the 1990s, Bank Melli's New York

office and ONSD corresponded about the risk of seizure in the

event that Bank Melli's ownership of Assa Corp. were disclosed.

a.   In a letter dated December 29, 1993, bearing the
seal of the Islamic Republic of Iran with "Bank
Melli Iran" written inside (in Farsi), ONSD wrote
to the head of Bank Melli's New York office:

. . . Assa Limited and Harter Holding Companies
are registered in the Channel Islands and had been
initially registered as legal entities. In 1990,
they changed their ownership to Bank Melli Iran.
At that time, this change in ownership had been
deemed appropriate by the legal advisors of the
London Branch because the Channel Islands is a
free trade zone and accessing the ownership
backgrounds of the companies behind the captioned

corporation is not an easy task for investigators. However, please have them look into whether Mr. Naghshineh -- the Assa Corp New York Director whose affiliation with the Bank could be easily proven -- could be replaced with another individual whose affiliation with the Bank could not be easily proven. Would this make it possible to maintain to ownership of the building's shares?

b.    In a letter dated July 21, 1994, bearing letterhead for Bank Melli Iran's New York office, Karjooravary wrote to a Khajeh Pour:

As you have been informed, the above company [Assa Corp.] has been established in relation with the partnership with 650 Building.  The above company's affairs had, at no time, been reflected in the [Bank Melli New York] Agency's accounts and only the person in charge of the Agency -- until the arrival of Mr. Shafaat, the Managing Director of the Al-Makaaseb Company -- had been taking care of its affairs. . . . Since last year, following a complaint registered by a person named Norman Gaby against the partnership's partner and one in which the partnership's building had been mentioned, it seems that management has declared that all the partnership's affairs be handled by a different entity other than this Agency.  Nevertheless, Assa Corporation's legal issues are now being handled by this Agency in connection with the Central Office.

c.    Four days later, on June 25, 1994, ONSD responded to Karjooravary, in a letter bearing the letterhead for Bank Melli Iran, stating:

[Bank Melli New York] Agency's fax dated June 21, 1994 and its attachments extracted from the U.S. banking regulations regarding real estate ownership have been reviewed. Initially, that Agency's interpretation of the aforementioned article of law regarding the limitations which the law recognizes for active banks in the U.S. on the ownership, holding, and the rental of real estate properties seemed to be accurate. However, what might cause some doubt is whether the captioned regulation is applicable to non-U.S. banks

(registered outside of the U.S.). In other words, the New York Agency, which is a bank branch registered in the U.S. and naturally subject to the banking laws and other current U.S. regulations, is not the owner of Assa Corporation. In fact, Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies. Now, considering the discussion of legal inclusion, it is requested that the matters be reviewed again and have that Agency's viewpoints declared.

Of course, the other noteworthy issue in this regard is the matter related to Algeria's statement and the financial disagreement between the two countries, which could be significant due to the risk of seizure of the elements connected to the Islamic Republic of Iran's assets in the United States. This, of course, has no relationship with the topic of legal inclusions. It is obvious if that Agency has any opinions regarding the latter subject and could estimate the percentage of risk of the seizure of these properties in case of the revelation of the ownership by Assa Corporation, it would be appreciated. A quick response is highly appreciated.

## V.    ADDITIONAL DEFENDANT PROPERTIES

### The Assa Accounts

120. Defendant Accounts-1, -2, -3, and -4 (collectively, the "Assa Accounts") are held in the name of Assa Corp.  Tafti was the only signatory on the Assa Accounts.

121. Between January 7, 2000 and December 5, 2007, approximately $17,083,000 from 650 Fifth Avenue Company was deposited into Account-1.  The bank records for Account-1 also show the following financial activities, among others:

a.    On or about December 3, 2007, Tafti wrote a check

for $10,500, from Account-1, to pay the rent for the house in which he lived.

b.    On or about December 5, 2007, Account-1 received a wire transfer of $200,000 from 650 Fifth Avenue Company.

c.    On or about April 2, 2008, Tafti wrote a check for $40,000 to New York State Corporation Tax from Account-1.

d.    On or about April 2, 2008, Tafti wrote a check for $1,240 to New York State Corporation Tax from Account-1.

e.    On or about April 2, 2008, Tafti wrote a check for $202 to New York State Corporation Tax from Account-1.

f.    On or about April 3, 2008, Tafti wrote a check for $37,500 to the New York City Department of Finance from Account-1.

122. Approximately $1.09 million was transferred from Account-1 to Account-3 in November 2006.  In addition, Tafti transferred substantial amounts from Account-1 to Assa Co. Ltd. For example, checks drawn from Account-1 and made payable to Assa Limited were debited to Account-1 on the following dates and for the following amounts:

| Date | Amount |
|------|--------|
| 4/15/2002 | $1,020,600.00 |
| 2/21/2003 | $1,020,600.00 |
| 4/5/2004 | $1,360,800.00 |
| 8/27/2004 | $700,000.00 |

123. In or about October 2008, agents of the Federal Bureau of Investigation ("FBI") executed federal seizure warrants

-81-

for the funds in the Assa Accounts.  Approximately $1.9 million
was seized from Citibank, and approximately $1.2 was seized from
JPMorgan.

### The Alavi Accounts

124. Defendant Accounts-7, -8, and -9 (collectively,
the "Alavi Accounts") are held in the name of the Alavi
Foundation at Sterling National Bank, N.A.

125. Tax records show that the vast majority of the
Alavi Foundation's income has consisted of proceeds of the
Building.  For the tax years 1999 through 2007, the Alavi
Foundation reported approximately $38,969,065 in income from 650
Fifth Avenue Company, versus approximately $3,812,053 in other
income, as summarized below:

| Fiscal Year Ending March 31 | Income From 650 Fifth Avenue Company | Total Income | Percentage |
|---|---|---|---|
| 1999 | $4,887,235 | $5,445,501 | 90% |
| 2000 | $5,330,497 | $5,844,672 | 91% |
| 2001 | $4,655,384 | $5,294,560 | 88% |
| 2002 | $4,469,901 | $4,723,404 | 95% |
| 2003 | $3,938,018 | $4,161,752 | 95% |
| 2004 | $2,764,687 | $3,029,671 | 91% |
| 2005 | $3,884,354 | $4,366,568 | 89% |
| 2006 | $4,499,680 | $5,013,490 | 90% |
| 2007 | $4,506,464 | $4,901,500 | 92% |
| TOTAL | $38,936,220 | $42,781,118 | 91% |

126. The other income reported by the Alavi Foundation consisted of dividends and capital gain on investments, interest on savings and temporary cash investments, contributions, rental income from Defendant Property-3, and "miscellaneous." The vast majority of this other income was income on investments and savings; only a small percentage of the Alavi Foundation's reported income came from contributions or rent from Defendant Property-3. For tax years 1999 through 2007, Alavi's income from investments totaled approximately $3,213,889, while income from contributions and rent from Defendant Property-3 totaled only approximately $113,428 and $484,736, respectively.

127. Alavi Foundation bank records similarly show that at least approximately $36,720,900 was deposited from 650 Fifth Avenue Company bank accounts into the Alavi Accounts between in or about January 2000 and in or about October 2008.

  a. Between in or about June 2002 and in or about October 2008, approximately $17,946,649 was transferred from 650 Fifth Avenue Company to an account held by the Alavi Foundation at JPMorgan Chase Bank, N.A., numbered 987078225765 ("Alavi JPMC Account-1"). Between in or about June 2002 and in or about February 2009, approximately $15,820,000 was transferred from the Alavi JPMC Account-1 to a second account held by Alavi at JPMorgan Chase, N.A., numbered 987078212665 ("Alavi JPMC Account-2").

  b. Between in or about January 2000 and in or about May 2002, approximately $11,512,000 was transferred from 650 Fifth Avenue Company to an account held by the Alavi Foundation at Citibank, N.A., numbered 48707101.

c.    Between in or about June 2002 and in or about July
      2006, approximately $6,582,251 was transferred
      from 650 Fifth Avenue Company to an account held
      by the Alavi Foundation at HSBC USA, N.A.,
      numbered 640801422 ("Alavi HSBC Account-1").

d.    Between in or about September 2002 and in or about
      September 2003, approximately $250,000 was
      transferred from 650 Fifth Avenue Company to
      Account-7 at Sterling National Bank, N.A.

e.    In or about December 2001, approximately $100,000
      was transferred from 650 Fifth Avenue Company to
      an account held by the Alavi Foundation at
      Citibank, N.A., numbered 49807841.

128. Based on an analysis of presently-available bank
records for the Alavi Foundation, generally covering the time
period from in or about January 2000 through in or about February
2007, only approximately $24,595 was deposited into Alavi
Foundation bank accounts from sources other than 650 Fifth Avenue
Company or other accounts held in the name of the Alavi
Foundation.

129. The Alavi Accounts were funded by transfers from
the Alavi JPMC Accounts.

a.    On or about December 10, 2008, approximately
      $500,000 was transferred to Account-7 from the
      Alavi HSBC Account.

b.    Between in or about July 2009 and in or about
      October 2009, approximately $981,533 was
      transferred to Account-7 from 650 Fifth Avenue
      Company.

c.    The most recently-available account balance for
      Account-7 is approximately $899,890.

d.    Between in or about December 2008 and in or about
      June 2009, approximately $784,324 was transferred

-84-

to Account-8 from Account-7 and another account
held in the name of the Alavi Foundation at HSBC
USA, N.A., numbered 610751042.  The second HSBC
account, in turn, was funded by transfers from
Alavi JPMC Account-1 and from Alavi HSBC Account-
1.  Between in or about May 2007 and in or about
November 2008, the second Alavi HSBC account
received transfers from Alavi JPMC Account-1 and
Alavi HSBC Account-1 totaling approximately
$669,383.

e.     The most recently-available account balance for
       Account-8 is approximately $448,624.

f.     Between in or about August 2009 and in or about
       October 2009, approximately $1,350,000 was
       transferred to Account-9 from Account-7.  The most
       recently-available account balance for Account-9
       is approximately $228,416.

### The Partnership Accounts

130. Defendant Accounts-5 and -6 (collectively, the

"Partnership Accounts") are held in the name of 650 Fifth Avenue

Company.  The only source of funds in the Partnership Accounts is

income from the Building.  The Partnership Accounts are used by

650 Fifth Avenue Company to pay distributions to Assa Corp. and

to the Alavi Foundation.

131. As discussed supra in paragraph 125, between in or

about January 2000 and in or about October 2008, approximately

$36,720,900 was transferred from the Partnership Accounts to the

Alavi Accounts, including the following transfers:

| Date | From | To | Amount |
|------|------|-----|--------|
| 7/11/2008 | Partnership Account-5 | Alavi JPMC Account-1 | $330,000 |
| 8/1/2008 | Partnership Account-5 | Alavi JPMC Account-1 | $330,000 |
| 9/4/2008 | Partnership Account-5 | Alavi JPMC Account-1 | $330,000 |
| 10/3/2008 | Partnership Account-5 | Alavi JPMC Account-1 | $330,000 |

132. As discussed above, between in or about January 2000 and in or about December 2007, approximately $17,083,000 was transferred from the Partnership Accounts to Assa Corp.'s Account-1.

133. In addition, income from 650 Fifth Avenue Company was used to pay for the Building's maintenance and other expenses.  For example, in December 2008, approximately $578,000 was spent on building expenditures.

**The Alavi Foundation's Other Real Properties**

134. Defendant Real Properties-2, -3, -4, -5, -6, -7, and -8 (collectively, the "Foundation Real Properties") are held in the name of the Alavi Foundation.  The Alavi Foundation has spent millions of dollars in proceeds of IEEPA violations on the Foundation Real Properties.

135. The Alavi Foundation (then known as the Mostazafan Foundation of New York) acquired Defendant Real Property-2 on or about November 7, 1988, for approximately $1.1 million.  Between

-86-

in or about October 1997 and in or about July 2004, the Alavi
Foundation spent at least approximately $285,000 on the land and
improvements of Defendant Real Property-2.  Alavi Foundation bank
records show that:

> a.   On or about October 3, 1997, the Alavi Foundation
> spent approximately $60,000 for construction /
> remodeling at Defendant Real Property-2
>
> b.   On or about December 30, 1997, the Alavi
> Foundation spent approximately $60,000 for
> construction / remodeling at Defendant Real Property-2.
>
> c.   On or about September 11, 2000, the Alavi
> Foundation spent approximately $75,000 for second floor
> construction at Defendant Real Property-2.
>
> d.   On or about August 25, 2000, the Alavi Foundation
> spent approximately $75,000 for second floor
> construction at Defendant Real Property-2.
>
> e.   On or about July 23, 2004, the Alavi Foundation
> spent approximately $15,000 for second floor
> construction at Defendant Real Property-2.

136. The Alavi Foundation acquired Lot 1 of Defendant
Real Property-3 on or about March 20, 1991, and acquired lots 6,
7, and 8 on or about April 14, 1997.  Lot 1 was purchased with a
mortgage loan from Bank Saderat Iran in the principal sum of
$2,523,461.  On or about March 24, 1998, Bank Saderat executed a
satisfaction of mortgage with respect to this loan.

137. Between in or about March 1995 and in or about
March 2008, the Alavi Foundation spent approximately $8,648,064
on land and improvements of Defendant Real Property-3.  The Alavi
Foundation's 2008 990-PF discloses that the Foundation spent

$211,666 on land in or about October 1997, and spent the
following amounts on improvements:

| Month | Approximate expenditures |
|---|---|
| March 1995 | $2,651,057 |
| March 1996 | $1,905,069 |
| October 1996 | $641,152 |
| October 1997 | $253,992 |
| March 1999 | $584,826 |
| January 2000 | $1,902,927 |
| January 2001 | $182,899 |
| November 2001 | $117,348 |
| September 2002 | $89,100 |
| March 2004 | $20,968 |
| March 2005 | $15,000 |
| June 2005 | $10,000 |
| September 2006 | $42,060 |
| March 2008 | $20,000 |

138. Alavi Foundation bank records confirm that the
Foundation spent at least approximately $2,000,685 on
construction projects at Defendant Real Property-3 between in or
about February 1999 and in or about March 2008.

139. The Alavi Foundation (then known as the Mostazafan
Foundation of New York) acquired Defendant Real Property-4 on or
about March 21, 1989.  Between in or about July 1996 and in or

about November 2005, the Alavi Foundation spent at least approximately $14,373.74 on improvements and real estate taxes for Defendant Real Property-4.

140. The Alavi Foundation (then known as the Mostazafan Foundation of New York) acquired Defendant Real Properties-5 and -6 on or about May 25, 1990.  On or about July 17, 1995, the Mostazafan Foundation of New York transferred title to the properties to the Alavi Foundation.  According to banking records, from at least in or about June 2002 through in or about November 2007, the Alavi Foundation paid approximately $114,345.65 in real estate taxes for these properties.

141. The Alavi Foundation (then known as Mostazafan Foundation of New York) acquired Defendant Real Property-7 on or about July 22, 1981, and acquired Defendant Real Property-8 on or about October 30, 1984.  On or about August 31, 1995, the Mostazafan Foundation of New York transferred title to the properties to the Alavi Foundation.

142. Between March 2000 and January 2008, the Alavi Foundation spent approximately $1,010,042 on the land and improvements at Defendant Real Properties-7 and -8.  The Alavi Foundation's 2008 990-PF discloses that the it spent the following amounts on improvements:

| Month | Approximate expenditures |
|-------|--------------------------|
| March 2000 | $75,000 |
| August 2000 | $170,500 |
| February 2001 | $7,226 |
| September 2001 | $232,582 |
| November 2002 | $101,300 |
| January 2006 | $55,000 |
| April 2006 | $3,800 |
| May 2006 | $20,000 |
| September 2006 | $55,384 |
| January 2007 | $43,000 |
| July 2007 | $40,000 |
| August 2007 | $99,500 |
| October 2007 | $21,000 |
| November 2007 | $65,000 |
| January 2008 | $20,750 |
| **Total:** | **$1,010,042** |

143. Alavi Foundation bank records confirm that the Foundation spent at least approximately $356,500 on construction, improvement, and repair projects at Defendant Real Property-7 and -8 between in or about May 2000 and in or about October 2007.

## VI. CLAIMS FOR FORFEITURE

144. The statutory provisions pursuant to which the Defendant Properties are subject to seizure and forfeiture are

described below.

## Proceeds Traceable to Violations of IEEPA

145. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

146. Under Section 1956(c)(7), the term "specified unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]."  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

147. In addition, Title 18, United States Code, Section 984 provides in relevant part that:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals –
>
> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the
property involved in such an offense has been
removed and replaced by identical property.

(2) Except as provided in subsection (b), any
identical property found in the same place or
account as the property involved in the
offense that is the basis for the forfeiture
shall be subject to forfeiture under this
section.

(b) No action pursuant to this section to
forfeit property not traceable directly to
the offense that is the basis for the
forfeiture may be commenced more than 1 year
from the date of the offense.

148. Because the Defendant Properties constitute or
were derived from proceeds traceable to violations of executive
orders and regulations issued pursuant to IEEPA (including
Executive Orders 12969 and 13059; 31 C.F.R. §§ 560.203, 560.204,
560.206, 560.207, and 560.208; Executive Order 13382; and 31
C.F.R. § 544.201), the Defendant Properties are subject to
forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**Property Involved in Laundering Proceeds of IEEPA Violations**

149. Title 18, United States Code, Section 981(a)(1)(A)
subjects to forfeiture "[a]ny property, real or personal,
involved in a transaction or attempted transaction in violation
of . . . section 1956 or 1957 of this title [relating to money
laundering], or any property traceable to such property."

150. Title 18, United States Code, Section 1956(a)
provides criminal penalties for:

(a)(1) [w]hoever knowing that the property

-92-

involved in a financial transaction
represents the proceeds of some form of
unlawful activity, conducts or attempts to
conduct a financial transaction which in fact
involves the proceeds of specified unlawful
activity –

(A) (i) with the intent to promote the
carrying on of specified unlawful activity;
or

. . .

(B) knowing that the transaction is
designed in whole or in part --

(i) to conceal or disguise the nature, the
location, the source of ownership, or the
control of the proceeds of specified unlawful
activity; or

(ii) to avoid a transaction reporting
requirement under State or Federal law . . .
.

(2) Whoever transports, transmits, or
transfers, or attempts to transport,
transmit, or transfer a monetary instrument
or funds from a place in the United States to
or through a place outside the United States
or to a place in the United States from or
through a place outside the United States--

(A) with the intent to promote the carrying
on of specified unlawful activity; or

(B) knowing that the monetary instrument or
funds involved in the transportation
represent the proceeds of some form of
unlawful activity and knowing that such
transportation, transmission, or transfer is
designed in whole or in part--

(i) to conceal or disguise the nature, the
location, the source, the ownership, or the
control of the proceeds of specified unlawful
activity; or

-93-

>          (ii) to avoid a transaction reporting
>          requirement under State or Federal law.

151. In addition, Section 1956(h) provides, in part, that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

152. 18 U.S.C. § 1957 provides in relevant part that:

> Whoever . . . knowingly engages or attempts
> to engage in a monetary transaction in
> criminally derived property of a value
> greater than $10,000 and is derived from
> specified unlawful activity, shall be
> punished as provided in subsection (b).

153. "Monetary transactions" is defined in 18 U.S.C. § 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

154. "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

155. "Specified unlawful activity" is defined in 18 U.S.C. § 1957(f)(3) as having the same meaning as that term has in 18 U.S.C. § 1956. As noted above, the term "specified unlawful activity," as defined in Section 1956, includes

violations of IEEPA.

156. In addition, the term "financial transaction" is defined in 18 U.S.C. § 1956(c)(4), and includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

157. Because the Defendant Properties constitute properties involved in money laundering transactions and attempted money laundering transactions in violation of Sections 1956 and 1957, they are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated:     New York, New York
           November 12, 2009

                         PREET BHARARA
                         United States Attorney for
                         Plaintiff United States of America

              By:        _____
                         SHARON COHEN LEVIN
                         ANNA E. ARREOLA
                         MICHAEL D. LOCKARD
                         Assistant United States Attorneys
                         One St. Andrew's Plaza
                         New York, New York 10007
                         (212) 637-1060/2218/2193

<u>VERIFICATION</u>

STATE OF NEW YORK            )
COUNTY OF NEW YORK          :
SOUTHERN DISTRICT OF NEW YORK )

         GEORGE J. ENNIS, JR. being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"); that he has read the foregoing amended complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information and belief.

         The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

 

                                     GEORGE J. ENNIS, JR.
                                       Special Agent
                                       Federal Bureau of Investigation

Sworn to before me this
12th day of November 2009

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2016