**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x**
                                **:**

**In re 650 Fifth Avenue and**                 **08 Civ. 10934 (RJH)**
**Related Properties**               **:**

                                  **ECF Case**

                                **:**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x**

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**MOTIONS BY CLAIMANTS THE ALAVI FOUNDATION AND**
**650 FIFTH AVENUE COMPANY, AND BY ASSA CORP. AND ASSA CO. LTD.**
**TO DISMISS THE VERIFIED COMPLAINT**

                                                  **PREET BHARARA**
                                                  **United States Attorney for the**
                                                  **Southern District of New York**
                                                  **Attorney for the United States of America**

**SHARON COHEN LEVIN**
**ANNA E. ARREOLA**
**MICHAEL D. LOCKARD**
**Assistant United States Attorneys**
**- Of Counsel -**

**One St. Andrew's Plaza**
**New York, New York**
**(212) 637-1060/2218/2193**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Following the 1979 Iranian Revolution, the Pahlavi Foundation
           Became the Mostazafan Foundation of New York and a New Slate
           of Directors Was Installed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    In the 1980s, the Iranian Government Engineered the
           Creation of 650 Fifth Avenue Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    The Iranian Government Has Continued to Exercise of Control Over the
           Mostazafan Foundation of New York/the Alavi Foundation . . . . . . . . . . . . . . . . 6

           1.    In 1991, the Islamic Republic of Iran Changed the Board of the
                  Mostazafan Foundation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           2.    Meetings Between the Iranian Ambassador and Members of the Alavi
                  Foundation's Board of Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    Jahedi's Obstruction of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.      LEGAL STANDARD ON A MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.     THE COMPLAINT ADEQUATELY PLEADS THAT ASSA
        CORP. AND ASSA CO. LTD. VIOLATED THE IEEPA . . . . . . . . . . . . . . . . . . . . . . . 17

      A.    The IEEPA, the Iranian Embargo, and the Ban on Weapons of Mass
           Destruction Proliferation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           1.    Executive Orders 12959 and 13059 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           2.    The ITR - 31 C.F.R. Part 560 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           3.    Executive Order 13382 and the WMD Regulations . . . . . . . . . . . . . . . 23

      B.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii

1.    Assa Corp. and Assa Co. Ltd. Are a Front for Bank Melli . . . . . . . . . . . 25

2.    Assa Corp.'s Management of Bank Melli's Ownership
Interest in the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    Assa Corp.'s and Assa Co. Ltd.'s Violations of the IEEPA . . . . . . . . . . . . . . . 30

III.   THE COMPLAINT ADEQUATELY PLEADS THAT 650 FIFTH
AVENUE COMPANY AND THE ALAVI FOUNDATION
VIOLATED THE IEEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.    The Alavi Foundation Is a Front for the Iranian Government . . . . . . . . 35

2.    The Alavi Foundation's Role as the Managing Partner of
650 Fifth Avenue Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

3.    The Mostazafan Foundation's Successful Concealment of Its
Relationship with the Iranian Government in Civil Lawsuits . . . . . . . . . 37

B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IV.   THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT
PROPERTIES CONSTITUTE AND WERE DERIVED FROM PROCEEDS
TRACEABLE TO VIOLATIONS OF THE IEEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B.    The Partnership and the Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

C.    The Other Defendant Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

V.    THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT
PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN MONEY
LAUNDERING, IN VIOLATION OF 18 U.S.C. §§ 1956(a)(1) AND (h) . . . . . . . . . . . 50

A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

1.    Property Subject to Forfeiture Under 18 U.S.C. § 981(a)(1)(A) . . . . . . . 50

2.    The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(1) . . . . 52

B.    The Complaint Adequately Pleads that the Defendant Properties Were
Involved in Concealment Money Laundering in Violation of
18 U.S.C. §§ 1956(a)(1)(A)(i) and (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

1.    Financial Transactions to Send Money to Bank Melli . . . . . . . . . . . . . 53

2.    Other Financial Transactions to Collect and Disburse
Income from Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

C.    The Complaint Adequately Pleads That the Defendant Properties
Were Involved in Promotion Money Laundering in Violation
of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

VI.    THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT
PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN A
VIOLATION OF, AND CONSPIRACY TO VIOLATE, THE INTERNATIONAL
MONEY LAUNDERING STATUTE, 18 U.S.C. § 1956(a)(2) . . . . . . . . . . . . . . . . . . . 59

A.    The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(2) . . . . . . . . . 59

B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

VII.    THE COMPLAINT IS NOT BARRED BY THE TREATY OF AMITY OR
THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . 61

A.    The Complaint Is Not Barred by the Treaty of Amity . . . . . . . . . . . . . . . . . . . . 62

B.    The Complaint Is Not Barred by the Takings Clause . . . . . . . . . . . . . . . . . . . . . 64

C.    The Complaint Does Not Present A Political Question . . . . . . . . . . . . . . . . . . . . 66

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### FEDERAL CASES

*Beacon Prods. v. Reagan*,
    633 F. Supp. 1191 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987). . . . . . . . . . . 67, 68

*Acadia Tech., Inc. v. United States*,
    458 F.3d 1327 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Baker v. Carr*,
    369 U.S. 186 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Bennis v. Michigan*,
    516 U.S. 442 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Breard v. Greene*,
    523 U.S. 371 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 663 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Can v. United States*,
    14 F.3d 160 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Empresa Cubana del Tabaca v. Culbro Corp.*,
    399 F.3d 462 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*,
    375 F.3d 168 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Flatow v. Islamic Republic of Iran*,
    67 F. Supp. 2d 535 (D. Md. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Gabay v. Mostazafan Foundation of Iran*,
    968 F. Supp. 895 (S.D.N.Y. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

v

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Levitt v. Bear Stearns & Co.*,
    340 F.3d 94 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nixon v. Herndon*,
    273 U.S. 536 (1927).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sumitomo Shoji Am., Inc. v. Avagliano*,
    457 U.S. 176 (1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63

*Trans World Airlines v. Franklin Mint Corp.*,
    466 U.S. 243 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. 216 Kenmore Ave.*,
    657 F. Supp. 2d 1060 (D. Minn. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. $15,270,885.69 Formerly on Deposit in Account No. 8900261137*,
    No. 99 Civ. 10255 (RCC), 2000 WL 1234593 (S.D.N.Y. Aug. 31, 2000). . . . . . . . . . . 17

*United States v. All Funds on Deposit at Dime Sav. Bank*,
    255 F. Supp. 2d 56 (E.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. All Funds on Deposit in United Bank of Switz., New York, New York, Account Number 101WA263232000*,
    188 F. Supp. 2d 407 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 46

*United States v. All Funds on Deposit in United Bank of Switz., New York, New York, Account Number 101WA263232000*,
    No. 01 Civ. 2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 3, 2003).. . . . . . . . . . . . . . . 32

*United States v. Baker*,
    227 F.3d 955 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Cefaratti*,
    221 F.3d 502 (3d Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Contents of Account Nos. 208-06070 & 208-06068-1-2*,
    847 F. Supp. 329 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Cuellar,*
    128 S. Ct. 1994 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*United States v. Daccarett,*
    6 F.3d 37 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 49

*United States v. Dennis,*
    237 F.3d 1295 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Ehsan,*
    163 F.3d 855 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*United States v. Evanson,*
    No. 05 Cr. 00805, 2008 WL 3107332 (D. Utah Aug. 4, 2008) . . . . . . . . . . . . . . . . . . . . 41

*United States v. Farshid Jahedi,*
    09 Cr. 460 (SAS) (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Frank,*
    354 F.3d 910 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Funds from First Nat'l Bank,*
    639 F. Supp. 2d 1203 (W.D. Wash. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Ghilarducci,*
    480 F.3d 542 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Gotti,*
    459 F.3d 296 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. G.P.S. Auto. Corp.,*
    66 F.3d 483 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Grant,*
    05 Cr. 1192 (NRB), 2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008) . . . . . . . . . . . . . . . 47

*United States v. Hoffman-Vaile,*
    568 F.3d 1335 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States v. Homa Int'l Trading Corp.,*
    387 F.3d 144 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Huber,*
    404 F.3d 1047 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Ivanchukov,*
    405 F. Supp. 2d 708 (E.D. Va. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Krasinski,*
    545 F.3d 546 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Ladum,*
    141 F.3d 1328 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Levine,*
    970 F.2d 681 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 49

*United States v. Maher,*
    108 F.3d 1513 (2d Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Mondragon,*
    313 F.3d 862 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 30, 31, 49

*United States v. Morelli,*
    169 F.3d 798 (3d Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Nicolo,*
    597 F. Supp. 2d 342 (W.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. One 1997 E35 Ford Van,*
    50 F. Supp. 2d 789 (N.D. Ill. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. One Parcel of Real Prop.,*
    960 F.2d 200 (1st Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. One Parcel of Real Property,*
    921 F.2d 370 (1st Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 50

*United States v. Pierce,*
    224 F.3d 158 (2d Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Piervinanzi,*
    23 F.3d 670 (2d Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*United States v. Reiner*,
    397 F. Supp. 2d 101 (D. Me. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Santos*,
    553 U.S. 507 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Schlesinger*,
    396 F. Supp. 2d 267 (E.D.N.Y. 2005), *aff'd*, 514 F.3d 277 (2d Cir. 2008). . . . . . . . 51, 57

*United States v. Seher*,
    562 F.3d 1344 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 57

*United States v. Uddin*,
    551 F.3d 176 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*United States v. Yusuf*,
    536 F.3d 178 (3rd Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Weinstein v. Islamic Republic of Iran*,
    624 F. Supp. 2d 272 (E.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

## FEDERAL STATUTES

18 U.S.C. § 981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 67

18 U.S.C. § 981(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

18 U.S.C. § 981(e)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

18 U.S.C. § 981(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55

18 U.S.C. § 981(a)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 64

18 U.S.C. § 981(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

18 U.S.C. § 982. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

18 U.S.C. § 982(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

18 U.S.C. § 983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 983(a)(3)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 983(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 51

18 U.S.C. § 1502. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 1512. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 1956(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1956(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . 55, 59, 60, 61

18 U.S.C. § 1956(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 52

18 U.S.C. § 1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 50, 52, 53

18 U.S.C. § 1957. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 50, 53, 61

28 U.S.C. § 547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

28 U.S.C. § 1345. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

28 U.S.C. § 1355. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

31 U.S.C. § 5317. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

50 U.S.C. § 1701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

50 U.S.C. § 1702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 47, 61

50 U.S.C. § 1705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 52

International Emergency Economic Powers Act,
    95 Pub. L. 223, 91 Stat. 1625 (Dec. 28, 1977).. . . . . . . . . . . . . . . . . . . . . . . . . 61

Money Laundering Control Act of 1986,
    99 Pub. L. 570, 100 Stat. 3207 (Oct. 27, 1986). . . . . . . . . . . . . . . . . . . . . . . 51, 66

x

Civil Asset Forfeiture Reform Act,
106 Pub. L. 185, 114 Stat. 202 (Apr. 25, 2000). . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 32, 41


**FEDERAL RULES**

Fed. R. Civ. P. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 31, 49

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 46


**FEDERAL REGULATIONS**

31 C.F.R. Part 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

31 C.F.R. Part 544. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 49

31 C.F.R. § 544.201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 61

31 C.F.R. Part 560. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20, 21

31 C.F.R. § 560.203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

31 C.F.R. § 560.204. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

31 C.F.R. § 560.206. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

31 C.F.R. § 560.304. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

31 C.F.R. § 560.313. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

31 C.F.R. § 560.314. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

31 C.F.R. § 560.316. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

64 Fed. Reg. 20168, 20171 (Apr. 26, 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46


**EXECUTIVE ORDERS**

Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987). . . . . . . . . . . . . . . . . . . . . . . . 6, 42

Exec. Order 12938, 59 Fed. Reg. 59099 (Nov. 14, 1994). . . . . . . . . . . . . . . . . . . . . . . 23, 51

Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995).. . . . . . . . . . . . . 18, 19, 20, 50, 57

Exec. Order 12959, 60 Fed. Reg. 24757 (May 6, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 19, 1997). . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Exec. Order 13382, 70 Fed. Reg. 38567 (June 28, 2005). . . . . . . . . . . . . . . . . . 23, 24, 34, 63, 65

## OTHER AUTHORITIES

Herman Walker, Jr., *Modern Treaties of Friendship, Commerce and Navigation*,
     42 Minn. L. Rev. 805 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Treaty of Amity, Economic Relations, and Consular Rights,
     Aug. 15, 1955, U.S.-Iran, 8 U.S.T. 899. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

The Government respectfully submits this memorandum of law in opposition to the motions by (a) claimants Assa Corporation ("Assa Corp.") and Assa Company, Limited ("Assa Co. Ltd." (together, the "Assa Claimants") and (b) claimants the Alavi Foundation (the "Alavi Foundation" or the "Foundation") and 650 Fifth Avenue Company ("650 Fifth Avenue Company" or the "Partnership"), to dismiss the Government's verified amended complaint (the "Complaint" or "Compl."), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule G(8)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. For the reasons explained below, the motions should be denied.

## STATEMENT OF FACTS[1]

This civil forfeiture action relates to a conspiracy by 650 Fifth Avenue Company, the Alavi Foundation, Assa Corp., and Assa Co. Ltd. (collectively, the "Claimants") to provide services to the Islamic Republic of Iran, in violation of the International Emergency Economic Powers Act (the "IEEPA"), codified at 50 U.S.C. § 1701 etc. These entities are a front for the Iranian Government and have allowed that government to operate, undetected, a commercial enterprise and non-profit organization in the United States, and have helped funnel millions of dollars to Bank Melli Iran ("Bank Melli"), a state-owned bank.

As explained below, 650 Fifth Avenue Company is a partnership between the Alavi Foundation (a New York not-for-profit corporation) and Bank Melli. The principal asset of 650 Fifth Avenue Company is a 36-story office tower located at 650 Fifth Avenue, New York, New York (the "Building"). The Alavi Foundation owns 60 percent of the Partnership. Bank Melli owns the remaining 40 percent through two shell companies, Assa Corp., a New York corporate

---

[1]    This Statement of Facts is based upon the allegations in the Complaint, which was filed November 12, 2009 and verified by Special Agent George Ennis of the Federal Bureau of Investigation.

entity, and Assa Co. Ltd., a corporation domiciled in Jersey, Channel Islands, United Kingdom. Assa Corp. is wholly owned by Assa Co. Ltd.

The Alavi Foundation is controlled by the Islamic Republic of Iran and has been providing numerous services to the Iranian Government, in violation of the IEEPA, including managing a commercial building for the Iranian Government, running a charitable organization for the Iranian Government, and transferring funds from 650 Fifth Avenue Company to Bank Melli.

Likewise, Assa Corp. is owned and controlled by Bank Melli and has been providing numerous services to Bank Melli in contravention of the IEEPA, such as managing Bank Melli's substantial investment interest in 650 Fifth Avenue Company and sending income from that investment overseas.

Claimants do not dispute the sufficiency of the Government's allegations establishing that they are either owned and/or controlled by the Islamic Republic of Iran.  These allegations are summarized below.

**A.**    **Following the 1979 Iranian Revolution, the Pahlavi Foundation Became the Mostazafan Foundation of New York and a New Slate of Directors Was Installed**

The Alavi Foundation is the successor organization to the Pahlavi Foundation, a not-for-profit corporation organized under the laws of the State of New York.  (Compl. ¶ 24). The Pahlavi Foundation was established in 1973 by the former Shah of Iran, Shah Reza Mohammad Pahlavi,  to pursue Iran's charitable interests in the United States.  (*Id*.).  In the 1970s, the Pahlavi Foundation constructed an office tower at 650 Fifth Avenue in Manhattan (the "Building") as a source of revenue for the Foundation.  (*Id*.).  The Building's construction was

financed by a substantial loan from Bank Melli.  (*Id*.).

The Iranian revolution broke out in 1978, and on April 1, 1979, the previously exiled religious leader Ayatollah Ruhollah Khomeini proclaimed the establishment of the Islamic Republic of Iran.  (Compl. ¶ 25).  After the revolution, the Islamic Republic of Iran established the Bonyad Mostazafan, also known as the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan"), to centralize, take possession of, and manage property expropriated by the revolutionary government.  (Compl. ¶ 26).  The Bonyad Mostazafan was created in or about March 1979 by order of the Ayatollah Khomeini.  (*Id*.).  It reports directly to the Ayatollah and is controlled by the government of Iran.  (*Id*.).  The Bonyad Mostazafan sought to take control of the Shah's property, including the assets of the Pahlavi Foundation.  (*Id*.).

Between October 1978 and October 1979, all five previous directors of the Pahlavi Foundation resigned.  (Compl. ¶ 26).  Four new directors took their places.  (*Id*.).  On or about February 25, 1980, an amended Certificate of Incorporation for the Pahlavi Foundation was filed renaming the Foundation "The Mostazafan Foundation of New York" (hereinafter, the "Mostazafan Foundation").  (*Id*.).   In 2008, law enforcement conducted a search of the Alavi Foundation's offices.  (Compl. ¶ 29).  During the search, agents found two letters, both dated October 1981, from the president of the Mostazafan Foundation to two employees, terminating their employment.  (*Id*.).   The letterhead at the top of each letter shows the symbol for the Mostazafan Foundation of New York, above which appears a symbol for the Islamic Republic of Iran.  (*Id*.).

The Mostazafan Foundation was later renamed the Alavi Foundation.  (Compl. ¶ 27).  As discussed below, since the revolution, the Mostazafan Foundation of New York, and later the

Alavi Foundation, have acted at the direction of, and provided services to, entities owned and controlled by the Islamic Republic of Iran.[2]

**B.**      **In the 1980s, the Iranian Government Engineered the Creation of 650 Fifth Avenue Company**

In the late 1980s, the Mostazafan Foundation faced a substantial tax liability as a result of the Bank Melli debt on the Building.  (Compl. ¶ 31).  Under the debt-financed property rules of the federal tax code, the Foundation's rental income was considered unrelated business debt-financed income because of the mortgage and was therefore subject to tax.  (*Id*.).  In order to avoid this tax, Iranian government officials and directors of the Mostazafan Foundation devised a plan to create a partnership with Bank Melli in order to remove the mortgage on the Building and free the rental income from tax.  (*Id*.).  In 1989, the Mostazafan Foundation created 650 Fifth Avenue Company, a partnership with Bank Melli.  However, Bank Melli disguised its ownership by establishing two shell companies—Assa Corp. and Assa Co. Ltd.  (Compl. ¶ 20).  Mohammad Behdadfar ("Behdadfar"), a Bank Melli board member, was appointed Assa Corp.'s president, and a director of Assa Co. Ltd.  (Compl. ¶ 44).

The Mostazafan Foundation and Assa Corp. entered into a written Partnership Agreement on or about July 31, 1989.  (Compl. ¶ 41).  The Partnership Agreement provided, in part, that the partnership would be called 650 Fifth Avenue Company, that the Foundation would contribute the Building to the Partnership, and that Assa Corp. would contribute $44.8 million to the capital of the partnership.  (Compl. ¶ 42).  As a result of this partnership, the debt on the Building was

---

[2]      The Foundation changed its name in 1992, after an individual with a judgment against Iran filed a civil action against the Foundation, alleging that the Foundation is controlled by the Iranian Government.  (*See* Compl. ¶¶ 101-108).

removed, permitting the Alavi Foundation to avoid paying U.S. taxes on revenue from the Building.  (*Id.*).

The correspondence and meeting minutes described in the Complaint show that the decision to form a partnership interest between Bank Melli and the Alavi Foundation was discussed and approved by high-level Iranian government officials.  Among others, the Office of the Prime Minister of Iran, the head of the Bonyad Mostazafan (also the Deputy Prime Minister of Iran), the director of the Central Bank of Iran, and the general director of Bank Melli, as well as other Bonyad Mostazafan and Bank Melli officials, discussed and approved the partnership between the Alavi Foundation and Bank Melli.  (Compl. ¶¶ 31-40).  After the Alavi Foundation and Assa Corp. entered into the 650 Fifth Avenue Company partnership agreement, a Bonyad Mostazafan official forwarded the agreement to the head of the Bonyad Mostazafan, noting that "the partnership is based on prior agreements between the Ministry of Finance, Bank Melli Iran, and the Bonyad Mostazafan, with the only change being the building will be valued at two million dollars less than as previously agreed . . . ."  (Compl. ¶ 39; *see also* Compl. ¶ 40 (telex dated February 2, 1990, from Bank Melli's New York office, explaining the reasons for the formation of 650 Fifth Avenue Company and stating that the decision to form Assa Co. Ltd. was made "after ample study" at the Mostazafan Foundation, the Bonyad Mostazafan and Bank Melli)).

Today, the two straw owners of Assa Co. Ltd. are Davood Shakeri ("Shakeri") and Fatemeh Aghamiri ("Aghamiri"), who are residents of Iran and represent the interests of Bank

Melli.  (Compl. ¶ 47).[3]

**C.    The Iranian Government Has Continued to Exercise Control Over the Mostazafan Foundation of New York/the Alavi Foundation**

> 1.    In 1991, the Islamic Republic of Iran Changed the Board of the Mostazafan Foundation

After the formation of the Partnership, the Iranian Government continued to control the

Alavi Foundation.  (Compl. ¶ 48).  In the early 1990s, control over the Mostazafan Foundation of

New York shifted from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations.

In 1989, Kamal Kharrazi ("Kharrazi") became the new Iranian Ambassador to the United

Nations.  (Compl. ¶ 49).  After assuming his duties as Ambassador, Kharrazi informed the

Foundation's president, Badr, that Kharrazi was the representative of the Ayatollah and that all

Iranian entities in the United States were under his control.    (*Id*.).

As a result of tension between the new Ambassador and the Alavi Foundation's president,

the Ambassador eventually demanded the president's resignation, which was ordered by the

---

[3]    The decision to conceal Bank Melli's interest may have arisen out of tax questions that the deal raised and/or U.S. restrictions on financial dealings with Iran.  In a letter dated 1988, a member of the Mostazafan Foundation's board of directors wrote to the Foundation's president, Mohammad Badr Taleh ("Badr"), that a partnership with Bank Melli might be viewed as tax evasion, stating: "The probability of the IRS agreeing with the exchange of the loan for a proportion of the partnership share is very weak. The IRS will argue that no real change has been made except the loan has been changed in name to capital, with the only result being the payment of no tax. The IRS will therefore consider it tax evasion."  (Compl. ¶ 36).

In addition, in 1987, the United States ordered an import embargo against the Government of Iran as a result of that government's support of terrorism.  That year, President Ronald Reagan issued Executive Order 12613 based upon his finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy."  Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987).  (Compl. ¶ 6).  The Order prohibited the importation into the United States of goods and services of Iranian origin, in order "[t]o ensure that United States imports of Iranian goods and services will not contribute financial support to terrorism or to further aggressive actions against non-belligerent shipping."  (*Id*.).

Ayatollah and communicated through the head of the Bonyad Mostazafan.  (Compl. ¶ 50).  In a

letter dated May 7, 1991, three board members, including the President, wrote to the Ayatollah

that they would resign pursuant to his instructions, which were conveyed through his

representative, the head of the Bonyad Mostazafan.    (*Id.*).   The board members wrote that,

despite the "sensitive" political conditions between the United States and Iran, they had

succeeded in "protecting and expanding the Foundation's interests which in truth belongs to the

people of Iran." (*Id.*).  They further wrote that they were "also able to successfully carry out

cultural and Islamic activities in the country of the Great Satan which faced an excessive void in

the area of Islamic teachings due to the non-representation of the Islamic Republic of Iran."  (*Id.*).

On May 16, 1991, the board of directors of the Alavi Foundation held a meeting in

Zurich, Switzerland to discuss the composition of the board.  (Compl. ¶ 52).  The meeting was

also attended by the head of the Bonyad Mostazafan, who explained the changes to be made to

the board of directors "as directed by the Supreme Leader [the Ayatollah]," and that several of

the board members, including the president, were to resign.  (*Id.*).  Noting the length of time

required to nominate and transition new board members, the head of the Bonyad Mostazafan

instructed the present board members to continue their duties until the transition was completed.

(*Id.*).  The minutes of the meeting show that the attendees also discussed issues relating to the

charitable services of the Foundation and the Building's operations, including the collection of

rent from one of the tenants and the payment of Assa Corp.'s ownership distributions.  (*Id.*).

In a letter, Badr described how, a few days after the Zurich meeting, Kharrazi called the

president and another board member to his office.  (Compl. ¶ 54).  The Ambassador said that

"the Foundation from here on out is under the oversight of Haj Agha, not Mr. Rafighdoost [then

7

the head of the Bonyad Mostazafan]. . . . [F]rom now on, the role of the Managing Director and the role of the Board of Directors will be just a formality and he [the Ambassador] will be conducting all of its [the Foundation's] affairs." (*Id.*). The Ambassador said that he was now "directly responsible for the Foundation and . . . the Managing Director of the Board of Trustees." (Compl. ¶ 54; *see also* Compl. ¶ 58 (letter from Badr, dated June 3, 1991, recalling that Kharrazi and his brother had "told almost everyone that they will be directly responsible for the Mostazafan Foundation of New York and will not only control its activities, but supervise it as well")).

On May 30, 1991, Badr wrote a letter to the Ayatollah cautioning that although the Ambassador's "appointment to a position of responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader has made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects." (Compl. ¶ 56).

Badr later wrote to Karim Sobhani ("Sobhani"), the Advisor and Director General of the Regional and International Chairmanship of the Bonyad Mostazafan, about the danger posed by Kharrazi's interference. (Compl. ¶ 58). In a letter dated June 3, 1991, Badr wrote that he was "afraid that these gentlemen have knowingly created a situation that will beyond a doubt jeopardize the Foundation in the future and involve the security authorities and the Attorney General." (*Id.*). Badr further noted that he and other members of the Foundation's board had "frequently signed affidavits addressed to American authorities - whether the Attorney General, legal courts, tax office, or the FBI - stating that the Foundation is independent and devoid of any connection to the Government of Iran and the Iranian Government's qualified authorities."

8

(Compl. ¶ 59).  He expressed concern that "If this issue [the Ambassador's interference with the Foundation's activities], which has created a connection between the Foundation to Government of Iran and is surely known to the American authorities, is deemed a violation and causes actions to be taken against the Foundation, I and the other members of the Board of Trustees . . . will be culpable of a heavy offence," and "a solution needs to be thought of for us."  (*Id*.).

In July 1991, Badr resigned his position.  In or about August 1991, he ceased working for the Mostazafan Foundation and was replaced by Mohammad Geramian ("Geramian"), who served as president until the summer of 2007.  (Compl. ¶¶ 61 & 66; *see generally* Compl. ¶¶ 48-61).

2.    Meetings Between the Iranian Ambassador and Members of the Alavi
      Foundation's Board of Directors

During Geramian's tenure, the Iranian Government continued to direct the affairs of the Foundation through its Iranian Ambassadors to the United Nations.  (Compl. ¶¶ 62-81).  For example, Kharrazi (Ambassador from in or about 1989 through in or about August 1997) and Seyed Mohammad Hadi Nejad Hosseinian ("Hosseinian") (Ambassador from in or about 1998 through in or about summer 2002) both attended Board meetings.  (Compl. ¶ 63).  Hosseinian originated the idea, which the Alavi Foundation adopted and continues to follow, of using a "one-third" formula to fund projects, whereby recipients of funding for building projects obtain one-third of the necessary funds from the local community, one-third is a grant from the Alavi Foundation, and the final third is a loan from the Foundation.  (*Id*.).

In 2004, Hosseinian's successor, Javad Zarif (Ambassador from in or about August 2002 through in or about July 2007), told the Alavi Foundation to settle a lawsuit with a company

controlled by a former Alavi Foundation president for $4 million, because the former president threatened to reveal in open court what he knew about Assa Corp.'s true ownership.  (Compl. ¶¶ 62-65).

Bank Melli officials also acknowledged the Iranian Government's control over the Alavi Foundation. For example, on August 25, 1992, Geramian (the Alavi Foundation's president) met with Bank Melli officials in Tehran to discuss $1.7 million in real estate taxes owed by 650 Fifth Avenue Company and $2.2 million in unpaid distributions owed by the partnership to Assa Corp. (Compl. ¶¶ 83-84).  In addition to Geramian, the meeting was attended by a Bank Melli board member, the head of Bank Melli's Overseas Network Supervisory Department ("ONSD"), the head of Bank Melli's New York branch, and the head of Bank Melli's Foreign Affairs.   (*Id.*).

After the meeting, Bank Melli's managing director, who was also the head of its board of directors, forwarded the minutes of this meeting to the head of the Bonyad Mostazafan, along with a cover letter stating:  "[W]e remind you the Alavi Foundation of New York is in partnership with this Bank in the ownership of the building at 650 5th Ave. . . . , and has been in partnership since August of 1989, with the Foundation's share set at 65% and Assa Corp New York's share set at 35% . . . . It is hoped that your firm instructions and the extra attention of the brothers from that esteemed Foundation, who are responsible for the Alavi Foundation of New York, will resolve the partnership's mutual problems quickly. . . ."  (Compl. ¶¶ 83-87).

A Bank Melli employee later wrote a letter questioning whether Assa Corp. should have to pay a tax penalty as a result of the Alavi Foundation's untimely payment of taxes; the employee asked, "should the two sides of the partnership -- which are the organs of the Islamic Republic of Iran -- claim that due to the other side's unfamiliarity with local laws, try to take

10

advantage of the other side and, God forbid, impose a financial burden on the other party?" (Compl. ¶ 88).[4]

The Complaint also describes an incident in which Bank Melli acknowledged the Ambassador's control over the Foundation.  In the late 1990s, two Bank Melli employees sought Ambassador Kharrazi's permission for Assa Corp. to sell its interest in 650 Fifth Avenue Company.  (Compl. ¶ 64).  The Ambassador informed the Bank Melli officials that the Building would be sold when the real estate market improved.  (*Id*.).

The Alavi Foundation eventually became more discreet when interacting with the Ambassador.  (Compl. ¶ 66).  In July 2007, Farshi Jahedi ("Jahedi") replaced Geramian as president of the Alavi Foundation.  (*Id*.).  That same month, Mohammad Khazaee ("Khazaee") assumed responsibilities as the new Iranian Ambassador to the United Nations.  (*Id*.).  Jahedi and Khazaee met at the latter's residence on at least two occasions, and periodically met alone in a closed room at a location in Queens, New York, after which Jahedi generally met with the Foundation's board.  (Compl. ¶¶ 67-68).

On October 5, 2007, just a few months after becoming president, Jahedi met with the Khazaee at the Ambassador's residence to discuss issues relating to the Building's management and the Foundation's charitable services.  (Compl. ¶ 68).  The meeting was also attended by Ali Ebrahimi (a member of the Foundation's board since 1992 and its secretary), and Mehdi Faridzadeh ("Faridzadeh"), the former cultural ambassador for the Iranian Mission to the United Nations.  (*Id*.).  Jahedi and Ebrahimi each took detailed notes of the meeting.  (*Id*.).

---

[4]    The minutes of this meeting were found during a search, in 2008, of a residence owned by Bank Melli.  (Compl. ¶¶ 82-83).

According to Jahedi's notes, the Ambassador instructed that he would determine the composition of the Alavi Foundation's board of directors; that the profitability of the Building had to be improved; and that the Alavi Foundation should only allocate to Shiites. (Compl. ¶ 70). The Ambassador ordered a study about the possibility of increasing the Foundation's revenue and profit, stating that a business plan and comparative analysis had to be done. (Compl. ¶ 71). He further instructed: "I have to definitely see the proposed allocations before a final decision is reached. I have to be kept informed and I have to be able to state my opinion in order for you to make a decision." (*Id*.) Regarding future meetings, the Ambassador instructed Jahedi that contact between them would have to increase. He told the board members that "[i]f there is an issue that needs to be conveyed to Tehran, let me know, I will convey it." (Compl. ¶ 72; *see generally* Compl. ¶¶ 67-72). The Ambassador also expressed concern about Assa Corp.'s 40 percent share. (Compl. ¶ 70).

Ebrahimi's notes confirm that Khazaee spoke at the meeting about, among other issues, increasing profit, Bank Melli's 40 percent interest (written, in Farsi, as "40% shares → [scratched out] → Bank Melli" ), and increasing the composition of the Board.[5] (Compl. ¶ 76).

## D.    Jahedi's Obstruction of Justice

On December 17, 2008, the United States commenced this civil forfeiture action by filing a verified complaint. That same day, Jahedi, as president of the Alavi Foundation, was served with a grand jury subpoena. (Compl. ¶ 109). The subpoena that was directed to the Foundation

---

[5]    Jahedi's handwritten notes were seized from his office pursuant to a search warrant that was issued in the immediate aftermath of law enforcement witnessing his destruction of documents. (*See* Compl. ¶ 69). Ebrahimi's notes were seized pursuant to a separate search warrant. (Compl. ¶¶ 75-77).

commanded the production to the grand jury of financial documents concerning the Alavi
Foundation, Assa Corporation, Assa Company Limited, and 650 Fifth Avenue Company.
(Compl. ¶ 110).

The day after the subpoena was served, FBI personnel observed Jahedi discarding torn
documents into a public trash can.  (Compl. ¶ 110).  Upon reassembling certain of the
documents, the FBI determined that the documents referred to Assa Limited, Assa Company, and
650 Fifth Avenue Company, and thus were responsive to the grand jury subpoena.  (*Id*.).

Jahedi was arrested on December 19, 2008.  On May 5, 2009, he was charged in a two-
count Indictment with destroying a document, with the intent to impair that document's
availability for use in an official proceeding, in violation of 18 U.S.C.  §§ 1512(c)(1) and 2
(Count One), and obstruction of justice, in violation of 18 U.S.C. §§ 1502 and 2 (Count Two).
to which he pleaded guilty on December 30, 2009.  *See United States v. Farshid Jahedi*, 09 Cr.
460 (SAS).  (Compl. ¶ 111).  Jahedi pleaded guilty to both counts on December 30, 2009, and
was sentenced on April 29, 2010.

## PROCEDURAL HISTORY

On December 17, 2008, the United States commenced this civil action by filing a
complaint that sought forfeiture of Assa Corp.'s 40 percent interest in 650 Fifth Avenue
Company and the funds seized from Assa's bank accounts, as properties that constitute and were
derived proceeds of IEEPA violations.  The complaint also sought forfeiture of these properties
on the ground that they were involved in money laundering and attempted money laundering
transactions, in violation of 18 U.S.C. §§ 1956 and 1957.

On November 12, 2009, the Government filed the amended Complaint.  In addition to Assa Corp.'s 40 percent interest in 650 Fifth Avenue Company, the amended Complaint seeks forfeiture of the Alavi Foundation's 60 percent interest, as well as the Foundation's other real properties, as property constituting or derived from proceeds traceable to an IEEPA violation, and as property involved in money laundering and attempted money laundering transactions.  The amended complaint seeks forfeiture also of bank accounts held in the names of the Alavi Foundation and 650 Fifth Avenue Company.  The defendants *in rem* are hereinafter referred to as the "Defendant Properties."

On March 1, 2010, claimants the Alavi Foundation and 650 Fifth Avenue Company filed a joint motion to dismiss the Complaint.  *See In re: 650 Fifth Avenue and Related Properties*, 08 Civ. 10934 (Docket Items 75-76).  The Assa Claimants also moved to dismiss.  *See id.* (Docket Items 78, 81).[6]

## ARGUMENT

### I.    LEGAL STANDARD ON A MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) seeks dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In two recent decisions, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court revisited the pleading requirements necessary to survive a motion to dismiss.  Generally speaking, a Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[6]    "Alavi Br." refers to the brief, dated March 1, 2010, filed by the Alavi Foundation and 650 Fifth Avenue Company in support of their motion to dismiss.  "Assa Br." refers to the brief, dated March 1, 2010, filed by the Assa Claimants in support of their motion to dismiss.

*Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also id.* at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . .") (quoting Fed. R. Civ. P. 1).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949; *accord Twombly*, 550 U.S. at 556.  "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.

In a civil forfeiture action, the complaint must adhere to the more stringent pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.[7]  Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Rule G(2)(f).  Thus, the standard to be applied to a civil forfeiture complaint is more stringent than the general pleading requirements under the Federal Rules of Civil Procedure.  *See, e.g.*, *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).

The Government is not, however, required to have sufficient evidence at the time it files its complaint to establish the forfeitability of property.  The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), codified in part at 18 U.S.C. § 983, makes clear that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the

---

[7]     Supplemental Rule G, which became effective December 1, 2006, provides that, "[t]o the extent that [Rule G] does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply."  Rule G(1).

property."  18 U.S.C. § 983(a)(3)(D); *see also* Rule G(8)(b)(ii) ("In an action governed by 18

U.S.C. § 983(a)(3)(D) the complaint may not be dismissed on the ground that the government did

not have adequate evidence at the time the complaint was filed to establish the forfeitability of

the property. The sufficiency of the complaint is governed by Rule G(2)."); 18 U.S.C. § 983(c)(2)

("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to

establish, by a preponderance of the evidence, that property is subject to forfeiture.").

   The Government is also not required to show probable cause for forfeiture.  *E.g.*,

*Daccarett*, 6 F.3d at 47.  Instead, the complaint simply needs to establish a "reasonable belief"

that the government will be able to meet its burden at trial.  *Id.*; *see id.* ( "In other words, the

complaint need not allege facts sufficient to show that specific property is tainted, but facts

sufficient to support a reasonable belief that the government can demonstrate" the ultimate trial

burden "for finding the property tainted.").  Stated differently, the Government must plead "the

circumstances from which the claim arises with such particularity that the defendant or claimant

will be able, without moving for a more definite statement, to commence an investigation of the

facts and to frame a responsive pleading."  *United States v. Mondragon*, 313 F.3d 862, 865-67

(4th Cir. 2002) (quoting Supplemental Rule E(2)(a)).[8]

   When considering a Rule 12(b)(6) motion to dismiss, the court must "must accept as true

all of the factual allegations set out in plaintiff's complaint, draw inferences from those

---

   [8]    Prior to the adoption of Rule G, courts applied the pleading standard in Supplemental
Rule E(2)(a)—which governs maritime and admiralty actions—to civil forfeiture actions.  The
Advisory Committee Notes to Rule G state that "application of this standard to civil forfeiture
actions has evolved to the standard stated in [Rule G(2)(f)]."  Citing the decision in *Mondragon*,
the Advisory Committee Notes state that Rule G(2)(f) "carries this forfeiture case law forward
without change."

allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)). The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also United States v. $15,270,885.69 Formerly on Deposit in Account No. 8900261137*, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *5 (S.D.N.Y. Aug. 31, 2000) (motion to dismiss may not be used to test the sufficiency or admissibility of the evidence). "[T]he issue is not whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citations omitted).

## II.    THE COMPLAINT ADEQUATELY PLEADS THAT ASSA CORP. AND ASSA CO. LTD. VIOLATED THE IEEPA

As alleged in the Complaint, Assa Corp. and Assa Co. Ltd. are owned and controlled by Bank Melli, and Assa Corp. has been illegally providing significant and valuable services to Bank Melli, such as managing the bank's substantial investment interest in 650 Fifth Avenue Company, sending income from that investment overseas, and concealing the bank's interest from law enforcement and judgment creditors. The Assa Claimants nevertheless argue that these services are not actually services, but instead merely "communications that do[] not involve a transfer of value," and that therefore fall outside the scope of the IEEPA. (Assa Br. 14). As explained in more detail below, this argument is frivolous.

A.    **The IEEPA, the Iranian Embargo, and the Ban on Weapons of Mass Destruction Proliferation**

1.    Executive Orders 12959 and 13059

The IEEPA, enacted in 1977 and codified at 50 U.S.C. § 1701 *et seq.*, confers upon the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency.  *See* 50 U.S.C. § 1701.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).   As described below, the President and the Department of Treasury have issued executive orders and regulations pursuant to the IEEPA that prohibit a broad range of conduct with respect to Iran, including conduct relating to imports from Iran, exports to Iran, dealings in Iranian goods and services, and financial dealings with Iran.

On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995).  Using the powers conferred by the IEEPA and other statutes, the President declared a national emergency to deal with that threat.  On May 6, 1995, the President issued Executive Order 12959, which, with some exceptions not applicable here, prohibited the supply or exportation of any service from the United States to Iran, any transaction or dealing by a United States person relating to goods or services of Iranian origin or owned or controlled by the Government of Iran, and other conduct as well.  Exec. Order 12959, 60 Fed. Reg. 24757 (May 6, 1995).

On August 19, 1997, the President issued Executive Order 13059 to consolidate and

18

clarify Executive Orders 12957 and 12959. Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 19,

1997). In general, this Executive Order prohibits the following without a valid license: (1) the

importation into the United States of goods or services of Iranian origin; (2) the exportation or

supply, directly or indirectly, from the United States or by a United States person, of goods or

services to Iran or the Iranian Government; (3) any new investments by a United States person in

Iran or property owned or controlled by the Iranian Government; (4) any transaction or dealing by

a United States person in or related to goods or services (a) owned or controlled by Iran, or (b)

for exportation or supply, directly or indirectly, to Iran or the Iranian Government; (5) facilitation

or approval of a transaction by foreign persons where the transaction would otherwise be

prohibited if performed by a United States person or within the United States, and (6) any

transaction that evades or avoids, or has the purpose of evading or avoiding, the prohibitions in

the order.

> The relevant text of Sections 1 and 2 of Executive Order 13059 provides, in part:
>
> Section 1. Except to the extent provided in section 3 of this order or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, other than information or informational materials within the meaning of section 203(b)(3) of IEEPA [50 U.S.C. § 1702(b)(3)], is hereby prohibited.
>
> Section 2. Except to the extent provided in section 3 of this order, in section 203(b) of IEEPA [50 U.S.C. § 1702(b)], or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the following are prohibited:
>
> (a) the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a

19

third country undertaken with knowledge or reason to know that:

> (i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

(c) any new investment by a United States person in Iran or in property, including entities, owned or controlled by the Government of Iran;

(d) any transaction or dealing by a United States person, wherever located, including purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing, in or related to:

> (i) goods or services of Iranian origin or owned or controlled by the Government of Iran; or

> (ii) goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran;

(e) any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this order if performed by a United States person or within the United States; and

(f) any transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order.

Exec. Order 13059.

> 2.    The ITR - 31 C.F.R. Part 560

In September 1995, in order to implement Executive Orders 12957 and 12959, OFAC expanded the Iranian Transactions Regulations (the "ITR"), 31 C.F.R. Part 560.  The prohibitions relevant to this forfeiture action include Sections 560.203, 560.204, 560.206, 560.207 and 560.208.  (*See* Compl. ¶¶ 9-14).[9]

---

[9]    The current version of Sections 560.204, 560.206, 560.207 and 560.208 became effective on August 20, 1997.  64 Fed. Reg. 20168, 20171 (Apr. 26, 1999).

Generally speaking, Section 560.204 prohibits the exportation or supply, directly or indirectly, of any service from the United States to Iran or the Government of Iran, without having first obtained a valid license from OFAC.  The relevant text of this provision states:

> Except as otherwise authorized pursuant to this part, including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995,  the exportation . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a)     Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .

31 C.F.R. § 560.204.

The term "Government of Iran" is defined in the ITR and includes, among things, any "entity owned or controlled directly or indirectly" by the Government of Iran, any person to the extent such person is acting or purporting to act on behalf of the Government of Iran, and any person or entity designated by the Secretary of the Treasury as falling with the definition of "Government of Iran." 31 C.F.R. § 560.304.   The term "entity owned or controlled by the Government of Iran" includes "any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government."  31 C.F.R. § 560.313.

As alleged in the Complaint, Bank Melli is wholly owned and controlled by the Iranian Government.  (Compl. ¶ 12).  In addition, in 1999, OFAC identified Bank Melli in Iran, and all of its offices worldwide, as entities "owned or controlled by the Government of Iran."  31 C.F.R. Part 560, App. A.

The Complaint also alleges forfeiture based upon violations of 31 C.F.R. § 560.206,

21

which prohibits United States persons from engaging in any transaction or dealing, in or related

to goods, technology or services, for exportation to Iran or the Government of Iran.  This section

states, in part:

> (a) Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may engage in any transaction or dealing in or related to:
>
>> (1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or
>>
>> (2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.
>
> (b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

31 C.F.R. § 560.206.

The Complaint also alleges violations of Sections 560.207 and 560.208.  Section 560.207

bans "any new investment by a United States person in Iran or in property (including entities)

owned or controlled by the Government of Iran."  Pursuant to Executive Order 13059 and the

ITR, the term "new investment" means "a commitment or contribution of funds or other assets,"

or "a loan or other extension of credit," with some exceptions not applicable here.  Exec. Order

13059 § 4(f); 31 C.F.R. § 560.316.

Section 560.208 provides that no United States person may "approve, finance, facilitate,

or guarantee any transaction by a foreign person where the transaction by that foreign person

would be prohibited by this part if performed by a United States person or within the United

States."[10]

Finally, the ITR also prohibit "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part . . ."  31 C.F.R. § 560.203.

     3.     <u>Executive Order 13382 and the WMD Regulations</u>

On November 14, 1994, President Clinton announced that the proliferation of weapons of mass destruction ("WMDs") and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.  Using the powers conferred by the IEEPA and other statutes, the President declared a national emergency to deal with that threat.  Exec. Order 12938, 59 Fed. Reg. 59099 (Nov. 14, 1994).

On June 28, 2005, President George W. Bush issued Executive Order 13382, announcing additional steps to address the national emergency described in Executive Order 12938.  Exec. Order 13382, 70 Fed. Reg. 38567 (June 28, 2005).  Generally speaking, this Order blocks all property and interests in property of any person determined by the Secretary of Treasury to be a proliferator of WMDs or to have provided or attempted to provide financial, material, technological, or other support for the proliferation of WMDs.  *See* Exec. Order 13382 § 1(a). The Order also bans any transaction or dealing in property or interests in property blocked pursuant to the order, including but not limited to (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of, any person whose property and interests

---

     [10]     The term "United States person" is defined as "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States."  31 C.F.R. § 560.314.

in property are blocked, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person.  *See* Exec. Order 13382 § 1(b).

The individuals and entities whose property is blocked pursuant to this Executive Order are listed in OFAC's "Specially Designated Nationals" ("SDN") list.  Bank Melli and all of its offices worldwide were added to the SDN list on or about October 25, 2007.  (Compl. ¶ 18).  Assa Corporation and Assa Company Limited were added to the SDN list on or about December 17, 2008.  (*Id.*).

In April 2009, pursuant to Executive Order 13382, OFAC adopted the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. Part 544.  Generally speaking, 31 C.F.R. § 544.201 also blocks property and prohibits transactions with respect to that property. [11]

The Alavi Foundation has never received a license from OFAC to run a commercial building for the Government of Iran, to run a charitable organization for the Government of Iran, or to provide services to Bank Melli through Assa Corp.  (Compl. ¶ 17).  Prior to the commencement of this forfeiture action on December 17, 2008, Assa Corp. and Assa Co. Ltd. never received a license from OFAC.  In addition, Bank Melli has never received a license from OFAC relating to the Building.  (*Id.*).

## B.    Facts

The Complaint contains detailed factual allegations showing that Assa Corp. and Assa Co. Ltd. are shell companies owned and controlled by Bank Melli, and that Assa Corp. manages Bank Melli's investment interest in 650 Fifth Avenue Company, conceals that interest from law

---

[11]    The full text of the relevant provisions in Executive Order 13382 and 31 C.F.R. § 544.201 appears in the Complaint.  (*See* Compl. ¶¶ 16-17).

enforcement, and exports millions of dollars of income from that investment to Bank Melli. (Compl. ¶¶ 19-119).  The Assa Claimants do not argue that the Complaint sufficiently alleges these facts, but instead dispute whether these activities violate the IEEPA.

      1.     <u>Assa Corp. and Assa Co. Ltd. Are a Front for Bank Melli</u>

As explained *supra*, the factual allegations in the Complaint establish Assa Corp. and Assa Co. Ltd. are a front for Bank Melli.

The Complaint also alleges that, in the 1990s, Bank Melli officials corresponded about the risk of Assa Corp.'s true owner becoming known.  In a letter dated December 29, 1993, Bank Melli's Overseas Network Supervisory Department ("ONSD") wrote to the head of Bank Melli's New York office expressing concern that the Assa director's  affiliation with the Bank might be discovered.  ONSD requested that an inquiry be made into "whether Mr. Naghshineh -- the Assa Corp New York Director whose affiliation with the Bank could be easily proven -- could be replaced with another individual whose affiliation with the Bank could not be easily proven," and further asked, "Would this make it possible to maintain the ownership of the building's shares?" (Compl. ¶ 119a).

The danger of Bank Melli's interest in Assa Corp. being uncovered eventually prompted Bank Melli to limit the role of its New York office in overseeing Assa Corp.'s operations.  In a letter dated July 21, 1994,  the head of Bank Melli's New York office, Mohammad Karjooravary ("Karjooravary"), wrote about precautions that the bank had taken after a civil lawsuit was filed against the Mostazafan Foundation based upon its alleged ties to the Iranian Government.  (*See* discussion *infra* Part III(A)(3)).  In the letter,  Karjooravary wrote that the New York office initially managed the affairs of Assa Corp.  However, "[s]ince last year, following a complaint

registered by a person named Norman Gaby [*sic*] against the partnership's partner and one in which the partnership's building had been mentioned, it seems that management has declared that all the partnership's affairs be handled by a different entity other than this Agency."  (Compl. ¶ 119b).

ONSD wrote a response on June 25, 1994.  Therein, ONSD questioned whether the United States banking laws apply to Bank Melli Iran, writing: "the New York Agency [of Bank Melli], which is a bank branch registered in the U.S. and naturally subject to the banking laws and other current U.S. regulations, is not the owner of Assa Corporation.  In fact, Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies."  ONSD asked the New York office to "estimate the percentage of risk of the seizure of these properties in case of the revelation of the ownership by Assa Corporation." (Compl. ¶ 119c).[12]

---

[12]    The Alavi Foundation's directors were also concerned about Bank Melli's 40 percent interest in the Partnership.  One of Ebrahimi's journals, dated Summer 2003, contains an entry dated July 25th with lengthy notes relating to a possible sale of Assa's 40 percent interest.  These notes state, in part: ". . . Assa share → Sell it → 30,000 → . . . Assa dangerous → Get rid of it → Who is going to buy it . . . " (Compl. ¶ 93).  In an entry dated July 27th, he wrote, in part:

> Assa → 40% share → August 8th → The amount of 42 million → Reputable Company → Half of the real price → Tax → . . . Collusion and illegal arrangement →. . . Foundation shares → Public prosecutor → Foundation's loss → Insist → Assa Corp → Sale → To take out Assa . . .

(Compl. ¶ 94).  Ebrahimi further wrote:  "Assa → Bank Melli 40% share → I cannot sleep at night."  (*Id.*).

As noted above, the Iranian Ambassador to the United Nations also said that he was worried about Assa Corp.'s 40 percent interest during a meeting with Jahedi in October 2007. (Compl. ¶ 70).

2.      Assa Corp.'s Management of Bank Melli's Ownership Interest in the Partnership

From in or about 1996 through in or about late 2008, Assa Corp. had a single employee working for it in the United States, Mohammad Hassan Dehghani Tafti ("Tafti").  (Compl. ¶ 112).  The Complaint describes a series of emails between Tafti and Bank Melli officials discussing the business affairs of Assa Corp.  These emails were sent to or from the Hotmail account taftimhd@hotmail.com, which Tafti used to conduct business on behalf of Assa Corp.

For example, in the Summer of 2005, Tafti corresponded with a high-level Bank Melli employee, Mohsen Ghadimipour ("Ghadimipour"), about concerns over the fact that the straw owners of Assa Ltd., Shakeri and Aghamiri, reside in Iran.  (Compl. ¶¶ 117i-k). Ghadimipour is the head of ONSD, which is located in Tehran, Iran.  (Compl. ¶¶ 117c, e).

On or about July, 2, 2005, Tafti sent an email to Ghadimipour (whom he addressed as "Mr. Ghadimipour, the director of the branches of Bank Melli, outside of Iran") at the email address overseas2@bankmelli-iran.com (the "Bank Melli Email Address").  Tafti wrote to Ghadimipour about the legal problem created by the fact that Shakeri and Aghamiri reside in Iran.  (Compl. ¶ 117i).  In the message, Tafti wrote, in part: "As you are aware, the issue of the place of residence of shareholders and the director of the Company in the USA has a special importance.  At present, shareholders are forbidden from having residences in Iran, and as per the view of the legal experts, the American government may freeze the capital of the shareholders." (*Id*.).  In light of this issue, Tafti asked Ghadimipour to "please make some arrangements" to change the "residence location" of Shakeri and Aghamiri to another country, and he proposed the United Arab Emirates.  (*Id*.).

On July 6, 2005, Tafti again wrote to Ghadimipour, this time to the email address

onsd_ir@yahoo.com (the "ONSD Email Address"), about the problem of Shakeri's and

Aghamiri's residence.  (Compl. ¶ 117j).  He stated:  "this is to inform you [about] the result of

my discussions and investigations with the consultants and the lawyers in America and London:

changing the shareholder of Assa Ltd. is possible, but the shareholder should reside in a tax free

country.  Otherwise, the country of residence will collect a tax from the income of the

shareholder."  (*Id*.).

Tafti received a response to the concerns he raised about Shakeri's and Aghamiri's

residence in a message sent on or about August 9, 2005.  (Compl. ¶ 117k).  In this email, sent

from the ONSD Email Address, the sender wrote to Tafti: "With reference to the email of

7/7/2005, regarding the location of residence of the shareholders, this is to inform you that, as per

the orders of the Bank Manager, until the appointment of the qualified individuals, act as before."

(*Id*.).

Other emails described in the Complaint illustrate other types of activities that Tafti

performed for Bank Melli and Assa Corp.  For example, on June 19, 2005, Tafti sent an email to

the ONSD Email Address about a problem arising from Citibank's refusal to wire $1.3 million

from an Assa Corp. bank account to Assa Co. Ltd. (Compl. ¶ 117h).  Tafti wrote that Citibank

invited the directors of Assa Corp. to a meeting and "wants to know all the directors," but this

created a problem because of "the absence of Mr. Shakeri."  (*Id*.).  Although this email was

addressed to the "shareholders of Assa Co. Ltd.," Tafti proposed telling Citibank that Shakeri

was on a trip or had resigned, and that Tafti and Assa Corp.'s New York attorney were now the

directors.  (*Id*.).  This email shows that Shakeri was unable or unwilling to travel to the United

States to attend to the substantial financial concerns of Assa Corp. and that he could easily be

replaced as director.

Similarly, on February 5, 2005, Tafti sent an email to Ghadimipour at the Bank Melli Email Address. (Compl. ¶ 117e). He wrote that documents that had been sent for the signatures of Aghamiri and Shakeri had not yet been received, and he urged Ghadimipour to obtain the signatures because the "lawyer and the secretary of the Company . . . are anxious." (*Id.*).

Likewise, on June 19, 2003, Tafti received an email message from "A. Azizi," sent from the address m.chowdhury@mellibank.co.uk. (Compl. ¶ 117b). Azizi is an official at Bank Melli in London. In the message, Azizi wrote, "I have had the letter of Intent and the Contract for Sale reviewed." (*Id.*). As alleged in the Complaint, this email was referring to a proposed deal, which ultimately collapsed, to sell Assa Corp.'s interest in 650 Fifth Avenue Company. (*Id.*).

Finally, the emails show that Tafti regularly sent financial statements and other business information about Assa Corp. to Bank Melli.[13]

---

[13]    In emails dated March 5 and March 16, 2005, and February 26 and May 17, 2006, sent to the ONSD Email Address, Tafti wrote that the financial statements of Assa Corp. had been sent to the recipient of the email. (Compl. ¶¶ 117f-g, l-m). Likewise, on June 12, 2003, Tafti forwarded correspondence from a New York attorney for Assa Corp. to the email address a.azizi@mellibank.co.uk. (Compl. ¶ 117a). And, on November 20, 2004, Tafti received an email from Ali Safari, an ONSD employee, sent from the address safari_onsd@yahoo.com, in which Safari requested that Tafti send the "detailed expenses" of Assa Corp. so that they "are available for the use of the auditors." (Compl. ¶ 117c).

Finally, the Complaint cites examples of Assa Corp.'s transfer of money to Assa Ltd., identifying four checks, dated 2002 to 2004, that were drawn from one of Assa's bank accounts and made payable to Assa Ltd.  These checks totaled approximately $4.1 million.  (Compl. ¶ 122).

**C.**     **Assa Corp.'s and Assa Co. Ltd.'s Violations of the IEEPA**

Here, there can be no dispute that the Complaint sufficiently alleges that Assa Corp. and Assa Co. Ltd. performed services for Bank Melli in violation of Executive Orders 12959 and 13059 and the ITR (collectively, the "Iranian Embargo").  As explained above, Assa Corp. and its parent, Assa Co. Ltd., *are* Bank Melli, and were created in order to conceal and protect Bank Melli's interest in the Partnership.  Assa Corp. performed the significant and valuable services of (1) acting as a front for Bank Melli to shield it from judgment creditors and law enforcement, (2) managing its substantial investment interest in 650 Fifth Avenue Company, and (3) funneling millions of dollars to Bank Melli, a state-owned bank.  The Complaint sets forth detailed factual allegations describing the breadth of services that Assa Corp. performed for Bank Melli to carry out these functions.  Tafti managed the day-to-day affairs of Assa Corp.  Among other things, he consulted with New York counsel regarding the legal problems created by Shakeri and Aghamiri's residence; he transferred income to Assa Co. Ltd. and, when a problem arose with Citibank about a $1.3 million transfer to Assa Co. Ltd., he worked with Assa Corp.'s legal counsel to address the problem; he paid Assa Corp.'s New York State corporate taxes (Compl. ¶ 121); and he forwarded Assa Corp.'s financial records to Bank Melli.  In addition, between 2002 and 2004, over $4 million was transferred to Assa Ltd.  These facts are sufficiently detailed to allow the Assa Claimants "to commence an investigation of the facts and to frame a responsive

30

pleading." *Mondragon*, 313 F.3d at 865-67.

The Assa Claimants argue that the activities alleged in the Complaint do not constitute the exportation of supply of services to Iran, but rather "the internal corporate activities of a New York licensed corporation." (Assa Br. 14). Even if this distorted characterization of the allegations were correct, Executive Orders 12959 and 13059 and the ITR do not carve out an exception for the "internal corporate activities" of a New York corporation. To the extent that "internal corporate activities" involve services, those services are prohibited by the IEEPA.

The Assa Claimants also argue that the activities alleged in the Complaint are at most "communication[s] that do[] not involve a transfer of value," and therefore fall outside the scope of the IEEPA. (Assa Br. 15-16). This argument is based upon a faulty application of Section 1702(b) of Title 50, United States Code. This subsection provides, in part, that "[t]he authority granted to the President by [§ 1702] does not include the authority to regulate or prohibit, directly or indirectly-- (1) any postal, telegraphic, telephonic, or other *personal communication*, which does not involve a transfer of anything of value . . . ." (emphasis added). This is not, however, a case involving personal communications being sent to Iran. On the contrary, Assa Corp. managed Bank Melli's entire investment in 650 Fifth Avenue Company, shielded that investment from judgment creditors and law enforcement, and transferred millions of dollars of income from that investment to Bank Melli. These services required a number of other services, such as working with legal counsel, paying taxes, maintaining bank accounts, and keeping Bank Melli abreast of its investment.

These types of services are plainly prohibited by Executive Orders 12959 and 13059 and the ITR. In these orders and regulations, the President and OFAC used the general terms "*any*

31

goods, technology, or services," indicating an intent to cover as broad an array of conduct as possible. *See United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) ("[Executive Order 12959] is clothed with the most serious of purposes, and it is couched in the broadest of terms"). The Second Circuit has stated that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee." *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004); *accord United States v. All Funds on Deposit in United Bank of Switz., New York, New York, Account Number 101WA263232000*, No. 01 Civ. 2091 (JSR), 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) ("[The] term[] 'services,' carries its ordinary legal meaning–see Black's Law Dictionary 1372 (7th ed.1999), defining 'service' as 'the act of doing something useful for a person or company for a fee' . . . "). Thus, by managing Bank Melli's interest in 650 Fifth Avenue Company, shielding that investment from judgment creditors and law enforcement, and transferring money to Assa Ltd., Assa Corp. provided "services" in violation of the IEEPA. *See Homa Int'l Trading Corp.*, 387 F.3d at 146 (transferring a customer's money to Iran for a fee "clearly fall[s] within the sweep of the statute"); *Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999, at *1 (offering to exchange a customer's currency and deliver it to a foreign country for a fee "is well within the ordinary meaning of supplying a 'service'").

Claimants also argue that "following instructions," "reporting back," and "managing affairs" do not involve the transfer of value to Bank Melli.  (Assa Br. 15-16).  This argument is meritless.  Executive Orders 12959 and 13059 and the ITR prohibit *any* services, not simply

those that involve a "transfer of value."[14]  In any event, these activities transferred enormous

value to Bank Melli.  By managing Bank Melli's affairs, following its instructions, and reporting

back to Bank Melli, Assa Corp. provided services to Bank Melli in the same way that a building

management company provides services to its clients.  Excluding these services from the

Executive Orders and the ITR would leave them with a gaping hole, freely permitting entities

owned and controlled by the Government of Iran to manage, within the United States, lucrative

investments for the benefit of the Government of Iran.  It is implausible to believe that these

orders and regulations—aimed at isolating Iran economically and denying it access to funds to

finance terrorism—freely permit companies in the United States to covertly manage a business

enterprise and financial investment belonging to an entity owned and controlled by the

Government of Iran.  *See Ehsan*, 163 F.3d at 859 ("The obvious purpose of the order is to isolate

Iran from trade with the United States. . . . This broad export ban reflected the President's

appraisal of the nation's interest in sanctioning Iran's sponsorship of international terrorism, its

frustration of the Middle East peace process, and its pursuit of weapons of mass destruction.")

(citing Message to Congress on Iran, 31 Weekly Comp. Pres. Doc. 1584 (Sept. 25, 1995)).

Finally, managing Bank Melli's investment interest was not the only service that Assa Corp.

performed.  Assa also sent millions of dollars to Assa Ltd. and shielded Bank Melli's assets from

law enforcement and judgment creditors.

Accordingly, the Complaint states sufficiently detailed facts to support a reasonable belief

that the Government will be able to show that Claimants exported and supplied services to Bank

---

[14]       Claimants appear to be referring to the language in § 1702(b), which, as noted
above, excludes from the President's powers under the IEEPA the power to regulate "personal
communications" that do not "involve a transfer of anything of value."

Melli in violation of the IEEPA.[15]

## III.   THE COMPLAINT ADEQUATELY PLEADS THAT 650 FIFTH AVENUE COMPANY AND THE ALAVI FOUNDATION VIOLATED THE IEEPA

As alleged in the Complaint, the Alavi Foundation has been controlled by, and provided substantial services to, the Iranian Government since as early as the 1979 Iranian revolution. These services have included, for example, (1) running a commercial enterprise (650 Fifth Avenue Company and its principal asset, the Building) for the Iranian Government, (2) shielding the Partnership's assets from judgment creditors and law enforcement by concealing the Iranian Government's relationship with the Foundation and Assa Corp., and (3) funneling millions of dollars to Bank Melli.

Claimants 650 Fifth Avenue and the Alavi Foundation do not argue, in their motion papers, that the Complaint fails to allege an IEEPA violation.  Instead, they argue that the only conceivable proceeds of the alleged IEEPA violations are the management fees that the Foundation received for running 650 Fifth Avenue Company.  This argument, however, fails to account for breadth of services that 650 Fifth Avenue Company and the Foundation performed for the Iranian Government in violation of the IEEPA.  Thus, before discussing the proceeds of the IEEPA violations (Part IV), a brief description of those IEEPA violations is warranted.

---

[15]     Exporting services to Iran is not the only violation of the IEEPA alleged in the Complaint.  As noted above, the Iranian Embargo proscribes other activities relating to Iran, including the importation into the United States of services of Iranian origin, any new investments by a United States person in property owned or controlled by the Iranian Government, and any transaction or dealing by a United States person in or related to goods or services (a) owned or controlled by Iran, or (b) for exportation or supply, directly or indirectly, to Iran or the Iranian Government.  In addition, pursuant to Executive Order 13382, Bank Melli's property has been blocked since October 25, 2007, and any transactions and dealings in property of Bank Melli have been strictly prohibited.  The Complaint alleges these as additional bases for forfeiture in the Complaint.

A.    **Facts**

1.    650 Fifth Avenue Company and the Alavi Foundation Are a Front for the Iranian Government

As discussed *supra* pp. 1-13, the Complaint alleges that, in the years since the Iranian revolution, the Government of Iran has controlled the Alavi Foundation, first through the Bonyad Mostazafan Foundation and subsequently through Iran's Ambassador to the United Nations.  The Iranian government, for example, discussed and approve the decision to form 650 Fifth Avenue Company (Compl. ¶¶ 31-47), determined the composition of the Alavi Foundation's board of directors (Compl. ¶¶ 48-61), and made decisions regarding the Building's operations and the Foundation's charitable services (Compl. ¶¶ 62-76).

2.    The Alavi Foundation's Role as the Managing Partner of 650 Fifth Avenue Company

The Alavi Foundation has played a critical role in managing the Partnership and the Building, acting as the Managing Partner and overseeing all of the finances of the Building and the Partnership.  (Compl. ¶¶ 96-100).

The 1989 Partnership Agreement (the "Agreement") between the Mostazafan Foundation and Assa Corp. required the Foundation to administer the day-to-day business and affairs of the Foundation and empowered the Foundation with important decision-making authority.  The Agreement provides, in part, that "the Foundation shall have the obligation of administering the day-to-day business and affairs of the Partnership consistent with the provisions [of the Agreement]."  It also provides "[t]he Alavi Foundation "shall have sole authority to execute instruments on behalf of the Partnership and any third party may rely on the Foundation's authority to bind the Partnership."  (Compl. ¶ 96).  According to the Agreement, the "Foundation

shall have the authority to make the following decisions and take the following actions without obtaining the prior written consent of any other Partner:  (i) the execution of any lease of space in the Building having a rentable area of less than twenty-five thousand (25,000) square fee of rentable floor area and a term of less than five (5) years . . .; (ii) contracting with vendors of supplies and services required in the ordinary course of business of the Partnership and payment of all sums due therefor, provided that such contract does not provide for the payment, <u>per annum</u>, of an amount in excess of [\$100,000]  . . .; (iii) payment of all taxes that are due; and (iv) prosecuting, defending and/or resolving by settlement all disputes provided that such litigation and/or settlement would not require payment by the Partnership of consideration reasonably valued at more than [\$100,000]. . . ."  (*Id.*).

        The Alavi Foundation collected substantial fees from 650 Fifth Avenue Company for the management services that it provided to the Partnership.  According to the Alavi Foundation, the management fee was used to pay a portion of the salaries of the Alavi Foundation's president, controller and secretary, for their work on behalf of 650 Fifth Avenue Company.  The monthly management fee was approximately \$20,000 per month from at least in or about April 2001 through 2002, and increased to approximately \$30,000 per month in or about 2003.  The last management fee was paid on or about December 1, 2008.  Likewise, the Alavi Foundation's federal tax returns for the years ending in 2001 through 2008 show that the Foundation received hundreds of thousands of dollars annually from 650 Fifth Avenue Company, reportedly for expenses incurred by the Foundation in connection with the services rendered to the Partnership by the employees of the Foundation.  These expenses included employee salaries and benefits, rent, and office supplies.  (Compl. ¶ 99).

36

As managing partner, the Alavi Foundation also directed when ownership distributions were made to the partners of 650 Fifth Avenue Company (i.e., the Alavi Foundation and Assa Corp). For example, from at least in or about December 2002 through at least in or about August 1, 2007, the Alavi Foundation sent at least 29 letters to the Building's management companies authorizing a distribution to Assa Corp. The distribution was typically for $200,000, but in some instances was for $158,750. (Compl. ¶ 100).

The Foundation also entered into contracts with third parties to provide services for the Building. (Compl. ¶ 96-97). On May 2, 2007, Geramian entered into a Management and Rental Agreement with a real estate management company to provide management services for the Building. Geramian signed the Agreement in his capacity as President of 650 Fifth Avenue Company. (Compl. ¶ 97).

   3.    <u>The Mostazafan Foundation's Successful Concealment of Its Relationship with the Iranian Government in Civil Lawsuits</u>

In the 1990s, civil lawsuits were filed against the Mostazafan Foundation of New York and the Bonyad Mostazafan by individuals with judgments against the Government of Iran. During the course of litigating these cases, members of the Board of Directors of the Mostazafan Foundation concealed the relationship between the Foundation and the Islamic Republic of Iran. (Compl. ¶¶ 101-08).

For example, in 1992, Norman Gabay ("Gabay") filed a civil action against the Bonyad Mostazafan and the Mostazafan Foundation of New York to recover damages resulting from the Iranian Government's alleged expropriation of several businesses he owned in Iran. During the litigation, Geramian submitted an affidavit, dated November 5, 1992, in which he wrote, in part: "The New York Foundation conducts no business with the Government of Iran or the

37

Mostazafan Foundation of Iran. . . . The New York Foundation has never been the agent or instrumentality of the Government of Iran or the Mostazafan Foundation of Iran."  Just two months before signing this affidavit, Geramian participated in a meeting with high-level Bank Melli officials in Iran.  (Compl. ¶¶ 102-03).

At his deposition in the case, on November 30, 1995, Geramian was asked, "Is there a relationship between . . . the Mostazafan Foundation of Iran, and the Alavi Foundation of New York," to which he falsely responded, "No, not at all."  Likewise, on January 23, 1996, Ahmadi was deposed and asked, "Did you ever receive instructions in terms of your role as a director for the New York Foundation from any person or entity in Iran," to which he responded, "No." Ahmadi, however, was one of three board members who had previously agreed to resign pursuant to instructions received from the Ayatollah.  (Compl. ¶¶ 104-05).

While the Alavi Foundation was publicly disavowing any relationship with Iran, its president was secretly corresponding with the Bonyad Mostazafan about the Gabay litigation, as reflected in documents obtained from a search of the Alavi Foundation's offices.  In a letter dated November 19, 1992, Geramian wrote to Askari, an employee at the Alavi Foundation's office in Tehran, about the Gabay litigation and his concerns about the relationship between the Mostazafan Foundation and the Alavi Foundation.  He stated, in part: "It is necessary to explain that this defense, according to the facts, indicates the denial of any relationship as well as financial and administrative relations between the government of Iran and Mostazafan and Janbazan. In consideration of the above mentioned circumstances, please take action to cooperate with us to resolve any possible worries in this regard."  (Compl. ¶ 106a).

Shortly thereafter, by letter dated December 7, 1992, Geramian wrote to the legal office

of the Bonyad Mostazafan, notifying it that written responses to the Gabay lawsuit had been forwarded to Askari at the Alavi Foundation's office in Tehran.  He requested that the Bonyad Mostazafan "contact that office immediately and cooperate with them to settle the attributed accusations."  (Compl. ¶ 106b).

In a letter dated February 3, 1993, the legal office of the Bonyad Mostazafan wrote to Geramian about the litigation to request an attorney recommendation and to provide instructions to hire that attorney.  The letter states, in part: "[I]f that office knows a reputable local attorney (except the attorney introduced to the court), please give instructions to hire him immediately. Also, please inform us of the fee structure as well as your contract with the selected attorney." Geramian responded in a letter dated February 4, 1993, in which he provided a recommendation as to legal counsel in the U.S.  He further wrote that, although the Alavi Foundation would "not take on any role in these legal contracts and the specifics relating to them," it would "not withhold from any consultation and intellectual assistance in this matter."  (Compl. ¶¶ 106c-d).

Gabay's case was eventually dismissed because the Court determined that he had failed to show that the Bonyad Mostazafan exercised day-to-day control over the Alavi Foundation during the relevant time periods.  *See Gabay v. Mostazafan Foundation of Iran*, 968 F. Supp. 895 (S.D.N.Y. 1997).  (Compl. ¶ 107).

In 1998, Stephen M. Flatow ("Flatow") filed a wrongful death action against the Islamic Republic of Iran and others, after his daughter was killed in the Gaza strip by the explosion of a terrorist bomb.  Flatow obtained a default judgment against the Iranian Government and, later that year, brought an action against the Alavi Foundation and others in order to attach and execute the judgment.  In a motion filed in the case, the Alavi Foundation submitted, among

39

other things, Geramian's November 5, 1992 declaration and the excerpts from the Ahmadi and

Geramian depositions that are quoted above.  This civil action was also dismissed as a result of

Flatow's failure to prove that the Iranian Government exercised day-to-day control over the

activities of the Mostazafan Foundation of New York.  *See Flatow v. Islamic Republic of Iran*,

67 F. Supp. 2d 535 (D. Md. 1998).  (Compl. ¶ 108).

**B.**    **Discussion**

As set forth above, the Complaint alleges that 650 Fifth Avenue Company and the Alavi

Foundation have been illegally supplying and exporting services to the Iranian Government,

including managing the Building, sending ownership distributions to Bank Melli's front

company, and concealing the Alavi Foundation's and Assa Corp.'s relationship with the Iranian

Government.  These services have entailed numerous other services.  For example, as the

Managing Partner of 650 Fifth Avenue Company, the Alavi Foundation was responsible for

executing leases, contracting with vendors for services to maintain and operate the Building,

paying expenses such as employee salaries and taxes, and handling the legal affairs of the

Partnership.  (*See, e.g.*, Compl. ¶ 96).  Accordingly, the Complaint sufficiently alleges that 650

Fifth Avenue Company and the Alavi Foundation unlawfully provided services to the Iranian

Government and to an entity owned and controlled by the Iranian Government, in violation of the

IEEPA.[16]

---

[16]    As noted *supra* note 15, the Complaint alleges additional violations of the IEEPA
in addition to the exportation of services to the Iranian Government.

IV.   **THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT PROPERTIES CONSTITUTE AND WERE DERIVED FROM PROCEEDS TRACEABLE TO VIOLATIONS OF THE IEEPA**

A.   <u>**Applicable Law**</u>

Section 981(a)(1)(C) of Title 18, United States Code, provides, in part, that:

> The following property, real or personal, is subject to forfeiture to the United States: . . . [a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 981(a)(1)(C).  Under Section 1956(c)(7), the term "specified unlawful activity" ("SUA") includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]."  As noted above, 50 U.S.C. § 1705(a) makes it "unlawful . . . to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  Thus, any property which constitutes or is derived from proceeds traceable to a violation of Executive Order 12959, Executive Order 13059, or the ITR is forfeitable to the United States.

Courts apply a "but for" test to determine whether property is proceeds of an offense; under this test, the term "proceeds" means any property that a person would not have obtained or retained but for the criminal offense.  *See, e.g.*, *United States v. Nicolo*, 597 F. Supp. 2d 342, 350 (W.D.N.Y. 2009) (applying "but for" test to determine amount of proceeds forfeitable under under § 981(a)(1)(C)); *United States v. Reiner*, 397 F. Supp. 2d 101, 106-07 (D. Me. 2005) (same); *United States v. Evanson*, No. 05 Cr. 00805, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008) ("proceeds are property a defendant would not have obtained or retained but for the commission of the criminal offense").  *See also, e.g.*, *United States v. Hoffman-Vaile*, 568 F.3d

41

1335, 1344-45 (11th Cir. 2009) (applying "but for" test to determine the amount of "proceeds"

forfeitable under the criminal forfeiture statute 18 U.S.C. § 982); *United States v. Ivanchukov*,

405 F. Supp. 2d 708, 712 (E.D. Va. 2005) (same).[17]

**B.**     **The Partnership and the Building**

The Complaint adequately alleges that the Partnership and its principal asset, the

Building, constitute and were derived from proceeds traceable to the IEEPA violations discussed

in Part II.[18]

---

[17]     Section 981(a)(2) defines the term "proceeds" as either net proceeds or gross
proceeds depending upon the type of case.  This subsection states, in part:

> (A) In cases involving illegal goods, illegal services, unlawful activities, and
> telemarketing and health care fraud schemes, the term "proceeds" means property of any
> kind obtained directly or indirectly, as the result of the commission of the offense giving
> rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or
> profit realized from the offense.

> (B) In cases involving lawful goods or lawful services that are sold or provided in an
> illegal manner, the term "proceeds" means the amount of money acquired through the
> illegal transactions resulting in the forfeiture, less the direct costs incurred in providing
> the goods or services. . . .

18 U.S.C. § 981(a)(2).  The Assa Claimants incorrectly suggest that the net proceeds definition in
§ 981(a)(2)(B), rather than the gross proceeds definition in § 981(a)(2)(A), applies in this case.
(Assa Br. 11).  However, because the Complaint seeks forfeiture based upon specified unlawful
activity, § 981(a)(2)(A) applies.  *See United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009)
(applying gross proceeds definition in § 981(a)(2)(A) to food stamp fraud, which is a specific
unlawful activity); *United States v. All Funds on Deposit in United Bank of Switz., New York,
New York, Account Number 101WA263232000*, 188 F. Supp. 2d 407, 409-10 (S.D.N.Y. 2002).
The Alavi Foundation and 650 Fifth Avenue Company cite *United States v. Santos*, 553 U.S. 507
(2008) for the proposition that "proceeds" means "profits." (Alavi Br. 19-20).  *Santos*, however,
does not apply to civil forfeiture cases.  *See, e.g.*, *United States v. Funds from First National
Bank*, 639 F. Supp. 2d 1203, 1216 (W.D. Wash. 2009).  The Court does not need to address this
issue for purposes of deciding the motions to dismiss.

[18]     The Building is the only source of income in the Partnership's bank accounts.
(Compl. ¶ 85; *see also* Compl. ¶ 20).  Thus, any crime proceeds received by the Building *ipso*

First, the Complaint adequately alleges that the Building received proceeds from the illegal services that 650 Fifth Avenue Company and its partners supplied to the Iranian Government by running the Building. As discussed *supra* Part II, these services included, among other things, entering into lease agreements with tenants, collecting rent, paying taxes, and hiring a management company to oversee the Building's operations. The proceeds of these services were the rental receipts from the Building. Some of this rental income was in turn used to pay for the Building's maintenance and other expenses. In December 2008 alone, for example, at least approximately $578,000 of 650 Fifth Avenue's income was spent on Building expenditures. (Compl. ¶ 133; *see also* Compl. ¶ 99 (from 2001 through 2008, the Partnership paid hundreds of thousands of dollars year to the Alavi Foundation for services rendered to the Partnership)). The Government is entitled to seek forfeiture of the Building to the extent that crime proceeds were used to pay for maintenance, renovations, and the Building's other expenses. The Government is also entitled to seek forfeiture of the entire Building because the unlawful services that 650 Fifth Avenue and its partners provided—which included procuring lease agreements, maintaining the premises, and performing other management services—served to preserve and enhance the market value of the Building.

Claimants argue that the Building cannot constitute proceeds of an IEEPA violation because the Partnership acquired the Building in 1989, before the effective dates of Executive Order 12959 and the ITR in 1995. (Alavi Br. 10-13; Assa Br. 10-16). However, Claimants overlook the fact that rental income from the Building (SUA proceeds) has been used to pay for maintenance and other expenses of the Building since 1995. Claimants also overlook the fact

---

*facto* were received by the Partnership.

43

that the services provided by the Alavi Foundation's officers and employees, such as executing

leases, managing operations, and maintaining the premises, preserved and enhanced the overall

value of the Building.  Where the Government seeks forfeiture under a proceeds theory, then the

portion of the property traceable to the offense is forfeitable to the United States.  *E.g.*, *United*

*States v. One Parcel of Real Property*, 921 F.2d 370, 375-77 (1st Cir. 1990) (allegations in

complaint were sufficient to establish a reasonable belief that the government could demonstrate

probable cause that the down payment and mortgage payments on the defendant property were

traceable to drug proceeds; "the possibility that some portion of the purchase monies may have

been untainted does not mean that the complaint is insufficient, but may merely delimit the

portion of the defendant property found forfeitable at trial"); *United States v. 216 Kenmore Ave.*,

657 F. Supp. 2d 1060, 1066 (D. Minn. 2009) (motion to dismiss civil forfeiture action denied

where government alleged that improvements to property and the taxes were paid with fraud

proceeds; even though Government did not allege that the property was purchased with crime

proceeds, "the law is well-established that the Government may seek forfeiture of the property in

part, to the extent that tainted funds were used therein").  The fact that the Building may have

received untainted funds does not insulate it from forfeiture—a point which the Alavi Foundation

and 650 Fifth Avenue Company Claimants appear to acknowledge.  (*See* Alavi Br. 12-13 ("The

use of proceeds to support or maintain a property does not render the entire property forfeitable. .

. . [T]hat portion (or a pro rata interest)—and exclusively that portion—of the Real Properties

would be subject to forfeiture if the Foundation used IEEPA proceeds to make capital

44

improvements in them.")).[19]

The Alavi Foundation and 650 Fifth Avenue Company also argue that the Government cannot show that the Building's rental income is proceeds under the but-for test. (Alavi Br. 13-17). According to Claimants, only the Alavi Foundation's management fees arguably are proceeds. (Alavi Br. 10, 16). This argument, however, fails to account for the breadth of services that 650 Fifth Avenue Company and the Alavi Foundation provided in violation of the IEEPA and the benefits that those services conferred. The Building is not a passive investment that was left unattended after its construction. Instead, it has required intensive management to preserve its value and to generate and collect its income. But for Claimants' having illegally managed the Building for the Iranian Government by, among other things, executing lease agreements, collecting rent, and maintaining the premises, the Building would not have generated any rental income after 1995, and the Building's overall market value would not have been maintained. Accordingly, the rental income from the Building and the Building itself are proceeds of the unlawful services that Claimants provided in violation of the IEEPA.

The Assa Claimants also argue, incorrectly, that the Complaint seeks forfeiture based solely on Iran's ownership of assets. (Assa Br. 7-9). The Assa Claimants appear to suggest that the Government's ability to forfeit property is limited by 50 U.S.C. § 1702, which allows the President to confiscate property when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals. (*Id.* at 8). This civil action, however, does not seek forfeiture under § 1702, but rather 18 U.S.C. § 981, which expressly authorizes

---

[19] Claimants suggest that the Government conceded, in a prior brief, that properties acquired prior to the commission of an offense cannot be considered proceeds of that offense. The Government has never adopted such a position, which is an incorrect statement of law.

45

civil forfeiture of the proceeds of IEEPA violations and property involved in money laundering

offenses.  The Complaint's forfeiture claims are not based on mere ownership, but on Claimants'

extensive illegal activities over the course of more than a decade.  Moreover, there is nothing

"novel" or "unprecedented" (Assa Br. 2, 7) about a forfeiture action seeking proceeds of IEEPA

violations and property involved in laundering the proceeds of those violations.  *See, e.g.*, *United*

*States v. All Funds on Deposit in United Bank of Switz., New York, New York, Account Number*

*101WA263232000*, 188 F. Supp. 2d 407 (S.D.N.Y. 2002) (case cited by the Assa Claimants at p.

15, in which court denied motion to dismiss complaint seeking forfeiture of funds in bank

account that were unlawfully obtained in connection with unlawful transfer of equivalent

amounts to Iran, in violation of the IEEPA).  The only thing unprecedented about this case is

Assa's and Alavi's successful, long-standing campaign to disguise the Iranian Government's

control over a midtown Manhattan commercial building and the fact that this control resulted in

millions of dollars of revenue for the Iranian Government.

       Finally, the Building is forfeitable for another reason as well.  The law is clear that

"proceeds" includes property that a person would not have *retained* but for the commission of the

offense.  For example, unpaid taxes that are retained as a result of the filing of false tax returns

are proceeds of mail fraud or wire fraud.  *See United States v. Yusuf*, 536 F.3d 178, 185, 189 (3rd

Cir. 2008) (unpaid taxes that are retained by means of filing of false tax returns through the mails

constitute "proceeds" of mail fraud for purposes of money laundering; "simply because funds are

*originally* procured through *lawful* activity does not mean that one cannot thereafter convert

those same funds into the 'proceeds' of an unlawful activity") (emphasis in original); *United*

*States v. Morelli*, 169 F.3d 798, 806 (3d Cir. 1999) (unpaid taxes that were unlawfully disguised

46

and retained constituted proceeds of wire fraud for purposes of supporting a conviction on a

federal money laundering charge).  Likewise, in the bankruptcy context, property that is retained

by concealing it from a bankruptcy court is proceeds of bankruptcy fraud.  *See e.g.*, *United States*

*v. Dennis*, 237 F.3d 1295, 1301-03 (11th Cir. 2001) (bank account concealed from bankruptcy

court constitutes proceeds of bankruptcy fraud for purposes of money laundering statute); *United*

*States v. Ladum*, 141 F.3d 1328, 1340 (9th Cir. 1998) (stores and rental income that were not

disclosed to bankruptcy trustee constitute proceeds of bankruptcy fraud for purposes of money

laundering); *United States v. Levine*, 970 F.2d 681, 686 (10th Cir. 1992) (sustaining money

laundering conviction where the defendant concealed corporate tax refunds from bankruptcy

court).[20]

      Here, the Partnership retained the Building because Claimants concealed the Iranian

Government's ownership and/or control of 650 Fifth Avenue Company and its partners, thereby

shielding the Building from law enforcement and civil lawsuits.  As officers of the Alavi

Foundation recognized, concealing the Partnership's ties with the Iranian Government protected

it from law enforcement.  (*See, e.g.*, Compl. ¶ 58 (letter from Alavi Foundation's president, dated

June 3, 1991, to an official of the Bonyad Mostazafan, reminding him that members of the

Foundation's board had "frequently signed affidavits addressed to American authorities -

whether the Attorney General, legal courts, tax office, or the FBI - stating that the Foundation is

---

[20]    *See also United States v. Frank*, 354 F.3d 910, 919 (8th Cir. 2004) (funds hidden
from court to avoid paying restitution were proceeds of mail fraud, wire fraud and obstruction of
justice); *United States v. Grant*, 05 Cr. 1192 (NRB), 2008 WL 4376365, at *1 (S.D.N.Y. Sept.
25, 2008) (but for defendant's fraud, company would have been forced into bankruptcy and lost
its trading rights; therefore, all income derived from the business thereafter was proceeds of the
fraud).

independent and devoid of any connection to the Government of Iran and the Iranian

Government's qualified authorities," and cautioning that, if the Ambassador's interference

becomes known, he and other members of the Board would "be culpable of a heavy offence")).

Claimants also shielded the Partnership from civil lawsuits.  In the 1990s, for example,

creditors who held judgments against the Iranian Government based upon acts of terrorism or

expropriation of property attempted to collect on those judgments by filing civil lawsuits against

the Mostazafan Foundation (the Alavi Foundation's predecessor) and the Bonyand Mostazafan.

(Compl. ¶¶ 101-08).  During the course of litigating these actions, at least two officers of the

Foundation falsely disavowed a relationship between the Foundation and Iran in depositions

and/or affidavits in order to avoid an adverse judgment.  (Compl. ¶¶ 103-08).  The lawsuits were

ultimately dismissed because the creditors failed to show that the Iranian Government exercised

day-to-day control over the Alavi Foundation.  (Compl. ¶¶ 107-08).  Thus, by illegally concealing

the Iranian Government's control of the Foundation and ownership of Assa Corp. from law

enforcement, the Partnership was able to retain the Building.  Accordingly, the entire Building is

forfeitable to the United States as property constituting or derived from proceeds traceable to

IEEPA violations.

For these reasons, the Complaint sufficiently alleges that the Partnership and its principal

asset, the Building, constitute and were derived from proceeds traceable to violations of the

IEEPA.

## C.    The Other Defendant Properties

Furthermore, the Complaint alleges that millions of dollars of the proceeds from the

Building were deposited into the Defendant Accounts and were spent acquiring and maintaining

the other Alavi Real Properties.  For example, the Complaint alleges that the Alavi Accounts

have received millions of dollars of the Building's rental income since 2000.  (Compl. ¶¶ 124-

29). And the only source of funds in the Partnership Accounts is income from the Building.

(Compl. ¶ 130).  The Assa Accounts also have been funded with millions of dollars from the

Building since 2000.  (Compl. ¶¶ 120-23).

The Complaint also alleges that the Alavi Real Properties were acquired and/or

maintained with the proceeds of IEEPA violations.  (Compl. ¶¶ 134-43).  These properties thus

are forfeitable because they are traceable to the proceeds of IEEPA violations.  These properties

are also forfeitable because, as explained *supra*, Claimants concealed their relationship with the

Iranian Government from law enforcement and creditors with judgments against Iran.

The Alavi Claimants argue that the Court should dismiss the Government's forfeiture

claim with respect to some unidentified percentages of the Alavi Real Properties that are not the

proceeds of IEEPA violations.  (Alavi Br. 12-13).  Claimants' contention that the Court should

make a factual determination at the pleadings stage of the percentage of each property that is

traceable to crime proceeds is insupportable.  Rule G requires only that the Government "state

sufficiently detailed facts to support a reasonable belief that the government will be able to meet

its burden of proof at trial."  Rule G(2)(f).  The Complaint alleges that the Alavi Real Properties

received millions of dollars of proceeds from the Building, which plainly establishes a

"reasonable belief" that the government will be able to meet its burden at trial, *Daccarett*, 6 F.3d

at 47, and is sufficient to permit the claimant "to commence an investigation of the facts and to

frame a responsive pleading."  *Mondragon*, 313 F.3d at 865-67 (quoting Supplemental Rule

E(2)(a)).  The Government is entitled to seek discovery to determine the full extent to which the

Alavi Real Properties received proceeds of IEEPA violations.  *See, e.g.*, *One Parcel of Real Property*, 921 F.2d at 375 ("Whether none, all, or only a portion of the defendant property is forfeitable is not determined at the pleadings stage, but at trial.").

Accordingly, the Complaint adequately pleads that the Defendant Properties are forfeitable as property constituting and derived from proceeds traceable to violations of the IEEPA.

## V.  THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN MONEY LAUNDERING, IN VIOLATION OF 18 U.S.C. §§ 1956(a)(1) AND (h)

As alleged in the Complaint, 650 Fifth Avenue Company and its partners have been operating as a front for the Iranian Government to collect income from the Building and to distribute that money in accordance with the Iranian Government's directives.  These entities engaged in countless financial transactions on behalf of the Iranian Government in order to promote their continued service to the Iranian Government and to conceal it controls over income from the Building.  Accordingly, the Complaint sufficiently pleads that the Defendant Properties are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in money laundering and attempted money laundering transactions, as well as a conspiracy to commit money laundering.

### A.    Applicable Law

1.    Property Subject to Forfeiture Under 18 U.S.C. § 981(a)(1)(A)

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, *involved in a transaction or attempted transaction* in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."  18 U.S.C. § 981(a)(1)(A)

(emphasis added).  Property "involved in" a money laundering offense includes, among other things, any property that facilitates the offense, including any property used to conceal, disguise, or promote the money laundering.  *E.g.*, *United States v. Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009) (the inventories of two jewelry stores were properly forfeited as facilitating property pursuant to 18 U.S.C. § 982(a)(1)[21] and 31 U.S.C. § 5317, because the inventories made it easier for the defendant to launder drug money by giving customers a variety of jewelry options, and by giving the transactions a facade of legitimacy).[22]

Under § 983(c), "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c).

The Alavi Foundation and 650 Fifth Avenue appear to suggest, incorrectly, that the amount of property that is forfeitable in a money laundering case is limited to the amount of SUA proceeds involved in the offense.  (*See* Alavi Br. 21 (where property is involved in money

---

[21]    18 U.S.C.  § 982 contains criminal forfeiture provisions (whereas § 981 relates to civil forfeiture).  Like the civil money laundering provision in § 981(a)(1)(A), the criminal forfeiture provision in § 982(a)(1) authorizes forfeiture of any and all property "involved in" a money laundering offense, and any property traceable to such property.

[22]    *See, also, e.g.*, *United States v. McGauley*, 279 F.3d 62, 77 (1st Cir. 2002) (legitimate funds in a bank account that had been commingled with dirty money were properly forfeited because the clean funds were used to conceal and disguise the tainted funds); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005), *aff'd*, 514 F.3d 277 (2d Cir. 2008) (interpreting language in 18 U.S.C. § 982, and stating that the "term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate" the offense); *United States v. Contents of Account Nos. 208-06070 & 208-06068-1-2*,  847 F. Supp. 329, 334-35 (S.D.N.Y. 1994) (legitimate funds used to disguise the source of illegitimate funds and to make the proceeds of a green card scheme more difficult to trace facilitated the money laundering scheme and were forfeitable under § 981).

laundering, then the property is "would only be 'involved in' a money laundering transaction in proportion to the amount of funds used")). This argument is belied by the statute, which broadly states that "any property . . . involved" in the financial transaction is forfeitable to the United States. If forfeiture were limited to the amount of money involved in a financial transaction, only the portion of the property traceable to SUA proceeds could be forfeited. The statute does not contain any such limitation.

    2.    <u>The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(1)</u>

The Complaint alleges "promotion money laundering" in violation of 18 U.S.C. § 1956(a)(1)(A)(i), "concealment money laundering" in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

The elements of promotion money laundering under § 1956(a)(1)(A)(i) are: (1) an actual or attempted financial transaction; (2) involving SUA proceeds; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) an "intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i); *see also, e.g.*, *United States v. All Funds on Deposit at Dime Sav. Bank*, 255 F. Supp. 2d 56, 70 (E.D.N.Y. 2003) (internal quotations and citations omitted).[23]

The elements of concealment money laundering under § 1956(a)(1)(B)(i) are the same as the elements of promotion money laundering with one exception; instead of showing an intent to promote an SUA, the Government must show knowledge that the transaction was designed in

---

[23]    The terms "transaction" and "financial transaction" are broadly defined in 18 U.S.C. § 1956(c)(3) and (c)(4). The mere receipt of funds may constitute a financial transacton. *E.g.*, *United States v. Gotti*, 459 F.3d 296, 336-37 (2d Cir. 2006).

whole or in part either (a) "to conceal or disguise the nature the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity," or (b) "to avoid a transaction reporting requirement under State or Federal law."  18 U.S.C. § 1956(a)(1)(B)(i); *see also, e.g.*, *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997).

Finally, § 1956(h) makes it unlawful to "conspire[] to commit any offense defined" in Sections 1956 or 1957.

**B.    The Complaint Adequately Pleads That the Defendant Properties Were Involved in Concealment Money Laundering in Violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (h)**

1.    Financial Transactions to Send Money to Bank Melli

For the reasons explained below, the Complaint adequately alleges that the Partnership, the Building, and the funds seized from the bank accounts of 650 Fifth Avenue and Assa Corp. are forfeitable as properties involved in the laundering of millions of dollars to Bank Melli.

As an initial matter, the Complaint adequately alleges concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  As previously discussed, the rental income from the Building is SUA proceeds.  *See supra* Part IV.  The Complaint also alleges that Bank Melli's share of this rental income was transferred, at the direction of the Alavi Foundation, from 650 Fifth Avenue Company to Assa Corp., and then from Assa Corp. to Assa Co. Ltd.  These financial transactions were made to Assa Corp. and to Assa Co. Ltd., rather than directly to Bank Melli, in order to conceal and disguise Bank Melli's ownership and control of the funds.  Accordingly, the Government has adequately alleged that 650 Fifth Avenue and its partners conducted financial transactions of SUA proceeds, with knowledge that the transactions were "designed in whole or in part . . . to conceal or disguise . . . the ownership, or the control of the

53

proceeds of specified unlawful activity," in violation of § 1956(a)(1)(B)(i).

The Complaint also pleads that a number of the Defendant Properties were involved in this money laundering operation.  For example, the Alavi Foundation's Majority Interest was involved in the laundering because the Foundation, in its capacity as the Managing Partner, directed the ownership distributions to Assa Corp., with knowledge that Assa Corp. was a front for Bank Melli.  (Compl. ¶100 (Alavi Foundation, in its capacity as Managing Partner, directed the Building's management company to make ownership distribution to the Foundation and Assa Corp., including over $4 million to Assa Corp. from December 2002 through August 1, 2007)).  Thus, the Alavi Foundation's 60 percent in the Partnership was responsible for authorizing the distributions to Assa Corp.

Assa Corp. was also involved in the money laundering operation.  As alleged in the Complaint, Bank Melli disguised its 40 percent interest in 650 Fifth Avenue Company by creating two shell companies, Assa Corp. and Assa Co. Ltd. , in order to manage its investment and export its income from the United States.  Thus, Assa Corp. and Assa Co. Ltd. played a critical role in transmitting funds to Bank Melli, and the Minority Interest was the specific property that allowed Bank Melli to conceal and disguise its ownership in 650 Fifth Avenue Company.

Finally, the Partnership's bank accounts and Assa Corp.'s bank accounts were involved in the money laundering operation because these were the accounts used to transfer funds from the Building to Assa Corp., and from Assa Corp. to Assa Co. Ltd.

The Assa Claimants argue that the Minority Interest was not involved in money laundering because, "[a]t most, the Government alleges that the Minority Interest generated funds

54

that were later used as part of an alleged IEEPA violation." (Assa Br. 18). However, this argument incorrectly assumes that the transfer of funds from Assa Corp. to Assa Co. Ltd. is the only service in violation of the IEEPA that is alleged in the Complaint. As explained *supra* Part IV(B), all of the rental income from the Building is proceeds of the unlawful services that 650 Fifth Avenue and its partners provided in running the Building for the Iranian Government.[24]

The Alavi and 650 Fifth Avenue Claimants likewise argue that the Partnership and the Building were not involved in money laundering because, at most, the Foundation's management fees constitute SUA proceeds. (Alav Br. 18-21). However, as discussed *supra* Part IV(B), all of the Building's income is SUA proceeds.

The Assa Claimants further argue that because § 1956(a)(2) addresses only transfers of "monetary instruments or funds," this statute cannot the form basis of forfeiture of real property. (Assa Br. 17 n.9). This argument is meritless. Section 981(a)(1) does not limit forfeiture to the "monetary instruments or funds" involved in money laundering, but expressly subjects to forfeiture "*any* property, *real* or personal," involved in money laundering. 18 U.S.C. § 981(a)(1)(A) (emphasis added).

Finally, the Assa Claimants argue that under *United States v. Cuellar*, 128 S. Ct. 1994 (2008), the Complaint must allege that "substantial efforts" were undertaken to conceal some attribute of the laundered money, and that the Complaint has failed to allege "substantial efforts."

---

[24]     Assa Corp.'s ownership distributions are also proceeds of the services that Assa Corp. performed by managing Bank Melli's substantial investment in 650 Fifth Avenue Company. But for Assa Corp. paying taxes, maintaining bank accounts, and otherwise continuing its operations, Assa Corp. would not have received any ownership distributions. Accordingly, any ownership distributions received by Assa Corp. are proceeds of services provided in violation of the IEEPA.

(Assa Br. 22).  The Assa Claimants misconstrue *Cuellar*, which imposes no "substantial efforts" test (though the Complaint does, in fact, allege "substantial efforts" to conceal Bank Melli's ownership and control of the SUA proceeds).  In *Cuellar*, the Supreme Court held that the concealment language of the international money laundering statute required proof that the "purpose - not merely effect - of the transportation was to conceal or disguise a listed attribute." *Cuellar*, 128 S. Ct. at 2005.  In other words, the statute distinguishes between "*how* one moves the money" and "*why* one moves the money."  *Id.*  (emphases in original).  *See also* 128 S. Ct. at 2003 ("[M]erely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been made to conceal the money.").

     2.     <u>Other Financial Transactions to Collect and Disburse Income from Building</u>

The Complaint alleges that all of the Defendant Properties are forfeitable for another reason as well.  650 Fifth Avenue Company and its partners, serving as a front for the Iranian Government, conducted countless financial transactions of SUA proceeds on behalf of the Iranian Government in order to conceal the fact that the Iranian Government owned and/or controlled the funds.  In so doing, these entities allowed the Iranian Government to operate undetected a lucrative commercial enterprise and not-for-profit organization in the United States, in violation of the IEEPA.

As explained above, the Iranian Government is prohibited from operating a commercial enterprise or charitable organization in the United States as a result of the Iranian Embargo.  In addition, the threat of lawsuits by creditors with judgments against the Iranian Government has prevented it from openly owning assets in the United States, such as the Building and the other Defendant Properties.  The Iranian Government circumvented the Embargo and the plaintiffs'

lawsuit by concealing its control of the Alavi Foundation and its ownership and control of Assa Corp., thereby enabling the Iranian Government to run a lucrative commercial enterprise (the Building) and a not-for-profit organization (the Alavi Foundation) in the United States.

Thus, every financial transaction by 650 Fifth Avenue Company and its partners was conducted with intent to conceal and disguise the Iranian Government's ownership and/or control of the Defendant Properties.  These three entities—650 Fifth Avenue Company, the Alavi Foundation, and Assa Corp.—engaged in countless financial transactions of rental income (SUA proceeds).  650 Fifth Avenue, for example, collected rental income and disbursed that income for ownership distributions and operating expenses.  The Alavi Foundation collected its ownership distributions and used those funds to pay for operating expenses and to fund its not-for-profit activities, including acquiring and maintaining the Alavi Real Properties.  (Compl. ¶¶ 135-143).  Likewise, Assa Corp. collected its share of ownership distributions and then transferred those funds to Assa Co. Ltd. and to pay for operating expenses.

Where, as here, a business is used to run and conceal a money laundering operation, the assets of the entire business are forfeitable to the United States.  *See, e.g.*, *Seher*, 562 F.3d at 1369; *United States v. Baker*, 227 F.3d 955, 969-70 (7th Cir. 2000) (assets of a massage parlor business that helped bankroll a money laundering conspiracy, and the business premises on which the transactions occurred, are forfeitable as property involved in the money laundering offense); *United States v. G.P.S. Auto. Corp.*, 66 F.3d 483, 487 (2d Cir. 1995) (assets of a business that was used to sell stolen auto parts and launder the crime proceeds are forfeitable as property involved in money laundering); *Schlesinger*, 396 F. Supp. 2d at 273 (factory and business used in furtherance of money laundering offense are forfeitable as property involved in

57

the offense).

Accordingly, the Complaint adequately alleges that the Defendant Properties are forfeitable to the United States as property involved in concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[25]

## C.   The Complaint Adequately Pleads That the Defendant Properties Were Involved in Promotion Money Laundering in Violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h)

The Complaint also sufficiently pleads promotion money laundering.  As alleged in the Complaint, the Building was the only source of income for 650 Fifth Avenue Company and the predominant source of income for the Alavi Foundation.  (Compl. ¶¶ 125-128, 130).  650 Fifth Avenue Company and its partners therefore relied upon rental income from the Building to pay their operating expenses, such as maintenance, taxes, employee salaries, occupancy, and supplies. (*See, e.g.*, Compl. ¶¶ 97-99, 133 (the Partnership used rental income to pay management fees and other operating expenses); Compl. ¶ 99 (the Alavi Foundation used rental income for employee compensation and other expenses); Compl. ¶ 121 (Assa Corp. used rental income to pay taxes and employee compensation)).  Each of these payments was a financial transaction intended to promote the ongoing operations of these entities and their continued service to the Iranian Government, including the continued operation of the Building and the continued operation of Alavi Foundation's not-for-profit activities.  Accordingly, 650 Fifth Avenue Company (including the Building and bank accounts) and its partners, and their respective bank accounts, are forfeitable as property involved in promotion money laundering.

---

[25]    The Defendant Account Funds are also forfeitable as property that Claimants conspired to launder.  *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (lawfully obtained proceeds properly included in forfeiture order because the defendant conspired to launder these funds through commingling).

For the same reasons, Alavi Real Properties are properties involved in promotion money laundering.  The Alavi Foundation spent its illicit earnings from the Building to acquire, maintain, and support the Alavi Real Properties in order to promote the Alavi Foundation's continued services of operating a charitable organization on behalf of the Iranian Government, in further violation of the IEEPA.  (Compl. ¶¶ 134-143).

Because each of these transactions was intended to promote the violations of the IEEPA, the Complaint adequately alleges financial transactions of SUA proceeds "with the intent to promote the carrying on of specified unlawful activity, " in violation of § 1956(a)(1)(A)(i).

## VI. THE COMPLAINT ADEQUATELY PLEADS THAT THE DEFENDANT PROPERTIES ARE FORFEITABLE AS PROPERTY INVOLVED IN A VIOLATION OF, AND CONSPIRACY TO VIOLATE, THE INTERNATIONAL MONEY LAUNDERING STATUTE, 18 U.S.C. § 1956(a)(2)

### A. The Elements of Money Laundering Under 18 U.S.C. § 1956(a)(2)

The Complaint also alleges that the Partnership, the Building, and the Defendant Accounts are forfeitable as property involved in a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2), and a conspiracy to violate that section.  To establish a violation of § 1956(a)(2)(A), the Government must show three elements: (1) the transfer (or attempted transfer) of a monetary instrument or funds, (2) from a place in the United States to or through a place outside the United States, and (3) an intent to promote the carrying on of specified unlawful activity.  *E.g.*, *United States v. Pierce*, 224 F.3d 158, 162 (2d Cir. 2000).[26]

Thus, the elements of § 1956(a)(2)(A) are the same as § 1956(a)(1) with 2 exceptions.

_____

[26]    The Alavi Foundation and 650 Fifth Avenue Company incorrectly state that the Complaint does not allege a violation of the international money laundering statute.  (Alavi Br. 3).  *See* Compl. ¶ 150.

First, instead of a "financial transaction," the Government must show that the defendant engaged in the transportation, transfer, or transmission of property into or out of the United States. Second, § 1956(a)(2)(A) does not require proof that the monetary instruments or funds are crime proceeds.[27]  Thus, violations of § 1956(a)(2)(A) may be committed with clean money if the funds are transferred into or out of the United States with intent to promote an SUA.[28]

**B.    Discussion**

As alleged in the Complaint, the Partnership transferred rental income from the Building to Assa Corp., which Assa Corp. in turn transferred to accounts overseas, in order to supply money to Bank Melli and also to perpetuate the ongoing operation of Assa Corp.  (Compl. ¶¶ 120-22, 130, 132).  Accordingly, the Complaint adequately pleads a violation of § 1956(a)(2)(A) by alleging a transfer of funds from a place inside the United States to a place outside the United States with an intent to promote an IEEPA violation.

As mentioned above, § 1956(a)(2)(A) does not require proof that the funds being

---

[27]    *E.g.*, *United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994) ("§ 1956(a)(2) contains no requirement that 'proceeds' first be generated by unlawful activity, followed by a financial transaction with those proceeds, for criminal liability to attach."); *United States v. Krasinski*, 545 F.3d 546, 550-51 (7th Cir. 2008) (same); *United States v. One 1997 E35 Ford Van*, 50 F. Supp. 2d 789, 797-803 (N.D. Ill. 1999) (government's forfeiture complaint stated a claim under § 1956(a)(2)(A) by alleging that funds were transferred to the United States by HAMAS, a certified terrorist organization, with the intent of supporting murder and extortion in Israel; § 1956(a)(2)(A) does not require proof that the funds are SUA proceeds).

[28]    The Complaint also alleges a violation of § 1956(a)(2)(B), which occurs when monetary instruments or funds are transferred to or from the United States with knowledge that the property represents SUA proceeds and that the transfer is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  Claimants challenge the Government's § 1956(a)(2)(B) allegations on the same grounds used to challenge the other § 1956 allegations.  Their arguments are meritless for the same reasons discussed above.

transferred from the United States constitute SUA proceeds. Instead, it is sufficient to show that the funds were transferred with the intent to promote an SUA. Thus, even under the Assa Claimants' theory—that the IEEPA violation could not have occurred until money was transferred from Assa Corp. to Assa Co. Ltd.—this transfer of funds constituted money laundering under § 1956(a)(2)(A) because it was intended to promote the supply of funds to Bank Melli.[29]

Finally, the Complaint alleges that the Partnership (including the Alavi Foundation's and Assa Corp.'s interests), the Building, and the bank accounts of the Partnership and Assa Corp. were involved in and facilitated these money laundering transfers and the money laundering conspiracy and are therefore forfeitable for the same reasons discussed *supra* Section V.[30]

## VII.   THE COMPLAINT IS NOT BARRED BY THE TREATY OF AMITY OR THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT

The Assa Claimants contend that the Government's forfeiture claims are barred by the Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, U.S.-Iran, 8 U.S.T.

---

[29]   The transfer of money out of the country in order to supply it to Bank Melli is both an IEEPA violation and a money laundering transaction. *See, e.g.*, *United States v. Piervinanzi*, 23 F.3d 670, 679-80 (2d Cir. 1994) (wiring money out of the United States to promote fraud against a bank constituted both money laundering and bank fraud).

[30]   The Complaint also alleges that the Defendant Properties were involved in money laundering in violation of 18 U.S.C. § 1957. This statute, sometimes referred to as the "money spending statute," provides criminal penalties for any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). It is broader than Section 1956 because the defendant need not to intend to promote specified unlawful activity or to conceal the nature, location, source, ownership, or control of the funds. *E.g.*, *United States v. Ghilarducci*, 480 F.3d 542, 551 (7th Cir. 2007); *United States v. Cefaratti*, 221 F.3d 502, 506 (3d Cir. 2000). Claimants challenge the Government's § 1957 allegations on the same grounds used to challenge the § 1956 allegations. Their arguments are meritless for the same reasons discussed above.

61

899 (the "Treaty of Amity") and by the Fifth Amendment's Takings Clause.  As explained

below, neither contention has merit.

**A.**    **The Complaint Is Not Barred by the Treaty of Amity**

The Assa Claimants assert, in conclusory fashion, that the Government's forfeiture claims

are barred by a laundry list of provisions in the Treaty of Amity.  (Assa Br. 24-25).  The Assa

Claimants contend that, even if Assa Corp. and Assa Co. Ltd. are in fact owned and controlled by

Bank Melli, then the Treaty prohibits Congress and the President from enacting laws that impede

Bank Melli's unfettered ability to carry on business, through Assa, in the United States.  (Assa

Br. 26-27).  This contention is utterly meritless.

As an initial matter, the Assa Claimants cannot claim the benefit of many of the

provisions of the Treaty of Amity they cite.  Though owned and controlled by Bank Melli, Assa

Corp. is a New York corporation and Assa Co. Ltd. is a Jersey limited liability company.

(Compl. ¶ 20).  They are not Iranian nationals or Iranian companies and, therefore, cannot invoke

the provisions of the Treaty that apply to such persons and entities.  *See Sumitomo Shoji Am., Inc.*

*v. Avagliano*, 457 U.S. 176, 182-83, 189 (1982) (a New York corporation, though a wholly-

owned subsidiary of a Japanese company, was not a "company of Japan" under the Friendship,

Commerce and Navigation Treaty between the United States and Japan); *see* Treaty of Amity,

art. II cl. 1, art. III cl. 1, art. IV cl. 1 & 2.

But even assuming *arguendo* that the Treaty of Amity applies to the Assa Claimants, it

does not bar forfeiture of the Defendant Properties.  The Treaty of Amity is an example of

several Treaties of Friendship, Commerce, and Navigation negotiated between the United States

and various trading partners between the Confederacy and the post-World War II era.  *See*

62

*generally* Herman Walker, Jr., *Modern Treaties of Friendship, Commerce and Navigation*, 42 MINN. L. REV. 805 (1958). Under the Treaty, the United States and Iran agreed to permit each others' nationals and companies to conduct business on the same basis provided to nationals and companies of third countries. Like other friendship treaties of its era, the purpose of the Treaty of Amity "was not to give foreign corporations *greater* rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage." *Sumitomo*, 457 U.S. at 187-88 (emphasis supplied). The Treaty's terms do not exempt Iranian nationals or companies from complying with domestic laws, including the IEEPA and CAFRA, as all other domestic and foreign individuals and companies must. Like any other individual or company, foreign or domestic, the Assa Claimants are barred from exporting or supplying goods or services from the United States to Iran or the Government of Iran without an OFAC license under 31 C.F.R. part 501, subpart E and part 560, subpart E.

Moreover, even if, again *arguendo*, provisions in the Treaty of Amity were inconsistent with the forfeiture authorized by CAFRA and the IEEPA, the terms of the latter statutes control. A bedrock principle of statutory interpretation is that later-enacted legislation controls over earlier, inconsistent treaties. *E.g.*, *Empresa Cubana del Tabaca v. Culbro Corp.*, 399 F.3d 462, 481 (2d Cir. 2005) (1963 Cuban Asset Control Regulations, 31 C.F.R. § 515.201 et seq., supersede inconsistent provisions of the Paris Convention for the Protection of Industrial Property); *United States v. Yousef*, 327 F.3d 56, 110 (2d Cir. 2003) ("legislative acts trump treaty-made international law") (citing *Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam) (provisions of Antiterrorism and Effective Death Penalty Act of 1996 supersede inconsistent

provisions of Vienna Convention on Consular Relations)); *Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272, 275 (E.D.N.Y. 2009) (Terrorism Risk Insurance Act of 2002 supersedes inconsistent provisions of the Treaty of Amity).[31]  The IEEPA, the ITR, CAFRA, and the federal money laundering statutes were all enacted after the Treaty of Amity[32] and, to the extent they are inconsistent with the Treaty, the unambiguous terms of the statutes control.  Holding otherwise would cripple the IEEPA.  The Assa Claimants' arguments based on the Treaty of Amity, accordingly, lack merit.

**B.**     **The Complaint Is Not Barred by the Takings Clause**

The Assa Claimants' argument that the Complaint is barred by the Takings Clause is meritless.  The Takings Clause of the Fifth Amendment provides, in relevant part, that "nor shall

---

[31]     The Assa Claimants rely on *Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243 (1984), to argue that, if the Assa Claimants' interpretation of the Treaty of Amity is correct, the IEEPA does not trump the Treaty.  (Assa Br. 30-31).  There, the Court held that, when the United States abandoned the gold standard for international monetary cooperation in 1978, it did not implicitly repeal portions of the 1934 Warsaw Convention establishing liability limits for carriers expressed in terms of gold.  *TWA*, 466 U.S. at 253.  There, both the Warsaw Convention's liability limits and the repeal of the international gold standard could be implemented; there was no conflict.  *Id.* at 260-61.  That is not the case with the Assa Claimants' proposed interpretation of the Treaty of Amity: that interpretation is in direct conflict with the IEEPA, the ITR, CAFRA,and the money laundering statutes.  As the Supreme Court's decision in *Breard* and the Second Circuit's decisions in *Empresa Cubana* and *Yousef* make clear, if there is any conflict between the Treaty of Amity and the IEEPA, the IEEPA controls.

[32]     The Treaty of Amity was signed in 1955, ratified by the Senate in 1956, and entered into force in 1957.  The provisions of law relied upon in the Complaint were enacted afterwards.  The IEEPA was enacted in 1977.  95 Pub. L. 223, 91 Stat. 1625 (Dec. 28, 1977) (codified at 50 U.S.C. § 1701 *et seq*.).  The ITR became effective in 1995.  *See supra* Part II(A)(2).  The money laundering statutes, which include IEEPA violations in the definition of "specified unlawful activity," were enacted in 1986 as part of the Anti-Drug Abuse Act of 1986.  *See* Money Laundering Control Act of 1986, 99 Pub. L. 570 § 1352, 100 Stat. 3207 (Oct. 27, 1986).  Finally, in 2000, CAFRA added offenses constituting SUAs (including IEEPA violations) to the offenses giving rise to forfeiture under 18 U.S.C. § 981(a)(1)(C). 106 Pub. L. 185 § 20, 114 Stat. 202 (Apr. 25, 2000).

private property be taken for public use, without just compensation." U.S. Const. amend. *v.* Forfeiture is not a taking under the Constitution. *Bennis v. Michigan*, 516 U.S. 442, 452-53 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680-88 (1974) (forfeiting an innocent owner's interest in property used in violation of law without just compensation is not an unconstitutional taking); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331-32 (Fed. Cir. 2006) ("When property has been seized pursuant to the criminal laws or subjected to in rem forfeiture proceedings, such deprivations are not 'takings' for which the owner is entitled to compensation.") (citing cases); *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 210 (1st Cir. 1992) ("We think it is settled that if the federal government's actions comport, procedurally and substantively, with the terms of a lawfully enacted forfeiture statute, it may seize private property without compensating the owner.") (citing cases). Nor does the fact that the Government may, pursuant to statutory and regulatory authority, apply forfeited property to compensate victims of the underlying offenses for their losses turn a forfeiture into a taking, any more than a restitution order is a taking. *Cf.*, *Weinstein*, 624 F. Supp. 2d at 276-77 (attaching Bank Melli's property pursuant to the IEEPA and TRIA was not a constitutional "taking") (citing *Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002)).

Assa also complains that the Government's use of its police powers in this case is not for a public purpose, but is "pretextual." (Assa Br. 32-33). This argument is frivolous. Through this civil forfeiture action, the Government is seeking to protect the United States' vital interest in preventing terrorism and the proliferation of weapons of mass destruction. The Iranian

Embargo was instituted in order to address the "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" posed by the actions and policies of the Government of Iran and to prevent financial support of terrorism.  (Compl. ¶¶ 6-8).  In addition, on October 25, 2007, OFAC identified Bank Melli as an entity of proliferation concern because of its financial support for the development of WMDs.  (Compl. ¶ 18, OFAC SDN List, *available at* http://www.ustreas.gov/press/releases/hp644.htm).  Claimants' efforts to circumvent the Embargo and WMD Regulations by using Assa Corp. as a front company to funnel millions of dollars to Bank Melli is a matter of grave public importance.

For these reasons, Claimants' takings argument is meritless.

## C.    The Complaint Does Not Present A Political Question

The political question doctrine holds that a federal court should not adjudicate a dispute if it would force the court to resolve issues committed to the political branches of the government (the Executive Branch and Congress).  *Baker v. Carr*, 369 U.S. 186, 209-10 (1962).  However, in *Baker*, the Supreme Court stated that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  Thus, courts must consider the relevant factors on a case-by-case basis to determine whether the political question doctrine is implicated.  *Id.* at 211; *see also Nixon v. Herndon*, 273 U.S. 536, 540 (1927); *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994).

Six factors guide the determination of whether a claim presents a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of

66

> a kind clearly for nonjudicial discretion; or [4] the impossibility of
> a court's undertaking independent resolution without expressing
> lack of the respect due coordinate branches of government; or
> [5] an unusual need for unquestioning adherence to a political
> decision already made; or [6] the potentiality of embarrassment
> from multifarious pronouncements by various departments on one
> question.

*Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (citing *Baker*, 369 U.S. at 217) (claims by

Croat and Muslim victims of wartime atrocities against the former leader of Bosnian-Serb forces

did not involve a political question because none of the six *Baker* factors was present).

This civil forfeiture action involves none of these six factors. Congress has explicitly

committed the enforcement of IEEPA violations, including the remedy of civil forfeiture, to the

Attorney General. *See* 50 U.S.C. § 1705 (criminalizing IEEPA violations); 28 U.S.C. § 547

(providing that the duties of the United States Attorney includes the prosecution of federal

offenses and civil suits in which the United States is concerned); 18 U.S.C § 981 (defining

criminal offenses resulting in civil forfeiture). Jurisdiction over the Government's claims is

expressly committed to the district courts. 18 U.S.C. § 3231 (vesting original jurisdiction over

offenses against federal law in the district courts); 28 U.S.C. §§ 1345 (vesting original

jurisdiction over civil actions commenced by the United States in the district courts) & 1355

(vesting original jurisdiction over forfeiture actions in the district courts). Thus, this case

involves the straightforward and eminently manageable application of the IEEPA and the

forfeiture laws, and the Court need not make any foreign policy determinations in enforcing the

IEEPA and CAFRA because those determinations have already been made by Congress and the

President. While courts have treated the President's declaration of a national emergency under

the IEEPA as a non-justiciable political question, *e.g.*, *Beacon Prods. v. Reagan*, 633 F. Supp.

1191, 1195 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987) ("[W]hether Nicaragua poses a sufficient threat to trigger the President's IEEPA powers is a nonjusticiable political question."); an action brought by an Executive agency to enforce the IEEPA does not present a political question.

Assa does not argue that this case poses a nonjusticiable political question because of any issues presented by the enforcement of the IEEPA, the Executive Orders, or regulations promulgated thereunder; or because of any issues presented by the application of the forfeiture laws as a remedy for the alleged IEEPA violations.  Rather, Assa's argument is based on the statement by an attorney for the Government at a pretrial conference that, *after* the conclusion of this case, the Government intends to ask the Attorney General to invoke his discretion to use forfeited funds to compensate victims of the underlying offenses that gave rise to the forfeiture. (Assa Br. 35-38).  The possible use of forfeited property to compensate victims is not and will not be an issue before the Court in this case.  That issue is committed, pursuant to Congressional authority, to the discretion of the Executive *after* the property has been judicially forfeited and this case is closed.  18 U.S.C. § 981(d), (e)(6).

Accordingly, Assa's contention that this action presents non-justiciable questions should be rejected.

68

## CONCLUSION

For the foregoing reasons, the Claimants' motions to dismiss should be denied in their

entireties.

Dated: June 5, 2010
       New York, New York

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York


                      By:    _____/s/_____
                              SHARON COHEN LEVIN
                              ANNA E. ARREOLA
                              MICHAEL D. LOCKARD
                              Assistant United States Attorneys
                              One Saint Andrew's Plaza
                              New York, New York 10007
                              Tel. (212) 637-1060/2218/2193
                              Fax (212) 637-0421

69