UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

IN RE 650 FIFTH AVENUE AND RELATED
PROPERTIES

1:08-cv-10934-RJH

**MEMORANDUM
OPINION AND ORDER**

---------------------------------------------------------------

Richard J. Holwell, District Judge:

In this *in rem* forfeiture action, the United States seeks to forfeit real properties,

partnership interests, and accounts owned by or under the control of claimants 650 Fifth

Avenue Company, the Alavi Foundation (the "Foundation"), Assa Corp., and Assa Ltd.

(together, with Assa Corp. , the "Assa Claimants").  The government alleges that these

properties are the proceeds of illegal services that the claimants allegedly provided to the

Islamic Republic of Iran in violation of the International Emergency Economic Powers

Act ("IEEPA"); traceable to such proceeds; or involved in the laundering of such

proceeds.  The claimants have moved to dismiss the complaint for failure to state a claim

for which relief can be granted.  For the reasons set forth below, the motion is denied.

## BACKGROUND

The story of this case begins in 1973 when Shah Reza Mohammad Pahlavi, then

the Shah of Iran, established a non-profit charitable foundation under the laws of the

State of New York.   (Compl. ¶ 24.)  The Shah named the foundation the Pahlavi

Foundation and caused the Iranian government to loan the foundation $42 million.  (*Id.*)

The loan was made by Bank Markazi (the Central Bank of Iran) to Bank Melli Iran, a

state-owned financial institution, and in turn to the Pahlavi Foundation.  (*Id.*)  The funds

were used to purchase real estate at 650 Fifth Avenue in Manhattan and to construct a commercial office building on the property ("the Building").  (*Id.*)

In 1979, a revolution toppled the Shah, who fled Iran, and Ayatollah Ruhollah Khomeini returned from exile to take control of the Iranian government.  (*Id.* ¶ 25.)  On April 1, 1979, Khomeini proclaimed the establishment of the Islamic Republic of Iran. (*Id.*)  During this political upheaval, the directors of the Pahlavi Foundation resigned and were replaced.  (*Id.* ¶ 27.)  And on February 25, 1980, the foundation filed an amended Certificate of Incorporation which changed the name of the Pahlavi Foundation to "The Mostazafan Foundation of New York."  (*Id.*).  The name of that foundation, which later became the Alavi Foundation (and therefore is also referred to below as the "Foundation"), referred to the Bonyad Mostazafan, an entity formed by the newly established Revolutionary Council of the Islamic Republic of Iran to manage property expropriated by the revolutionary government.  (*Id.* ¶ 26.)

### A.  The Formation of the Partnership

In the years following the revolution, the Foundation ran into a problem caused by its outstanding loan from Bank Melli.  The federal tax code classified rent from the Building as debt-financed income unrelated to the Foundation's charitable services on which the Foundation was required to pay taxes.  (*Id.* ¶ 31.)  In 1987, Tahmasb Mazaheri, then the Deputy Prime Minister of Iran and the head of the Bonyad Mostazafan, wrote a letter on Bonyad Mostazafan letterhead to Mir-Hossein Mousavi, then the Prime Minister of Iran, regarding "a major problem of the Mostazafan Foundation of New York, namely the debt they owe to the New York branch of Bank Melli Iran."  (*Id.* ¶ 32.)  Mazaheri asked Mosauvi to approve a plan to transfer ownership of the Building to a new legal entity owned by the Mostazafan Foundation and a to be formed European company who

would pay the debt balance to Bank Melli in exchange for its ownership share.  (*Id.*)
Mazaheri reported that he had discussed the plan with the director of the Central Bank of
Iran and the general director of Bank Melli. (*Id.*)  Mazaheri wrote another letter to
Mousavi later in 1987 again requesting approval for the plan and estimating that the plan
would result in tax savings of $3.5 million.  (*Id.* ¶ 33.)  In a letter dated December 1,
1987 on letterhead entitled "Islamic Republic, Office of the Prime Minister," Mousavi
authorized the plan proposed by Mazaheri, who forwarded the letter to the director of the
Central Bank of Iran.  (*Id.* ¶ 34.)  However, for some reason not apparent from the
complaint, the plan was not executed in 1987.

On March 22, 1988, Habib Zobeidi Om-Jarideh, a member of the Board of
Directors of the Foundation, wrote a letter on the Foundation's letterhead to Mohammad
Badr Taleh, the President of the Foundation, in a renewed attempt to solve the tax
problem.  (*Id.* ¶ 36.)  The letter noted that the plan advanced by Mazaheri "was presented
for two reasons:  1. [t]o avoid paying an unnecessary and large amount of taxes to the US
government" and "2. [t]o express our concerns about possible interference by the New
York public prosecutor in the Foundation's business."  (*Id.*)  Zobeidi advised against the
plan because the IRS would consider it tax evasion since "no real change has been made
except the loan has been changed in name to capital, with the only result being the
payment of no tax."  (*Id.*)  And on March 14, 1989, Badr wrote to Mazaheri requesting
approval to enter into a long-term lease of the Building as an alternative.  (*Id.* ¶ 37.)
However, the Bonyad Mostazafan rejected this proposal and instead approved the plan
originally advanced by Mazaheri.

On July 31, 1989, the Foundation entered into a written partnership agreement
(the "Partnership Agreement") with Assa Corp., a corporation newly organized under the

laws of the State of New York, that established a partnership called 650 Fifth Avenue Company (the "Partnership").  (*Id.* ¶ 41.)  Pursuant to the Partnership Agreement, the Foundation agreed to contribute the Building and Assa Corp. agreed to contribute $44.8 million to the Partnership, to be used to retire the debt on the Building owed to Bank Melli.  (*Id.* ¶ 42.)  The Foundation initially took a 65% interest in the Partnership; Assa Corp. took the remaining 35% interest.  The Foundation now owns a 60% interest in the Partnership and Assa Corp. owns the remaining 40% interest.  (*Id.* ¶ 20.)

In correspondence with the New York Attorney General, the Foundation, through counsel, represented that the officers of the Partnership were Mohammad Hossein Behdadfar, Moshen Kakavand, and Peter Livingston, and that the directors were Behdadfar and Kakavand.  (*Id.* ¶¶ 43-44.)  The Foundation also represented that the sole shareholder of Assa was Assa Co. Ltd., an entity organized under the laws of Jersey, Channel Islands, United Kingdom; that Assa Ltd.'s sole beneficial owners were Behdadfar and Kakavand; and that "there were no pre-existing arrangements or understandings between any director, officer or principal of Assa Corp. and the [Mostazafan] Foundation."  (*Id.* ¶ 44.)  Badr, the President of the Mostazafan Foundation, made similar representations in a verified petition filed in New York State Supreme Court for leave to transfer the Building to the Partnership.  (*Id.* ¶ 46.)  And the Foundation, through counsel, represented to the Assistant Attorney General that "the formation of the Partnership represents an arms-length transaction between the Foundation and Assa Corp." (*Id.* ¶ 45.)

## B.  Assa Corp. and Bank Melli

The government alleges that these representations were false because contemporaneous correspondence and minutes of meetings of Bonyad Mostazafan

officials show that Assa Corp. was actually controlled by Bank Melli.  The government alleges that Behdadfar and Kakavand, officers and directors of the Partnership and the beneficial owners of Assa Co. Ltd., were, respectively, a Bank Melli board member and a manager of the London branch of Bank Melli.  (*Id.* ¶  40.)  The government quotes from meeting minutes and letters signed by Bonyad Mostazafan officials that describe the Partnership as the result of "the mutual agreement between the New York Foundation and Bank Melli Iran"; a "partnership agreement between the Mostazfan Foundation of New York and Bank Melli Iran"; and "agreements between the Ministry of Finance, Bank Melli Iran, and the Bonyad Mostazafan."  (*Id.* ¶¶ 38-39.)  These documents also state that "Assa Co., which belongs to Bank Melli, is the partner of the Mostazafan Foundation" and that the Bonyad Mostazafan "decided to form a company called Assa Channel Islands which would be financed by the bank and under direction of Mr. Behdadfar and Mr. Kakavand."  (*Id.* ¶¶ 39-40.)  The government alleges that Assa Co. Ltd., and thus Assa Corp., continue to be owned by two individual shareholders, Davood Shakeri and Fatemeh Aghamiri, who are Iranian citizens and representatives of Bank Melli. (*Id.* ¶ 47.)

The sole employee of Assa Corp. in the United States from 1996 through late 2008 was Mohammad Hassan Dehghani Tafti, an Iranian citizen who allegedly obtained visas to enter and work in the United States under false pretenses.  (*Id.* ¶¶ 112-116.)  The complaint quotes from e-mails sent by Tafti and received by Tafti from officials in the Overseas Network Supervisory Department (ONSD) of Bank Melli regarding Assa Corp. business.   These e-mails reflect that Tafti requested information regarding Assa Corp.'s expenses, a possible sale of the Building, loan documentation, and financial statements from Bank Melli officials.  (*Id.* ¶ 117.)  The e-mails also reflect that Tafti requested that

Bank Melli officials change the residence of the Assa Co. Ltd. shareholders, Shakeri and Aghamiri, to a country other than Iran.  (*Id.*)

The complaint also quotes telexes in which officials at the office of Bank Melli in New York and the ONSD discussed the possibility of transferring ownership of Assa Corp. from Assa Co. Ltd. to Bank Melli.  (*Id.* ¶¶ 118-119.)  These telexes state that "Assa Corporation's legal issues are now being handled by" the New York Office of Bank Melli and that "Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies."  (*Id.* ¶ 119.)  The same telexes note "the risk of seizure of the elements connected to the Islamic Republic of Iran's assets in the United States . . . . in case of the revelation of the ownership by Assa Corporation."  (*Id.*)

## C.  The Foundation and the Iranian Mission to the United Nations

Just as the complaint alleges that the Iranian government controls Assa Corp. through Bank Melli, the complaint also alleges that the Iranian government has continued to control Assa Corp.'s partner, the Foundation.  The complaint quotes from a letter dated May 7, 1991 from the members of Foundation's Board of Directors to the Ayatollah Khomeini declaring their intention to comply with the Ayatollah's request for their resignations.  (*Id.* ¶ 50.)  On May 16, 1991, the Foundation held a board meeting in Zurich, Switzerland at which representatives of the Bonyad Mostazafan were also in attendance.  (*Id.* ¶ 52.)  According to the minutes from that meeting, the head of the Bonyad Mostazafan informed the board members that all but one of the members were to resign "as directed by the Supreme Leader," *i.e.*, the Ayatollah Khomeini.  (*Id.*)  The same minutes show that the board received a report "regarding the status of the building, its office floors, and retailers" and that the "Directors very much appreciated the way in

which they have executed their duties, in particular regarding the collection of $5.5

million from one of the tenants."  (*Id.*)

After that meeting, control of the Foundation allegedly shifted from the Bonyad

Mostazafan to the Iranian Mission to the United Nations.  The complaint quotes from

1991 correspondence indicating that Kamal Kharrazi, then Iranian Ambassador to the

United Nations, called Badr, the president of the Foundation, to inform him that Kharrazi

was "directly responsible for the Foundation" and that the "Board of Directors will be

just a formality."  (*Id.* ¶ 54.)  Other quoted correspondence indicates that the Ambassador

was "trying to make the point that hereafter he is to be considered the Foundation's

employees['] point of contact and the Foundation will operate under the Iranian Mission

office," and that the Ambassador and his brother had "told almost everyone that they will

be directly responsible for the Mostazafan Foundation of New York and will not only

control its activities, but supervise it as well."  (*Id.* ¶¶ 54, 58.)

The complaint also quotes from letters sent by Badr to the Ayatollah, Kharrazi

and others in 1991 in which Badr warned that Kharrazi was "resorting to a channel

unacceptable by the laws and regulations governing non-profit organizations in America"

and that "Kharrazi's involvement posses a great danger to the Foundation."  (*Id.* ¶¶ 55-

57.)   In particular, Badr warned that he "and other members of the Foundation's Board

of Trustees have frequently signed affidavits addressed to American authorities . . .

stating that the Foundation is independent and devoid of any connection to the

Government of Iran and the Iranian Government's qualified authorities."  (*Id.* ¶ 59.)

Nevertheless, Badr agreed to abide by the instructions of the Ayatollah and resigned his

post on July 7, 1991.  (*Id.* ¶ 60.)  He was replaced later that summer as President of the

Foundation by Mohammad Geramian.  (*Id.* ¶ 61.)

In 1992, the Foundation changed its name to the Alavi Foundation. (*Id.* ¶ 27.) According to the complaint, however, the Foundation continued to be controlled by the Iranian Mission. The complaint alleges that Kharrazi and his successors, Seyed Mohammad Hedi Nejad Hosseinian, Ambassador from 1999 to 2002, Javad Zarif, Ambassador from 2002 to 2007, and Mohammad Khazaee, who succeeded Zarif, all attended Foundation board meetings and directed Foundation affairs. (*Id.* ¶¶ 63, 66-77.) The complaint alleges that these meetings took place both at a property in Queens owned by the Foundation as well as at the official residence of the Ambassador in New York.

The complaint also alleges that, at least as late as 2007, these meetings involved discussions about Foundation affairs, including the Building and the Partnership. (*Id.* ¶¶ 67-68.) For example, the complaint quotes from notes of a meeting between Khazaee, a former cultural attaché at the Iranian Mission, a Foundation board member, and Farshi Jahedi, who replaced Geramian as President of the Foundation, that was held at the Ambassador's residence in October 2007. The notes, which are titled "Board Meeting," reflect that Khazaee gave directions regarding Foundation affairs, asked that "contact with him" be "increased," and directed that "I have to be kept informed and I have to be able to state my opinion in order for you to make a decision" as well as that "we have to be kept informed regarding the general on goings and allocations because we will be held responsible." (*Id.* ¶ 74.) With regard to "[t]he composition of the Board of Trustees," Khazaee said that "[w]hatever I decide should be approved and it should not be otherwise." (*Id.*) In addition, the notes reflect that Khazaee asked "[w]hat are you doing to safeguard the interests of the regime . . . .?" (*Id.*) The notes also indicate that Khazaee asked others to "[s]et aside a budget for the building and bring it up to par." (*Id.*)

The complaint also alleges that Zarif, the Ambassador from 2002 to 2007, directed the Foundation to settle a lawsuit against it, Assa Corp., and Assa Ltd. arising out of an alleged agreement to sell Assa Corp.'s interest in the Partnership to an entity called the Hanif Partnership.  (*Id.* ¶¶ 78-81.)  The Hanif Partnership's complaint alleged that the Foundation refused to accept any new partner because "a new partner might some day inform the Attorney General of the State of New York that Alavi was mismanaging or even wasting its assets and could seek involuntary judicial dissolution of the Alavi Foundation."  (*Id.* ¶ 80.)

### D.  The Foundation, Bank Melli and the Iranian Government

Such allegations posed a risk because the Partnership allegedly had not been paying distributions to Assa Corp.  The complaint quotes from minutes of an August 25, 1992 meeting in Tehran between Bank Melli officials and Garamian, the President of the Foundation and Director of the Partnership, to discuss two issues: (1) distributions that the Partnership owed to Assa Corp.; and (2) real estate taxes owed by the Partnership that Assa Corp. claimed the Foundation was responsible for paying pursuant to the Partnership Agreement.  These minutes again describe a "partnership between the Foundation and the Bank" rather than between the Foundation and Assa Corp.  (*Id.* ¶ 83.)  The managing director of Bank Melli forwarded those minutes to the head of the Bonyad Mostazafan in a letter stating that "the Alavi Foundation of New York is in partnership with this Bank in the ownership of the building at 650 5th Ave., New York " and describing Bank Melli as "one of the pillars of the Islamic Republic of Iran." (*Id.* ¶¶ 85-86.)  The letter indicated that Garamian had met with Bank Melli officials in attempt to resolve the issues regarding the distributions and taxes and requested the Bonyad Mostazafan's "firm instructions" to "resolve the partnership's mutual problems quickly."

(*Id.* ¶ 87.)  In other correspondence regarding the dispute between Assa Corp. and the Foundation regarding real estate taxes, Bank Melli officials asked "should the two sides of the partnership – which are the organs of the Islamic Republic of Iran – claim that due to the other sides's unfamiliarity with local laws, try to take advantage of the other side and . . . impose a financial burden on the other party?"  (*Id.* ¶ 88.)

### E.  The Foundation's Alleged Concealment

The complaint alleges that the Foundation concealed these alleged connections with the Iranian government to shield itself from lawsuits brought by judgment creditors of the Islamic Republic of Iran.  In 1992, Norman Gabay filed a lawsuit against the Bonyad Mostazafan and the Foundation for damages from the alleged expropriation by the Iranian government of businesses he owned.  *See Gabay v. Mostazafan Found. of Iran*, 968 F. Supp. 895 (S.D.N.Y. 1997).  The complaint quotes from correspondence in which Garamian asked the Bonyad Mostazafan for guidance regarding the lawsuit, which in his view required "the denial of any relationship as well as financial and administrative relations between the government of Iran and Mostazafan . . . ."  (*Id.* ¶ 106.)  Geramian submitted an affidavit in which he affirmed that "[t]he New York Foundation conducts no business with the Government of Iran or the Mostazafan Foundation of Iran" and "has never been the agent or instrumentality of the Government of Iran or the Mostazafan Foundation of Iran."  (*Id.* ¶ 103.)  Geramian repeated that denial at his deposition, and, at another deposition, a board member whom the complaint alleges had resigned along with Badr in 1991 at the behest of the Ayatollah denied that he ever received instructions from "any person or entity in Iran."  (*Id.* ¶¶ 104-105.)  The court dismissed the action for lack of subject matter jurisdiction because "the facts developed by Gabay d[id] not show that

the [Mostazafan] Foundation exercised control over the day-to-day activities of the New York Foundation." *Gabay*, 968 F. Supp. at 899.

The complaint alleges that the Foundation submitted the same affidavits and deposition testimony in an attachment action to execute a judgment entered against Iran in a wrongful death suit by the father of a woman killed by a terrorist attack in Gaza. (*Id.* ¶ 108.)  That suit was also dismissed because the "Plaintiff [could not] establish that the Foundation was an agent, alter ego, or instrumentality of the Iranian Government" where the Foundation "submitted proof by affidavit that the Directors are elected by the Foundation itself," that "the Foundation files its own tax returns . . . .  that it is funded through the rental income that it receives from the interest it has in its building located in New York City," that "the Foundation has its own bank accounts," and that "it hires its own employees and that none of these employees are agents, officers, or employees of the Iranian Government as well."  *See Flatow v. Islamic Republic of Iran*, 67 F. Supp. 2d 535, 542-43 (D. Md. 1998).

### F.  The Partnership and the Building

The complaint alleges that the Foundation is the managing partner of the Partnership and that Geramian, the President of the Foundation from 1992 through 2007, also served as Director of the Partnership.  The government alleges that, in its capacity as managing partner, "[t]he Alavi Foundation has played a critical role in managing the Building, acting as the Building's managing partner and overseeing all of the Building's finances."  (*Id.* ¶ 98.)   Indeed, the Partnership Agreement provides that "the Foundation shall have the obligation of administering the day-to-day business and affairs of the Partnership . . . ."  (*Id.* ¶ 96.)   The Partnership Agreement further provides that the

"Foundation shall have the authority to make the following decisions and take the

following actions without obtaining the prior written consent of any other Partner:

> (i)  the execution of any lease of space in the Building having a rentable area of less than twenty-five thousand (25,000) square fee[t] of rentable floor area and a term of less than five (5) years . . . .

> (ii) contracting with vendors of supplies and services required in the ordinary course of business of the Partnership and payment of all sums due therefor, provided that such contract does not provide for the payment, *per annum*, of an amount in excess of [$100,000] . . . .

> (iii) payment of all taxes that are due; and

> (iv) prosecuting, defending and/or resolving by settlement all disputes provided that such litigation and/or settlement would not require payment by the Partnership of consideration reasonably valued at more than [$100,000] . . . .

(*Id.*)  The complaint alleges that, pursuant to this authority, the Foundation managed the

Building on behalf of the Partnership until December 1997, and that from that time

through the present, two real estate management companies have managed the Building,

ostensibly through agreements with the Partnership that were signed by the Geramian, the

President of the Foundation and Director of the Partnership.  (*Id.* ¶ 97.)

As managing partner, the Foundation allegedly directed ownership distributions

of rent earned from the Building to itself and to Assa Corp.  (*Id.* ¶ 100.)   The Foundation

also directed the Partnership to pay the Foundation tens of thousands of dollars in

management fees, some of which was used to pay for the salaries of the Foundation's

officers.  (*Id.*)  And the Foundation's federal tax returns show that the Partnership paid

the Foundation for expenses. (*Id.* ¶ 99.)

### G.  Defendant Properties

The government seeks to forfeit the Building as well as the Foundation's and

Assa Corp.'s interests in the Partnership.  The government also seeks to forfeit (1)

accounts held in the name of the Partnership (the "Partnership Accounts"); (2) accounts

held in the name of the Foundation (the "Foundation Accounts"); (3) accounts held in the name of Assa Corp. (the "Assa Accounts"); and (4) seven other real properties owned by the Foundation (the "Other Real Properties").

### 1. Partnership Accounts

The government seeks to forfeit two accounts owned by the Partnership used to pay distributions to the Foundation and to Assa Corp. as well as for maintenance and other expenses on the Building.  (*Id.* ¶¶ 130, 133.)  The government alleges that "[t]he only source of funds in the Partnership Accounts is income from the Building."  (*Id.*)

### 2. Foundation Accounts

The government seeks to forfeit three accounts held in the name of the Foundation.  The government alleges that "the vast majority of the Alavi Foundation's income has consisted of proceeds of the Building" and alleges that the Foundation earned $38.9 million from the Building from 1999 through 2007 as compared with only $3.8 million from other sources such as one of the Other Real Properties, "dividends and capital gains on investments, [and] interest on savings and temporary cash investments." (*Id.* ¶¶ 125-126.)

### 3. Assa Accounts

The government seeks to forfeit three accounts held in the name of Assa Corp. whose only signatory was Tafti, Assa Corp.'s only employee.  (*Id.* ¶ 120.)  The government alleges that the Partnership deposited funds into these Assa Accounts and that Tafti drew on funds in the accounts to pay income taxes and to transfer funds to Assa Co. Ltd.  (*Id.* ¶¶ 121-123.)

### 4.  Other Real Properties

The government also seeks to forfeit Other Real Properties owned by the Foundation: (1) a property located in Houston, Texas acquired in 1998; (2) a property located in Queens, New York,  part of which was acquired in 1991 and the remainder of which was acquired in 1997; (3) a property located in Carmichael, California acquired in 1989; (4) a property located in Catharpin, Virginia acquired in 1990; (5) another property in Catharpin, Virginia acquired at the same time;  (6) a property in Rockville, Maryland acquired in 1981; and (7) another property in Rockville, Maryland acquired in 1984.  (*Id.* ¶¶ 1, 134-141.)  The government alleges that the Foundation has spent millions of dollars in improvements on these properties.  (*Id.* ¶¶ 134-143.)

### H.  Procedural History

The government filed the original verified complaint [1] in this action on December 17, 2008.  That complaint sought to forfeit only assets owned or controlled by Assa Corp. and Assa Co. Ltd. who moved [32] to dismiss the original complaint on July 10, 2009.  While that motion was pending, the government filed an amended complaint [51] on November 16, 2009.  The Court issued an order [50] that the amended complaint rendered the Assa Claimants' motion moot but that their notices of claim would be deemed sufficient with respect to the amended complaint.  The Foundation and the Partnership filed notices [54, 56] of claim on December 17, 2009.  On March 1, 2010, the Foundation and Assa each moved [75, 78] to dismiss the amended complaint.

In the meantime, numerous judgment creditors of Iran filed claims to the defendant properties on the ground that the claimants are agents or instrumentalities of the Iranian government.  In a case management order [103] dated March 16, 2010, the

Court consolidated and stayed these actions pending disposition of the instant motions to dismiss.

## LEGAL STANDARD

Motions to dismiss *in rem* forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  When considering a motion to dismiss under Rule 12(b)(6), the Court will "consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "'[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss,' and "determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)).

Under Rule G(2)(f), a forfeiture complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  The Second Circuit has noted that "[t]hese standards are more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure . . . ." *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).   *See also* 12 C. Alan Wright, A. Miller, and R. Marcus, Fed. Prac. & Proc. Civ. § 3242 (2d ed.) ("[The Rule] requires a more particularized complaint than is demanded in civil actions generally . . . . Apparently this requirement for added specifics is thought appropriate because of the drastic nature of those remedies.  Thus, it fortifies the procedural-due-process protections against improper use of these remedies.").

Nevertheless, "the complaint need not allege facts sufficient to show that specific property is tainted, but facts sufficient to support a reasonable belief that the government can demonstrate probable cause for finding the property tainted." *Daccarett*, 6 F.3d at 47. The complaint "must state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *See* Supp. R. E(2)(a) for Admiralty or Maritime Cl. and Asset Forfeiture Actions. *Cf.* Supp. R. G(2)(f), Adv. Comm. Note.

Under the Supplemental Rules, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *see also* Supp. R. G(8)(b) (same). And "[o]nce the government establishes that there is probable cause to believe that a nexus exists between the seized property and the predicate illegal activity, the burden shifts to the claimant to show by a preponderance of the evidence (1) that the defendant property was not in fact used unlawfully, *or* (2) that the predicate illegal activity was committed without the knowledge of the owner-claimant, that is, that the claimant is an innocent owner." *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 104 (2d Cir. 2000) (internal citation and quotation marks omitted).

## DISCUSSION

### A. Political Question

The first issue in this case is whether the case is justiciable. The Assa Claimants contend that, because the government has represented that it intends to use any properties

forfeited in this action to compensate private plaintiffs with default judgments against

Iran, the action presents a non-justiciable political question.

The Supreme Court has instructed courts determining whether a case presents a

non-justiciable political question to consider whether the case involves the following:

> a textually demonstrable constitutional commitment of the issue to a coordinate
> political department; or a lack of judicially discoverable and manageable
> standards for resolving it; or the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or the impossibility of a
> court's undertaking independent resolution without expressing lack of the respect
> due coordinate branches of government; or an unusual need for unquestioning
> adherence to a political decision already made; or the potentiality of
> embarrassment from multifarious pronouncements by various departments on one
> question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  "Unless one of these formulations is

inextricable from the case at bar, there should be no dismissal for non-justiciability on the

ground of a political question's presence."  *Id.*  None of these factors is present here.

The Second Circuit has described the first *Baker* factor as "the dominant

consideration in any political question inquiry." *Lamont v. Woods,* 948 F.2d 825, 831 (2d

Cir. 1991).  The Assa Claimants invoke the Victims of Trafficking and Violence

Protection Act ("VPA"), P.L. 106-386, 114 Stat. 1541-1543 (2000), as amended by the

Terrorism Risk Insurance Act ("TRIA"), P.L. 107-297 (2002); President Carter's

decision to nullify attachments of private litigants against Iran; and "the long history of

governmental action compensating our own citizens in this county for wrongs done them

by foreign governments abroad."  (Assa Br. at 35-36 (quoting *Sardino v. Fed. Reserve

Bank of New York*, 361 F.2d 106, 112 (2d Cir. 1966)).)  The Assa Claimants argue that

these events demonstrate that "[i]t is the prerogative of Congress and/or the Executive—

not the judiciary—to determine whether, as a matter of U.S. policy, to create a

compensation fund to settle the claims of U.S. citizens against a foreign government."

(Assa Br. at 35.)  Yet none of this demonstrates "a textually demonstrable *constitutional commitment*" to the political branches.  *Baker*, 369 U.S. at 217 (emphasis added).

Moreover, "the existence of judicially discoverable and manageable standards further undermines the claim that such suits relate to matters that are constitutionally committed to another branch."  *Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir. 1995).  There is hardly "a lack of judicially discoverable and manageable standards" for interpreting the statutes the government seeks to enforce.  The parties have extensively litigated the application of terms in the forfeiture statutes that are regularly applied and interpreted by the federal courts.  These are "clear and well-settled rules on which the district court can easily rely . . . ."  *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 49 (2d Cir. 1991) (finding that "common law of tort" provided "judicially discoverable and manageable standards" in an action against the Palestine Liberation Organization).  Indeed, for just that reason, another court in this district has found justiciable civil forfeiture proceedings against property of a foreign state.  *See United States v. Portrait of Wally, A Painting by Egon Schiele*, No. 99 Civ. 9940, 2002 WL 553532, at *11 (S.D.N.Y. Apr. 12, 2002) ("The issues to be resolved in the instant case include whether the Leopold owns a painting under Austrian law and whether the Leopold violated United States law in transporting that painting into the United States and thereby subjected the painting to civil forfeiture . . . . Determining the standards to resolve such a claim . . . is within the court's competence.")

Nor is this a case where the Court has been asked to make "an initial policy determination of a kind clearly for nonjudicial discretion", such as whether one government has succeeded another, *see 767 Third Ave. Assocs. v. Consulate Gen. of*

*Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152, 161 (2d Cir. 2000); *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994), or whether Congress has properly authorized military action, *see Berk v. Laird*, 429 F.2d 302, 305 (2d Cir. 1970).  Indeed, in *Portrait of Wally*, a civil forfeiture proceeding to recover a painting allegedly stolen by the Nazis that was owned by an Austrian national museum and loaned to the Museum of Modern Art ("MOMA"), this court found that "there [wa]s no impermissible policy determination to be made, nor any intrusion on or lack of respect for a decision already made, or yet to be made, that would engage the remainder of the *Baker* factors."  2002 WL 553532, at *11.   That was because, even though various Austrian laws and treaties signed by the United States provided for mechanisms to recover stolen art, "the Austrian restitution systems ha[ve] never been found to be the exclusive mechanism for the recovery of Holocaust property, and the United States has never committed such claims to the Austrian government." *Id.* at *11 (citation omitted).  *Cf. Alperin v. Vatican Bank*, 410 F.3d 532, 555 (9th Cir. 2005) ("The Property Claims focus on the extent to which the Holocaust Survivors were wrongfully deprived of personal property and the value of such property that was transferred to the Vatican Bank. Adjudicating these discrete issues will not require the court to make pronouncements on foreign policy or otherwise trigger the third *Baker* test.").

It is just so here.   The Assa Claimants argue that "a compensation fund created as a result of this lawsuit also does not respect the determination of Congress and the President that private plaintiffs must, if they wish to obtain compensation from the U.S. Government, follow the guidelines of the VPA."  (Assa Br. at 38.)  But it is hard to see why this case presents any lack of respect for the executive branch when it is the executive branch that is seeking forfeiture.  *See Kadic*, 70 F.3d at 250 (finding "no

concern that interference with important governmental interests warrants rejection of appellants' claims" where the executive branch disclaimed such concerns).   Nor would adjudication of this matter evince any lack of respect for the legislative branch.  Congress enacted the VPA and the TRIA against the background of the IEEPA and the forfeiture statutes at issue here.   Nothing in those statutes did anything to limit the United States' civil forfeiture authority.  On the contrary, the TRIA provided that "[n]othing in this subsection shall bar, or require delay in, enforcement of any judgment to which this subsection applies under any procedure or against assets otherwise available under this section *or under any other provision of law*."  116 Stat. at 2339 (emphasis added); *see also* H.R. Conf. Rep. 106-939, at 118 (2000) ("Future Presidents should follow the precedent set by [the VPA], and find the best way to help victims of terrorism collect on their judgments and make terrorist states pay for their crimes.").

     The Assa Claimants also focus on a statement the government made at an April 4, 2009 hearing and argues that "the Government seeks, by this lawsuit, to create a fund to compensate various private plaintiffs with default judgments against Iran."  (Assa Br. at 35.)  That is not quite what the government said.   Counsel for the government did say that it was the government's hope "ultimately to provide victims with the proceeds of this IEEPA violation or the property involved in money laundering" but the government also stated that it "currently ha[d] pending a request with the Department of Justice for guidance on how this could be done."  (Tr. of Hr'g, Apr. 3, 2009, at 6:1-7.)  Indeed, the government represented that "we haven't determined, since a decision that's going to be made out of main justice in Washington."  (*Id.* at 5:21-23.)

That decision seems likely to involve political considerations about the distribution of government resources and this country's policy toward Iran. [1]  But that does not mean that the application of routinely applied statutes to decide whether the government can recover in the first place involves a non-justiciable political question. "The doctrine . . . is one of 'political questions,' not one of 'political cases.'"  *Baker*, 369 U.S. at 217.  "Given the checks and balances among the three branches of our government, the judiciary can no more usurp executive and legislative prerogatives than it can decline to decide matters within its jurisdiction simply because such matters may have political ramifications."  *Conn. v. Am. Power & Elec. Co.*, 582 F.3d 309, 332 (2d Cir. 2009).

Indeed, in *Portrait of Wally*, this court rejected an argument very similar to that advanced by the Assa Claimants here.  The defendants argued, *inter alia*, that the

---

[1] The Assa Claimants argue that the Department of Justice does not have the legal authority to distribute any assets forfeited in this proceeding to victims of terrorism. Specifically, the Assa Claimants argue that the government cannot use any assets forfeited in this proceeding to compensate judgment creditors "as restoration to any victim of the offense giving rise to the forfeiture, including, in the case of a money laundering offense, any offense constituting the underlying specified unlawful activity", 18 U.S.C. § 981(e)(6), because none of the IEEPA violations here were involved in the terrorist acts whose victims the government intends to compensate.  (Assa Reply at 26-27.)  It is hard to square the Assa Claimants' argument that federal law prevents the Attorney General from taking an action regarding the potential outcome of this case with their argument that the case presents a non-justiciable political question.  But is also far from clear that the Assa Claimants have correctly stated the law.  Section 981 also empowers the Attorney General to "to transfer such property on such terms and conditions as he may determine—to any other Federal agency."  18 U.S.C. § 981(e)(1). Since the VPA authorizes the Secretary of the Treasury to make payments to victims of terrorism, *see* 114 Stat. 1541-1543, it is not clear why the Attorney General could not transfer any assets forfeited through this proceeding to the Secretary of the Treasury on the condition that the Secretary distribute them pursuant to VPA and TRIA.  Though VPA provides that "the Secretary of the Treasury shall make such payments from amounts paid and liquidated from" rental proceeds on Iranian diplomatic property and funds in the "Iran Foreign Military Sales Program account", 114 Stat. 1543, the statute does not explicitly prohibit using funds otherwise designated according to law.

forfeiture was "an improperly brought interpleader action" and that the "court [could not]

award [the painting] to Bondi's heirs even if it [wa]s established that the heirs have a

legal right to the painting and should prevail on their claim" because "the court's only

options [we]re to forfeit the painting to the government, or return it to MoMA as

improperly seized."  2002 WL 553532, at *28.  The court rejected that contention

because "[i]f accepted, this argument would frustrate the whole purpose of this

proceeding.  As is true in every forfeiture case, the government is acting to seize property

that is alleged to be the subject of criminal activity.  Any person who has a legal interest

in the property may file a claim to defend against forfeiture, and a claimant with a

meritorious claim will prevail." *Id.* at *29.  The same is true here.  The Court has stayed

claims by judgment creditors of Iran pending disposition of this motion and, if necessary,

will address whether and how they can recover any assets forfeited through this

proceeding.  Nothing about that potential determination makes the government's

forfeiture action non-justiciable.

### B.  Civil Forfeiture Under § 981(a)(1)(C)

#### 1.  Statutory Framework

The government's first claim for forfeiture arises under 18 U.S.C. § 981(a)(1)(C).

That statute provides in relevant part:

> (a)(1) The following property is subject to forfeiture to the United States:
>
> (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 981(a)(1)(C).  Section 1956(c)(7) defines "specified unlawful activity" to

include "section 206 (relating to penalties) of the International Emergency Economic

Powers Act."  18 U.S.C. § 1956(c)(7)(D).

The International Emergency Economic Powers Act ("IEEPA") was enacted in

1977.  The Act empowers the President to employ a variety of economic sanctions and

other measures in response to situations which the President has declared national

emergencies.  *See generally* 50 U.S.C. § 1702.  Section 206 of the IEEPA is codified at

50 U.S.C. § 1705, which provides that "[i]t shall be unlawful for a person to violate,

attempt to violate, conspire to violate, or cause a violation of any license, order,

regulation, or prohibition issued under this chapter."  50 U.S.C. § 1705(a).

On October 29, 1987, President Reagan issued Executive Order 12613 in which

he found that "that the Government of Iran is actively supporting terrorism as an

instrument of state policy."  Exec. Order 12613, 52 Fed Reg. 41940 (Oct. 29, 1987).

President Reagan ordered that "no goods or services of Iranian origin may be imported

into the United States, including its territories and possessions, after the effective date of

this Order" and authorized the "Secretary of the Treasury . . . to take such actions,

including the promulgation of rules and regulations, as may be necessary to carry out the

purposes of this Order."  *Id.*  Pursuant to that order, the Office of Foreign Asset Control

("OFAC") at the United States Treasury Department issued Iranian Transaction

Regulations ("ITRs") to implement the embargo.  *See* 31 C.F.R. 560, 52 Fed Reg. 44076

(Nov. 17, 1987).

On March 15, 1995, President Clinton issued Executive Order 12957 in which he

found "that the actions and policies of the Government of Iran constitute an unusual and

extraordinary threat to the national security, foreign policy, and economy of the United

States" and "declare[d] a national emergency to deal with that threat."  Exec. Order

12957, 60 Fed. Reg. 14615 (Mar. 15, 1995).   Pursuant to the IEEPA, President Clinton

issued an order prohibiting American persons and corporations from engaging in various

transactions involving Iranian petroleum.   *See id.*  On May 6, 1995, President Clinton

issued Executive Order 12959 which more broadly prohibited transactions involving

export to, financing of, and investment in Iran.  *See* Exec. Order 12959, 60 Fed Reg.

24757 (May 6, 1995).

In September 1995, pursuant to the IEEPA and Executive Orders 12957 and

12959, OFAC issued revised ITRs that prohibited a series of economic transactions

related to Iran, including several of the regulations that the government alleges have been

violated here.  For example, 31 C.F.R. § 560.204 prohibits

> the exportation, reexportation, sale, or supply, directly or indirectly, from the
> United States, or by a United States person, wherever located, of any goods,
> technology, or services to Iran or the Government of Iran . . . including the
> exportation, reexportation, sale, or supply of any goods, technology, or services to
> a person in a third country undertaken with knowledge or reason to know that:
>
> (a)  Such goods, technology, or services are intended specifically for supply,
>       transshipment, or reexportation, directly or indirectly, to Iran or the
>       Government of Iran . . . .

The ITRs also provide that no American person or corporation "may engage in any

transaction or dealing in or related to:

> (1) Goods or services of Iranian origin or owned or controlled by the Government
> of Iran; or
>
> (2) Goods, technology, or services for exportation, reexportation, sale or supply,
> directly or indirectly, to Iran or the Government of Iran.

31 C.F.R. § 560.206.  Further, "any new investment by a United States person in Iran or

in property (including entities) owned or controlled by the Government of Iran is

prohibited." 31 C.F.R. § 560.207.[2]  The ITRs define the "Government of Iran" to include "[a]ny entity owned or controlled directly or indirectly" by the "the the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof," 31 C.F.R. § 560.304, which "includes any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government." 31 C.F.R. § 560.314.

On August 19, 1997, President Clinton issued Executive Order 13059 which prohibited a series of economic transactions related to Iran and the Iranian government that largely tracked the provisions of the ITRs just described.  *See* Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 19, 1997).

### 2.  "Services"

Since the government does not allege any provision of "goods" or "technology" under 31 C.F.R. §§ 560.206 and 560.207, the first question as to whether the government has stated a claim for forfeiture based on the alleged activities of the Alavi Foundation and Assa is whether those activities constitute "services to Iran or the Government of Iran" within the meaning of the ITRs.

The ITRs themselves do not define the term "services."  The Second Circuit has stated that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee."  *United States v. Homa Int'l Trading Co.*, 387 F.3d 144, 146

---

[2] In addition, "no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by [the ITRs] if performed by a United States person or within the United States", 31 C.F.R. § 560.208, and "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." 31 C.F.R. § 560.203.  The government does not appear to rely on these provisions and the claimants do not devote much attention to addressing them. Accordingly, the Court will not do so either.

(2d Cir. 2004) (citing *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01-CV-2091, 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) (finding that "services" "carries its ordinary legal meaning") (citing *Black's Law Dictionary* 1372 (7th ed. 1999) (defining "service" as "the act of doing something useful for a person or company for a fee").

The complaint alleges that Assa Corp.

> has repeatedly transferred rental income generated from 650 Fifth Avenue Company to Bank Melli through Assa Co. Ltd., has regularly [been] following Bank Melli's instructions with regard to Assa Corp.'s business affairs and its management of the investment, has regularly reported back to Bank Melli on its financial situation and business dealings, and has managed the affairs of Assa Corp. for the benefit of Bank Melli."

(Compl. ¶ 22.)  The complaint quotes from a communication by Bank Melli found at its New York residence stating that "Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies."  (*Id.* ¶ 119.)  Indeed, the complaint describes numerous communications from Assa Corp.'s sole employee in the United States to Bank Melli that reflect efforts to sell Assa Corp.'s interest in the Partnership, manage Assa Corp.'s American bank accounts, document Assa Corp.'s expenses, and restructure Assa Corp.'s ownership for tax purposes.  (*Id.* ¶¶ 117-118.)  In short, the complaint alleges with great specificity that Assa Corp. served as an investment manager and straw owner for Bank Melli, which is owned by the Iranian government.

The complaint alleges that the Foundation "has been providing numerous services to the Iranian Government . . . including managing a commercial building for the Iranian Government, running a charitable organization for the Iranian Government, and transferring funds from 650 Fifth Avenue Company to Bank Melli."  (Compl. ¶22.)  The management services in particular appear to have involved, at a minimum, collecting

rent, contracting with management companies, entering into leases, and paying taxes and other expenses.  The complaint also alleges that the Foundation concealed the Iranian government's ownership of the Building from judgment creditors, both by in effect serving as a straw owner of the Building and by making false statements in judicial proceedings and to government authorities.  (Compl. ¶¶ 101-108.)

The Partnership and the Foundation argue that these allegations do not state a claim that the Foundation provided "services" in violation of the ITRs because "[t]he complaint does not allege that the Foundation or any of its officers were paid anything for participating in the Foundation's and the Fifth Avenue Company's legal defense" and instead "alleges that these activities were done to protect Claimants' own interests, not those of Iran or others."  (Foundation Reply. at 12.)  Judge Keenan rejected precisely that argument in a recent case, *United States v. Banki*, 733 F. Supp. 2d 404 (S.D.N.Y. 2010), which involved a *hawala*, a system in which persons desiring to send funds to Iran deposited the funds in an American network of accounts whose operator instructed Iranian institutions to distribute corresponding funds.  In *Banki*, the defendant argued that he did not violate the IEEPA because his "service" was "an act of generosity and friendship."  *Id.* at 416.  Judge Keenan found that "the dictionary definition of a service" was "an act of assistance for another . . . . It is not the motivation behind the transaction that the IEEPA intends to regulate, but the transaction itself."  *Id.* Judge Keenan read the Second Circuit's reference to "a fee" in *Homa* "not as case law introducing the receipt of fees as an element of the IEEPA offense, but as general guidance on the law."  *Id.* at 417.  Since *Homa* "affirmed an IEEPA conviction in a trial in which Judge Griesa did not explicitly instruct the jury about fees", Judge Keenan held that the Second Circuit "did not intend to restrict the application of the IEEPA such that money transferring services a

defendant provides for financial gain other than fees would be permissible despite the Embargo." *Id.*

The Court agrees that nothing in the ITRs suggests that OFAC or Congress intended to limit the reach of IEEPA to services provided for financial gain. Indeed, if "services" only applied to fee-earning services, OFAC would have had no reason to exempt "donations by United States persons of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering." 31 C.F.R. § 560.210(b). Moreover, it seems highly unlikely that OFAC executed its rule-making authority in response to President Clinton's finding "that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" by making an exception for persons acting out of an affinity for the nation creating the threat. Where the text and purpose of the statute so strongly suggest that it would make no sense to interpret "services" to exclude the alleged activities here, there is no need to apply the rule of lenity, for that is a doctrine "of last resort, to be used only after the traditional means of interpreting authoritative texts have failed to dispel any ambiguities." *Ruiz-Almanzar v. Ridge,* 485 F.3d 193, 199 (2d Cir. 2007). *Cf id.* ("We apply the rule of lenity only when none of the other canons of statutory construction is capable of resolving the statute's meaning . . . .").

The Assa Claimants argue that, under the IEEPA, forfeiture of property on the mere ground that a foreign state owns it can occur only "when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals." 50 U.S.C. § 1702(a)(1)(C). The Assa Claimants therefore contend that the alleged services "involve activities that are purely incident to ownership of the Building" and that "[i]f the Executive Branch had sought to make it illegal for the Government of

Iran to own property in the United States, it surely would have done so with language more direct than a prohibition on 'supply of services' to Iran."  (Assa Reply 1-3.)  Perhaps so, but it does not follow from the fact that it is legal for the Iranian government to own property in the United States that it is legal to serve as a commercial real estate manager for property that one knows is secretly owned by the Iranian government.

The ITRs contain no explicit exception for services incidental to Iranian government-owned property.  The ITRs do, however, contain an exception for "[a]ll transactions ordinarily incident to . . . the provision of goods or services in the United States to[] the missions of the Government of Iran to international organizations in the United States" or "to the Iranian Interests Section of the Embassy of Pakistan" or employees thereof.  31 C.F.R. § 560.512.  Accordingly, it would seem that OFAC knew how to create an exception for "incidental" services but chose to limit that exception to services incident to official Iranian diplomatic business in which none of the claimants purports to be engaged.[3]

Against that background, applying the prohibition on supplying "services" to Iran to include management of Iranian government-owned property or investments makes sense.  "The obvious purpose of the [Executive Order authorizing the ITRs] is to isolate Iran from trade with the United States."  *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998).  OFAC may well have concluded that, on the one hand, prohibiting the Iranian government from owning any property in the United States or utilizing services

---

[3]  Although the complaint alleges that the Foundation was secretly controlled by the Iranian Ambassador to the United Nations (Compl. ¶¶ 49, 62-65), there is no indication that the services provided by the Foundation were "incidental" to the Ambassador's duties.  On the contrary, the complaint alleges that successive Iranian Ambassadors attempted to conceal their relationship with the Foundation.  (*Id.* at 66-67).  It would be a strange result, indeed, if that action vitiated rather than triggered the IEEPA.

incidental to its participation in international organizations would severely intrude on Iran's exercise of traditional sovereignty but, on the other, that the United States could at least require Iran to brave the consequences of its policies by owning outright, in its own name and without assistance, any for-profit commercial real estate.  And, given that several Presidents had declared Iran a national security threat, it would not be speculation to say that OFAC could have reasonably believed that tenants would be less apt to send a check to "650 Fifth Avenue Company" than to "The Government of Iran."  Yet the complaint alleges that the claimants' actions enabled the Iranian government to avoid the consequences of any ignominy in the minds of Americans from the actions that caused two Presidents to declare Iran a threat to the national security of their country and to authorize the ITRs.  The complaint therefore adequately alleges that the claimants supplied "services" to Iran in violation of the ITRs and the IEEPA. [4]

### 3. "Constitutes or is Derived from Proceeds"

Section 981(a)(1)(C) does not permit forfeiture of all the assets of one who provides "services to Iran or the Government of Iran."  Rather, the statute provides for forfeiture of "[a]ny property, real or personal, which constitutes or is derived from *proceeds* traceable to a violation . . . ." 18 U.S.C. § 981(a)(1)(C) (emphasis added).  The next question, then, and the heart of this case, is whether the properties the government

---

[4] The Assa Claimants also argue that their alleged "services" merely "constitute the internal corporate activities of a New York licensed corporation" and that Assa Corp.'s employee's communications cannot be IEEPA violations because 50 U.S.C. §1702(b) provides that the IEEPA "does not include the authority to regulate or prohibit, directly or indirectly—(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." That statute has no application to the present case.  First, the IEEPA does not exempt "internal corporate activities." Second, the complaint alleges in extensive detail that Tafti repeatedly sent and received communications regarding Assa Corp.'s interest in the Partnership and its relationship with Bank Melli.  Those communications were plainly not "personal communications."

seeks to forfeit are property "which constitutes or is derived from proceeds" of the

Foundation's and Assa Corp.'s alleged "services to Iran or the Government of Iran."

In general "[p]roceeds are property that a person would not have but for the

criminal offense . . . ." *United States v. Grant*, No. S4 05 Cr 1192, 2008 WL 4376365, at

*2 n. 1 (S.D.N.Y. Sept. 25, 2008); *see also United States v. Nicolo*, 597 F. Supp. 2d 342,

350 (W.D.N.Y. 2009).  *Cf. United States v. Porcelli*, 865 F.2d 1352, 1366 (2d Cir. 1989)

(applying RICO forfeiture statute); *United States v. Ofchinick*, 883 F.2d 1172, 1183 (3d

Cir. 1989) (same); *United States v. Angiulo*, 897 F.2d 1169, 1213 (1st Cir. 1990) (same);

*United States v. Horak*, 833 F.2d 1235, 1243 (7th Cir. 1987) (same).   However, the "but

for" test is insufficiently specific because it does not appear in the statute itself and

claimants raise objections to forfeiture based on the statutory definition of "proceeds."

Accordingly, while the "but for" test provides general guidance, the Court must decide

which one of two definitions of proceeds applies.

Section 981 defines "proceeds" in the following bifurcated way:

(A) In cases involving illegal goods, illegal services, unlawful activities, and
telemarketing and health care fraud schemes, the term "proceeds" means property
of any kind obtained directly or indirectly, as the result of the commission of the
offense giving rise to forfeiture, and any property traceable thereto, and is not
limited to the net gain or profit realized from the offense.

(B) In cases involving lawful goods or lawful services that are sold or provided in
an illegal manner, the term "proceeds" means the amount of money acquired
through the illegal transactions resulting in the forfeiture, less the direct costs
incurred in providing the goods or services.

18 U.S.C. § 981(a)(2)(A)-(B).  The government contends that the first gross proceeds

definition applies because an IEEPA violation is a "specified unlawful activity."  (Gov't

Opp'n at 42 n.17.)  The Assa Claimants counter that the net proceeds definition applies

because the gross proceeds section refers to "unlawful activities" rather than "specified

unlawful activities." (*See* Assa Reply at 7-8.)

Two courts in this district have addressed this issue.  The court in *All Funds on Deposit in United Bank of Switzerland*, 188 F. Supp. 2d 407 (S.D.N.Y. 2002) determined that the gross proceeds definition applied regardless of whether "forbidden currency transfers to Iran" were "illegal services" or "lawful services that are sold or provided in an illegal manner" because the currency transfers were "specified unlawful activities" as defined in 18 U.S.C. § 1956(c)(7) and therefore were also "unlawful activities" under 18 U.S.C. § 981(a)(2)(A).  188 F. Supp. 2d at 409.  However, the court in *United States v. Kalish*, No. 06 Cr. 656, 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009) (Patterson, J.) rejected that reasoning on the ground that if, by the term "unlawful activities" in the proceeds definition Section 981, "Congress had meant 'specified unlawful activity,' a defined term in the money laundering statute, it would have used that precise term—as it did in section 981(a)(1)(C)—instead of the looser term 'unlawful activities' used in section 981(a)(2)(A)."  *Id.* at *7.  *Cf. United States v. Nacchio*, 573 F.3d 1062, 1088-1089 (10th Cir. 2009) (finding *Kalish* more persuasive than *All Funds*).

The Court agrees that the term "unlawful activities" does not include every "specified unlawful activity."  In addition to the fact that Congress decided to use two separate terms in the same statute, Section 981 provides another textual clue.  Section 981(a)(2)(A) refers to "cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes."  However, 18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" to include "any act or activity constituting an offense involving a Federal health care offense."  18 U.S.C. § 1956(c)(7)(F).  Since it seems highly unlikely that at least some "health care fraud schemes" would not also be "Federal health care offense[s]", interpreting "unlawful activities" to include every "specified unlawful activity" would render the phrase "health care fraud schemes"

superfluous.  The Court must interpret the statute to avoid that result. *See Garcia-Villeda v. Mukasey*, 531 F.3d 141, 147 (2d Cir. 2008) ("There is a presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective.").

Since the alleged IEEPA violations here are not "unlawful activities," the Court must decide whether they are "illegal services" or "lawful services that are sold or provided in an illegal manner." Transferring funds, managing business affairs and real estate investments, and running a charitable organization are normally legal activities; they are only alleged to be illegal here because they were performed for the Iranian government.  The Court therefore finds that those services are "lawful services that are sold or provided in an illegal manner." 18 U.S.C. § 981(a)(2)(B).  Accordingly, for those services, "the term 'proceeds' means the amount of money *acquired* through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id.* (emphasis added).  On the other hand, concealing ownership of assets from a judgment creditor is never a legal activity.  Accordingly, for that service alone, "the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

### a.  Rent

The Complaint alleges that the Foundation effectively acted as a commercial real estate manager on behalf of the Iranian government. The United States argues that "the proceeds of these services were the rental receipts from the Building" and that the government "is entitled to seek forfeiture of the Building to the extent that crim[inal]

proceeds were used to pay for maintenance, renovations, and the Building's other expenses" and "served to preserve and enhance the market value of the Building." (Gov't Opp'n at 43.)  Indeed, the Complaint alleges that the Partnership used rental income to fund expenditures on the Building.  (Compl. ¶ 133.)

The Partnership and the Foundation argue that rent cannot be the proceeds of any management services because the complaint refers to rent merely as "income from the Building" and states that the Foundation directed the Partnership to pay a management fee "[a]s payment for its management services . . . ."  (Compl. ¶ 98.)  That puts the cart before the horse.   Since the Foundation directed the Partnership to pay its management fee and "[t]he only source of funds in the Partnership Accounts is income from the Building" (Compl. ¶ 130), the question is whether the income from the Building—*i.e.*, rent—was proceeds of the Foundation's illegal services.  If that is so, then the fact that some of the income was used to compensate the Foundation above its ownership interest does not mean that the income was not proceeds.  It would turn the very notion of "proceeds" on its head to conclude that the funds coming into a scheme are not "proceeds" merely because the manager who makes them possible takes some of them for himself.

With respect to whether rent from the Building was proceeds of the Foundation's illegal services, all the claimants stake much of their motions on the premise that paying rent is not only permitted by law, but required by the terms of a lease.  The Partnership and the Foundation argue that "[b]ecause the funds in the Partnership Accounts were derived solely from non-criminal rental payments by tenants of the Building, those funds are not proceeds of an IEEPA violation." (Foundation Br. at 17).  In particular, they argue that the "Complaint does not allege that rent was 'obtained' or 'acquired' because of the

alleged offense or illegal transactions, or that tenants would not have paid 'but for' the Foundation's services to the Partnership." (Foundation Reply at 3, 5.)   Similarly, the Assa Claimants argue that "[n]o matter what the allegations about Assa Corp.'s ownership are, since 1989, the tenants of 650 Fifth Avenue would still be required to pay rent, and Assa Corp. would still receive a share of that income."  (Assa Reply at 11.)

It is unclear exactly what claimants' argument is, but the Court can discern three possible iterations.  First, claimants may be arguing that rent cannot be proceeds because tenants would have had to pay rent regardless of who owned the Building.  True enough, but that is not the test.  "Proceeds are property that a person would not have but for the criminal offense." *Grant*, 2008 WL 4376365, at *2 n. 1.   It is somewhat more complicated to apply that test to legal services provided in an illegal manner than to purely unlawful activities.  In the case of, say, a bank robbery, it is easy to see that the funds stolen are proceeds because, in a hypothetical world where the robbers had not robbed the bank, the robbers would not have what they stole.  However, in the case of legal services provided illegally, it is tempting to apply the "but for" test in a hypothetical world where the same services were provided legally.  That is essentially what claimants ask the Court to do to the extent that they argue that they would have collected rent from tenants even if they had collected it for, say, Canada.

But claimants' own arguments implicitly acknowledge that changing only the owner of the Building is a half-hearted application of the "but for" test.   In arguing that the rent is not proceeds, claimants repeatedly argue that the "proceeds of the Foundation's management services were the 'management fees' referred to in the Complaint."  (Foundation Reply 3; *see also id.* 5 ("[T]he only proceeds of the Foundation's services are management fees.")); *id.* 6, 10, 14, 15, 16 (same)).  But it is not

clear why that follows if the "but for" test requires assuming that Canada owned the Building rather than Iran.  In that hypothetical, the Foundation would be managing the Building for Canada, and because that is not a crime, any fees it earned for that service would not be proceeds.   Yet by acknowledging that the complaint adequately alleges that the management fees are proceeds, the Partnership and the Foundation concede that the "but for" test does not measure what the Partnership would have obtained if the Iranian government did not own the Building but what the Partnership would have obtained if the Foundation did not manage the Building for the Partnership.

Second, claimants may be arguing that rent cannot be proceeds because someone other than the Foundation could have managed the Building for the Partnership.  Indeed, the Foundation contends that "[r]ental income . . . would have been 'obtained' or 'acquired' whether or not the Foundation, as opposed to any other entity, provided services to the Partnership."  (Foundation Br. at 6.)  That argument ignores that whether services have been provided in violation of IEEPA turns not on who is providing the service but on whether the service was provided to the Iranian government.  The complaint alleges in extensive detail that the Partnership was formed at the direction and for the benefit of the Iranian government and that the Partnership's sole business was to manage the Building.  If that is so, the act of managing the Building is *ipso facto* a service on behalf of the Iranian government, and therefore a violation of IEEPA and the ITRs, regardless of who provides the service.[5]

---

[5] For that reason, even if another company managed the Building, as was the case after 1997, that management was also a violation of the IEEPA.  And, in any event, even if the third-party company did not know the true owner of the Building, the Foundation allegedly did.  Thus if the Foundation entered into contracts with third-party management vendors as Managing Partner of the Partnership to do what the Foundation could not do

*United States v. Hodge*, 558 F.3d 630 (7th Cir. 2009), cited by all claimants, is not to the contrary.  *Hodge* involved an action to forfeit revenues earned by a massage parlor business that allegedly had been providing prostitution services.  The Seventh Circuit reversed the district court's order forfeiting the parlor's entire revenue because "if it could have operated as a legitimate massage parlor, then the revenues of the legal part of the business are not forfeitable."  *Id.* at 635.  The Seventh Circuit stated that "[w]hen a business has both lawful and unlawful aspects, only the income attributable to the unlawful activities is forfeitable."  *Id.*  But *Hodge* does not help claimants because the complaint alleges that the Partnership had one business:  commercial real estate management for the Iranian government.  That is not a business that has "both lawful and unlawful aspects"; it is a business that, if the complaint is to be believed, is entirely unlawful.[6]

Third, claimants may be arguing that rent cannot be proceeds because the tenants would have paid it even if nobody managed the Building for the Partnership.   But common sense suggests "probable cause" to doubt that claim.  For example, suppose that nobody told the tenants where to send their rental payments.  How would the tenants know to send the payments to the Partnership?  Suppose that a tenant was late on or missed a payment.  How would a repayment solution be found?  Moreover, it is hard to

---

itself, the Foundation would also have been providing a service in violation of the IEEPA and the rent collected through that third-party would also be proceeds of that violation.

[6] *United States v. Khanani*, 502 F.3d 1281 (11th Cir. 2007) is also distinguishable.  In *Khanani*, the Eleventh Circuit affirmed the district court's holding that, under the money laundering statute, income earned from sales of jeans was proceeds of the sales of the jeans, not proceeds of hiring illegal immigrants to produce the jeans.  *See id.* at 1296-1297. The court rejected the government's theory that the manufacturer earned proceeds because of the tax and cost savings from employing illegal workers.  *See id.*  But forfeiture here is not premised on the tax savings enjoyed by the Partnership but instead on the rental income earned by the Partnership.

understand why tenants would continue to make payments if the Partnership did not

provide or contract to provide certain critical management services.  Why would a tenant

pay rent in a building where stopped elevators are never fixed and heat is never turned

on?  Yet any person or company that instructs tenants to send payments to designated

Partnership accounts, monitors the timeliness of payments, contracts for routine

maintenance, or hires a management company to do the same, knowing that these

services are being performed by a Partnership owned by the Iranian government, is

performing a service prohibited by the IEEPA.

Accordingly, the complaint states a claim that the rent from the Building was

"proceeds" of the Foundation's management of a real estate investment for the Iranian

government in violation of IEEPA.

### b.  The Accounts

#### i.    Partnership Accounts

The government seeks forfeiture of funds in the Partnership Accounts.  The

complaint alleges that "[t]he only source of funds in the Partnership Accounts is income

from the Building." (Compl. ¶ 130.)  Since that income consisted of rent, and the

complaint sufficiently alleges that rent is "proceeds", the complaint sufficiently alleges

that the funds in the Partnership accounts are forfeitable as "proceeds."

#### ii.   Alavi Accounts

The government also seeks forfeiture of the Foundation Accounts.  The complaint

alleges that the vast majority of funds in these accounts consists of income and

management fees transferred from the Partnership.  (*See* Compl. ¶¶ 125-129, 131.)  Since

"[t]he only source of funds in the Partnership Accounts is income from the Building"

(Compl. ¶ 130), and the complaint sufficiently alleges that the income is proceeds, the

complaint sufficiently alleges that at least some of the funds transferred to the Foundation Accounts were forfeitable "proceeds."

### iii.    Assa Accounts

The complaint also seeks forfeiture of the Assa Accounts.  The Partnership allegedly transferred millions of dollars to those accounts.  (*See* Compl. ¶¶ 121-122.) Since "[t]he only source of funds in the Partnership Accounts is income from the Building" (Compl. ¶ 130), there is more than a "reasonable belief" that at least some of the funds the Partnership transferred to the Assa Accounts were rent and therefore "proceeds" subject to forfeiture.

The Assa Claimants correctly note that "there is no allegation in the Amended Complaint or opposition brief that Assa Corp. took some ascertainable illegal action with respect to the tenants which resulted in newly acquired funds."  (Assa Reply at 11.) Indeed, the partnership agreement delegated management responsibility to the Foundation, not Assa Corp. (Compl. ¶ 96.)  But the owner of criminal proceeds does not need to have committed the offense giving rise to their forfeiture. "Once the government establishes that there is probable cause to believe that a nexus exists between the seized property and the predicate illegal activity, the burden shifts to the claimant to show by a preponderance of the evidence (1) that the defendant property was not in fact used unlawfully, *or* (2) that the predicate illegal activity was committed without the knowledge of the owner-claimant, that is, that the claimant is an innocent owner."  *Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d at 104 (internal citation and quotation marks omitted).  Thus the Assa Claimants' argument that "Assa Corp. passively accepted its share of rental proceeds from a legal commercial real estate venture" (Assa Reply at 11) is an affirmative defense on which Assa has the burden of

proof. *United States v. One Parcel of Property, Located at 755 Forest Road, Northford, Conn.*, 985 F.2d 70, 72 (2d Cir. 1993); *see also* 18 U.S.C. § 983(d)(1) ("The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence."). Given that the allegations in the complaint that Assa Corp. was far from innocent must be taken as true, there is no reason to dismiss any part of the complaint on the ground that Assa Corp. did not provide the services that generated criminal proceeds.[7]

### c. The Building and the Partnership

The Partnership was formed in 1989 and took title to the Building the same year, six years before the IEEPA became applicable to Iran. The government therefore cannot forfeit interests in the Partnership or the Building on the ground that they were "acquired" in the traditional sense of being bought in the first instance using "proceeds" of an IEEPA violation. *See United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). Instead, the government advances two others theories why the the Building can be forfeited under § 981(a)(1)(C).

First, the government contends that the *entire* Building can be forfeited because, "by illegally concealing the Iranian Government's control of the Foundation and ownership of Assa Corp. from law enforcement, the Partnership was able to retain the Building." (Gov't Opp'n at 48.) In support of this argument, the government cites

---

[7] The Assa Claimants also argue that 18 U.S.C. § 984 bars the government from forfeiting funds in the Assa accounts. That is incorrect for the reasons set forth in Section C(3)(c) *infra*. And even if the one-year statute of limitations did apply, it would not bar the government's forfeiture action here under § 981(a)(1)(C). The offense giving rise to forfeiture under that provision is the Foundation's alleged management of real estate for the Iranian government in violation of the IEEPA. The complaint alleges that those services continued until the filing of the complaint. (Compl. ¶ 97.) Accordingly, an action to recover fungible property in the Assa Accounts is timely.

money laundering cases involving tax fraud, *see United States v. Yusuf*, 536 F.3d 178, 185, 189 (3d Cir. 2008); *United States v. Morelli*, 169 F.3d 798, 806 (3d Cir. 1999), and bankruptcy fraud, *see United States v. Dennis*, 237 F.3d 1295, 1301-1303 (11th Cir. 2001); *United States v. Ladum*, 141 F.3d 1328, 1340 (9th Cir. 1998); *United States v. Levine*, 970 F.2d 681, 686 (10th Cir. 1992).   But as the Partnership and the Foundation point out, none of these cases involved a forfeiture action under § 981.   That distinction is not without a difference.   Since the government's allegation is not related to rent proceeds, and therefore is not that the Building is property "derived from proceeds," the government must be able to show that the Building itself meets the definition of proceeds.

With respect to the Foundation's alleged concealment, "the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).   That statute can be contrasted with the way the money laundering statute defines "proceeds" to mean "any property derived from or *obtained or retained*, directly or indirectly, through some form of unlawful activity." 18 U.S.C. § 1956(c)(9) (emphasis added).   The difference suggests that "obtained" does not also mean "retained." Congress defined "proceeds" in the money laundering statute in 2009, *see* P.L. 111-21, 123 Stat. 1617, 1619 (2009), well after it defined "proceeds" in the civil forfeiture statute, *compare* P.L. 106-185, 114 Stat. 224 (2000).   Thus "obtained" in the civil forfeiture statute could mean "retained" only if in defining money laundering "proceeds" Congress (a) overlooked the civil forfeiture statute or (b) added a superfluous word.

The latter possibility founders on the rocks of the presumption that Congress did not add a superfluous word, *see Garcia-Villeda*, 531 F.3d at 147, and the legislative history makes the former possibility unlikely.  Congress defined money laundering "proceeds" in response to *United States v. Santos*, 128 S. Ct. 2020 (2008), which held that the term proceeds—which was undefined in the money laundering statute at that time—referred to net rather than gross profits.  The Senate Report stated that adding the definitional "section would amend the criminal money laundering statutes to make clear that the proceeds of specified unlawful activity include the gross receipts of the illegal activity, not just the profits from the illegal activity."  S. Rep. 111-10, at 7 (2009) (internal citation omitted).  The definitional section of "proceeds" in Section 981 is also largely concerned with net and gross methods of calculating proceeds.  Accordingly, it is hard to imagine that Congress was not aware that the existing civil forfeiture definition used only "obtained" when Congress chose the phrase "retained or obtained."  Hence the Court is left to conclude that Congress did not believe that "obtained" also meant "retained."  And the Court is not aware of any court that has permitted an action to proceed under 18 U.S.C. § 981(a)(1)(C) on the basis that property was retained as the result of a criminal offense.   The government's action under § 981(a)(1)(C) based on the theory that concealing the Building's true owner in civil lawsuits cannot proceed either.[8]

The government also argues that it "is entitled to seek forfeiture of the Building to the extent that crime proceeds were used to pay for maintenance, renovations, and the Building's other expenses."  (Gov't Opp'n at 43.)  In their initial brief, the Partnership

_____

[8] For the same reasons, the argument is equally unavailing to the extent that the government seeks to forfeit any rent on the theory that, but for their concealment, claimants would have had to pay rent to satisfy judgments against the Iranian government.

and the Foundation did not contest that point as such; they merely argued that rent was not proceeds.  (*See* Foundation Br. at 12-13 ("The use of proceeds to support or maintain a property does not render the entire property forfeitable.  Thus that portion (or a pro rata interest)—*and only that portion*—of the Real Properties would be subject to forfeiture if the Foundation used IEEPA proceeds to make capital improvements in them.")).

In their reply brief, however, the Partnership and the Foundation contends that the definition of proceeds in Section 981 does not include property "maintained" using criminal proceeds.  (Foundation Reply at 9-10.)  Since, as set forth above, the services but for which the Partnership would not have earned rent are "lawful services that are sold or provided in an illegal manner," "the term 'proceeds' means the amount of money *acquired* through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."  18 U.S.C. § 981(a)(2)(B) (emphasis added).  The Partnership and the Foundation contrast this definition with the RICO forfeiture statute, 18 U.S.C. 1963(a)(1), which refers to "any interest the person has acquired *or maintained* . . . ."  (emphasis added).

The Foundation's comparison is unpersuasive.  In the first place, the comparison is apples to oranges.   The "acquired or maintained" language in the RICO forfeiture statute is not a definition of proceeds; it appears as one of several types of property connected to a RICO violation that are subject to forfeiture.   Another such category is "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962."  18 U.S.C. § 1963(a)(3).  That phrase is almost identical to the way the civil forfeiture statute provides for forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [IEEPA]."   18 U.S.C. §

981(a)(1)(C).  Given that language, whether the Building is forfeitable to the extent it was maintained using rent does not turn on the definition of proceeds alone.  Rather, the Building would be forfeitable to the extent that it is property "*derived from* proceeds," *i.e.*, rent.  *Id.* (emphasis added).  *See, e.g.*, *United States v. Real Property and Premises Located at 216 Kenmore Ave, Deerfield, Ill.*, 657 F. Supp. 2d 1060, 1066 (D. Minn. 2009) ("Although the Government does not contend that the property was originally purchased with the proceeds of fraud, it *does* allege that improvements to the property and property taxes were paid with illicit funds.  And the law is well-established that the Government may seek forfeiture of the property in part, to the extent that tainted funds were used therein.") (emphasis in original).  Accordingly, the government has stated a claim that at least some portion of the Building is property derived from proceeds.

### d.  Other Foundation Properties

The complaint also seeks forfeiture of the Other Real Properties on the ground that the Foundation spent millions of dollars in IEEPA proceeds on the properties.  According to the complaint, with the exception of lots 6, 7, and 8 of Real Property-3, which the Foundation acquired on April 14, 1997 (*see* Compl. ¶ 136), the Foundation acquired all of the Other Real Properties before 1995 when providing services to Iran became an IEEPA violation.  However, the complaint alleges in extensive detail that the Foundation spent millions of dollars in purchasing and improving these properties.  (*See* Compl. at ¶¶ 135-143.)  Since (a) "[t]he only source of funds in the Partnership Accounts is income from the Building" (Compl. ¶ 130), (b) the complaint adequately alleges that rent is "proceeds"; and, therefore, (c) adequately alleges that some portion of the funds transferred to the Foundation's accounts were forfeitable "proceeds", the complaint adequately alleges that the Foundation used "proceeds" to acquire and/or maintain the

Other Real Properties.  Accordingly, for the reasons noted above with respect to the Building, the government has stated a claim that at least some portion of the Other Real Properties can be forfeited.

### C.  Civil Forfeiture Under § 981(a)(1)(A)

#### 1.  Statutory Framework

The complaint also alleges a claim for forfeiture under § 981(a)(1)(A). That statute provides in relevant part:

> (a)(1) The following property is subject to forfeiture to the United States:
>
> (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

To prove forfeiture under this section, "the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c). Section 1956 is the money laundering statute.  The complaint alleges that various defendant properties are forfeitable as property involved in both promotion money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) and concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i)-(ii).  The Court first considers whether the complaint alleges that any such transaction took place.

#### 2.  Money Laundering

Section 1956(a)(1)(B) provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or  . . . .
>
> (B) knowing that the transaction is designed in whole or in part--

(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; [shall be guilty of an offense].

This statute

require[s] the government to prove that the defendants, (1) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction (3) which in fact involved the proceeds of that unlawful activity, (4) either (a) with the intent to promote the carrying on of that unlawful activity or (b) with the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

*United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006).  Under the statute, "the term

'financial transaction' means (A) a transaction which in any way or degree affects

interstate or foreign commerce (i) involving the movement of funds by wire or other

means or (ii) involving one or more monetary instruments, or (iii) involving the transfer

of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the

use of a financial institution which is engaged in, or the activities of which affect,

interstate or foreign commerce in any way or degree."  18 U.S.C. § 1956(c)(4).

As noted above, rent from the Building was proceeds of the Foundation's services

in violation of IEEPA, a "specified unlawful activity."[9]  The complaint alleges in

---

[9] The parties all seem to assume that the same definition of "proceeds" applies to an action under 18 U.S.C. § 981(a)(1)(C) and an action under 18 U.S.C. § 981(a)(1)(A). That is not the case.  Section 981(a)(1)(A) does not use the term "proceeds" at all.  That term only appears in the provisions of the money laundering statute which defines the term as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity."  18 U.S.C. § 1956(c)(9). That could make a difference because the definition of proceeds applicable to 18 U.S.C. § 981(a)(1)(C) does not contain the word "retained." Thus where property retained as a result of a "specified unlawful activity" is transferred in a financial transaction it would not be forfeitable under 18 U.S.C. § 981(a)(1)(C) but would be forfeitable under 18 U.S.C. § 981(a)(1)(A). That is not the case here.  Though the government contends that the Building here was unlawfully retained as a result of the Foundation's actions to conceal the Iranian government's ownership from judgment creditors, there is no allegation that the

extensive detail that the Partnership, the Foundation, and Assa Corp. knew that the Foundation's services were being provided to the Iranian government.   And the complaint describes a series of "financial transactions" that in fact involved these rent proceeds: (1) the Partnership's distributions to the Foundation and Assa Corp.; (2) the Partnership's and Assa Corp.'s payment of expenses and taxes; and (3) Assa Corp.'s transfer of its distributions to Assa Ltd., to be sent on to Bank Melli.   Accordingly, the first three elements of the money laundering offenses appear satisfied.   The next question is whether the complaint sufficiently alleges these transactions were made "either (a) with the intent to promote the carrying on of that unlawful activity or (b) with the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity."

### a.  Concealment

As an initial matter, the Assa Claimants argue that because "Bank Melli's alleged ownership of Assa Corp. is not proscribed by the Iranian Trade Embargo Provisions . . . . there can be no alleged concealment of ownership or control of any [specified unlawful activities] proceeds which is required to establish concealment money laundering."  (Assa Reply 13.)  But concealment money laundering criminalizes the concealment of the proceeds of a specified unlawful activity; the statute does not say that concealment must involve disguising the specified unlawful activity itself.   While "taking steps to make funds appear legitimate is the common meaning of the term 'money laundering,'" the Supreme Court has noted in analyzing an analogous provision of the money laundering statute that "Congress used broad language that captures more than classic money

_____

Partnership, the Foundation, or Assa Corp. engaged in a transaction transferring the Building itself.

laundering . . . ."  *Cuellar v. United States*, 553 U.S. 550, 558 (2008); *see also United States v. Thorn*, 317 F.3d 107, 132 (2d Cir. 2003) ("We have found that the language of § 1956(a)(1)(A)(i) demonstrates that Congress 'sought to reach conduct that went beyond the concealment of proceeds of criminal activity. Indeed, the words of this provision of the statute, in conjunction with the definitions provided in 18 U.S.C. § 1956(c) (1988), demonstrate that Congress intended to make unlawful a broad array of transactions designed to facilitate numerous federal crimes.'") (quoting *United States v. Skinner*, 946 F.2d 176, 178 (2d Cir. 1991)).  Indeed, the Second Circuit has affirmed money laundering convictions where the evidence showed that the defendants served as nominee owners of various properties to disguise the fact that they were proceeds of drug trafficking and were beneficially owned by a drug trafficker.  *See United States v. Monaco*, 194 F.3d 381, 384-87 (2d Cir. 1999).

Here, the complaint appears to allege that the Partnership's distributions of rent proceeds to the Foundation and Assa Corp. as well as Assa Corp.'s transfer of its distributions to Assa Ltd. were "designed at least in part to conceal or disguise the nature . . . ownership," and "control" of the rent proceeds.  The complaint alleges in extensive detail that the rent proceeds were distributed to the Foundation and Assa Corp., and in turn to Assa Ltd., rather than directly to the Iranian government at least in part to avoid detection of the fact that the payments would benefit the Iranian government.   *Cf. Cuellar*, 553 U.S. at 566 (noting that concealment refers to "*why* one moves the money") (emphasis in original).

The Assa Claimants also argue that "[n]either a single-purpose real estate entity created in 1989, years before the [ITRs] were in effect, nor any of the regular corporate activities which were performed in the very same way since that time, could be designed

to conceal anything." (Assa Reply 14.)  That argument misses the mark for two reasons.

First, the fact that transactions are "regular corporate activities" does not mean they

cannot be money laundering transactions.  Indeed, the money laundering statute defines

"financial transaction" in a way that includes all manner of "regular corporate activities,"

but it is the concealment of specified unlawful activity that transforms these run of the

mill transactions into laundering transactions.

Second, the complaint alleges in extensive detail that the Partnership was

designed at least in part to conceal that the Iranian government was the ultimate

beneficiary of ownership of the Building.   Indeed, the complaint quotes from

correspondence stating that the partnership "was presented . . . [t]o express . . . concerns

about possible interference by the New York public prosecutor in the Foundation's

business." (Compl. ¶ 36.)   Yet the complaint alleges that the Foundation denied to New

York authorities that the Partnership was being formed by entities connected to the

Iranian government even though everyone involved in the formation of the Partnership

knew that it was in fact between the Foundation—an entity controlled by the Iranian

government—and Bank Melli—an entity owned by the Iranian government.

In sum, the complaint alleges that the Partnership was created in no small part as

a network by which income from a skyscraper in Manhattan could flow undetected to the

Iranian government.  It follows that the complaint alleges that transactions transferring

income through that network—the Partnership distributions and the transfers from Assa

Corp. to Assa Ltd.—were designed in part to conceal that the income was flowing to the

Iranian government.  True, since providing services to Iran only became a "specified

unlawful activity" in 1995, transactions in rent proceeds were not money laundering

transactions prior to that time.  But that only shows that the concealment became illegal; it does not show that the transactions did not conceal anything.[10]

###### b.  Promotion

With respect to promotion money laundering, the government argues that the complaint alleges that the Partnership "and its partners . . . relied upon rental income from the Building to pay their operating expenses, such as maintenance, taxes, employee salaries, occupancy, and supplies" and that "[e]ach of these payments was a financial transaction intended to promote the ongoing operations of these entities and their continued service to the Iranian Government, including the continued operation of the Building and the continued operation of the Alavi Foundation's not-for-profit activities." (Gov't Opp'n at 58.)

To the extent that the Partnership and its partners' payment of "operating expenses" promoted the "operation of the Alavi Foundation's not-for-profit activities," those payments do not constitute promotion money laundering.  Promotion money laundering "require[s] the government to prove that the defendants, (1) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity," conducted a financial transaction with the proceeds "with the intent to promote the carrying on of *that* unlawful activity."  *Gotti*, 459 F.3d at 334 (emphasis added).  *Cf. United States v. Dovalina*, 262 F.3d 472, 475 (5th Cir. 2001)  ("Proof that financial transactions involving the proceeds of unlawful activity merely promoted other criminal activity is insufficient to support a conviction under section 1956(a)(1)(A)(i).").

---

[10] The Assa Claimants' argument that "[a]lleged concealment of an entity's owner is not a factor" (Assa Reply 14) is similarly unpersuasive.  Perhaps the distributions were designed to conceal that the Foundation and Assa Corp. were controlled or owned by the Iranian government, but that is hardly a reason to conclude that distributions to those entities were not designed to conceal the owner of the funds distributed.

Even if the payment of the operating expenses were intended to promote the Foundation's charitable activities, rent from the Building was not proceeds of those activities.

The government's theory with respect to promoting the "continued operation of the Building" stands on a different footing.  The complaint alleges in detail that the Partnership paid the Foundation management fees and compensated the Foundation "for expenses incurred by the Foundation in connection with the services rendered to the Partnership by the Foundation."  (Compl. ¶¶ 98-99.)   Such payments would certainly appear to have promoted the Foundation's services to the Partnership.  However, "Section 1956(a)(1)(A)(i) is not satisfied by a showing that a financial transaction involving the proceeds of specified unlawful activity merely promoted the carrying on of unlawful activity."  *United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999).  Rather, the government must show "that the receipt and deposit of laundered funds was made with the *intent* to promote the specified underlying unlawful activity, be it, for example, by promoting continued illegal activity or by being essential to the completion of the scheme."  *Thorn*, 317 F.3d at 133 (emphasis added).  The intent requirement is important to avoid "turning the money laundering statute into a money spending statute."  *Brown*, 186 F.3d at 670 (quotation marks omitted).  Doing so is particularly important in cases involving payments of business expenses, since "[t]he crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture."  *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004).

Nevertheless, the Second Circuit has rejected the argument "that merely spending money obtained through [a specified unlawful activity] on legitimate office expenses does not, as a legal matter, constitute promotion money laundering." *Thorn*, 317 F.3d at 133. Consistent with that conclusion, numerous courts have held that using criminal proceeds to pay for expenses can constitute promotion money laundering. *See, e.g.*, *United States v. Lee*, 558 F.3d 638, 642 (7th Cir. 2009) (stating that rent payments on spa offering prostitution services "clearly satisfy the requirement that the transactions were made with the intent to promote the carrying on of the underlying illegal operation"); *United States v. Lawrence*, 405 F.3d 888, 901 (10th Cir. 2005) (holding in prosecution for money laundering proceeds of Medicare fraud, that, since "keeping the doors of the clinic open assisted [the defendant] in carrying out his fraudulent scheme," evidence that the defendant used proceeds to pay rent was "sufficient to show an intent to carry on the fraud for the purposes of the money laundering charges"); *United States v. Murray*, 154 Fed.Appx. 740, 744 (11th Cir. 2005) (holding that, where proceeds that defendants "spent on rent, furniture, payroll, travel expenses, and office supplies was integral to creating an impression of legitimacy that would entice their victims to pay," the "money was spent with the intent to promote the fraudulent scheme"); *United States v. Pressley*, 20 Fed.Appx. 331, 334 (6th Cir. 2001) (upholding money laundering convictions where "the defendants knowingly deposited proceeds from the investors into bank accounts and expended those proceeds on . . . an office from which their efforts to promote their fraudulent scheme were conducted"). And even those courts that have stressed the importance of the intent requirement have recognized that, "[i]n many cases, the intent to promote criminal activity may be inferred from the particular type of transaction." *Brown*, 186 F.3d at 670.

That is so at this stage of this case.  It seems far more than plausible that alleged payments for expenses related to management of the Building were intended to promote that management, and, therefore, to promote an alleged violation of the IEEPA. Accordingly, the complaint states a claim that those payments were promotion money laundering transactions.

   3.   **"Involved In"**

The next question is what property was "involved in" these transactions.  It is clear that "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3). Whether property "involved in" money laundering includes property "used to facilitate" that transaction is less clear.

In some respects, the plain language of the forfeiture statute suggests that "involved" does not include "facilitate."  Indeed, the use of the disjunctive in Section 983(c)—"a theory of forfeiture that the property was used to commit or facilitate the commission of a criminal offense, *or* was involved in the commission of a criminal offense"—suggests that the two terms do not have the same meaning.  *Cf. Mizrahi v. Gonzales*, 492 F.3d 156, 164 (2d Cir. 2007) ("It is a standard canon of statutory construction that words separated by the disjunctive are intended to convey different meanings unless the context indicates otherwise.").   Section 981(a) also refers to each term without referring to the other.  Section 981(a)(1)(A) refers to "property, real or personal, involved in a transaction"; Section 981(a)(1)(B) refers to "property, real or personal, within the jurisdiction of the United States, constituting, derived from, or

traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense."  In addition, as the Court will discuss in further detail, some courts in this Circuit have rejected a facilitation theory when the government seeks to forfeit fungible property.  *See, e.g.*, *Marine Midland Bank v. United States*, Nos. 93-CV-307, 93-CV-357, 1993 WL 158542 (S.D.N.Y. May 11, 1993); *United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at Am. Express Bank*, 832 F. Supp. 542 (E.D.N.Y. 1993) (Gleeson, J.).

Nevertheless, courts in this district have held that "[t]he term 'involved in' refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense."  *United States v. 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others*, No. 03-CV-8004, 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008).  Those courts are hardly alone.  "Though § 981 does not contain the phrase 'facilitating property,' it has been interpreted by various district courts to encompass such property through its use of the phrase 'involved in.'"  *United States v. Eleven Vehicles*, 836 F. Supp. 1147, 1153 (E.D. Pa. 1993).  Indeed, numerous courts have so interpreted the phrase.  *See Seher*, 562 F.3d at 1368; *United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005); *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998); *United States v. Tencer,* 107 F.3d 1120, 1134-35 (5th Cir. 1997); *Nicolo*, 597 F. Supp. 2d at 351; *United States v. 10.1 Acres Located on Squires Rd. in Chees Twp., Orange County, N.C.*, 386 F. Supp. 2d 613, 616 (M.D.N.C. 2005); *United States v. One 1988 Prevost Liberty Motor Home*, 952 F. Supp. 1180, 1205 (S.D. Tex. 1996); *United States v. Contents of Account Nos. 208-07070 and 208-0608-1-2*, 847 F. Supp. 329, 334 (S.D.N.Y. 1994); *United States v. All of Inventories of*

*Businesses Known as Khalife Bros. Jewelry*, 806 F. Supp. 648, 650 (E.D. Mich. 1992);

*United States v. Certain Funds on Deposit in Account No. 01-0-71417, Located at the*

*Bank of New York*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991); *United States v. All Monies*

*($477,048.62) In Account No. 90-3617-3, Israel Discount Bank, New York, N.Y.*, 754 F.

Supp. 1467, 1473 (D. Hawaii 1991).  That conclusion is consistent with the legislative

history as well.  *See* 134 Cong. Record S17365 (daily ed. Nov. 10, 1988) ("[T]he term

'property involved' is intended to include the money or other property being laundered

(the corpus), any commissions or fees paid to the launderer, and any property used to

facilitate the laundering offense.")

Moreover, "[t]he Second Circuit appears to have embraced the 'facilitation

approach," *United States v. Schlesinger*, 396 F. Supp. 2d 267, 272 (E.D.N.Y. 2005),

*aff'd*, 514 F.3d 277 (2d Cir. 2008), and has affirmed forfeiture of property as "involved

in" money laundering transactions when it has "served as a conduit for the proceeds of

the illegal transactions.'"  *United States v. Schlesinger*, 261 Fed. Appx. 355, 361 (2d Cir.

2008) (quoting *United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d

Cir. 1995)).  *Schlesinger* involved a clothing manufacturing business owned by the

Schlesinger brothers who were convicted of two mail and wire fraud schemes.

> One scheme involved defrauding insurance companies by submitting fraudulent
> claims for losses sustained as a result of a series of fires that occurred in the
> [business] [p]remises . . . .  The second scheme involved using [the business] as a
> vehicle to defraud various creditors by masking the true ownership of the
> companies.  This scheme involved the use of nominees and shell corporations to
> carry out what was, in effect, two self organized bankruptcies.

396 F. Supp. 2d at 269.  "Evidence at trial showed that Schlesinger deposited the

proceeds of his insurance and creditor fraud into the business operating accounts of the

companies he ran at the premises, and the proceeds were then used to pay the companies'

monthly lease and tax expenses."  261 Fed.Appx. at 361.  On those facts, the Second

Circuit concluded that "the premises served as a conduit for the proceeds of the illegal transactions, making it subject to forfeiture." *Id.* (quotation marks omitted).

As discussed in further detail below, the government advances a similar theory here with respect to the Partnership: that "650 Fifth Avenue Company and its partners . . . serv[ed] as a front for the Iranian Government . . . ." (Gov't Opp'n 56). Accordingly, in considering whether the complaint sufficiently alleges that property was "involved in" money laundering, the Court will consider whether the property facilitated money laundering.

"Facilitation of a laundering offense occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Huber*, 404 F.3d at 1060; *see also Seher*, 562 F.3d at 1368 ("Property would facilitate an offense if it makes the prohibited conduct less difficult or more or less free from obstruction or hindrance.") (quotation marks omitted). But "[f]acilitation is not to be confused with promotion under section 1956(a)(1)(A)(i)." *Huber*, 404 F.3d at 1060-61.

> Abstractly speaking, promotion and facilitation overlap: that which promotes, facilitates, and that which facilitates, promotes. But the two have different applications. Section 1956(a)(1)(A)(i) promotion is geared at the purpose of a transaction that involves funds unlawfully obtained—to promote (or facilitate) *the specified unlawful activities* that generate the funds being laundered. When proceeds of specified unlawful activity are involved in a financial transaction that has as its purpose the promotion of specified unlawful activity, those funds are forfeitable as the corpus of the money-laundering offense. But facilitation under section 982(a)(1)'s "involved in" clause is geared at the forfeitability of instrumentalities, including funds in some cases, that facilitate (or promote) *the money-laundering transactions*.

*Id.* at 1061 (emphasis in original). In other words, promotion involves conducting a money laundering transaction to further a specified unlawful activity; facilitation involves furthering the money laundering transaction itself.

The Court now considers whether each of the properties the government seeks to forfeit was either (a) property "involved in" the above concealment or promotion money laundering transactions, an inquiry that includes analysis of whether each property facilitated those money laundering transactions, or (b) property "traceable to" such property.

### a.   The Building

The Building was surely connected to transactions in rent proceeds in the sense that the rent was paid for space in the Building.  But "involved in" has a narrow meaning for purposes of the statute.  Second Circuit "case law consistently distinguishes between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together."  *United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001), *abrogation on other grounds recognized by United States v. Robinson*, 430 F.3d 537 (2d Cir. 2005); *see also United States v. Loe*, 49 F. Supp. 2d 514, 519 (E.D. Tex. 1999) ("It is not sufficient to establish that property was 'involved in' the underlying [offense] but rather it must also be 'involved in' the money laundering itself.").  The Foundation's services in violation of IEEPA enabled the Partnership to earn rent from the Building.  However, the alleged money laundering occurred when the Partnership, the Foundation, and Assa Corp. distributed the rent with the intent to conceal that it was meant for the benefit of the Iranian government.  Those transfers of rent did not involve the Building in any way other than that the rent was paid for space in the Building.

The Second Circuit has found that such "an incidental or fortuitous connection between the property and the illegal activity" does not mean that the property is "involved in" an offense.  *United States v. Parcel of Property*, 337 F.3d 225, 233 (2d Cir.

2003).  Rather, "some direct financial link between a defendant's money laundering and his real property must be shown before a court will order forfeiture of the property." *Nicolo*, 597 F. Supp. 2d at 356; *see also 250 Documents Containing the Forged Handwriting of President John F. Kennedy*, 2008 WL 4129814, at *3 ("Cusack obtained the proceeds of his criminal acts by fraudulently creating and selling the documents to unwary third-party purchasers.  Cusack's *subsequent* monetary transactions, with the proceeds of his mail and wire fraud activities, did not involve the documents that were now in the legal possession of innocent owners.") (emphasis added); *United States v. Hassan*, 439 F. Supp. 2d 903, 907-908 (E.D. Ark. 2006) (holding that "the fact that the store was used to generate money, some of which was sent overseas in transactions allegedly structured to avoid reporting, is insufficient to establish that the store facilitated the structuring"); *United States v. Iacoboni*, 221 F. Supp. 2d 104, 116 (D. Mass. 2002), *aff'd in part and rev'd in part on other grounds by* 363 F.3d 1 (1st Cir. 2004) ("To justify forfeiture [under the essentially identical criminal forfeiture statute] it is not enough merely to show that the Union St. property was involved in the gambling operation; the Government must also demonstrate that the house was involved in money laundering."). No such link is present here.  The Building was merely the source of the money laundered; it was not involved in the laundering itself.   The Building as a whole therefore cannot be forfeited as having been "involved in" money laundering.

However, "[r]eal [p]roperty is involved in a money laundering offense if laundered funds are used . . . to pay for improvements."  *10.10 Acres*, 386 F. Supp. 2d at 616; *see also Schlesinger*, 261 F. Appx. at 361 (affirming forfeiture of real property where proceeds of insurance fraud were used to pay lease and taxes on the real property); *United States v. Meyers,* 21 F.3d 826, 831 (8th Cir. 1994) ("The evidence is clear that

Myers paid for equipment and items used in the marijuana operation from the account to which the laundered money had been transferred. Myers also made substantial payments on the real estate contract and improvements on the property from this account. Thus, the property was equally forfeitable on this theory because the property was clearly involved in the criminal activity . . . ."); *216 Kenmore Ave.*, 657 F. Supp. 2d at 1069 ("There is no serious dispute that, by spending allegedly tainted funds on renovations and property taxes for 950 Bristol Drive, the property is 'traceable to' a money laundering offense."). The complaint alleges that the Partnership used rent proceeds to maintain the Building and the Other Real Properties.   Accordingly, the complaint states a claim for forfeiture with respect to the Building and the Other Real Properties.[11]

### b.  The Partnership

The complaint alleges that the Partnership played a part in many of the concealment money laundering transactions by distributing millions of dollars in rent to the Foundation and Assa Corp.  (Compl. ¶¶ 121, 125, 127, 131-32.)   Both partners in the Partnership also allegedly played a part in transferring rent distributions:  the Foundation

---

[11] There is some dispute as to what extent the Building is forfeitable on this basis.  The Foundation argues that "even if rent were to be considered proceeds of the alleged IEEPA offenses . . . . where the alleged involvement is limited to the receipt of criminal proceeds, forfeiture should be proportional to the amount of total funds received." (Foundation Reply 16-17; *see also* Foundation Br. at 21.)  But that is not what the statute says.  Section 981(a)(1)(A) does not provide for forfeiture of the proceeds laundered; it provides for forfeiture of "[a]ny property, real or personal, involved in" money laundering or "any property traceable to such property."  And *United States v. Loe*, 49 F. Supp. 2d 514, 522 (E.D. Tex. 1999), in which the court limited the forfeiture to the amount of tainted funds used to purchase real property, is distinguishable because the property involved in that case was "traceable to" property involved in money laundering rather than itself involved in money laundering.  *See id.*  ("Since the Court finds the Florida property is subject to forfeiture as traceable to rather than involved in, it must now address the issue of how much, if any, of the property is subject to forfeiture."). However, the Court need not resolve the extent to which the Building was "involved in" money laundering for purposes of the instant motions.

allegedly transferred rent to its charitable activities and Other Real Properties (Compl. ¶¶ 134-143) and Assa Corp. allegedly transferred rent to Assa Ltd. who ultimately transferred funds to Bank Melli.  (*Id.* ¶ 122.)  Accordingly, the government argues that "every financial transaction by 650 Fifth Avenue Company and its partners was conducted with the intent to conceal and disguise the Iranian Government's ownership and/or control of the Defendant Properties." (Gov't Opp'n 57.)   Perhaps so, but the question is whether the complaint alleges that the Partnership and the claimants' interests in it were "involved in" or facilitated those transactions.

On that point, the Partnership and the Foundation argue that "[a] property is not involved in a money laundering transaction simply because the owner of the property was involved in the alleged laundering."  (Foundation Reply 17.)   That argument has some appeal.  On one level, the Partnership was involved in the laundering transactions merely in the sense that the Partnership was on the sending end and the owners of the Partnership were on the receiving end of those transactions.[12]   And those transactions were largely a function of the Partnership Agreement.

But only a surface reading of the complaint could mistake the Partnership or claimants' interests in it as empty vessels.  The nub of the complaint is that rather than own the Building outright or having rent from the Building sent to it directly, the Iranian government directed that a partnership should be formed to own the Building and that the partners should be (1) a foundation under its control and (2) a bank under its ownership.  As discussed above, the complaint alleges that the Iranian government structured the partnership in that way, at least in part, to conceal that it owned and/or controlled the

---

[12] With respect to the transfers from Assa Corp. to Assa Ltd., one of the owners was on the sending end as well.

disposition of income from the Building.  By the same token, the structure would conceal that any entity managing the Building was doing so for the Iranian government.

Taking those allegations as true, it would be an understatement to say that the ownership structure of the Partnership had a "substantial connection" to the concealment of Iran's ownership and made that concealment "less difficult or more or less free from obstruction or hindrance." The complaint makes numerous allegations supporting a reasonable belief that the ownership structure of the Partnership made it possible to conceal the Iranian government's ownership and control in the first place and that the parties executing the money laundering transactions used that structure in order to do so. Hence, if the complaint is to be believed, each claimant's interest in the Partnership was not, as the Partnership and the Foundation would have it, "simply an ownership interest" that "merely generated rent." (Foundation Reply 16-17.)  On the facts the government has alleged, the Partnership that the claimants owned was part and parcel of laundering the rent.

In that respect, as an entity designed to disguise where money was going, the Partnership was no different than a "front" business set up to disguise money came from. And "[t]he ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established." *United States v. Swank*, 797 F. Supp. 497, 502 (E.D. Va. 1992) (denying motion to modify order restraining assets of a business as potentially forfeitable where "the corporate bank accounts were used to conduct financial transactions involving the proceeds of monies which represent the proceeds of mail fraud activity in violation of 18 U.S.C. § 1956(a)(1)").  Indeed, courts have held that such entities can be forfeited as "involved in" concealment money laundering.  *See, e.g., Schlesinger*, 261 Fed. Appx. at 361; *Seher*, 562 F.3d at 1369 (forfeiting assets of two

jewelry businesses where "the availability of the two stores' inventories made it easier for [defendant] to launder money by giving potential buyers a large variety of jewelry options" and defendant "used telephones, business cards, and other company property to create a facade of legitimacy, which aided in the concealment of his actions"); *All Assets of G.P.S. Auto. Corp.*, 66 F.3d at 487; *In re Restraint of Bowman Gaskins Fin. Group*, 345 F. Supp. 2d 613, 624 (E.D. Va. 2004) (denying motion to vacate order restraining assets where "[a company] and its assets further facilitated money laundering activity by enabling and providing an appearance of legitimacy to the money laundering financial transactions that were executed to promote the same visa fraud scheme"); *United States v. S. Side Finance*, 755 F. Supp. 791, 797-798 (N.D. Ill. 1991) (denying motion to dismiss action under § 981(a)(1)(A) to forfeit a car dealership where "[t]he government contend[ed] that the proceeds from the drug deals were laundered through the car dealership in an attempt to legitimize the profits"); *United States v. Parcel of Property Located at 155 Bemis Road, Manchester, N.H.*, 760 F. Supp. 245, 251 (D.N.H. 1991) (same where "the use of [business's] checks and [business's] address in connection with [the] purchase of real and personal property suggests the probability that the adoption of such "fronts" well served to assist . . . the laundering of the proceeds of such drug transactions").

Courts have also held that entities engaged in money laundering to promote underlying criminal activity can be forfeited.  *See Eleven Vehicles*, 836 F. Supp. at 1155 (finding that "the Government has satisfied its burden of establishing that there is probable cause to believe that [a business] is a facilitating property" where "affidavits filed by the Government . . . aver that various officers of [the business] were involved in a long-running conspiracy to evade the U.S. arms embargo against the country of South

Africa" and "[a]s part and parcel of the arms-running conspiracy, the officers engaged in money laundering and wire fraud"); *United States v. Joseph Health and Beauty Supply*, 807 F. Supp. 320, 321-22 (S.D.N.Y. 1992) (Leval, J.) (finding that the government showed probable cause for forfeiture of a business that "purchased and resold medications" that were fraudulently obtained by Medicare beneficiaries, and therefore "'proceeds' of mail fraud," by showing that "by engaging in these purchases and sales [the business] intended to promote the mail fraud, by creating a market for such fraudulently diverted medications").

Other than the argument that rent is not proceeds that the Court rejected *supra*, the claimants make several arguments as to why forfeiture of the Partnership as "involved in" money laundering is not proper here.  First, the Assa Claimants argue that there is a so-called "merger problem" because the "Government argues that acting as a front for Bank Melli, managing Bank Melli's investment in 650 Fifth Avenue, and transferring money to Assa Limited constituted *both* a 'supply of services' . . . in violation of IEEPA, *and* a money laundering transaction."  (Assa Reply 12.)  That argument misses the mark.  As discussed above, the specified unlawful activity and the money laundering transactions are two different acts:  the Foundation's alleged collection of rent and management of the Building are specified unlawful activities that generated rent proceeds, and the alleged onward transfers of that rent in the form of partnership distributions and payments for expenses are concealment and promotion money laundering transactions respectively.

Second, the Partnership and the Foundation argue that forfeiting the Partnership would forfeit property that was only involved in the specified unlawful activity but not in laundering.  (*See* Foundation Reply 17-18 ("[T]here are no allegations in the Complaint that the Foundation's Partnership interest was involved in a money laundering

transaction.")) For the reasons set forth above, that is true with respect to the Building as a whole, but it is not true with respect to the Partnership. True, the Partnership was involved in the specified unlawful activity in the sense that the Foundation managed the Building as Managing Partner of the Partnership. However, for the reasons just discussed, the Partnership was also involved in providing a cover for financial transactions in the rent proceeds of the Foundation's management. For those same reasons, this is not a case such as *250 Documents Containing the Forged Handwriting of President John F. Kennedy*, 2008 WL 4129814, where an asset was used to obtain funds that were then laundered. It is a case where the asset—the Partnership—was part and parcel of the laundering itself.

Third, the Assa Claimants argue that the government's theory for forfeiting the Partnership relies on the mistaken premise that "all of Assa Corp.'s assets were forfeitable." (Assa Reply at 14.) Not so. Putting aside that the complaint alleges in extensive detail that Assa Corp. was formed as a mere shell for Bank Melli, whether all of Assa Corp.'s assets are forfeitable is irrelevant. The Partnership is forfeitable because it facilitated transactions designed to conceal the true beneficiary of rent from the Building. The Partnership is an asset owned by two corporations, Assa Corp. and the Foundation, but that does not mean that forfeiture of the Partnership is a forfeiture of the corporations that own it. Assa Corp. and the Foundation are no different than the individual owners of a business that serves as a "front" for any other illegal activity.

Finally, the Partnership and the Foundation argue that "the Complaint does not allege that the Foundation or the Fifth Avenue Company exist solely to engage in unlawful conduct and that the tenants['] rental payments were unlawful." (Foundation Reply 19.) With respect to the Foundation, the argument is misplaced for the reasons just

stated with respect to Assa Corp.   With respect to the Partnership, the argument requires more discussion but is no more availing.

The Partnership and the Foundation again cite *Hodge* for the proposition that "[w]hen a business has both lawful and unlawful aspects, only the income attributable to the unlawful activities is forfeitable."  *Hodge*, 558 F.3d at 635.  In *Hodge*, the defendant, who had pled guilty to laundering money earned by a spa offering prostitution, challenged his sentence on the ground that "the forfeiture [wa]s excessive because it represent[ed] the intake of the business . . . without subtracting revenues from the lawful shower-and-massage service."  *Id.*   *Hodge*, then, was a case about whether revenues are forfeitable, not whether an entity is forfeitable.  The terms used by the *Hodge* court make that clear.  In the statement quoted by the Foundation, the Seventh Circuit stated that "[w]hen a business has both lawful and unlawful aspects, only the *income* attributable to the unlawful activities is forfeitable."  *Hodge*, 558 F.3d at 635 (emphasis added).  The *Hodge* court later added that "if the only reason why anyone paid for a massage at the Royal Health Spa was to purchase sexual services, then all of the business's *income* derives from prostitution and is forfeitable," and that "[i]f the business as a whole would have closed its doors but for the prostitution component, then it makes sense to say that all of its *revenues* derive (if indirectly) from prostitution; but if it could have operated as a legitimate massage parlor, then the *revenues* of the legal part of the business are not forfeitable."  *Id.*  (emphasis added).  And, tellingly, the Foundation used the same quote in arguing that rent from the Building was not proceeds.  (*See* Foundation Reply 6-7.)

Yet the issue for present purposes is not whether the Partnership's income—*i.e.*, rent—was proceeds of the IEEPA violation but whether the Partnership itself was property involved in the laundering of rent proceeds.  As the Seventh Circuit put it in an

analogous case cited in *Hodge*, a "district court should not . . . base[] its analysis on the prostitution business *per se*" but "on the fact that these funds were involved in [the] conspiracy to launder the proceeds of [the] prostitution business . . . . " *United States v. Baker,* 227 F.3d 955, 969 (7th Cir. 2000).  The Foundation argues that the *Hodge* court "distinguished *Baker*," but the Court is not persuaded.  (Foundation Reply 18).   The Seventh Circuit in *Hodge* cited *Baker* for the proposition that ""if the only reason why anyone paid for a massage at the Royal Health Spa was to purchase sexual services, then all of the business's income derives from prostitution and is forfeitable."  *Hodge*, 558 F.3d at 635.  Indeed, the district court in *Baker* found that "*all* of the funds from Baker's prostitution business over the years . . . were illegal, and as a result Baker *laundered all of them*."  *Baker,* 227 F.3d at 969 (emphasis in original).  Thus in remanding for further fact-finding regarding the source of the alleged criminal proceeds, the *Hodge* court did not find that the case before it was distinguishable from *Hodge*.  The Seventh Circuit merely found that the district court had not considered whether the case was distinguishable.  But this case is not distinguishable from *Baker*:  the complaint alleges that rent from the Building was the Partnership's only source of income and the Partnership laundered all of that income because the Partnership itself served to conceal that the income was flowing to the Iranian government.

Given these allegations, *Baker* actually illustrates why the government has stated a claim for forfeiture of the Partnership as involved in money laundering.  In *Baker*, the defendant was convicted of conspiring to launder funds he had obtained for offering prostitution services by women disguised as masseuses.  The defendant ran "a complex," called "Fantasyland," of "inter-related sex businesses" that included "'massage parlors' that were fronts for prostitution."  *Baker*, 227 F.3d at 958.  The massage parlors allowed

customers to pay for prostitution services by ATM and credit card transactions as well as in other ways, and the defendant was convicted of conspiring to launder funds through the electronic transactions. *See id.* at 958-959. "The district court ordered Baker to forfeit all the monies that had been involved in the federal activities, not just the credit card transactions the government had proved" as well as "the real estate where the "'Fantasyland' compound was located" because it had "found that Baker's bank accounts were used to facilitate his federal crimes . . . ." *Baker,* 227 F.3d at 959. Since even "the funds that were not from credit card and ATM transactions facilitated the conspiracy by helping to further the prostitution business" and thus "helped 'bankroll' the conspiracy," the Seventh Circuit affirmed forfeiture of those funds. *Id.* at 969. Moreover, and particularly relevant here, the Seventh Circuit added that "[i]n this regard, the Fantasyland compound is clearly forfeitable" because "the ATM and credit card transactions occur[red] on the premises" and "the conspiracy was obviously run from this compound. As the key to Baker's operation, it was obviously 'involved in' the [money laundering] conspiracy." *Id.* at 969 n.3. It is just so here. In the scheme described by the complaint, the Partnership was the "key" to concealing that the rent proceeds were flowing to the Iranian government. If that is so, the Partnership was involved in the money laundering.[13]

---

[13] True, given that the defendant in *Hodge* had pled guilty of money laundering, it is somewhat puzzling that the *Hodge* court focused on whether the funds obtained for legal services were proceeds of the prostitution in the sense that there would have been no business without the prostitution but did not consider whether those funds were "involved in" or facilitated the money laundering of the prostitution proceeds. That would seem to ignore the advice of the panel in *Baker*. However, rather than concluding that the *Hodge* court eschewed an opinion it cited favorably or abrogated that opinion *sub silentio*, it seems more likely that the *Hodge* court did not consider a facilitation theory because, unlike in *Baker*, the district court in *Hodge* had not found facts sufficient to support a

### c.   Bank Accounts

The money laundering transactions involved transfers of rent between bank accounts controlled by the Partnership, the Foundation, and Assa that the government seeks to forfeit.   Property "involved in" or "traceable to" money laundering includes the funds laundered.   *See, e.g.*, *250 Documents Containing the Forged Handwriting of President John F. Kennedy*, 2008 WL 4129814 at *3.   Here, the funds laundered were the rent proceeds from the Building.   Since the Partnership's only asset is rent from the Building, the complaint appears to state a claim for forfeiture of the funds in the Partnership Accounts under § 981(a)(1)(A).   But with respect to the Foundation Accounts and the Assa Accounts, the matter is more complicated because the Assa Claimants raise a statute of limitations defense.

"When the government seizes property under § 981, it must prove that the property is itself involved in, or is traceable to property involved in, a proscribed transaction."   *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 792 (D. Vt. 2003).   "The tracing requirement, however, poses particular problems in the case of money or other fungible property.   Once money is deposited into a bank account, the government cannot trace the physical currency."   *Id.*; *see also Accounts Maintained at Am. Express Bank*, 832 F. Supp. at 556 ("These principles are complicated where fungible property is seized since identifying the particular funds traceable to the criminal violation is nearly impossible.").

So "how can the government trace fungible property, like money, back to proscribed conduct once it has been comingled with other fungible property?"   *Contents*

---

facilitation theory.   Indeed, "the district judge [in *Hodge*] did not attempt to sort . . . out" the facts regarding the parlor's receipts.   *Hodge*, 558 F.3d at 635.

*in Account No. 059-644190-69*, 253 F. Supp. 2d at 792.  The Second Circuit sanctioned

one way of doing so in *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir.

1986).  In that case, borrowing from the "lowest intermediate balance" doctrine in the law

of trusts, the Second Circuit adopted the so-called "drugs-in, last out rule":  as long as the

balance in an account where proceeds are deposited remains higher than the amount of

proceeds deposited, the government can trace funds equal to that amount.  *Id.* at 1159.

"This is because the government is entitled to assume that the first deposit—the million

dollars in laundered money—remains in the account until the last withdrawal is made."

H.R. Rep. No. 102-28, 1991 WL 42201, at *47.  Nevertheless, that rule contained a

loophole: a launderer could place funds in a volatile account in order to "zero out" the

balance and render tracing impossible.  *See id*.

In response, Congress enacted 18 U.S.C. § 984 which provides that when the

property subject to forfeiture is "funds deposited in an account in a financial institution . .

. . it shall not be necessary for the Government to identify the specific property involved

in the offense that is the basis for the forfeiture; and it shall not be a defense that the

property involved in such an offense has been removed and replaced by identical

property."  18 U.S.C. § 984 (a).  Section 984(b) provides that "no action pursuant to this

section to forfeit property not traceable directly to the offense that is the basis for the

forfeiture may be commenced more than 1 year from the date of the offense."  18 U.S.C.

§ 984 (b).  That provision "frees the Government from having to prove that the dollars in

the Account are the same ones that are traceable to the criminal activity giving rise to the

forfeiture."  *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 371

(S.D.N.Y. 2008).  But, in the view of at least one court in this Circuit, Section 984(b)

"simultaneously tempers the additional power given the government by means of a

statute of limitations." *Accounts Maintained at Am. Express Bank*, 832 F. Supp. at 558. On that view, "[t]he time limitation is considered necessary to ensure that the property forfeited has a reasonable nexus to the offense giving rise to the original action for forfeiture." *Id.* (quoting H.R. Rep. 102-28).

The Assa Claimants argue that "18 U.S.C. § 984 bars the Government's attempt to now forfeit the Account Funds, because there is no transfer alleged within the one-year statute of limitations period prior to the seizure." (Assa Reply at 11 n.8; *see also* Assa Br. at 15 n.7.) Indeed, the complaint does not allege that Assa received any rent distributions from the Partnership after December 5, 2007, over one year before the original complaint was filed in this action on December 17, 2008. *Cf. Accounts Maintained at Am. Express Bank*, 832 F. Supp. at 560-61 ("[A] cause of action to forfeit property that was the result of 'specified illegal activity' under 18 U.S.C. § 1956 accrues when the proceeds of that violation are deposited . . . ."). And some courts in this Circuit have held that Section 984 prevents forfeiture of funds placed in account more than a year prior to the filing of the complaint regardless of whether the government attempts to trace the funds or not. *See, e.g.*, *Marine Midland Bank, N.A.*, 1994 WL 381536, at *3 ("[S]ection 984 applies to this action as the government seeks civil forfeiture of fungible property based on allegations which include purported violations of 18 U.S.C. §§ 1956 and 1957."); *United States v. All Funds Distributed to, or on Behalf of Weiss*, No. 99-CV-1453, 2001 WL 1150217, at *2-3 (E.D.N.Y. Sept. 21, 2001) ("If, however, the property is "fungible," the statute of limitations is governed by the one year period provided for by § 984(c)."), *vacated on other grounds by* 345 F.3d 49 (2d Cir. 2003); *Accounts Maintained at Am. Express Bank*, 832 F. Supp. at 559 ("*[A]ll* forfeitures of fungible property . . . are subject to a one-year statute of limitations.") (emphasis in original).

But in 2000, Congress added Section 984(d) which provides that "[n]othing in this section may be construed to limit the ability of the Government to forfeit property under any provision of law if the property involved in the offense giving rise to the forfeiture or property traceable thereto is available for forfeiture."  At least one court in this Circuit has held that this provision made clear that "§ 984 enhances rather than replaces and limits the government's forfeiture powers" and that "where the government can establish property is traceable to an offense giving rise to forfeiture, it is free to proceed under any other provision of law, whether or not the property is fungible." *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d at 794.

That reasoning is persuasive.  Section 984 has always stated that "it shall not be *necessary* for the Government to identify the specific property involved in the offense that is the basis for the forfeiture."  18 U.S.C. § 984 (a) (emphasis added).  The phrase "shall not be necessary" implies that the government is free to identify specific property if it can.  And at this stage the Court cannot conclude that the government cannot do so. The complaint provides numerous paragraphs of detail showing when funds were transferred into an account and when they were transferred out.   Accordingly, the Court cannot conclude at this stage that the one-year statute of limitations bars any and all forfeiture of funds transferred to the Foundation Accounts and the Assa Accounts.  The complaint states a claim for forfeiture of funds from those accounts traceable to rent from the Building.  Exactly what funds can be forfeited is not necessary to decide at this juncture.[14]

---

[14] For that reason, the Court also need not address whether the entire accounts, regardless of whether the funds are traceable to rent from the Building, are forfeitable because those accounts facilitated the money laundering transactions.  The complaint does not allege and the government does not contend as much.  Thus, though numerous courts, including

### D.  Treaty of Amity

The Assa Claimants contend that this forfeiture action is barred by the Treaty of

Amity, Economic Relations, and Consular Rights, between the United States and Iran.

*See* Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, Aug. 15,

1955, 8 U.S.T. 899 ("Treaty of Amity").  That Treaty provides in relevant part:

*Article II*

1. Nationals of either High Contracting Party shall be permitted, upon terms no less favorable than those accorded to nationals of any third country, to enter and remain in the territories of the other High Contracting Party for the purpose of carrying on trade between their own country and the territories of such other High Contracting Party and engaging in related commercial activities, and for the purpose of developing and directing the operations of an enterprise in which they have invested, or in which they are actively in the process of investing, a substantial amount of capital.

*Article III*

1. Companies constituted under the applicable laws and regulations of either High Contracting Party shall have their juridical status recognized within the territories of the other High Contracting Party.

---

courts in this Circuit have endorsed such theories, *see, e.g.*, *United States v. Certain Accounts on Deposit in Account No. 90-361703 Located at Bank of New York*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991), while others have doubted the vitality of a facilitation theory after Congress enacted Section 984, *see, e.g.*, *United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at Am. Express Bank*, 832 F. Supp. 542, 561-562 (E.D.N.Y. 1993), their application is not at issue in the present motion.

The Court also need not address whether, as one court in this Circuit has held, the "drugs-in, last out" rule even applies to forfeiture under Section 981 as well as under the drug forfeiture statute at issue in *Banco Cafatero*.  *See United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 795 (D. Vt. 2003).  ("There is no reason to think that *Banco Cafetero*'s drugs-in, last-out rule does not still provide the proper test in this Circuit for traceability when the government seizes fungible property pursuant [to] § 981.").  To the extent that the rule does apply and the government cannot trace all the funds in these accounts to rent from the Building, the government may be able to pursue forfeiture of the untraceable funds pursuant to Section 984 if the action is timely under the one-year statute of limitations.  However, it is not clear from the complaint whether the account balance ever dropped below the amount of rent deposited into any of the accounts and the Court expresses no opinion on that question.

*Article IV*

2. Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

\*     \*     \*     \*

*Article VII*

1. Neither High Contracting Party shall apply restrictions on the making of payments, remittances, and other transfers of funds to or from the territories of the other High Contracting Party, except (a) to the extent necessary to assure the availability of foreign exchange for payments for goods and services essential to the health and welfare of its people, or (b) in the case of a member of the International Monetary Fund, restrictions specifically approved by the Fund.

\*     \*     \*     \*

The government argues that, because the Assa claimants "are not Iranian nationals or Iranian companies, [they] cannot invoke the provisions of the Treaty that apply to such entities." (Gov't Opp'n at 62.) Indeed, in *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176 (1982), the Supreme Court held that a New York corporation that was a subsidiary of a Japanese corporation could not claim the benefits of a similar treaty between the United States and Japan as a defense to an action in the United States courts. *Cf. Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53 (2d Cir. 2010) (finding *Sumitomo* relevant to interpreting the Treaty of Amity). The Supreme Court held that "[a]s a company of the United States operating in the United States . . . [the subsidiary] cannot invoke the rights provided in [the treaty], which are available only to companies

of Japan operating in the United States and to companies of the United States operating in Japan." *Id.* at 182-183.

Sumitomo is not squarely controlling here for two reasons.  First, the treaty in that case provided that "[c]ompanies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party." *Id.* at 182 (quoting Art. XXII(3), Friendship, Commerce and Navigation Treaty between the United States and Japan, Apr. 2, 1953, 4 U.S.T. 2063).  The Treaty of Amity, however, does not contain the "shall be deemed companies thereof language." *Compare* Treaty of Amity, Art. III(1).  Second, several provisions of the treaty at issue in *Sumitomo* referred to companies "controlled by such nationals and companies" of the other party, thereby implying that the term "company" did not include companies incorporated under the laws of one party but under the control of companies incorporated under the laws of the other party. *See Sumitomo*, 457 U.S. at 182 n. 8.  The Treaty of Amity contains no such language.

Nevertheless, that does not mean that Assa Corp. can claim the protection of the Treaty of Amity.  "While it is true that the Court [in *Sumitomo*] focused its analysis on the phrase 'shall be deemed companies thereof,' it went on to explain that the intent behind [these kinds of] treaties as a whole was simply to grant legal status to corporations of each of the signatory countries in the territory of the other, thus putting the foreign corporations on equal footing with domestic corporations." *Weinstein*, 609 F.3d at 53. "Whether a treaty creates a right in an individual litigant that can be enforced in domestic proceedings by that litigant is for the court to decide as a matter of treaty interpretation." *Mora v. New York*, 524 F.3d 183, 193 (2d Cir. 2008).  Nothing in the Treaty states that

protections for corporations incorporated in Iran also apply to corporations controlled by Iran but organized under the laws of the United States.  Given that silence, the treaty "should be interpreted to effectuate its evident purposes."  *Reed v. Wiser*, 555 F.2d 1079, 1088 (2d Cir. 1977); *see also Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 385 (2d Cir. 2004) ("Where, as here, the literal meaning of a treaty is ambiguous, we may look to the purposes of the treaty to aid our interpretation.") (quotation marks omitted).  Interpreting the Treaty to protect Iranian-controlled but American-incorporated companies would be inconsistent with its purpose "to give corporations of each signatory legal status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms."  *Sumitomo*, 457 U.S. at 186; *see also id.* at 188 ("By treating these subsidiaries as domestic companies, the purpose of the Treaty provisions—to assure that corporations of one Treaty party have the right to conduct business within the territory of the other party without suffering discrimination as an alien entity—is fully met.").  Indeed, it would be strange if Assa Corp., a New York corporation which has allegedly subverted the American corporate form, could benefit from a treaty meant to ensure respect for Iranian nationals' use of that form.

In response, the Assa Claimants raise a kind of estoppel argument.  They argue that, because the alleges that Assa Corp. is merely a "shell" for Bank Melli, an Iranian bank (Compl. ¶ 20), the government cannot contend that Assa Corp. is an American company for purposes of the Treaty of Amity.  But there is no contradiction between, on the one hand, allegations that Assa has violated IEEPA by serving as a front for Bank Melli and the Iranian government, and, on the other, the argument that the Treaty does not allow Assa Corp. to abuse the New York corporate form to serve Iran effectively.  Indeed, the complaint alleges that Assa Corp.'s status as a New York corporation enabled

Bank Melli to conceal the true character of the Partnership from the New York Secretary

of State and the New York Attorney General.  (Compl. ¶¶ 43-46, 119).  Adopting the

Assa Claimants' argument would create the perverse result that by engaging in activity

prohibited by federal statutes, Assa Corp. gained the benefits of the Treaty of Amity that

it otherwise would not have had.  The Treaty of Amity was not intended to provide such

an incentive, for "[t]he purpose of [postwar Friendship, Commerce and Navigation

Treaties] was not to give foreign corporations greater rights than domestic companies, but

instead to assure them the right to conduct business on an equal basis without suffering

discrimination based on their alienage."  *Sumitomo*, 457 U.S.  at 187-188. [15]  Indeed, the

Treaty of Amity is one of many treaties signed to provide that foreign companies

incorporated abroad are "subject to the responsibilities of other domestic corporations."

*Id.* at 188.  One such responsibility is complying with federal statutes such as the IEEPA.

If Assa Corp. has not done so, the Treaty of Amity cannot protect it. [16]

---

[15] For that reason, nothing about forfeiture would ignore the "juridical status" of Assa Corp.   Therefore, even if Assa Corp. could benefit from it the Treaty of Amity, forfeiture would not violate Article III(1) of the Treaty.

[16] That would be true even if Assa Corp. could benefit from the Treaty of Amity.  Article XX(1)(d) provides that the Treaty "shall not preclude the application of measures . . . necessary to fulfill the obligations of a High Contracting Party for the maintenance or restoration of international peace and security, or necessary to protect its essential security interests."  The Executive Orders applying the IEEPA were adopted following a finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995).  That judgment is reserved to the executive branch and cannot be reviewed by this court.  *See Beacon Prods. v. Reagan*, 633 F. Supp. 1191, 1995 (D. Mass. 1986), *aff'd* 814 F.2d 1 (1st Cir. 1987) (holding that "whether Nicaragua poses a sufficient threat to trigger the President's IEEPA powers is a nonjusticiable political question").

That renders immaterial the Assa Claimants' citation to *Oil Platforms (Islamic Republic of Iran v. United States of Am.),* Judgment, I.C.J. Rep. 2003 at 161, in which the International Court of Justice ("ICJ") held that the United States Navy's attacks on Iranian-owned oil rigs were not justified under Article XX of the Treaty of Amity as a

### E.  Takings Clause

Finally, the Assa Claimants argue that forfeiture is also barred by the Takings

Clause of the Fifth Amendment to United States Constitution.[17]  That amendment

provides that "private property [shall not] be taken for public use, without just

compensation."  U.S. Const. Amend. V.  However, the Supreme Court has held that an *in

rem* forfeiture of property involved in criminal activity is not a taking for which just

compensation is required.  *See Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (forfeiture

of car used in prostitution was not a taking because "the property in the automobile was

transferred by virtue of that proceeding from petitioner to the State" and "[t]he

government may not be required to compensate an owner for property which it has

already lawfully acquired under the exercise of governmental authority other than the

power of eminent domain."); *see also Arcadia Tech., Inc. v. United States*, 458 F.3d

1327, 1331 (Fed. Cir. 2006) ("When property has been seized pursuant to the criminal

laws or subjected to *in rem* forfeiture proceedings, such deprivations are not "takings" for

which the owner is entitled to compensation."); *United States v. One Parcel of Real*

_____

response to Iran's laying mines and harassing vessels in the Persian Gulf.  Even if the ICJ decision could bind this Court, Assa stretches *Oil Platforms* too far in arguing that "the Government cannot bear its burden to show that [forfeiture] is a necessary and proportional response to any actions of Assa Corp" because "[a]ll of the properties in question are blocked and of no use to Assa Corp., Bank Melli, or Iran.  Forfeiture adds nothing whatsoever to the security interest of the Government."  (Assa Br. at 30.)  The ICJ in *Oil Platforms* emphasized strict proportionality because the American attacks there at issue "constituted to recourse to armed force not qualifying, under international law on the question, as acts of self-defen[s]e . . . ."  *Oil Platforms*, ¶ 78.  That has little bearing on this case where the use of force is not involved.

[17] Assa also argues that forfeiture is barred by a similar provision of the Treaty of Amity which provides that "[p]roperty of nationals and companies of either High Contracting Party, including interests in property . . . shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation."  However, that argument fails for the reasons set forth above.

*Property with Buildings, Appurtenances, and Improvements, Known as Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 210 (1st Cir. 1992) ("We think it is settled that if the federal government's actions comport, procedurally and substantively, with the terms of a lawfully enacted forfeiture statute, it may seize private property without compensating the owner."); *Redford v. United States Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms*, 691 F.2d 471, 473 (10th Cir. 1982). ("[I]t has long been settled that if the government acts pursuant to a forfeiture statute, it may seize personal property without compensating the owner.").

      The Assa Claimants further argue that "the sovereign may not take the property of A for the sole purpose of transferring it to another private party B . . . ."  (Assa Br. at 33 (quoting *Kelo v. City of New London*, 545 U.S. 469, 477)).  True enough, but that is not the case here.  The government has represented that it is exploring the possibility of distributing any forfeited assets to judgment creditors of Iran, but that is far from the "sole purpose" of the forfeiture proceeding here.  It is hard to deny that using forfeiture to enforce the IEEPA advances the government's efforts to combat the "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" that the President has declared that Iran poses to the United States.  Exec. Order 12957.  That is particularly true where some of the assets are allegedly owned by Bank Melli, whom OFAC has designated a financial supporter of the development of weapons of mass destruction. (Compl. ¶ 18.)  And if forfeiture itself advances that goal, distributing the assets to victims of the very threat that IEEPA is designed to combat would seem to advance the same goal.

      The Assa Claimants contend that "[t]here is *no* allegation that Assa Corp., Assa Limited, Bank Melli, or any of the Assa Claimants' properties have been used for or

- 78 -

associated with *any* act of terrorism, including the specific terrorism acts suffered by the private plaintiffs."  (Assa Reply Br. at 24 (emphasis in original).)   But that makes little difference.  In *Weinstein*, the Second Circuit held that attaching Bank Melli's assets pursuant to a statute, the Terrorism Risk Insurance Act, designating assets frozen by OFAC to compensate victims of terrorism with default judgments against Iran.  *See Weinstein*, 609 F.3d at 54.  The attachment was not a taking even though the judgment creditors were not victims of Bank Melli's funding of weapons of mass destruction, the conduct that rendered the bank's assets liable for attachment under TRIA.  As a result, the Assa Claimants' argument here about an "end-run" around TRIA is really an argument that the civil forfeiture statutes do not authorize the Department of Justice to do what it says it might do if it wins this action.  That is not a taking claim.  Whether distributing the fruits of this action in a certain way would be unlawful says nothing about whether the action itself is unlawful.

## CONCLUSION

For the reasons above, claimants' motions to dismiss **[75, 78]** are DENIED.


SO ORDERED.


Dated: New York, New York
      March 24, 2011

Richard J. Holwell
United States District Judge