USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 27, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :        08 Civ. 10934 (KBF)
IN RE 650 FIFTH AVENUE AND RELATED     :
PROPERTIES                             :
_____ :        OPINION & ORDER
                                       :
This Document Relates To:              :
                                       :
Case Nos. 09 Civ. 553, 10 Civ. 2464,   :
& 10 Civ. 1627                         :
--------------------------------------- X

KATHERINE B. FORREST, District Judge:

        Pending before this Court are a series of actions to

enforce money judgments against the Islamic Republic of Iran

("Iran") relating to acts of terrorism for which it has been

found liable in various courts in the United States.[1]

        Among the assets as to which plaintiffs seek turnover is

real property located at 650 Fifth Avenue, New York City, New

York (alternatively, plaintiffs seek payment of a sum of money

of equivalent value).[2]  This building is currently held in the

name of two of the defendants herein--the Alavi Foundation ("the

Foundation") and the 650 Fifth Avenue Company ("650 Fifth

_____

[1] These actions have been consolidated for pre-trial purposes.

[2] Plaintiffs seek turnover of any real or personal property that collectively
would fulfill their judgments; the 650 Fifth Avenue building is an exemplar
of the property sought--and its acquisition and transfer have particular
relevance to the facts the Court discusses herein.

Avenue" and collectively with the Foundation, the "Moving Defendants").[3]

Defendants have moved to dismiss these actions pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction and failure to state a claim.  Moving Defendants' core argument as to both bases is the same: any action to enforce a judgment against the government of Iran must be brought against Iran--and neither the Foundation nor 650 Fifth Avenue is "Iran" in any sense, including as an agency or instrumentality.  As a result, according to Moving Defendants, plaintiffs have failed to state a cause of action for turnover of assets.  Moreover, Moving Defendants argue, even if there was some arguable connection to Iran, the only basis for subject matter jurisdiction against Iran here is the Foreign Sovereign Immunities Act ("FSIA"), and, for the same reason that the claim fails as a matter of law (i.e., neither the Foundation nor 650 Fifth Avenue is "Iran"), plaintiffs have failed to allege sufficient facts to support subject matter jurisdiction.

Moving Defendants have previously defeated similar attempts by judgment creditors seeking to collect judgments for other acts of terrorism and obtained dismissal of several actions. See, e.g., Gabay v. Mostazafan Foundation of Iran, 152 F.3d 918,

---

[3] The complaints also name other defendants including Assa Corp., Assa Co. Ltd., and Bank Melli (Iran).  Those defendants have not joined in the motions that are the subject of this Opinion.

1998 WL 385909 (2d Cir. 1998); <u>Flatow v. Islamic Republic of Iran</u>, 67 F. Supp. 2d 535 (D. Md. 1999); <u>Gabay v. Mostazafan Foundation of Iran</u>, 968 F.Supp. 895 (S.D.N.Y. 1997).

They cannot do so here.  There is a critical and dispositive difference between prior determinations with respect to other "turnover actions" and the one now before this Court: in 2008 and 2009, documents were obtained via search warrants executed against both Moving Defendants as well as the other, non-moving defendants.  The historical record assembled from seized documents is extensively quoted in the verified complaint of the United States and incorporated by reference into the three complaints that are the subject of this motion.  Those documents--the authenticity of which Moving Defendants do not dispute--demonstrate a robust factual basis to find that plaintiffs have sufficiently set forth a basis for subject matter jurisdiction because Moving Defendants "are" in fact, "Iran," or are legally "alter egos" or "organs" of Iran; accordingly, plaintiffs have also stated a claim.

For the reasons set forth below, Moving Defendants' motion to dismiss is DENIED.

I.   FACTS

The disposition of this motion turns upon this Court's determination, consistent with the standards for a motion pursuant to 12(b)(1), as to whether the Moving Defendants are in

3

fact either synonymous with the Iranian government, are alter egos of the Iranian government (which would then place them in the equivalent legal position of the Iranian government), or are organs of the Iranian government whose activities provide a basis to ignore their separate corporate forms.

On March 29, 2011 (and prior to transfer of this matter to this Court), Judge Holwell issued a decision denying a motion to dismiss the in rem forfeiture action brought by the United States against these and the non-movant defendants (that action has also been transferred to this Court).[4]  That opinion sets forth a detailed chronology of the lineage of the defendant entities and their interconnections.  See In re 650 Fifth Avenue and Related Properties, 777 F. Supp. 2d 529 (S.D.N.Y. 2011). This Court assumes familiarity with that opinion and recites only facts relevant to its decision on this motion.

A.   Plaintiffs

On October 23, 1983, Hezbollah and the Iranian Revolutionary Guard bombed a U.S. Marine Corps Barracks in Beirut, Lebanon, killing 241 United States Servicemen.  A group of nearly 1000 plaintiffs, representing those injured, the estates of those killed, and family members, commenced a wrongful death class action lawsuit in the United States

---

[4] The United States' in rem forfeiture is consolidated with the Greenberg, Acosta and Peterson actions for pre-trial purposes.

District Court for the District of Columbia.  On September 7, 2007, that court ruled that Iran and the Iranian Ministry of Information and Security ("MOIS") had acted as state sponsors of terrorism and were liable for the deaths of the servicemen, awarding damages totaling $2,656,944,877.  Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007).

On November 5, 1990, El Sayyid Nosair, a member of Al-Gam'aa Islamiyah--a terrorist organization led by Sheik Omar Ahmad Ali Abdel Rahman--shot and killed Rabbi Meir Kahane and wounded Irving Franklin and U.S. Postal Officer Carlos Acosta (collectively, the "Acosta plaintiffs").  The Acosta plaintiffs commenced a wrongful death suit in the United States District Court for the District of Columbia against Iran and MOIS.  They were awarded $350,172,000.  See Acosta v. The Islamic Republic of Iran, 574 F. Supp. 2d 15 (D.D.C. 2008).

On August 9, 2001, a suicide bomber in Israel killed Judith Greenbaum, a pregnant American woman.  Her husband, father, mother, and her estate (collectively, the "Greenbaum plaintiffs") commenced a wrongful death suit in the United States District Court for the District of Columbia against Iran and MOIS.  See Greenbaum v. Islamic Republic of Iran, 451 F.Supp.2d 90 (D.D.C. 2006).  In 2006, that court found that Iran and MOIS had "provided material support and assistance to Hamas, the terrorist organization that orchestrated the bombing" and

were therefore jointly and severally liable for damages in the amount of $19,879,023.  See id. at 94.

B.    The Foundation and 650 Fifth Avenue

The Alavi Foundation was originally established by the government of Iran and all facts appear to indicate that it has been continuously operated as part of the Iranian governmental apparatus.  (Am. Compl. of the United States (Dkt. No. 51) ("U.S. Compl.") ¶ 21.)

The Foundation has gone through several name changes:  it started as the Pahlavi Foundation in 1973; in 1980, following the Iranian Revolution, its name was changed to the Mostazafan Foundation of New York; in 1992 its name was again changed, this time to the Alavi Foundation.[5]  (U.S. Compl. ¶¶ 24, 27.)

In 1973, Shah Reza Mohammad Pahlavi, who was then the Shah of Iran, established the "Pahlavi Foundation," a New York not-for-profit corporation. (U.S. Compl. ¶ 24.)  Once the Foundation was established, the government of Iran, through its central bank, loaned to Bank Melli, which in turn loaned the Foundation, the funds to purchase the building located at 650 Fifth Avenue, New York, New York.  (Id.)[6]

---

[5] The assets of Bank Melli, Assa Corp. and Assa Co. Ltd. have previously been deemed "blocked" "Iranian assests".  See, e.g., 31 C.F.R. Pt. 560, App. A.

[6] Bank Melli has conceded that it is an instrumentality of Iran.  See, e.g., Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 48 (2d Cir. 2010).

The Iranian revolution began in 1978; by 1979 the Shah had fled the country and the then-exiled religious leader, Ayatollah Ruhollah Khomeini ("Khomeini" or the "Ayatollah"), returned to Iran and assumed control.  Khomeini proclaimed establishment of the Islamic Republic of Iran in April 1979.  (U.S. Compl. ¶ 25.)

In March 1979, the Ayatollah ordered the creation of the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan") as an umbrella organization to take possession of, manage and control property expropriated by the new Iranian revolutionary government.  (U.S. Compl. ¶ 26.)  The Revolutionary Council of the Islamic Republic of Iran approved the creation of the Bonyad Mostazafan.  The Bonyad Mostazafan took control of the assets of the Pahlavi Foundation, including one of its major assets--the building located at 650 Fifth Avenue.  (Id.)

In 1978-79, the new revolutionary government in Iran forced all five of the directors of the Pahlavi Foundation to resign. The Iranian Bonyad Mostazafan appointed new directors in 1980. (U.S. Compl. ¶ 27.)  That same year, the Pahlavi Foundation filed an amended certificate of incorporation which, inter alia, renamed the Foundation the "Mostazafan Foundation of New York." (Id.)  More than a decade later, in 1992, the Mostazafan Foundation of New York renamed itself the Alavi Foundation. (Id.)

C.   Factual Record Derived from Seized Documents

Nearly thirty years after the Iranian Revolution and the establishment of the Foundation, in 2008 and 2009, search warrants were executed at the Alavi Foundation, a residence of a member of the board of the Foundation, a residence owned by Bank Melli, and the offices of 650 Fifth Avenue.  (U.S. Compl. ¶¶ 69, 75, 82.)  Documents obtained pursuant to these warrants reveal the following facts regarding extensive and continuous connections between the Foundation, 650 Fifth Avenue, Bank Melli, the Assa Corp., Assa Co. Ltd., and the Iranian government:

- In November 1980, the Bonyad Mostazafan held a conference in Tehran for the directors and managers of all of the offices of the various Iranian Mostazafan foundations worldwide.  The then-president of the Mostazafan Foundation of New York, Manoucher Shafie ("Shafie"), communicated with the supervisor of the Iranian Bonyad Mostazafan, Mahmood Karimi Nouri ("Nouri") regarding arrangements for the conference. Nouri wrote to Shafie that reservations to attend the meeting could be made via the Iranian Ministry of Foreign Affairs and that he should bring with him all of the "beneficial suggestions you have to discuss the improvement of your unit."  (U.S. Compl. ¶ 28.)

- In 1981, Shafie notified two employees of the Mostazafan Foundation of New York that they were

8

terminated; the letterhead he used bore the symbol for
the Islamic Republic of Iran.  (<u>Id.</u> ¶ 29.)

- By the 1980s, the Mostazafan Foundation of New York
  had incurred a tax liability relating to rental income
  from the 650 Fifth Avenue property.  To avoid the tax,
  Iranian government officials and directors of the
  Mostazafan Foundation of New York discussed various
  options.  The plan that was ultimately adopted led to
  the creation of the 650 Fifth Avenue Company. (<u>Id.</u>
  ¶ 31.)

- As part of the discussions that led to the decision to
  create the 650 Fifth Avenue Company, the Deputy Prime
  Minister of Iran at that time, Tahmasb Mazaheri, wrote
  to the then Prime Minister of Iran, Mir-Hossein
  Mousavi regarding the tax issue and the possibility of
  creating the new legal entity.  (<u>Id.</u> ¶ 32.)

- Mousavi noted his approval for this option stating,
  "The above circumstances were discussed in the office
  of the brother Ghasemi, the president of the Central
  Bank, in the presence of brother Najafi Elmi and both
  promised to cooperate. Your recommendation of this
  action, which will surely be beneficial to the Islamic
  Republic, will expedite processing this by the end of
  1987 and allow new arrangements to be made for 1988."
  (<u>Id.</u> ¶ 32.)  At that time, Ghasemi was the director of
  the Central Bank of Iran and Najafi Elmi was the
  general director of Bank Melli.  (<u>Id.</u>)

- In November 1987, Mazaheri wrote to Mousavi seeking the Iranian Prime Minister's approval for the creation of the new entity to avoid paying taxes. (Id. ¶ 33.)

- In December 1987, the Iranian Prime Minister's office responded by giving authorization to proceed with the proposal to create the new legal entity.  The letter was written on letterhead bearing a symbol for the Islamic Republic of Iran and the words "Islamic Republic, Office of the Prime Minister." (Id. ¶34.)

- Meeting minutes dated May 24, 1989, on letterhead for the Bonyad Mostazafan, describe a joint meeting held in Tehran that was attended by the Iranian Assistant Director of Commerce and International Affairs for the Bonyad Mostazafan and a member of the board of Bank Melli.  The minutes state that "Bank Melli Iran company will partner with the New York Foundation"; the building at 650 Fifth Avenue was to be contributed to the new company.  The minutes state "a representative from Bank Melli Iran should supervise the plan." (Id. ¶ 38.)

- In 1989, the Assistant Director of Commerce and International Affairs for the Bonyad Mostazafan requested approval of the partnership agreement between the Mostazafan Foundation of New York and Bank Melli Iran and states, "Please note the partnership is based on prior agreements between the Ministry of Finance, Bank Melli Iran, and the Bonyad Mostazafan . . . [I]t was decided to set the value of the building at $128 million and the share of Assa Company (Assa

Co., which belongs to Bank Melli, is the partner of
the Mostazafan Foundation) at $44,800,000, thus Bank
Melli will earn $200,000 in cash." This letter was
copied to the president of the Foundation. (<u>Id.</u> ¶39.)

- In a telex from early 1990 that was found in a search
  of the residence owned by Bank Melli, two individuals
  employed by Bank Melli discuss the history of the
  formation of 650 Fifth Avenue. That telex confirms
  that the Bonyad Mostazafan was involved in the
  formation of the new company. (<u>Id.</u> ¶ 40.)

- According to the partnership agreement entered into
  between the Foundation and Bank Melli, it was agreed
  that the partnership would be called the 650 Fifth
  Avenue Company, that the Foundation would contribute
  the building at 650 Fifth Avenue, New York, New York,
  and that Assa Corp. would contribute capital. (<u>Id.</u>
  ¶ 42.)

- Formalizing the creation of 650 Fifth Avenue required
  various filings with the State of New York's Attorney
  General's Office. In a letter dated September 21,
  1989, the Attorney General's Office requested a list
  of officers and directors of the Assa Corp. and a
  statement as to whether there was any personal or
  business relationship between those persons and the
  Foundation. (<u>Id.</u> ¶ 43.) The Foundation's letter in
  response listed the officers and directors and did not
  state that two of them were affiliated with Bank Melli
  or detail the extensive prior contacts with the
  Foundation. Alavi's counsel responded "to the best of
  counsel's knowledge, 'there were no pre-existing

agreements or understandings between any director, officer or principal of Assa Corp. and the Foundation.'" (Id. ¶ 44.)

- On September 29, 1989, the Attorney General's office specifically asked whether the transaction was "arms length." On October 4, 1989, Alavi's counsel stated that the formation of "the Partnership was an arms-length transaction between the Foundation and Assa Corp." (Id. ¶ 45.)

- A verified petition filed in New York State Supreme Court requesting leave to transfer the 650 Fifth Avenue building from the not-for-profit charitable foundation to the new 650 Fifth Avenue Company stated that the transaction was arms-length. Notably, that petition did not disclose the involvement of Bank Melli. (Id. ¶ 46.)

- In 1991, the Iranian Ambassador to the United Nations demanded the resignation of the Mostazafan Foundation's president. Subsequently, three of the Mostazafan Foundation's board members, including its president, wrote directly to the Ayatollah that they would resign from the Foundation pursuant to his instructions that had been conveyed to them. (Id. ¶¶ 49, 50.) Their letter stated, "In obedience to the Supreme Leader's Directives, we herewith announce our readiness to resign our posts of responsibility at the Mostazafan Foundation of New York . . . " (Id. ¶ 50.) The letter also set forth the activities undertaken by the Foundation and stated, "Our hope is that these activities will further improve and develop under the

supervision of your Excellency and respected
representative in the Mostazafan and Janbazan
Foundation." (Id. ¶ 51.)

- In 1991, the Foundation held a meeting in Switzerland
  with the General and Regional International
  Chairmanship of the Bonyad Mostazafan regarding
  changes to the board of the New York Mostazafan.  The
  minutes of that meeting reflect that the changes were
  "directed by our Supreme Leader."  The minutes also
  describe (i) the status of the building at 650 Fifth
  Avenue; and in a section entitled "Building 650,"
  (ii) the minutes describe the collection of rent from
  tenants, and (iii) payments made to Assa Corp.  The
  minutes reflect that group also discussed charitable
  activities of the Foundation.  (Id. ¶ 52.)

- Later in May 1991, the soon-to-be-former president of
  the Mostazafan Foundation, Badr, wrote to Sobhani,
  (Iran's International Director of the Bonyad
  Mostazafan), "Brother Kharrazi [the Iranian Ambassador
  to the United Nations] said to me that from now on,
  the role of the Managing Director and the role of the
  Board of Directors [of the Mostazafan Foundation] will
  be just a formality and he will be conducting all of
  its affairs. (Id. ¶ 54.)

- On May 30, 1991, Badr wrote to the Ayatollah that he
  had followed the Ayatollah's directives concerning his
  own resignation from the Foundation and that the final
  meeting would be in August 1991.  Badr wrote that his
  and the other board member's resignations had been
  obtained "by resorting to a channel unacceptable by

the laws and regulations governing non-profit organizations in America." (<u>Id.</u> ¶ 56.)

- In a separate letter attached to his letter to the Ayatollah, Badr warned Kharrazi (the Iranian Ambassador to the U.N.) that the pressure he was exerting on the board members to resign immediately could cause problems for the Foundation since it did not follow New York State law protocols. (U.S. Compl. ¶ 57.) He stated,

> Dear brother, the danger posed by your direct interference in the affairs of the Foundation, in view of the very dire political and security atmosphere in America, is not hidden to all; God forbid it should cause numerous problems for the Foundation . . . However, we will all wholly abide by this decision as it was made through the judgment, wisdom and insight of the Supreme Leader . . . I therefore once more announce my sole obedience of the Supreme Leader's orders . . . I reiterate that I have presented, in written and verbal form, all the problems and dangers associated with changing 80 percent of the members of the Board of Trustees and that dear brother's official and unofficial interference, to you and the brothers in charge of the Mostazafan and Janbazan Foundation . . .

(<u>Id.</u> ¶ 57.)

- In June, Badr wrote to Sobhani that Kharrazi had been interviewing employees of the Foundation "to make the point that hereafter he is to be considered the Foundation's employees' point of contact and the Foundation will operate under the Iranian Mission Office." (<u>Id.</u> ¶ 58.) Badr also wrote that Kharrazi

had "told almost everyone that they [Kharrazi and the Ayatollah] will be directly responsible for the Mostazafan Foundation of New York and will not only control its activities, but supervise it as well." (Id.)

- In that letter, Badr set forth the dangers of an open connection between the Foundation and the Islamic Republic of Iran:

  > . . . I and members of the Foundation's Board of Trustees have frequently signed affidavits addressed to American authorities . . . stating that the Foundation is independent and devoid of any connection to the Government of Iran and the Iranian Government's qualified authorities.  If this Issue, which has created a connection between the Foundation and the Government of Iran and is surely known to the American authorities, is deemed a violation and causes actions to be taken against the Foundation, I and the other members of the Board of Trustees . . . will be culpable of a heavy offence [sic].  Therefore a solution needs to be thought of for us.

  (Id. ¶ 59.)

- Following Badr's resignation from the Mostazafan Foundation, Kharrazi and Seyed Mohammad Hadi Nejad Hosseinian (Iran's Ambassador to the U.N. after Kharrazi stepped down until approximately 2002) attended the Foundation's board meetings.  (Id. ¶ 63.) Hosseinian set forth the formula that the Foundation would use to distribute funds.  (Id.)

- In the late 1990s, two Bank Melli employees met with Kharrazi to discuss the possibility of Assa Corp.

selling its interest in the building at 650 Fifth
Avenue.  Kharrazi did not give them permission.  (<u>Id.</u>
¶ 64.)

- There were numerous meetings at which individuals from
  the Foundation and employees from Bank Melli met to
  discuss business associated with the Foundation, the
  building at 650 Fifth Avenue, distributions to the
  Assa Corp. and other matters.  (<u>Id.</u> ¶¶ 83-95.)

- In 2004, the Iranian Ambassador to the United Nations
  and the Finance Minister for Iran met to discuss the
  resolution of a lawsuit brought against the
  Foundation.  (<u>Id.</u> ¶¶ 65, 81.)

- Starting in approximately 2007, the Iranian Ambassador
  to the United Nations would meet with individuals from
  the Foundation in a closed room in Queens or at one of
  the Ambassador's residences.  At those meetings,
  issues with respect to management of the building at
  650 Fifth Avenue and the charitable activities of the
  Foundation were discussed.  (<u>Id.</u> ¶¶ 67-68.)

- In 2007, Mohammad Khazaee became the Iranian
  Ambassador to the United Nations.  (<u>Id.</u> ¶ 66.)  At a
  meeting relating to the Foundation held at the
  residence of the Iranian Ambassador to the United
  Nations, he stated that it should only allocate grants
  to Shiites and that he would determine the composition
  of the Board of the Foundation.  (<u>Id.</u> ¶ 70.)  He also
  stated that if there was an issue "that needs to be
  conveyed to Tehran, let me know, I will convey it."
  (<u>Id.</u> ¶ 72.)  During that meeting in 2007, the Iranian

16

Ambassador to the U.N. and individuals from the
Foundation discussed that the Cultural Assembly of
Iran would provide "cultural guidance" regarding to
the activities of the Foundation.  At the same
meeting, the participants discussed "What are you
doing to safeguard the interests of the regime and
Islam . . .?" and "We need your opinion in relation to
the cultural strategy." (Id. ¶¶ 74-75.)

- The Foundation has played an ongoing role in managing
the operations of the building at 650 Fifth Avenue.
(Id. ¶¶ 98-100.)

Documents obtained pursuant to the search warrants also
reveal that there was an ongoing attempt to deny any
relationship between the Foundation and the Government of Iran
in order to avoid paying civil judgments obtained against Iran
in courts in the United States.  (U.S. Compl. ¶ 103.)  For
instance, in 1992 a lawsuit was filed in the United States
District Court for the Southern District of New York against the
Foundation to obtain compensation for assets expropriated by the
Government of Iran.  (Id. ¶ 102.)  In 1992, the Foundation
submitted an affidavit[7] in connection with that lawsuit which
represented, "The New York Foundation conducts no business with
the Government of Iran or the Mostazafan Foundation of Iran . .

---

[7] As set forth above, just prior to the submission of that affidavit in the
other matter, the Foundation had had a meeting with individuals from Bank
Melli to discuss all aspects of the Foundation and 650 Fifth Avenue's
operations.

.  The New York Foundation has never been an agent or instrumentality of the Government of Iran or the Mostazafan Foundation of Iran." (<u>Id.</u> ¶ 103.)

Similarly, in a 1995 deposition, the president of the Foundation was asked whether there was a "relationship between . . . the Mostazafan Foundation of Iran, and the Alavi Foundation of New York," to which he responded, "No, not at all." (U.S. Compl. ¶ 104.)  In his 1996 deposition, the Foundation's Ahmadi was asked, "Did you ever receive instructions in terms of your role as a director for the New York Foundation from any person or entity in Iran?" to which he responded, "No." (<u>Id.</u> ¶ 105.) Ahmadi had been one of the individuals who had resigned from the board pursuant to the direction of the Iranian Ambassador to the United Nations as instructed by the Ayatollah. (<u>Id.</u> ¶ 50.)

D.   <u>Additional Background</u>

Moreover, documents seized pursuant to the search warrants revealed that the New York Foundation in fact communicated with the Iranian Mostazafan Foundation regarding the <u>Gabay</u> litigation pending against the Foundation at various times during 1992-1993. (U.S. Compl. ¶ 106.)  The <u>Gabay</u> case was dismissed on the grounds that there was no connection between the Bonyad Mostazafan of Iran and the New York Foundation.  See <u>Gabay</u>, 968 F.Supp. at 900.  The Second Circuit affirmed the dismissal stating, "We affirm the district court's conclusion that it

18

lacks jurisdiction over this Foreign Sovereign Immunities Act

('FSIA') suit because plaintiff Gabay has offered insufficient

evidence to overcome the presumption of independence between

defendants Mostazafan Foundation of Iran and Mostazafan

Foundation of New York."  Gabay, 152 F.3d 918, 1998 WL 385909,

at *1.  It is notable the district court and the Second

Circuit's decisions were issued prior to the execution of the

search warrants in 2008 and 2009.

   Stephen M. Flatow brought a wrongful death lawsuit against

Iran relating to the death of his daughter resulting from a

terrorist bombing in the Gaza Strip, with which Iran was

associated.  Flatow obtained a default judgment against Iran,

but when he attempted to attach assets of the Foundation, the

court dismissed his action on the grounds that Flatow could not

demonstrate a connection between the Foundation and the

government of Iran.  See Flatow v. Islamic Republic of Iran, 67

F. Supp. 2d 535, 542-43 (D. Md. 1998.)[8]

   In 2008, the president of the Foundation was served with a

Grand Jury Subpoena for documents relating to the Assa Corp.,

Assa Company Ltd., the 650 Fifth Avenue Company.  The following

day, the president of the Foundation was observed by the FBI

---

[8] In Flatow, the court based its decision in part on the fact that although
Flatow asserted interconnections between the entities, he had failed to
support certain assertions with an affidavit.  See 67 F. Supp. 2d at 542.
Here, the facts contained in the documents as set forth in the verified
complaint of the United States eliminate that as a basis for dismissal.

attempting to destroy documents.  He was subsequently charged in a criminal complaint for obstruction of justice.  See United States v. Jahedi, 681 F. Supp. 2d 430 (S.D.N.Y. 2009).

II.  LEGAL STANDARDS

    A.  Subject Matter Jurisdiction

    Plaintiffs have asserted that this Court has subject matter jurisdiction over their actions, inter alia, by virtue of the FSIA.  (See Third Am. Compl. of Steven Greenbaum ("Greenbaum Compl.") (Dkt. No. 256-1) ¶ 4; Am. Acosta of Carlos Acosta ("Acosta Compl.") (Dkt. No. 256-3) ¶ 5; Am. Compl. of Deborah Peterson ("Peterson Compl.") (Dkt. No. 259-1) ¶ 10.)

    Determining the existence of subject matter jurisdiction is a threshold inquiry and a case is properly dismissed under 12(b)(1) when the district court lacks the constitutional power to adjudicate the action.  See Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008).  The party invoking federal subject matter jurisdiction bears the burden of establishing jurisdiction by a preponderance of the evidence.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

    In determining whether it has subject matter jurisdiction over plaintiffs' actions, the court accepts as true all material factual allegations in the complaint, but refrains from drawing inferences favorable to the plaintiff because the burden of

establishing jurisdiction is the plaintiff's.  See APWU v.
Potter, 343 F.3d 619, 623 (2d Cir. 2003).  In addition, for
jurisdictional purposes, the court may resolve disputed factual
issues by reference to evidence outside of the pleadings.  See
Flores v. Southern Peru Copper Corp., 343 F.3d 140, 161 n.30 (2d
Cir. 2003); see also Makarova, 201 F.3d at 113.

        Here, the verified complaint filed by the United States
government is incorporated by reference into each of plaintiffs'
complaints.  (See, e.g., Greenbaum Compl. ¶ 20; Acosta Compl.
¶21; Peterson Compl. ¶ 37.)  As an initial matter then, this
Court may accept all material facts alleged in that complaint as
true.  See Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170
(2d Cir. 2008).  The factual matters addressed in the U.S.'s
complaint have been verified by a Special Agent of the FBI; that
verified complaint is legally treated as an affidavit that may
be considered on this motion.  See Patterson v. Cnty. of Oneida,
375 F.3d 206, 219 (2d Cir. 2004).[9]  Moving Defendants have failed
to controvert the authenticity or accuracy of the extensive
quotations from the seized documents in that complaint and thus,
those facts are uncontested for purposes of determining subject

---

[9] As Moving Defendants acknowledge in footnote 1 of their Memorandum in
Support of this motion (Dkt. No. 251), and  in footnote 3 of their
Supplemental Brief in Support (Dkt. No. 271), when considering a motion to
dismiss for lack of subject matter jurisdiction, this Court can examine
affidavits submitted in connection with such a motion.  See, e.g., Filetech
S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998.)

matter jurisdiction.  See Aetna Cas. & Sur. CO. v. Aniero

Concrete Co., Inc., 404 F.3d 566 (2d Cir. 2009); Vega v. Miller,

273 F.3d 460, 466 (2d Cir. 2001).

    B.   Motion to Dismiss

    To survive a Rule 12(b)(6) motion to dismiss, "the

plaintiff must provide the grounds upon which [its] claim rests

through factual allegations sufficient 'to raise a right to

relief above the speculative level.'"  ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell

Alt. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other

words, the complaint must allege "enough facts to state a claim

to relief that is plausible on its face."  Starr v. Sony BMG

Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly,

550 U.S. at 570).  See also Ashcroft v. Iqbal, 556 U.S. 662, 129

S. Ct. 1937, 1949 (2009) (same).  "A claim has facial

plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  Iqbal, 129 S.

Ct. at 1949.  In applying that standard, the court accepts as

true all well-plead factual allegations, but does not credit

"mere conclusory statements" or "threadbare recitals of the

elements of a cause of action."  Id.  If the court can infer no

more than "the mere possibility of misconduct" from the factual

averments--in other words, if the well-pleaded allegations of

the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate.  Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 129 S. Ct. at 1950).

   C.   The FSIA

   The FSIA codifies "the restrictive theory of sovereign immunity."  Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488 (1983).  However, the FSIA also provides exceptions to such immunity for attachment to fulfill a judgment:

> (b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . . if—
>
> (2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3) or (5) or 1605(b), or 1605A of this chapter. . .

28 U.S.C. § 1610 (emphasis added).

   Section 1605A is the "Terrorism Exception to the Jurisdictional Immunity of a Foreign State."  It states:

> (a)  In general—
>
>> (1)  No immunity—A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if

> such act or provision of material support or
> resources is engaged in by an official, employee,
> or agent of such foreign state . . .

28 U.S.C. § 1605A.

According to section 1603 of the FSIA, a "foreign state"

includes, "a political subdivision of a foreign state or an

agency or instrumentality of a foreign state as defined in

subsection (b)."  28 U.S.C. § 1603(a).

Subsection (b) provides:

(b) An 'agency or instrumentality of a foreign state' means
any entity—

(1)  Which is a separate legal person, corporate or
     otherwise, and

(2)  Which is an organ of a foreign state or political
     subdivision thereof, or a majority of whose shares or
     other ownership interest is owned by a foreign state
     or political subdivision thereof, and

(3)  Which is neither a citizen of a State of the United
     States as defined in section 1332(c) and (e) of this
     title, nor created under the laws of any third
     country.

28 U.S.C. § 1603(b).

D.   TRIA

The Terrorism Risk Insurance Act of 2002 ("TRIA"), codified

in a note to the FSIA, allows a plaintiff to execute against

"blocked" assets of a terrorist party.  The TRIA states, in

relevant part,

Notwithstanding any other provision of law . . . in
every case in which a person has obtained a judgment

24

> against a terrorist party on a claim based upon an act
> of terrorism, or for which a terrorist party is not
> immune under section 1605(a)(7) of title 28 United
> States Code, the blocked assets of that terrorist
> party . . . shall be subject to execution or
> attachment in aid of execution in order to satisfy any
> judgment to the extent of any compensatory damages for
> which such terrorist party has been adjudged liable.

TRIA § 201(a), Pub. L. No. 107-297, Title II, 116 Stat. 2337

(2002)).[10]

The TRIA defines the term "terrorist party" as "a

terrorist, terrorist organization . . ., or a foreign state

designated as a state sponsor of terrorism under section 6(j) of

the Export Administration Act of 1979 (50 U.S.C. App. 2405(j))

or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C.

2371)." TRIA § 201(d)(4), Pub. L. 107-297, Title II. Iran has

been designated as a "state sponsor of terrorism" under section

6(j) of the Export Administration Act of 1979 since January 19,

1984. State Sponsors of Terrorism, U.S. Dep't of State,

http://www.state.gov/j/ct/c14151.htm (last visited July 27,

2012).

The "blocking" of such assets is effectuated through the

President of the United States, who is empowered by the

International Emergency Economic Powers Act ("IEEPA") to do so.

50 U.S.C. §§ 1701, 1702. On February 6, 2012, President Obama

---

[10] At issue in this action are the blocked assets of Iran or the blocked
assets of any agency or instrumentality of Iran.

wielded such power with respect to the assets of Iran.  In

Executive Order 13599 ("E.O. 13599"), the President ordered that

> [a]ll property and interests in property of the
> Government of Iran, including the Central Bank of
> Iran, that are in the United States, that are or
> hereafter come within the United States, or that
> hereafter come within the possession or control of any
> United States person, including any foreign branch,
> are blocked and may not be transferred, paid,
> exported, withdrawn, or otherwise dealt in.

Exec. Order No. 13,599, 77 Fed. Reg. 26 (Feb. 6, 2012).  For

purposes of that Executive Order, the "Government of Iran" is

"any political subdivision, agency or instrumentality thereof, .

. . and any [individual or entity] owned or controlled by, or

acting for or on behalf of, the Government of Iran."  Id.  That

definition is similar to the definition promulgated by the

Department of Treasury:

> (a) The state and the Government of Iran, as well as
> any political subdivision, agency or instrumentality
> thereof; (b) Any entity owned or controlled directly
> or indirectly by the foregoing; (c) Any person to the
> extent that such person is, or has been, or to the
> extent that there is reasonable cause to believe that
> such person is, or has been, since the applicable
> effective date, acting or purporting to act directly
> or indirectly on behalf of any of the foregoing.

31 C.F.R. § 560.304

The Office of Foreign Assets Control ("OFAC"), operating

under the United States Department of Treasury, has determined

that "E.O. 13599 requires U.S. persons to block all property and

interests in property of the Government of Iran, unless

otherwise exempt under OFAC."  OFAC FAQs; see also 31 C.F.R.
§ 501.603(a)(1) ("Any person . . . holding property blocked
pursuant to this chapter must report.").  For purposes of the
Executive Order, "blocking" constitutes "freezing," and the
words are used interchangeably.  See OFAC Regulations for the
Financial Community, Dep't of the Treasury § V(A) (Jan. 24,
2012); Fact Sheet: Implementation of National Defense
Authorization Act Sanctions on Iran, U.S. Dep't of Treasury,
available at http://www.treasury.gov/press-center/press-
releases/Pages/tg1409.aspx (last visited July 25, 2012) ("Among
other things, the E.O. [13599] freezes all property of the
Central Bank of Iran and all other Iranian financial
institutions, as well as all property of the Government of Iran
. . .").

     Although OFAC periodically publishes a list of "Specially
Designated Nationals and Blocked Persons" (the "SDN list"), that
list is not dispositive of whether that entity's assets are in
fact "blocked" pursuant to E.O. 13599.  See Frequently Asked
Questions and Answers, U.S. Dep't of Treasury,
http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/ans
wer.aspx (last visited July 25, 2012) (hereinafter "OFAC FAQs")
("E.O. 13599 blocks the property and interests in property of
any individual or entity that comes within its definition of the
term 'Government of Iran' regardless of whether it is listed on

the SDN List . . .").  At present, Assa Co., Ltd., Assa Corp.,

and Bank Melli are on the SDN list.  Specially Designated Nat'ls

List, U.S. Dep't of Treasury,

http://www.treasury.gov/ofac/downloads/t11sdn.pdf (last visited

July 26, 2012).

 E. Caselaw of Sovereigns

 The Supreme Court found that when Congress enacted the

FSIA, it intended to ensure that "duly created instrumentalities

of a foreign state are to be accorded a presumption of

independent status."  See First Nat'l City Bank v. Banco Para El

Comercio Exerior De Cuba, 462 U.S. 611, 627 (1983) ("Bancec").

The "presumption of independent status" is not to be "lightly

overcome."  Hercaire Int'l, Inc. v. Argentina, 821 F.2d 559, 565

(11th Cir. 1987).  Such "instrumentalities" include a foreign

state's "political subdivisions and agencies or

instrumentalities," as set forth in the statute.  See Hester

Int'l Corp. v. Federal Republic of Nigeria, 879 F.2d 170, 176

n.5 (5th Cir. 1989) (emphasis added).

 Despite the presumption of independent status, in Bancec

the Supreme Court recognized that "equitable principle[s]" allow

a court to disregard the corporate form "where it is interposed

to defeat legislative purposes" or would "work fraud or

injustice."  Id. at 629-630.  Indeed, the Supreme Court found

that "where a corporate entity is so extensively controlled by

its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." Id. at 629-630.[11]  Thus, where a court disregards the corporate form and determines that an entity is an "alter ego" of a foreign state, it essentially finds that the entity "is" a foreign state for purposes of the FSIA.  See, e.g. Hester Int'l Corp. 879 F.2d at n.7; Hercaire Int'l, Inc. v. Argentina, 821 F.2d 559, 565 (11th Cir. 1987); Baglab, 665 F.Supp. at 294; Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia, 616 F.Supp. 660, 666 (W.D. Mich. 1985).

An example sheds light on how the Bancec test has taken hold in practice.  In Kalamazoo, the district court found that where the government had assumed day-to-day operations of a government-owned corporation as well as, inter alia, expropriated the majority of the corporation's stock, the corporation was no longer distinguishable from the government

---

[11]  In Bancec, the Supreme Court considered whether Citibank could assert a set-off against a claim made by Bancec against Citibank, for assets previously seized by the Cuban Government. Based on the facts of that case, the Court determined that Bancec was not an independent entity from the Cuban government and found that if Bancec recovered the full amount it sought from Citibank, the true beneficiary would have been the government of Cuba.  The Court found that there would have been an obvious inequity in allowing the government of Cuba to "obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets . . ." Bancec, 462 U.S. at 632.

itself and thus, was an instrumentality of the foreign state. 616 F.Supp. at 666.[12]

Two examples where courts did <u>not</u> disregard the corporate form under <u>Bancec</u> also provide insight into what type of conduct is affirmatively required to find an entity "is" a foreign state for purposes of the FSIA.  In <u>Gibbons v. Republic Of Ireland</u>, 532 F.Supp. 668 (D.D.C. 1982), the court declined to find that the defendant was a foreign sovereign or an instrumentality thereof on the basis that plaintiffs had failed to show that the government officials acted in concert with the employees of the instrumentality: "undisputed affidavits . . . establish that no representative of the ministries had any actual involvement with these matters."  <u>Id.</u> at 672.

In <u>Letelier v. The Republic of Chile</u>, 748 F.2d 790 (2d Cir. 1984), the Second Circuit analyzed whether LAN's assets should be treated as those of Chile.  The court reviewed <u>Bancec</u> and stated that although it did not find that LAN itself had engaged in the sort of abuse that eliminated the presumption of separateness, it acknowledge that "[t]he broader message [from

---

[12] In other contexts, courts have allowed a court to ignore corporate separateness when the corporate form has been achieved by fraud.  <u>See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.</u>, 909 F.2d 698, 703 (2d Cir. 1990); <u>Gartner v. Snyder</u>, 607 F.2d 582, 586 (2d Cir. 1979)(stating that courts can and have ignored the corporate form when the corporation has been so dominated by an individual or another corporation . . . and its separate entity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.").

30

Bancec] is that foreign states cannot avoid their obligations by engaging in abuses of corporate form." Id. at 794.

In Dole Food Co. v. Patrickson, 538 U.S. 468 (2003), the Supreme Court refined the doctrine set forth in Bancec. There, the Supreme Court reiterated that "[t]he veil separating corporations and their shareholders may be pierced in some circumstances . . .  The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or certain other exceptional circumstances . . . and is usually determined on a case by case basis." The Court noted that "control and ownership, however, are distinct concepts." Id. at 477.[13] The language of "control" is nonetheless consistent with Bancec in which the Supreme Court found that control can rise to such a level that an agent/principle relationship is effectively created.  See Bancec, 462 U.S. at 629; see also United States Fidelity and Guar. v. Braspetro Oil Service Co., 199 F.3d 94, 98 (2d Cir. 1999) (citing Bancec for the proposition that control can rise to such a level that an entity becomes the alter ego of another entity).

In EM Ltd. v. The Republic of Argentina, 720 F.Supp. 273 (S.D.N.Y. 2010), applying the rationale of both Bancec and Dole, Judge Griesa held that the Central Bank of Argentina was the

---

[13] Ultimately, the Supreme Court held that although Israel had exerted substantial control over the operations of certain companies, on the facts before it, such control was not commensurate with ownership and thus, was insufficient for piercing the veil.  Id. at 1659-62.

alter ego of the Republic of Argentina on the basis that corporate formalities will be disregarded where to recognize them would work a fraud or injustice.  See id. at 298.  In EM, the court correctly noted that in Bancec the Supreme Court set forth a distinction between an "agent" of a foreign government and an "agency" of a foreign government--i.e., where an entity is an "agent," there is no legal distinction between it and its principal and thus, it can become liable for the debts of its principal.  Id. at 299.

Although those illustrations provide guidance as to how to determine whether the corporate form may be disregarded to determine that an instrumentality "is" a foreign state, or an "organ" thereof, see 28 U.S.C. § 1603(b)(2), the body of caselaw sets forth various relevant factors a court can consider, including (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.  See Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004); see also Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 846-47 (5th Cir. 2000); Hausler v. JPMorgan Chase Bank, N.A., No. 09 Civ. 10289, 2012 WL 601034, at *14

(S.D.N.Y. Feb. 22, 2012).  No one factor is dispositive or should be given particular weight.  See Hausler, 2012 WL 601034, at *14.  In both Weininger v. Castro, 462 F.Supp.2d 457 (S.D.N.Y. 2006), and the recently-decided Hausler case, the court noted that it is mindful of the fact that the "instrumentality and its related government" will frequently possess most of the information needed to establish organ status.  See Weininger, 462 F.Supp.2d at 495; Hausler, 2012 WL 601034, at *14.

III. DISCUSSION

Those principles set the ground work for determining (a) whether Moving Defendants are Iranian[14] and thus, subject to this Court's jurisdiction under the FSIA, and (b) whether, at this stage of the proceedings, plaintiffs have stated a claim for turnover of the assets for satisfaction of a judgment under TRIA.  The inquiry that provides the answer to both questions is whether the assets to which plaintiffs seek turnover are "Iranian":  if so, this Court must determine whether one of the exceptions to the FSIA confers subject matter jurisdiction; if not, then they do not fall within the definition of TRIA and this action would therefore be subject to dismissal under Fed. R. Civ. P. 12(b)(6).

---

[14] Here, on these facts, "Iranian" or "Iran" is used synonymously with the Government of Iran.

The relevant legal principles along with the facts derived from the documents seized pursuant to search warrants (the authenticity of which have not been contested by Moving Defendants) amply supports this Court's determination that Moving Defendants are "Iran," or alter egos or organs thereof, and that the terrorism exception to the FSIA precludes immunity from suit.

Accordingly, the Court finds that plaintiffs have set forth a sufficient factual basis for subject matter jurisdiction and have stated a claim.

A.   Iran

First, the Court finds that the Foundation and 650 Fifth Avenue meet the definition of "Iran" as set forth in E.O. 13599 and the definition promulgated by the U.S. Department of Treasury at 31 C.F.R. § 560.304.[15]

E.O. 13599 defines Iran as "any political subdivision, agency or instrumentality thereof, . . . and any [individual or entity] owned or controlled by, or acting for or on behalf of, the Government of Iran."  Based on the facts set forth in the seized documents, there can be no serious debate at this stage

_____

[15] On page 8 of their Reply Memorandum (Dkt. No. 261), Moving Defendants argue (without citation) that plaintiffs cannot import definitions of "Iran" from the Executive Order or from Treasury Regulations.  There is no basis for that position.  The FSIA is designed to provide immunity to sovereign governments (unless an exception applies); it does not purport to provide an exclusive manner of defining a sovereign government.  It only provides a set of factors for determining if an entity is an agency or instrumentality if one needs to inquire at that level.  Here, the Court finds a sufficient factual support to find that these entities "are" the Iranian government.

of the proceedings that Moving Defendants well and truly meet
that definition.  As of the date of the Iranian Revolution, it
is clear that the operations and direction of the Foundation
were driven from Tehran based upon the direct orders of the
Ayatollah and/or the Iranian Ambassador to the United Nations
acting at Khomeini's direction.  It is apparent from the
numerous interactions that occurred between members of the
Iranian government and individuals associated with the
Foundation over the years that Iran drove decisions on
charitable strategy, operation of the 650 Fifth Avenue building,
the creation of the separate 650 Fifth Avenue Company,
distributions to Assa Corp. (an entity openly acknowledged to be
the Iranian government and, although not dispositive, an entity
on the SDN list), as well as the leadership and board membership
of the Foundation.  The Foundation corresponded on letterhead of
the Islamic Republic of Iran, terminated employees and board
members pursuant to directives from the government of Iran, and
was told that the Iranian Ambassador would be in fact managing
its affairs.  Those facts leave little question that the
Foundation was an entity "controlled" by the Government of Iran.
See E.O. 13599.

Indeed, those facts inexorably drive towards the conclusion
that the Foundation and 650 Fifth Avenue have no true separate
decision making authority, power or real existence except that

allowed and directed by the Iranian government.  That is far from the type of mere "control" without ownership that the Supreme Court in the Dole case stated was insufficient.  See also United States Fidelity and Guar., 199 F.3d at 98.  The fact that the Foundation and 650 Fifth Avenue are situated in the United States and have obtained the trappings of corporate form by submitting what may be perjurious and false statements (that may be proven or disproven at trial but has not been contested on this motion) cannot change the clear reality of what is before this Court at this time.  The Foundation and 650 Fifth Avenue are the Iranian government.

The Treasury's 31 C.F.R. § 560.304 provides for an even broader definition of the Iranian government than E.O. 13599:

> (a) the state and Government of Iran, as well as any political subdivision, agency or instrumentality thereof; (b) Any entity owned or controlled directly or indirectly by the foregoing; (c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing.

Under that guidance, the Court finds "reasonable cause" to believe that the Foundation and 650 Fifth Avenue have been acting directly or indirectly on behalf of the Iranian government.  Certainly the facts recited directly above and in the detailed recitation of facts support such reasonable cause.

36

Accordingly, this Court finds that the Moving Defendants are "Iran" or the "government of Iran."

### B.   Alter Egos of the Iranian Government

Second, under Bancec and its progeny, the Court finds that the Foundation and 650 Fifth constitute "alter egos" of the Iranian Government such that they can be considered one and the same.

Again, the facts set forth above support that conclusion. In addition to the above recitation, it is clear that by taking all significant direction from the Ayatollah and/or the Iranian Ambassador to the United Nations, the government of Iran dominated Moving Defendants such that they are at least "agents" of the Iranian government.  The Foundation's charitable giving appears to be driven by directives from the Iranian government; and the management and operations of the property at 650 Fifth Avenue appears to be overseen and controlled by the Iranian government.  The facts in the seized documents demonstrate (at least at this stage) that Moving Defendants have no ability to act in any significant way without authorization from Tehran. That is certainly enough at this stage of the proceedings for a finding that Moving Defendants are "alter egos" of Iran.  See Kalamazoo, 616 F.Supp. at 666.

C.   Organs of Iran Under the FSIA

Third, even if this Court were to assume that the Moving Defendants are neither part of the Iranian government nor alter egos of the Iranian government, it would nonetheless conclude that they meet the definition of an organ of a foreign state under the FSIA.  As set forth above, section 1603 of the FSIA sets forth a three factor test for determining whether an entity is an agency or instrumentality of a foreign state.

Here, Moving Defendants purport to meet the first factor of having formalistically separate corporate forms (the Foundation is incorporated in New York and 650 Fifth Avenue purports to be organized as a partnership under New York state law).  The facts before the Court indicate, however, that the corporate forms were obtained (or maintained) fraudulently.

Moving Defendants also meet the second factor of constituting "organs" of a foreign state.  Although there is no specific definition of "organ", caselaw sets forth relevant, non-exclusive factors.  Among those met here are that the Pahlavi Foundation was created by the Shah for a national purpose; this purpose was overtaken by the purposes of the Ayatollah who assumed control over its direction on behalf of the Iranian government; the extensive history of Iranian government involvement in all aspects of the Foundation and the creation of the 650 Fifth Avenue Company make it clear that the

38

Iranian government actively supervises both entities; and the
Ayatollah appears to have required the termination of board
members and replacement with other board members.  As set forth
above, there are numerous additional facts suggesting that the
Foundation and the 650 Fifth Avenue Company have no true
independent discretion regarding their operations.

The fact that a receiver was put in place after the
commencement of this action by Order of this Court does not
alter that analysis.  That receiver was appointed to insure that
the assets were maintained in accordance with U.S. law pending
the outcome of this lawsuit.  The fact of the receivership does
not alter the history of the organizations or what would occur
if the receivership were to be terminated.  Indeed, the fact
that on the date of the execution of the search warrants the FBI
caught the Foundation's president attempting to destroy
documents demonstrating the Foundation's connection to the
Iranian government further demonstrates that the passage of time
has done nothing to alter the unmistakable connection with (and
control by) the Iranian government.

An additional requirement under the FSIA "organ" test is
that the entities in question are not citizens of a State.  See
28 U.S.C. § 1603(b)(3).  Moving Defendants argue that since the
Foundation was incorporated in New York by the Shah in 1973, it
is duly incorporated in a state, and the partnership that

established 650 Fifth Avenue meets the requirements to be a citizen of New York state as well.  Moving Defendants emphasize that point by citing instances in which plaintiffs allege that the Foundation and 650 Fifth Avenue are citizens of the state of New York.  This argument is without merit.  The caselaw recited above and as set forth in Bancec, demonstrates that courts have long recognized instances in which formalistic adherence to corporate form can work inequity--particularly, where there is fraud.  See 462 U.S. at 629-30.  As the Supreme Court stated clearly in Bancec, in those instances, the Court may disregard the corporate form.  Id.

That is precisely the case here.  The extensive facts suggesting that the Foundation submitted false affidavits and made false representations to the Attorney General's Office of the State of New York support an equitable disregard of the Foundation's corporate form and 650 Fifth Avenue's alleged citizenship.  To adhere to corporate formalities that the factual record suggests were achieved in order to obscure ownership by Iran, would privilege form over substance, and thereby form over equity.

Accordingly, this Court finds that Moving Defendants constitute "organs" under § 1603(b) of the FSIA.

D.   The Terrorism Exception to the FSIA

As a foreign sovereign (or instrumentality thereof) (as found in Part III.A. supra) or as an alter ego of a foreign sovereign (as found in Part III.B supra), Moving Defendants would necessarily be immune from suit.  However, section 1605A of the FSIA states that "[a] foreign state shall not be immune from the jurisdiction . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . ."  28 U.S.C. § 1605A.  The TRIA provides for the same.  See 28 U.S.C. § 1610(f)(1)(A).  Where, as here, plaintiffs seek turnover of assets to fulfill judgments obtained in actions that were premised upon terrorist acts, those exceptions do away with any immunity Moving Defendants may have had.  Accordingly, the Court has subject matter jurisdiction over Moving Defendants.[16]  The motion to dismiss is denied in that regard.

IV. PLAINTIFFS STATE A CLAIM

Plaintiffs' lawsuits seek compensation from the Iranian government for the wrongful death of numerous individuals who died as a result of Iran's acts of terrorism.  This Court has

---

[16] Because this Court determines that there is a sufficient basis for subject matter jurisdiction based on the FSIA, it need not reach the other asserted bases for such jurisdiction.

found that at this stage of the proceedings, there is a
sufficient basis--and plausible facts alleged--to determine that
Moving Defendants are the Iranian government, or agencies or
instrumentalities thereof.  For that reason, the Court finds
that plaintiffs have adequately stated a claim.

V. CONCLUSION

     For the aforementioned reasons, Moving Defendants' motion
to dismiss is DENIED.

     The parties are directed to appear for a status conference
on September 7, 2012 at 1:30 p.m. to set a date for a trial on
the merits.

     The Clerk of the Court is directed to terminate the motion
at Docket No. 250.


     SO ORDERED:

Dated:   New York, New York
         July 26, 2012


                              _____
                                KATHERINE B. FORREST
                              United States District Judge


42