UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                     :

                                     :          No. 08 Civ. 10934 (KBF)

IN RE 650 FIFTH AVENUE
AND RELATED PROPERTIES       :

                                     :

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- X

**ALAVI FOUNDATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO
SUPPRESS EVIDENCE SEIZED PURSUANT TO THE SEARCH WARRANT ISSUED
ON DECEMBER 19, 2008**

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

*Attorneys for Claimants Alavi Foundation
and 650 Fifth Avenue Company*

PRELIMINARY STATEMENT ...............................................................................1

Relevant Factual Background ...............................................................................3

    A.    The Search Warrant ...............................................................................3

    B.    The Search and Seizure of Foundation Records...............................................................................7

ARGUMENT...............................................................................11

I.    The Evidence Seized in the December 19, 2009 Search Must Be Suppressed Because the Government Failed to Establish Probable Cause for the Issuance of the Warrant...............................................................................12

    A.    Legal Standards for the Issuance and Review of a Search Warrant ...................12

    B.    The Warrant Application Does Not Establish a Substantial Basis For The Existence of Probable Cause ...........................................................14

        1.    The Warrant Application Does Not Establish Probable Cause to Believe that the Foundation Engaged in Criminal Conduct ...............................15

        2.    The Warrant Application Does Not Establish Probable Cause to Believe that Evidence of a Crime Would Be Found at the Foundation's Offices or in its Records...............................................................................17

    C.    The Warrant Application Is Also Insufficient to Establish Probable Cause Because It Relies On Conclusory Allegations Rather Than Reliable Facts..........20

II.    The Search Warrant Violates the Fourth Amendment Because It Lacks Particularity And Improperly Authorizes an Overbroad Seizure of Documents and Electronic Media ...............................................................................22

    A.    The Warrant Completely Fails to Identify The Crime for Which the Search Was Being Undertaken...............................................................................23

    B.    The Warrant Does Not Particularly Identify the Documents To Be Seized And Instead Relies on Overly-Broad Catch-All Provisions................................26

    C.    The Warrant Is Unconstitutionally Overbroad Because It Lacks Any Temporal Limitation ...............................................................................27

III.    The Government's Execution of the Search and Seizure Was Unreasonable and Violated the Fourth Amendment...............................................................................29

    A.    The Government's Seizure Exceeded the Scope of the Warrant.........................29

i

B. The Government's Search of the Seized Materials is Unreasonable Because the Government Has Not Taken Steps to Minimize its Intrusive Review of Privileged Material ............................................................. 32

C. The Government's Search is Unreasonable Because the Government Has Recklessly Violated the Attorney-Client Privilege ............................................... 34

IV. The Government Would Not Have "Inevitably Discovered" the Seized Evidence .......... 36

A. Inevitable Discovery Standard ............................................................. 37

B. The Government Has Not Established That the Discovery of Each Piece of Seized Evidence was Inevitable ....................................................... 38

CONCLUSION ............................................................................................ 39

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilar v. Texas,*
    378 U.S. 108 (1964) ...........................................................................................13

*Alderman v. United States,*
    394 U.S. 165 (1969) ...........................................................................................39

*Andresen v. Maryland,*
    427 U.S. 463 (1976) ...........................................................................................32

*Bivens v. Six Unknown Named Agents of Fed. Bureau ofNarcotics,*
    403 U.S. 388 (1971) ...........................................................................................30

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971) ...........................................................................................25

*Groh v. Ramirez,*
    540 U.S. 551 (2004) .....................................................................................23, 24

*Illinois v. Gates,*
    462 U.S. 213 (1983) .............................................................................. 13, 20, 21

*In re Extradiction of Ben-Dak,*
    2008 U.S. Dist. LEXIS 29460 (S.D.N.Y. Apr. 11, 2008) ..................................21

*Maryland v. Garrison,*
    480 U.S. 79 (1987) .............................................................................................22

*Nardone v. United States,*
    308 U.S. 338 (1989) ...........................................................................................39

*Nathanson v. United States,*
    290 U.S. 41 (1933) .............................................................................................21

*One 1958 Plymouth Sedan v. Pennsylvania,*
    380 U.S. 693 (1965) ...........................................................................................11

*Payton v. New York,*
    445 U.S. 573 (1980) ...........................................................................................13

*Richards v. Jain,*
    168 F.Supp.2d 1195 (W.D. Wash. 2001) ...................................................... 36

*Steagald v. United States,*
    451 U.S. 204 (1981) ...................................................................................... 12

*Travis v. Village of Dobbs Ferry,*
    355 F.Supp.2d 740 (S.D.N.Y. 2005) ............................................................. 19

*United States v. (Under Seal),*
    757 F.2d 600 (4th Cir. 1985) ........................................................................ 36

*United States v. 500 Delaware St.,*
    113 F.3d 310 (2d Cir. 1997) ......................................................................... 11

*United States v. Abboud,*
    438 F.3d 554 (6th Cir. 2006) ........................................................................ 28

*United States v. Bianco,*
    998 F.2d 1112 (2d Cir. 1993) ................................................................. 23, 27

*United States v. Biasucci,*
    786 F.2d 504 (2d Cir. 1986) ......................................................................... 33

*United States v. Brown,*
    951 F.2d 999 (9th Cir. 1991) ........................................................................ 18

*United States v. Carey,*
    172 F.3d 1268 (10th Cir. 1999) .................................................................... 26

*United States v. Cioffi,*
    668 F. Supp. 2d 385 (E.D.N.Y. 2009) ................................................. 23, 24, 25

*United States v. Cohan,*
    628 F. Supp. 2d 355 (E.D.N.Y. 2009) ........................................................... 24

*United States v. Comprehensive Drug Testing, Inc.,*
    579 F.3d 989 (9th Cir. 2009) ........................................................................ 33

*United States v. D'Amico,*
    734 F. Supp. 2d 321 (S.D.N.Y. 2010) ........................................................... 34

*United States v. Debbi,*
    244 F. Supp. 2d 235 (S.D.N.Y. 2003) ..................................................... 31, 32

*United States v. Diaz,*
    841 F.2d 1 (1st Cir. 1988) ....................................................................... 28, 29

*United States v. Dzialak*,
    441 F.2d 212 (2d Cir. 1971) ..................................................................................30

*United States v. Eng*,
    971 F.2d 854 (2d Cir. 1992) ("*Eng I*") ............................................ 37, 38, 39

*United States v. Eng*,
    997 F.2d 987 (2d Cir. 1993) ("*Eng II*") ......................................................37

*United States v. Falso*,
    544 F.3d 110 (2d Cir. 2008) ........................................................... 18, 19

*United States v. George*,
    975 F.2d 72 (2d Cir. 1992) ...................................... 14, 22, 23, 25

*United States v. Grant*,
    2004 U.S. Dist. LEXIS 9462 (S.D.N.Y. May 25, 2004) ..................................35

*United States v. Heath*,
    455 F.3d 52 (2d Cir. 2006) .................................................................. 37, 39

*United States v. Hickey,*
    16 F. Supp. 2d 223 (E.D.N.Y. 1998) .........................................................27

*United States v. Hill*,
    459 F.3d 966 (9th Cir. 2006) ............................................................ 28, 33

*United States v. Horn*,
    811 F.Supp. 739 (D.N.H. 1992) .................................................................36

*United States v. Hunter*,
    13 F. Supp. 2d 574 (D. Vt. 1998) .................................................... 26, 34

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ....................................................................................30

*United States v. Jicarilla Apache Nation*,
    131 S.Ct. 2313 (2011) ................................................................................36

*United States v. Kow*,
    58 F.3d 423 (9th Cir. 1995) ............................................................. 27, 28

*United States v. Leon*,
    468 U.S. 897 (1984) ................................................................... 13, 14, 19

*United States v. Matias,*
    836 F.2d 744 (2d Cir. 1988) ......................................................................30

*United States v. Moore*,
    968 F.2d 216 (2d Cir. 1992) ................................................................14

*United States v. Otero*,
    563 F.3d 1127 (10th Cir. 2009)............................................................27

*United States v. Riccardi*,
    405 F.3d 852 (10th Cir. 2005) .......................................................26, 27

*United States v. Roberts*,
    852 F.2d 671 ........................................................................................38

*United States v. Rosa*,
    11 F.3d 315 (2d Cir. 1993) ..................................................................13

*United States v. Shi Yan Liu*,
    239 F.3d 138 (2d Cir. 2000) ................................................................32

*United States v. Stewart*,
    2002 U.S. Dist. LEXIS 10530 (S.D.N.Y. June 11, 2002) ...................35

*United States v. Torres*,
    751 F.2d 875 (7th Cir. 1984) ..............................................................33

*United States v. Travisano*,
    724 F.2d 341 (2d Cir. 1983) ..........................................................13, 20

*United States v. Ventresca*,
    380 U.S. 102 (1965) ...............................................................13, 18, 20

*United States v. Vilar*,
    2007 U.S. Dist. LEXIS 26993 (S.D.N.Y., April 4, 2007) ..................26, 32, 33, 39

*United States v. Voustianiouk*,
    685 F.3d 206 (2d Cir. 2012) ................................................................14

*United States v. Wagner*,
    989 F.2d 69 (2d Cir. 1993) ......................................................18, 19, 21

*United States v. Waker*,
    534 F.3d 168 (2d Cir. 2008) ..........................................................23, 24

*United States v. Winters*,
    2006 U.S. Dist. LEXIS 70488 (S.D.N.Y. Sept. 27, 2006) ..................35

*Whiteley v. Warden, Wyo. State Penitentiary*,
    401 U.S. 560 (1971) ......................................................................14, 21

*Wong Sun v. United States,*
    371 U.S. 471 (1963) ....................................................................................11

*Ybarra v. Illinois,*
    444 U.S. 85 (1979)........................................................................................18

**OTHER AUTHORITIES**

2 W. LaFave, Search and Seizure § 3.7(d) (4th ed. 2011) ........................................14

U.S. Const. Amend. IV ................................................................................passim

## PRELIMINARY STATEMENT

On December 19, 2008, on the basis of an affidavit that did not describe any unlawful conduct by the Alavi Foundation ("Alavi" or the "Foundation") and an incorporated civil forfeiture complaint against properties belonging to a distinct entity, the Government obtained a warrant to search and seize records from the Foundation's offices without limitation as to date and without reference to any specific crime for which evidence was being collected. Over the next several hours, agents of the Federal Bureau of Investigation ("FBI") seized virtually every hard copy and electronic record in the Foundation's offices. Over the next months, and even years, the FBI reviewed the seized materials with little regard for the privileged nature of many of the Foundation's documents or for the Foundation's need to have access to its records to continue with its operations. This unreasonable search and seizure violated the Foundation's Fourth Amendment rights in several important ways.

First, the Government's warrant application, which consisted of nothing more than a bare-bones affidavit appended to a civil forfeiture complaint against the assets of another entity, *i.e.*, Assa Corporation ("Assa"), was insufficient to establish probable cause. The application contained scant information about the Foundation, and what information there was consisted of stale hearsay that neither implicated the Foundation in a crime nor suggested that evidence of someone else's crime would be found in the Foundation's offices. Indeed, the only information in the application about the Foundation concerned a single transaction that occurred nineteen years before the Government applied for the warrant, ten years before the Iranian Transaction Regulations made it illegal to transact with Bank Melli, and six years before it became illegal to provide services to Iran. The application provided no evidence that the

1

Foundation maintained a relationship with Assa thereafter, much less that the Foundation participated in Assa's alleged unlawful activities or maintained records of Assa's activities.

Second, the Magistrate Judge issued a constitutionally defective search warrant that failed to particularly identify the objects properly subject to seizure. The warrant failed to describe the suspected legal violation, failed to limit the seizure to relevant types of records, and failed to limit the temporal scope of the records to be seized. As a result, the warrant improperly authorized--and the Government subsequently executed--an overbroad exploratory search in violation of the Fourth Amendment.

Third, the agents who executed the search failed to abide by even the permissive and unconstitutionally overbroad limitations in the warrant and, instead, seized virtually every documents, computer, disk, and record in the Foundation's offices, irrespective of subject matter, date, or apparent relevance to the ostensible purpose of the search. The Government then proceeded, over the course of four years, to comb through these records—many of which were protected by the attorney-client privilege—at their leisure in an attempt to build and support the forfeiture case against the Foundation's assets.

The Government cannot evade suppression in this case simply by citing the purported good faith of the searching agents or the possibility that it might discover the seized evidence by other means. The warrant application here was so lacking in indicia of probable cause, and the warrant itself so facially deficient, that reliance on the warrant was *per se* unreasonable. Nor would the Government have "inevitably" discovered the seized records as part of a contemporaneous investigation, as a previously-served subpoena demonstrates that any such investigation was targeted at Assa, its alleged ultimate parent, Bank Melli, and their relationships with the Foundation, and did not seek the limitless volume of records that the

Government swept up in its search.   The Government's wholesale search and seizure of Alavi's records was an unreasonable and factually unsupported intrusion undertaken to support a fishing expedition for incriminating evidence.  This is precisely the misconduct that the Fourth Amendment is intended to prevent.  Accordingly, this Court must suppress the unlawfully seized evidence and any fruits therefrom.

<u>**Relevant Factual Background**</u>

A.       **The Search Warrant**

On December 19, 2008, former Magistrate Judge Theodore H. Katz issued a warrant authorizing the Federal Bureau of Investigation ("FBI") to search and seize certain financial records and computer storage devices from Alavi's offices at 500 Fifth Avenue in New York City.  (*See* attached Search Warrant[1].)  Judge Katz granted the warrant based on an application consisting of a twelve-paragraph affidavit signed by FBI Special Agent George J. Ennis (the "Ennis Affidavit"), which incorporates a previously-filed civil forfeiture complaint against properties allegedly held by Assa (the "Assa Complaint" (Ennis Aff. Ex. A)), and a list of "Items To Be Seized At The Premises" (Ennis Aff. Ex. B).  The relevant portion of the Ennis Affidavit comprises two perfunctory paragraphs, asserting that the Government has been investigating

> [A] 1989 transaction involving 650 Fifth Avenue, New York, New York, a Manhattan office tower . . . which is largely filled by commercial tenants.  The Building was constructed in 1970s with a loan from Bank Melli to Alavi's predecessor organization.  In 1989, in order to avoid a substantial anticipated tax liability, Alavi repaid its mortgage to Bank Melli by selling a 40% interest in the Building to Assa Corp., a subsidiary of Assa Co. Ltd., both of which were shell companies owned by Bank Melli.  In 1999, the U.S. Treasury Department's Office of Foreign Asset Control

---

[1] For ease of reference, the Search Warrant and warrant application are attached directly to this memorandum.

> identified Bank Melli and its offices worldwide as entities "owned
> or controlled by the Government of Iran."  31 C.F.R. Part 560,
> App. A.  Accordingly, Bank Melli is subject to the Iranian
> Transactions Regulations ("ITR"), Title 31 United States Code of
> Federal Regulations, Part 560, and Assa Co.'s interest in the
> Building and its rents is subject to civil forfeiture, as fully set forth
> in [the Assa Complaint].

(Ennis Aff. ¶ 4.)  The Ennis Affidavit also attaches a form document entitled "Methods To Be Used To Seize and Search Computers and Computer-Related Equipment" (Search Warrant Ex. C).  These documents ostensibly set forth probable cause to justify the warrant and, therefore, the Government's subsequent search of the Foundation's offices.

      The Ennis Affidavit does not assert that the 1989 transaction (the "1989 Partnership Transaction") in which the Foundation and Assa formed the 650 Fifth Avenue Company (the "Fifth Avenue Company") was illegal or improper under U.S. tax laws.  Indeed, as Agent Ennis reported, the 1989 Partnership Transaction occurred a full *ten years* before the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC") "blocked" Bank Melli as being owned or controlled by Iran.  While Agent Ennis attested that ***Bank Melli*** is subject to the ITRs and that ***Assa's*** properties are subject to forfeiture, the Ennis Affidavit says nothing about the Foundation being subject to any regulation and nothing about its properties.  Apart from the brief mention of the 1989 Partnership Transaction, the Ennis Affidavit does not set out any further details regarding the Foundation's conduct or its relationship with Assa or Bank Melli.

      Instead, the Affidavit incorporates the Assa Complaint by reference and asserts that:

> As the Verified Complaint sets forth, although the property and
> funds which are subject to forfeiture belong to Bank Melli and its
> related entities, the transactions underlying Bank Melli's
> acquisition of its interest in the Building was not an arms-length
> transaction with Alavi, but rather was structure[d] both to evade
> Alavi's tax liability and to conceal Bank Melli's interest in the
> Building.

(Ennis Aff. ¶ 5.).  The Ennis Affidavit offers absolutely no support, however, for the claims that: (1) the acquisition of the building at 650 Fifth Avenue (the "Building") was not an arms-length transaction; (2) the 1989 Partnership Transaction was anything other than a lawful mechanism to reduce the Foundation's tax exposure; or (3) the Transaction was intended to conceal Bank Melli's interest in the Building.  Yet, based on these unsupported claims, the Ennis Affidavit concludes that "there is probable cause to believe that Alavi committed the same crimes alleged as a basis for the forfeiture sought in the [Assa] Complaint, and that Alavi and its directors, employees, and other agents, committed, conspired to commit, and aided and abetted the same violations by Alavi and Bank Melli, among others."  (*Id*.)

The Ennis Affidavit does not offer any explanation why the 1989 Partnership Transaction provides probable cause to believe the Foundation committed the "same crimes" as alleged in the Assa Complaint, and no explanation is self-evident.  The Assa Complaint alleges that Assa is a straw company owned and operated by Bank Melli, and that Assa has been "transferring rental income generated from the Fifth Avenue Company to Bank Melli, following Bank Melli's instructions with regard to Assa Corp.'s affairs, reporting back to Bank Melli on Assa Corp.'s financial situation and business dealings, and managing the affairs of Assa Corp. for the benefit of Bank Melli."  (*See* Assa Compl. ¶¶ 17, 6-13, 38-48.)  The Assa Complaint further alleges that, through these actions, Assa has been violating the International Emergency Economic Powers Act ("IEEPA"), which prohibits, among other things, "the exportation . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran . . . undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . ."

(*See id.* ¶¶ 5-13.)  The Assa Complaint also alleges that Assa's alleged IEEPA violations

constitute underlying "unlawful activity" supporting separate money-laundering charges.[2]  (*Id.*

¶¶ 40-48.)

              Importantly, the Assa Complaint does *not* allege that the Foundation violated

IEEPA, or any other law for that matter, and does not seek forfeiture of *any* Foundation property

or money.  The only mention of the Foundation in the Assa Complaint involves the same 1989

Partnership Transaction referenced in the Ennis Affidavit.  (*See id.* ¶¶ 16, 18-22.)  Like the Ennis

Affidavit, the Assa Complaint asserts that the Foundation entered the 1989 transaction to "avoid

paying U.S. taxes on revenue from the Building," but does not offer any basis by which a reader

could conclude that the Transaction was unlawful.  (*Id.* ¶ 22.)  The Complaint does not allege

that Alavi had any further dealings with Assa or Bank Melli after the 1989 Partnership

Transaction, and does not allege that Alavi ever knew or had reason to know that Assa or its

parent company, Assa Company Ltd., was owned or controlled by Bank Melli.  The Assa

Complaint does not include information about any Government investigation of the Foundation,

and does not cite any sources to support the allegations regarding Alavi.[3]  (*See id.* ¶¶ 16, 18-22.)

Accordingly, the Assa Complaint provides no basis whatsoever to conclude that the Foundation

committed the "same crimes" or "same violations" that Assa is alleged to have committed in the

Assa Complaint.

---

[2] On December 17, 2008, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") designated Assa as an entity owned or controlled by Bank Melli, and issued a Blocking Order as to Assa's assets.  The Foundation was not, and has never been, designated by OFAC as an agency or instrumentally of Iran, and the December 17, 2008 OFAC Blocking Order did not apply to any of the Foundation's assets.  Also on December 17, 2008, the SDNY issued a grand jury subpoena to the Foundation seeking various documents relating to Assa, Bank Melli Iran, and the Fifth Avenue Company.  (Declaration of Daniel S. Ruzumna in Support of Alavi's Motion to Suppress ("Ruzumna Decl.") Ex. A.)

[3] It was not until November 12, 2009 – almost 11 months after the search warrant issued – that the Government filed its Amended Complaint alleging for the first time that the Alavi Foundation had provided services to Iran, and seeking forfeiture of the Foundation's properties on that basis.  *See* Amended Complaint.

Despite the paucity of evidence in the Ennis Affidavit and rest of the warrant application, Magistrate Judge Katz issued a warrant authorizing the government to seize all documents listed in Exhibit A to the Ennis Affidavit, namely:  (1) "Any and all documents . . . concerning or relating to" ownership interests in Assa, its parent company Assa Co. Ltd., the Fifth Avenue Company, the Building, and Bank Melli Iran; (2) "Any and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records" of Assa, Assa Co.  Ltd., the Fifth Avenue Company, Bank Melli Iran, the Foundation, "or any of the officers and employees of these entities"; and (3) "Any and all computers" and related equipment and data storage devices without limitation.  (*See* Search Warrant.)  Neither the warrant nor Exhibit A identifies the purported crimes of which evidence could be searched and seized, the type or nature of computer files permitted to be seized, or a date restriction or date guidance for documents that could be seized.

### B.    The Search and Seizure of Foundation Records

FBI agents executed the warrant the day it was issued, seizing virtually each and every document and digital media device in the Foundation's offices, regardless of its content, age, or apparent relevance to the investigation described in the warrant application.  The FBI carried off all of the Foundation's computers, all of its servers, and over 200 boxes of materials from the Foundation's offices.  The boxed materials included virtually all of the Foundation's hard-copy files, containing all of the Foundation's records going back to the 1970s.  (Ruzumna Decl. ¶¶ 3, 4 and Exs. B, C .)   Materials seized ranged from financial documents to transit checks, letters of credit, employee benefit information, personal diaries, the Foundation's checks, documentation concerning the Foundation's 401(k) and pension plans, utilities bills, health insurance and dental expense plan records, asbestos survey reports, and files regarding the Islamic centers to which the Foundation donated.  (*Id.* ¶ 6 .)  Among the documents seized were

many documents protected by the attorney-client privilege, including documents whose privileged status was obvious from their face, such as letters to the Foundation's directors and officers printed on law firm letterhead and clearly labeled with the legend "***PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT***."  (*See*, *e.g.*, *id.* ¶¶ 8-12 & Exs. D, E, F. (emphasis in original). )

Because the Foundation could not operate without the seized computers and certain documents, the Foundation's counsel sought an expeditious return of the most critical materials.  (*See* Ruzumna Decl. ¶ 7.)  The Government agreed to return the seized materials, or copies of the materials, after they had been reviewed and duplicated.  (*Id.*)  But only after several weeks in which the Foundation was effectively prevented from operating did the FBI return the Foundation's computers.  (*Id.*)  Even then, many specifically-requested and significant items— including a letter of credit in an amount of several hundred thousand dollars and personal items of Foundation employees—were not returned until months later.  (*Id.*)

On March 11, 2009, nearly three months after the documents were seized, and following additional requests for return of or access to the seized materials, the Government finally permitted the Foundation's lawyers to come to the U.S. Attorney's Office in Manhattan and review five boxes of what the Government characterized as the "most relevant documents" seized during the search.  (Ruzumna Decl. ¶ 8.)  The review of these documents demonstrated that the Government was actively ignoring the Foundation's attorney-client privilege, as a number of these "most relevant documents" revealed *on their face* their privileged nature, *e.g.*, letters on law firm letterhead to the Foundation's directors and officers labeled "**Attorney-Client Privileged**" or "**Confidential**."  (*Id.*)

8

A month and a half later, on April 22, 2009, the FBI provided CDs containing electronic copies of additional documents that had been seized on December 19, 2008 and subsequently reviewed by the FBI, which were said to represent approximately 5% to 10% of the total seized materials. (Ruzumna Decl. ¶ 9.)  Numerous blatantly privileged communications were also contained in these materials that the FBI had reviewed and copied. (*Id.*)  Such documents included a letter memorandum from Patterson Belknap Webb & Tyler attorneys printed on firm letterhead and labeled "**PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT**"; a letter from the law firm of Berliner & Maloney on firm letterhead labeled "PERSONAL AND CONFIDENTIAL"; a letter from the law offices of Kaplan, Russein & Vecchi, labeled "CONFIDENTIAL / ATTORNEY CLIENT PRIVILEGED"; and other similar communications. (*Id.* Exs. D, E, F (redacted to preserve privilege).)

Over the next several months counsel for the Foundation repeatedly attempted to verify that the Government would indeed respect the Foundation's attorney-client privilege, and requested that the Government start taking adequate steps to safeguard the Foundation's privilege by, among other things, establishing a dedicated "taint team" to identify and segregate privileged materials prior to substantive FBI review. (*See, e.g.*, Ruzumna Decl. Ex. G, 5/8/09 Ltr. from D. Ruzumna to D. Liebowitz, at 2.).  However, based on recent deposition testimony, a taint team of agents was not set up until approximately three years later, after evidence seized in the search of the Foundation's offices had been reviewed. (*See* Ruzumna Decl. Ex. N, McReynolds Dep. 88-91, 6/28/2013).  Alavi filed a motion to compel the return of certain documents in June 2009, but agreed to withdraw that motion a few weeks later after an FBI Special Agent delivered 8 boxes and two file folders of documents to the Foundation's counsel on July 14, 2009, nearly 8 months after the seizure.  Six of these boxes were purportedly in the

same condition as when they were seized by the government, and the two remaining boxes and folders represented "culled" materials deemed privileged by the FBI.  After additional, protracted communications with the Foundation's counsel, the Government returned additional boxes of documents, including privileged documents, in October and November 2010.  (*Id.* ¶ 14.)

      During this time period, it also became apparent that the FBI was sharing privileged documents with other federal agencies.  On January 26, 2010, the Foundation provided the Government—at its express request—a log identifying privileged documents that that the Government had returned to the Claimants, including privileged material on five CDs that the Government returned on April 22, 2009.  (*See* Ruzumna Decl. Ex. I, 8/23/09 e-mail from J. Cronan to D. Ruzumna; Ex. J, 1/26/10 e-mail from D. Ruzumna to H. Chernoff.)  The purpose of this log was to allow a Government taint team to identify and segregate privileged documents before further review or dissemination.  (*Id.*)  The Government averred that it "has not looked at these [five CDs] because of possible privilege concerns you have expressed, and therefore don't want to be going through them without guidance from you first."  (*Id.* Ex. I.)  But despite these assurances, counsel for Claimants subsequently discovered through a Freedom of Information Act Request to the Department of Treasury that the Government had ignored the log and simply copied and turned over all five of the April 22, 2009 CDs to the Department of Treasury, without removing or redacting privileged documents.  (*See, e.g., id.* Ex. K, 5/15/12 Ltr from K. Adler to D. Argall.)

      Almost four years after the search, the Government and the Foundation have still not come to a mutually satisfactory arrangement for the protection of the Foundation's privilege.[4]

---

[4] On July 31, 2012, the Government for the first time disclosed the affidavit supporting the warrant that the Government used to separately seize and search documents belonging to Foundation director Alireza Ebrahimi on May 11, 2009.  After reviewing the affidavit, the Foundation decided not to file a joint motion seeking suppression of the fruits of both searches.

## ARGUMENT

The Court should suppress the documents and materials seized in the December 19, 2009 search of the Foundation's offices because the search and seizure were executed in violation of the Foundation's Fourth Amendment rights. Because forfeiture proceedings are "quasi-criminal in character" the object of which, "like a criminal proceeding, is to penalize for the commission of an offense against the law," the Fourth Amendment's exclusionary rule applies to such proceedings. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700-01 (1965); *United States v. 500 Delaware St.,* 113 F.3d 310, 313 n.3 (2d Cir. 1997) ("The Fourth Amendment's exclusionary rule applies to forfeiture cases."). Thus, evidence seized in violation of the Fourth Amendment cannot lawfully be used in this forfeiture action. *One 1958 Plymouth Sedan*, 380 U.S. at 698. Moreover, the Court must also suppress as "fruits of the poisonous tree" all additional evidence obtained as a result of the Government's review of information uncovered in the unlawful search. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

There are three separate and independent bases for suppression in this case. First, the seized evidence must be suppressed because the Government's warrant application failed to establish probable cause to believe the Foundation had committed a crime or that evidence of a crime would be found at its premises. Second, the warrant itself is constitutionally infirm because it fails to particularly identify the evidence to be seized and authorizes an overbroad search. Third, the Government's execution of the search violated the Fourth Amendment because the agents seized materials far exceeding the scope of the warrant and because agents have been unreasonably reviewing Alavi's attorney-client privileged records. The Government's conduct in seeking the relevant warrant and executing the search went well beyond "good faith" mistakes. The evidence seized in the December 19, 2008 search, and all evidence derived therefrom, should be suppressed.

11

I.      **The Evidence Seized in the December 19, 2009 Search, and All Evidence Derived Therefrom, Must Be Suppressed Because the Government Failed to Establish Probable Cause for the Issuance of the Warrant**

        The Court should suppress the evidence seized on December 19, 2008 from the Foundation's offices because the warrant application provides no basis for concluding that the Foundation committed a crime, or that evidence of a crime would be discovered in its offices or its business or computer records.  The only information in the warrant application about the Foundation's conduct concerns a single real-estate transaction from 1989—*i.e., nineteen years before the Government applied for the warrant, ten years before the Iranian Transaction Regulations made it illegal to engage in business transactions with Bank Melli, and six years before providing services to Iran became illegal*.  The allegations simply do not provide probable cause for the search.  First, the Ennis Affidavit itself makes clear that it was not unlawful to transact with Assa or Bank Melli in 1989, and there is no suggestion that the 1989 Partnership Transaction was otherwise unlawful.  Second, because the warrant application does not include any indication that the Foundation had further business dealings with Assa or Bank Melli *after* 1989, the evidence offered to establish probable cause is unquestionably stale.  Third, the "evidence" described in the supporting Assa Complaint is grounded in hearsay rather than the personal knowledge of the affiant.  Thus, the application does not establish a fair probability that Alavi committed or was connected to a crime, or that its records contained evidence of crime.

      A.      **Legal Standards for the Issuance and Review of a Search Warrant**

        The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.  The purpose of the Amendment is to prevent the issuance of "general warrants" authorizing exploratory searches unjustified by particularized evidence of law breaking.  *See Steagald v. United States*, 451 U.S. 204, 220

(1981); *Payton v. New York*, 445 U.S. 573, 583-84 (1980).  A search warrant must be based on

probable cause to believe that (1) a crime has been committed, *and* (2) evidence or

instrumentalities of the crime will be found in the place to be searched.  *United States v.*

*Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).  Probable cause is determined by reference to the

facts set forth in the warrant application.  *Travisano*, 724 F.2d at 345.

    Although a magistrate judge's probable cause determination is entitled to

deference, "reviewing courts will not defer to a warrant based on an affidavit that does not

'provide the magistrate with a substantial basis for determining the existence of probable

cause.'" *United States v. Leon*, 468 U.S. 897, 915 (1984) (quoting *Illinois v. Gates*, 462 U.S.

213, 239 (1983)); *see also United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (reviewing

court must "ensure that the magistrate has a substantial basis for . . . conclud[ing] that probable

cause existed") (quotation omitted).  Probable cause cannot be made out "by affidavits which are

purely conclusory, stating only the affiant's or an informer's belief that probable cause exists

without detailing any of the 'underlying circumstances' upon which that belief is based.  Recital

of some of the underlying circumstances in the affidavit is essential if the magistrate is to

perform his detached function and not serve merely as a rubber stamp for the police."  *United*

*States v. Ventresca*, 380 U.S. 102, 108-109 (1965) (internal citation omitted); *see also Gates*, 462

U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to

determine probable cause; his action cannot be a mere ratification of the bare conclusions of

others.").

    Because the sufficiency of a warrant turns on the information actually presented

to the magistrate judge, a warrant lacking probable cause on its face cannot later be sustained

based on evidence discovered during the unsupported search.  *Aguilar v. Texas*, 378 U.S. 108,

109 n.1 (1964).  Nor can an application be saved by a showing that the affiant possessed

additional information at the time of the application which, had it been conveyed to the

magistrate, would have supported probable cause.  *See Whiteley v. Warden, Wyo. State*

*Penitentiary*, 401 U.S. 560, 565 n.8 (1971) ("[A]n otherwise insufficient affidavit cannot be

rehabilitated by testimony concerning information possessed by the affiant when he sought the

warrant but not disclosed to the issuing magistrate."); *United States v. Voustianiouk*, 685 F.3d

206, 214 (2d Cir. 2012) ("[T]he mere fact that officials were in possession of evidence that

would have provided probable cause for the search that they ultimately conducted is irrelevant in

determining whether a search violated the Fourth Amendment of the Constitution.").

Thus, where the underlying affidavit fails to establish the existence of crime or a

nexus between crime and the objects to be searched, "a reviewing court may properly conclude

that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the

magistrate's probable-cause determination reflected an improper analysis of the totality of the

circumstances."  *Leon*, 468 U.S. at 915; *see also* 2 W. LaFave, Search and Seizure § 3.7(d) (4th

ed. 2011).[5]

**B.    The Warrant Application Does Not Establish a Substantial Basis For The Existence of Probable Cause**

The application for a warrant to search the Foundation's offices fails to set forth

facts establishing probable cause to believe either that Alavi committed a crime or that evidence

---

[5] While evidence seized in objective good faith reliance on an invalid warrant is admissible, this exception does not apply "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable" or "where the warrant is so facially deficient that reliance upon it is unreasonable," and evidence seized pursuant to such a deficient application or warrant must be suppressed.  *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992); *see also United States  v. George*, 975 F.2d 72, 78 (2d Cir. 1992).  The Government may wish to make such an argument in response, but as set forth below, the application is so lacking in supporting factual detail, and the warrant so plainly fails to set any meaningful limits on the scope of the search and seizure, that the warrant could not be relied on in objective good faith, and the seized evidence must be suppressed.

or instrumentalities of a crime would be found in Alavi's offices or its computer records.  The Ennis Affidavit contains no real substantive evidence of a crime and instead incorporates the Assa Complaint, relying on it for much of the application's factual content.  (*See* Ennis Aff. ¶¶ 4-5.)  That Complaint, however, does not demonstrate probable cause for the search because it is primarily focused on *Assa* and the crimes *Assa* allegedly committed.  The Assa Complaint offers no evidence that Alavi—the actual target of the search—acted unlawfully, and provides no basis to believe that evidence of *Assa's* or *anyone else's* purported wrongdoing would be found in Alavi's offices or computer records.  Accordingly, probable cause for the December 19, 2008 search is completely lacking.

> 1.    The Warrant Application Does Not Establish Probable Cause to Believe that the Foundation Engaged in Criminal Conduct

The warrant application offers no evidence from which the Magistrate Judge could have determined probable cause to believe that the Foundation committed a crime.  As described in the Ennis Affidavit, the Government's investigation "concern[ed] a 1989 transaction involving 650 Fifth Avenue, New York, New York.," in which "Alavi repaid its mortgage to Bank Melli by selling a 40% interest in the Building to Assa Corp., a subsidiary of Assa Co. Ltd., both of which were shell companies owned by Bank Melli."  (Ennis Aff. ¶ 4.)  But Agent Ennis does not attest, and the Government does not otherwise assert in the application, that the 1989 Partnership Transaction was unlawful or in any way improper.  Nor could they:  the application itself establishes as a matter of fact and law that the 1989 Partnership Transaction could not have violated the ITRs, because the ITRs were promulgated in 1995—*six years after the 1989 transaction*.  (*See* Assa Compl. ¶¶ 7-11.)  Moreover, as the Ennis Affidavit explains, it was not until 1999—*ten years after the relevant transaction*—that OFAC "identified Bank Melli

and its offices worldwide as entities 'owned or controlled by the Government of Iran,'" thereby making it illegal to transact with Bank Melli.  (Ennis Aff. ¶ 4).

The warrant application implies that the 1989 Partnership Transaction may have been done for a nefarious purpose because it was designed to "evade Alavi's tax liability" (Ennis Aff. ¶ 5), but it does not actually state that the Transaction was in any way illegal.  Indeed, as the Government is well aware, there was nothing unlawful about the Foundation's effort to reduce its tax liability.  In point of fact, the tax-savings purposes of the transaction were fully disclosed to, and approved by, the New York State Attorney General and the New York courts.  (Ruzumna Decl. Ex. M.)  The warrant application studiously avoids any substantive explanation of the 1989 Partnership Transaction and its legally-permissible benefits, relying instead on omissions and innuendo to misleadingly suggest an improper tax dodge.  Similarly, the unsupported allegation that the 1989 Partnership Transaction was somehow structured to "conceal Bank Melli's interest in the Building" (Ennis Aff. ¶ 5) is both vague and irrelevant, given that it was perfectly legal to conduct business with Bank Melli in 1989.  Tellingly, the application does not actually assert that the Foundation's supposed "evasion" of taxes and the alleged "concealment" of Bank Melli's involvement were criminal acts that support probable cause.

The application does not assert that the Foundation engaged in *any actions of any kind*—legal or illegal—after the 1989 Partnership Transaction.  (*See* Ennis Aff. ¶¶ 4-5; Assa Compl. ¶¶ 18-22.)  Indeed, the Ennis Affidavit states only that the Government's investigation "concerns a 1989 transaction involving 650 Fifth Avenue, New York, New York "; it does not mention any later conduct.  (*See* Ennis Aff. ¶ 4.)  Likewise, the Assa Complaint, which is focused on *Assa*'s actions, is essentially silent about the Foundation's post-1989 activities.  The warrant application does not even contain information about any ongoing relationship between

16

the Foundation and Assa after 1989, much less after 1999, when it first became illegal to transact business with Bank Melli.  There is no allegation that the Foundation and Assa had further dealings under the Partnership Agreement; that the Foundation provided services or gave anything of value to Assa or Bank Melli after 1989; or that Assa or Bank Melli ever exerted any sort of influence or control over the Foundation's charitable operations.  In fact, the warrant application does not allege that the Foundation had *any other contact whatsoever* with Assa, Bank Melli, or any person or entity that could be said to represent Iran's interests after the 1989 Partnership Transaction.

Accordingly, Agent Ennis's assertion that "there is probable cause to believe that Alavi committed *the same crimes* alleged as a basis for the forfeiture sought in the [Assa] Complaint, and that Alavi and its directors, employees, and other agents, committed, conspired to commit, and aided and abetted *the same violations* by Alavi and Bank Melli, among others," is without evidentiary basis.  (*Id*. (emphasis added).)  The scant factual evidence in the warrant application offers no basis to conclude that the Foundation, like Assa, was "providing numerous services to Bank Melli in contravention of the ITRs, including transferring rental income generated from the Fifth Avenue Company to Bank Melli, following Bank Melli's instructions with regard to Assa Corp.'s affairs, reporting back to Bank Melli on Assa Corp.'s financial situation and business dealings, and managing the affairs of Assa Corp. for the benefit of Bank Melli."  (*See* Assa Compl. ¶ 17.)  There is no simply basis in the warrant application to conclude that the Foundation committed a crime.

2.  The Warrant Application Does Not Establish Probable Cause to Believe that Evidence of a Crime Would Be Found at the Foundation's Offices or in its Records

Apart from failing to establish probable cause to believe that the Foundation had committed a crime, the warrant application also fails to recite any "underlying circumstances"

17

that could support a finding of probable cause that evidence or instrumentalities of Assa's or anyone else's purported crimes would be found in the Foundation's files. *See Ventresca*, 380 U.S. at 108-109. As set forth above, the Application contains no evidence that the Foundation maintained a continuing relationship with Assa, so there was no reason to believe that fruits, instrumentalities, or evidence of a crime allegedly committed by Assa (or anyone else) would be found in the Foundation's files or computer records. The bare fact that the Foundation entered into a business arrangement with Assa *nineteen years* before the warrant application is not sufficient to establish probable cause to search the Foundation's records. *See Ybarra v. Illinois,* 444 U.S. 85, 91 (1979) ("[M]ere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *United States v. Brown*, 951 F.2d 999, 1003 (9th Cir. 1991) (individual officer's membership in corrupt police unit does not establish probable cause without further proof that the officer actually participated in illegal activities). In the absence of any evidence that the Foundation maintained a close association with Assa, much less that Alavi kept custody of Assa's communications and transactions with Bank Melli, the Affidavit does not establish probable cause to believe that evidence of Assa's crimes would be found in Alavi's files. *Id*; *see also United States v. Falso*, 544 F.3d 110, 121 (2d Cir. 2008).

Even if the paltry "evidence" in the warrant application were deemed sufficient, probable cause to search would still be lacking for the independent reason that the facts set forth in the warrant application were unquestionably stale. Facts supporting the issuance of a search warrant "must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).

Staleness may only be cured if an affidavit "establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *Id*.

Here, the only relevant allegation in the warrant application concerns a single, legal transaction that occurred *almost two decades* before the application. *Cf. Falso*, 544 F.3d at 122-23 (18-year-old conviction for sex offense too stale to support probable cause for child-pornography offense). The application contains no evidence that the Foundation provided any services or gave anything of value to Assa or Bank Melli after 1989 (when the Partnership Agreement was consummated), much less after 1995 (when the ITRs first prohibited transactions with Iran) or after 1999 (when transacting business with Bank Melli was first prohibited).  The application does not even allege that the Foundation maintained a business relationship with Assa after 1989.  The Government's failure to provide evidence to support, or even allege, such facts is particularly conspicuous because the Government spent substantial time investigating the Foundation's relationship with Assa before submitting the application.  (*See* Ennis Aff. ¶ 4).  A single nineteen-year old transaction, standing alone, cannot support a finding of probable cause. *See Travis v. Village of Dobbs Ferry*, 355 F.Supp.2d 740, 749 (S.D.N.Y. 2005) (stale evidence did not establish probable cause where police investigation found "nothing to corroborate any 'pattern of continuing criminal activity'") (quoting *Wagner*, 989 F.2d at 75).

Because of the lack of evidence of continuing "criminal" activity by Alavi or any other reason to believe that evidence of criminal activity by *anyone* would be found at Alavi's offices or in its computer records, the application failed to establish probable cause for the December 19, 2008 search.  Accordingly, and "notwithstanding the deference that magistrates deserve," *Leon*, 468 U.S. at 915, the search warrant must be invalidated and evidence suppressed

19

because the application did not provide the Magistrate Judge with a sufficient basis for determining probable cause to believe that evidence of a crime would be uncovered.

### C.    The Warrant Application Is Also Insufficient to Establish Probable Cause Because It Relies On Conclusory Allegations Rather Than Reliable Facts

Aside from its failure to set forth evidence to support probable cause for the December 19, 2008 search, the warrant application is fatally flawed because it consists almost entirely of unsubstantiated allegations, rather than facts grounded in Agent Ennis' personal knowledge.  To support probable cause, an application must establish the veracity and basis of knowledge of the person supplying the information so that the warrant does not become "a mere ratification of the bare conclusions of others."  *Gates*, 462 U.S. at 238, 239; *see also Travisano*, 724 F.2d at 345 (facts in an affidavit must be reliable as well as adequate to make out probable cause).  Probable cause cannot be made out by "affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based."  *Ventresca*, 380 U.S. at 102, 108-109.

The warrant application in this case consists of a bare-bones affidavit by Agent Ennis accompanied by a civil forfeiture complaint that primarily addresses conduct by Assa and Bank Melli, *i.e.*, entities other than the one whose offices were searched.  The Ennis Affidavit is replete with conclusory allegations, but does not cite documents, testimony, or personal observations to support these allegations.  In describing the Government investigation and the basis for probable cause, the Ennis Affidavit does not reference a single witness's testimony or interview, and does not offer a single citation to a document or thing to support any of its assertions regarding the Foundation's activities.  (*See* Ennis Aff. ¶¶ 4-5.)

20

The Assa Complaint provides substantial detail concerning *Assa*, but contains only conclusory allegations regarding *the Foundation*. (*See* Assa Compl. ¶¶ 18-22.) It does not cite any document, testimony, or personal observation to support its allegations regarding the Foundation or the Foundation's relationship with Assa or Bank Melli.[6] (*See id.*). Therefore, unless Agent Ennis was the sole source of all the information in the Assa Complaint, it is clear that some or all of the assertions in the warrant application are hearsay. But hearsay cannot be used to support probable cause in a warrant application unless "a substantial basis for crediting that hearsay is presented." *Gates*, 462 U.S. at 241-42; *see also Wagner*, 989 F.2d at 72 (affidavit must permit the magistrate to assess "the veracity and basis of knowledge of persons supplying hearsay information"). The warrant application offers no reason, apart from Agent Ennis' say-so, to credit any of the allegations in the Assa Complaint, and Agent Ennis' mere suspicion, belief, or speculation is not sufficient to establish probable cause.[7]

This case is reminiscent of a case before this Court only a few years ago, *In re Extradition of Ben-Dak*, in which the court held that an affidavit that was "simply . . . an account of criminal conduct, without citations, sources or references" could not establish probable cause because there was no indication "which factual allegations are based on [the affiant's] personal knowledge, which are based on the personal knowledge of some other individual, and which are

---

[6] While it is true that Agent Ennis, the warrant affiant, verified the Complaint by attesting that its contents were "true to the best of his knowledge, information, and belief," *see* Compl., such a verification does not establish the *basis* for his knowledge that any particular allegation in the Complaint was true or correct. *See Nathanson v. United States*, 290 U.S. 41, 44, 46 (1933) (rejecting warrant issued upon sworn allegation that the affiant "has cause to suspect and does believe" that merchandise was in a specified location because "a mere affirmation of suspicion and belief without any statement of adequate supporting facts" is insufficient to support probable cause); *Gates*, 462 U.S. at 239 (affiant's conclusory statements based upon information and belief insufficient to establish probable cause).

[7] Under clear Supreme Court precedent detailed above, only information actually disclosed to the magistrate judge at the time of the warrant application may be considered by a reviewing court in assessing probable cause. It is irrelevant to this analysis what the search yielded, as well as what other evidence in support of probable cause the affiant may have possessed at the time of the application. *Whiteley*, 401 U.S. at 565 n.8

merely conjecture." 2008 U.S. Dist. LEXIS 29460, at *16 (S.D.N.Y. Apr. 11, 2008). Similarly,

the warrant application here provided no basis for Magistrate Judge Katz to determine whether

the allegations regarding the Foundation or the location of evidence of wrongdoing were based

on Agent Ennis's personal knowledge, the personal knowledge of some other individual,

documents viewed by Agent Ennis, documents viewed by another investigator or attorney,

hearsay testimony from individuals with or without knowledge of alleged transactions, or merely

the conjectural assertions of Agent Ennis or the attorneys who drafted the warrant application.

Accordingly, the statements in the Ennis Affidavit and the entire warrant application are too

unreliable to establish probable cause to search the Foundation's offices or its computer records.

## II.   The Search Warrant Violates the Fourth Amendment Because It Lacks Particularity And Improperly Authorizes an Overbroad Seizure of Documents and Electronic Media

In addition to the flaws in the underlying application, the search warrant in this

case is facially deficient because it does not "particularly describ[e]" the items to be seized. U.S.

Const. Amend. IV. The Fourth Amendment particularity requirement guards against "wide-

ranging exploratory searches," *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), by requiring

warrants to clearly identify the proper objects subject to seizure, *United States v. George*, 975

F.2d 72, 75 (2d Cir. 1992). Here, the warrant does not describe the suspected violation for which

evidence was being sought, nor does the warrant limit the seizure to specific types of records,

relying instead on catch-all provisions that allowed the agents to seize virtually anything found in

the Foundation's offices or in its computers or other electronic storage devices. Finally, despite

the fact that the only Foundation-related transaction described in the Ennis Affidavit and the

Assa Complaint was initiated and consummated in 1989, the warrant contains no limit on the

temporal scope of documents to be seized. For these reasons, the warrant violates the

particularity requirement of the Fourth Amendment.

**A.      The Warrant Completely Fails to Identify The Crime for Which the Search Was Being Undertaken**

One of the most basic requirements of the particularity rule is that the warrant must limit the search by reference to the specific crimes alleged:  "[I]t is obvious that a general warrant authorizing the seizure of 'evidence' without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment. . . . [A] warrant not limited in scope to *any crime at all* is . . . unconstitutionally broad."  *See George*, 975 F.2d at 77 (emphasis in original); *United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993) (warrant lacked particularity where it did not describe "the possible crimes involved"); *United States v. Cioffi*, 668 F. Supp. 2d 385, 392 (E.D.N.Y. 2009) (describing the requirement that the warrant identify the alleged crime as "one form of particularity whose absence the Second Circuit has unequivocally and unqualifiedly condemned").

Under the Supreme Court's decision in *Groh v. Ramirez*, the particularized description of items, including the description of the alleged crimes, must appear in either (1) the warrant itself or (2) in a supporting application if "the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant."  540 U.S. 551, 557-58 (2004).  This rule is necessary to prevent general searches, because "unless the particular items described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit."  *Id.* at 560.  The Second Circuit has explained that an attached affidavit will be properly incorporated into a warrant under *Groh* if the warrant contains "deliberate and unequivocal language of incorporation."  *United States v. Waker*, 534 F.3d 168, 172, 173 n.2 (2d Cir. 2008) (affidavit properly incorporated where warrant stated that the affidavit "is

incorporated herein by reference," and magistrate also "initialed the [relevant] portion of the

attached affidavit"); *see also United States v. Cohan*, 628 F. Supp. 2d 355, 363 (E.D.N.Y. 2009)

(discussing application of *Groh* to rule that warrant must state the alleged crime); *Cioffi*, 668

F. Supp. 2d at 393-96 (same).

   The warrant in this case is a boilerplate form, and does *not* identify the crimes to

which the seized documents relate.  (*See* Warrant.)  The only document incorporated by

reference is Exhibit A, the list of "Items To Be Seized At the Premises."  This list is cross-

referenced in the warrant via the following statement: "In the Southern District of New York,

*there is now being concealed property, namely* [SEE ATTACHMENT] and as I am satisfied that

there is probable cause to believe that *the property so described* is being concealed on the person

or premises above-described . . . ."  (*Id.* (emphasis added).)  Exhibit A does not identify any

alleged crime, much less limit the documents to be seized to those containing evidence of the

crimes listed in the Ennis Affidavit or Assa Complaint.  (*See* Ennis Aff., Ex. A.)  Although the

warrant makes a passing reference to "the supporting affidavit(s)," no other document besides

Exhibit A is explicitly incorporated into the warrant.  This approach is insufficient under

governing Supreme Court and Second Circuit precedent.  *See Cohan*, 628 F. Supp. 2d 355, 363

("[I]n light of *Groh* and *Waker,* the Government cannot rely on language in a warrant simply

referencing the underlying affidavit to satisfy the particularity prong of the Fourth Amendment;

rather, it must attach the affidavit to the warrant and incorporate it by reference using deliberate

and unequivocal language.") (internal quotation omitted).

   The *Cioffi* court rejected a nearly identical search warrant for failing to limit a

document search to evidence of particular crimes.  Like the warrant in this case, the *Cioffi*

warrant did not identify the alleged crimes and contained only "a boilerplate statement reflecting

the magistrate judge's 'satisf[action] that the affidavit(s) and any recorded testimony establish

probable cause to believe that the person or property . . . described is now concealed on the . . .

premises above-described and establish grounds for the issuance of this warrant.'" *Cioffi*, 668

F. Supp. 2d at 388.  The only document explicitly incorporated into the warrant by reference was

a list of emails to be seized, which lacked any provision "limiting the emails to be seized to those

containing evidence of the crimes charged in the indictment or, indeed, of any crime at all." *Id*.

at 389.  Because the warrant did not limit the seizure to documents containing evidence of crimes

or attach and incorporate the affidavit describing the alleged crimes, the court held the warrant

unconstitutional under *George*.  *Id*. at 396.  Accordingly, the court suppressed the seized

evidence.  The warrant in this case is functionally indistinguishable from the warrant in *Cioffi*,

and requires a similar remedy.

      Moreover, the harm caused by the deficient warrant in this case is not speculative

or a mere matter of form.  Based on the improper warrant authorization, the searching agents

seized every item listed in Exhibit A, regardless of whether the items constituted evidence of a

violation of IEEPA, the ITRs, or any other statute.  These items included, among other things, *all*

of the Foundation's financial and employment records and *all* of its computers and data-storage

devices, without limitation.  (*See* Ennis Aff., Ex. A).  Because the warrant lacked any language

confining the search and seizure to evidence of specific crimes or alleged violations, it gave

government agents carte blanche to engage in an extended, exploratory rummaging of the

Foundation's belongings—*i.e.*, the precise evil that the Fourth Amendment is intended to

prevent.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

**B.    The Warrant Does Not Particularly Identify the Documents To Be Seized And Instead Relies on Overly-Broad Catch-All Provisions**

The search warrant is insufficiently particular for the additional reason that it authorizes a wholesale seizure and search of Alavi's computer storage devices, without particularly identifying the categories of files or information sought.  The law is clear that "when the government seeks to seize the information stored on a computer . . . that underlying information must be identified with particularity and its seizure independently supported by probable cause."  *United States v. Vilar*, 2007 U.S. Dist. LEXIS 26993, at *117 (S.D.N.Y., April 4, 2007); *see also United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) ("[W]arrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material."); *United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999) (warrant to seize evidence stored on a computer should specify "which type of files are sought."); *United States v. Hunter,* 13 F. Supp. 2d 574, 584-85 (D. Vt. 1998) (invalidating warrant to seize "[a]ll computers" for failure to identify with particularity the underlying information to be seized).  This requirement simply applies the general rule that a warrant may not rely on a catch-all paragraph authorizing the seizure of "'any or all records' of a particular type."  *Vilar*, 2007 U.S. Dist. LEXIS 26993, at *67 (collecting cases).

The warrant authorizing the search of the Foundation's offices permitted the seizure of "[a]ny and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMS, hard disks, floppy disks; and related or connected computer or data storage equipment."  (Ennis Aff., Ex. A.)  Although the warrant application makes clear that the agents would search the data contained in these materials (*see* Ennis Aff, Ex. C), the warrant does not limit this search to particular types of files.  As a result, the warrant improperly gave the

FBI license to comb through all of the data contained on the Foundation's computers and servers, from personal email of the Foundation's employees to donor information to privileged attorney-client communications, regardless of its relevance to the criminal investigation. *See United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (warrant authorizing seizure of "any and all information and/or data" fails the particularity requirement); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (warrant for computers and diskettes with no probable cause limitation on which files could be seized was a general warrant); *Riccardi,* 405 F.3d at 862-63 (computer search warrant that "permitted the officers to search for anything-from child pornography to tax returns to private correspondence," was "precisely the kind of wide-ranging exploratory search that the Framers intended to prohibit") (internal quotations omitted).  A warrant to seize all data-storage devices on the premises, without limitation, is equivalent to a warrant to seize all paper documents on the premises, regardless of type or relevance.  *Cf. Bianco,* 998 F.2d at 1115 (warrant lacked particularity where it authorized the seizure of all "Notes, Ledgers, Envelopes, Papers, and Records Containing Initials, Names, Addresses, Dollar Amounts, Codes, Figures, and the Like; United States Currency"); *United States v. Hickey,* 16 F. Supp. 2d 223, 240 (E.D.N.Y. 1998) (warrant lacked particularity where it directed seizure of "all business records").  Accordingly, all electronic data seized from the computers and data-storage equipment on the Foundation's premises should be suppressed as the fruits of an invalid warrant.

### C.    The Warrant Is Unconstitutionally Overbroad Because It Lacks Any Temporal Limitation

The search warrant is also unconstitutionally overbroad because it authorizes search and seizure of documents that pre-date and post-date the 1989 Partnership Transaction

between the Foundation and Assa.[8]  Where, as here, the conduct under investigation was a one-

time transaction in 1989, a warrant must impose a corresponding and reasonable date limitation

to avoid authorizing searches and seizures for which there is no probable cause.  *See United*

*States v. Abboud,* 438 F.3d 554, 576 (6th Cir. 2006) (stating that "[f]ailure to limit broad

descriptive terms by relevant dates, when such dates are available to the police, will render a

warrant overbroad" and holding that "all evidence seized irrelevant to the three-month period

[for which probable cause existed] should have been suppressed"); *Kow,* 58 F.3d at 427 (finding

warrant overbroad where government "did not limit the scope of the seizure to a time frame

within which the suspected criminal activity took place" and invalidating entire search); *United*

*States v. Diaz,* 841 F.2d 1, 4–5 (1st Cir. 1988) (warrant overbroad because it "included

permission to seize records . . . [before the date] when the first instance of wrongdoing

mentioned in the affidavit occurred").

        As outlined above, the only material allegations regarding the Foundation in the

warrant application are limited to the 1989 Partnership Transaction.  The Ennis Affidavit

indicates that the Government's investigation of the Foundation was limited to "a 1989

transaction involving 650 Fifth Avenue, New York, New York . . . ." (Ennis Aff., ¶ 4).  But the

warrant itself contains no time-frame limitation, thereby permitting the arbitrary seizure of

records dating from the Foundation's formation as a not-for-profit corporation in the 1970s all

the way into the present.[9]  Unsurprisingly, the agents in this case did in fact seize and search all

---

[8] As the Ninth Circuit has explained, the specificity requirement of the Fourth Amendment "has two
aspects:  particularity and breadth. Particularity is the requirement that the warrant must clearly state what
is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable
cause on which the warrant is based." *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006).

[9] Even if the Government were to argue it was searching for evidence of Assa's crimes, that would still
not cure the lack of a temporal limitation in the warrant.  Assa's alleged criminal activity – providing
services to Iran in contravention of the ITRs *see* Assa Compl. ¶ 17 – only became illegal in 1995 when
the ITRs were promulgated, *see id.* ¶¶ 7-14.  *See Kow*, 58 F.3d at 427 (warrant must "limit the scope of

of the Foundation's hard-copy and computer records, regardless of their dates.  The resulting

prejudice is evident from the subsequent amendment to the Assa Complaint, which relies in part

on documents believed to have been seized from the Foundation's files dating as far back as

1981 (*see* Alavi Compl. ¶ 29) and as recently as October 2007 (*see id.* ¶¶ 68-74).

### III.    The Government's Execution of the Search and Seizure Was Unreasonable and Violated the Fourth Amendment

As set forth above, the search warrant in this case lacked probable cause, failed to

particularly identify the items to be seized, and authorized an overbroad seizure.  The

Government, armed with such a sweeping search warrant, might have been expected to abide by

its terms and to tailor its off-site search to avoid unnecessary review of irrelevant private

documents.  But it is clear from the documents returned to the Foundation that the Government

ignored the whatever limitations that existed in the warrant and indiscriminately seized almost all

of the Foundation's papers and electronic records for plenary search and review.  Almost four-

and-a-half years later, the Government is still holding those records, and still has not provided

information to the Foundation or its counsel what steps, if any, were taken to minimize its review

of irrelevant or privileged materials.  As a result, even if this Court were to determine that the

warrant were valid, any evidence seized in the December 19, 2008 search outside of the scope of

the warrant should be suppressed.

### A.    The Government's Seizure Exceeded the Scope of the Warrant

The Supreme Court has recognized that "a seizure lawful at its inception can

nevertheless violate the Fourth Amendment because its manner of execution unreasonably

infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable

---

the seizure to a time frame within which the suspected criminal activity took place")); *Diaz,* 841 F.2d at 4–5 (warrant overbroad because it "included permission to seize records . . . [before the date] when the first instance of wrongdoing mentioned in the affidavit occurred").

seizures.'"  *United States v. Jacobsen*, 466 U.S. 109, 124-125 (1984).   Thus, even when agents

obtain a lawful search warrant, their search "must be confined to the terms and limitations of the

warrant authorizing it."  *United States v. Matias,* 836 F.2d 744, 747 (2d Cir. 1988); *see also*

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n. 7

(1971) ("[T]he Fourth Amendment confines an officer executing a search warrant strictly within

the bounds set by the warrant."); *United States v. Dzialak*, 441 F.2d 212, 216-17 (2d Cir. 1971)

(reversing conviction based on evidence outside the warrant's scope).

       The searching officers in this case blatantly disregarded even the very minimal

limitations set forth in the search warrant.  The warrant authorized seizure of (1) documents

concerning "the ownership of, rental of, mortgaging of, or investing in" Assa, Assa Company

Ltd, the Fifth Avenue Company, 650 Fifth Avenue, or Bank Melli; (2) financial documents

concerning these entities, the Foundation, and their officers and employees; and (3) the

Foundation's computers and data storage equipment.  (*See* Ennis Aff., Ex. A.)  Instead of abiding

by these generous limits, the searching agents carried off virtually all of the Foundation's hard-

copy files—nearly 200 boxes—containing all of the Foundation's records going back to  the

1970s.  The vast majority of these records concern the Foundation's charitable programs and

day-to-day operations, and are not covered by the warrant or relevant to the 1989 Partnership

Transaction.  The Government has been picking over these private documents for the last four-

and-a-half years without oversight or restraint.

       The Government cannot justify this wholesale seizure by exigency or the need to

separate intermingled relevant and irrelevant documents.  The Foundation maintained meticulous

and well-organized hard-copy records.  At the time of the search, the documents in the

Foundation's file folders and cabinets were arranged in hanging file folders, each of which was

labeled with a clear and accurate description of the folder's contents.  Older records were kept in

boxes that also bore descriptive labels.  (Ruzumna Decl. ¶ 5.)  The searching agents, therefore,

could have easily segregated relevant and irrelevant evidence at the time of the seizure.  Instead,

the Government appears to have seized every box, folder, and document the FBI agents could lay

their hands on, in the hope of uncovering criminal evidence through subsequent unconstrained

searches at a time and place of their choosing.  Indeed, the FBI's search and seizure was so

comprehensive and indiscriminate that, four-and-a-half years later, the Government still has not

returned all irrelevant evidence.  (*See* Ruzumna Decl. Ex. N, McReynolds Dep. 92-94,

6/28/2013).

   As a result of its indiscriminate seizure, the Government took possession of

obviously irrelevant documentation about university educational programs, student loan

programs, the Foundation's 401(k) and pension plans, utilities bills and records, transit checks,

health insurance and dental expense plan records, asbestos survey reports, and even a folder

marked "2007 Christmas Cards," among other things.  (Ruzumna Decl. ¶6.)  The FBI also seized

scores of clearly marked  folders containing information about the U.S.-based mosques and

Islamic cultural centers that have interacted with the Foundation in the past.  (*Id*.)  The

Government also seized personal files and diaries—documents that are at the core of the Fourth

Amendment's protections.  (*Id*.)

   It is therefore clear that the court must, at a minimum, "suppress and order the

prompt return" of items beyond the scope of the warrant.  *United States v. Debbi*, 244

F. Supp. 2d 235, 238 (S.D.N.Y. 2003).  But the Government's blatant and extreme disregard of

the warrant terms in this case strongly suggests that the Government used the search

authorization as a pretext for a fishing expedition through the Foundation's private property.

Such willful disregard would require complete suppression of all seized items.  *See United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000) (suppression of all items seized pursuant to a valid warrant appropriate where the search "greatly exceeds the bounds of a warrant" and "is not conducted in good faith").  The evidence seized in the search should be suppressed.  At a minimum, the Foundation is entitled to an evidentiary hearing to determine whether the Government's failure to comply with the warrant and its subsequent four-and-a-half year retention and search of documents it should never have seized constitutes bad faith.  *See Debbi*, 244 F. Supp. 2d at 238 (ordering evidentiary hearing on whether to suppress all items where Government seized documents beyond scope of the warrant, "pick[ed] over them for months thereafter without determining which were actually evidence of the alleged crimes, and . . . refrain[ed] from returning what it was never entitled to seize").

B.    **The Government's Search of the Seized Materials is Unreasonable Because the Government Has Not Taken Steps to Minimize its Intrusive Review of Privileged Material**

In addition to wrongfully seizing documents outside the scope of the warrant, the Government failed to take necessary precautionary measures during its subsequent search of those documents for the purpose of minimizing its exposure to irrelevant or privileged material. The Supreme Court has recognized that "there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). Accordingly, Government agents "must take care to assure that [document searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.* Although the Government is not generally required to obtain *ex ante* approval of its search methods in a warrant, the manner in which the government executes a search "will always be subject to a subsequent reasonableness review." *Vilar*, 2007 U.S. Dist.

32

LEXIS 26993, at *1123; *see also United States v. Hill*, 459 F.3d 966, 978 (9th Cir. 2006) ("The reasonableness of the officer's acts both in executing the warrant and in performing a subsequent search of seized materials remains subject to judicial review.").

In this case, the Court should find, or at least order a hearing to consider, whether the Government's indiscriminate four-and-a-half year retention and review of the majority of the Foundation's paper records from the time of its incorporation to the present, as well as of every document, email, and file on the Foundation's server and its computers, were "reasonable" means to search for evidence of the allegedly improper conduct outline in the warrant application.  In particular, the Government does not appear to have taken any steps, as it was required to do under the Fourth Amendment, to minimize its review and use of documents that are either irrelevant or outside the scope of the warrant.  *See United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir. 1986) (discussing Fourth Amendment minimization requirement); *United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 1006 (9th Cir. 2009) (discussing minimization requirement in computer-search context and holding that "[s]egregation and redaction must be either done by specialized personnel or an independent third party . . . .  The government's search protocol must be designed to uncover only the information for which it has probable cause, and only that information may be examined by the case agents.").  The need to minimize the intrusiveness of a document search is particularly acute where, as here, the searching agents have been rummaging through the Foundation's private records "unencumbered by the type of time pressures attendant to doing a search of a physical premises." *Vilar*, 2007 U.S. Dist. LEXIS 26993, at *114; *see also United States v. Torres*, 751 F.2d 875, 884 (7th Cir. 1984) (Posner, J.) (distinguishing ongoing search from a conventional search, in which "the police go through a home or an office looking for contraband or evidence of a crime, and they

33

either find what they are looking for or not, and then they leave," and where "much of what they examine may be at once personal and irrelevant to the objective of the search, but the search is usually brief").

There is strong evidence that that the Government has been searching the Foundation's paper records in an unreasonable and overly intrusive manner.   In several instances, the Government has returned copies of seized Foundation documents that contain evidence, *e.g.*, post-it notes, indicating that agents have reviewed documents that are obviously irrelevant or privileged on their face.  (*See*, *e.g.*, Ruzumna Decl. ¶¶ 8-12.)  Similarly, there is no indication, either in the warrant application or in subsequent correspondence with the Government, that the agents have taken any steps to limit their exposure to computer records unrelated to the alleged "tax avoidance scheme," if one can call it that, described in the warrant application.  *Cf. United States v. Hunter*, 13 F. Supp. 2d 574, 583 (D. Vt. 1998) (upholding search where warrant application "included a detailed set of instructions to the searching agents, to the AUSA, and to computer analysts, all designed to limit invasion of confidential or privileged or irrelevant material"); *United States v. D'Amico*, 734 F. Supp. 2d 321, 358, 367 (S.D.N.Y. 2010) (approving computer search conducted according to minimization protocol set forth in warrant application).  Accordingly, the Court should hold a hearing to determine what steps, if any, the Government took to "reasonably" limit its review and dissemination of Foundation materials that were not covered by the scope of the warrant.

**C.    The Government's Search is Unreasonable Because the Government Has Recklessly Violated the Attorney-Client Privilege**

The Government's post-seizure search of the Foundation's documents has also been unreasonable because the Government has been substantively reviewing attorney-client privileged communications, and has taken minimal steps to limit its exposure to, or distribution

34

of, privileged communications.  The Government was on notice at the time of the warrant that the evidence it sought would include a large number of documents covered by the attorney-client privilege.  The primary, if not sole basis purportedly justifying the search—*i.e.*, the 1989 Partnership Transaction—is almost necessarily the type of transaction that would be structured and reviewed by attorneys.  Further, it was to be expected that a search and seizure of nearly all of the Foundation's hard copy and electronic records going back to the date of its incorporation would include documents subject to the attorney-client privilege and work product doctrine.  In such situations, the proper procedure is for the Government to segregate possibly privileged documents and appoint a "taint team" of agents or Assistant United States Attorneys who are not involved in the trial to conduct a substantive review.  *See, e.g.*, *United States v. Grant*, 2004 U.S. Dist. LEXIS 9462, at *2-3 (S.D.N.Y. May 25, 2004); *United States v. Winters*, 2006 U.S. Dist. LEXIS 70488, at *5 (S.D.N.Y. Sept. 27, 2006).  Indeed, some courts have held that even a privilege team represents too great a threat to the privilege, and have required that screening be done by a special master or judge.  *See United States v. Stewart*, 2002 U.S. Dist. LEXIS 10530, (S.D.N.Y. June 11, 2002) (collecting cases).

Based on recently-taken depositions, a taint team of agents appears to have been first established sometime in 2012, *i.e.* years after the evidence was seized and after the majority of it had been reviewed.  The Government's "taint team" procedures have not prevented the agents assigned to the case from reviewing privileged documents, annotating them, and sharing them with other federal agencies.  (See Ruzumna Decl.  ¶¶ 7-14, & Exs. D-H, K.)  The Government has not responded to multiple requests to better protect the Foundation's privileges and to report back information regarding what steps were being taken to do so.  Indeed, the Foundation has provided the Government with privilege logs, cited numerous examples of

35

privileged documents contained in the Government's production, provided lists of diary pages to be redacted, and continually reminded the Government of its obligation to install a taint team and stop reviewing privileged materials.  (*Id*. Exs. G-L.)  Nonetheless, examples of the Government's inappropriate search methods continued to come to light.  (*See*, *e.g.*, *id.* Ex. L (August 22, 2012 e-mail from Alavi counsel detailing discovery of government notes on privileged material).)

       The searching agents' wholesale disregard for the one of "the oldest and most established evidentiary privileges known to our law," *United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313, 2318 (2011), is plainly unreasonable.  Moreover, the agents' exposure to privileged communications—and apparently long-term exposure—raises the issue of whether they, and perhaps others who deliberately accessed privileged materials of an opponent, should be disqualified from this case.  *See United States v. (Under Seal)*, 757 F.2d 600 (4th Cir. 1985); *United States v. Horn*, 811 F. Supp. 739, 752 (D.N.H. 1992); *Richards v. Jain*, 168 F.Supp.2d 1195 (W.D. Wash. 2001).  Accordingly, the Court should conduct a hearing to explore the degree to which the agents and attorneys have reviewed, used, and disseminated the Foundation's privileged communications.

## IV.    The Government Would Not Have "Inevitably Discovered" the Seized Evidence

       The Government may argue that neither the evidence unlawfully seized from Alavi nor the evidence obtained as a result of the Government's review of those documents should be suppressed because it would have been "inevitably discovered" as a result of a grand jury subpoena served on the Foundation two days before the search warrant was executed.  Any such argument fails because the Government cannot provide this Court with sufficient proof that each contingency necessary for it to obtain Alavi's paper and electronic records would have been resolved in its favor.

A.    **Inevitable Discovery Standard**

The Court may admit illegally seized evidence if the Government can prove that "the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55, 58 n.6 (2d Cir. 2006). This inquiry requires a court "to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) ("*Eng II*") (emphasis in original). The lawful discovery of any particular piece of evidence will be deemed "inevitable" *only* where a court finds "with a high level of confidence . . . that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Heath*, 455 F.3d at 60. The Government may not rely on "speculative elements" to satisfy this burden, but must instead adduce "demonstrated historical facts capable of ready verification or impeachment." *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) ("*Eng I*") (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

Where the Government attempts to use its subpoena power as a means to prove inevitable discovery, the Second Circuit has cautioned the district courts to exercise "special care" to "prevent the inevitable discovery exception from swallowing the exclusionary rule." *Eng I*, 971 F.2d at 860. A subpoena issued contemporaneously with an unlawful search may not be used to "validate [the] unlawful search under the inevitable discovery doctrine," and the Government may not rely on general assertions that the unlawfully seized materials would have been produced in response to the subpoena. Instead, with regard to "each particular piece of evidence" that the Government asserts would have been inevitably discovered, the district court must "specifically analyze and explain how, if at all, discovery of that piece of evidence would

37

have been more likely than not inevitable absent the [unlawful] search." *Eng I*, 971 F.2d at 862

(citing *Nix,* 467 U.S. at 444) (internal quotation marks omitted).

### B.   The Government Has Not Established That the Discovery of Each Piece of Seized Evidence was Inevitable

As a threshold matter, the Government cannot establish that any document not

specifically within the scope of the subpoena would have been inevitably discovered.  The grand

jury subpoena served on the Foundation sought only post-1988 documents relating or referring to

Assa, Bank Melli, and the 650 Fifth Avenue Company.  (Ruzumna Decl. Ex. A (Subpoena).)

Indeed, the subpoena expressly limited the required production to documents "from January 1,

1989 to the present."  (*Id.*).  The December 19, 2008 search warrant, by contrast, authorized the

Government to seize essentially all of Alavi's financial documents and all of its computers,

digital media, and electronic files, regardless of whether those records bore any connection to

Assa or Bank Melli or predated the 1989 Partnership Transaction.  (Ennis Aff. Ex. A.)  The

Government therefore may not claim that it would have obtained—much less "inevitably"

obtained—financial records, ledgers, bank account information, meeting minutes, employee

records, correspondence, and other documents pertaining solely to Alavi, or any documents

predating 1989.

Even with respect to documents within the subpoena's scope, the Government has

the burden of establishing that "a response to the subpoena producing the evidence" it requested

was inevitable.  *Eng I*, 971 F.2d at 860.  As the Second Circuit has observed in the inevitable-

discovery context, "[t]he mere fact that the government serves a subpoena . . . does not mean that

it will obtain the documents it requests.  A subpoena can be invalid for a variety of reasons, as

when it is unduly burdensome, when it violates the right against self-incrimination, or when it

calls for privileged documents."  *United States v. Roberts*, 852 F.2d 671, 676 (internal citations

omitted).  The Government has not demonstrated and cannot demonstrate that "each particular piece of evidence" it seized, *Eng I*, 971 F.2d at 862, could not have been properly withheld from production by Alavi. Specifically, the Government would not have "inevitably discovered" privileged communications with counsel.

Accordingly, the Court should suppress all documents seized from the Foundation's offices except those that the Government can specifically prove would have been inevitably discovered.  The Government should not be permitted to use at trial any record from the seizure unless it can establish, based on demonstrated historical facts capable of ready verification or impeachment, a high level of confidence that each of the contingencies necessary to the legal discovery of the particular record would be resolved in the government's favor.  *See Heath*, 455 F.3d at 60; *Eng I*, 971 F.2d at 859.  The Court must also suppress all evidence derived from the Government's review of unlawfully seized documents and records that would not have been inevitably discovered.  Accordingly, the Foundation is entitled to a hearing to determine the extent to which additional evidence obtained by the Government after the search is "tainted" by the unlawful search. *Nardone v. United States*, 308 U.S. 338, 341 (1939); *Alderman v. United States*, 394 U.S. 165, 183-84 (1969); *United States v. Vilar*, 530 F. Supp. 2d 616, 641-42 (S.D.N.Y. 2008).[10]

## CONCLUSION

For the foregoing reasons, Alavi respectfully requests that this Court suppress all evidence seized pursuant to the December 19, 2008 search warrant and all evidence constituting the "fruits" of the Government's unlawful search.  Alavi also requests that the Court hold a hearing to determine (1) the extent to which, if any, Government agents and attorneys improperly

---

[10] The Foundation intends to seek limited disclosures from the Government concerning the scope of its use of the seized materials and information contained therein.

reviewed privileged information belonging to the Foundation and, if so, what constitutes an

appropriate remedy; and (2) the extent to which evidence obtained by the Government after

December 19, 2008, was tainted by the Government's unlawful search.

Dated:     July 1, 2013

By: ___/s/ Daniel S. Ruzumna_____
        Daniel S. Ruzumna
        Sean H. Murray
        Melissa Ginsberg
        PATTERSON BELKNAP WEBB & TYLER LLP
        1133 Avenue of the Americas
        New York, New York  10036-6710
        Telephone:  (212) 336-2000
        Facsimile:  (212) 336-2222
        Email: druzumna@pbwt.com
        Email: smurray@pbwt.com
        Email: mginsberg@pbwt.com
        Email: mcolitigation@pbwt.com

        *Attorneys for Claimants Alavi Foundation
        and 650 Fifth Avenue Company*

# SEARCH WARRANT

DEC-19-2008  12:37        ALAVI FOUNDATION                                    P.02/02

AO
(Rev.
8/97)

## SEARCH WARRANT ON WRITTEN AFFIDAVIT

| **United States District Court** | DISTRICT |
|---|---|
| | SOUTHERN DISTRICT OF NEW YORK |
| **UNITED STATES OF AMERICA** <br> v. | DOCKET NO: **08 MAG 2789** |
| PREMISES located at 500 FIFTH AVENUE, SUITE 2320, NEW YORK, NEW YORK AND 500 FIFTH AVENUE, FIRST LOWER LEVEL STORAGE AREA UNIT 25, NEW YORK, NEW YORK | TO: **SPECIAL AGENT GEORGE ENNIS OR ANY AUTHORIZED FEDERAL AGENT** |

Affidavit(s) having been made before me by Special Agent George Ennis that he has reason to believe that on the premises known as

**500 FIFTH AVENUE, SUITE 2320, NEW YORK, NEW YORK,  AND 500 FIFTH AVENUE, FIRST LOWER LEVEL, STORAGE AREA UNIT 25, NEW YORK, NEW YORK, and any closed or locked containers therein**

in the Southern District of New York, there is now being concealed property, namely

### SEE ATTACHMENT

and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the person or premises above-described and that the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit(s),

YOU ARE HEREBY COMMANDED to search on or before December 26, 2008 (not to exceed 10 days) , upon receipt by a person within the premises specified of the package described in the supporting affidavit,  the person or place named above for the property specified, serving this warrant and making the search (in the daytime — 6:00 A.M. to 10:00 P.M.) and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to <u>any U.S. Magistrate Judge</u>  as required by law.

| NAME OF AFFIANT | SIGNATURE OF JUDGE OR U.S. MAGISTRATE | DATE/TIME ISSUED |
|---|---|---|
| George J. Ennis, Jr. <br> Special Agent <br> Federal Bureau of Investigation | s/ *Theodore H. Katz* | DEC 1 9 2008 |

THEODORE H. KATZ
UNITED STATES    MAGISTRATE JUDGE

TOTAL P.02

## Exhibit A

### ITEMS TO BE SEIZED AT THE PREMISES

1. Any and all documents,[1] including contracts, memoranda of understanding, partnership agreements, incorporation documents, deeds, mortgages, loan documentation, rentals, leases, records of payment, e-mails, letters, memoranda, or other documents or records concerning or relating to the ownership of, rental of, mortgaging of, or investing in the following entities:

    a.  Assa Corporation
    b.  Assa Company Limited
    c.  650 Fifth Avenue Company
    d.  650 Fifth Avenue, New York, New York
    e.  Bank Melli Iran

2. Any and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of Assa Corporation; Assa Company Limited; 650 Fifth Avenue Company; Bank Melli Iran; the Alavi Foundation; or any of the officers and employees of these entities.

3. Any and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs, hard disks, floppy disks; and related or connected computer or data storage equipment.

---

[1]   As used herein, the term "documents" means any and all tangible forms of expression, in any language or format, including drafts or finished versions, originals, copies, or annotated copies, however created, produced or stored (manually, mechanically, electronically, electromagnetically, or otherwise), including without limitation: books, papers, files, writings, handwritten notes, typewritten notes, letters, correspondence, memoranda, notebooks, ledgers, term sheets, telexes, telefaxes, telephone message slips, tape recordings, magnetic tapes, digital recordings, electronic recordings, photographs, computerized records stored on computer hard-drives, computer disks, computer hard-drives, recorded telephone messages, recorded fax transmissions, electronic mail messages, voice mail messages, microform, and microfiche.

As used herein, "concerning" means relating to, referring to, describing, evidencing, or constituting.

# Affidavit of George J. Ennis in Support of Search Warrant

AO
(Rev. 8/97)                    AFFIDAVIT FOR SEARCH WARRANT

| United States District Court | DISTRICT<br>Southern District of New York |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>PREMISES KNOWN AND DESCRIBED AS | DOCKET NO.   **08 MAG   2789**   MAGISTRATE'S CASE NO. |
| PREMISES located at 500 FIFTH AVENUE, SUITE 2320, NEW YORK, NEW YORK,  AND 500 FIFTH AVENUE, FIRST LOWER LEVEL, STORAGE AREA UNIT 25, NEW YORK, NEW YORK | To:<br>Honorable Theodore H. Katz<br>United States Magistrate Judge |

The undersigned being duly sworn deposes and says: That he/she has reason to believe that

| ☐ on the person of | ☒ on the premises | DISTRICT   Southern District of New York |
|---|---|---|

PREMISES KNOWN AND DESCRIBED AS

500 FIFTH AVENUE, SUITE 2320, NEW YORK, NEW YORK,  AND 500 FIFTH AVENUE, FIRST LOWER
LEVEL, STORAGE AREA UNIT 25, NEW YORK, NEW YORK, and any closed or locked containers therein

The following property is concealed:


SEE ATTACHED AFFIDAVIT


Affiant alleges the following grounds for search and seizure[2]


SEE ATTACHED AFFIDAVIT


The attached affidavit which is incorporated as part of this affidavit for search warrant
Affiant states the following facts establishing the foregoing grounds for issuance of a
Search Warrant


SEE ATTACHED AFFIDAVIT

| SIGNATURE OF AFFIANT | OFFICIAL TITLE, IF ANY |
|---|---|
|  | George J. Ennis, Special Agent,<br>Federal Bureau of Investigation |

Sworn to before me, and subscribed in my presence:

| DEC 1 9 2008 | JUDGE' OR FEDERAL MAGISTRATE |
|---|---|

United States Judge or Judge of a State Court of Record.
If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show
reasonable cause therefor

THEODORE H. KATZ
UNITED STATES      MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    :
IN THE MATTER OF THE APPLICATION OF :   **TO BE FILED**
THE UNITED STATES OF AMERICA        :   **UNDER SEAL**
FOR SEARCH WARRANTS FOR THE PREMISES :
KNOWN AND DESCRIBED AS 500 FIFTH    :   AFFIDAVIT IN SUPPORT
AVENUE, SUITE 2320, AND 500 FIFTH   :   OF SEARCH WARRANT
AVENUE, FIRST LOWER LEVEL STORAGE   :
AREA UNIT 25, NEW YORK, NEW YORK; AND :
ANY CLOSED OR LOCKED CONTAINERS     :
THEREIN.                            :
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        GEORGE J. ENNIS, Jr., being duly sworn, deposes and says:

        1.   I am a Special Agent with the Federal Bureau of
Investigation ("FBI").  I have been so employed for over
seventeen years.  For the last two years, I have been assigned to
a group that focuses on terrorism financing.  As part of my
duties, I investigate material support of terrorism, money
laundering, and violations of the International Emergency
Economic Powers Act, among other crimes.  I have also
participated in executing approximately 30 search warrants.

        2.   I am familiar with the information contained in this
affidavit based on my review of documents, conversations I have
had with other individuals and law enforcement officers about
this matter, and my training and experience.  Because this
affidavit is being submitted for the limited purpose of
establishing probable cause to search the PREMISES described
below, I have not included herein the details of every aspect of

the investigation.  Where actions, conversations and statements
of others are related herein, they are related in substance and
in part, except where otherwise indicated.

3.    I respectfully submit this affidavit in support of an
application for a warrant to search the premises known and
described as: 500 Fifth Avenue, Suite 2320, New York, New York
("the Office Premises") and 500 Fifth Avenue, First Lower Level
Storage Area Unit 25, New York, New York, ("the Storage
Premises") as well as any closed or locked containers within
either (collectively, the "PREMISES"), and to seize the items set
forth in Exhibit A (attached hereto), which constitute evidence,
fruits, and/or instrumentalities of, among other crimes,
violations of the International Emergency Economic Powers Act
Title 50, United States Code, Sections 1701 through 1706, and
Title 31, Code of Federal Regulations, Section 595 et. seq., the
money laundering statutes, Title 18, Sections 1956 and 1957, and
the mail fraud, wire fraud, and related conspiracy statutes,
Title 18, United States Code, Sections 1341, 1343, and 1349

## THE INVESTIGATION

4.    The basis for this application for a search warrant is
information gathered in the course of an investigation by the FBI
("the Investigation") of: the Alavi Foundation ("Alavi"), a New
York-based non-profit; Assa Corporation ("Assa Corp."), a New
York corporate entity; Assa Company Limited ("Assa Co. Ltd."), a

-2-

SDNY-0733546

corporation domiciled in Jersey, Channel Islands, United Kingdom; and Bank Melli Iran ("Bank Melli"), an Iranian-chartered bank owned by the Government of Iran.  The Investigation concerns a 1989 transaction involving 650 Fifth Avenue, New York, New York, a Manhattan office tower ("the Building") which is largely filled by commercial tenants.  The Building was constructed in 1970s with a loan from Bank Melli to Alavi's predecessor organization. In 1989, in order to avoid a substantial anticipated tax liability, Alavi repaid its mortgage to Bank Melli by selling a 40% interest in the Building to Assa Corp., a subsidiary of Assa Co. Ltd., both of which were shell companies owned by Bank Melli. In 1999, the U.S. Treasury Department's Office of Foreign Asset Control identified Bank Melli and its offices worldwide as entities "owned or controlled by the Government of Iran."  31 C.F.R. Part 560, App. A.  Accordingly, Bank Melli is subject to the Iranian Transactions Regulations ("ITR"), Title 31 United States Code of Federal Regulations, Part 560, and Assa Co.'s interest in the Building and its rents is subject to civil forfeiture, as fully set forth in a Verified Complaint, <u>United States</u> v. <u>All Right, Title, and Interest of Assa Corporation, Assa Company Ltd., and Bank Melli Iran in 650 Fifth Avenue Company et al.</u>, 08 Civ. 10934 (RJH) ("the Verified Complaint"), filed on December 17, 2008, in United States District Court for the Southern District of New York, a complaint which I verified.

-3-

SDNY-0733547

The Verified Complaint is attached hereto as Exhibit B and is incorporated by reference herein.  It contains a fuller description of the investigation and the facts underlying the allegations in the Verified Complaint and which are the bases for this application.

5.   As the Verified Complaint sets forth, although the property and funds which are subject to forfeiture belong to Bank Melli and its related entities, the transactions underlying Bank Melli's acquisition of its interest in the Building was not an arms-length transaction with Alavi, but rather was structure both to evade Alavi's tax liability and to conceal Bank Melli's interest in the Building.  Accordingly, I submit that there is probable cause to believe that Alavi committed the same crimes alleged as a basis for the forfeiture sought in the Verified Complaint, and that Alavi and its directors, employees, and other agents, committed, conspired to commit, and aided and abetted the same violations by Alavi and Bank Melli, among others.

<u>THE PREMISES</u>

6.   Following service of the Verified Complaint and related notifications of administrative actions against Assa Corp. and Assa Ltd., other law enforcement agents and I conducted a series of interviews of Alavi directors, personnel, and agents.  Among others, we interviewed a portfolio manager (the "Portfolio Manager") for the real-estate management company that manages the

-4-

SDNY-0733548

Building on behalf of the 650 Fifth Avenue Company, which is owned by Alavi (60%) and Assa Corp. (40%).  The Portfolio Manager provided us with information concerning both the Storage Premises and the Office Premises.  With respect to the Storage Premises, the Portfolio Manager advised us that Alavi maintains a storage area in the basement of 500 Fifth Avenue, New York, New York, a building which houses the offices of Alavi; the Portfolio Manager stated the Storage Premises contains approximately 100 to 200 boxes and files dating back approximately 30 years containing records of Alavi and the 650 Fifth Avenue Company.  With respect to the Office Premises, the Portfolio Manager stated that lease agreements and various records for the Building were maintained in his own office at 500 Fifth Avenue, New York, New York, within the Office Premises, which is the Alavi office suite.

7.    Additionally, law enforcement agents interviewed the president of Alavi, who stated that he possesses records of Alavi dating back 30 years.  During the interview, which took place in the Office Premises, agents observed numerous file cabinets and other furniture that apparently contained files and records.

8.    I know from conversations with agents who have visited the Office Premises and the Storage Premises the following:

a.    The Office Premises is a suite of approximately four offices, a reception area, and a conference room on the 23rd floor of 500 Fifth Avenue, New York, New York.  500 Fifth Avenue

-5-

SDNY-0733549

is an office tower approximately 60 stories high located between 42nd and 43rd Streets.  The door to the Office Premises bears in gold lettering the suite number "2320" and "The Alavi Foundation."  Upon entering the Office Premises, there is reception area next to a hallway which contains several file cabinets and from which the individual offices are accessible.

b.     The Storage Premises is a locked storage area located on the first lower level of the basement of 500 Fifth Avenue, New York, New York.  It is within a basement containing multiple storage areas.  The Storage Premises is approximately 430 square feet.  Its black-painted door bears the number "25" scratched into the paint.

<u>REQUEST TO SEARCH THE PREMISES</u>

9.    Based on my experience and training, I know that businesses and organizations involved in commercial rental, investments, mortgages and real estate transactions routinely maintain on their premises extensive records and documents concerning the transaction in which they participate, records and documents that are of the kind listed in Exhibit A.  These records are likely to reveal important aspects and details of the crimes committed by Alavi and Assa Corp., among others, as well as the location of the substantial proceeds from these crimes. It is also possible that these documents and records will identify additional co-conspirators who have participated in the

-6-

SDNY-0733550

offense conduct with the targets of this investigation.  Based
upon all of the foregoing, I submit that there is probable cause
to believe that these documents and records will contain evidence
of the offense described above and that those records will be
found at the PREMISES.

10.  Based upon my training and experience, I also know that
office personnel frequently maintain, within closed and/or locked
cabinets, desks, briefcases, and other containers kept within
their places of business, custody of documents and records
relating to their mortgage business and other business
enterprises.  Based upon all of the foregoing, I submit that
there is probable cause to believe that these closed and/or
locked containers on the PREMISES will contain evidence of the
offense described above.

<u>Computer Searches</u>

11.  Based on my experience and training, as well as
information received from other law enforcement agents and
witnesses, I know that businesses involved in commercial rentals,
investments, mortgages and real estate transactions routinely use
computers and computer-related equipment.  Computers are
typically used to communicate with other parties through e-mail,
and to generate documents and recordings concerning leases, rent
receipts, and other aspects of transactions with tenants.  Based
on the foregoing, I believe there is probable cause to believe

-7-

SDNY-0733551

that the PREMISES likely contains: computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs, hard disks, floppy disks, all of which could contain or be used to transmit or store records, documents, and materials. Based upon all of the foregoing, I submit that there is probable cause to believe that any such computer equipment on the PREMISES will contain evidence of the offenses described above.

12. Specific methods to be employed relating to the search of any computer-related equipment at the PREMISES are described in Exhibit C hereto.

SDNY-0733552

WHEREFORE, I respectfully request that the Search Warrants sought herein issue pursuant to Rule 41 of the Federal Rules of Criminal Procedure, permitting authorized agents or officers to enter the PREMISES and therein to search for and seize the items listed in Exhibit A.


GEORGE J. ENNIS, Jr.
Special Agent
Federal Bureau of Investigation


Sworn to before me this
___ day of December, 2008


DEC 1 9 2008

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

THEODORE H. KATZ
UNITED STATES      MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-9-

# EXHIBIT A

SDNY-0733554

### Exhibit A

### ITEMS TO BE SEIZED AT THE PREMISES

1.   Any and all documents,[1] including contracts, memoranda of understanding, partnership agreements, incorporation documents, deeds, mortgages, loan documentation, rentals, leases, records of payment, e-mails, letters, memoranda, or other documents or records concerning or relating to the ownership of, rental of, mortgaging of, or investing in the following entities:

      a.   Assa Corporation
      b.   Assa Company Limited
      c.   650 Fifth Avenue Company
      d.   650 Fifth Avenue, New York, New York
      e.   Bank Melli Iran

2.   Any and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of Assa Corporation; Assa Company Limited; 650 Fifth Avenue Company; Bank Melli Iran; the Alavi Foundation; or any of the officers and employees of these entities.

3.   Any and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs, hard disks, floppy disks; and related or connected computer or data storage equipment.

--------------------

[1]   As used herein, the term "documents" means any and all tangible forms of expression, in any language or format, including drafts or finished versions, originals, copies, or annotated copies, however created, produced or stored (manually, mechanically, electronically, electromagnetically, or otherwise), including without limitation: books, papers, files, writings, handwritten notes, typewritten notes, letters, correspondence, memoranda, notebooks, ledgers, term sheets, telexes, telefaxes, telephone message slips, tape recordings, magnetic tapes, digital recordings, electronic recordings, photographs, computerized records stored on computer hard-drives, computer disks, computer hard-drives, recorded telephone messages, recorded fax transmissions, electronic mail messages, voice mail messages, microform, and microfiche.

As used herein, "concerning" means relating to, referring to, describing, evidencing, or constituting.

SDNY-0733555

# EXHIBIT B

SDNY-0733556

08 CIV 10934

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     ANNA E. ARREOLA
     HARRY A. CHERNOFF
     ERIC SNYDER
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2218/2481/2534

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                       :

          -v.-                                 :

ALL RIGHT, TITLE, AND INTEREST OF ASSA         :     08 Civ.
CORPORATION, ASSA COMPANY LIMITED, AND BANK
MELLI IRAN IN 650 FIFTH AVENUE COMPANY,        :
INCLUDING BUT NOT LIMITED TO THE REAL
PROPERTY AND APPURTENANCES LOCATED AT 650      :     **VERIFIED**
FIFTH AVENUE, NEW YORK, NEW YORK, WITH ALL           **COMPLAINT**
IMPROVEMENTS AND ATTACHMENTS THEREON,          :

ALL FUNDS FORMERLY ON DEPOSIT AT CITIBANK,     :
N.A., NEW YORK, NEW YORK, IN ACCOUNT NUMBER
78429712, IN THE NAME OF ASSA CORPORATION,     :
AND ALL FUNDS TRACEABLE THERETO,

                                               :

ALL FUNDS FORMERLY ON DEPOSIT AT CITIBANK,     :
N.A., NEW YORK, NEW YORK, IN ACCOUNT NUMBER
8881654552, IN THE NAME OF ASSA CORPORATION,   :
AND ALL FUNDS TRACEABLE THERETO,

ALL FUNDS FORMERLY ON DEPOSIT AT JPMORGAN      :
CHASE BANK, N.A., BATON ROUGE, LOUISIANA, IN
ACCOUNT NUMBER 2724409590, IN THE NAME OF      :
ASSA CORPORATION, AND ALL FUNDS TRACEABLE
THERETO, AND                                   :

ALL FUNDS FORMERLY ON DEPOSIT AT JPMORGAN      :
CHASE BANK, N.A., BATON ROUGE, LOUISIANA, IN
ACCOUNT NUMBER 725700280, IN THE NAME OF       :
ASSA CORPORATION, AND ALL FUNDS TRACEABLE
THERETO,                                       :

          Defendants *in rem*.                 :

                                               :

- - - - - - - - - - - - - - - - - - - - - - - x

SDNY-0733557

Plaintiff United States of America, by its attorney, Lev L. Dassin, Acting United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I. NATURE OF THE ACTION

1.    This is an action by the United States of America seeking forfeiture of the properties described below:

    a.    All right, title, and interest of Assa Corporation, Assa Company Limited, and Bank Melli Iran in 650 Fifth Avenue Company, including but not limited to the real property and appurtenances located at 650 Fifth Avenue, New York, New York, with all improvements and attachments thereon, and all property traceable thereto (the "Defendant Real Property");

    b.    All funds formerly on deposit in Account Number 78429712, at Citibank, N.A., New York, New York ("Defendant Account-1");

    c.    All funds formerly on deposit in Account Number 8881654552, at Citibank, N.A., New York, New York ("Defendant Account-2");

    d.    All funds formerly on deposit in Account Number 2724409590, at JPMorgan Chase Bank, N.A., Baton Rouge, Louisiana ("Defendant Account-3");

    e.    All funds formerly on deposit in Account Number 725700280, at JPMorgan Chase Bank, N.A., Baton Rouge, Louisiana ("Defendant Account-4").

(collectively, the "Defendant Properties").

2.    The Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.* In addition, the Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C.

SDNY-0733558

§ 981(a)(1)(A), as property involved in money laundering transactions and attempted money laundering transactions, in violation of 18 U.S.C. §§ 1956 and 1957, and as property traceable to such property.

## II. JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    Venue is proper pursuant to 28 U.S.C. § 1395(b) because the Defendant Properties are located in the Southern District of New York and pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.  The Defendant Accounts are currently in the custody of the United States Marshals Service for the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

### The International Emergency Economic Powers Act ("IEEPA") and the Iranian Transaction Regulations

5.    This civil forfeiture action relates to violations of regulations issued pursuant to IEEPA, codified at 50 U.S.C. § 1701 *et seq.*  This law, which was enacted in 1977, authorizes the President of the United States to regulate financial transactions with foreign countries and foreign nationals in order to deal with threats with respect to which a national emergency has been declared, and prescribes criminal penalties for violations of the statute and the regulations promulgated thereto.

6.    Using the powers conferred by IEEPA, the President

-3-

SDNY-0733559

and the Executive Branch declared a national emergency and issued orders and regulations prohibiting certain transactions with Iran and the Government of Iran by United States persons or involving the export of goods or services from the United States.  Section 1705 of Title 50, United States Code, provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

7.   In 1995, in order to implement a series of executive orders issued pursuant to IEEPA, the Department of Treasury promulgated the Iranian Transaction Regulations ("ITRs"), Title 31, United States Code of Federal Regulations, Part 560.  The relevant provisions of the ITRs generally prohibit (1) the exportation, sale or supply, directly or indirectly, by a United States person or from the United States, of any goods, technology, or services to Iran or the Government of Iran, and (2) the engagement by United States persons in any transaction or dealing, in or related to goods, technology or services, for exportation to Iran or the Government of Iran, without having first obtained a valid license from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC").

8.   The ITRs impose the following prohibitions, among others:

> 31 C.F.R. § 560.204 - Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran.
>
> Except as otherwise authorized pursuant to this part,

-4-

SDNY-0733560

including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995,  the exportation . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .

<u>31 C.F.R. § 560.203</u> ~ Evasions; attempts.

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

9.    Courts have recognized that the term "services," as used in the ITRs, includes the performance of something useful for a fee, such as conducting money transfers from the United States to Iran on behalf of others.

10.    Pursuant to 31 C.F.R. § 560.304, the term "Government of Iran" includes: "(a) The state and the Government of Iran . . . (b) [a]ny entity owned or controlled directly or indirectly by the foregoing; (c) [a]ny person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and (d) [a]ny person or entity designated by the Secretary of the Treasury as included within paragraphs (a) through (c) of this section."

-5-

SDNY-0733561

11.   The term "entity owned or controlled by the Government of Iran" is defined at 31 C.F.R. § 560.313, and "includes any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government."

12.   Bank Melli Iran ("Bank Melli") is wholly owned and controlled by the Government of Iran.  In addition, in 1999, OFAC identified Bank Melli in Iran, and all of its offices worldwide, as entities "owned or controlled by the Government of Iran."   31 C.F.R. Part 560, App. A.

13.   The ITRs further impose the following prohibitions:

> 31 C.F.R. § 560.206 - Prohibited trade-related transactions with Iran; goods, technology, or services.
>
> (a) Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may engage in any transaction or dealing in or related to . . .
>
> (2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.
>
> (b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

14.   Pursuant to 31 C.F.R. § 560.314, the term "United States person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United

-6-

SDNY-0733562

States."

Overview

15.   This civil forfeiture action concerns the
ownership of a 36-story office building located at 650 Fifth
Avenue, New York, New York (the "Building").

16.   As explained below, the Building is owned by 650
Fifth Avenue Company (the "Fifth Avenue Company"), which is a
partnership between the Alavi Foundation of New York and Bank
Melli.  Bank Melli owns 40% of the Fifth Avenue Company through
two shell companies, Assa Corporation ("Assa Corp."), which is a
a New York corporate entity, and Assa Company Limited ("Assa Co.
Ltd."), which is a corporation domiciled in Jersey, Channel
Islands, United Kingdom.  Assa Corp. is wholly owned by Assa Co.
Ltd.

17.   As set forth below, Assa Corp. has been providing
numerous services to Bank Melli in contravention of the ITRs,
including transferring rental income generated from the Fifth
Avenue Company to Bank Melli, following Bank Melli's instructions
with regard Assa Corp.'s affairs, reporting back to Bank Melli on
Assa Corp.'s financial situation and business dealings, and
managing the affairs of Assa Corp. for the benefit of Bank Melli.

The Formation of 650 Fifth Avenue Company and
Bank Melli's Straw Companies, Assa Corp. and Assa Co. Ltd.

18.   The Building was constructed in the 1970's by the
Pahlavi Foundation, a non-profit organization operated by the
Shah of Iran to pursue Iran's charitable interests in the United
States.   In the 1970's, Bank Melli loaned the Pahlavi Foundation

-7-

SDNY-0733563

approximately $42 million to be used for the construction and acquisition of the Building.

19.   Following the Iranian revolution of 1979, the Pahlavi Foundation was renamed the Mostazafan Foundation of New York (the "Mostazafan Foundation"), and later renamed the Alavi Foundation of New York (the "Alavi Foundation").   The Alavi Foundation is presently a not-for-profit corporation organized under the laws of New York.   A substantial portion of the Alavi Foundation's funds come from the significant rent roll of the Building.

20.   In 1989, the Mostazafan Foundation entered into a partnership with Bank Melli in order to avoid paying taxes on rental income from the Building.   Under the debt-financed property rules of the federal tax code, the Foundation's rental income was unrelated business income and therefore subject to tax.

21.   In order to remove the debt and avoid paying taxes on income from the Building, the Mostazafan Foundation formed the 650 Fifth Avenue Company (the "Fifth Avenue Company"), a partnership with Bank Melli.   However, Bank Melli disguised its ownership interest by establishing two shell companies, Assa Corp. and Assa Co. Ltd.   Mohammad Behdadfar ("Behdadfar"), a Bank Melli board member, was appointed the President of Assa Corp., and a director of Assa Co. Ltd.

22.   The Mostazafan Foundation and Assa Corp. entered into a written Partnership Agreement on or about July 31, 1989. The Partnership Agreement provided, in part, that the partnership

-8-

SDNY-0733564

would be called 650 Fifth Avenue Company, that the Foundation would contribute the Building to the Partnership, and that Assa Corp. would contribute $44.8 million to the capital of the partnership.  As a result of this partnership, the debt on the Building was removed, permitting the Alavi Foundation to avoid paying U.S. taxes on revenue from the Building.

23.   Today, the two straw owners of Assa Co. Ltd. are Davood Shakeri ("Shakeri") and Fatemeh Aghamiri ("Aghamiri"), who are residents of Iran and represent the interests of Bank Melli. Financial statements for Assa Co. Ltd. state that Shakeri and Aghamiri each own 50% share capital of the company.

24.   Since at least 1990, Assa Corp. has repeatedly transferred rental income from the Fifth Avenue Company to Bank Melli through Assa Co. Ltd.  Assa Corp. has also regularly followed Bank Melli's instructions with regard to Assa Corp.'s business affairs and its management of the investment, and has regularly reported back to Bank Melli on its financial situation.

25.   Assa Corp. and Assa  Co. Ltd. have never received a license from OFAC.  Bank Melli has never received a license from OFAC relating to the Building.

### Tafti's Employment by Assa Corp.

26.   In the United States, Assa Corp. has a single employee working for it, Mohammad Hassan Dehghani Tafti ("Tafti").  Tafti is a naturalized Iranian citizen, born in India.

27.   Tafti first came to the United States in or about 1999 with an L-1 visa, which was issued on the basis of a

SDNY-0733565

petition made on his behalf by his employer, Assa Corp.  An L-1
visa is a visa issued to managers or executives of companies
doing business in the United States.  Assa Corp. submitted a
petition in or about May 1999 in support of Tafti's application
for the L-1 visa.  The petition described Tafti's "proposed
duties in the U.S." as "Treasurer, oversee financial operations
and investments."  The L-1 visa was initially granted to Tafti in
or about July 1999 for three months, and was subsequently renewed
upon further applications in or about September 2000, March 2001,
August 2001, and December 2001.

          28.  In or about November 2002, Tafti applied for an H-
1B visa at the United States Embassy in Ankara, Turkey. An H-1B
visa is a visa issued to employees with specialized knowledge.
In the application, Tafti identified his present employer as
"Assa Corp., 500 Fifth Avenue, NY, NY," and his present
occupation as "financial executive."  However, Tafti stated that
he intended to work in the United States at Optima Mortgage
Company in Santa Ana, California.  Shortly after submitting his
application for an H-1B visa, Tafti submitted another
application.  In this subsequent application, Tafti again stated
that he intended to work for Optima Mortgage.  The H1-B visa was
issued in January 2003, after which Tafti again entered the
United States.

          29.  While living in the United States with his H-1B
visa, Tafti in fact continued to work for Assa Corp., pretending
to work for Optima Mortgage Corporation ("Optima Mortgage") only
for immigration purposes.  To create the image that he worked for

                              -10-

SDNY-0733566

Optima Mortgage, Tafti moved money from Assa Corp. to Optima
Mortgage to cover his payroll from Optima Mortgage.  In order to
do this, Tafti transferred monies from Assa Corp. to his personal
bank account, and from his personal bank account to Optima
Mortgage.  On approximately 23 occasions from in or about May
2003 through in or about September 2005, checks and wire
transfers in the approximate amount of $3,800 each were made from
Tafti's personal bank account to the president of Optima
Mortgage, or his wife, also an employee of Optima Mortgage.
Close in time to each of these checks and wire transfers, Tafti
was paid approximately $2,800 by Optima Mortgage.  These
transactions appeared to be designed to return to Tafti the
$3,800 payments, minus requisite payroll taxes.  Additionally, on
or about July 27, 2006, Assa Corp. paid Optima Mortgage the sum
of $22,500.

          30.  On or about December 31, 2006, Tafti left the
United States for Turkey.  In or about May 2007, Tafti applied
for an H-1B visa at the United States Embassy in Dubai, United
Arab Emirates.  In this application, Tafti stated that he was
employed as a "market analyst manager" for Optima Mortgage in
Tustin, California, but that he would be living in Tuckahoe, New
York.  Initially, no action was taken on the application.  In
February 2008, Tafti reactivated this application and an H-1B
visa was subsequently granted.  In May 2008, Tafti returned to
New York from Dubai.

                    **Bank Melli's Control of Assa Corp. through Tafti**

          31.  Tafti used the email account 

                              -11-

to conduct business on behalf of Assa Corp.  Emails sent to and
from this account show that Tafti regularly provided reports to
Bank Melli about Assa Corp.'s business dealings, and then
followed Bank Melli's instructions with regard to Assa Corp.'s
business affairs.  The following emails, which have been
translated from Farsi, were among the emails sent to or from the
account:

> a.   On or about June 12, 2003, Tafti sent an email to
> the email address ████████████████████.  In this
> email, Tafti forwarded to Ahmad Azizi ("Azizi")
> correspondence from a New York attorney for Assa Corp.
> Upon information and belief, Azizi is an official at
> Bank Melli in London, England.
>
> b.   On or about June 19, 2003, Tafti received an email
> from the email address ████████████████████.  In
> this message, the sender wrote, in part, "I have had
> the letter of Intent and the Contract for Sale
> reviewed."  The sender of the email identified himself
> as "A. Azizi."  Upon information and belief, Azizi sent
> this message using the email account of Maria
> Chowdhury, a Bank Melli employee in London.  Upon
> information and belief, this email was referring to a
> proposed deal, which ultimately collapsed, to sell Assa
> Corp.'s interest in the Fifth Avenue Company.
>
> c.   On or about November 20, 2004, Tafti received an
> email from the email address ████████████████████  In
> this message, the sender wrote, "You are kindly
> requested [to] . . . send the monthly expenses of Assa
> Corp from April 2004 onward, to please make some
> arrangement so that the detailed expenses of this Co.
> are available for the use of the auditors."  Upon
> information and belief, this email was sent by Ali
> Safari, an employee in Bank Melli's Overseas Network
> Supervisory Department, known as "ONSD," which is
> located in Tehran, Iran.
>
> d.   On or about December 3, 2004, Tafti received an
> email from the email address ████████████████
> containing a list of Assa Corp. expenses.
>
> e.   On or about February 5, 2005, Tafti sent an email
> to the email address ████████████████████ and
> wrote, "Dear brother Mr. Ghadimipour: As you are aware
> approximately two months ago two sets of minutes

SDNY-0733568

regarding the ending of the court file and extension of
the loan were sent for the signature of the
shareholders, Mrs. Aghamiri and Mr. Shakeri.
Regretfully, it has not been received yet.  Because the
matter is important, and the lawyer and the secretary
of the Company . . . are anxious, please issue proper
order because any delay will cause doubt and
sensitivity here and God forbid will cause irrevocable
loss. Once more asking an urgent action."  Upon
information and belief, "Mr. Ghadimipour" is Mohsen
Ghadimipour, the current head of ONSD.

f.    On or about March 5, 2005, Tafti sent an email to
███████████████.  In this email, Tafti wrote, "To
shareholders of Assa Co.: With reference to the message
of 2/28/05, this is to inform you that the financial
statements of both Assa Ltd. Co. and Assa Corp. New
York, were sent to you in the last week via London."
Upon information and belief, this email address belongs
to ONSD.

g.    On or about March 16, 2005, Tafti sent another
email to ██████████████.  In this email, Tafti
wrote, "To the shareholders of Assa Corp.:  With
reference to today's email, this is to inform you that
the financial statements of Assa Corp up to 3/31/04
were sent to your office addressed to Mr. Ghadimipour."

h.    On June 19, 2005, after Citibank in New York, New
York, had refused to wire $1.3 million from an Assa
Corp. bank account to Assa Ltd., Tafti sent an email
from the email address ████████████████ to the
"shareholders of Assa Co. Ltd."  In this email, Tafti
wrote, "With reference to the email #M-KH of 6/16/2005
this is to inform you that the Company [Assa Corp.] has
made an extended action to remit the monies to banks
outside of the U.S.  In this regard, many meetings were
held with Citibank.  Tomorrow I have a meeting with the
bank because they invited all of the directors of Assa
New York to participate.  The only problem is the
absence of Mr. Shakeri.  I thought I might tell them
that Mr. Shakeri is on a trip or resigned from
directorship, and that [a New York attorney for Assa
Corp.] and I are the directors of Assa in New York now;
however, I will consult with [the New York attorney]
because he will participate in the meeting as the
director and secretary of the Co.  Hoping God will
help.  As you are aware, Citibank has not transferred
the sum of $1,360,800 to the account of Assa Ltd. to
London auditors.  I spoke many times with the bank and
presented evidence such as payment of the tax, and hope
with activity can solve the problem.  I will make a
report to you of the result of tomorrow's session.

-13-

Also I believe after solving the above issue, that we
should send smaller amounts in the form of monthly,
maximum in 3 months payments, to London, so that the
amounts would not appear big.  Meanwhile I will try to
open an account in another bank, unfortunately owing to
special problems here, because the bank wants to know
all the directors.  However, the interests of the
shareholders will be preserved in the best way.
Thanks. Assa Corp.  Tafti."  By this email, Tafti
acknowledged the apparently fictional nature of
Shakeri's ownership of Assa Corp. through Assa Co.
Ltd., and that Shakeri was apparently unwilling or
unable to travel to the United States to attend to his
substantial financial concerns here.

i.    On or about July 2, 2005, Tafti sent an email to
███████████████████████.  In this email, Tafti
wrote, "Mr. Ghadimipour, the director of the branches
of Bank Melli, outside of Iran.  As you are aware, the
issue of the place of residence of shareholders and the
director of the Company in the USA has a special
importance.  At present, shareholders are forbidden
from having residences in Iran, and as per the view of
the legal experts, the American government may freeze
the capital of the shareholders.  At the present time,
owing to prevention of our Iranian companies, the
issues are more sensitive.  Fortunately, Assa Corp. has
not had a problem, except for the weakness of residence
location of the shareholder which should be removed.
Therefore, please make some arrangement that the
residence location of the shareholders of Assa, Mr.
Davood Shakeri and Mrs. Aghamiri be changed to another
country, and considering my knowledge of the United
Arab Emirates, one of the Emirates is proposed.  Please
order appropriately."

j.    On or about July 6, 2005, Tafti sent another email
to the email address ████████████████.  In this email,
Tafti wrote, "To Mr. Ghadimipour, the director of the
branches outside of the country.  With reference to the
email and phone conversations of 4/7/2005, this is to
inform you the result of my discussions and
investigations with the consultants and the lawyers in
America and London: changing the shareholder of Assa
Ltd. is possible, but the shareholder should reside in
a tax free country.  Otherwise, the country of
residence will collect a tax from the income of the
shareholder."  By this communication proposing to
"chang[e]" the shareholders, Tafti acknowledged the
fictional nature of ownership of Assa Co. Ltd. by
Shakeri and Aghamiri.

k.    On August 9, 2005, Tafti received an email from

-14-

the email address ███████████████   In this email, the sender wrote, "With reference to the email of 7/7/2005, regarding the location of residence of the shareholders, this is to inform you that, as per the orders of the Bank Manager, until the appointment of the qualified individuals, act as before."

l.    On or about February 26, 2006, Tafti sent an email to the email address ██████████████. Tafti wrote, in part, "To the Shareholders of Assa Co.:  With reference to the today's e-mail this is to inform you that the financial statements of Assa Corp. of New York today were sent to you via London.  Please note that the reason of the delay was the preparing the financial statements of Sherkate Tazamoni (General Partnership Co.) of Alavi Foundation Co. Ltd., which is to be regretted."

m.    On or about May 17, 2006, Tafti sent an email to the email address ██████████████.  Therein, he wrote: "Following the email of 4/29/06, this is to inform you that the financial statements of Assa Co. Ltd. up to 3/31/05 after auditing . . . have been dispatched to you via London."

## The Defendant Accounts

32.   Defendant Accounts-1, -2, -3, and -4

(collectively, the "Defendant Accounts") are held in the name of

Assa Corp.  Tafti is the only signatory on the Accounts.

33.   Between January 7, 2000 and December 5, 2007,

approximately $17,083,000 from the Fifth Avenue Company was

deposited into Account-1.  The bank records for Account-1 also

show the following financial activities, among others:

a.    On or about December 3, 2007, Tafti wrote a check for $10,500, from Account-1, to pay the rent for the house in which he lived.

b.    On or about December 5, 2007, Account-1 received a wire transfer of $200,000 from the Fifth Avenue Company.

c.    On or about April 2, 2008, Tafti wrote a check for $40,000 to New York State Corporation Tax from Account-1.

-15-

SDNY-0733571

d.    On or about April 2, 2008, Tafti wrote a check for $1,240 to New York State Corporation Tax from Account-1.

e.    On or about April 2, 2008, Tafti wrote a check for $202 to New York State Corporation Tax from Account-1.

f.    On or about April 3, 2008, Tafti wrote a check for $37,500 to the New York City Department of Finance from Account-1.

34.    Approximately $1.09 million was transferred from Account-1 to Account-3 in November 2006.    In addition, Tafti transferred substantial amounts from Account-1 to Assa Co. Ltd.

35.    In or about October 2008, agents of the Federal Bureau of Investigation ("FBI") executed federal seizure warrants for the funds in the Defendant Accounts.    Approximately $1.9 million was seized from Citibank, and approximately $1.2 was seized from JPMorgan.

### IV. CLAIMS FOR FORFEITURE

### STATUTORY BASES FOR FORFEITURE

36.    The statutory provisions pursuant to which the Defendant Properties are subject to seizure and forfeiture are as follows.

### Proceeds Traceable to Violations of IEEPA

37.    Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

38.    Under Section 1956(c)(7), the term "specified

-16-

SDNY-0733572

unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]." Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

　　　　39.　Because the Defendant Properties constitute or were derived from proceeds traceable to violations of regulations promulgated under IEEPA (namely, 31 C.F.R. §§ 560.203, 560.204, and 560.206), the Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**Property Involved in Laundering Proceeds of IEEPA Violations**

　　　　40.　Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."

　　　　41.　Title 18, United States Code, Section 1956(a) provides criminal penalties for:

> (a)(1) [w]hoever knowing that the property
> involved in a financial transaction
> represents the proceeds of some form of
> unlawful activity, conducts or attempts to
> conduct a financial transaction which in fact
> involves the proceeds of specified unlawful
> activity -
>
> (A) (i) with the intent to promote the carrying on of
> specified unlawful activity; or
>
> . . .

-17-

SDNY-0733573

(B) knowing that the transaction is designed
in whole or in part --

(i) to conceal or disguise the nature, the location,
the source of ownership, or the control of the proceeds
of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under
State or Federal law . . . .

(2) Whoever transports, transmits, or transfers, or
attempts to transport, transmit, or transfer a monetary
instrument or funds from a place in the United States
to or through a place outside the United States or to a
place in the United States from or through a place
outside the United States--

(A) with the intent to promote the carrying on of
specified unlawful activity; or

(B) knowing that the monetary instrument or funds
involved in the transportation represent the proceeds
of some form of unlawful activity and knowing that such
transportation, transmission, or transfer is designed
in whole or in part--

(i) to conceal or disguise the nature, the location,
the source, the ownership, or the control of the
proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under
State or Federal law.

42.  In addition, Section 1956(h) provides, in part,

that "[a]ny person who conspires to commit any offense defined in

this section or section 1957 shall be subject to the same

penalties as those prescribed for the offense the commission of

which was the object of the conspiracy."

43.  18 U.S.C. § 1957 provides in relevant part that:

Whoever . . . knowingly engages or attempts
to engage in a monetary transaction in
criminally derived property of a value
greater than $10,000 and is derived from
specified unlawful activity, shall be
punished as provided in subsection (b).

44.  "Monetary transactions" is defined in 18 U.S.C.

-18-

SDNY-0733574

§ 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

45. "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

46. "Specified unlawful activity" is defined in 18 U.S.C. § 1957(f)(3) as having the same meaning as that term has in 18 U.S.C. § 1956. As noted above, the term "specified unlawful activity," as defined in Section 1956, includes violations of IEEPA.

47. In addition, the term "financial transaction" is defined in 18 U.S.C. § 1956(c)(4), and includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

48. Because the Defendant Properties constitute properties involved in transactions or attempted transactions in violation of Sections 1956 and 1957, they are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

SDNY-0733575

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated:      New York, New York
            December 17, 2008

                        LEV L. DASSIN
                        Acting United States Attorney for
                        Plaintiff United States of America

            By:         _____
                        SHARON COHEN LEVIN
                        ANNA E. ARREOLA
                        HARRY A. CHERNOFF
                        ERIC SNYDER
                        Assistant United States Attorneys
                        One St. Andrew's Plaza
                        New York, New York 10007
                        (212) 637-1060/2218/2481/2534

SDNY-0733576

<u>VERIFICATION</u>

STATE OF NEW YORK              )
COUNTY OF NEW YORK            :
SOUTHERN DISTRICT OF NEW YORK )

      GEORGE J. ENNIS, JR. being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"); that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information and belief.

      The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

                            GEORGE J. ENNIS, JR.
                            Special Agent
                            Federal Bureau of Investigation

Sworn to before me this
17th day of December 2008

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2010_

SDNY-0733577

# EXHIBIT C

SDNY-0733578

Exhibit C

## METHODS TO BE USED TO SEIZE AND SEARCH
## COMPUTERS AND COMPUTER-RELATED EQUIPMENT

1.   Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that searching computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  This is true for the following reasons:

a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now

SDNY-0733579

commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

2.    In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items contain contraband and whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.    If the computer equipment and storage devices cannot be searched on-site within a reasonable amount of time and without jeopardizing the ability to preserve the data, and if the computer equipment and storage devices do not contain contraband, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.

c.    If the computer personnel determine that these items contain contraband, or that it is not practical to perform an on-site search or make an on-site copy of the data, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for

review.  The computer equipment and storage devices will be
reviewed by appropriately trained personnel in order to extract
and seize any data that falls within the list of items to be
seized set forth herein.

        d.    The analysis of electronically stored data,
whether performed on-site or in a separate, controlled
environment, may entail any or all of several different
techniques.  Such techniques may include, but shall not be
limited to, surveying various file "directories" and the
individual files they contain (analogous to looking at the
outside of a file cabinet for the markings it contains and
opening a drawer believed to contain pertinent files); "opening"
or reading the first few "pages" of such files in order to
determine their precise contents; "scanning" storage areas to
discover and possibly recover recently deleted data; scanning
storage areas for deliberately hidden files; and performing
electronic "key-word" searches through all electronic storage
areas to determine whether occurrences of language contained in
such storage areas exist that are related to the subject matter
of the investigation.

        3.    Any data that is encrypted and unreadable will not be
returned unless law enforcement personnel have determined that
the data is not (1) an instrumentality of the offense, (2) a
fruit of the criminal activity, (3) contraband, (4) otherwise
unlawfully possessed, or (5) evidence of the offense specified
above.

        4.    In searching the data, the computer personnel may
examine all of the data contained in the computer equipment and
storage devices to view their precise contents and determine
whether the data falls within the items to be seized as set forth
herein.  In addition, the computer personnel may search for and
attempt to recover "deleted," "hidden" or encrypted data to
determine whether the data falls within the list of items to be
seized as set forth herein.[1]

        5.    If the computer personnel determine that the computer
equipment and storage devices are no longer necessary to retrieve
and preserve the data, and the items are not subject to seizure
pursuant to Federal Rule of Criminal Procedure 41(b), the
government will promptly return these items, upon request, within
a reasonable period of time.

        6.    In order to search for data that is capable of being

_____

        [1]    Agents will have procedures in place to segregate any
potentially privileged materials or files.

read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

       a.   Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed above;

       b.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

       c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

       d.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

       e.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

       f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

       g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

SDNY-0733582

read or interpreted by a computer, law enforcement personnel will
need to seize and search the following items, subject to the
procedures set forth above:

      a.   Any computer equipment and storage device capable
of being used to commit, further or store evidence of the
offenses listed above;

      b.   Any computer equipment used to facilitate the
transmission, creation, display, encoding or storage of data,
including word processing equipment, modems, docking stations,
monitors, printers, plotters, encryption devices, and optical
scanners;

      c.   Any magnetic, electronic or optical storage device
capable of storing data, such as floppy disks, hard disks, tapes,
CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory
buffers, smart cards, PC cards, memory calculators, electronic
dialers, electronic notebooks, and personal digital assistants;

      d.   Any documentation, operating logs and reference
manuals regarding the operation of the computer equipment,
storage devices or software;

      e.   Any applications, utility programs, compilers,
interpreters, and other software used to facilitate direct or
indirect communication with the computer hardware, storage
devices or data to be searched;

      f.   Any physical keys, encryption devices, dongles and
similar physical items that are necessary to gain access to the
computer equipment, storage devices or data; and

      g.   Any passwords, password files, test keys,
encryption codes or other information necessary to access the
computer equipment, storage devices or data.