UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                :

                                :        No. 08 Civ. 10934 (KBF)

IN RE 650 FIFTH AVENUE
AND RELATED PROPERTIES        :

                                :

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- X

**ALAVI FOUNDATION'S AND 650 FIFTH AVENUE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
<u>FOR SUMMARY JUDGMENT AGAINST THE GOVERNMENT</u>**

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

*Attorneys for Claimants Alavi Foundation
and 650 Fifth Avenue Company*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................3

    A.    The Alavi Foundation .........................................................................3

        1.    New York Not-For-Profit Corporation .................................3

        2.    Charitable Mission ................................................................4

        3.    The Foundation's Bylaws and Board ....................................6

    B.    The 650 Fifth Avenue Company ..........................................................8

    C.    The OFAC SDN List ..........................................................................9

STANDARD FOR SUMMARY JUDGMENT .........................................................10

ARGUMENT .........................................................................................................12

I.    TO ESTABLISH THAT CLAIMANTS' CHARITABLE AND OTHER EVERDAY ACTIVITIES CONSTITUTE IEEPA VIOLATIONS, THE GOVERNMENT MUST PROVE DAY-TO-DAY CONTROL BY IRAN OVER THE FOUNDATION AND   THE FIFTH AVENUE COMPANY ...............................12

    A.    The International Emergency Powers Act ..............................................13

    B.    "Controlled by" .................................................................................15

II.    THE GOVERNMENT HAS NO COMPETENT EVIDENCE SINCE THE MID-1990S SHOWING THE GOVERNMENT OF IRAN CONTROLLED THE FOUNDATION ..............................................................................................18

    A.    The Undisputed Evidence Demonstrates that the Foundation Was Not Controlled by the Government of Iran ................................................18

    B.    The Government Cannot Offer Affirmative Evidence of Control ............................21

    C.    OFAC Has Determined that the Foundation and Fifth Avenue Company Are Not Controlled by the Government of Iran ..........................................24

CONCLUSION .....................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bickerstaff v. Vassar College*,
    196 F.3d 435 (2d Cir. 1999).........................................................................11

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
    667 F. Supp. 2d 308 (S.D.N.Y. 2009)..........................................................17

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012), *appeal dismissed by, mandamus dismissed by,*
    706 F.3d 92 (2d Cir. 2013).....................................................................11, 22

*Major League Baseball Props. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)........................................................................11

*Manhattan Eye, Ear & Throat Hosp. v. Spitzer*,
    715 N.Y.S.2d 575 (N.Y. Sup. Ct. 1999) .....................................................16

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d. Cir. 1996).....................................................................18

*Sampson v. City of Schnectady*,
    160 F. Supp. 2d 336 (N.D.N.Y. 2001) .........................................................22

*United States Fid. and Guar. Co. v. Braspetro Oil Services*,
    199 F.3d 94 (2d Cir. 1999)..........................................................................18

*United States v. Banki*,
    685 F.3d 99 (2d Cir. 2011).....................................................................15, 16

*United States v. Certain Real Prop. and Premises Known as: 4003-4005 5th Ave.,*
    *Brooklyn, NY,*
    55 F.3d 78 (2d Cir. 1995)............................................................................22

*United States v. Homa Int'l Trading Co.*,
    387 F.3d 144 (2d Cir. 2004)........................................................................15

*United States v. Torres*,
    845 F.2d 1165 (2d Cir. 1988)......................................................................23

*Vacold, L.L.C. v. Cerami*,
    545 F.3d 114 (2d Cir. 2008)........................................................................10

*Valenti v. Penn Mut. Life Ins. Co.*,
    850 F. Supp. 2d 445 (S.D.N.Y. 2012), *aff'd*, 511 Fed. Appx. 57 (2d Cir. 2013) ..............11, 22

ii

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000)........................................................................11


**CONSTITUTION AND STATUTES**

18 U.S.C. § 981 ......................................................................................12

19 U.S.C. § 1621 ....................................................................................12

31 U.S.C. § 560.215 ...........................................................................17, 16

31 U.S.C. §§ 560.301-.321. .....................................................................16

50 U.S.C. §§ 1701-1702 ..........................................................................13

I.R.C. § 501(c)(3) .................................................................................3, 4

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1707 (1977)
   ("IEEPA") ..................................................................................... passim

N-PCL §§ 501, 601 .................................................................................16

N-PCL §§ 1001 *et seq.*.............................................................................4

U.S. Const., amend. V...................................................................2, 7, 20, 22


**OTHER AUTHORITIES**

26 C.F.R. § 1.501(c)(3)-1(c) .....................................................................4

31 C.F.R. Part 535....................................................................................9

31 C.F.R. Part 560....................................................................................9

31 C.F.R. § 560.204 ...........................................................................12, 14, 15

31 C.F.R. § 560.304 .................................................................................15

American Heritage Dictionary of the English Language (5th ed. 2011) .........................17

Archive of Changes to the SDN List, available at: http://www.treasury.gov/resource-
   center/sanctions/SDN-List/Pages/archive.aspx. ...........................................10

Black's Law Dictionary ............................................................................17

Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995)....................................13

iii

Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995) ........................................................14

Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) ...................................................14

Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012) ........................................................14

Fed. R. Civ. P. 56 ........................................................................................................1, 10, 25

Random House Dictionary of the English Language (2nd ed. Unabridged 1987) .........................17

Claimants Alavi Foundation (the "Foundation") and 650 Fifth Avenue Company (the "Fifth Avenue Company" and collectively, "Claimants") respectfully submit this memorandum of law in support of their motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on claims brought by the Government against Claimants.  For the reasons set forth below, Claimant's motion should be granted.

## PRELIMINARY STATEMENT

The incontrovertible evidence in this case demonstrates that the Government cannot prevail on its primary theory of liability—that the Claimants were controlled by the Government of Iran between 1995 and 2009 and therefore the Foundation's and the Fifth Avenue Company's ordinary, everyday actions, during this time were as a matter of law services to Iran.[1] Since this litigation began, the Government has consistently asserted in a conclusory fashion that the Foundation has been controlled continuously by Iran since its inception in 1973.  Its assertions, however, are supported with only fragments of evidence from decades ago.  As to the last 15 years, when the Foundation's records are most plentiful, discovery has revealed that the Foundation and Fifth Avenue Company are operating independently and in the best interests of the Foundation, not the Government of Iran.

First, it is undisputed that the Alavi Foundation is a not-for-profit corporation duly-established and authorized under the Laws of New York.  As such, it is not and cannot be owned by any individual or entity, including by the Government of Iran or any Iranian entity. Likewise, the Fifth Avenue Company is duly-organized under the laws of New York and

---

[1] As discussed below, the Government has advanced two underlying IEEPA violations to support its forfeiture claims.  Its allegations that the Foundation and Fifth Avenue Company are controlled by the Government of Iran and therefore provide services for such Government comprise the first purported violation.  Claimants' summary judgment motion challenges this purported violation only. Therefore, even if Claimants are successful in this motion, the Government's other alleged IEEPA violation— purported services for Bank Melli—will proceed to trial.

1

managed by the Foundation.  On both points, no evidence has been offered to the contrary.

It is also indisputable that the Foundation and the Fifth Avenue Company are not controlled on a day-to-day basis by the Government of Iran through influence on the Foundation's Board by the Iranian Ambassador to the United Nations or any other means whatsoever.  Instead, the record evidence demonstrates that the Fifth Avenue Company is managed by the Foundation—its majority partner—and the Foundation is operated and overseen by its Board of Directors, pursuant to the organization's bylaws.  Since 1995, the Board has made decisions independently and to advance the best interests of the Foundation.  The uncontroverted statements by those with personal knowledge of the Foundation's activities—including a Board member of the Foundation and key employees during the relevant time period—confirm that the Foundation's day-to-day activities are performed to further the best interests of the Foundation and free of influence or control from the Government of Iran or any Iranian officials.  The Government cannot offer any competent evidence from the relevant time period to dispute this conclusion.

Nor does the fact that several former Board members and officers have invoked their Fifth Amendment right against self-incrimination during depositions alter this conclusion.  Since this case has begun, the Government has repeatedly threatened criminal prosecution of the Foundation's officers and Board members—without any factual basis—as a means to coerce cooperation or deliberately compel these individual to assert their constitutional right against self-incrimination.  Indeed, on the one occasion in which a witness who had previously expressed his intention to assert his constitutional right subsequently changed his mind and agreed to testify, the Government immediately cancelled his deposition.  Without any showing that these witnesses' testimony, if given, would actually support the Government's claims, an

2

adverse inference is unwarranted and even if granted, is insufficient to defeat summary judgment.

Finally, it is indisputable that neither the Foundation nor the Fifth Avenue Company has been designated by OFAC as "Specially Designated Nationals," despite comprehensive investigations undertaken by that office to determine whether they are owned or controlled by the Government of Iran.  The Court has held that in such circumstances, OFAC's determination is entitled to significant deference, and it confirms the record evidence in this case.

Having failed to set forth a material issue of fact as to whether the Government of Iran "controls" the Foundation and Fifth Avenue Company, summary judgment should be granted on this aspect of the Government's claims.

## BACKGROUND

### A.    The Alavi Foundation

#### 1.    New York Not-For-Profit Corporation

The Foundation is a not-for-profit corporation organized under the laws of New York State.  (Ruzumna Decl. Exs. 17-19, 58; Stmt. ¶ 1.)  Established in 1973 under the name Pahlavi Foundation, the Foundation was subsequently renamed the Mostazafan Foundation of New York in 1980 and then the Alavi Foundation in 1992.  (Ruzumna Decl. Exs. 17-21, 58; Stmt. ¶¶ 1-3.)  The Foundation does not have—and has never had—any owners, members, or shareholders as a matter of New York not-for-profit law.  (Ruzumna Decl. Ex. 2, 50; Stmt. ¶ 8.)  Indeed, it cannot be owned by any individual or entity, including the Government of Iran or any Iranian entity.  (Ruzumna Ex. 50; Stmt. ¶ 9.)  The Internal Revenue Service has confirmed that the Foundation is a charitable organization under § 501(c)(3) of the Internal Revenue Code, (Ruzumna Decl. Exs. 10-11, 43; Stmt. ¶ 7.), and the New York State Attorney General's Office

3

has confirmed it is a non-profit corporation in good standing.  (Goldman Dep. 81:24-83:5, 83:10-14, 83:21-84:3, Ruzumna Decl. Ex. 2; Stmt. ¶ 17.)  In the Foundation's forty years of incorporation, the New York Attorney General's Office has never taken any action against the Foundation, its trustees, officers or employees, or sought to discipline the Foundation in any way.  (Goldman Dep. 81:24-83:5, 83:10-14, 83:21-84:3, Ruzumna Decl. Ex. 2; Stmt. ¶ 18.)

   As a New York non-for-profit corporation, the Foundation is also prohibited from generating a profit for itself or for its officers, Board members and employees.  I.R.C. § 501(c)(3) (2013); 26 C.F.R. § 1.501(c)(3)-1(c) (defining the prohibition on inurement).  Before dissolving, it must obtain permission from the State of New York—generally by both petition to the court and by permission of the Attorney General.  N.Y. N-PCL §§ 1001 *et seq*.  If it dissolves, New York law requires that the Foundation's assets be distributed to other charitable organizations under an approved plan or at the Attorney General's direction.  (Goldman Dep. 29:6-13, 29:22-30:11, Ruzumna Decl. Ex. 2; Stmt. ¶ 12.)

   2. <u>Charitable Mission</u>

   Since its inception, the Foundation's mission has been to promote and support Islamic culture and the study of Persian language, literature and civilization in the United States. The Foundation fulfills this mission by financially supporting various educational, religious, and cultural programs.  (Ruzumna Decl. Exs. 17-19, 50, 54; Stmt. ¶ 22.)  These activities include making grants to colleges and universities; donations to Persian schools and Islamic organizations; and grants to Persian art and literature programs.  (Ruzumna Decl. Exs. 16, 50, 54; Stmt. ¶ 23.)  For example, the Foundation annually provides donations to a number of colleges and universities, which have included Columbia University, Harvard University, Rutgers University, and Sacred Heart University, among others.  (Ruzumna Decl. Ex. 52; Stmt. ¶ 24.)

4

The Foundation employs several individuals to perform its charitable activities, manage the finances of the Foundation and Fifth Avenue Company, and otherwise carry out its day-to-day functions. (Ruzumna Decl. Ex. 22; Stmt. ¶ 37.) Ms. Hanieh Safakamal is the current Financial Manager for the Foundation, and has worked there since 1999. (Ruzumna Decl. Ex. 50; Stmt. ¶ 38.) As the Financial Manager for the Foundation, Ms. Safakamal is responsible for maintaining the Foundation's accounting books, reviewing its payroll and expenses, entering its various income and expenses into the Foundation's accounting software, and compiling the Foundation's financial documents for its outside accountant. (Ruzumna Decl. Ex. 50; Stmt. ¶ 38.) Ms. Safakamal also works with and oversees the management company—currently CBRE, Inc.— responsible for managing the 650 Fifth Avenue building. (Ruzumna Decl. Ex. 50; Stmt. ¶ 39.)

Dr. Ali Aliabadi is currently the Program Coordinator for the Foundation, a position he has held since 2005. (Ruzumna Decl. Ex. 54; Stmt. ¶ 43.) As the Foundation's Program Coordinator, Dr. Aliabadi is responsible for directing the Foundation's charitable donations and managing its programs on a day-to-day basis, including ensuring that the eligibility requirements for the various Foundation programs are initially met. (Ruzumna Decl. Ex. 54; Stmt. ¶ 44.) Dr. Aliabadi is also partially responsible for making recommendations to the President of the Foundation regarding where to donate the Foundation's resources. (Ruzumna Decl. Ex. 54; Stmt. ¶ 45.) His recommendations are neither influenced by the Government of Iran nor any Iranian Official, and the Board accepts his recommendations most of the time. (Ruzumna Decl. Ex. 54; Stmt. ¶ 46.)

5

      3.      <u>The Foundation's Bylaws and Board</u>

As a New York not-for-profit entity, the Foundation is required to maintain organization bylaws.  Pursuant to its present bylaws, the Foundation's Board of Directors (the "Board") has "the general power to manage and control the affairs of the Foundation." (Ruzumna Decl. Exs. 34, 50, 53; Stmt. ¶ 50.)[2]  The President of the Foundation is the chief executive officer, responsible for supervising the business of the Foundations and its officers. (Ruzumna Decl. Exs. 34, 53; Stmt. ¶ 51.)  The President serves subject to the control of the Board.  (Ruzumna Decl. Ex. 34, 53; Stmt. ¶ 51.)

Pursuant to the Foundation's bylaws, the Board is elected annually at the Annual Meeting of the Board by a majority vote of the directors in office at the time and are "eligible for unlimited reelection."  (Ruzumna Decl. Exs. 53; Stmt. ¶ 54.)  In addition to the annual meetings of the Board, the Board or the President of the Foundation may call a special meeting of the Board.  (Ruzumna Decl. Exs. 34, 53; Stmt. ¶ 68.)  The Board may also issue resolutions instructing how the Foundation's funds should be spent.  (Ruzumna Decl. Exs. 34, 53; Stmt. ¶ 69.)

Between 1995 and 2009, the following individuals served as President of the Foundation or on its Board:

**FOUNDATION BOARD OF DIRECTORS[3]**

| Name | Year Elected | Year Resigned or Replaced |
|---|---|---|
| Houshang Ahmadi | 1980 | 2013 |

---

[2] As to the key provisions, the 2008 bylaws are substantially similar to the previous version from 1987. (Ruzumna Decl. Ex. 34, 53; Stmt. ¶¶ 48-51, 68-69, 70-72.)

[3] (Stmt. ¶¶ 55-65.)

| Mohammad Pirayandeh | 1983 | 2005 |
|---|---|---|
| Mehdi Hodjat | 1991 | 2005 |
| Abbas Mirakhor | 1991 | 2005 |
| Alirez Ebrahimi | 1991 | 2013 |
| Ali Afshar | 2005 | 2006 |
| Ali Dabiran | 2005 | 2013 |
| Hassan Hassani | 2005 | 2013 |

**FOUNDATION PRESIDENT**

| Name | Year Elected | Year Resigned or Replaced |
|---|---|---|
| Mohammad Geramian | 1991 | 2007 |
| Farshid Jahedi | 2007 | 2009 |
| Houshang Ahmadi | 2009 | Present |

The Board may act at a meeting only if a quorum—a majority of the entire Board—is present.  (Ruzumna Decl. Exs. 34, 53; Stmt. ¶ 70.)  Assuming a quorum is established, all matters are then decided by a vote of a majority of the directors present.  (Ruzumna Decl. Exs. 34, 53; Stmt. ¶ 71.)  Outside of a meeting, the Board may act only "if all members . . . consent in writing to the adoption of a resolution authorizing the action."  (Ruzumna Decl. Exs. 34, 53; Stmt. ¶ 72.)



6386187

### B.    The 650 Fifth Avenue Company

In 1989, the Foundation and Assa Corporation ("Assa") formed the 650 Fifth Avenue Company, a partnership under New York State law.  (Ruzumna Decl. Exs. 10-11, 33; Stmt. ¶¶ 89-90.)  Assa is a corporation duly-formed under New York State law as well, and is a subsidiary of Assa Company Limited, a corporation domiciled in Jersey, Channel Islands, United Kingdom.  (Ruzumna Decl. Exs. 1, 12; Stmt. ¶¶ 83-84.)  Under the partnership agreement entered into by the Foundation and Assa on July 31, 1989, the Foundation contributed the Building to the Fifth Avenue Company and Assa contributed $44.8 million, which was used to satisfy a loan held by Bank Melli.  (Ruzumna Decl. Exs. 24, 33; Stmt. ¶¶ 93, 95, 96.)  Today, the Foundation holds a 60% interest in the Fifth Avenue Company while ASSA maintains a 40% interest.  (Ruzumna Decl. Ex. 1; Stmt. ¶ 99.)

Since its inception, the Foundation has served as the managing partner of the Fifth Avenue Company.  (Ruzumna Decl. Exs. 33, 50; Stmt. ¶ 102.)  In that role, the Foundation administers the day-to-day business and affairs of the Fifth Avenue Company, including the management of the Property.  (Ruzumna Decl. Exs. 33, 50; Stmt. ¶ 102.)  The Fifth Avenue Company contracts for management services from established management companies operating in New York, (Ruzumna Decl. Ex. 50; Stmt. ¶ 104.), and pursuant to the partnership agreement, the Foundation and Assa were to receive distributions from the income of the Fifth Avenue Company "on a pro rata basis" based on their respective percentage interests in the Fifth Avenue Company each calendar quarter.  (Ruzumna Decl. Ex. 33; Stmt. ¶ 100.)  Assa has played no role in the daily management and affairs of the Fifth Avenue Company or the Property.  (Ruzumna Decl. Exs. 33, 50; Stmt. ¶ 107.)

6386187

C.    The OFAC SDN List

The Office of Foreign Assets Control ("OFAC") is an office within the U.S. Department of Treasury's Office of Terrorism and Financial Intelligence.  (Ruzumna Decl. Exs. 4; Stmt. ¶ 110.)  Pursuant to authority delegated to it by the President, OFAC is responsible for administering the economic and trade sanctions related to the Government of Iran, including the Iranian Transactions Regulations, 31 C.F.R. Part 560, and the Iranian Assets Control Regulations, 31 C.F.R. Part 535.  (Ruzumna Decl. Ex. 4; Stmt. ¶ 111.)

As part of administering the sanctions programs, OFAC (a) designates certain persons or entities for sanctions; (b) acts to secure blocked property and enforce prohibitions against the transfer of, or other transactions related to, blocked property; (c) investigates potential violations of OFAC's regulations; (d) imposes civil penalties for sanctions; (e) refers violations for criminal investigation; and (f) issues licenses related to certain transactions that would otherwise be prohibited.  (Ruzumna Decl. Ex. 4; Stmt. ¶ 112.)

One of OFAC's primary responsibilities is to determine whether to "designate" or "block" a person or entity pursuant to standards established by the Executive Branch.  (Ruzumna Decl. Ex. 4; Stmt. ¶ 113.)  OFAC undertakes a comprehensive and detailed process for designating a person or entity under the sanctions regime, beginning with an extensive investigation that involves and incorporates information from a wide range of sources, including publicly available, non-publicly available, and classified information.  (Ruzumna Decl. Ex. 4; Stmt. ¶ 114.)  Specific information the OFAC investigators may utilize in their investigation include corporate records, law enforcement reports, intelligence information, information from foreign counterparts, indictments or court transcripts, public media reports, and other classified sources of information. (Ruzumna Decl. Ex. 4; Stmt. ¶ 115.)  After collecting and analyzing

9

these materials, the investigators determine whether or not to move forward with the designation process.  If they elect to proceed, an evidentiary memorandum is prepared and, together with the associated evidence, is reviewed for legal sufficiency by Department of Treasury attorneys as well as other agencies of the U.S. Government where appropriate.  (Ruzumna Decl. Ex. 4; Stmt. ¶ 116.)  Finally, after legal and interagency review, the OFAC Director reviews the evidentiary package and, if he agrees that the target should be designated or identified, signs a blocking memorandum, which makes the designation a final and enforceable administrative action. (Ruzumna Decl. Ex. 4; Stmt. ¶ 117.)

If the OFAC Director designates a target, it is added to a "Specially Designated Nationals" or SDN List, a list maintained and published by OFAC that contains individuals and companies allegedly owned or controlled by, or acting for or on behalf of, a targeted country, such as Iran.  (Ruzumna Decl. Ex. 4; Stmt. ¶ 118.)  Currently, over 16,000 individuals or entities have been designated by OFAC as SDNs, including nearly 1,000 as SDNs of Iran.  (Ruzumna Decl. Ex. 51; Stmt. ¶ 119.)  Although OFAC continually investigates and evaluates whether individuals or entities should be added to the SDN list, it has not placed either the Foundation or the Fifth Avenue Company on the list.  (Ruzumna Decl. Ex. 4; Stmt. ¶¶ 120-21.)  *See* Archive of Changes to the SDN List, available at: http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/archive.aspx. (last visited August 15, 2013).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted where the evidence that would be admissible at trial demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (internal citations omitted).  "Although the moving

party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  A party may not defeat summary judgment merely by "making assertions that are conclusory or based on speculation." *Major League Baseball Props. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (internal citations omitted); *see also Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.").

To the extent the Court were to draw adverse inferences against Claimants on the basis of assertions of the right against self-incrimination by former Foundation Board members or officers, such inferences would not, standing alone, defeat a motion for summary judgment. *Valenti v. Penn Mut. Life Ins. Co.*, 850 F. Supp. 2d 445, 453-54 (S.D.N.Y. 2012), *aff'd*, 511 Fed. Appx. 57 (2d Cir. 2013); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) ("[A]n adverse inference, without more, cannot satisfy a non-moving party's burden on summary judgment to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.) (internal quotation marks omitted), *appeal dismissed by, mandamus dismissed by,* 706 F.3d 92 (2d Cir. 2013).  Additional "not insubstantial" evidence of a triable issue of fact is required.  *Valenti*, 850 F. Supp. 2d at 454 (quoting *Byrnie v. Town of Cromwell, Bd. of Educ*, 243 F.3d 93, 107 (2d Cir. 2001)); *Gill*, 893 F. Supp. 2d at 553.

## ARGUMENT

I.     **TO ESTABLISH THAT CLAIMANTS' CHARITABLE AND OTHER EVERDAY ACTIVITIES CONSTITUTE IEEPA VIOLATIONS, THE GOVERNMENT MUST PROVE DAY-TO-DAY CONTROL BY IRAN OVER THE FOUNDATION AND THE FIFTH AVENUE COMPANY**

The U.S. Government seeks to forfeit the Claimants' interests in various real estate properties and bank accounts, claiming first, that Claimants' interests in the Defendant Properties constitute "proceeds" of violations of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1707 (1977) ("IEEPA"), and are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C), and, second, that Claimants' interests are forfeitable under § 981(a)(1)(A) as properties "involved in" money laundering transactions.  Under both theories of forfeiture the Government has asserted, it must establish that Claimants committed an IEEPA violation.

The Government alleges two types of IEEPA violations to support its forfeiture claims.  First, the Government asserts the Claimants are a front for the Government of Iran, and thus perform their ordinary activities as a "service[] to Iran or the Government of Iran." *See* 31 C.F.R. § 560.204.  In essence, the Government argues that the Foundation and Fifth Avenue Company *are* the Government of Iran because they are controlled by that Government. Accordingly, all of the Foundation's and the Fifth Avenue Company's activities, including managing the 650 Fifth Avenue building, undertaking charitable services, and otherwise carrying out the daily functions of the Foundation and Fifth Avenue Company, comprise services to Iran.[4]

---

[4] To the extent the Government can establish an IEEPA violation prior to Nov. 16, 2004, it is insufficient to support its forfeiture claims, as it falls outside of the statute of limitations period.  *See* 18 U.S.C. § 981(d); 19 U.S.C. § 1621 (an action shall commence "within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever is later.")  If the government asserts that the Foundation and Fifth Avenue Company's conduct were part of a continuing IEEPA violation, that violation would need to extend beyond Nov. 16, 2004 without a significant gap.  Thus, if the Government is only able to show that the Foundation and Fifth Avenue Company were controlled by the Government

12

Second, the Government asserts that whether or not Claimants day-to-day activities are performed on behalf of the Government of Iran, the Foundation's and Fifth Avenue Company's transfers of ownership distributions (derived from rental payments) to Assa, an entity the Government asserts is owned by Banki Melli and therefore included within the definition of the "Government of Iran," constitute IEEPA-violating services.

Claimants challenge the Government's first proposed IEEPA violation.  Although the Government has had years to accumulate evidence to support its claim, there remains no competent evidence that either the Foundation or the Fifth Avenue Company were "controlled by Iran" and therefore "provide[d] services to Iran" in the alleged manner post-1995.  Instead, the record evidence establishes that no material issue of fact exists and that summary judgment should be granted in favor of the Claimants on this issue.

### A.   The International Emergency Powers Act

To advance any of its forfeiture claims, the Government must establish an underlying IEEPA violation.  The IEEPA was enacted by Congress in 1977 and grants the President broad authority to enact through regulations a range of economic sanctions and other measures where he declares a "national emergency" with respect to an "unusual and extraordinary threat" to the national security, foreign policy, or economy of the United States. *See generally* 50 U.S.C. §§ 1701-1702.  On March 15, 1995, President Clinton issued Executive Order 12,957, which found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat." Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995).  On May 6, 1995, the President followed up with

---

of Iran in the late 1990s, but not after Nov. 16, 2004, it has not established an IEEPA violation within the limitations period.

Executive Order 12,959, which imposed broad financial and sanctions on Iran, including a prohibition on "the exportation from the United States to Iran, the Government of Iran, or to any entity owned or controlled by the Government of Iran, or the financing of such exportation, of any goods, technology, ... or services." Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995).[5] And two years later, in August 1997, President Clinton issued a third Executive Order— 13,059—to clarify the previous two. Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997.) The order restates and expands the previous restrictions to include all exportation and reexportation, direct and indirect, with Iran. *Id.*

Pursuant to the IEEPA and Executive Orders Nos. 12,957 and 12,959, the Department of Treasury's OFAC office promulgated Iranian Transactions Regulations (ITRs) that prohibit a series of economic transactions related to Iran. Most applicable to the Government's claims, 31 C.F.R. § 560.204 prohibits

> the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

---

[5] On February 5, 2012, President Obama issued an executive order with respect to the assets of Iran that built on several of the past orders. In Executive Order 13,599, the President ordered that

> [a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that are or hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012).

6386187

31 C.F.R. § 560.204.  Section 560.204 went into effect on August 20, 1997.  *Id.* § 560.301.

Although the ITRs do not define "services," *see* 31 C.F.R. § 560.204; *see also id.* §§ 560.301-

.321 ("General Definitions"), the Second Circuit has defined the term broadly to mean "the

performance of something useful," whether or not the entity received a fee for its conduct.

*United States v. Banki*, 685 F.3d 99, 106-07 (2d Cir. 2011); *see also United States v. Homa Int'l*

*Trading Co.*, 387 F.3d 144, 146 (2d Cir. 2004).

   The Government's theory is based on an assertion that the Foundation and Fifth

Avenue Company were controlled by—and *were* therefore as a matter of law—the Government

of Iran.  The ITRs define the "Government of Iran" to include "(a) The state and the Government

of Iran, as well as any political subdivision, agency, or instrumentality thereof, including the

Central Bank of Iran; (b) Any person owned or controlled, directly or indirectly, by the

foregoing; (c) Any person to the extent that such person is, or has been, since the effective date,

acting or purporting to act, directly or indirectly, for or on behalf of the foregoing; and (d) Any

other person determined by the Office of Foreign Assets Control to be included within

paragraphs (a) through (c) of this section.  31 C.F.R. § 560.304.  "Person" is defined as "an

individual or entity," *id.* § 560.305(a), and "entity owned or controlled by the Government of

Iran" includes "any corporation, partnership, association, or other entity in which the

Government of Iran owns a majority or controlling interest, and any entity which is otherwise

controlled by that government," *id.* § 560.313.

  **B.**  **"Controlled by"**

   To establish that all of the Foundation's and the Fifth Avenue Company's day-to-

day activity after 1995—including the Foundation's charitable giving, the entities' management

of the Building they owned, and their daily operations—were "services to Iran" under IEEPA,

the Government therefore must show that the Foundation (and, through the Partnership

Agreement, the Fifth Avenue Company) were "controlled by" Iran.[6]  The Government has

alleged exactly that, asserting throughout this case that the Foundation and Fifth Avenue

Company are merely "a front for the Iranian Government."  (*See* Dkt. No. 139, at 35

(Government's Memorandum of Law in Opposition to Motions to Dismiss); *see also* Dkt. 51, at

¶ 21 (Verified Amended Complaint).)

   "In interpreting an administrative regulation, as in interpreting a statute, we must

begin by examining the language of the provision at issue."  *Banki*, 685 F.3d at 107 (internal

quotation marks omitted).  The ITRs do not define "control" or "controlled by."  *see* 31 U.S.C.

§§ 560.301-.321 ("General Definitions").  The definition of "entity owned or controlled by the

Government of Iran" offers no guidance on the phrase, other than to note that if the Government

of Iran owns a majority or controlling interest in the entity, it is an entity either owned or

controlled by such government."  *id.* § 560.313.  As discussed above, there is no dispute here that

the Government of Iran *does not* own a majority or controlling interest in the Foundation or the

Fifth Avenue Company.  (Stmt. ¶ 9.)

   Other provisions in the ITRs offer limited guidance on the phrase "controlled by."

Section 560.215, which addres entities "owned or controlled by a United States person," defines

such as entity as one that "(i) Holds a 50 percent or greater equity interest by vote or value in the

entity; (ii) Holds a majority of seats on the board of directors of the entity; or

---

[6] It is undisputed based on the law and record evidence that the Foundation is not owned by Iran or the
Government of Iran.  As a not-for-profit corporation, the Foundation as a matter of law maintains no
owners or shareholders.  *See* N.Y. N-PCL §§ 501, 601; (Goldman Dep. 19:6-9, 84:22-85:3, Ruzumna
Decl. Ex. 2; Stmt. ¶ 8 (testifying that there is no ownership of not-for-profit corporations under New York
law)); *see also Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 715 N.Y.S.2d 575, 592 (N.Y. Sup. Ct.
1999) ("[A] nonprofit corporation has no 'owners' or private parties with a pecuniary stake.")  Even if the
court were to believe that the Foundation had owners, there is simply no evidence that the Government of
Iran is the Foundation's owner.

(iii) Otherwise controls the actions, policies, or personnel decisions of the entity." *See* 31 U.S.C. § 560.215.  Without further defining "control," this provision nevertheless suggests that a court should consider the entities' "actions, policies, and personnel decisions" when assessing whether one entity is controlled by another.

Without a clear definition of "control" in the Executive Order or regulations, courts look to the ordinary meaning of the term.  *See, e.g., Taniguchi v. Kan Pacific Saipan*, Ltd., 132 S.Ct. 1997, 2002 (2012); *see also United States v. All Funds on Deposit in United Bank of Switzerland, New York, New York, Account No. 101WA263232000* (01-Civ. 2091) (JSR), 2003 U.S. Dist. LEXIS 101, *3-4 (S.D.N.Y. Jan. 6, 2003).  Black's Law Dictionary defines the noun "control" as "the direct or indirect power to direct the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee" and the verb as "to exercise power or influence over," (8th ed. 2004).  Other dictionaries define "control" in a similar fashion.  *See* The American Heritage Dictionary of the English Language (5th ed. 2011) ("To exercise authoritative or dominating influence over; direct."); Random House Dictionary of the English Language (2nd ed. Unabridged 1987) ("To exercise restraint or direction over; dominate; command.").

Other areas of law also offer guidance as to the definition of control in similar contexts.  For example, in the context of assessing whether a court maintains personal jurisdiction over a foreign parent corporation via its United States subsidiary, *see, e.g., GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009), courts applying New York State law evaluate four factors in order to determine "if a subsidiary is a mere department or shell of a parent."  In the context of the Foreign Sovereign Immunities Act, courts have found that where an entity is "is so extensively controlled . . . that a relationship of

17

principle and agent is created", it may find that the entity *is* the foreign state for purposes of the FSIA.  *See United States Fid. and Guar. Co. v. Braspetro Oil Services* , 199 F.3d 94, 98 (2d Cir. 1999) (internal quotation omitted).  In other areas—such as alter-ego liability or control person liability under Section 20(a) of the 1934 Securities Exchange Act—courts have utilized similar standards and tests.  *See, e.g., S.E.C. v. First Jersey Sec., Inc*., 101 F.3d 1450, 1472-73 (2d. Cir. 1996).

Setting aside the small variations in these formulations, it is clear that in order for the Government to establish that the all of the Foundation's activities from 1995 forward were controlled by the Government of Iran, it must show that the Government had significant or dominant influence over the actions, policies, and personnel decisions of the Foundation, tantamount to a showing that the Foundation was an "alter ego" of the Government of Iran.  This is a very significant threshold to satisfy, and one that the Government cannot come close to reaching.

## II.    THE GOVERNMENT HAS NO COMPETENT EVIDENCE SINCE THE MID-1990S SHOWING THE GOVERNMENT OF IRAN CONTROLLED THE FOUNDATION

### A.    The Undisputed Evidence Demonstrates that the Foundation Was Not Controlled by the Government of Iran

In the hundreds of thousands of pages of discovery and dozens of depositions taken in this case, there remains no evidence that the Government of Iran exercised dominant, day-to-day control over the Alavi Foundation from 1995 forward.  All of the record evidence shows independence by the Foundation and its Board.

As to the Foundation, there is no evidence that during the relevant period Iranian officials directed the Foundation's charitable giving, dictated the selection of Board members, officers or Foundation employees, or otherwise managed the day-to-day operations of the

18

charity.  There is no also no evidence that the Government of Iran was involved in the day-to-day operations of the Fifth Avenue Company, including recruiting tenants, collecting and processing rent, managing and maintaining the Building, and otherwise controlling the daily business of owning and operating a midtown Manhattan rental property.

   The record evidence supports the opposite conclusion—that the Foundation was managed on a day-to-day basis by the Board and the Foundation's employees, who served the interests of the Foundation and not the Government of Iran.  Significantly, the testimony of Abbas Mirakhor, a Foundation Board member from 1991 through 2005, makes clear that the Foundation's activities—charitable, management, personnel, and otherwise—were made by the Board and President on behalf of the Foundation and were not controlled by the Government of Iran or any agent of such Government.  The Foundation's Board determined which charities to donate to, not the Government of Iran.  (Mirakhor Dep. 65:25-66:1-6,77:22-25, Ruzumna Decl. Ex. 5; Stmt. ¶ 75.)  The donations themselves were made on behalf of the Foundation and not for, or on behalf of, Iran.  (Mirakhor Dep. 76:14-77:20; Ruzumna Decl. Ex. 5; Stmt. ¶ 76.)  And the Government of Iran did not require the Foundation to hire certain employees or pay their salaries.  (Mirakhor Dep. 35:15-25, 36:18-37:1; Ruzumna Decl. Ex. 5; Stmt. ¶ 75.)  According to Mr. Mirakhor, for the entire time that he was a board member of the Foundation, the Alavi Foundation was an independent organization with no relationship to organizations in Iran. (Mirakhor Dep. 55:3-14; Ruzumna Decl. Ex. 5; Stmt. ¶¶ 73, 79.)

   The sworn statements of the Foundation's long-time employees confirm these conclusions.  Ms. Safakamal, the Financial Manager for the Alavi Foundation for over a decade, has affirmed that the Foundation neither receives funds from the Government of Iran nor provides funds to it.  (Ruzumna Decl. Ex. 50; Stmt. ¶¶ 28-29.)  The Foundation also manages its

own assets and chooses its own employees, without any influence from the Government of Iran. (Ruzumna Decl. Ex. 50; Stmt ¶ 36, 42.)  Finally, neither the Government of Iran nor any Iranian officials have (or have had) any influence over the day-to-day decisions made by the Foundation or the Fifth Avenue Company.  (Ruzumna Decl. Ex. 50; Stmt. ¶¶ 41, 53.)

The statements of Dr. Aliabadi, the Foundation's Program Coordinator, affirm that that the Government of Iran does not (and did not) participate in, let alone control, the day-to-day charitable decisions of the Foundation.  (Ruzumna Decl. Ex. 54; Stmt. ¶ 47.)  As to the Foundation's programs, Dr. Aliabadi is responsible for reviewing grant applications and partially responsible making recommendations to the President of the Foundation regarding where it should donate its resources.  (Ruzumna Decl. Ex. 54; Stmt. ¶ 45.)  According to Dr. Aliabadi, neither the Government of Iran nor any Iranian officials influence how the Foundation's programs are managed and operated, or how the Foundation's funds should be allocated. (Ruzumna Decl. Ex. 54; Stmt. ¶ 47.)  Mr. Aliabadi's recommendations as to donations are mostly approved and accepted by the Board.  (Ruzumna Decl. Ex. 54; Stmt. ¶ 46.)

Ms. Safakamal's and Dr. Aliabadi's statements cannot be disputed by the Government. ███████████████████████████████

████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████

In sum, statements by the individuals with the most operational knowledge of the Foundation and the Fifth Avenue Company make clear that neither entity is influenced, let alone controlled, by the Government of Iran or any Iranian Officials.

**B.      The Government Cannot Offer Affirmative Evidence of Control**

In opposition to this motion, the Government may come forward with certain materials that it alleges support its claim that the Government of Iran controls the Foundation. None of these items should alter the court's analysis or create an issue of material fact as to whether the Foundation was in fact controlled by Iran.

The Government's primary support for its claims will likely be documentary evidence relating to the 1989 transaction between the Foundation and Assa, meeting minutes from various Board meetings suggesting control of Foundation personnel in 1991 or before, Foundation letters bearing the symbol of the Islamic Republic of Iran, and other documents showing that an ambassador from the Iranian Mission to the United Nations ("IMUN") attended several Foundation board meetings in the 1990s and 2000s.  To the extent these materials can be admitted at trial, the overwhelming majority of them relate only to the 1970s, 1980s, or early 1990s, not the period after the Executive Orders or ITRs were in effect.  The Amended Complaint references numerous items from before 1992, but very little after that date.  (*See* Dkt. No. 51.)  To the extent there are any post-1995 allegations, they fail to establish control by the Government of Iran.  Sporadic contact and advice by the Iranian Ambassador to the United Nations and irregular attendance at Foundation Board Meetings simply do not constitute dominant influence or day-to-day control.  (Mirakhor Dep. 70:20-71:5-25; Ruzumna Decl. Ex. 5; Stmt. ¶ 77) (explaining that IMUN ambassadors attended board meetings occasionally, but were not vocal).)

21

The Government is also likely to seek adverse inferences in response to the decisions by various Foundation board members to assert their Fifth Amendment privilege against self-incrimination at depositions.  Even if the Court draws adverse inferences against Claimants based on assertions by former Foundation Board members and officers of their right against self-incrimination, those alone are insufficient to defeat a motion for summary judgment. *Valenti*, 850 F. Supp. 2d 445 at 453-54; *Gill, PLC*, 893 F. Supp. 2d at 553.

In addition, adverse inferences are unwarranted here.[7] ████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████    ██████████████████

████████████████. As the Second Circuit has stated:

> [D]istrict courts should make special efforts to accommodate both the constitutional [privilege] against self-incrimination as well as the legislative intent behind the forfeiture provision. And, in so doing, trial courts should not disregard the fact that the plaintiff in forfeiture actions is the Government, which controls parallel criminal proceedings in federal court and also possesses the power to grant some forms of immunity.

*United States v. Certain Real Prop. and Premises Known as: 4003-4005 5th Ave., Brooklyn, NY*, 55 F.3d 78, 83 (2d Cir. 1995).

Further, because the Government can offer no evidence to suggest that the testimony of these witnesses who chose to assert their Constitutional privilege would support the

---

[7] "Although, a court is entitled to draw an adverse inference against a party to a civil action that refuses to testify under the Fifth Amendment, there is no requirement for the Court to do this. In fact, the drawing of an adverse inference against a litigant who invokes the Fifth Amendment is a harsh remedy that is normally employed to counter a defendant's desire to obstruct discovery or abuse the privilege against self-incrimination."  *Sampson v. City of Schnectady*, 160 F. Supp. 2d 336, 351 (N.D.N.Y. 2001).  In light of how discovery has proceeded in this case, the Government cannot credibly allege that C*laimants* have attempted to obstruct discovery or abuse privileges preventing full discovery.

22

Government's case, particularly on this issue of control, an adverse inference is wholly inappropriate. Indeed, to the extent any party is harmed by the witnesses' decisions not to testify, it is the Foundation, not the Government. ███████████████████

████████████████████████████████████████

████████████████████████. The Court should not condone the Government's tactics, let alone artificially build its case where it otherwise does not exist, by granting adverse inferences against the Foundation's Board members and officers. *See United States v. Torres*, 845 F.2d 1165, 1170 (2d Cir. 1988) ("[C]ourts have been reluctant to find a witness practically unavailable when it appears that the [party] has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship in an effort to obtain a missing witness charge.").

　　　　The other witnesses the Government intends to call can add little to its claim of control since the mid-1990s. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████

　　　　For the same reasons, it cannot be disputed that the Government of Iran does not control the Fifth Avenue Company. The Government cannot offer any evidence that Iran managed the Fifth Avenue Company on a day-to-day basis, required the contracting of a specific

management company or the hiring of employees, or controlled when distributions were made to the Foundation and Assa.  (*See* Ruzumna Decl. Ex. 50; Stmt. ¶¶ 39, 41.)

> ### C.    OFAC Has Determined that the Foundation and Fifth Avenue Company Are Not Controlled by the Government of Iran

In addition to the evidence produced in this case, the question of control has already been decided by the U.S. Government.  The responsibility of determining whether an entity is controlled by the Government of Iran lies primarily with the Treasury Department, specifically OFAC.  (Ruzumna Decl. Ex. 4; Stmt. ¶¶ 111, 113; *see* Dkt. No. 512.)  OFAC is tasked with determining through comprehensive investigations whether an entity or individual should be "blocked" as owned or controlled by the Government of Iran, and added to its SDN list.  (Ruzumna Decl. Ex. 4; Stmt. ¶¶ 113-14.)  In total, over 16,000 blocked entities or individuals are currently on the SDN list, with close to 1,000 associated with Iran, including Bank Melli and Assa.  (Ruzumna Decl. Ex. 51; Stmt. ¶ 119.)

Despite numerous comprehensive investigations undertaken by OFAC from the 1990s forward, OFAC has not designated the Foundation an entity controlled by the Government of Iran or added it to the SDN list.  (Ruzumna Decl. Ex. 4; Stmt. 120-21.)  Although the list is not dispositive of whether an entity's assets should be "blocked" pursuant to the sanctions regime, OFAC's conclusion as to the Foundation's designation (or lack thereof), which corroborates the record evidence in this case, is entitled to significant deference.   (*See* Dkt. No. 512.) ("Given OFAC's unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes its determinations, it is entitled to deference even greater than that afforded an administrative agency statutory interpretation under *Chevron*.").

## CONCLUSION

For the reasons set forth above, Claimants respectfully request that the Court grant their motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the Government's claim that the Foundation and Fifth Avenue Company are controlled by the Government of Iran.

Dated:  August 16, 2013

Respectfully submitted,

_/s/ *Daniel S. Ruzumna*_____
Daniel S. Ruzumna (DR-2105)
Adam Blumenkrantz (AB-1002)
Sean Murray (SM-0276)
Melissa R. Ginsberg (MG-2410)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000
Facsimile 212-336-2222
Email druzumna@pbwt.com
Email ablumenkrantz@pbwt.com
Email smurray@pbwt.com
Email mginsberg@pbwt.com
Email mcolitigation@pbwt.com

6386187