# EXHIBIT
# 1

**Report by Patrick Clawson on the Bonyad Mostazafan**
June 24, 2013

This report is submitted to provide facts and evidence concerning the relation of the government of the Islamic Republic of Iran (hereafter: "Iran") to the Bonyad Mostazafan and the Alavi Foundation of New York, as well as information about certain individuals.

**Origins of the Bonyad Mostazafan**
The Bonyad Mostazafan, meaning the Foundation for the Oppressed, has as its Persian name *Bonyad-e Mostazafan.*

Accounts of the early days of the Bonyad Mostazafan are not fully consistent, although the apparent inconsistencies may simply reflect the chaos of the early days of the Iranian Revolution. For instance, by some accounts, the Bonyad Mostazafan was initially established by order of the interim prime minister and then the revolutionary leader Ruhollah Khomeini issued the order confirming this action. Other accounts cite as the origin of the Bonyad Mostazafan the February 28, 1979 ordered by Khomeini, which in a good translation appears on the website of the Bonyad Mostazafan:

"To: Council of the Islamic Revolution

"By means of this letter, the Assembly is appointed to confiscate all movable and immovable property of Pahlavi dynasty and its branches, subsidiary and associates whatsoever who have embezzled from the treasury of the Muslims during this unlawful reign, for benefit of the needy, and frail workers and employees, and to deposit the movable assets in a bank account under the name of the Islamic Revolution Council or mine, and to notarize and seize the immovable assets, such as real estate and land lots, in order to utilize them for the benefit of the poor from every stratum of the society, to generate housing, employment, etc. All the Islamic Revolution Committees across the country are ordered to deposit in the bank account whatever possessions of this type they seize. The administration should be directed that these seized properties do not belong to the government and shall be managed by the Islamic Revolution Council; and the government officers shall submit to the same bank account whatever they have or will confiscate; and those persons who have come into possession of some of this property shall give it back immediately to the Revolution Committees or to the bank; any violation will be prosecuted."

The Bonyad Mostazafan website's account of the Bonyad's history states that on March 5, 1979, Bonyad Mostazafan "was established under the supervision of a board selected by the Great Leader of the Revolution," i.e., Khomeini. But the website also says the "Foundation was established on March 18, 1979 by the founding committee for an unlimited period." The website goes on to say that the founding board drew up the Articles of Association (assas nameh) on June 24, 1979, which was duly approved by the Islamic Revolution Council, and the Foundation was registered on July 25, 1979 with the registration number 1983, under article 8 of the Amendment Bylaws of the Non-profit Organizations. The website also says that "on July 12, 1980, the Legal Act of the Articles of Association of Mostaz'afa-n Foundation [Bonyad Mostazafan] were approved by the Islamic Revolution Council and replaced the Articles drawn

-1-

up by the founding members."

On September 17, 1980, Khomeini appointed Iran's Prime Minister Mohammad Ali Rajai as president of the Bonyad Mostazafan; Rajai in turn named someone as acting president. After Rajai was killed by a terrorist bomb, Khomeini appointed his successor as Prime Minister, Mir Hosein Musavi, as president of the Bonyad Mostazafan, and he in turn appointed an acting president, lasting until 1989. In other words, for about nine years, the Prime Minister of Iran appointed the Bonyad Mostazafan president – an indication of the close relation between the Iranian government and the Bonyad Mostazafan.

In 1988, the name of the Foundation was changed to Bonyad Janbazan (janbazan, or "self-sacrificers," being the term the Islamic Republic of Iran used for those injured in the war with Iraq), and the mission shifted to caring for the war-wounded. The Foundation lost that role of caring for the war wounded in 2003, and the name of the Foundation was changed back to its original form in 2004.

### Control over the Bonyad Mostazafan

The Bonyad Mostazafan is governed by its Articles of Association, the Persian text of which is found on its website at irmf.ir/About-Us/rules.aspx as is a generally accurate if inelegant English translation (quotations below are my translation, which is more exact than that of the Bonyad Mostazafan's English website, but the differences are not material to the points made here). The Articles' Article 2 states, "As the date of Esfand 9, 1357 [February 28, 1979], by order of His Excellency Grand Aytollah Imam Khomeini Lord of the Era for Muslims [a traditional title] and Grand Leader of the Islamic Revolution, the Foundation is established for an unlimited time period."

The Articles of Association's Article 4 provides, "The Bonyad [Mostazafan] is an institution issuing from the Islamic Revolution, a non-profit with a distinct legal personality and financial, management, and employment independence, with management and control under the supervision of he who holds the position of Leader." Article 12 provides, "The President of the Bonyad is appointed by order of he who holds the position of Leader." Article 10 provides the same for the Board of Trustees, which is to report to the Leader every six months. Article 11 provides that the Bonyad's audit is to be done "under the supervision of he who holds the position of Leader" and the results of the audit are to be provided to the Leader. Article 13 provides, "The President of the Bonyad is to carry those activities which are assigned to him by he who holds the position of Leader." Articles 2, 4, 10, 11, 12, and 13 make no reference to any other person or body other than the Leader as having a role in establishing, running, controlling, or auditing the Bonyad Mostazafan. As provided for in the Articles of Association, the Leader has modified the Articles of Association on several occasions, the most recent of which was May 26, 2004, by which time the Leader was the current holder of that position, namely, Ayatollah Ali Khamenei. All references here are to the Articles of Association as modified by the Leader.

As provided in the Bonyad Mostazafan's Association, its president is appointed by Iran's Leader. The current Leader's website, *khamenei.ir*, gives the Persian-language text of his orders appointing the president of the Bonyad Mostazafan. The most recent was posted August 28, 2009 appointing Mohammad Firuzandeh head of the Bonyad Mostazafan for a period of five years; the previous one was posted December 3, 2005 also appointing Mohammad Firuzandeh head for a period of five years. The exact same texts of Khamenei's orders can be found on the website of the Bonyad Mostazafan, irmf.ir/history/fifth_period.aspx, though there they are listed

by the date on which the order was issued, namely, August 26, 2009 and November 21, 2005.

Researchers who have looked at the activities of the Bonyad Mostazafan in Iran describe it as part of a dense network of state institutions which thrive based on tax exemptions, access to heavily subsidized foreign exchange, and exemptions or evasion of regulations applicable to private businesses. For instance, from his detailed and extensive interviews with merchants in Tehran's bazaar – the heart of Iran's private commerce – Arang Keshavarzian, in his *Bazaar and State in Iran* (Cambridge University Press, 2007), describes the bazaar merchants' strong opinion that the Bonyad Mostazafan is part of the government. When Keshavarzian referred to the Bonyad's leaders as *bazaaris* (bazaar merchants), he "was promptly cut off and told, 'They are not *bazaaris*, they are *dawlati* (officials of the government).'" He writes, "Another person described them as *ahl-e regime*, literally, 'of the regime.'"

The Bonyad Mostazafan website irmf.ir provides extraordinarily detailed annual financial reports in Persian and English. The most recent, which is 152 pages in English, covers the year ending March 22, 2012. That report shows the size and complexity of the Bonyad Mostazafan's operations.

### The Alavi Foundation (of Iran)

Iranian sources agree that in the early weeks after coming to power in 1979, the revolutionary government changed the name of the Pahlavi Foundation to the Alavi Foundation. What happened after that point is not entirely clear. The 1979 Articles of Association of the Bonyad Mostazafan do not refer to the Alavi Foundation. By contrast, the 1980 version of the Bonyad Mostazafan Articles of Association, stated in Article 29, "All land, real property, factories, farms, institutions, and other things which were confiscated are to be the property of the Bonyad Mostazafan and subject to the regulations of this Foundation and in this regard, the Alavi Foundation and instances of that type are not to be separate" (my translation from the Persian original - the Bonyad Mostazafan's website gives a slightly different translation: "All the real properties, factories, farms, institutions, etc. confiscated shall be a part of the foundation, shall follow the regulations of this foundation, and shall be under its management, therefore the Alavī Foundation and the like shall not have a separate title.")

Despite the reference in the 1980 Articles of Association to the transfer to the Bonyad Mostazafan of the assets of the Alavi Foundation (the former Pahlavi Foundation), a respected Iranian reference work writes about the continued existence after that time of the Alavi Foundation as an institution controlling the land assets of the former Pahlavi Foundation. Those land assets were controversial. Indeed, they continue to be controversial: a May 2013 speech by one of the candidates for president in the current election campaign (from former Foreign Minister Mottaki) criticized the Alavi Foundation for holding on to extensive lands that the Pahlavi shahs had confiscated, saying that these lands should have been returned to their original owners. To be sure, Reza Shah (ruled 1926-41) was well-known for confiscating for himself huge tracts of land all over Iran, and that land was a very important of the assets of the Pahlavi Foundation and one of the reasons the Foundation was deeply resented.

According to that Iranian reference work, in January/February 1996 -- seventeen years after the Bonyad Mostazafan was created -- the court set up under the 1979 Constitution's Article 49 to adjudicate confiscation of improperly obtained assets ruled that the Alavi Foundation assets were to be transferred to the Bonyad Mostazafan. That source states that since then the Alavi Foundation has been the legal name for a part of the Bonyad Mostazafan. I do not know if

the Alavi Foundation existed in practice or only as a shell during the years 1979-1996.

In 2005, Iranian Supreme Leader Khamenei charged the Alavi Foundation with a new and important mission, namely, serving as a charitable operating arm of the Bonyad Mostazafan. For that purpose, the Alavi Foundation opened offices in many Iranian cities, especially in the poor regions. I am not aware of any indications that this Iran-based Alavi Foundation has activities outside of Iran or any connection to institutions outside Iran.

The Alavi Foundation certainly continues to exist as a distinct legal entity completely controlled by the Bonyad Mostazafan. The Alavi Foundation of Iran has a detailed Persian-language website, alavi-bonyad.org, with many details about its activities. The latest financial statement of the Bonyad Mostazafan, covering the year 2011/12, contains many references to both income and expenses of the Alavi Foundation. There are many articles on Iranian websites about the Alavi Foundation selling land in Iran, mostly in far-flung places – land which certainly appears to have been that confiscated by the Pahlavi shahs and formerly under the Pahlavi Foundation.

### Iran's Leader

Iran's Constitution has detailed provisions about the Leader (the current Leader insists that he always be referred to as Supreme Leader, so that is the term now used). Article 5 provides, "During the occultation of the Lord of the Age [the Mahdi, or Hidden Imam] (May God hasten his advent), the governance and leadership of the nation is entrusted to a just and pious jurisprudent [*faqigh*] ... who will assume the responsibilities of this office in accordance with Article 107 below." Article 107 provides for the selection of the Leader by the Assembly of Experts, a body of clerics elected under the procedures laid out in Article 108 – procedures which provides that Leader selects a body which decides who may run for the Assembly of Experts.

The powers of the Leader, as set out in Article 110, include: commander-in-chief; appointment of the head of the judiciary, the head of the radio/television network, "ranking officials of the three branches [of government]"; dismissal of the president; and "resolving the problems which afflict the system and which may not be solved by conventional methods" -- which has been understood to mean the power to override all laws. Article 113 makes clear the centrality of the Leader; it reads, "The president is the highest official position of the country after the position of the Leader."

In short, the Leader is a government official with unlimited powers. In that capacity, he directly controls some of Iran's most important institutions, which do not come under the control of the three branches of government but instead report to him alone. Those institutions include the Revolutionary Guards, the radio/television network, and several important foundations [*bonyads*] including the Bonyad Mostazafan.

The institutions the Leader directly controls, including the Bonyad Mostazafan, have often fought bitter political fights to stake out their claims to independence from Iran's executive and legislative branches, refusing to respond to directives from the president or to have their accounts audited under the law governing state corporations. That independence from the three branches – executive, legislative, and judicial – does not change the fact that these institutions are part and parcel of the Iranian government.

The direct control by the Supreme Leader over institutions central to the Islamic Republic of Iran is an important reason that many analysts describe Iran as a theocracy, though

that term is not completely accurate in that the control is in the hands of the Leader rather than those of the clergy as a class. In any case, Iran's constitution provides for a divided form of government, with ultimate power in the hands of the Supreme Leader.

In sum, in my expert opinion, the Bonyad Mostazfan was established by the Government of Iran, received all its resources from the Government of Iran, and is controlled by the Government of Iran through that government's Supreme Leader.

### Khamenei's Taking Control

After Ali Khamenei became the Supreme Leader on Khomeini's death on June 3, 1989, he proceeded to remove many of the prominent individuals who had held posts under Khomeini. One of the first such set of changes he made was at the Bonyad Janbazan (the former Bonyad Mostazafan - the name by which I will refer to it; note that the name was changed in 1989 to "Bonyad Mostazafan and Janbazan"). On September 5, 1989, he appointed a new president of the foundation, Moshen Rafiqdoost, who had for years been the Minister for the Revolutionary Guards (a position what was merged with the Minister of Defense).

Naming Rafiqdoost to the Bonyad Mostazafan was an important part of Khamenei's policy of currying favor with the Islamic Revolutionary Guard Corps (IRGC). As president until 1989, Khamenei's relationship with the IRGC had been contentious. But Khamenei made the strategic decision to cultivate a close relationship with the IRGC – a wise move which laid the foundation for his increasing power. Indeed, the extremely tight relationship between the IRGC and Khamenei has become the centerpiece of how the Islamic Republic is run, to the extent that U.S. government officials refer to the Islamic Republic as being a military dictatorship rather than a theocracy. Certainly Khamenei appears publicly with IRGC officials much more often than he does with clerics, with whom he has had at times a difficult relationship.

The reason that Rafiqdoost's appointment was an important way to cultivate the IRGC was that the IRGC was rather at a loss for a mission in the aftermath of the Iran-Iraq war. Its prestige in society was plummeting; indeed, its members became the butt of popular humor as outdated ideologues. What Khamenei was doing was handing over the IRGC one of the richest institutions in Iran, and one which long refused to provide public accounting about its activities. The takeover of Bonyad Mostazafan launched the IRGC on the path to become the key play in Iran's economy. It was the first of many institutions the IRGC was to take over. Former IRGC officials went on to take over control of many of Iran's largest companies, such a blatantly manipulated takeover of Iran's largest telecommunications company, as well as the ousting of the firm selected to run Tehran's new airport (using tanks to do so) so that the IRGC could continue to control smuggling there. Its role in smuggling became so notorious that when Ahmadinejad got into a dispute with the IRGC in 2012, he began a televised lecture to IRGC officers with the greeting "Brother smugglers" and went on to berate them for their control over smuggling.

Besides cultivating the IRGC, the other key institution over which Khamenei consolidated his power during the 1990s was the clerical establishment, which historically had been very independent. Khamenei strengthened the role of the special clerical court, using it to bring actions against clerics who criticized the government or questioned his claim to be the chief interpreter on religious issues – a delicate issue, since Khamenei, while a cleric, was not a distinguished one, and he had clearly been put in his post for political reasons rather than because of any claim to be a religious leader. He also systematized and centralized the long

independent clerical establishment, establishing government-run bodies to determine who could call themselves a cleric and to regulate the control of the religious seminaries – profound changes to a centuries-old system in which the faithful gave donations to those they respected, who in turn used the extent of the support they received to buttress their claims to religious legitimacy and to fund seminaries they completely controlled.

As Khamenei consolidated his control over the two key institutions behind the Islamic Republic – the IRGC and the clergy – he moved to assert more and more control over the government. Rafsanjani's memoirs, based on the diary he kept at the time, describes how already during his 1989-97 presidency, he had to consult closely with Khamenei on key government appointments, including to the cabinet. This process accelerated when the reformist Mohammad Khatemi unexpectedly was elected president in 1997. Khatemi complained that he had little control over key ministries because Khamenei directly appointed the ministers and those ministers only responded to Khamenei. Indeed, Khatemi repeatedly threatened to resign because he complained he had little control over the power centers of the government and had no role in the appointment of some cabinet ministers.

### The Role of Iran's UN Representatives

UN Ambassadors have long been individuals particularly close to Khamenei and not necessarily close to their nominal boss (the foreign minister) or the president. As discussed below, Kamal Kharrazi, appointed to the UN position in 1989, has been a long-time close associate of Khamenei: his brother Mohsen had been since the 1960s a close friend of Khamenei's, and Kamal held two of the few key posts under Khameni's control while president from 1981 to 1989. Kamal Kharrazi's successor in 1997 was his nephew Sadegh Kharrazi, who appeared to have slim qualifications for the post other than his family ties. That would fit a common pattern in the Islamic Republic, particularly for positions decided by Khamenei, in which important post are determined more on the basis of family ties than professional background. Sadegh Kharrazi's successor in 2002 was Javad Zarif, for whom Khamenei is widely said to have had particular respect.  I have heard well-informed Iranians and Iranian-Americans refer to Khamenei soliciting Zarif's advice about how Iran should approach difficult issues, particularly regarding the United States – which, if true, is remarkable, since Khamenei is not know to be solicitous of advice from others.

Iran's UN Mission has been central in relations with Americans who want to engage with the Islamic Republic's government.  Numerous U.S. journalists who have visited Iran have described to me the central role the UN mission played. The key person with whom the journalists negotiated about their visa was the UN ambassador or his assistant, while the Iranian Interests Section in Washington was responsible only for handling the paperwork, without playing any important role in the decision-making process. Similarly, numerous Americans who have tried – sometimes successfully, sometimes unsuccessfully – to arrange meetings in Iran, or in Europe with Iranian official participation, have described to me that the key interlocutor for such efforts was the UN ambassador or his assistant. No one has ever stated that the Interest Section was at all important for such efforts, and several has disparaged the Interests Section as paper-pushers. When after the September 11, 2001 attacks the Bush administration arranged a series of high-level bilateral secret meetings with Iranian officials primarily to discuss counter-terrorism cooperation, a key Iranian participant was incoming UN Ambassador Zarif. A much-debated March 2003 initiative to launch talks for normalizing U.S.-Iranian relations had as its

Iranian co-author Sadegh Kharrazi, who had recently left his post as Iran's UN Ambassador, and his successor (Zarif) has acknowledged that he edited the document (the other co-author was Swiss Ambassador to Iran Urs Christian Timotheus, or "Tim," Guldimann, who represented U.S. interests in Iran). And of course the UN Mission has been responsible, when Iran's president visited New York for UN meetings, for arranging meetings between Iran's president and American journalists, politicians, and foreign policy experts.

I have been told by numerous Iranian-Americans that Iran's UN Mission has played an important role in relations with Iranian-Americans and in promotion of the Islamic Republic's ideology, including cultural outreach activities. And of course the UN Mission has been responsible, when Iran's president visited New York for UN meetings, for arranging meetings between Iranian-Americans and Iran's president.

### The Islamic Republic's Influence over Expatriates

A December 3, 2009 *Wall Street Journal* investigation (published as "Iranian Crackdown Goes Global") found, "Interviews with roughly 90 ordinary Iranians abroad -- college students, housewives, doctors, lawyers, businesspeople -- in New York, London, Dubai, Sweden, Los Angeles and other places indicate that people who criticize Iran's regime online or in public demonstrations are facing threats intended to silence them....Dozens of individuals in the U.S. and Europe who criticized Iran on Facebook or Twitter said their relatives back in Iran were questioned or temporarily detained because of their postings." The report described anonymous e-mail threats to Iranian-Americans, threatening bodily harm. That would fit with the threats issued in public statements by Iranian officials that they would deal harshly with Iranian critics wherever in the world they live.

This pattern was hardly new. In 1980, the Iranian government organized the assassination of Ali Akbar Tabitabai in Potomac, Maryland. Tabitabai was president of the Iranian Freedom Foundation. His assassin, an American Muslim convert, fled to Iran where he became a well-known physician and later movie actor under the name Dawud Salahuddin; in public interviews, he has acknowledged that he carried out the assassination. Many Iranian-Americans believe that the Islamic Republic was also behind the deaths of some other Iranian-Americans, both in the United States and abroad. Though none of these allegations have ever been proved, many Iranian-Americans feel intimidated by the kind of threats described above.

The Islamic Republic engaged in high-profile assassinations of prominent Iranian dissidents in Europe in the 1980s and 1990s. A few examples will illustrate:

In July 1989, Dr. Abdul Rahman Ghassemlou, Secretary-general of Kurdish Democratic Party of Iran and two of his collaborators, were assassinated in Vienna, Austria by envoys of the Islamic Republic, with whom they were negotiating at the latter's invitation, for a peaceful solution to the Kurdish issue in Iran.

After escaping one attempt on his life in 1990, in 1991, former prime minister Shahpour Bakhtiar was assassinated in a Paris, France suburb despite the guards provided by the French government (Bakhtiar had been a hero of the French Resistance during World War II).

In September 1992, four prominent members of the Kurdish Democratic party of Iran who had just attended a meeting with prominent European polticians were assassinated in Berlin, Germany at the Mykonos Restaurant. After a high-profile trial, the German court ruled that the assassination had been ordered by Iranian intelligence minister Ali

Fallahian with the knowledge of Supreme Leader Khamenei and President Rafsanjani. In reaction, all the European Union countries withdrew their ambassadors from Iran. They returned only after a de facto deal had been worked out that Iran would cease the assassination of Iranian dissidents in Europe.

In addition to intimidation, the Islamic Republic has used inducements to influence Iranian-Americans. Some Iranian-Americans friendly to the regime have done well in business dealings in Iran. Organizations promoting more friendly policies towards the Islamic Republic have been well-funded, even though opinion polling suggests few Iranian-Americans are friendly to the regime – and the organizations in questions have not been transparent about their finances.

Many in the Iranian-American community are convinced that the Islamic Republic collects much information about their activities. That would be consistent with the harrassing emails described above. The *Wall Street Journal* article cited above stated, "In Germany, a national intelligence report indicates that Iranian intelligence operatives are monitoring about 900 critics of the Iranian regime within Germany." There are many suspicions about monitoring by religious centers which have representatives of Supreme Leader's Khamenei's office, such as the Islamic Center for Education in Potomac, Maryland. It is run by Ahmad Bahraini, who was Khamenei's former representative at Shahid Beheshti University, Khamenei's former representative in London, and who once worked at the Special Court for the Clergy which metes out harsh punishment to any cleric even vaguely critical of the regime's politics.

### The Pahlavi Foundation of Iran

The Pahlavi Foundation in Iran (unless otherwise specified, all references hereafter to the "Pahlavi Foundation" are to the Iranian organization of that name, as distinct from the "Pahlavi Foundation of New York") was founded by Shah Mohammad Reza Pahlavi in 1958. In part, it replaced the Pahlavi Estates Office which managed the 6 million acres of land, comprising 830 village, that had been acquired by Mohammad Reza's father Shah Reza Pahlavi during his rule from 1926 to 1941. Most of that acquisition was by confiscation of dubious legality. The Shah established himself as the chief Custodian of the Foundation. There were nine other Custodians, five of them ex-officio (the Prime Minister, Court Minister, head of the Senate, speaker of the Majlis, and the Chief Justice of the Supreme Court). The Foundation has always been run by the Deputy Chief Custodian, who for many years was Ja'afar Sharif-Emami, the head of the Senate.

The most detailed information about the Pahlavi Foundation comes from Robert Graham in his 1978 book, *Iran: The Illusion of Power* (London: Croom Helm, 1978). Mr Graham was a Tehran-based reporter for the *Financial Times* from 1975 to 1977. He quotes an unpublished booklet about the Foundation's activities by Siavash Danesh, the public relations director of the foundation and asssistant to Sharif Emami (Graham writes the Foundation "had second thoughts on its value and content"),

> "The last and by no means least service of the Social Affairs Department [of the Foundation] is to seek out the near and distant relatives of the founder of the Pahlavi dynasty and see to their basic requirements and needs; for welfare begins at home and no foundation could be expected to ignore the essential requirements of its own flesh and blood relatives."

Graham also describes in detail the intermingling of government, royal family, and Foundation funds in entirely non-transparent ways. For instance, he writes, "The Foundation is believed to be the conduit for end-of-year bonuses" for government officials and military

officers, as well as cash grants to those in favor with the Shah. Government funds have been used to buy out the Foundation's bad investments in particular projects. Some of the Foundation's charitable activities were financed by government funds.

The Pahlavi Foundation was completely non-transparent about its assets as well as it operations. Graham writes, "The Foundation itself refuses to part with any information concerning the value of its assets, annual income or the composition of investments." He footnotes that sentence, "Minister of Information Karim-Pasha Bahadori wrote a letter in May 1978 on the author's [Graham's] behalf requesting assistance from [Sharif] Emami in supplying these details. The Foundation's view was that it took orders only from the Shah and that it was a private – not a state – institution." Graham's estimate was that the Foundation's assets were at least $2.8 billion, and estimate which "does not fully take account of the enormously variable element in the value of [real estate] property."

Graham explains how the Foundation was the beneficiary of corruption:
"It has been and still is a practice in Iran for those establishing industrial and commercial ventures to offer small stakes to members of the Royal Family or to the Pahlavi Foundation direct.... This practice grew out of the generally well founded belief that royal patronage was the most effective guarantee of profitability.. In the same way the commissions on contracts, especially defence contracts, paid to intermediaries have been channelled to the Foundation on the Shah's instructions."

Some of the Foundation's assets were abroad. The French weekly *Le Canard enchaîné* published a 1962 monthly bank account of the Pahlavi Foundation at the Union de Banques Suisses showing payments to twelve members of the royal family as well as showing $12 million in deposits that month from the National Iranian Oil Company, a firm totally owned by the government that runs Iran's share in its oil industry (at that time, there were also foreign partners, later nationalized). Graham wrote in his 1978 account, "The Pahlavi Foundation is now actively searching the international property market for investment opportunities; and even employs a senior Member of parliament, Senator Foroughi, to act as an international adviser in this respect." Some of those investments may have been through Bank Omran, Iran's fifth-largest bank which was totally owned by the Pahlavi Foundation. Press reports suggest that either Bank Omran or the Pahlavi Foundation was planning to invest in the Canal Street project in New Orleans, a large real estate project.

All accounts of the Pahlavi Foundation describe its activities as being micromanaged by the Shah, who was well-known for making even small decisions about government operations. Newsday reporter Kenneth Crowe, wrote, "While the public doesn't get annual reports [about the Foundation], the Shah is supposed to get weekly progress reports. 'He gets a report of the meetings and procedures...Once a week, the vice executor reports directly to His Majesty on the activities of the Pahlavi Foundation. I believe it is on Tuesdays,' an executive said." Crowe describes the Shah as having been deeply involved in the details about the investment in 650 Fifth Avenue and the establishment of the Pahlavi Foundation of New York.

The Pahlavi Foundation engaged in many charitable activities, such as providing food to the faithful during the fast month of Ramadan; assistance to the blind, deaf and dumb; and aid to orphans. One of the highest-profile activities was funding university students abroad. In a 1977 speech, Sharif-Emami said that the Foundation had funded more than 13,000 university students abroad at quite generous rate; in 1977, the Foundation estimated the average student cost $500 a

month. The Pahlavi Foundation also made grants to American universities to promote the study of Iran, including a $500,000 endowment to Princeton University and for at least several years in the 1970s an annual grant of between $17,000 and $18,000 a year to Columbia University. One stated reason for the investment in New York was to reduce the burden on Iran's balance of payments from such payments.

### The Transition from the Pahlavi Foundation of NY to the Alavi Foundation

The Pahlavi Foundation of New York was established on December 3, 1973, receiving from the Pahlavi Foundation in Iran the building at 650 Fifth Avenue which the latter had bought in the summer of 1973. In a lengthy article by Anne Crittenden "The Shah in New York: What is His Foundation's Aim?," the *New York Times* cites former Assistant Secretary of Treasury and Pahlavi Foundation consultant James Reed as writing that "foundation officials in Tehran made clear that they would not go ahead with investment unless they were able to obtain an income-tax exemption." Yet the Pahlavi Foundation in Iran did not want to apply for tax-exempt status which would require opening up its books. Award-winning *Newsday* investigative report Kenneth Crowe wrote on June 4, 1976, "[Pahlavi] Foundation executives, interviewed in the Pahlavi Building on Pahlavi Avenue in Tehran, frankly admit that the Pahlavi Foundation (New York) was formed to prevent the exposure of the business holdings and operations of the parent foundation in Iran."

In order to create a Pahlavi Foundation of New York and secure for it a tax exemption, the Pahlavi Foundation in Iran engaged the services of Rogers and Wells, the law firm founded by William P. Rogers who was Secretary of State until September 3, 1973. Rogers and Weil secured the exemption. Mr. Rogers became one of the founding directors of the Pahlavi Foundation of New York exactly three months after leaving the office of secretary of state. That fits the pattern of the Shah's government seeking to have financial dealings with former and serving U.S. government officials. As of 1976, another of the seven directors of the Pahlavi Foundation of New York was the influential serving congressman John Murphy (representing Staten Island). The third American director at that time was the Foundation's secretary Fredrick Glick, a partner in Rogers and Wells.

The 1976 seven-member initial Foundation Board included four Iranians. The most prominent, who served as president and treasurer of the Foundation, was Ja'afar Sharif-Emami, whose name is sometimes spelled Sherif-Emami. As described above, he had been prime minister of Iran and was the long-time deputy custodian of the Pahlavi Foundation in Iran, that is, its effective head. The other Iranians were Taher Zial, a member of the Iranian Senate and an advisor to the Pahlavi Foundation in Iran, and two members of the Pahlavi Foundation's Tehran staff, Nasser Sayyah and Majid Montakheb.

The Pahlavi Foundation was not particularly active between its founding and the transition to the Ahlavi Foundation. As of 1976, it had no full-time employees. The address on its 1975 tax return was the offices of Rogers and Wells. That tax return showed no assets other than 650 Fifth Avenue, which at the time was under construction, and it reported that the only expenses "to accomplish charitable purpose" was $36,000 – this category in tax reporting includes the accounting fees. The foundation had little source of income until the completion of construction at 650 Fifth Avenue, which occurred only during the chaos of the revolution in the winter of 1978/79 – an event which slowed decision-making involving any Iranian-linked institution.

-10-

Once the Shah and his family fled Iran in early 1979, they no longer had access to funds from the government and the Pahlavi Foundation in Iran. They were well known for their luxurious lifestyle, so their funding needs were great. What they expected from the Pahlavi Foundation of New York is well described by professor Abbas Milani of Stanford University, who is a distinguished scholar close to the royal family. On p 241 of his book *The Shah* (Palgrave Macmillan, 2011), he writes, "Even after the 1979 revolution, his family believed it should be given control of the Pahlavi Foundation's properties in the United States—a high rise on New York's Fifth Avenue bought for $40 million in the mid-1960s with a small down payment and a loan guaranteed by the National Bank of Iran, and a big property in New Orleans arguing that they were never more than a trust set up the Shah for his and his family's use. The royal family was particularly dismayed by the decision of Ja'afar Sharif-Emami, one of the executors of the foundation, to turn over the rights to the Pahlavi Foundation to the Islamic government in Iran (which immediately renamed it the Alavi Foundation, after Ali, the first Imam of Shiism)."

To understand why the Pahlavi Foundation of New York directors agreed to resign between October 1978 and October 1979, allowing the appointment of new directors sympathetic to the revolutionary government, it is useful to examine the actions at the time of the most prominent Iranian director, Sharif-Emami. In 1982 Sharif Emami gave series of interviews to Habib Ladjevardi, director of the Iranian Oral History Project at Harvard University (not unsealed until Sharif-Emami's 2001 death). Ladjavardi describes a conversation revealing account of Sharif-Emami's naivete about and vulnerability to the new government:

"In early May 1982, I [Ladjevardi] telephoned him again and arranged to go to his apartment at 9:30 A.M., Thursday, May 13 to begin recording his memoirs. All three recording sessions took place with the two of us alone in his study. His study was furnished with a desk, a large sofa and a couple of leather chairs. Facing the sofa was a bookcase filled with perhaps 100 to 150 books, mostly on Iran. Before we began recording his memoirs, he told me that he had left nearly 11,000 books in his house in Tehran which, along with the house, he had offered to give to the new government to be designated as a public library. He had also offered certificates of deposits in a Tehran bank, income from which was to be used to maintain the library. He had sent this proposal to the Revolutionary Council through his wife who was still in Tehran. The Council had accepted his gift and conditions, according to Mr. Sharif-Emami, and the agreement had been implemented for a few months before the books were transported to Qom and the house was confiscated for other uses." (available at http://ibexpub.com/index.php?main_page=pubs_product_book_info&products_id=89)

That description shows Sharif-Emami had misplaced confidence that he could work with and trust the new government. He was negotiating with them in good faith, when they had no intention of carrying out the agreement into which they entered. He was still interested in charitable works that promoted Iranian culture, similar to the activities the Pahlavi Foundation in New York was intended to carry out, and he thought that he could enter into agreements with the new government to this end.

The statement also shows the new government in Tehran had a ready instrument of pressure on Sharif-Emami because his wife was still in Iran. This was at a time when the

families of many of those connected to the imperial government were trying to leave Iran and the new government was banning their departure. Many people had to flee through the mountains to Turkey or the desert to Pakistan in order to save their lives. Sharif-Emami would have been well aware of this.

While we have no similar information about the actions of the other Iranian directors of the Pahlavi Foundation of New York, it would have been entirely consistent with the actions of many others in their situation for them to share the same position as Sharif-Emami: misplaced confidence they could work with the revolutionary government to advance the common interest of Iranians (e.g., in education of Iranians abroad) and vulnerability to pressure from the new authorities.

We also lack information about the actions of the American directors of the Pahlavi Foundation of New York. William Rogers had only left the position of Secretary of State a few years earlier and the State Department has a long tradition of consulting with former Secretaries of State. It is therefore useful to look at what the State Department was doing about U.S. relations with the revolutionaries before they came to power and then new government. Until the U.S. Embassy was seized in November 1979, the State Department was actively promoting close U.S. relations with the new authorities. Indeed, research in the U.S. documents seized during the Embassy takeover has shown that all during that period, the U.S. government was going to extraordinary lengths to preserve good working relations with whoever would take over in Tehran. The U.S. government went so far as to continue shipping military arms to the new government and to send CIA agents to Iran to warn the revolutionary government that Iraq was beginning preparations to invade Iran, which in fact did in September 1980. In other words, the U.S. government policy was to cooperate as far as possible with the new authorities.

It is against this background that we should look at what Ladjavardi wrote about his conversation with Sharif-Emami about the Pahlavi Foundation of New York in 1978/79, which is an annex to this report. To understand this passage, it is important to know that in his lengthy interviews with Ladjavardi, Sharif-Emami refused to discuss the controversial issues in which he was implicated, such as the September 1987 massacres when he was prime minister. In particular, he did not discuss his role at the Pahlavi Foundation, such as the many allegations of corruption involving the Foundation. He did not agree to talk on tape with Ladjavardi about the Pahlavi Foundation of New York. Instead, Ladjavardi wrote an annex about his conversations and lunches with Sharif-Emami, and of the topics covered there was the transfer of the Pahlavi Foundation assets. A translation of that account is Annex II below.

From this account, it would appear that Princess Ashraf – the Shah's twin sister and often described as a more forceful personality and ruthless person than her brother – was pressing Sharif-Emami to get all the Pahlavi Foundation of New York board members to resign. Presumably this was part of her effort, also referred to by Abbas Milani, to get control of the Pahlavi Foundation of New York assets for the royal family. However, it is also possible Sharif-Emami was playing a double game, since Milani states that the royal family blamed him for those assets ending up under the control of people friendly to the Islamic Republic. So perhaps Sharif-Emami was simultaneously doing what Princess Ashraf had asked (getting a board member to resign) while also ensuring that the Pahlavi Foundation of New York would come under the control of those friendly to the new government, which he may have been unwilling to antagonize (his wife still being in Iran) and which he may have thought would carry through the intention about the Pahlavi Foundation of New York funding Iranian students in the United

States and Iranian studies at U.S. universities.

It is interesting to note Sharif-Emami's claim that he had been serving on the board of the Pahlavi Foundation of New York in an *ex oficio* capacity as head of the Pahlavi Foundation in Iran, not in a personal capacity. It would be interesting to look at the incorporation documents of the Pahlavi Foundation of New York from 1973 to see if that claim was accurate – it may not be, since Sharif-Emami was searching for an explanation why he could no longer be involved in the Pahlavi Foundation of New York. If his explanation is accurate, it would suggest a close link between the two organizations, and it would raise the question whether that provision was changed and if so, when.

### Individuals Associated with the Alavi Foundation or the Assa Corporation

Much of the information below comes from the Alavi Foundation tax returns from 1999 through 2011 available as PDFs at the Economic Research Institute's (ERI) Library of nearly 7 million IRS tax returns for non-profits, that is, Form 990, 990PF, and 990EZ reports (http://www.eri-nonprofit-salaries.com/index.cfm?FuseAction=NPO.Search).  The Alavi Foundation tax return for 2011 covers the year beginning April 1, 2011 and ending March 31, 2012, which I cite as the 2011/12 tax return; the same·convention is followed for otheryears. Each return shown on the ERI website includes separate attachments showing the details of who are the directors and highest paid employees, that is, this information is not filled in on the Form 990-PF Part VIII items 1 and 2 which instead states "see separate attachment." The Alavi Foundation website also shows PDFs of some of these IRS Form 990-PF tax returns, but it does not include the attachments about directors and highest paid employees. However, for the year 2010/11, the tax return (both the one on the Foundation website and one on the ERI site) show the information about the directors and the highest paid employees on the Form 990-PF in Part VIII items 1 and 2 respectively as well on the separate attachment. The two listings give slightly different titles to some individuals and show somewhat different amounts for compensation for some individuals. The 990-PF Part VIII lists the home street address and hours worked for each individual; the attachment only lists the home town.

Fatemeh Aghamiri. She is an Iranian economist who is quoted from time to time in the Iranian press offering analysis of economic development and government economic policy. I have not seen any citation of her professional affiliation.

Ali Afshar.  He is listed on the Alavi Foundation tax returns for the years 2005/06 and 2006/07 as a director of the Foundation, with compensation of $10,450 and $4,350 respectively. In both years, he is listed as living in Dobbs Ferry, NY.

Hooshang Ahmadi Javadi, also known as Houshang Ahmadi and Hoshang Ahmadi. He is cited in various places on the Alavi Foundation website as president of the Alavi Foundation. On the tax return for 2010/11 posted on that website, his compensation for the year is shown as $129,320 with $46,425 in contributions to employee benefit plans and deferred compensation; he is shown as working 40 hours a week. His address is listed as P.O. Box 29, Riverdale, NY 10471.  He is also listed on the tax returns for the years 1999/2000-2004/05 as a director of the Foundation, with compensation ranging from $4,670 a year to $16,523 per year, and with the address as "New York, NY."  He is also listed on the tax returns for the years 2005/06-2008/09 as treasurer of the Foundation, with compensation ranging from $10,450 per year to $37,466 per year, and with the address of "Riverdale, NY." In the tax returns on the ERI website, he is shown as president for the years 2009/10-2011/2 with compensation ranging from $166,554 per year to

$184,742 per year.

Ali Aliabadi, also known as Ali Mohammad Aliabadi. He is shown on the 2009/10 Alavi Foundation tax return on the Foundation website as the program coordinator, working 40 hours a week, and living at 15 Bank Street, Nutley NJ 07110, with $74,762 in compensation and $25,553 in contributions to employee benefit plans and deferred compensation. He is also shown on the Alavi Foundation tax returns available through ERI as the program coordinator for each year from 2006/07 through 2011/12 , though here is address is shown as "Nutley, NJ" for the first three years and then from 2009/10 as "Bayside, NY." His compensation ranges from $56,625 per year to $74,762 per year.

Ali Ashgar Dabiran. He is listed as a director of the Alavi Foundation website on the 2010/11 tax return posted on the Alavi Foundation website, where his compensation for that year is listed as $11,800 and he is shown as working 5 hours a week. His address is listed as 15 Wood Avenue, Albertson NY 11507. On the Foundation tax returns for 2009/10 through 2011/12 available at the ERI website, he is listed as treasurer of the Foundation, with compensation ranging from $10,500 per year to $14,500 per year and the address of "Bayside, NY.". On those tax returns for 2005/06-2008/2009, he is listed as a director of the Foundation with compensation ranging from $8,250 per year to $19,850 per year, and with the address "Bayside, NY."

Ali Reza Ebrahimi. He is listed as a director of the Alavi Foundation on the 2010/11 tax return posted on the Alavi Foundation website, where his compensation for that year is listed as $14,900 and he is shown as working 5 hours per week. His address is listed as 51 Jackson Avenue 2nd Floor, Mineola NY 11501. On the Foundation 2010/11 tax return available through ERI, he is listed as the Foundation's secretary for every year from 1999/2000 through 2011/12, with compensation ranging from $4,720 per year to $18,050 per year.

Mohammad Geramian. He is listed on the Alavi Foundation tax returns as president, working full time, every year from 1999/2000 through 2007/08. His compensation ranges from $98,675 per year to $313,144 per year.

Hassan Hassani. He is listed as a director of the Alavi Foundation on the 2010/11 tax return posted on the Alavi Foundation website, where his compensation for that year is listed as $10,700 and he is shown as working 5 hours per week. His address is listed as 302 Grunether Avenue, Rockville MD 20851. He is also listed as a director on the Alavi Foundation tax returns available at the ERI website for every year from 2005/06 through 2011/12.

Farshid Jahed, also known as Farshid Jehedi. Numerous press reports, and press releases from the FBI, identify him as a former president of the Alavi Foundation who in December 2008 was arrested for destroying documents which had been subpoenaed. In December, he 2009 pled guilty to obstruction of justice for these activities. He is listed on the Alavi Foundation tax return for 2007/08 as president, full time, starting August 1, 2007, with his compensation that year as $129,347. On the tax return for 2008/09, he is listed as president, full time, with his compensation that year as $154,822. On the tax return for 2009/10, he is shown as having no position but having received as severance pay $17,585 and $22,635 in contributions to employee benefit plans.

Seyed Mojtaba Hesami Kiche. A person by this name is shown on some website as conducting business from 260 Water Oak Place, Alpharetta GA 30009. I have no other knowledge about this matter.

Mohammad Pirayandeh. A glowing biography of a man by this name on the Iranian website irpo.ir describes his willingness over more than five decades to take on responsibilities

-14-

for for "this Islamic nation" stating, "for example, at the University of Science and Industry, management of the Alavi Foundation, deputy director for management and finance at Azad University, management of the Azad University in Karaj," and so on. On the Alavi Foundation tax returns, he is listed as director from 1998/99 to 2004/05, with compensation ranging from nothing for the last two years to $2,300 in 2002/03.  Each year, his address is listed as "Tehran, Iran."

Manoucher Shafie. A February 18, 1996, article in the *New York Daily News* by Gene Mustain (the *News*' organized crime correspondent and a well-known figure in that field) stated, "In 1992, ... Manoucher Shafie was charged with conspiring to export prohibited U.S. technology to Iran. In court papers detailing Shafie's arrest, he is identified as an agent of the Iranian mission. Charges in the case were later dropped. Court records show that ....Shafie, who headed the Alavi Foundation after a fundamentalist regime took power in Iran in 1979, retain[s] close ties to the foundation" (http://www.nydailynews.com/archives/news/fbi-feared-iran-nuke-plot-feeling-betrayed-mole-speaks-article-1.723245?print). Mustain's information source was a Mafia moneyman turned FBI informant who had been asked to tape Shafie's conversations.

## Certain Public Figures

Kamal Kharrazi. He was deputy foreign minister for political affairs from August 1979 to March 1980. During the Iran-Iraq war (1980-1988) he was a member of the Supreme Defense Council and head of the War Information Headquarters. He was also vice-chairman of the state broadcasting company Islamic Republic of Iran Broadcasting (IRIB) from March to August 1979, while from 1980 to 1989 he headed the official Iranian Republic News Agency (Irna). The post at Irna and at the War Information Headquarters were two of the relatively few important positions controlled at that time by Iran's president, who was Khamenei – most government posts were controlled by the prime minister, while Rafsanjani had been named by Khomeini to be commander-in-chief of the armed forces. One reason he may have served in these posts under Khamenei was that Kamal's brother Mohsen had been a close friend of Khamenei since the 1960s. In 1989, Kamal Kharazi was named to be Iranian ambassador to the UN. It is unclear who was responsible for that decision, which formally was made by Foreign Minister Ali Akbar Velayati, but it is interesting to note that Velayati has long been said to be much closer to Khamenei than to Rafsanjani (then president and nominally Velayati's boss) – indeed, since leaving the position of foreign minister, Velyati has been on Khamenei's payroll as a foreign policy advisor. In August 1997 soon after Mohammad Khatami became president, Kharrazi was named foreign minister, in what was widely described at the time as a decision made by Khamenei rather than by Khatami. When in 2005 Kharrazi gave up the foreign minister post, he was asked by Khamenei to create a Strategic Council for Foreign Relations in Khamenei's office, which is widely said to be a key institution – if not the key institution – to which Khamenei turns regarding foreign policy. In short, it is my expert opinion that Kharrazi has long been a close political ally of Khamenei.

Sadegh Kharrazi. He is the nephew of Kamal Kharrazi. He began his career at the Ministry of Culture and Islamic Guidance, which is responsible for censoring and guiding the press. An autobiographical on his personal website emphasizes his long-standing interest in cultural and cultural-scientific issues. He worked closely with Iranian Foreign Minister Ali Akbar Velayati on several issues, including a 1997 summit of the Islamic Conferenc Organization. That said, it is hard to see how his professional background explains his 1997

-15-

promotion to be Iranian ambassador to UN, which is difficult to explain without referring to his family ties to Kamal Kharrazi. Upon his 2002 return to Iran, he appears to have served in the capacity of being a deputy foreign minister; by some accounts, he was removed that from position for unauthorized contact with unofficial Americans. In May 2003, not long after being appointed Iranian ambassador to France (a position in which he served until 2006), he was a key actor in a much debated episode in which he and Swiss Ambassador to Iran Tim Guldimann (who represented U.S. interests in Iran) sent to the State Department what Guldimann described as an Iranian offer to negotiate a resolution of all outstanding U.S.-Iranian differences which he and Kharrazi had composed, with input from Kharrazi's successor as UN Ambassador Javad Zarif. Sadegh Kharrazi's wife is the sister of Khamenei's son.

Mohammad Hossein Mahallati. He was the Alavi Foundation director, though accounts differ on which dates he held that position; my best estimate is from 1983 to sometime in the late 1980s. The February 18, 1996, *New York Daily News* article by Gene Mustain referred to earlier stated, "In 1992, one of the ex-presidents of the Alavi Foundation, Mohammad Hossein Mahallati, was questioned by federal agents about an alleged plot to export germ-warfare toxins to Iran." Mohammad Hossein's brother Mohammad Ja'far was Iranian ambassador to the United Nations from 1987-1989 and then a visiting professor at Columbia University from 1991 to 1997. They come from a long line of distinguished clerics. Their father Ayatollah Fazlollah Mahallati was Khomeini's representative to the Islamic Revolution Guard Corps in the 1980's.

Abbas Mirakhor. After earning a PhD in economics from Kansas State University in 1968, he was a professor at various universities in the United States including the University of Alabama, Alabama A&M University, and the Florida Institute of Technology, as well as a 2-year stint at the Az-Zahara University in Tehran, until he joined the International Monetary Fund in 1984. He and I were colleagues in the same IMF office for a brief period. He went on to serve as the representative on the IMF Executive Board for a group of countries of which the largest is Iran until he retired in 2008. In 2010, he then joined the Kuala Lumpur, Malaysia-based International Centre for Education in Islamic Finance as distinguished scholar. On the Alavi Foundation tax returns, he is shown as "treasurer/director" for each year from 1998/99 to 2004/05; he received no compensation for his service at any time.

Mir-hossein Mousavi. He was Prime Minister of Iran from 1981 to 1989. On December 4 1981, shortly after he became prime minister, he was appointed by Khomeini as the head of the Bonyad Mostazafan, a post to which he soon appointed his deputy Tahmasb Mazaheri. While Mousavi was prime minister, Khamenei was president. The two fought constantly, and Mousavi usually won, since at the time, the presidency was a largely ceremonial post. Their battles worked to the advantage of then-Majlis speaker Ali Akbar Hashemi Rafsanjani, who established a reputation as the deal-maker and behind-the-scenes power broker which let him become the most powerful person in Iran as president in 1989, while Khamenei even though Supreme Leader was relegated to the sidelines. This history colored Khamenei's view of Mousavi, and was one reason Khamenei moved whenever he could to move against Mousavi and those close to him. Mousavi turned his attention away from politics, but he was drawn out of his private business and cultural activities in 2009 to run as president. His candidacy took off among those unhappy with the direction of the Islamic Republic, and Mousavi became the de facto head of a broad trend known as the Green Movement. Protests after the elections, claiming fraud that deprived Mousavi of victory, drew up to three million people into the streets of Tehran. He has been under house arrest since those protests escalated into riots in late 2009

Mohsen Rafighdoost. He was the head of Khomeini's security detail in 1979. He helped found the Islamic Republic Revolutionary Guard and went on to be Minister of the Revolutionary Guards from 1982 to 1989. When Rafsanjani became president in 1989, that position was consolidated along with Minister of Defense, and Rafighdoost was appointed head of the Bonyad Mostazafan. In 1995, his brother Morteza Rafighdoost was sentenced to ten years' imprisonment for bank fraud. This led to much criticism of Mohsen's role as head of the Bonyad Mostazafan, since Mohsen was known to have become very wealthy. In a mood typical of his approach, Khamenei ignored the criticism, or rather, he went exactly against it by reappointing Rafighdoost for another term as head of the Bonyad Mostafazan a year before his second term expired. After he left the Bonyad Mostazafan, he became and remains executive director of the Noor Foundation.

Javad Zarif. He was Iran's ambassador to the UN from 2002 to 2007. He has spent most of his adult life in the United States, with a B.A. from San Francisco State University and a PhD. from the University of Denver. He worked at the Iranian Mission to the UN from 1985 until 1992, serving as deputy permanent representative (the number two position) from 1989 to 1992. From 1992 to 2002, he was evidently Deputy Foreign Minister for Legal and International Affairs. He has lived in Tehran since 2007.

### Bank Melli

Bank Melli Iran is listed on the Central Bank of Iran's website as a "commercial government-owned bank" (http://www.cbi.ir/simplelist/3088.aspx). Bank Melli Iran was established as a government-owned bank in 1930; it was responsible for issuing Iran's currency from 1931 to 1960, when the Central Bank of Iran was established (its history is described in detail in *The Monetary History of Iran* by Matthee, Floor, and Clawson). The 2008/09 financial report on Bank Melli's website, in either English or Persian, available in a serviceable if awkward English at http://www.bmi.ir/Fa/uploadedFiles/FinanceReportFiles/2011_2_13/f97c06b161__2752675b48.pdf, states, "The capital is completely owned by the Government of the Islamic Republic of Iran." I am unaware of any proposals to privatize Bank Melli Iran. That Bank Melli Iran is owned by the Iranian government is well known to those interested in Iranian banking and business. Based on these facts, it is my expert opinion that Bank Melli Iran in an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran and are agencies and instrumentalities of Iran as defined in FSIA § 1603.

Respectfully submitted,

*Patrick Clawson*

Patrick Clawson
June 24, 2013

-17-

### Annex I: Patrick Clawson

I am Director of Research of the Washington Institute for Near East Policy, where I have been employed since 1997.  My previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund. I have done contract consulting work about Iran for U.S. government agencies over the last twenty-five years, including the Central Intelligence Agency, the Defense Department, and the State Department Bureau of Intelligence and Research.

As the Director of Research at the Washington Institute for Near East Policy, a think tank focusing on contemporary issues of the Middle East, I supervise a staff of about twenty senior researchers who study Middle East politics and terrorism, with considerable focus on Iran. I also brief and receive briefings from senior United States military officials and senior officials of other governments friendly to the United States, about Iran.

I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given live or written testimony in various cases brought against Iran for its sponsorship of terror, including:

*Cicippio v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 96-01805 (1996);
*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998);
*Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999);
*Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999);
*Stethem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000);
*Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000);
*Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);
*Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000);
*Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999);
*Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01799 (2000);
*Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000);
*Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001);
*Rafii v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001);
*Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001);
*Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001);
*Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002);
*Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 93 (D.D.C. 2002);
*Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003);
*Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003);
*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003);
*Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374241 at *3 (D.D.C. Aug. 10, 2006);
*Levin v. Islamic Republic of Iran*, U.S.D.C. No. 05-2494 (2007); and
*Peterson v. Iran*, 264 F. Supp. 2d 46(2003), among others.

My books and monographs include: *Monetary History of Iran from the Safavids to the Qajars* (I.B. Tauris, 2013, with Rudi Matthee and Willem Floor); *Preventing an Iranian*

*Breakout: U.S.-Israel Coordination* (The Washington Institute, 2012, with David Makovsky*); An Iranian Nuclear Breakout Is Not Inevitable* (The Washington Institute, 2011); *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Engagement Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years 1995-1997); *U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business As Usual? Western Policy Options Towards Iran* (American Jewish Committee, 1995); *Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited); *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the West: How, When, and Why* (the Washington Institute for Near East Policy, 1993).

My Ph.D. in economics is from the New School for Social Research and my B.A. is from Oberlin College. I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet. I also read other publications from Iran, including books in Persian.

My knowledge of Iran's economy comes as a result of my routine and in-depth access to facts concerning Iran and my extensive study of Iran as outlined herein, including my professional research and publishing in this field over the course of many years. Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's economy and debate the economic situation and government economic policy; Iran has many internet sites that publish information on these subjects. From my years studying Iranian politics and given the competing sources which can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible. Indeed, I use this information as a source to brief the United States and other governments.

My opinions set forth in this report are based upon my education, research, and experience, as well as my review and analysis of documents typically relied upon by experts in my field. Such basis includes, but is not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries; my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press).

I am being compensated in this matter at the rate of $150 per hour and my travel expenses to New York for consultation with the U.S. Attorney's Office for the Southern District of New York are also being reimbursed.

I affirm that the materials I rely on here in this statement are of the type commonly relied on in my field.

**Annex II :**
**Translation of Habib Ladjavardi's Account of His Discussion with Sharif Emami about**
**"The Transfer of Pahlavi Foundation Assets to the Government of the Islamic Republic"**

A translation of the full text of the section with that title, which is on pages 287-289 of Habib Ladjevardi (editor), *Memoirs of Jafar Sharif-Emami, Prime Minister of Iran (1960-61 and 1978)*, Cambridge, MA: Iranian Oral History Project of the Center for Middle Eastern Studies of Harvard University, 1999 (distributed by Ibex, Bethesda, MD)

"I asked Mr. Sharif-Emami how the Pahlavi Foundation building on 5th Avenue in New York had been transferred to the Islamic Republic's representatives, and how this transformation took place. He said, 'When I came to the United States, Her Majesty Ashraf Pahlavi got in touch with me and urged to sell the building for the Pahlavi family. I told her that the building belongs to a non-profit organization that had been registered in the state of New York, and therefore was not eligible for sale.'

"Sharif-Emami went on to say he received several letters signed by William Rogers, the United States Secretary of State, and also a board member to the Pahlavi Foundation (in New York). William Rogers had written that because of pressure from creditors— the entirety of the architectural and construction contracts charged to the foundation was in the amount of $7 million–a board meeting was to take place as soon as possible.

"According to Mr. Sharif-Emami, the Pahlavi Foundation's New York office had received $45 million from Bank Melli in Iran. He placed the average value of the Foundation's New York office in the range of $60-$70 million during the year 1982 (1361).

"Mr. Sharif-Emami responded to Secretary Rogers' letter by saying that because His Majesty had removed him as head of the Pahlavi Foundation several months prior, he was not in a position of power (as an ex-officio member of the Pahlavi Foundation's New York office), and therefore could not participate in any board meeting.

"After some time, Secretary Rogers also resigned from the Pahlavi's board. Following the resignation of two out five members of the board, Princess Ashraf ordered Mr. Sharif-Emami to arrange for the resignation of Dr. Taher Ziai (another member of the foundation). Mr. Sharif-Emami brought the issue to the attention of Dr. Ziai via telephone, and he gave his resignation from the board as well. There were two other members of the foundation, consisting of Mr. Sayyah and one other individual, whom Mr. Sharif-Emami suspected of having ties to the Alavi Foundation in Tehran. In the end, two members of the board reached an agreement with the Islamic Republic to transfer the rights of the foundation."

## Annex III

### Professional Biography of Patrick L. Clawson

Dr. Clawson is Director for Research at The Washington Institute for Near East Policy. His previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.

Dr. Clawson's books and monographs include:

*The Monetary History of Iran From the Safavids to the Qajars* (I.B. Tauris, 2013, with Rudi Matthee and Willem Floor)

*Preventing an Iranian Nuclear Breakout: U.S.-Israel Coordination* (The Washington Institute for Near East Policy, 2012, with David Makovsky)

*An Iranian Nuclear Breakout Is Not Inevitable* (The Washington Institute for Near East Policy, 2011)

*The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute for Near East Policy, 2010)

*Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute for Near East Policy, 2010)

*Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited)

*The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute for Near East Policy, 2008, with Michael Eisenstadt)

*Deterring the Ayatollahs: Complications in Applying Cold War Strategy to Iran* (The Washington Institute for Near East Policy, 2007, edited with Michael Eisenstadt)

*Forcing Hard Choices on Tehran: Raising the Costs of Iran's Nuclear Program* (The Washington Institute for Near East Policy, 2006, with Michael Eisenstadt)

*Reducing Vulnerability to Middle East Energy Shocks: A Key Element in Strengthening U.S. Energy Security* (The Washington Institute for Near East Policy, 2005, with Simon Henderson)

*Eternal Iran: Contiuity and Chaos* (Palgrave, 2005, with Michael Rubin)

*Getting Ready for a Nuclear Ready Iran* (Strategic Studies Institute of the U.S. Army War College, 2005, edited with Henry Sokolski)

*Checking Iran's Nuclear Ambitions* (Strategic Studies Institute of the U.S. Army War College, 2004, edited with Henry Sokolski)

*How to Build a New Iraq After Saddam* (The Washington Institute for Near East Policy, 2002, edited)

*The Last Arab-Israeli Battlefield? Implications of an Israeli Withdrawal from Lebanon,* (The Washington Institute for Near East Policy, 2000, with others)

*Dollars and Diplomacy: The Impact of U.S. Economic Initiatives on Arab-Israeli Negotiations* (The Washington Institute for Near East Policy, 1999, with Zoe Danon Gedal)

*Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others)

*U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997)

*Energy Security in the Twenty-First Century* (National Defense University Press, 1995,

edited)

*Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited)

*Iran's Challenge to the West: How, When, and Why* (The Washington Institute for Near East Policy, 1993)

*Economic Consequences of Peace for Israel, Palestinians and Jordan* (The Washington Institute for Near East Policy, 1991, with Howard Rosen)

*Syria's Military Build-Up and Economic Crisis 1977-88* (The Washington Institute for Near East Policy, 1989).

Dr. Clawson has written extensively about the Iranian economy, including "The Islamic Republic's Economic Failure" in the Fall 2008 *Middle East Quarterly*. He speaks often about the Iranian economy, for instance in 2010 for the U.S. government, to the United States Central Command's 2010 annual conference, the U.S. Army's Central Command's January 2010 three-day course on Iran, and several April 2010 lectures in the Czech Republic arranged by the U.S. embassy in Prague.

Dr. Clawson has written for *The New Republic* as well as op-ed articles in *New York Times*, *Wall Street Journal*, and *Washington Post*, among other newspapers. He is the author of more than thirty scholarly articles in *Foreign Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals. He has testified often before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees.

Dr. Clawson has been an expert witness about Iran, its economy, and its support of terrorism in thirty federal court cases, including:   Cicippio v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-01805 (1996); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 8-9 (D.D.C. 1998); Cronin v. Islamic Republic of Iran, U.S.D.C., D.C. No. 99-02890 (1999); Higgins v. Islamic Republic of Iran, U.S.D.C., D.C. No. 99-00377 (1999); Stethen v. Islamic Republic of Iran, U.S.D.C., D.C. No. 00-00159 (2000); Hegna v. Islamic Republic of Iran, U.S.D.C., D.C. No. 00-00716 (2000); Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); Elahi v. Islamic Republic of Iran, U.S.D.C., D.C. No. 99-02802 (1999); Wagner v. Islamic Republic of Iran, U.S.D.C., D.C. No. 00-01799 (2000); Polhill v. Islamic Republic of Iran, U.S.D.C., D.C. No. 00-01798 (2000); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); Rafii v. Islamic Republic of Iran, U.S.D.C., D.C. No. 01-850 (2001); Kerr v. Islamic Republic of Iran, U.S.D.C., D.C. No. 01-01994 (2001); Surette v. Islamic Republic of Iran, U.S.D.C., D.C. No. 01-00570 (2001); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 93 (D.D.C. 2002); Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); Rieger v. Islamic Republic of Iran, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); Greenbaum v. Islamic Republic of Iran, No. 02-2148, 2006 WL 2374241 at *3 (D.D.C. Aug. 10, 2006); and Levin v. Islamic Republic of Iran, U.S.D.C. No. 05-2494 (2007), among others.

Dr. Clawson serves on the Distinguished Advisory Panel of the Department of Energy's Sandia National Laboratory. From 1994 to 2012, he was senior editor of *Middle East Quarterly*. From 1990 through 1994, he was editor of *Orbis*, a foreign policy quarterly.

Dr. Clawson's  Ph.D. in economics is from the New School for Social Research and his B.A. is from Oberlin College. He speaks fluently Persian and French , as well as some Hebrew, Spanish, and German.