UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

```
                                      :
                                      :
                                      :
IN RE: 650 FIFTH AVENUE AND           :
RELATED PROPERTIES                    :
                                      :
                                      :
                                      :
```

---------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

08 Civ. 10934 (KBF)
and all member and related
cases

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This Opinion resolves five pending motions: (1) a summary judgment motion filed by several judgment creditor groups against defendants Assa Corp. and Assa Co. Ltd. (collectively "Assa"), the Alavi Foundation ("Alavi" or "the Foundation"), and 650 Fifth Avenue Company ("650 Fifth Ave. Co.") (ECF No. 869); (2) a summary judgment motion filed by the judgment creditors against Alavi to turn over seven properties and three bank accounts held solely in Alavi's name (ECF No. 950); (3) a summary judgment motion filed by the Government against Alavi to forfeit its interest in the seven Alavi-only properties (ECF No. 956); (4) a summary judgment motion filed by the government against Alavi to forfeit its interest in the three Alavi-only bank accounts (ECF No. 1075); and (5) a petition filed by Alavi pursuant to 18 U.S.C. § 983(g) (ECF No. 1019).

First, the Greenbaum, Acosta, Beer, Kirschenbaum, Heiser, Havlish, Peterson, and Rubin judgment creditor groups[1] have moved for summary judgment

---

[1] The various judgment credit groups were initially plaintiffs in various actions that were consolidated into this action.  (See In re 650 Fifth Ave. & Related Props., 2013 WL 5178677, at *13–

to turn over the building located at 650 Fifth Avenue, New York, New York ("the Building") and associated bank accounts—the assets at issue in the Court's Opinion & Order of September 16, 2013 (the "September 2013 Opinion")—under the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 ("TRIA"), and the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–11. (ECF No. 869.)  That motion became fully briefed on October 11, 2013.  (ECF Nos. 879, 938, 969.)

The judgment creditor plaintiffs have also filed a supplemental motion for summary judgment to turn over the seven properties and the three bank accounts owned in Alavi's name only, which the Court severed in the September 2013 Opinion, pursuant to TRIA and the FSIA.  (ECF No. 950.)  That motion became fully briefed on October 23, 2013.  (ECF Nos. 977, 996.)  On October 7, 2013, the Hegna judgment creditors filed a memorandum arguing that they are also entitled to turnover of all property owned by the defendants for largely the same reasons as those stated in the judgment creditors' motion.  (ECF Nos. 954, 955.)

The Government has also filed a motion for summary judgment with respect to the same seven Alavi-only properties, seeking to forfeit the properties as traceable to violations of the International Emergency Economic Powers Act ("IEEPA") and traceable to property involved in money laundering.  (ECF No. 956.)  That motion became fully briefed on October 23, 2013.  (ECF Nos. 979, 998.)  The Government has also filed a motion for summary judgment to forfeit the three Alavi

14 (S.D.N.Y. Sept. 16, 2013); Nov. 27, 2012 Order, ECF No. 328; May 27, 2011 Order, ECF No. 173; Feb. 7, 2011 Order, ECF No. 160; March 17, 2010 Order, ECF No. 108.)

bank accounts.  (ECF No. 1075.)  That motion became fully briefed on January 29, 2014.  (ECF No. 1086.)

For the following reasons, the Court GRANTS all four motions for summary judgment filed by the Government and the judgment creditors, and DENIES Alavi's petition pursuant to 18 U.S.C. § 983(g).

I.      BACKGROUND

A.  Factual Background

The Court assumes familiarity with the facts underlying this action, particularly the facts described in the September 16 Opinion.  See In re 650 Fifth Ave. & Related Props., No. 08 Civ. 10934 (KBF), 2013 WL 5178677, at *6–16 (S.D.N.Y. Sept. 16, 2013) ("September 2013 Opinion").  The Court recites here only certain facts relevant to resolving the instant motions.

1.  Facts Relevant to the Building at 650 Fifth Avenue

In 1973, Shah Mohammad Reza Pahlavi formed the Pahlavi Foundation as a New York not-for-profit corporation.  (Corrected Local Rule 56.1 Statement of Undisputed Facts ("Gov't 56.1 I") ¶ 1; McReynolds Decl. Ex. 1, ECF No. 687.)[2]  At the Shah's direction, the Central Bank of Iran, Bank Markazi, loaned the Pahlavi Foundation approximately $42 million in order to acquire 650 Fifth Avenue, New York, New York, and to construct the Building on the property.  (Gov't 56.1 ¶ 2; McReynolds Decl. Exs. 2, 3; Am. Compl. ¶ 24; Alavi Ans. ¶ 24.)  Bank Markazi

---

[2] On October 15, 2013, the Government submitted to the Court a Corrected Local Rule 56.1 Statement of Undisputed Facts ("Gov't 56.1 I"), which corrected typographical errors in its initial Statement, and an accompanying Supplemental Declaration of Jennifer A. McReynolds ("McReynolds Supp. Decl.").  The two Statements are substantively the same; the Court refers herein to the corrected version.

loaned the $42 million through Bank Melli Iran, a bank wholly owned by the Iranian government, which in turn loaned the funds to the Foundation.  (Gov't 56.1 I ¶ 3; McReynolds Decl. Ex. 3; Am. Compl. ¶ 24; Alavi Ans. ¶ 24.)

In 1979, Ayatollah Ruhollah Khomeini ordered the formation of the Bonyad Mostazafan to manage property controlled by the revolutionary government.  (Gov't 56.1 I ¶ 6; Lockard Decl. Ex. 1, at 1–3, ECF No. 686.)  In 1980, the Pahlavi Foundation was renamed the "Mostazafan Foundation of New York" ("MFNY"). (Gov't 56.1 I ¶¶ 10–11; McReynolds Decl. Ex. 13.)

In July 1987, the Iranian Deputy Prime Minister and then-head of the Bonyad Mostazafan, Tahmasb Mazaheri, reported to the Prime Minister of Iran, Mir-Hussein Mousavi, about a tax situation relating to income generated by the Building.  (Gov't 56.1 I ¶ 19; McReynolds Supp. Decl. Ex. 1.)  Mazaheri discussed a potential solution to the tax issue with the Director General of Bank Melli, Majid Ghasemi, who promised to assist.  (Gov't 56.1 I ¶ 21; McReynolds Supp. Decl. Ex. 1.) This solution called for the creation of an entity in New York that would own the Building and take responsibility for a Bank Melli loan, ultimately causing a transfer of $45 million to the "Islamic Republic of Iran Central Bank."  (Gov't 56.1 I ¶ 20; McReynolds Supp. Decl. Ex. 1.)  Mazaheri stated that this solution would "surely be beneficial to the Islamic Republic."  (Gov't 56.1 I ¶ 21; McReynolds Supp. Decl. Ex. 1.)

In March 1989, Seyed Mohammad Badr Taleh, then the Managing Director of the Mostazafan Foundation of New York MFNY, proposed to Mazaheri that the

MFNY lease the Building's retail space in order to avoid the tax.  (Gov't 56.1 I ¶ 27; McReynolds Decl. Ex. 29.)

In May 1989, the MFNY, the Bonyad Mostazafan, and Bank Melli met in Iran to finalize an agreement for a partnership between Bank Melli Iran and the Foundation in New York.  (Gov't 56.1 I ¶ 28; McReynolds Supp. Decl. Ex. 4.)  At the meeting, it was decided that "Bank Melli Iran" would partner with "the New York Foundation."  (Gov't 56.1 I ¶ 29; McReynolds Supp. Decl. Ex. 4.)  To do so, Bank Melli Iran would create "two companies in Jersey Island," and one of those companies would "become partners with the New York Foundation via the other company."  (Id.)  It was also determined that "all proceedings should be made with the presence of an agent from Bank Melli Iran."  (Id.)

In July 1989, the Mostazafan Foundation entered into an agreement with Assa to form a partnership called the 650 Fifth Avenue Company.  (McReynolds Decl. Ex. 37.)  In August 1989, Issa Shahsavar Khojasteh, an assistant director for the Bonyad Mostazafan, wrote to Mohammed Bagherian, then head of the Bonyad Mostazafan, to request that Bagherian "endorse the partnership" between Assa, which he stated "belongs to Bank Melli," and MFNY.  (Gov't 56.1 I ¶ 30; McReynolds Decl. Ex. 31.)

The partnership between Assa Corporation and the Mostazafan Foundation was formed in October 1989.  (Gov't 56.1 I ¶ 32; McReynolds Decl. Ex. 37.)  In November 1989, Badr Taleh wrote to the General Director of Bank Melli to report that Assa Corp. was a partner in the ownership of the Building and that this

arrangement would exempt Bank Melli from millions of dollars in taxes.  (Gov't 56.1 I ¶ 34; McReynolds Decl. Ex. 111.)  He also expressed his thanks to Mohammad Behdadfar, a member of Bank Melli's board, and to Mohammad Karjooravary, the president of Bank Melli's New York branch, because they had "truly done whatever possible to safeguard the interests of the Islamic Republic." (Id.)

In February 1990, Karjooravary described the 650 Fifth Ave. Co. partnership as intended to resolve tax issues related to the Building: he stated that the tax issue had been solved through the "efforts of the Foundation and bank officials in Tehran and New York."  (Gov't 56.1 I ¶ 37; McReynolds Decl. Ex. 32.)  A September 1990 telex describes a transfer of Assa (referred to as the "mother company") from indirect ownership by Bank Melli officials to ownership by Bank Melli itself. (McReynolds Decl. Ex. 109.)

In May 1991, Badr Taleh wrote a letter to the Ayatollah stating that Ambassador Kamal Kharrazi had told him that henceforth the Ambassador—not the Bonyad Mostazafan—would oversee the Foundation.  (Gov't 56.1 I ¶ 63; McReynolds Decl. Ex. 80.)  Badr Taleh also wrote, "[T]he Supreme Leader has made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects."  (Gov't 56.1 I ¶ 64; McReynolds Decl. Ex. 80.)  Also that month, three of the Foundation's board members wrote to the Ayatollah that they would resign pursuant to instructions conveyed to them by Haj Mohsen Rafighdoost of the Bonyad Mostazafan, a representative of the Ayatollah.  (Gov't 56.1 I ¶ 60;

McReynolds Decl. Ex. 76.)  That letter also stated that the "Foundation's interests . . . in truth belong[ed] to the people of Iran." (Id.)

In the 1990s, individuals with judgments against the Government of Iran filed civil lawsuits against the MFNY and the Bonyad Mostazafan.  (Gov't 56.1 I ¶ 72; McReynolds Decl. Ex. 62.)

By August 1992, the MFNY had been renamed the "Alavi Foundation of New York." (Gov't 56.1 I ¶ 41; McReynolds Decl. Ex. 83.)

In December 1993, Bank Melli's Overseas Network Supervisory Department ("ONSD") expressed concern to the head of Bank Melli's New York office that an Assa director's affiliation with Bank Melli might be discovered.  (Gov't 56.1 I ¶ 45; McReynolds Decl. Ex. 38.)  The letter asked for an inquiry into whether "Mr. Naghshineh—the Assa Corp. New York Director whose affiliation with the Bank could easily be proven—could be replaced with another individual whose affiliation with the Bank could not be easily proven."  (Id.)

From approximately 1996 to 2008, one employee, Mohammed Hassan Dehghani Tafti, represented Assa in the United States.  (Gov't 56.1 I ¶ 53.)  Tafti and Bank Melli officials exchanged emails in 2005 discussing the residence of the two purported then-owners of Assa Co. Ltd., Davood Shakeri and Fatemeh Aghamiri, residents of Iran.  (Id. ¶ 54; McReynolds Decl. Exs. 44–49.)

From 1989 through 2008, when this action was filed, Alavi played an active and critical role in managing the Partnership and the Building, acting as the Managing Partner and overseeing all of the Partnership and Building's finances.

(Gov't 56.1 I ¶ 85; McReynolds Decl. Exs. 37, 107.)  The 1989 Partnership Agreement required the Foundation to administer the "day-to-day business and affairs of the Partnership" and stated that Alavi had the authority to execute instruments on behalf of and to bind the Partnership.  (McReynolds Decl. Ex. 37.)

Between 1996 and 2008, the Building generated approximately $228,217,798 in gross rents for 650 Fifth Ave. Co.  (Gov't Local Rule 56.1 Statement of Undisputed Facts ("Gov't 56.1 II") ¶ 1, ECF No. 958.)  During those years, Alavi received over $50,000,000 in income from the Building through 650 Fifth Ave. Co. partnership distributions, and approximately $63,461,181 in gross income.  (Id. ¶¶ 2–3.)  Those partnership distributions do not include management fees that the partnership reimbursed to the Foundation.

Approximately 89% of all of Alavi's revenue was derived exclusively from rental income from the 650 Fifth Avenue Building.  (Id.)  The Alavi Foundation used these funds to pay for its activities, including paying for improvements to its real estate and other related expenses, such as property taxes.  (Id.)

### 2.   Facts Relevant to the Seven Alavi-Only Real Properties

Alavi owns seven other real properties at issue: one each in Houston, Texas ("the Texas property"); Queens, New York ("the New York property" or "the Queens property"), and Carmichael, California ("the California property"); and two each in Virginia ("the Virginia properties") and Maryland ("the Maryland properties"). (Am. Compl. 3–4; see generally Judgment Creditor Pls.' Local Rule 56.1 Statement of Undisputed Facts ("Judgment Creditors 56.1") ¶¶ 1–55, ECF No. 953.)

Five of Alavi's real properties—the Texas, New York, California, and Maryland properties—are leased pursuant to usage agreements that are, according to their terms, "deemed to be . . . contract[s]" to house educational and religious organizations.  (Id. ¶¶ 1, 2, 9, 10, 13, 25, 27, 34, 37.)

Under the usage agreements, the tenant organizations that occupy those five properties undertake a number of obligations that confer various financial benefits on Alavi.  The tenants assume responsibility for: (1) maintaining insurance on the leased facility on behalf of themselves and Alavi; (2) paying "any taxes and assessments that may be charged or imposed" on the property; (3) maintaining and making "all major and minor repairs"; and (4) paying "utility charges for water, sewer, gas, heat, electricity, power, air conditioning, telephone and other utility services" for the Texas and California Properties."  (Id. ¶¶ 3–6, 14–16, 20–22, 28–31, 38–40.)  Alavi also receives the benefit of any improvements made by the tenant organizations, because any alteration shall "be and become the absolute property of [Alavi] and may not be removed by" the tenant organization.  (Id. ¶¶ 7, 17, 23, 32, 41.)

Alavi leases the Virginia properties to private individuals for traditional rent payments.  (Id. ¶ 46.)  On its 2011 tax statement, Alavi listed Virginia Property No. 1 as a "land investment."  (Id. ¶ 47.)  Alavi pays tax on the Virginia properties and has obtained appraisals of their value.  (Id. ¶¶ 48–55.)

Alavi purchased the New York property in April 1997 for approximately $1,057,485, and the property is presently valued at approximately $17,000,000.

(Gov't 56.1 II ¶¶ 6–7.)  Between March 1996 and March 2008, Alavi made improvements to the New York property totaling $5,997,007.  (Id. ¶ 8.)

The Mostazafan Foundation, which later became Alavi, purchased the Maryland properties in the 1980s for a total of $1,720,000.  (Id. ¶¶ 6–7.)  The properties were assessed at a total of $14,716,700 as of July 2013.  (Id. ¶¶ 12–13.) Between March 2000 and December 2008, Alavi made improvements to the Maryland properties totaling $1,118,112.  (Id. ¶ 14.)

Alavi purchased the Texas property in 1988 for $1,100,000.  (Id. ¶ 14.)  The property was assessed at $6,229,834 in 2012.  Between March 1996 and March 2008, the Alavi Foundation made improvements to the property totaling at least $210,000.  (Id. ¶ 17.)

Alavi purchased the Virginia properties in 1990 for a total of $1,285,680.  (Id. ¶¶ 18–19.)  The Virginia Properties are presently estimated to have a total value of $675,000.  (Id. ¶¶ 21–22.)  From 2002 through 2007, Alavi paid property taxes for the Virginia properties totaling $83,683.34.  (Id. ¶ 23.)  Alavi calls the Virginia property an "investment."  (Alavi's Resp. to Pls.' Statement of Undisputed Facts ("Alavi Seven Properties 56.1 I") Add'l Fact 6, ECF No. 978.)

The Mostazafan Foundation, which later became Alavi, purchased the California property in 1989 for $223,375.  (Gov't 56.1 II ¶ 24.)  The property is presently appraised at $212,000. (Id. ¶ 25.)  Between March 1996 and March 2008,

Alavi made improvements to the California property totaling $16,630.98.  (Id. ¶ 26.)[3]

The Foundation allows a number of religious and educational not-for-profit organizations to use its properties rent-free as part of its mission to promote and support Islamic culture and the study of Persian language, literature, and civilization in the United States.  (Alavi Seven Properties 56.1 I Add'l Facts 1, 4.) The usage agreements described above between Alavi and the tenants of the Texas, New York, California, and Maryland properties provide that the organizations will only use the space in furtherance of their cultural and religious purposes.  (Id. 7–16.)  For example, the Islamic Institute of New York and the Razi School share the New York property.  (Decl. of James L. Bernard in Supp. Judgment Creditor Pls.' Joint Supp. Mot. for Summ. J., Ex. 2, ECF No. 951.)  The Anjuman-E-Haideri organization runs the Texas property, and may only use it as a mosque, as a full-time school, and as a cultural and religious center.  (Id. Ex. 1.)  The Islamic Education Center and the Muslim Community Center share the Maryland property and use it as a mosque.  (Id. Ex. 7.)  Finally, the Qoba Foundation, a religious not-for-profit organization, uses the California property.  (Id. Ex. 5.)

Alavi also states that it made payments for each of the seven properties prior to 1995.  (Alavi & 650 Fifth Ave. Co.'s Resp. to Gov't Statement of Undisputed Facts ("Alavi Seven Properties 56.1 II") Add'l Facts 2–5, ECF No. 981.)  Moreover, Alavi received management fees from 650 Fifth Ave. Co. for its work managing the

---

[3] The Government appears to concede that the correct amount spent on construction and renovation of the California property is $16,630.98 rather than $34,671.66.  (See Reply Mem. of L. in Further Supp. of Gov't's Mot. for Summ. J. 3 n.2, ECF No. 998.)

partnership and the Building.  (Id. 6.)  Those fees, which in later years were approximately $30,000 per month, were intended to reimburse the Foundation for the time and salary expense of its employees who dedicated some of their working hours to addressing Partnership and/or Building issues.  (Id.)  Alavi recorded management fees as reductions in its operating expenses.  (Id.)

### 3.  Facts Relevant to the Three Alavi-Only Bank Accounts

The remainder of the Alavi-only properties at issue are three bank accounts at Sterling National Bank—a "small business account," a "money market account," and a "pro checking account" (referred to as the "Sterling accounts").  (See generally Am. Compl. 4–5; Judgment Creditors 56.1 ¶¶ 56–84.)  Alavi used the small business account to receive at least one payment from 650 Fifth Ave. Co., to issue student loans, to disburse 401(k) and payroll payments to its employees, and to make tax payments.  (Id. ¶¶ 56–65.)  Alavi used the money market account to receive regular distributions of hundreds of thousands of dollars each from 650 Fifth Ave. Co. and a life insurance credit for $1.5 million.  (Id. ¶¶ 66–71.)  Alavi used the pro checking account to receive regular deposits, totaling at a minimum almost one million dollars, and to make at least one payment to a credit card company.  (Id.)  Finally, Alavi regularly transferred hundreds of thousands of dollars from the money market account into the small business checking account and the pro checking account.  (Id. ¶¶ 78–84.)

According to its tax returns, 650 Fifth Ave. Co. generated $228,217,798 in gross rents received from its tenants at the Building.  (Gov't's Local Rule 56.1

Statement of Undisputed Facts ("Gov't 56.1 III") ¶ 22, ECF No. 1017; Alavi's

Response to Gov't's Statement of Undisputed Facts ("Alavi Bank Accounts 56.1") ¶

22, ECF No. 1087.)  The Alavi Foundation declared $62,633,722 in income from 650

Fifth Ave. Co., although the parties disagree as to whether Alavi in fact received

that income, as opposed to reporting it as income.  (Gov't 56.1 III ¶ 23; Alavi Bank

Accounts 56.1 ¶ 23.)  Between fiscal years 1996 and 2009, the Alavi Foundation

reported a total of $69,387,242 in gross income.  (Gov't 56.1 III ¶ 24; Alavi Bank

Accounts 56.1 ¶ 24.)  While the Government asserts that 90% of the Alavi

Foundation's total income during this time was derived exclusively from rental

income in the Building, Alavi disputes this, on the basis that the funds identified in

Alavi's tax forms do not reflect actual funds received by the Government in a given

year.  (Id.)  The Government also asserts that contributions, gifts, and grants

amounted to only 0.24 percent of the Alavi Foundation's income, but Alavi disputes

this as well.  (Gov't 56.1 III ¶ 25; Alavi Bank Accounts 56.1 ¶ 25.)  Rather, according

to Alavi, a partner such as the Foundation is obligated to report as income its

distributive share of the partnership's income for a year, regardless of whether the

partner actually received any distributions from the partnership.  (Id. ¶¶ 23–25.)

    B.  <u>Procedural History</u>

       In 2008, the Government commenced this <u>in rem</u> civil forfeiture action

against assets owned by Assa.  (ECF No. 1.)[4]  On November 12, 2009, the

---

[4] The full procedural history of this action is set forth in numerous prior decisions in this litigation. <u>See, e.g.</u>, <u>In re 650 Fifth Ave.</u>, 2013 WL 5178677; <u>In re 650 Fifth Ave. & Related Props.</u>, No. 08 Civ. 10934 (KBF), 2013 WL 2451067 (S.D.N.Y. June 6, 2013) (granting partial summary judgment to judgment creditor plaintiffs against Assa); <u>In re 650 Fifth Ave. & Related Props.</u>, 881 F. Supp. 2d

Government filed a Verified Amended Complaint adding assets owned by Alavi and 650 Fifth Ave. Co.  (ECF No. 51.)  (The Court refers to Alavi, 650 Fifth Ave. Co., and Assa together as "defendants.")

On September 16. 2013, the Court granted summary judgment to the Government with regard to their interests in the Building and the associated bank accounts.  In re 650 Fifth Ave., 2013 WL 5178677, at *32, 36.  The Court found that defendants had acted on behalf of the Government of Iran in violation of regulations promulgated pursuant to the IEEPA and that Alavi knew that Assa was a front company for Bank Melli Bank Melli and Iran.  (Id. at *4, 58.)  The Court then severed for further proceedings the question whether the Government was entitled to summary judgment on the seven real properties and the three bank accounts held in the name of Alavi only.  (Id. at *8 & n.14, 82; see also Dec. 17, 2013 Order, ECF No. 1048.)

Following that decision, the Greenbaum, Acosta, Beer, Kirschenbaum, Heiser, Havlish, Peterson, and Rubin judgment creditor plaintiffs filed two motions for summary judgment arguing that they are entitled to turnover of all property owned by the defendants, including the Building at 650 Fifth Avenue and the associated bank accounts at issue in the September 16 Opinion, as well as the seven properties and three bank accounts held in Alavi's name only that were severed by the September 16 Opinion.  (ECF Nos. 869, 950.)  Those motions became fully

---

533 (S.D.N.Y. 2012) (denying defendants' motions to dismiss judgment creditor plaintiffs' actions); In re 650 Fifth Ave. & Related Props., No. 08 CIV. 10934 (RJH), 2011 WL 3586169 (S.D.N.Y. Aug. 12, 2011) (denying defendants' motion to stay), reconsideration denied, No. 08 Civ. 10934 (RJH), 2012 WL 363118 (S.D.N.Y. Feb. 2, 2012); In re 650 Fifth Ave. & Related Props., 777 F. Supp. 2d 529 (S.D.N.Y. 2011) (denying a motion to dismiss the forfeiture action).

briefed on October 11, 2013.  (ECF Nos. 879, 938, 969, 977, 996.)  On October 7, 2013, the Hegna judgment creditors filed a memorandum and accompanying letter arguing that they are also entitled to turnover of all property owned by the defendants pursuant to the FSIA for the reasons stated in the judgment creditors' motion, as well as for other reasons.  (ECF Nos. 954, 955.)

The Government also filed motions for summary judgment seeking to forfeit the same seven Alavi-only real properties and three Alavi-only bank accounts as traceable to proceeds of IEEPA violations and traceable to property involved in money laundering.  (ECF Nos. 956, 1075.)  Those motions became fully briefed on January 29, 2014.  (ECF Nos. 979, 998, 1086.)

Alavi also filed a petition pursuant to 18 U.S.C. § 983(g) arguing that forfeiture of the entire building at 650 Fifth Ave. would be unconstitutionally disproportionate.  That motion became fully briefed on December 19, 2013.  (ECF Nos. 1044, 1055.)

## II.    STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving

all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted

by the record . . . that no reasonable jury could believe it."  Scott v. Harris, 550 U.S.

372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)

("Incontrovertible evidence relied on by the moving party . . . should be credited by

the court on [a summary judgment] motion if it so utterly discredits the opposing

party's version that no reasonable juror could fail to believe the version advanced by

the moving party.").

III.    DISCUSSION

A.  The Judgment Creditor Plaintiffs' Motions for Summary Judgment

The undisputed facts show that defendants Assa, Alavi, and 650 Fifth Ave.

Co. "are" the Government of Iran within the meaning of TRIA and the FSIA, thus

subjecting defendants and the properties at issue to the jurisdiction of this Court.

Furthermore, the seven real properties and three bank accounts are used for

commercial activity and are not immune from execution pursuant to the terms of

TRIA and § 1610(a)(7) of the FSIA.  The judgment creditor plaintiffs are therefore

entitled to summary judgment on all of their turnover claims.

1.  Jurisdiction Under the FSIA and TRIA

Sections 1604 and 1605 of the FSIA establish the framework for determining

whether a court may exercise jurisdiction over a foreign state or its agencies or

instrumentalities.  See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610–

11 (1992).  Under the FSIA, a "foreign state shall be immune from the jurisdiction of

the Courts of the United States" unless one of several statutorily defined exceptions

applies.  28 U.S.C. § 1604.

In a prior Opinion & Order, the Court denied defendants' motion to dismiss for lack of subject matter jurisdiction. In re 650 Fifth Ave., 881 F. Supp. 2d 533, 550 (S.D.N.Y. 2012) ("the July 2012 Opinion"). Accepting the facts alleged as true for the purposes of the motion to dismiss, the Court found the complaint to plausibly allege subject matter jurisdiction pursuant to the FSIA. First, plaintiffs had alleged sufficient facts to show that defendants "were" Iran on three grounds: pursuant to Treasury regulations and an Executive Order; under an "alter ego" theory; and as "agencies or instrumentalities" of Iran. See id. at 550–53. The Court then found that plaintiffs had alleged sufficient facts—because they sought turnover of assets to fulfill judgments in actions premised upon terrorist acts—to show that they met the requirements of § 1605A of the FSIA and section 201(d) of TRIA. See id. at 553 (citing 28 U.S.C. §§ 1605A, 1610(f)(1)).[5] No facts proffered in connection with the parties' briefing on summary judgment raise a triable issue as to that determination.

### 2. Exceptions From Immunity From Execution Under the FSIA and TRIA

The Court now returns to the question of jurisdiction in the context of immunity from attachment or execution. Sections 1609 and 1610 describe when a court may exercise jurisdiction over an action for the execution of property. "[F]ederal courts lack subject matter jurisdiction over enforcement proceedings against the property of a foreign state unless a statutory exception to immunity applies. . . . In the context of an enforcement proceeding, § 1609 renders the

---

[5] The Court made no binding findings of fact in that opinion, but rather found that plaintiffs had shown sufficient facts, "at least at this stage," to deny a motion to dismiss. 881 F. Supp. 2d at 552.

property in the United States of a foreign state immune from execution or attachment, including garnishment, unless §§ 1610–11 provide otherwise." Weininger v. Castro, 462 F. Supp. 2d 457, 467–68, 479 (S.D.N.Y. 2006).  In this case, four exceptions apply: section 201 of TRIA, and §§ 1610(a)(7), 1610(g), and 1610(b) of the FSIA.

### 3.  The Definitions of "Foreign State" and "Iran"

Before consulting each of those four provisions, the Court deals with a threshold question common to the three FSIA exceptions to immunity: whether the assets here owned by Assa, Alavi, and 650 Fifth Ave. Co. are "property . . . of a foreign state" within the meaning of those provisions.  For the following reasons, they are indeed property of the foreign state of Iran.

#### a.  Assa, Alavi, and 650 Fifth Ave. Co.'s Actions on Behalf of Iran

The fact that the Government of Iran wholly owns and controls Bank Melli is undisputed.  (See Alavi & 650 Fifth Ave. Co.'s Resp. to Gov't's Statement ¶ 92, ECF No. 769.)

In the September 2013 Opinion, the Court found no issue of material fact as to whether Assa performed services for and acts on behalf of Bank Melli, and therefore for and on behalf of Iran.  See In re 650 Fifth Ave., 2013 WL 5178677, at *23–24.  For example, Assa acted as a front for Bank Melli to conceal the Bank's 40% ownership of 650 Fifth Ave. Co. by replacing a director affiliated with Bank Melli with others "whose affiliation with the Bank could not be easily proven," and by transferring direct management of Assa's interests to indirect management

through Mohammad Hassan Dehghani Tafti.  (Gov't 56.1 I ¶¶ 45, 53.)  Assa also managed the Bank's concealed interest in the Building, by managing "Bank Melli and therefore Iran's minority ownership in the assets at issue."  In re 650 Fifth Ave., 2013 WL 5178677, at *23.  Finally, Assa was a partner in an ownership structure for the Building that was designed to exempt Bank Melli from millions of dollars in taxes.  (Gov't 56.1 I ¶ 34.)

Likewise, there is no issue of material fact as to whether Alavi performed services on behalf of Bank Melli and therefore on behalf of Iran.  For example, Alavi acted as a managing partner of 650 Fifth Ave. Co. since its inception, in which position it provided partnership and building management services to Assa—and consequently to Iran.  (See McReynolds Decl. Ex. 37, at 7–8, 21.)  Alavi administered the day-to-day business of 650 Fifth Ave. Co. and exercised decision-making authority on Assa's behalf pursuant to the terms of their Partnership Agreement.  (Gov't 56.1 I ¶¶ 85–88.)  Alavi acted in this capacity with the knowledge that Assa was in fact a front for Bank Melli—having been present at the birth of Assa and having participated in the plan to create Assa to act on behalf of the Bank.  (Gov't 56.1 I ¶ 30.)  See In re 650 Fifth Ave., 2013 WL 5178677, at *14 (explaining that Alavi "knew that Assa was controlled by Iran at the outset and retained this knowledge until the lawsuit against Alavi was filed").  Finally, Alavi received and executed instructions from Iranian officials, including Mohsen Rafighdoost, the head of the Bonyad Mostazafan, who ultimately reported to the Supreme Leader of Iran.  (Gov't 56.1 I ¶¶ 60, 63–64.)

Finally, there is no issue of material fact as to whether 650 Fifth Ave. Co. acted on behalf of Iran.  650 Fifth Ave. Co. made quarterly distribution payments—through Alavi as its manager—to Assa until December 1, 2008.  (Government's SOF ¶ 56; McReynolds Decl. Ex. 51.)  Furthermore, 650 Fifth Ave. Co. "is simply Alavi and Assa together."  In re 650 Fifth Ave., 2013 WL 5178677, at *2 n.13.  The parties to the partnership intended to benefit Iran through the creation of the entity.  (See, e.g., Gov't 56.1 I ¶¶ 19–21, 27, 30; McReynolds Decl. Exs. 29, 31, 111.)

>    b.   The Iranian Transactions Regulations and Executive Order

Defendants' actions on behalf of Iran are sufficient to deem them the Government of Iran under the Iranian Transactions Regulations (ITRs), 31 C.F.R. § 560, and Executive Order 13599 (E.O. 13599).

The regulations define Iran as the "state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof, including the Central Bank of Iran," and any "person to the extent that such person is, or has been, since the effective date, acting or purporting to act, directly or indirectly, for or on behalf of the foregoing."  31 C.F.R. § 560.304 (emphasis added).  E.O. 13599 similarly defines the Government of Iran as "any political subdivision, agency, or instrumentality thereof, . . . and any [individual or entity] owned or controlled by, or acting for or on behalf of, the Government of Iran."  Exec. Order No. 13,599, 77 Fed. Reg. 6659, 6660 (2012) (emphasis added).

Defendants argue that 31 C.F.R. § 560 and E.O. 13599 are not acceptable means of interpreting "foreign state" within the definition of the FSIA.  (See Alavi & 650 Fifth Ave. Co.'s Mem. of L. in Opp. to Private Pls.' Mot. for Summ. J. ("Alavi

TRIA/FSIA Opp.") 2–3, ECF No. 879; Assa Corp.'s & Assa Ltd.'s Memo. of L. in Opp. to Pls.' Mot. for Summ. J. ("Assa TRIA/FSIA Opp.") 4–5, ECF No. 938.)  However, the FSIA leaves "foreign state" undefined.  Section 1603 of the FSIA, "Definitions," simply states that a "foreign state . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  That barebones provision is "more descriptive than definitional."  Guar. Trust Co. v. Republic of Palau, 924 F.2d 1237, 1243 (2d Cir. 1991); see also Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 151 (D.C. Cir. 1994) (calling the provision "opaque").

Accordingly, it is proper to use the terms of 31 C.F.R. § 560 and E.O. 13599—just as it is to use other materials outside the four corners of the statute—in order to define "Iran."  "The FSIA is designed to provide immunity to sovereign governments (unless an exception applies); it does not purport to provide an exclusive manner of defining a sovereign government," particularly because the statute does not itself provide a definition.  In re 650 Fifth Ave., 881 F. Supp. 2d at 550 n.15.  Furthermore, TRIA and relevant applicable sanctions regulations "'establish a comprehensive statutory scheme.'"  Levin v. Bank of New York, No. 09 Civ. 5900 (RPP), 2011 WL 812032, at *17 (S.D.N.Y. 2011) (quoting Hausler v. JP Morgan Chase Bank, N.A., 740 F. Supp. 2d 525, 532 (S.D.N.Y. 2010)).  It is thus appropriate for the Court to consult the ITRs and executive order in defining the terms of the FSIA.  Cf. TRIA § 201(d) (defining key terms such as "terrorist party" and "act of terrorism" using the definitions established by the Immigration and

Nationality Act, the Export Administration Act of 1979, and the Foreign Assistance Act of 1961); Transaero, Inc., 30 F.3d at 151–52 (explaining that "Congress spoke against a rich background of federal and international law that colors the statutory terms and fills them out" with reference to the definition of agencies or instrumentalities under the statute).

Defendants also argue that, contrary to the Treasury regulations and executive order, a foreign state must be "'an entity possessed of a defined territory and a permanent population, controlled by its own government, and engaged in or capable of engaging in relations with other such entities.'" (Alavi TRIA/FSIA Opp. 2 (quoting Morgan Guar. Trust Co., 924 F.2d 1237, 1243 (2d Cir. 1991)); see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione, 937 F.2d 44, 47 (2d Cir. 1991); Assa TRIA/FSIA Opp. 4–5.)  Contrary to defendants' assertion, this definition, drawn from international law, is not the exclusive definition of "foreign state" for the purpose of TRIA and the FSIA.  Nor did the Second Circuit state that it was.  In interpreting a vague provision such as § 1603, it "is necessary to examine other sources for guidance"—up to and including the regulations and executive order.  See Morgan Guar. Trust Co., 924 F.2d at 1243.

The Second Circuit faced a very different context in the two cases cited by defendants.  In Morgan Guar. Trust Co., the question was whether the Republic of Palau, a trust territory of the United States, was a "foreign state," 924 F.2d at 1244; in Klinghoffer, the question was whether the Palestinian Liberation Organization, which styled itself as the government of Palestine, was a "foreign state," 937 F.2d at

46.[6]  Here, Iran itself is certainly a foreign state; the question is rather whether the

defendants have acted in such a manner as to render them, too, equivalent to Iran.

The international-law definition of foreign state—distinguishing those bodies

having territories and permanent populations from those that do not—is irrelevant

to such an inquiry.  Thus, the Court looks to "other sources"—in this case, 31 C.F.R.

§ 560 and E.O. 13599—to define "Iran."  See Morgan Guar. Trust Co., 924 F.2d at

1243.

There is no dispute of material fact as to whether defendants acted for or on

behalf of Iran.  There is thus no triable issue as to whether they fall within the

definition of Iran pursuant to Treasury regulations and E.O. 13599.[7]

### c.  The "Alter Ego" Theory

Even if Treasury regulations and E.O. 13599 were not dispositive, defendants

"are" Iran under an "alter ego" theory.  That theory allows parties to reach assets

where defendants might otherwise "escape liability for acts . . . simply by creating

juridical entities whenever the need arises."  First Nat'l City Bank v. Banco Para El

Comercio Exterior de Cuba, 462 U.S. 611, 618–19, 629–30, 633 (1983) ("Bancec").[8]

---

[6] Knox v. Palestinian Liberation Org., 306 F. Supp. 2d 424 (S.D.N.Y. 2004), cited by Assa (see Assa TRIA/FSIA Opp. at 5), is similarly irrelevant.  The question there—whether the Palestinian Liberation Organization was a "state" within the meaning of the FSIA—was the same as in Klinghoffer.  See Knox, 306 F. Supp. 2d at 432.

[7] The Court need not resolve the parties' dispute over whether collateral estoppel applies here.  (See TRIA/FSIA Mot. 14–17; Alavi TRIA/FSIA Opp. 5–6; Assa TRIA/FSIA Opp. 8–11.)  The Court grants summary judgment herein based directly on the undisputed facts set forth in the Government's Corrected Local Rule 56.1 Statement of Undisputed Facts and not contested by defendants, not on the conclusions of the September 2013 Opinion.

[8] As the court correctly noted in EM Ltd. v. Republic of Argentina, 720 F. Supp. 273 (S.D.N.Y. 2010), there is a distinction between being an "agent" of a foreign government—i.e., its alter ego—and an "agency" of a foreign government.  See id. at 299.  The fact that defendants have served as "agents" of Iran means that they are alter egos of Iran, and thus are Iran—not that defendants were "agencies" of Iran within the meaning of 28 U.S.C. § 1603(b).  However, as set forth below,

Accordingly, if a plaintiff can show that a defendant that would otherwise be "a foreign instrumentality that does not fit within an FSIA exception to sovereign immunity" is in fact an "alter ego" for an entity that would be subject to jurisdiction under the FSIA, then jurisdiction is proper over that defendant just as it would be over that other entity. First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 174 (2d Cir. 1998); see also United State Fidelity & Guar. Co. v. Petroleo Brasileiro S.A. Petrobas, 199 F.3d 94, 98 (2d Cir. 1999); Gabay v. Mostazafan Found. of Iran, 151 F.R.D. 250, 253 (S.D.N.Y. 1993), aff'd, 152 F.3d 918 (2d Cir. 1998) (citing decisions applying Bancec's "alter ego" theory to issues of FSIA jurisdiction).

An alter ego is an entity that "is so extensively controlled by its owner that a relationship of principal and agent is created," such that "one may be held liable for the actions of the other." Bancec, 462 U.S. at 629; see also EM Ltd. v. Republic of Argentina, 720 F. Supp. 2d 273, 298 (S.D.N.Y. 2010) (quoting Bancec's definition of "alter ego"), overruled on other grounds, 473 F.3d 462 (2d Cir. 2007); U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 199 F.3d 94, 98 (2d Cir. 1999); Gabay, 968 F. Supp. at 899 (discussing "control over day-to-day activities" as the "pivotal issue").

Here, no rational juror could find that defendants are not the alter egos of Iran; no rational juror could find that Iran does not exercise sufficient control over defendants. For example, Shah Mohammad Reza Pahlavi initially formed the Pahlavi Foundation, later the Mostazafan Foundation and then the Alavi

---

defendants do separately meet the definition of "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b).

Foundation.  (Gov't 56.1 I ¶ 1; McReynolds Decl. Ex. 1.)  In 1979, the Ayatollah ordered the formation of the Bonyad Mostazafan to manage property controlled by the revolutionary government.  (Gov't 56.1 I ¶ 5.)  In 1989, the Mostazafan Foundation met with the Bonyad Mostazafan and Bank Melli to finalize an agreement for a partnership.  (Id. ¶ 28.)  Mohammed Bagherian, the head of the Bonyad Mostazafan, endorsed the partnership between Assa (which he stated "belongs to Bank Melli") and the Mostazafan Foundation.  (Id. ¶ 6, 30; McReynolds Decl. Ex. 31.)  Issa Shahsavar Khojasteh of the Bonyad Mostazafan stated that the partnership was "based on prior agreements with the Ministry of Finance [and] Bank Melli," and Bagherian "ask[ed] that [Khojasteh] proceed with [the] plan." (Gov't 56.1 I ¶¶ 30.)  In 1991, Ambassador Kamal Kharrazi assumed oversight of the Foundation.  (Id. ¶ 58; McReynolds Decl. Ex. 79.)  The Ayatollah, through his representative Rafighdoost, instructed three Foundation board members to resign, which they did in May 1991.  (Gov't 56.1 I ¶ 60; McReynolds Decl. Ex. 76.)  In June 1991, Kharrazi informed Alavi's president, Badr Taleh, that Kharrazi was the representative of the Ayatollah and that all Iranian entities in the United States were under his control.  (Gov't 56.1 I ¶¶ 63–64; McReynolds Decl. Ex. 80.)

These facts drive inexorably toward the conclusion that Alavi and 650 Fifth Ave. Co. have no true separate decision-making authority or real existence except that which is allowed and directed by the Iranian government.  No reasonable juror could find otherwise.  Accordingly, defendants are alter egos of Iran, and therefore "are" Iran.

26

d.  The "Agency or Instrumentality" Theory

Alavi and 650 Fifth Ave. Co. "are" Iran under a third theory as well.  They fall within the definition of an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b), and in turn constitute a "foreign state" itself within the meaning of the FSIA.[9]  See 28 U.S.C. § 1603(a) ("A 'foreign state' . . . includes a foreign state or an agency or instrumentality of a foreign state . . . .").

Under the first prong of the three-part "agency or instrumentality" definition, the entity in question must be "a separate legal person, corporate or otherwise."  28 U.S.C. § 1603(b)(1).  Here, Alavi is incorporated in New York, and 650 Fifth Ave. Co. is organized as a partnership under New York state law. (See McReynolds Decl. Ex. 37.)

Second, the entity must be "an organ of a foreign state."  28 U.S.C. § 1603(b)(2).  "Although there is no specific test for 'organ' status under the FSIA, various factors are relevant: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign]

---

[9] Section 1603(b) reads in full:
  An "agency or instrumentality of a foreign state" means any entity—
  (1)  which is a separate legal person, corporate or otherwise, and
  (2)  which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
  (3)  which is neither a citizen of a State of the United States as defined in section 1332(c)and (e) of this title, nor created under the laws of any third country.
28 U.S.C. § 1603(b).

country; and (5) how the entity is treated under foreign state law." <u>Filler v. Hanvit</u> <u>Bank</u>, 378 F.3d 213, 217 (2d Cir. 2004).

Here, various undisputed facts show that Alavi and 650 Fifth Ave. Co. are organs of the Iranian government.  For example, looking to the first factor, the Shah created the Pahlavi Foundation "for a national purpose," <u>Filler</u>, 378 F.3d at 217, and Bank Markazi, the Central Bank of Iran, loaned the Foundation $42 million at the Shah's direction.  (Gov't 56.1 I ¶¶ 1–3.)  Furthermore, Iran actively supervised the Foundation in various ways: through the Ayatollah's creation of the Bonyad Mostazafan to manage its property, which later endorsed Assa and MFNY's partnership (<u>id.</u> ¶¶ 6, 30); through Bank Melli Iran's supervision of the partnership between MFNY and Assa (<u>id.</u> ¶¶ 28–29); through the Ayatollah's appointment of Ambassador Kharrazi to oversee the Foundation (<u>id.</u> ¶ 36); and through the Ayatollah's instructing board members to resign (<u>id.</u> ¶ 60).  These facts are sufficient to render Alavi and 650 Fifth Ave. Co.—which is nothing more than a partnership of Alavi and Assa together—organs of the Iranian government.

Under the third prong of the "agency or instrumentality" definition, the entity must be "neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(b)(3).  The Court is mindful that the Shah incorporated the Foundation in New York in 1973, and that the partnership was created in New York.  (<u>See</u> Gov't 56.1 I ¶ 1; McReynolds Decl. Ex. 37.)  However, "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice."

28

<u>Bancec</u>, 462 U.S. at 629; <u>cf.</u> <u>id.</u> at 633 (ruling that "Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities").  Accordingly, the Court may disregard the corporate form of the Foundation and of the partnership here.  To allow Alavi and 650 Fifth Ave. Co.'s corporate status as American entities to dominate their actual function as organs of Iran would violate the principles set forth in <u>Bancec</u>.

Thus, Alavi and 650 Fifth Ave. Co. meet all three requirements to be an "agency or instrumentality of a foreign state."  <u>See</u> 28 U.S.C. § 1603(b)(1).  In turn, they are the "foreign state" of Iran itself.  <u>See</u> 28 U.S.C. § 1603(b).

### 4.  <u>Turnover of Defendants' Assets Under TRIA and the FSIA</u>

#### a.  <u>TRIA § 201(a)</u>

The judgment creditors first seek turnover of defendants' assets (the Building, the seven Alavi-only properties, and the three Alavi-only bank accounts) pursuant to section 201(a) of TRIA.  (<u>See</u> Mem. of L. in Supp. of Judgment Creditor Pls.' Joint Mot. for Summ. J. ("TRIA/FSIA Mot.") 6–8, ECF No. 871; Mem. of L. in Supp. of Judgment Creditor Pls.' Joint Supp. Mot. for Summ. J. ("Judgment Creditors Seven Properties Mot.") 2–3, ECF No. 952.)

Under TRIA, "in every case in which a person has obtained judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)],[10] the blocked assets of that

---

[10] Until it was repealed in 2008, § 1605(a)(7) provided for an exception to sovereign immunity where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by

terrorist party (including the blocked assets of any agency or instrumentality) shall be subject to execution or attachment in aid of execution." TRIA § 201(a), Pub. L. No. 107-297, 116 Stat. 2322 (2002). There are thus three elements to a successful TRIA claim: (1) plaintiffs must have "obtained judgment" on a claim based upon an act of terrorism; (2) the assets plaintiffs seek to execute must belong to a terrorist party; and (3) the property in question must be "blocked assets." Id.

The first element is easily met here. The judgment creditor plaintiffs have all obtained judgments against Iran in the District Court for the District of Columbia and the Southern District of New York pursuant to two exceptions to sovereign immunity, under §§ 1605(a)(7) (in effect until January 2008) and 1605A of the statute.[11] (See Decl. of James L. Bernard in Supp. Judgment Creditor Pls.' Joint Mot. for Summ. J. ("Bernard Decl. I") Exs. 2–24, ECF No. 869.)

The second element is also met. TRIA defines the term "terrorist party" as "a terrorist, terrorist organization . . ., or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979." TRIA § 201(d)(4). Iran has been designated as a "state sponsor of terrorism" since 1984, and therefore is a "terrorist party" within the meaning of TRIA. See In re 650 Fifth Ave., 881 F. Supp. 2d at 547. All three defendants—Alavi, Assa, and 650 Fifth Ave. Co.—"are" Iran, and thus are a terrorist party within the meaning of TRIA.

---

an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

[11] Section 1605A of the FSIA provides for an exception to sovereign immunity where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A.

Finally, the third element is met, because the Building and associated bank accounts at issue here fall within the definition of "blocked assets."  Under TRIA, the term "blocked asset" includes "any asset seized or frozen by the United States under . . . the [IEEPA]."  TRIA § 201(d)(2)(A).  First, as to Assa, "the Assa Defendants' assets constitute 'blocked assets' of Bank Melli, an instrumentality of Iran," because they appear on OFAC's "Specially Designated Nationals and Blocked Persons List."  See In re 650 Fifth Ave., 08 Civ. 10934 (KBF), 2013 WL 2451067, at *2, 7 (S.D.N.Y. June 6, 2013) ("June 2013 Opinion") (granting partial summary judgment to judgment creditor plaintiffs).  Second, the assets of Alavi and 650 Fifth Ave. Co., which "are" also Iran, are similarly blocked by E.O. 13599, which provides that "[a]ll property and interest in property of the Government of Iran . . . that are in the United States . . . are blocked."  E.O. 13599(1)(a).

Alavi and 650 Fifth Ave. Co. argue that their properties are not "blocked under TRIA," because "[t]o seize or freeze assets" within the meaning of TRIA "transfers possessory interest in the property."  (Alavi TRIA/FSIA Opp. 4 (quoting Smith v. Federal Reserve Bank of N.Y., 346 F.3d 264, 272 (2d Cir. 2003) (emphasis in original)).)  Defendants argue that, because the Government has not "prohibited Defendants from exercising the powers and privileges normally associated with ownership," there has been no transfer of possessory interest.  (Alavi TRIA/FSIA Opp. 4.)  However, a transfer of "possessory interest" is not a self-defining term; it is to be contrasted with other actions authorized by the IEEPA, including the "regulat[ion]" or "licens[ing]" of assets.  See Weinstein v. Islamic Republic of Iran,

299 F. Supp. 2d 63, 75 (E.D.N.Y. 2004).  Here, the Court-appointed Monitor and Interim Trustee, Kathleen A. Roberts, controls all expenditures and manages the Building as well as funds related to the Building, including approving and paying invoices and leases.  (See Mem. Decision & Order 4, Nov. 22, 2013, ECF No. 1023.) Furthermore, the Monitor and Interim Trustee is only allowed to disburse payments in four limited categories of expenses.  (Id. at 5.)  Contrary to defendants' assertions, these facts are consistent with "prohibit[ing] Defendants from exercising the powers and privileges normally associated with ownership" (see Alavi TRIA/FSIA Opp. 4), and are sufficient to find a transfer of "possessory interest," Smith, 346 F.3d at 272.

There is no issue of material fact as to whether plaintiffs have obtained judgments on their claims or whether defendants' assets are "blocked" within the meaning of TRIA.  Plaintiffs are entitled to turnover of all of defendants' assets— the Building, the associated bank accounts, the seven Alavi-only properties, and the three Alavi-only bank accounts—under TRIA.[12]

b.  FSIA § 1610(g)

Second, the judgment creditors seek turnover of defendants' assets pursuant to § 1610(g) of the FSIA.  (See TRIA/FSIA Mot. 8–9; Judgment Creditors Seven Properties Mot. 2–3.)  The Hegna judgment creditors also seek turnover of all

---

[12] Assa argues that any turnover order would constitute "a due process violation."  (Assa TRIA/FSIA Opp. 11–13.)  That argument fails.  As was true on the previous motion, Assa has "received ample process," see In re 650 Fifth Ave., 2013 WL 5178677, at *2 n.10, including through the OFAC designation process, see In re 650 Fifth Ave., 2013 WL 2451067, at *6.

property owned by the defendants pursuant to § 1610(g) of the FSIA.  (See ECF Nos. 954, 955.)

Under § 1610(g) of the FSIA, "the property of a foreign state against which a judgment is entered under [28 U.S.C. § 1605A], and the property of an agency or instrumentality of such a state, . . . is subject to attachment in aid of execution, and execution, upon that judgment."  28 U.S.C. § 1610(g)(1).  There are thus two elements to plaintiffs' claim under § 1610(g): (1) the property in question must be the property of a foreign state or agency or instrumentality of such a state, and (2) judgment must have been entered against the foreign state under § 1605A.  For the reasons stated above, defendants here are properly deemed the Government of Iran, i.e., a foreign state; therefore, their property is the property of a foreign state.  Some of the plaintiffs have also already obtained judgments against Iran pursuant to § 1605A based on the aforementioned acts of terrorism sponsored by Iran.  (See Bernard Decl. I, Exs. 2–24.)

Therefore, as a matter of law, defendants' interests in the Building, its associated bank accounts, the seven Alavi-only properties, and the three Alavi-only bank accounts are subject to attachment and execution under § 1610(g) of the FSIA. This ruling applies to the Acosta, Beer, Kirschenbaum, Heiser, Havlish, Hegna, and Rubin judgment creditors only.[13]

---

[13] The Greenbaum and Peterson plaintiffs do not have judgments under section 1605A and therefore do not seek summary judgment under section 1610(g) of the FSIA.  (See Bernard Decl. Ex. 1; Mem. of L. in Supp. of Judgment Creditor Pls.' Joint Mot. for Summ. J. ("TRIA/FSIA Mot.") 9 n.9, ECF No. 871.)

c.  <u>FSIA § 1610(a)</u>

Third, the judgment creditors seek turnover of defendants' assets pursuant to § 1610(a)(7) of the FSIA.  (<u>See</u> TRIA/FSIA Mot. 9–12; Judgment Creditors Seven Properties Mot. 7–15.)

Section 1610(a) of the FSIA renders "property in the United States of a foreign state, . . . used for a commercial activity in the United States" subject to "attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . . if . . . the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based."  28 U.S.C. § 1610(a)(7).

As explained above, defendants' actions on behalf of Iran render them a foreign state for purposes of the FSIA as a matter of law.  Their assets located in the United States are therefore "property in the United States of a foreign state." <u>Id.</u>  Moreover, as explained above, all judgment creditor plaintiffs have obtained judgments for claims under § 1605A, § 1605(a)(7), or both.

There is one remaining element that must be met to satisfy the requirements of this provision: the properties must have been used for a "commercial activity." Under § 1603 of the FSIA, "Definitions," "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

The Court has "a great deal of latitude in determining what is a 'commercial activity' for purposes of" the FSIA.  H.R. Rep. No. 94-1487, at 16 (1976).

The Supreme Court has stated, in the context of the § 1605 exception,[14] that "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the <u>type</u> of actions by which a private party engages in trade and traffic or commerce."  <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 614 (1992) (emphasis in original) (quotation marks omitted).  The principal inquiry is whether the "foreign government acts, not as regulator of a market, but in the manner of a private player within it."  <u>Id.</u> at 614; <u>see also</u> <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 360 ("[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns") (internal quotation marks omitted); <u>Alfred Dunhill of London, Inc. v. Republic of Cuba</u>, 425 U.S. 682, 704 (1976) ("In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns.  Instead, they exercise only those powers that can also be exercised by private citizens.").

In <u>EM Ltd. v. Republic of Argentina</u>, 389 F. App'x 38, 43 (2d Cir. 2010), the Second Circuit applied the <u>Weltover</u> formulation to the context of attachment under § 1610.  The question before the court was whether Argentina's assets in a trust

---

[14] Section 1605 of the FSIA also provides for a separate exception to the jurisdictional immunity of a foreign state where "the action is based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605.

located in the United States were used for a commercial activity.  389 F. App'x at

44.  The court found that the assets were indeed "used to facilitate the investment

and eventual sale of the securities," which was "the kind of activity that a private

player in the market would carry on for profit and [was], therefore, a 'commercial

activity' under the FSIA."  Id.  The Second Circuit therefore affirmed the district

court's orders restraining and attaching certain of Argentina's assets.  Id. at 40.

While leasing may not always constitute "commercial activity," courts have

found leasing to be commercial activity in certain cases.  The House Report

accompanying the Act states that "a foreign government's . . . leasing of property . . .

would be . . . included within the definition."  H.R. Rep. No. 94-1487, at 16 (1976);

see Joseph v. Office of Consulate Gen. of Nigeria, 830 F.2d 1018, 1024 (9th Cir.

1987) (likening the leasing of property to "an ordinary private commercial

transaction"); Ford Motor Co. v. Russian Fed'n, No. 09 Civ. 1646 (JGK), 2010 WL

2010867, at *3 (S.D.N.Y. May 18, 2010) ("Plainly, leasing a motor vehicle is by

nature a commercial activity that a private party can engage in.").[15]  If this were not

the case, then a party could lease property that would otherwise be subject to

attachment to a charitable or non-commercial entity, thus maintaining its

commercial value while immunizing it from attachment, only to sell it and obtain

the full market value after a court ruling in its favor.

---

[15] Alavi states that the legislative history does not in fact generalize that all leases are commercial.
(See Alavi Seven Properties Opp. I 10.)  That may be true.  In this case, however, no rational juror
could find that the leases in which Alavi participated did not make these properties "used for a
commercial activity."

Additionally, in order to render defendants' assets subject to attachment, "the property [must have been] used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a) (emphasis added).  The Second Circuit and Supreme Court have not directly addressed the meaning of "used for"; EM Ltd. and Weltover focused on the definition of "commercial activity" itself.  In Connecticut Bank of Commerce v. Republic of Congo, however, the Fifth Circuit adopted an ordinary dictionary definition of "use for," meaning "to put the property in the service of the commercial activity, to carry out the activity by means of the property."  309 F.3d 240, 254 (5th Cir. 2002).[16]

Here, there is no triable issue as to whether the Building and the associated 650 Fifth Ave. Co. bank accounts were "used for a commercial activity" within the meaning of § 1610(a) of the FSIA.  For example, Alavi has the authority to lease space in the Building to tenants pursuant to the 1989 Partnership Agreement with Assa.  (Gov't 56.1 I ¶ 87.)  According to 650 Fifth Ave. Co.'s tax filings, the Building generated approximately $17 million per year in revenue between 2002 and 2004, and approximately $19 to $21 million per year between 2006 and 2009.  (Id. ¶ 55.) Alavi itself has also received millions of dollars in revenues from the partnership, 90% of which, on average, was derived directly from rent for the Building.  (Id. ¶ 90.)  Alavi and Assa's partnership shares in 650 Fifth Ave. Co. were also used for commercial activity, because they were the mechanism through which the partners

---

[16] The Ninth Circuit has used a similar definition of "used for."  See Af-Cap Inc. v. Chevron Overseas (Congo) Ltd., 475 F.3d 1080, 1088–89 (9th Cir. 2007) ("Like the Fifth Circuit, we conclude that property is 'used for a commercial activity in the United States' when the property in question is put into action, put into service, availed or employed for a commercial activity, not in connection with a commercial activity or in relation to a commercial activity.") (emphasis in original).

owned the Building and determined the distribution of revenue that it produced. (See id. ¶¶ 33, 56.)  In 1989, Alavi gave Assa a 35% share in 650 Fifth Ave. Co. in return for a $44.8 million contribution to the partnership.  (Id. ¶ 33.)  In 1994, after discussions regarding a $2.2 million debt that Alavi owed to Assa and the need for the partnership to obtain a $1.7 million loan from Bank Melli, Alavi transferred a 5% interest in 650 Fifth Ave. Co. to Assa.  (See id. ¶¶ 41–44.)

Defendants' bank accounts associated with the Building were also used for commercial activity.  650 Fifth Ave. Co. is engaged entirely in the ownership and distribution of proceeds from the Building, and it made regular distributions of revenue from its bank accounts to Alavi and Assa.  (Gov't 56.1 I ¶¶ 20, 22, 56.) Assa, which had been created specifically as a front for Bank Melli, obtained its bank accounts solely as a result of its ownership interest in and the revenue generated by the Building.  Assa then used these bank accounts to receive distributions from 650 Fifth Ave. Co. and to transfer funds to its principal, Bank Melli.  For these reasons, defendants' use of the Building and associated bank accounts was, as a matter of law, a commercial activity—an action "by which a private party engages in trade and traffic or commerce," Weltover, 504 U.S. at 614.

For the following reasons, the seven Alavi-only properties and three Alavi-only bank accounts were also "used for a commercial activity" within the meaning of § 1610(a) of the FSIA.  The Court is mindful of the philanthropic character of the lessees who occupy these properties, including mosques, non-profit schools, and education centers.  Nonetheless, as set forth below, the Court must evaluate the

leases by their nature, not their purpose; on that standard, the Alavi-only properties and accounts are indeed commercial.

To start with, the Virginia properties are most obviously used for commercial activity; Alavi leases those properties to private individuals for rent. (Judgment Creditors 56.1 ¶ 46; Alavi Seven Properties 56.1 I ¶ 46.) Nothing distinguishes the leases from private leases other than the identity of Alavi as a foreign state. See Ford, 2010 WL 2010867, at *3; see also Joseph, 830 F.2d at 1024; H.R. Rep. No. 94-1487, at *16. Alavi also pays tax on the Virginia Properties and has obtained appraisals of their value. (Judgment Creditors 56.1 ¶¶ 48–55.) Alavi treats Virginia Property No. 1 as an "investment" for tax purposes. (Id. ¶ 47.) No rational juror could find that Alavi did not use the Virginia properties for a commercial activity. See EM Ltd., 389 F. App'x at 44 (explaining that an investment of assets "is the kind of activity that a private player in the market would carry on" and "is, therefore, a 'commercial activity' under the FSIA").

Alavi also used the other Alavi-only real properties for commercial activity. The usage agreements are legally binding contracts that confer significant financial benefits on Alavi. Although the tenant organizations do not pay rent to Alavi, as with the Virginia properties, the tenants assume numerous of Alavi's liabilities in exchange for the right to use the properties, which indirectly compensates Alavi for the property. (See generally Judgment Creditors 56.1 ¶¶ 1, 2, 9, 10, 13, 25, 27, 34, 37; Alavi Seven Properties 56.1 I ¶¶ 1, 2, 9, 10, 13, 25, 27, 34, 37.) The usage agreements also specify that the parties enter into them for "good and valuable

consideration." (Judgment Creditors 56.1 ¶¶ 1, 2, 9–10, 12–13, 18–19, 25–27, 34, 36–37; Alavi Seven Properties 56.1 I ¶¶ 1, 2, 9–10, 12–13, 18–19, 25–27, 34, 36–37.) As set forth above, among the duties that Alavi's tenants incur that compensate Alavi for the property are (1) insurance coverage, (2) taxes and assessments on the property, (3) repairs, and (4) utility charges. (Judgment Creditors 56.1 ¶¶ 3–6, 14–16, 20–22, 28–31, 38–40; Alavi Seven Properties 56.1 I ¶¶ 3–6, 14–16, 20–22, 28–31, 38–40.) Tenants' maintenance of the properties also grows the value of Alavi's assets and causes them to appreciate.

Whether or not Alavi receives rent in the form of money, these are contracts for the use of real property through which Alavi receives tangible benefits—that is, leases. See Black's Law Dictionary 970 (9th ed. 2009) (defining a "lease" as a "contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu. rent"); see also Weltover, 504 U.S. at 616 ("Engaging in a commercial act does not require the receipt of fair value, or even compliance with the common-law requirements of consideration."). Accordingly, there is no issue of material fact as to whether these leases are actions "by which a private party engages in trade and traffic or commerce," id. at 614, and "powers . . . exercised by private citizens," Nelson, 507 U.S. at 360.

Alavi argues that "the Second Circuit has determined . . . that a lease by itself does not constitute a commercial activity." (Alavi's Mem. of L. in Opp. to Private Pls.' Joint Supp. Mot. ("Alavi Seven Properties Opp. I") 10, ECF No. 977 (citing Kato v. Ishihara, 360 F.3d 106, 111 (2d Cir. 2004)).) Kato is distinguishable,

however.  There, the Second Circuit found that the actions of the municipal

government of Tokyo—of which leasing was only one—were "only superficially

similar to actions typically undertaken by private parties," because "a private

Japanese business" would be unlikely to "undertake the promotion of other

Japanese businesses, or the promotion of Japanese business interests in general."

Id. at 111.  However, the court specifically noted that "a private Japanese business

might engage in these activities on its own behalf" in order "to promote its

products.  Id. at 112 (emphasis added).  Alavi characterizes these leases as

"[s]etting a condition on a donation" (Alavi Seven Properties Opp. I 11), but they

were more: they conferred significant economic and commercial benefits on Alavi.

That is sufficient to render the properties "used for a commercial purpose," even

under Kato.[17]

Alavi's fundamental argument is that the properties are "used by religious

and charitable organizations as mosques, not-for-profit schools, and Islamic

education centers," and that they serve "in furtherance of its charitable mission."

(Alavi Seven Properties Opp. I 6.)  Alavi characterizes its leases as "rent-free

charitable use agreements."  (Id. at 7–8.)  In support, Alavi cites In re Terrorist

Attacks on Sept. 11, 2001, which found that the "commercial activity" exception did

not apply to claims against four Saudi princes, because their "donations to charity

---

[17] The Court also notes that Kato was decided under the § 1605(a)(2) exception to jurisdictional
immunity, not the § 1610(a)(2) immunity from attachment or execution.  See 360 F.3d at 108.
City of Englewood v. Socialist People's Libyan Arab Jamahiriya, 773 F.3d 31 (3d Cir. 1985), which
Alavi also cites, is also inapposite.  Plaintiffs do not contend that "acquisition of property in a
particular commercial transaction or act indelibly stamp[s] the property as used for commercial
activity."  See id. at 36.  Here, Alavi receives various commercial benefits from the leases, making
the properties "used for a commercial activity" regardless of their origins.

are not part of the trade and commerce engaged in by a 'merchant in the marketplace.'"  538 F.3d 71, 92 (2d Cir. 2008) (quoting <u>De Letelier v. Republic of Chile</u>, 748 F.2d 790, 796 (2d Cir. 1984)).

Analogizing the seven real properties to "donations to charity" mischaracterizes their use.  In <u>In re Terrorist Attacks</u>, the defendant princes simply gave money away to Muslim charities.  538 F.3d at 94.  Here, while Alavi accrued no monetary rent from its leases, it contracted with tenant organizations for leasing its real property, and received financial benefits from those leases.  (Judgment Creditors 56.1 ¶¶ 3–7, 14–17, 20–23, 28–32, 38–41; Alavi Seven Properties 56.1 I ¶¶ 3–7, 14–17, 20–23, 28–32, 38–41.)[18]  No rational juror could find that such leases— referred to by their "nature," not their "purpose," as required by 28 U.S.C. § 1603(d)—were not "the type of actions by which a private party engages in trade and traffic and commerce."  <u>See</u> <u>Weltover</u>, 504 U.S. at 614.

Alavi's arguments that its three bank accounts were not "used for a commercial activity" within the meaning of § 1610(a)(7) also fail.  Alavi admits that it has used its bank accounts to support its "general operations, including issuing a student loan, paying staff salaries, and making other payments needed to maintain the Foundation's purposes."  (<u>See</u> Alavi Seven Properties Opp. I 12.)  Those are quintessential "actions typically undertaken by private parties."  <u>Kato</u>, 360 F.3d at 111.  <u>Kato</u>, upon which Alavi again relies, is distinguishable: in that case, the Second Circuit specifically noted that "a private Japanese business might engage in

---

[18] <u>In re Terrorist Attacks</u> was also decided under the § 1605(a)(2) exception to jurisdictional immunity rather than the § 1610(a)(2) exception to immunity from attachment or execution.  <u>See</u> <u>In re Terrorist Attacks</u>, 538 F.3d at 80.

these activities <u>on its own behalf</u>" in order "to promote <u>its</u> products," whereas the Japanese municipal government had "promot[ed] other Japanese businesses" and "Japanese business interests in general." <u>Id.</u> at 112 (emphasis added).  Here, Alavi's bank accounts supported its own activities and general operations, as would typically be the case with a private party.  Alavi thus used its bank accounts for a commercial activity.[19]  As for the argument that Alavi's operations "facilitate[d] the Foundation's non-profit mission" (Alavi Seven Properties Opp. I 12), Alavi focuses incorrectly on the "purpose" of its "course of conduct" rather than the "nature."  <u>See</u> 28 U.S.C. § 1603(d).

For these reasons, there is no issue of material fact as to whether defendants have generated, received, and distributed revenues, thus operating in the manner of a private player in the market rather than as a regulator.  <u>See</u> <u>Weltover</u>, 504 U.S. at 614.  Furthermore, as previously stated, defendants "are" Iran, and all judgment creditor plaintiffs have obtained judgments for claims under § 1605A, § 1605(a)(7), or both.  Accordingly, defendants' interests in the Building, the associated bank accounts, the seven Alavi-only real properties, and the three Alavi-only bank accounts are all subject to execution under 28 U.S.C. § 1610(a)(7).

---

[19] <u>Colella v. Republic of Argentina</u>, No. C 07-80084 WHA, 2007 WL 1545204 (N.D. Cal. May 29, 2007), is similarly inapposite.  The plane was not "used for" maintenance and service; it was "used for" transporting the president—not an activity that private parties typically undertake.  <u>See</u> <u>id.</u> at *6.  Alavi's bank accounts are "used for" supporting its general operations and mission—an activity that private parties do typically undertake.  (<u>See</u> Alavi Seven Properties Opp. I 12.)

d.  FSIA § 1610(b)

Finally, the judgment creditors seek turnover of Assa's assets pursuant to §

1610(b) of the FSIA.  (See TRIA/FSIA Mot. 12–14.)[20]

Under § 1610(b), "property in the United States of an agency or

instrumentality of a foreign state engaged in commercial activity in the United

States shall not be immune from attachment in aid of execution, or from execution,

upon a judgment entered by a court of the United States . . . if . . . the judgment

relates to a claim for which the agency or instrumentality is not immune by virtue

of" § 1605A or § 1605(a)(7) (as in effect on January 27, 2008).  28 U.S.C. §

1610(b)(3).  Unlike §§ 1610(g) and 1610(a), this provision requires that property

belong to an "agency or instrumentality of a foreign state."

As stated in the June 2013 Opinion and as reiterated above, Assa is an

instrumentality of Iran pursuant to OFAC's determination that "Assa Corporation

is controlled by, acts for or on behalf of, and had provided financial support for, and

services in support of Bank Melli."  See In re 650 Fifth Ave., 2013 WL 2451067, at

*4.  Assa is also "engaged in commercial activity": it has participated in the 650

Fifth Ave. Co. partnership, which itself conducts commercial activity through

collecting and distributing revenues (as set forth above), and it has itself accepted

millions of dollars in distributions from revenues generated by the Building and

transferring millions of dollars abroad.  (Gov't 56.1 I ¶¶ 55–57.)  Finally, as set forth

---

[20] The judgment creditor plaintiffs did not move to turn over Alavi and 650 Fifth Ave. Co.'s assets under this provision of the FSIA.  (See TRIA/FSIA Mot. 13 n.13 ("Plaintiffs' claims under FSIA § 1610(b) as to Alavi and 650 Fifth Ave. are not the subject of this motion, but are hereby reserved.").)

above, the judgment creditor plaintiffs have each obtained judgments under §
1605A, § 1605(a)(7), or both.

As a result, there is no issue of material fact as to whether Assa's assets are
subject to execution pursuant to § 1610(b)(3) of the FSIA.  Moreover, unlike §
1610(a)(7), which is applicable only to property involved in commercial activity, this
provision renders <u>all</u> of Assa's property located in the United States subject to
execution, because it belongs to an "agency or instrumentality of a foreign state"
that is "engaged in commercial activity"—even if the property itself is not.  <u>See</u> 28
U.S.C. § 1610(g)(3).

B. <u>The Government's Motion for Summary Judgment as to the Seven Alavi-
Only Properties</u>

There is no triable issue as to whether Alavi's investments in its seven
defendant properties are traceable to proceeds of International Emergency
Economic Powers Act (IEEPA) violations and traceable to property involved in
money laundering.  The Government is therefore entitled to summary judgment as
to the properties.

1. <u>Forfeitability of the Properties</u>

Alavi's investments in the seven properties are forfeitable both as traceable
to IEEPA violations and as involved in money laundering.

a. <u>Proceeds of IEEPA Violations</u>

Any "property, real or personal," "is subject to forfeiture to the United States"
if it "constitutes or is derived from proceeds traceable to a violation of . . . any
offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of

this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C).  Under § 1956(c)(7), the term "specified unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the [IEEPA]." 18 U.S.C. § 1956(c)(7).  That section in turn makes it "unlawful . . . to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705.

Presidents Reagan and Clinton and the Department of the Treasury have issued executive orders and regulations pursuant to the IEEPA that prohibit a broad range of conduct with respect to Iran, including conduct relating to imports from Iran, exports to Iran, dealings in Iranian goods and services, and financial dealings with Iran, without a valid license.  See In re 650 Fifth Ave., 2013 WL 5178677, at *19–21 (setting forth the history of the executive orders and regulations at issue).  Thus, any property that constitutes or is derived from proceeds traceable to a violation of Executive Order 12959, Executive Order 13059, or the Iranian Transactions Regulations (ITRs) is forfeitable to the United States.

Courts apply a "but for" test to determine whether property is "proceeds" of an offense for the purposes of § 981.  "Proceeds are property that a person would not have but for the criminal offense . . . ." United States v. Grant, No. S4 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008) (in the context of a conviction for securities and wire fraud); see also United States v. Porcelli, 865 F.2d 1352 (2d Cir. 1989) (in the context of mail fraud and a RICO violation); United

States v. Nicolo, 597 F. Supp. 2d 342, 345 (W.D.N.Y. 2009) (in the context of a conviction for conspiracy, mail and wire fraud, and money laundering).

When proceeds of unlawful activity are spent to obtain or improve property, any appreciation traceable to those proceeds is forfeitable.  See United States v. Moses, No. 05 Cr. 133 (JGM), 2010 WL 3521725, at *7 (D. Vt. Sept. 7, 2010) ("[A]ny profits or appreciation in value from drug proceeds is forfeitable."); United States v. Vogel, 08 Cr. 224, 2010 WL 547344, at *4 (E.D. Tex. Feb. 10, 2010) ([T]he government may seize all property from illegal drug-trafficking activity including any investment returns, appreciation, and interests that are traceable to that property."); United States v. Wahlen, 459 F. Supp. 2d 800, 814 (E.D. Wisc. 2006) ("[T]he portions of the real properties which are subject to forfeiture include appreciation attributable to the criminal proceeds.").

The summary judgment record contains no facts to alter the Court's conclusion in the September 2013 Opinion that Alavi engaged in IEEPA violations by providing services to Iran in violation of 31 C.F.R. §§ 560.204, 560.206, and 560.208.  See generally In re 650 Fifth Ave., 2013 WL 5178677, at *19–30.  First, Alavi "simply manag[ed] the partnership on behalf of an entity ultimately owned and controlled by Iran."  Id. at *29.  Second, Alavi also committed a "broader IEEPA violation" in which it "conspired with Bank Melli to conceal Assa's true identity and provided services to Assa that concealed its identity."  See id. at *24.[21]

---

[21] Bank Melli owns and controls Assa, and Iran owns and controls Bank Melli.  (See, e.g., McReynolds Decl. Exs. 31, 109.)

Moreover, the present record contains no facts to alter the Court's conclusion as to what proceeds are subject to forfeiture.  The Pahlavi Foundation, the precursor to Alavi, built the Building through a 1975 loan from Bank Melli Iran. (Gov't 56.1 I ¶ 3; McReynolds Decl. Ex. 3.)  The 650 Fifth Ave. Co. partnership was created as a solution to a tax situation related to income generated by the Building and in order to benefit Iran.  (Gov't 56.1 I ¶¶ 19–21.)  Later, Alavi acted as the general partner of the 650 Fifth Ave. Co. partnership while knowing that Bank Melli and the Government of Iran controlled Assa; this enabled Bank Melli to conceal its identity and enabled Iran to receive partnership distributions and the value of the partnership assets.  "Alavi's entire partnership is therefore traceable to illegal services . . . ."  In re 650 Fifth Ave., 2013 WL 5178677, at *30.  In turn, Alavi used the partnership distributions to pay for improvements and other expenses for the seven real properties in its name, such as property taxes.  (Gov't 56.1 II ¶ 5.)

Thus, each of the seven properties is forfeitable to the extent that Alavi spent forfeitable proceeds from the Building on the property, whether in the form of repairs, improvements, or payments of real estate taxes.  See United States v. Real Prop. & Premises Located at 216 Kenmore Ave., 657 F. Supp. 2d 1060, 1066 (D. Minn. 2009) (finding that the Government was entitled to forfeit a property in part to the extent that tainted funds were used for improvements to the property and payment of property taxes); see also United States v. Premises Known as 7725 Unity Ave. N., Brooklyn Park, Minn., 294 F.3d 954, 958 (8th Cir. 2002); United States v. Pole No. 3172, Hopkinton, 852 F.2d 636, 639 (1st Cir. 1988).

Alavi argues that the relevant proceeds are not all of its partnership distributions from the 650 Fifth Ave. Co. partnership, but only its "management fees." (See Alavi's Mem. of L. in Opp. to Gov't Mot. for Summ. J. ("Alavi Seven Properties Opp. II") 8, ECF No. 979.)  This argument fails.  Alavi also committed a much broader violation of the IEEPA than simply managing the Building and receiving management fees: it "act[ed] as the general partner of a partnership while knowing that the minority partner was controlled by Bank Melli and thus the Government of Iran."  In re 650 Fifth Ave., 2013 WL 5178677, at *30.  The 650 Fifth Ave. Co. partnership exists for the very purpose of acting as a screen for Iran.  Because of that broader violation, Alavi's entire partnership interest in 650 Fifth Ave. Co. constitutes proceeds of Alavi's illegal services, and its entire partnership interest is forfeitable.

Alavi argues that rents cannot be "proceeds" of such a service, because, if Alavi had never concealed Assa's identity, control, and ownership, then it would never have violated the IEEPA in the first place, while continuing to receive rental income.  (Alavi Seven Properties Opp. II 9–10.)  As a result, Alavi's IEEPA violation cannot be the "but for" cause of its receiving ownership distributions.

Alavi's theory is wholly implausible and contrary to the factual record.  Alavi is the latest iteration of an organization that the Shah formed as the Pahlavi Foundation and that purchased the Building using a loan from Bank Melli Iran.  (Gov't 56.1 I ¶¶ 1, 3.)  Alavi was present at the creation and birth of Assa, and, along with Bank Melli, directly participated in the plan to create Assa as a company

49

to act on behalf of Bank Melli.  (Id. ¶ 30; McReynolds Decl. Ex. 31.)  In addition, the 650 Fifth Ave. Co. partnership between Alavi and Assa was designed to solve a tax problem related to income generated by the Building.  (Gov't 56.1 I ¶¶ 19–20.)  No rational juror could envision a situation in which Alavi would be in a position to receive rental income without providing services to Iran.  Alavi "may not rely on mere speculation or conjecture as to the true nature of the facts."  Hicks, 593 F.3d at 159; see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

Additionally, without providing the services to Iran—that is, "but for" having provided the services—Alavi would not have retained its partnership interest.  See In re 650 Fifth Ave., 2013 WL 5178677, at *30 (citing United States v. Evanson, No. 05 Cr. 805 (TC), 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008)).  It is of no consequence that, in one possible scenario, Alavi could have received rental income while not providing services in violation of the IEEPA.  Alavi would not have rental income today if it were not for its services, and "[p]roceeds are property that a person would not have but for the criminal offense."  Grant, 2008 WL 4376365, at *2 n.1.  The entirety of Alavi's partnership interest, which came from rental income on the Building, is thus forfeitable as traceable to Alavi's IEEPA violations.

b.  Property Involved in Money Laundering

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal,

<u>involved in</u> a transaction or attempted transaction in violation of section 1956 [and]

1957 . . . of this title, or any property <u>traceable to</u> such property."  18 U.S.C. §

981(a)(1)(A) (emphasis added).  The phrase "involved in" has a broad definition: it

"refers to property that is itself being laundered, as well as property used to

facilitate a money laundering offense."  United States v. Approximately 250

Documents Containing the Forged Hand Writing of President John F. Kennedy and

Others, No. 03 Civ. 8004 (GBD), 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008);

see also United States v. Schlesinger, 396 F. Supp. 2d 267, 271–72 (E.D.N.Y. 2005),

aff'd, 514 F.3d 277 (2d Cir. 2008) ("The term 'involved in' has consistently been

interpreted broadly by courts to include any property involved in, used to commit, or

used to facilitate the money laundering offense.").  To qualify as "proceeds" subject

to forfeiture, the defendant must have "(1) acquire[d] the proceeds of a specified

unlawful activity, and then (2) engage[d] in a financial transaction with those

proceeds."  United States v. Napoli, 54 F.3d 63, 68 (2d Cir. 1995).

Alavi argues that the funds that it spent on the seven properties were not

"involved in" or "traceable to" money laundering transactions.  Alavi's argument

fails.  Alavi's services in violation of the IEEPA enabled the partnership to earn

rent from the Building; the partnership, Alavi, and Assa Corp. then distributed that

rent intending to conceal that it was meant for the benefit of Iran, and caused

partnership funds to be transferred abroad.  See In re 650 Fifth Ave., 2013 WL

51

5178677, at *32.  Thus, Alavi engaged in promotion and concealment money laundering by managing the Building, sending Assa partnership distributions, using funds from the Building to buy other properties and improve or maintain the Building, and disguising the origins and destinations of the partnership's proceeds. See id. at *33–35 (citing McReynolds Decl. Exs. 51, 56).  Alavi also engaged in international money laundering by transferring funds to Assa Corp. in the United States, which then transferred funds to Assa Ltd. in the United Kingdom.  See In re 650 Fifth Ave., 2013 WL 5178677, at *35.  Alavi would not have retained its ownership interest in 650 Fifth Ave. Co. and in the Building but for its laundering offenses.

Thus, the funds that Alavi received from the partnership distributions—rent revenue from the Building—were both "involved in" money laundering transactions and "traceable to" the Building, which was itself involved in money laundering.  It is undisputed that Alavi used those revenues to pay for Alavi's activities, including paying for improvements to its properties.  (Gov't 56.1 II ¶ 3, 5.)  Accordingly, all of the money that Alavi spent to maintain, improve, and pay for taxes on the properties is forfeitable as property traceable to property involved in money laundering.  See, e.g., Schlesinger, 396 F. Supp. 2d at 273 (finding that funds laundered through bank accounts to pay for real property rendered the property "involved in" laundering).

2.  Extent of Forfeiture

a.  "Proceeds" Theory

Alavi argues that the Government may only forfeit the properties to the extent that the property received proceeds of its violations, and that the Government has failed to trace the funds derived from the Building into the property to show the proportion of each property that it may forfeit.  Alavi's argument fails.  Under a "proceeds" theory pursuant to § 981, the Government seeks to forfeit 89% of Alavi's expenditures on each property from 1996 to 2008, as follows:[22]

| Property | Alavi Expenditures on Property From 1996 to 2008 | 89% of Alavi Expenditures on Property |
| --- | --- | --- |
| Queens | $5,997,007 | $5,337,336.23 |
| Maryland | $1,118,112 | $995,119.68 |
| Texas | $210,000 | $186,900 |
| Virginia | $83,683.34 | $74,478.17 |
| California | $16,630.98 | $14,801.57 |

The Government has met its burden to show the tracing required by § 981(a)(1)(A).  As set forth above, Alavi's entire partnership interest in 650 Fifth Ave. Co. constitutes proceeds of Alavi's illegal services, and Alavi's partnership interest is therefore forfeitable in its entirety.  Accordingly, any funds that Alavi received from its partnership interest—i.e., distributions in rental income—are forfeitable as proceeds traceable to Alavi's violations.  Because 89% of all of the funds that went into Alavi's accounts came from the Building, 89% of the payments

---

[22] The Government does not seek to forfeit Alavi's expenditures on the properties before 1995, when providing services to Iran became illegal.  (See Gov't 56.1 II ¶¶ 6, 9–10, 15, 18–19, 24.)  See United States v. Capoccia, 503 F.3d 103, 116 (2d Cir. 2007) (finding that funds based on conduct prior to the conduct leading to conviction were not forfeitable).

that Alavi made on its properties are similarly traceable to the IEEPA proceeds. See, e.g., United States v. Loe, 49 F. Supp. 2d 514, 523 (E.D. Tex. 1999) (finding that the Government was entitled to forfeit "a proportion of the property equal to the percentage of the tainted funds used to purchase the property"); United States v. One Parcel of Real Property Known as 352 Northup St., 40 F. Supp. 2d 74, 78 (D.R.I. 1999) ("[T]he government is entitled only to that portion of the property which it can demonstrate was acquired with tainted funds.").

Alavi does not dispute the relevant facts: 89% of its income during 1996 to 2008 came from rental income from the Building, these payments went into its bank accounts, and Alavi used these funds to pay for its activities, including improvements to real estate and expenses such as property taxes.  (Gov't 56.1 II ¶¶ 3, 5.)  Rather, Alavi argues that other sources of revenue made up 11% of the Foundation's total income during the relevant period.  (Id. ¶ 3.)  Alavi also argues that it engaged in other activities during the period in question.  Thus, according to Alavi's theory, the Government has not shown that exactly 89% of the funds spent on each property are traceable to the 89% forfeitable portion of Alavi's proceeds.

However, Alavi does not proffer any facts supporting its barebones argument that the Government's traceability calculation—under which 89% of Alavi's expenditures on each property are traceable to the forfeitable 89% of Alavi's income—is incorrect.  Rather, Alavi presents only an argument or a theory, without supporting facts.  Summary judgment is therefore proper.  See Wright, 554 F.3d at 266 ("[T]he party opposing summary judgment . . . must set forth "specific facts"

demonstrating that there is "a genuine issue for trial.") (emphasis added). Additionally, the law in the forfeiture context is clear that money is fungible. See, e.g., United States v. U.S. Currency Deposited in Account No. 1115000763247, 176 F.3d 941, 946 (7th Cir. 1999); United States v. Banco Cafetero Panama, 797 F.2d 114, 1158 (2d Cir. 1986). Thus, the Government is entitled to forfeit a total of 89% of Alavi's expenditures on all seven properties as a whole—equivalent, as mathematical matter, to forfeiting 89% of each property.[23]

### b. Money Laundering Theory

Under this theory, the Government is entitled to forfeiture of each property in the full amount that Alavi spent on each property, because all of the Government's expenditures are "traceable to" property "involved in" money laundering. Alavi argues that forfeiture is permissible only to the extent that tainted funds were invested in the properties. See Loe, 49 F. Supp. 2d at 523; 352 Northup St., 40 F. Supp. 2d at 78. However, Alavi does not appear to contest that, assuming that its investments in the properties came from funds that were traceable to money laundering, the Government would be entitled to forfeit the value of those investments. (See Alavi Seven Properties Opp. II 15.) Thus, under

---

[23] The fungibility of money also disposes of Alavi's argument regarding the California property—the one concrete fact that Alavi proffers in its opposition to the Government's motion. (See Alavi Seven Properties Opp. II 12.) It is of no consequence that the $34,330.08 invested in the California property on January 13, 1998 comprised two separate payments, one of which was earmarked only for "School." (See Van Driessche Decl. ¶ 45, Ex. 5, ECF No. 959.) Alavi may well have invested more of its illicit funds in some properties than in others, such as by earmarking certain payments for charitable purposes. However, 89% of Alavi's income is derived from the 650 Fifth Ave. Co. partnership and is therefore traceable to IEEPA violations and money laundering. The Government is thus entitled to forfeit 89% of Alavi's investments in its properties as a whole. That is equivalent mathematically to forfeiting 89% of each property, even if some properties received more charitable investments than others did, and some properties received more tainted investments than others did. See, e.g., United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at Am. Express Bank, 832 F. Supp. 542, 556 (E.D.N.Y. 1993).

the money laundering theory, the Government is entitled to forfeit the entirety of

Alavi's investments in the properties, as follows:

1. Queens property: $5,997,007
2. Maryland properties: $1,118,112
3. Texas property: $210,000
4. Virginia properties: $83,683.34
5. California property: $16,630.98

### c. Tax Payments

As part of its motion, the Government seeks to forfeit $83,683.34 in taxes

that Alavi paid for the Virginia properties.  (Mem. of L. in Supp. of Gov't's Mot. for

Summ. J. ("Gov't Seven Properties Mot.") 12, ECF No. 957.)  Alavi argues that,

because "[c]ivil forfeiture is an in rem proceeding against property involved in or

traceable to crime, not an action to recover monies from the owner," tax payments

are not forfeitable because they are not part of property.  (Alavi Seven Properties

Opp. II 16.)

Alavi's argument fails.  The Government does not seek to forfeit tax

payments themselves, but the portion of the Virginia properties equal to the funds

that Alavi spent on tax payments.  Alavi spent $83,683.34, which was traceable to

proceeds of IEEPA violations and money laundering, to pay taxes on the Virginia

properties.  (Gov't 56.1 II ¶ 23.)  But for those tax payments, the Virginia properties

would have been vulnerable to tax liens, and but for those tax payments, Alavi

would not have its present ownership interest in the properties.[24]  Tax payments

---

[24] Alavi emphasizes that it made tax payments on the Virginia properties only, and that it made such payments during only four years of the period in question.  (Alavi Seven Properties Opp. II 17.) That point is irrelevant.  What matters is that Alavi did make tax payments on the Virginia

are no different from investments to improve the property: both are traceable to tainted funds and were invested into a property.  The tainted funds spent on tax payments—just like the tainted funds spent on investment—are forfeitable.  See 216 Kenmore Ave., 657 F. Supp. 2d at 1069 (finding that a property is traceable to a money-laundering offense on the basis of "spending allegedly tainted funds on . . . property taxes"); Schlesinger, 396 F. Supp. 2d at 273 (finding that property was subject to criminal forfeiture because "the proceeds of the fraud were used to . . . make the monthly tax payments").

### d.  Appreciation

The Government is also entitled to forfeit the percentage of appreciation in the Queens, Maryland, and Texas properties that is traceable to the tainted funds expended on those four proceeds.[25]  The parties do not dispute that appreciation may theoretically be included in forfeitable amounts if the appreciation was a result of investments made using illicit income.  (See Alavi Seven Properties II Opp. 17–18.)  However, Alavi argues that the Government fails to meet its burden to show the amount of appreciation attributable to expenditures that Alavi made from tainted funds.  That is, appreciation in each property could have been the result of general appreciation of real estate, other improvements made by the charity using the property, or improvement that Alavi paid for before 1995, when its conduct became illegal.  (See id. (citing Alavi Seven Properties 56.1 II Add'l Facts 2–5).)

---

properties, and that it did so from forfeitable, tainted funds traceable to IEEPA violations and money laundering.

[25] The California and Virginia properties have depreciated since the time of Alavi's purchase, so there is no present appreciation to forfeit.

Contrary to Alavi's argument, the Government has met its burden to show the proportion of appreciation in the four properties that is traceable to Alavi's violations.  First, the Government adds together the undisputed purchase price for each of the four properties in question, the undisputed quantity of pre-1995 expenditures, and the undisputed quantity of post-1995 expenditures, to determine the "total basis" for each property—the purchase price together with all of Alavi's investments.  (Reply Mem. of L. in Further Supp. of Gov't's Mot. for Summ. J. 5–6, ECF No. 998.)  For each property, the Government then calculates the amount of post-1995 expenditures as a percentage of the property's total basis, which equals the proportion of Alavi's expenditures on the property after its conduct became illegal.  (Id. at 6.)  The Government then multiplies that percentage by the difference between the undisputed appraisal or assessment (the property's current value) and the total basis—that is, the quantity of appreciation in each property separate from Alavi's expenditures.  (Id. at 6.)  The result of this calculation is the percentage of that appreciation due to Alavi's post-1995 expenditures.

The Government's formula meets its burden to show the amount of appreciation that is "traceable to a violation" as required by 18 U.S.C. § 981(a)(1)(C).  In response to the Government's showing, Alavi proffers not facts, as required to defeat summary judgment, but a barebones argument: it is not necessarily true that, simply because Alavi invested a certain percentage of its expenditures in a given property, those expenditures caused that same percentage of the property's appreciation.  However, Alavi could have proffered facts regarding

actual rates of appreciation or an expert opinion regarding the relationship between its expenditures invested in each property and the consequent appreciation.  Alavi did not, and mere argument cannot defeat summary judgment.  See Wright, 554 F.3d at 266 ("[T]he party opposing summary judgment . . . must set forth "specific facts" demonstrating that there is "a genuine issue for trial.") (emphasis added).

        3.  Innocent Ownership

Alavi does not contest the Government's argument that it is not an innocent owner of the seven properties.  (See Gov't Seven Properties Mot. 12–13; see generally Alavi Seven Properties Opp. II.)  In any event, the Court agrees that Alavi is not an innocent owner.  "A claimant may assert an innocent-owner defense where his property interest existed at the time of the conduct giving rise to forfeiture if he 'did not know of the conduct giving rise to forfeiture,' or, 'upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.'"  United States v. One Tyrannosaurus Bataar Skeleton, No. 12 Civ. 4760 (PKC), 2012 WL 5834899, at *5 (S.D.N.Y. Nov. 14, 2012) (quoting 18 U.S.C. § 983(d)(2)(A)); see also United States v. One Parcel of Prop. Located at 755 Forest Road, 985 F.2d 70, 72 (2d Cir. 1993).

As the Court has previously explained, "Alavi has failed to raise a triable issue" on the question of innocent ownership, because the "evidentiary record is entirely one-sided on this point: Alavi knew that it was interacting with Bank Melli through Assa, and therefore Iran through Assa."  In re 650 Fifth Ave., 2013 WL 5178677, at *18, 33.  Therefore, Alavi is not an innocent owner of the proceeds of

property involved in and traceable to its money laundering and IEEPA conspiracy,
including the proceeds that it invested in the seven real properties.

   C.   <u>The Government's Motion for Summary Judgment as to the Three Alavi-
        Only Bank Accounts</u>

   Finally, Alavi's three Sterling Bank accounts, which contain $899,890.62,

$448,564.35, and $76,745.35, for a total of $1,425,200.32 (Van Driessche Decl. ¶ 28,

ECF No. 1076), are forfeitable both because they are proceeds of IEEPA violations

and property traceable to IEEPA violations, and because they are property

traceable to and involved in money laundering offenses.

   1.   <u>Forfeitability of the Bank Accounts</u>

        a.   <u>Proceeds of IEEPA Violations and of Property Traceable to
             IEEPA Violations</u>

   As set forth above, 18 U.S.C. § 981(a)(1)(C) subjects to forfeiture any property

that "constitutes or is derived from proceeds traceable to a violation of," among

other provisions, the IEEPA.  18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7).  That provision

encompasses violations of Executive Orders 12959 and 10359 as well as the ITRs.

<u>See</u> 50 U.S.C. § 1705.  Courts apply a "but for" test to determine whether property is

proceeds of an offense.  <u>See</u> <u>Grant</u>, 2008 WL 4376365, at *2 n.1.  As set forth above,

all of Alavi's proceeds from the 650 Fifth Ave. Co. partnership are forfeitable as

proceeds of Alavi's IEEPA violations.  Therefore, any funds in the Sterling Bank

accounts that are proceeds of those violations, or any funds in the accounts that are

traceable to such proceeds, are forfeitable.

b.  <u>Property Traceable to and Involved in Money Laundering</u>

18 U.S.C. § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or

personal, <u>involved in</u> a transaction or attempted transaction in violation of . . .

section 1956 or 1957 of this title [relating to money laundering], or any property

<u>traceable to</u> such property."  18 U.S.C. § 981(a)(1)(A) (emphasis added).  Under the

broad definition of "involved in," any funds in the accounts "used to commit or

facilitate" laundering are forfeitable.  18 U.S.C. § 983(c)(3); <u>see also</u> <u>United States v.</u>

<u>All Assets of G.P.S. Auto. Corp.</u>, 66 F.2d 483, 486 (2d Cir. 1995) (explaining that

premises that "served as a conduit for the proceeds of the illegal transactions" were

subject to forfeiture as "involved in" laundering).

As set forth in the September 2013 Opinion, there is no triable issue of fact

that the Building and the associated bank accounts were "involved in" money

laundering transactions.  <u>See</u> <u>In re 650 Fifth Ave.</u>, 2013 WL 5178677, at *32.  In

turn, the 650 Fifth Ave. Co. partnership distributed revenue from the Building to

Alavi bank accounts, including the Sterling Bank accounts.  (<u>See, e.g.</u>, Judgment

Creditors 56.1 ¶¶ 66–70.)  Thus, any funds present in the Sterling Bank accounts

that are traceable to those money laundering offenses are forfeitable.

2.  <u>Extent of Forfeiture</u>

As set forth below, the Government is entitled to forfeit all three Sterling

Bank accounts in their entirety pursuant to 18 U.S.C. §§ 984 and 981.

a.  <u>Forfeitability Pursuant to 18 U.S.C. § 984</u>

The relaxed tracing requirements of 18 U.S.C. § 984 enable the Government

to seize funds in a bank account into which forfeitable assets have been transferred

within one year.  Pursuant to that provision, the Government need not "identify the specific property involved in the offense that is the basis for the forfeiture," even if "the property involved in such an offense has been removed and replaced by identical property," so long as the forfeitable assets themselves were transferred into the account within the past year.  18 U.S.C. § 984(a)–(b).  "Section 984 does not relieve the Government of its obligation to show that funds derived from a criminal activity were deposited into the Account.  Rather, once such a showing has been made, it frees the Government from having to prove that the dollars in the Account are the same ones that are traceable to the criminal activity giving rise to the forfeiture."  United States v. $1,399,313.74, 591 F. Supp. 2d 365, 370–71 (S.D.N.Y. 2008).

Pursuant to § 984, the Sterling accounts are forfeitable in their entirety.  In the fiscal years 2008 and 2009, which cover the year prior to the filing of the amended complaint on November 16, 2009, more than 96% of all of Alavi's declared income was derived directly from the 650 Fifth Ave. Co. partnership—96.9% in 2008 and 99.7% in 2009.  (Van Driessche Decl. ¶ 21.)  Only 0.21% of Alavi's income in 2008 and 0.02% in 2009 was derived from contributions, gifts, and grants.  (Id. ¶ 22.)  Moreover, millions of dollars in proceeds traceable to the Building—far exceeding the quantity of funds in the accounts at the time of their seizure—were transferred into the accounts during the year prior to the filing of the amended complaint, as follows:

| Bank Account | Approximate Distributions Into Account From Partnership | Time Period | Funds in Account at Time of Seizure |
|---|---|---|---|
| Sterling Account 1 | $2,567,840.02 | December 2008–October 2009 | $899,890.62 |
| Sterling Account 2 | $550,000 | January 2008–January 2009 | $488,564.35 |
| Sterling Account 3 | $1,063,497.99 | June 2009–July 2009 | $76,745.35 |

(Van Driessche Decl. ¶¶ 25–28.)  Thus, each account contained funds at the time of seizure that were less than the distributions into that account from the partnership. Pursuant to § 984's relaxed tracing requirements, which allow for funds in a bank account to be forfeited even when they have been replaced with identical property due to the fungibility of money, the Government may therefore forfeit the entirety of each account.  See 18 U.S.C. § 984.[26]

Alavi first disputes the Government's allegedly "erroneous determination that 90% of the Foundation's income from 1996 to 2009 was derived from the Fifth Avenue Company."  (Alavi's Mem. of L. in Opp. to Gov't's Mot. for Summ. J. Concerning Alavi Bank Accounts ("Alavi Bank Accounts Opp.") 5, ECF No. 1086.) Specifically, Alavi argues that, based on its 60% partnership interest in Fifth Ave. Co., Alavi was require to report 60% of the partnership's income as its own income, regardless of whether Alavi in fact received that amount from the partnership.  See I.R.C. § 702; 26 C.F.R. § 1.702-1(a).  As an initial matter, that determination is not

---

[26] Alavi asserts that it received a deposit of $1,500,000 from John Hancock Life Insurance on July 28, 2009 that would not be forfeitable.  (Alavi's Mem. of L. in Opp. to Gov't's Mot. for Summ. J. Concerning Alavi Bank Accounts ("Alavi Bank Accounts Opp.") 6 n.3, ECF No. 1086; Van Driessche Decl. Ex. F.)  That fact is irrelevant.  Pursuant to § 984, the Government may forfeit the entire quantity of forfeitable funds even if the original illicit funds were replaced with "clean" funds.

crucial to the Government's analysis, because the Government has also documented actual transfers from the partnership into the distributions that exceed the amounts present in the accounts.  Additionally, Alavi's argument fails because Alavi's assets are forfeitable to the extent of its reportable <u>income</u> from the partnership, all of which is traceable to the partnership, not solely its distributions in a given year.  <u>Cf.</u> <u>Burke v. Comm'r of Internal Revenue</u>, 485 F.3d 171, 174–75 (1st Cir. 2007) (finding that a plaintiff's partnership distribution was properly taxed rather than his income although he had no access to it).

Alavi also argues that the Government fails to meet its burden on summary judgment because the evidence only shows $392,308.34 of <u>actual</u> proceeds deposited into the Sterling accounts within the year prior to the amended complaint—less than the funds in the account at the time of seizure.  (Alavi Bank Accounts Opp. 4.) Contrary to Alavi's argument, the Government's analysis, albeit relying in part on deduction and inference, meets its burden to show distributions traceable to the partnership.  For example, the Government extrapolates from records showing that Sterling Account 1 received $196,306.67 distributions in June and July 2009, combined with evidence that similar distributions were also made to some Sterling account in August, September, and October 2009, to determine that those transfers were made specifically to Sterling Account 1.  (Van Driessche Decl. ¶ 25(d).)  In response to the Government's tracing analysis, Alavi makes a conclusory argument that the Government's analysis is insufficient—but without proffering specific facts

to dispute any components of that tracing analysis.  Alavi's argument cannot defeat summary judgment.  See Wright, 554 F.3d at 266.

 For these reasons, the Government is entitled to forfeit the Sterling Bank accounts pursuant to 18 U.S.C. § 984.

### b.  Forfeitability Pursuant to 18 U.S.C. § 981(a)(1)(C)

Although the Government's analysis under § 984 is sufficient for purposes of this motion, the Government is also entitled to forfeit Alavi's bank accounts as "property, real or person, which constitutes or is derived from proceeds traceable to" an IEEPA or money laundering violation pursuant to 18 U.S.C. § 981(a)(1)(C). While § 981 does not require the Government to show that illicit funds were transferred within the past year, the Government must show that each forfeited account actually possessed unlawful proceeds at the time of seizure.

In Banco Cafetero, the Second Circuit adopted a "lowest intermediate balance" or "drugs-in, last-out" rule, by which the Government's ability to forfeit funds from illicit activity is capped at the lowest balance of unlawful funds in the account after the funds were deposited into the account, unless—crucially—the Government can show that later deposits were actually made using unlawful proceeds.[27]  797 F.2d at 1159–60; see United States v. Contents in Account No. 059-644190-69, 253 F. Supp. 2d 789, 795 (D. Vt. 2003) ("There is no reason to think that Banco Cafetero's drugs-

---

[27] One court has explained the rule as follows: "if $100 from a drug sale is deposited into an active account, the proceeds in the account are 'traceable' to the extent of $100 as long as the account balance never falls below that amount; untainted money added to the account after the balance falls below $100 is immune from seizure."  All Funds Presently on Deposit, 832 F. Supp. at 551 (emphasis added).

in, last-out rule does not still provide the proper test in this Circuit for traceability when the government seizes fungible property pursuant [to] § 981").

Alavi argues that the Government fails to meet its burden under § 981 because it cannot show that deposits after a low intermediate balance in each account were made using unlawful proceeds.  For example, Sterling Account 1 had a low intermediate balance of $258,540.52 on July 15, 2009, such that any forfeiture should be capped at that amount, rather than the larger balance of $899,890.62 at the time of the account's seizure.  (Alavi Bank Accounts Opp. 6.)  Additionally, Alavi proffers evidence that it received at least one lawful deposit for $1,500,000 from John Hancock Life Insurance on July 28, 2009.  (Van Driessche Decl. Ex. F, at SDNY-0654160.)

However, as set forth above, the Government has demonstrated millions of dollars of distributions from the partnership into the three Sterling accounts, and Alavi has not proffered specific facts to dispute those amounts.  (Van Driessche Decl. ¶¶ 25–28.)  The lowest intermediate balance rule therefore is no object to forfeiture, because the Government has shown actual illicit proceeds added to the accounts in an amount greater than the amounts currently present in the accounts.  The Government's tracing overrides the presumption that tainted money is the last money withdrawn and that untainted money is the last money added to a given account.  See Contents in Account No. 059-644190-69, 253 F. Supp. 2d at 792.  Thus, the Government may forfeit all three accounts in their entirety.[28]

---

[28] The Court also notes that the Government may be entitled to forfeit the entirety of each account, even if each contains some legitimate funds, due to Alavi's commingling tainted funds with

For these reasons, the Government is entitled to forfeit Alavi's three Sterling

Bank accounts in their entirety pursuant to 18 U.S.C. § 984 and 18 U.S.C. § 981.

    D.  <u>Alavi's 18 U.S.C. § 983(g) Petition</u>

    Alavi has also petitioned the Court for a determination pursuant to 18 U.S.C.

§ 983(g) that the forfeiture of the entire building at 650 Fifth Avenue is grossly

disproportionate to the offenses at issue.  ("§ 983(g) Petition," ECF No. 1019.)

Pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), in civil

forfeiture proceedings where "the forfeiture is grossly disproportional to the

offense," the Court "shall reduce or eliminate the forfeiture as necessary to avoid a

violation of the Excessive Fines Clause of the Eighth Amendment of the

Constitution."  18 U.S.C. § 983(g).  "The touchstone of the constitutional inquiry . . .

is the principle of proportionality: The amount of the forfeiture must bear some

relationship to the gravity of the offense that it is designed to punish."  <u>United

States v. Bajakajian</u>, 524 U.S. 321, 334 (1998).  In determining whether a forfeiture

is excessive, courts generally apply the following factors:

> (1) the harshness, or gross disproportionality, of the forfeiture in comparison
> to the gravity of the offense, giving due regard to (a) the offense committed
> and its relation to other criminal activity, (b) whether the claimant falls
> within the class of persons for whom the statute was designed, (c) the

---

legitimate funds.  <u>See, e.g.</u>, <u>United States v. McGauley</u>, 279 F.3d 62, 75 (1st Cir. 2002) ("[T]he commingling of tainted funds . . . with legitimate funds is enough to expose the legitimate funds to forfeiture, if the commingling was done for the purpose of concealing the nature or source of the tainted funds (that is, if the commingling was done to facilitate money laundering . . .).").  "Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme.  It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue."  <u>United States v. Certain Funds on Deposit in Account No. 01-0-71417</u>, 769 F. Supp. 80, 84–85 (E.D.N.Y. 1991).  <u>But see</u> <u>Contents in Account No. 059-644190-69</u>, 253 F. Supp. 2d at 799–800 ("[T]he government is required to demonstrate something more than the fact of commingling . . . to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds.").

> punishments available, and (d) the harm caused by the claimant's conduct;
> (2) the nexus between the property and the criminal offenses, including the
> deliberate nature of the use and the temporal and spatial extent of the use;
> and (3) the culpability of each claimant.

von Hofe v. United States, 492 F.3d 175, 186 (2d Cir. 2007).

Alavi argues that forfeiture of the Foundation's 60% interest in 650 Fifth

Avenue Co. and therefore in the Building—assets worth more than $500 million—is

grossly disproportionate to its offenses of (1) providing services to Assa (and

therefore to Bank Melli and to Iran) in violation of the IEEPA and ITRs and (2)

engaging in money laundering in violation of 18 U.S.C. § 1956.  (§ 983(g) Petition 2.)

Alavi argues that its "criminal behavior represents only a small portion of the

Foundation's forty-year history, involved the transfer of funds far less than the total

value of the Foundation's assets, and represent only a small part of the

Foundation's activities (the overwhelming majority of which were focused on its

charitable mission)."  (Id. at 2–3.)  Thus, any penalty imposed by the Court should

be proportional to claimants' conduct after 1995, when it became unlawful to

provide services to Iran.  (Id.)  This Court disagrees.[29]

### 1.  The Building as "Proceeds" of Alavi's Violation

The Government first argues that the Eighth Amendment does not apply to

the forfeiture of unlawful proceeds or that the forfeiture of unlawful proceeds is per

se proportionate.  See, e.g., United States v. Sum of $185,336.07, 731 F.3d 189, 194

(2d Cir. 2013) (finding that the Eighth Amendment does not apply to forfeitures of

---

[29] As an initial matter, it is unclear whether the Eighth Amendment applies to corporations,
including Alavi.  See, e.g., United States v. Chaplin's, Inc., 646 F.3d 846, 581 n.15 (11th Cir. 2001)
("The Supreme Court has never held that this amendment applies to corporations.").  The Court will
assume, for purposes of this discussion, that the Eighth Amendment does apply to corporations.

drug proceeds); <u>United States v. Betancourt</u>, 422 F.3d 240, 250–51 (5th Cir. 2005)

(same); <u>United States v. Rudaj</u>, No. 04 Cr. 1110 (DLC), 2006 WL 1876664, at *8

(S.D.N.Y. July 5, 2006) (same).  Alavi argues that those cases are distinguishable

because they dealt with forfeiture of drug trafficking proceeds rather than property

interests in real estate that were held before unlawful activity occurred.  <u>See</u> <u>Sum of</u>

<u>$185,336.07</u>, 731 F.3d at 194 (explaining why forfeiture of drug proceeds is <u>per se</u>

proportionate, unlike real estate); <u>Rudaj</u>, 2006 WL 1876664, at *6.  Nonetheless,

that distinction is not fatal to application of the principle here.  "All of our sister

courts of appeal that have considered this provision have concluded that the

forfeiture of guilty property, <u>such as</u> [but not exclusively] illicit drug proceeds, has

been traditionally regarded as non-punitive as to which the Eighth Amendment's

restrictions on punishment do not apply."  <u>Sum of $185,336.07</u>, 731 F.3d at 194

(emphasis added) (internal quotation marks omitted).[30]

     As discussed above and in the Court's September 2013 Opinion, there is no

triable issue as to whether Alavi acted as the general partner of 650 Fifth Ave. Co.

while knowing that Assa was controlled by Bank Melli and by the Government of

Iran.

> The service of acting as the general partner enabled Bank Melli to obtain the
> array of services needed to manage its partnership interest and to conceal its
> identity, thus enabling Iran to receive partnership distributions and the
> value of the partnership assets.  If it had been known earlier that Alavi was
> providing such services, its interest would have been forfeited.  Thus, Alavi
> retained its partnership interest through its concealment service.  Alavi's

---

[30] While <u>Rudaj</u> also applied to drug trafficking proceeds, the court there also stated that "the forfeiture of <u>proceeds</u>, as opposed to legally acquired property later involved in a criminal offense, does not implicate Eighth Amendment concerns of disproportionality."  <u>Rudaj</u>, 2006 WL 1876664, at *6.  As stated above, the Building constituted proceeds of Alavi's IEEPA violation here.

entire partnership interest is therefore traceable to illegal services; those
illegal services also separately allowed the partnership assets to be retained.

In re 650 Fifth Ave., 2013 WL 5178677, at *30.  Because Alavi retained its

partnership interest through providing services, its entire interest constitutes

proceeds of its violation.  Under Sum of $185,336.07, forfeiture of those proceeds

does not violate the Eighth Amendment.  See 731 F.3d at 194.

Alavi argues that the Building cannot be viewed as a "proceed" of an

underlying IEEPA violation, because it owned the Building before any allegedly

unlawful activity, and—contrary to the Court's ruling in its September 2013

Opinion—"there is no way of knowing what would have happened if the Foundation

had disclosed Assa's identity at an earlier date."  (Alavi & 650 Fifth Ave. Co's Reply

Mem. of L. in Supp. of § 983(g) Petition ("§ 983(g) Reply") 4–5, ECF No. 1055.)

However, no rational juror could find, as Alavi claims, that Alavi's partnership

interest would likely "have remained intact" if it had not provided its concealment

service to Iran.  (See id. at 5.)  The 650 Fifth Ave. Co. partnership was created

specifically to benefit Iran; that was its raison d'être.  (See, e.g., Gov't 56.1 I ¶ 34;

McReynolds Decl. Ex. 111.)

In any event, the Court need not resolve definitively whether the Eighth

Amendment applies to the proceeds at issue here, because forfeiture of the Building

is proportional under the von Hofe factors.

### 2.  The von Hofe Factors

Even assuming that proceeds of an offense are subject to an Eighth

Amendment analysis, the forfeiture of the Building is not grossly excessive in light

of Alavi's conduct.  Three factors are relevant to this inquiry: (1) a comparison of the harshness of the forfeiture in comparison with the gravity of the offense; (2) the nexus between the property and the criminal offense; and (3) the culpability of the claimant.  See von Hofe, 492 F.3d at 186.

First, forfeiture of the Building would not be harsh in comparison with the gravity of Alavi's offense.  As the Court previously found, Alavi knew that Assa was a front company for Bank Melli and therefore for Iran, and made affirmative efforts to hide Bank Melli's ownership interest in Assa and 650 Fifth Ave. Co. and its ownership of the Building.  See In re 650 Fifth Ave., 2013 WL 5178677, at *22–27. 650 Fifth Ave. Co. was "an entity designed to disguise where money was going," and "was no different than a 'front' business set up to disguise the origins and destinations of the proceeds of the IEEPA offense."  Id. at *34.  Thus, Alavi committed numerous IEEPA and money laundering violations.  See id. at *27, 32. The IEEPA, Executive Order 12959, and the ITRs promulgated pursuant to that executive order are intended to effect "broad economic sanctions intended to isolate Iran" due to the "threat posed by the Iranian government—namely, the proliferation of weapons of mass destruction, state-sponsored terrorist activity, and efforts of frustrate Middle East diplomacy."  United States v. Banki, 685 F.3d 99, 108 (2d Cir. 2012).  Money laundering is similarly a serious offense.  See von Hofe, 492 F.3d at 186.

Alavi argues that, at most, forfeiture would be proper of $996,650 that Alavi earned in management fees from 1995 to 2009, because the Building generated

revenue from legitimate tenants, and Alavi reinvested funds in the Building for operational expenses and building upkeep.  (See § 983(g) 6–8.)  However, courts have upheld forfeitures of property involved in violations where the unlawful proceeds were commingled with legitimate property.  See, e.g., United States v. Garza-Gonzalez, 512 F. App'x 60, 66 (2d Cir.), cert. denied, 134 S. Ct. 548 (2013) (finding a forfeiture of $29,505,265 in property involved in money laundering not to be a violation of the Excessive Fines Clause when the defendant received $7 million in drug proceeds).[31]

Second, an examination of the nexus between the Building and the criminal offense reveals that the Building was integral to Alavi's violations.  As the Court explained in the September 2013 Opinion, there is no triable issue of material fact that 650 Fifth Ave. Co. was created to benefit Iran, and that Assa, and therefore Bank Melli, received distribution payments thanks to the partnership.  See In re 650 Fifth Ave., 2013 WL 5178677, at *7–11.  The Building played a central role in Alavi's IEEPA and money laundering violations.  See id. at *32 ("Alavi's services in violation of the IEEPA enabled the Partnership to earn rent from the Building.").  Thus, based on "the nexus between the property and the criminal offenses, including the deliberate nature of the use and the temporal and spatial extent of the use," forfeiture of the Building is not excessive.  See von Hofe, 492 F.3d at 186.

---

[31] The Court does not need to resolve the parties' dispute over Alavi's maximum statutory fine in this case.  Courts regularly uphold forfeitures that dramatically exceed statutory maximums.  See, e.g., United States v. Castello, 611 F.3d 116, 123 (2d Cir. 2010) (finding a forfeiture of $12 million appropriate when the statutory maximum fine was $250,000, although the defendant there did not receive the maximum imprisonment term possible).

Third, the extent of Alavi's culpability is sufficient for full forfeiture of the Building.  There is no triable issue of fact as to whether "Alavi was present at the creation and birth of Assa," and whether, "along with Bank Melli, it directly participated in the plan to create Assa as a company . . . to act on behalf of Bank Melli."  In re 650 Fifth Ave., 2013 WL 5178677, at *18.  The Court has already rejected any argument that Alavi was willfully blind to the fact that Assa was controlled by Iran and that its acts were services to Iran.  See id.; United States v. Milbrand, 58 F.3d 841, 848 (2d Cir. 1995) (finding that forfeiture of a mother's interest in property was appropriate because she was, at best, willfully blind to her son's illegal use of the property).  The Court is mindful that Alavi has also conducted certain charitable activities, including making grants to universities, donations to schools, and grants to art and literature programs.  (§ 983(g) Reply 9.) Notwithstanding those charitable activities, Alavi's actions on behalf of Assa, Bank Melli, and Iran establish its culpability.

For these reasons, forfeiture of the entire Building at 650 Fifth Avenue is not grossly excessive.

IV.   CONCLUSION

For these reasons, the judgment creditors' motion for summary judgment as to Alavi and 650 Fifth Ave. Co.'s interests in the Building and the associated bank accounts is GRANTED; the judgment creditors' motion for summary judgment as to Alavi's seven properties and three bank accounts is GRANTED; the Government's motion for summary judgment as to Alavi's seven properties is GRANTED; the

Government's motion for summary judgment as to Alavi's three bank accounts is GRANTED; and Alavi's § 983(g) petition is DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 869, 950, 956, 1075, and 1110 and to remove the opinion at ECF No. 1102 from the docket.[32]

SO ORDERED.

Dated:      New York, New York
            April 18, 2014

                                        _K_ B. For___

                                        KATHERINE B. FORREST
                                        United States District Judge

---

[32] In its original opinion of March 28, 2014, the Court did not include the Rubin judgment creditor plaintiffs among those plaintiffs entitled to turnover under § 1610(g) of the FSIA. (See supra n.13.) On April 9, 2014, the Rubin plaintiffs filed a motion to correct the opinion pursuant to Fed. R. Civ. P. 60(a). (ECF No. 1110.) The Court granted any parties wishing to respond to the motion an opportunity to do so (ECF No. 1115), but no party did so. Accordingly, the Court has granted the Rubin plaintiffs' motion and corrected the relevant language on page 33 and footnote 13 of this opinion. This opinion is otherwise identical to the opinion of March 28, 2014.