UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE 650 FIFTH AVENUE
AND RELATED PROPERTIES

:
:
:
:
:
:

No. 08 Civ. 10934 (KBF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- X

**ALAVI FOUNDATION AND 650 FIFTH AVENUE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

*Attorneys for Claimants Alavi Foundation and the
650 Fifth Avenue Company*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF UNDISPUTED FACTS ...................................................................2

      A.     The Foundation and the Fifth Avenue Company....................................................2

      B.     The Government's Investigations of Alavi and the Fifth Avenue Company ..........3

      C.     The Government Alleges Continuous Conduct .....................................................9

SUMMARY JUDGMENT STANDARD .......................................................................10

ARGUMENT ...............................................................................................................11

I.     The Government Alleged a Continuing Offense that Is Barred by the Statute of
Limitations ...............................................................................................................11

II.    The Government Knew, or Possessed the Means to Discover, the Alleged Offenses
Before 2004 ...............................................................................................................15

CONCLUSION .............................................................................................................18

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................................11, 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...................................................................................................11

*Figueroa v. Mazza*,
   825 F.3d 89 (2d Cir. 2016) ...................................................................................10, 11

*Fujitsu Ltd. v. Federal Express Corp.*,
   247 F.3d 423 (2d Cir. 2001) .......................................................................................11

*Gannon v. UPS*,
   529 F. App'x 102 (2d Cir. 2013) ................................................................................11

*Gilvar v. United States*,
   No. 09-CV-8941, 2011 U.S. Dist. LEXIS 57640 (S.D.N.Y. May 26, 2011),
   *aff'd* 468 F. App'x 31 (2d Cir. 2012) ..........................................................................16

*Government of Guam v. United States*,
   744 F.2d 699 (9th Cir. 1984) ......................................................................................15

*Grynberg v. Total S.A.*,
   538 F.3d 1336 (10th Cir. 2008) ..................................................................................16

*Harris v. City of New York*,
   186 F.3d 243 (2d Cir. 1999).........................................................................................12

*Jeffreys v. City of N.Y.*,
   426 F.3d 549 (2d Cir. 2005).........................................................................................11

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998).........................................................................................16

*Lipton v. Nature Co.*,
   71 F.3d 464 (2d Cir. 1995)...........................................................................................11

*McIntyre v. United States*,
   367 F.3d 38 (1st Cir. 2004)..........................................................................................16

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010).....................................................................................................12

ii

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ...........................................................................................12

*Overall v. Klotz,*
    846 F. Supp. 297 (S.D.N.Y. 1994) .................................................................15

*Price v. Cushman & Wakefield, Inc.,*
    808 F. Supp. 2d 670 (S.D.N.Y. 2011) ............................................................11

*Shomo v. City of New York,*
    579 F.3d 176 (2d Cir. 2009) ...........................................................................12

*Trans Sport, Inc. v. Starter Sportswear, Inc.,*
    964 F.2d 186 (2d Cir. 1992) ...........................................................................11

*United States v. $515,060.42 in U.S. Currency,*
    152 F.3d 491 (6th Cir. 1998) .....................................................................12, 13

*United States v. 5443 Suffield Terrace, Skokie, Ill.,*
    607 F.3d 504 (7th Cir. 2010) ..........................................................................13

*United States v. Kivanc,*
    714 F.3d 782 (4th Cir. 2013) .....................................................................13, 14

*United States v. Kubrick,*
    444 U.S. 111 (1979) ........................................................................................13

*United States v. Payne,*
    591 F.3d 46 (2d Cir. 2010) .............................................................................12

**Statutes**

19 U.S.C. § 1621 ..................................................................................................11, 13

**Other Authorities**

Fed. R. Civ. P. 56(a) .................................................................................................10

Claimants Alavi Foundation ("Alavi" or the "Foundation") and 650 Fifth Avenue Company (the "Fifth Avenue Company" and, collectively, "Claimants") respectfully submit this memorandum of law in support of their motion for summary judgment with respect to their statute of limitations defense.

## PRELIMINARY STATEMENT

The statute of limitations in a civil forfeiture action is five years, and the limitations period runs from the time the Government discovered or should have discovered the conduct giving rise to forfeiture. The undisputed facts here reveal that the Government knew, or if reasonably diligent should have known, of the facts underlying its forfeiture claims by the late 1990s. The Government began its investigation of the Foundation almost immediately after the 1979 Iranian revolution, and that investigation continued for the next 20 years. By 1996, Government records show that three different federal agencies had reviewed the same allegations that were subsequently raised in the Amended Forfeiture Complaint—namely, that the Foundation was controlled by the Government of Iran ("Iran"), operating a charity on Iran's behalf, running the building at 650 Fifth Avenue (the "Building") on behalf of Iran, and transferring rental income from the Building to Iran. Major news organizations publicly reported on these investigations throughout the late 1990s and early 2000s, including by reference to a 1994 FBI report to Congress that concluded Alavi is "entirely controlled by the government of Iran." Despite this knowledge, the Government did not seek forfeiture of Claimants' assets until November 2009, more than ten years after learning of the alleged conduct. As a result, the Government's claims are barred by the statute of limitations.

## STATEMENT OF UNDISPUTED FACTS

### A.   The Foundation and the Fifth Avenue Company

Alavi is a not-for-profit corporation organized under the laws of New York. (Alavi 56.1 ¶ 1.)[1]  It was established in 1973 by the Shah of Iran, Shah Mohammad Reza Pahlavi, as the Pahlavi Foundation.[2]  (Id.)  In 1974, Alavi acquired property located at 650 Fifth Avenue, New York, New York, pursuant to a mortgage.  (Id. ¶ 2.)  In 1975, Alavi borrowed $42 million from Bank Melli, an Iranian bank with offices in New York, to retire the existing mortgage on the property and to construct an office tower on the property—the Building.  (Id.)  Although Alavi was then and remains today a tax-exempt non-profit organization, the fact that the property was debt-financed caused Alavi's rental receipts from the Building to be taxed as debt-financed unrelated business taxable income.  (Id.)

In 1989, Alavi and a newly-formed New York corporation, Assa Corporation ("Assa"), formed the Fifth Avenue Company, a partnership organized under New York State law.  (Id. ¶ 3.)  Under a partnership agreement entered into on July 31, 1989, Alavi contributed the Building to the Fifth Avenue Company, and Assa contributed $44.8 million, which was used to satisfy the mortgages extended by Bank Melli.  (Id.)  By eliminating the Bank Melli mortgages, this transaction freed Alavi from paying unrelated business income tax on the Building's rental receipts.  (Id.)  Today, Alavi holds a 60% interest in the Fifth Avenue Company

---

[1] References to "Alavi 56.1" refer to Claimants' Statement of Undisputed Material Facts Under Local Rule 56.1 in Support of Alavi Foundation's and 650 Fifth Avenue Company's Motion for Summary Judgment, dated April 12, 2017.  References to "Ex." refer to the exhibits annexed to the Declaration of Daniel S. Ruzumna, submitted herewith.

[2] After the Shah was deposed in 1979, Alavi was renamed the Mostazafan Foundation of New York in 1980, and then the Alavi Foundation in 1992.  (Alavi 56.1 ¶ 1.)

and Assa holds the remaining 40% (which has been determined to be subject to forfeiture). (*Id.* ¶ 4.) The Fifth Avenue Company's primary asset is the Building.

**B.    The Government's Investigations of Alavi and the Fifth Avenue Company**[3]

Almost immediately after the Iranian revolution in 1979, the Government began what would become a decades-long investigation of the Foundation.

In March 1980, the Department of Treasury's Office of Foreign Assets Control ("OFAC") received a letter from the New York Attorney General's Office ("NYAG") describing the NYAG's concerns regarding the Foundation's activities. The NYAG informed OFAC that the Foundation's board of directors (the "Board") "is composed of five individuals all of whom . . . are Iranian nationals and two of whom reside in Teheran." (Alavi 56.1 ¶ 5; Ex. 12.) The NYAG further informed OFAC that, following the 1979 revolution, the previous Board "had been directed by representatives of the government of the Islamic Republic of Iran" to resign. (*Id.*)

At around the same time, the New York Times publicly quoted a representative of the NYAG stating that he was "very uneasy" about "how close the Foundation is to the Teheran Government." (Alavi 56.1 ¶ 6; Ex. 13.) Similarly, in April 1980, the New York Post reported that the United States Department of Treasury was monitoring the Foundation and that "deteriorating relations with Iran could lead the federal government or the state to take over the $60 million Fifth Avenue skyscraper owned by the Pahlavi Foundation." (Alavi 56.1 ¶ 7; Ex.

---

[3] This statement of undisputed facts is based on documents exchanged in discovery in this litigation. As the Court is aware, Claimants have asked for, but the Government has refused to produce, documents concerning the Government's prior investigations of the Alavi Foundation and the Fifth Avenue Company. (*See, e.g.,* Jan. 6, 2017 Government Objections and Responses to Document Requests by Claimants (Ex. 40); transcript of Mar. 15, 2013 conference at 43-44, 49-51 (Dkt. No. 381) (Ex. 41); May 23, 2013 Declaration of George C. Venizelos (Ex. 42)). Claimants have every expectation that if the Government made a full production of such documents, there would be even more evidence demonstrating the Government's knowledge of the alleged offenses earlier than 2004.

14.)  The New York Post quoted a state official who indicated that the Foundation's "dependence

on Iranian sources means that it is indeed controlled by Iran."  (*Id.*)

By the late 1980s, the IRS had also begun investigating the Foundation.  The IRS

shared the NYAG's view that the Foundation's directors "historically have been appointed by

the government of Iran." (Alavi 56.1 ¶ 8; Ex. 15.)  The IRS further concluded that the

relationship between the Foundation and Bank Melli was "cloudy and does not appear to be an

arms-length relationship."  (*Id.*)  Indeed, in 1988, the IRS believed that "Mostazafan Foundation

and Bank Melli both may be controlled by the government of Iran."  (*Id.*)  By 1989, the

Department of Treasury believed that the Foundation's properties "constitute properties in which

the Government of Iran has an interest."  (Alavi 56.1 ¶ 9; Ex. 16.)

Meanwhile, the FBI had begun its own investigation.  (*See, e.g.*, Alavi 56.1 ¶ 10;

Ex. 17 at FBI092341 (noting that a "full field investigation [was] instituted" on April 27, 1982).)

In 1987, the FBI initiated surveillance on Mohammad Badr-Taleh, who became president of the

Foundation the next year, as well as other individuals employed by or associated with the

Foundation.  (Alavi 56.1 ¶¶ 11-12; Ex. 18.)  The investigation continued in the following years,

as the FBI collected, reviewed, and analyzed what appears to be internal Foundation

correspondence.  For example, by July 26, 1989 the FBI received—and translated—a March 22,

1988 letter from Habib Zobaidi to the Foundation's Board (the "Zobaidi Letter").  (Alavi 56.1

¶ 13; Exs. 20-22 (stamps noting the FBI received these documents on July 26, 1989 at pages

SDNY-0000974, 982, 988).)  The Zobaidi Letter, as translated, describes the Foundation's plans

to "prevent paying enormous and unnecessary taxes to the [United States Government]."  (Ex. 22

at SDNY-0000988.)  It discusses one potential solution—"Bank-e Melli-e Iran becoming a

partner," but notes that "[t]he possibility of the IRS accepting the idea of a loaner becoming a

4

partner is very weak," especially because of "the political climate." (*Id.* at SDNY-0000990.)  The FBI's handwritten notes on this document reveal that the FBI viewed the letter as evidence of the letter-writer's "recog[nition] of [Bank Melli International] as partner was illegal."  (Ex. 21 at SDNY-0000980.)

Throughout the 1980s, newspapers continued to publicly report on the Government's investigation into the Foundation's alleged connections to Iran.  For instance, in August 1989, the Wall Street Journal reported that "[i]ndividuals sympathetic to the new revolutionary regime [in Iran] seized control of the foundation, and critics say they have quietly been funneling millions of dollars to supporters of the late ayatollah in the U.S."  (Alavi 56.1 ¶ 14; Ex. 23.)  The Wall Street Journal quoted a U.S. government official as stating that "[t]he Foundation has a close abiding connection with the Iran government."  (*Id.*)  "Everything I've seen shows that," the U.S. government official added.  (*Id.*)

The FBI's investigation continued into the 1990s.



9668035

In May 1995, Newsday published an article reporting that a "secretive Iranian foundation in New York that U.S. officials link to espionage and the spread of militant Islam has been able to avoid paying virtually all U.S. income taxes."  (Alavi 56.1 ¶ 16; Ex. 25.)  This article publicly reported that "federal officials say" that "the Mostazafan Foundation of New York[] is controlled by Iran's clerical leadership."  (*Id.*)  It added that the "Foundation became exempt from paying millions of dollars in federal tax from rent income when it paid off an Iranian government bank mortgage on its Manhattan office building by forming a partnership with a top officer of that same bank."  (*Id.*)  Moreover, Newsday reported that former FBI Executive Associate Director Oliver Revell "said the foundation's activities in the United States are directed by Iran's mission to the United Nations."  (*Id.*)  Newsday also reported that other Government officials, including a former CIA officer, agreed that the "Mostazafan Foundation (of Iran) and the Alavi Foundation are the same, under different names."  (*Id.*)

In October 1995, a report by the Middle East Data Project detailed the transaction through which Alavi "shifted ownership of the 650 Fifth Avenue building in 1989 to a curious limited partnership, in an effort to decrease its tax burden and increase cash available for the Foundation's 'charitable' activities."  (Alavi 56.1 ¶ 17; Ex. 26.)  The report explained that Alavi transferred a 35% share in the partnership Assa Corp., whose parent company, Assa Co. Ltd., was "registered in the Channel Islands and owned by Mohammad Behdadfar and Mohsen Kakavand."  (*Id.*; Ex. 26 at ALV_00040091.)  It went on to explain that when Assa was established, "Kakavand was serving as the Director General for Europe, America, and the Far East for Bank Melli's main overseas branch in London" and that that Kakavand "was a very senior Iranian government official." (*Id.* at ALV_00040092.)

"[I]n the mid-1990s, financial information obtained in the [FBI's] investigation was provided to the IRS and OFAC to determine if any potential criminal violations existed." (Alavi 56.1 ¶ 18; Ex. 27 at REV-FBI000104.)  More specifically, on March 22, 1996, the FBI met "with OFAC representative Mark Roberts regarding possible legal action instituted by OFAC against [Alavi] for acting outside the scope of its non-profit corporation charter."  (Alavi 56.1 ¶ 20; Ex. 17 at FBI092341.)  Then, on April 30, 1996, the FBI sent copies of an "LHM" (*i.e.*, letterhead memorandum) regarding Alavi "to OFAC and IRS."  (Alavi 56.1 ¶ 22; Ex. 17.)  The Government has redacted the contents of that memorandum in its entirety.  (*Id.*)

By April 1996, the FBI had received a copy of Kenneth R. Timmerman's article titled "Islamic Iran's American Base," published in the American Spectator in December 1995 (the "American Spectator Article").  (Alavi 56.1 ¶ 21; Ex. 17 at FBI092342.)  That article sets forth nearly all of the allegations that would later form the basis of the Amended Forfeiture Complaint.  It reports that "according to a classified FBI report of 1994, Alavi is 'entirely controlled by the government of Iran.'"  (Ex. 29; *see also* Ex. 26 at ALV_00040061 (October 1995 report stating that "[a]ccording to a 1994 classified report to Congress, the FBI asserted that Alavi was 'entirely controlled by the government of Iran'").)  The article further elaborates that the "Bonyad-e Mostazafan [in Iran] remains Alavi's parent organization"; that, since 1979, the Foundation has been "a vehicle for propagating the ideas and the cause of the Islamic Republic in the U.S."; that former-Alavi presidents Manoucher Shafie and Mohammad Mahallati have both been investigated by the Government; and that "[t]he FBI alleges that the brother of Iran's current ambassador, Kamal Kharrazi, is a regular visitor to the foundation's Fifth Avenue headquarters."  (Ex. 29 at ALV_00049478-79.)  The article concludes that "there would seem to be enough maneuvering room" in the law "to allow Treasury and other agencies to close down

the Alavi Foundation." (*Id.* at ALV_00049480.) The FBI was thus aware of all of these allegations no later than April 1996. But the FBI did not merely receive a copy of the American Spectator Article; it also reviewed its contents and made concrete plans to undertake further investigation based on the material reported. (*See* Ex. 17 at FBI092342 (noting plans for New York FBI office "to conduct thorough indices searches and analysis of names and organizations mentioned in an article by Kenneth R. Timmerman, entitled Islamic Iran's American Base, published in a December 1995 issue of The American Spectator").)

News organizations continued to publish similar reports about the Foundation into the late 1990s. For instance, in February 1996, the Daily News published an article that stated that federal investigators suspected the Foundation of providing money to organizations that supported terrorism, and quoted former FBI Executive Associate Director Revell as saying that the Foundation was an arm of the Iranian government. (Alavi 56.1 ¶ 19; Ex. 28.) In May 1997, the Associated Press published an article describing federal investigations into the connections between the Foundation and Iran. (Alavi 56.1 ¶ 23; Ex. 30.) Yet again, a CIA officer is quoted as saying that "[t]he two foundations are 'the same, under different names.'" (*Id.; see also* Ex. 31 (September 1999 article with same quote).) And in October 1999, an article appeared in Iran Brief reporting that "U.S. government investigators began probing the finances of [the Foundation] in 1982." (Alavi 56.1 ¶ 25; Ex. 32.)

FBI documents reveal that its investigation of the Foundation also continued into the late 1990s. Although the FBI redacted the substantive content of these documents in their entirety, multiple confidential human source reporting documents reveal that the FBI relied on information "derived from" a January 1997 FBI report. (Alavi 56.1 ¶ 26; Exs. 33-35.) The

Government did not produce the January 1997 report that is mentioned in the confidential human source reporting documents.

The Government's investigation did not stop there.  In 2003 and 2004, the Senate Finance Committee investigated the Foundation as part of its review of "records related to 'tax exempt organization such as charities and foundations which finance and perpetuate violence.'" (Alavi 56.1 ¶¶ 29-30; Ex. 27 at REV-FBI000104; *see also* Ex. 38.)  Major news outlets also continued to publish articles discussing the Foundation and quoting Government officials who asserted that the Foundation was controlled by the Government of Iran in the early 2000s.  (*See* Alavi 56.1 ¶¶ 27-28; Ex. 36 (2001 Insight on the News article describing Alavi as a "nonprofit corporation identified by the IRS in 1988 as a front for the government of Iran"); Ex. 37 (2003 Washington Post article stating that "[a]fter two decades of classified investigation, U.S. officials say that, besides having close ties to the hard-line mullahs in Tehran, Alavi also has had close associations for years with the Mostazafan Foundation in Iran").)

In short, from 1979 until the Amended Forfeiture Complaint was filed in 2009, Claimants were under nearly continuous investigation by the FBI and other government agencies.

## C.    The Government Alleges Continuous Conduct

After nearly thirty years of investigation, the Government finally brought this action seeking to forfeit assets belonging to Assa in 2008, and assets belonging to the Foundation in 2009.  The Amended Forfeiture Complaint alleges that the Foundation has continuously provided services to Iran, or entities owned and controlled by Iran, on an ongoing basis for nearly thirty years.  (Am. Compl. ¶ 21 ("[T]he Alavi Foundation is controlled by the Islamic Republic of Iran and has been providing numerous services to the Iranian Government, in violation of IEEPA, including managing a commercial building for the Iranian Govenrment,

9

running a charitable organization for the Iranian Government, and transferring funds from 650

Fifth Avenue Company to Bank Melli.")  The Government describes these activities as

constituting a single, unbroken course of conduct, alleging that "*since the revolution*, the

Mostazafan Foundation of New York, and later the Alavi Foundation, have acted at the direction

of, and provided services to, entities owned and controlled by the Islamic Republic of Iran."

(Am. Compl. ¶ 30 (emphasis added).)  Indeed, the Complaint goes out of its way to emphasize

the continuity of Alavi's services and Iran's control despite significant shifts in power at the

Foundation.  (*See, e.g.,* Am. Compl. ¶ 48 ("Even after the formation of the Partnership, the

Iranian Government continued to control the Alavi Foundation, and the Alavi Foundation

continued to serve the Iranian Government."); ¶ 62 ("After Badr's resignation, Kharrazi and his

successors continued to direct the affairs of the Mostazafan Foundation of New York.").)

Moreover, the Government's claims for forfeiture (Am. Compl. ¶¶144-155) do

not identify specific unlawful acts and the property subject to forfeiture as a result of each of

those acts.  Rather, they generally allege that the "Defendant Properties constitute or were

derived from proceeds traceable to violations of executive orders and regulations issued pursuant

to IEEPA" and "involved in money laundering" (*id.* ¶¶ 148, 157), without providing any detail

about which properties are subject to forfeiture as a result of specific, discrete acts.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment upon a showing that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law,"

construing all facts in the nonmoving party's favor.  *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir.

2016) (citing Fed. R. Civ. P. 56(a)).  "A 'material' fact is one capable of influencing the case's

9668035

outcome under the governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Id.*

"In seeking to show that there is a genuine issue of material fact for trial, the nonmoving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial." *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation"); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (summary judgment cannot be defeated "on the basis of conjecture or surmise"). Instead, "[t]he non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *see also Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) ("The non-moving party must present *specific evidence* demonstrating a genuine dispute." (emphasis added)); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (a party opposing summary judgment must offer "hard evidence").

## **ARGUMENT**

### I.    The Government Alleged a Continuing Offense that Is Barred by the Statute of Limitations

The Government must commence a civil forfeiture action within five years of discovering the alleged forfeitable offense. *See* 19 U.S.C. § 1621.[4] The limitations period

---

[4] In pertinent part, 19 U.S.C. § 1621 reads:

begins to run when "the Government discovers or possesses the means to discover the alleged

wrong, whichever occurs first." *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491,

502 (6th Cir. 1998); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (finding

"discovery" of alleged facts "encompasses not only those facts the plaintiff actually knew, but

also those facts a reasonably diligent plaintiff would have known").  For continuing offenses or

violations, the limitations period runs from the initial point when the offense is or should have

been discovered, even if the offense extends for many years.  *$515,060.42 in U.S. Currency*, 152

F.3d at 501-02.

       A continuing violation is one that results from an ongoing practice or policy, or

where a "series of separate acts . . . collectively constitute one unlawful [act]." *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks and citations

omitted); *see also Shomo v. City of New York*, 579 F.3d 176, 181-82 (2d Cir. 2009) (applying

continuing violation analysis in the context of an Eighth Amendment claim of deliberate

indifference); *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010) (explaining that conspiracy

is a continuing offense); *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999).  The

classic example of a continuing violation is a hostile work environment claim, where a plaintiff

alleges that repeated conduct over an extended period of time amounts to an actionable

discriminatory offense.  *See Morgan*, 536 U.S. at 115-118.

       The Sixth Circuit's decision in *United States v. $515,060.42 in U.S. Currency*,

152 F.3d at 502, is instructive.  In that case, the Sixth Circuit deemed the Government's action

---

No suit or action to recover any duty under section 1592(d), 1593a(d), or any
pecuniary penalty or forfeiture of property accruing under the customs laws shall be
instituted unless such suit or action is commenced within five years after the time
when the alleged offense was discovered, or in the case of forfeiture, within 2 years
after the time when the involvement of the property in the alleged offense was
discovered, whichever was later[.]

time-barred because it had not been brought within five years of when the Government learned

that the claimant's currency was used to commit or facilitate the commission of an illegal

gambling business.  The Government argued that the currency seized was a product of

"relatively recent bingo operations" for which the statute of limitations had not yet run, but the

Sixth Circuit rejected this argument, reasoning that the "Government cannot disregard its

discovery of earlier occurring offenses in preference for later offenses which would produce a

more favorable timeline."  *Id.* at 503.  The court concluded the unlawful bingo games were not

individual, discrete acts, but part of a continuing violation—namely, the operation of a gambling

business.  The Sixth Circuit therefore affirmed the dismissal of the forfeiture claims, referencing

the policies behind the § 1621 limitations period:  "[s]tatutes of limitation are statutes of repose

representing 'a pervasive legislative judgment that it is unjust to fail to put the adversary on

notice to defend within a specified period of time and that the right to be free of stale claims in

time comes to prevail over the right to prosecute them.'"  *Id.* (quoting *United States v. Kubrick*,

444 U.S. 111, 117 (1979)).

Where courts have upheld forfeiture of property on the basis of separate, distinct

offenses (rather than continuing ones), they have required the Government to identify distinct

offenses that were not tied to one another and "independently could support forfeiture" of the

property at issue.  *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 508 (7th Cir.

2010).  For example, in *United States v. Kivanc*, 714 F.3d 782 (4th Cir. 2013), the Fourth Circuit

found that the claimant had committed two, distinct offenses (overprescribing of controlled

substances and healthcare fraud).  The first offense was known to the Government more than five

years before it brought suit, and was therefore time-barred.  *Id.* at 789-90.  The second offense

was not time-barred because it was a separate and distinct offense that occurred later in time.  *Id.*

13

The Fourth Circuit's conclusion was based in part on the Government's decision to indict Dr. Kivanc *separately* for the healthcare fraud, rather than treating all of the unlawful conduct (*i.e.,* overprescribing and healthcare fraud) as a single conspiracy.  *See id.* at 790 ("The government based its civil forfeiture action not on Dr. Kivanc's overprescribing of controlled substances, but specifically on the Remicade health care fraud.").  Indeed, Dr. Kivanc was indicted for *twenty-three* separate counts of health care fraud and conspiring to commit healthcare fraud alone.  *Id.*[5] In contrast, here, the Government has *not* sought forfeiture on the basis of separate and distinct acts, but rather an alleged continuous scheme that began in 1995.

In this case, the Government premised its forfeiture claims on allegations of decades-long schemes and conspiracies that purportedly began in the early 1980s and became unlawful in 1995—namely that Alavi was controlled by the Government of Iran since the early 1980s and entered into a partnership with a shell company owned by Bank Melli Iran in 1989. The Amended Forfeiture Complaint alleges that Alavi provided IEEPA-violating services that began in or about 1995 and continued unabated through the time of filing.  (Am. Compl. ¶ 21.) The Government did not seek forfeiture of specific amounts or specific property tied to discrete post-November 2004 acts; rather, it sought forfeiture of virtually all of the Defendant Properties based on the alleged schemes and conspiracies.  (*Id.* ¶¶ 1-2; 144-57.)  Throughout this litigation, the Government has continued to describe its allegations as a continuing offense.  (*See, e.g.,* Government's Motion for Summary Judgment at 39, *In re 650 Fifth Avenue*, No. 08-CV-10934 (S.D.N.Y. Aug. 17, 2013), Dkt. No. 689 ("[B]y providing the service of concealing the Government of Iran's ownership in the Building, the Alavi Foundation retained [its] ownership

---

[5] Those twenty-three counts are in addition to the nineteen counts of distributing and conspiring to distribute controlled substances, which were barred by the statute of limitations.  *See Kivanc*, 714 F.3d at 790.

interest in the Building, allowing it to continue in operation and to continue to earn rental income for both Alavi, the Partnership, and Assa."); Brief for the United States of America at 79-80, *In re: 650 Fifth Avenue and Related Properties*, No. 14-2027 (2d Cir. Jan. 29, 2015) (characterizing the crimes giving rise to forfeiture as "an ongoing conspiracy to commit IEEPA violations by providing services to the Government of Iran" and consisting of "complex violations of IEEPA that occurred as part of a scheme that spanned years and continents"); Government's Motion for Partial Summary Judgment at 5, *In re 650 Fifth Avenue*, No. 08-CV-10934 (S.D.N.Y. Dec. 9, 2016), Dkt. No. 1412 ("Alavi and the Partnership *continued to* provide services to Assa from 1995 at least up until the date of filing of the complaint in this case on December 17, 2008.") (emphasis added).)

Because the Government here has alleged and continues to argue that Claimants were engaged in continuing violations giving rise to forfeiture, and because the Government knew or should have known of these alleged offenses before November 2004 (five years before the Government filed the Amended Forfeiture Complaint), its forfeiture claims against Claimants' assets are barred by the statute of limitations.

## II.    The Government Knew, or Possessed the Means to Discover, the Alleged Offenses Before 2004

The record is clear:  the Government knew, or should have known, of the wrongful acts alleged in the Amended Complaint before 2004.  Indeed, the evidence reflects that it knew (or should have known) of these alleged violations by the late 1990s.[6]  The

---

[6] The fact that Alavi disputed—and continues to dispute—these allegations is irrelevant to the statute of limitations inquiry.  *See Overall v. Klotz*, 846 F. Supp. 297, 298, 302 (S.D.N.Y. 1994) (granting summary judgment based on statute of limitations defense even though defendant denied allegations in the complaint); *Government of Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984) ("The merit of a claim is irrelevant to operation of the bar of a statute of limitations."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is not precluded by disputes of fact that are "irrelevant or unnecessary" to the governing substantive law).

Government's allegations fall into two categories.  First, the Government contends that Alavi "is

controlled by the Islamic Republic of Iran" and "running a charitable organization for the Iranian

Government."  (Am. Compl. ¶ 21.)  Second, the Government asserts that Alavi provided services

to Iran by "managing a commercial building for the Iranian Government" and "transferring funds

from 650 Fifth Avenue Company to Bank Melli."  (*Id.*)

As described in greater detail above, there can be no material dispute that the

Government had concluded that Alavi was controlled by the Government of Iran well before

2004.  For example, in the late 1980s, the IRS determined that the Foundation's directors

"historically have been appointed by the government of Iran" and that the "Mostazafan

Foundation and Bank Melli both may be controlled by the government of Iran." (Ex. 15 at

ALV_00048263.)  In 1995, Newsday publicly reported that federal officials had determined that

"the Mostazafan Foundation of New York[] is controlled by Iran's clerical leadership" and that

"the Foundation's activities in the United States are directed by Iran's mission to the United

Nations."  (Ex. 25 at ALV_00049427.)[7]  And by 1996, the FBI received, reviewed, and

---

[7] Whether the Government received the Newsday article is unknown as a result of its failure to produce relevant information.  To the extent the Government intends to hide behind dubious claims of privilege to argue it was unaware of the Newsday report, it should be foreclosed from doing so.  The Government should not be permitted to use a claim of privilege to shield discovery and as a sword to claim lack of proof by Claimants.  In this particular instance, it is irrelevant whether the Government actually received the Newsday article or not.  The Government possessed the means to discover this publicly reported information, and certainly knew, or should have known, of the status of its own investigations.  *See Gilvar v. United States*, No. 09-CV-8941, 2011 U.S. Dist. LEXIS 57640, at *9-11 (S.D.N.Y. May 26, 2011) (statute of limitations barred claims where plaintiffs "knew or should have known the critical facts" prior to the limitations period "in light of the extensive media coverage" of those facts), *aff'd* 468 F. App'x 31 (2d Cir. 2012); *Kronisch v. United States*, 150 F.3d 112, 122 (2d Cir. 1998) (claim was untimely where information underlying claim was publicly available long before limitations period); *McIntyre v. United States*, 367 F.3d 38, 60-61 (1st Cir. 2004) ("Where events receive widespread publicity, plaintiffs may be charged with knowledge of their occurrence." (internal citations and quotation marks omitted)); *Grynberg v. Total S.A.*, 538 F.3d 1336, 1349-50 (10th Cir. 2008) (rejecting claims that general publicity was inadequate to establish that plaintiff knew or should have known of cause of action where plaintiff was not unsophisticated and where public information was not imprecise).

developed plans to further investigate the statements in the American Spectator Article that reported that the FBI had *already* determined that "Alavi is 'entirely controlled by the government of Iran'" and that, since 1979, Alavi has been "a vehicle for propagating the ideas and the cause of the Islamic Republic in the U.S." (Ex. 17 at FBI092342; Ex. 29.) Other news organizations published similar articles in the months and years that followed. (*See* Exs. 26, 30, 32, 37.)

      Likewise, the Government had the Zobaidi Letter in July 1989 and knew at least by then about the 1989 transaction that formed the Fifth Avenue Company and that, from that time forward, provided the basis for Alavi to transfer partnership distributions to Assa (and indirectly Bank Melli). And the Government either knew or possessed the means to discover that Assa was ultimately owned by Bank Melli. (*See, e.g.,* Ex. 15 (1989 IRS report noting that the relationship between the Foundation and Bank Melli was "cloudy and does not appear to be an arms-length relationship"); Exs. 20-22 (internal Alavi correspondence that the FBI received in 1989, with FBI handwritten notes evidencing the FBI's view that having Bank Melli "as partner was illegal"); Ex. 25 (1995 Newsday article reporting that the Foundation "form[ed] a partnership with a top officer of" "an Iranian government bank" (*i.e.,* Bank Melli)); Ex. 26 (October 1995 report explaining that Assa Co. Ltd. was owned, in part, by Mohammad Kakavand who "was a very senior Iranian government official").)

      As the Court is aware, the Government has refused to produce discovery relevant to the statute of limitations. Claimants repeatedly have explained how their ability to present this defense has been hampered by the Government's failure to make an adequate production, its extensive redactions of the relevant documents it did produce, its inappropriate invocation of privilege, and its selective production of documents. Because the Government has so heavily

redacted its production and fought the production of documents and information relevant to Claimants' statute of limitations defense, the full extent of the Government's knowledge has been shielded from discovery. The heavy redactions and the cryptic references to numerous FBI, IRS, and OFAC investigations strongly indicate that additional evidence of the Government's knowledge would have been revealed if such discovery had been produced, establishing beyond all doubt that this action is time barred.[8]

Nonetheless, the existing record makes clear that, based on its own investigations and the many news articles on the subject, the Government knew or should have known of the facts underlying its forfeiture claims no later than the mid-1990s. Its claims are therefore barred by the statute of limitations.

## **CONCLUSION**

For the reasons stated above, Claimants' motion for summary judgment on its affirmative statute of limitations defense should be granted.

Dated: April 12, 2017

Respectfully submitted,

_/s/ Daniel S. Ruzumna_____
Daniel S. Ruzumna
Melissa R. Ginsberg
Leigh E. Barnwell
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000

---

[8] Having repeatedly opposed Claimants' attempts to obtain discovery to corroborate the facts marshaled above, the Government should not now be heard to argue that an insufficiently developed record is a defense to summary judgment. Although this record is sufficient to grant summary judgment against the Government, Claimants expressly preserve—without relitigating here—their objections to the Government's refusal to provide discovery on this subject and the Court's finding that such discovery was waived.

9668035

Facsimile 212-336-2222
druzumna@pbwt.com
mginsberg@pbwt.com
lbarnwell@pbwt.com

DEBEVOISE & PLIMPTON LLP
John Gleeson
Matthew E. Fishbein
919 Third Avenue
New York, NY 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836
jgleeson@debevoise.com
mfishbein@debevoise.com

*Counsel for the Alavi Foundation and 650 Fifth
Avenue Company*

19