USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 17, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
:
:
:
IN RE: 650 FIFTH AVENUE AND                    :
RELATED PROPERTIES                             :
:
-----------------------------------------------------------------X

08 Civ. 10934 (KBF)
and all member and
related cases

OPINION & ORDER

-----------------------------------------------------------------X
:
KIRSCHENBAUM, et al.,                          :
:
                              Plaintiffs,      :
:
:
:
                    -v-                        :
:
650 FIFTH AVENUE and RELATED                   :
PROPERTIES,                                    :
:
                              Defendants.      :
:
:
-----------------------------------------------------------------X

09-cv-165 (KBF)
09-cv-166 (KBF)
10-cv-1627 (KBF)
11-cv-3761 (KBF)
12-mc-19 (KBF)
12-mc-20 (KBF)
12-mc-21 (KBF)
12-mc-22 (KBF)
13-mc-71 (KBF)
13-cv-1825 (KBF)
13-cv-1848 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

A coordinated jury and bench trial in the above-captioned actions is scheduled to commence on May 30, 2017. Before the Court are a number of motions in limine, some of which are ghosts of the past—motions dealt with in connection with the trial scheduled in 2013 that have again reared their head. So that the final pre-trial conference can be used to discuss other matters relating to the trial, the Court's rulings on the pending motions in limine are set forth below.

# I. APPLICABLE LEGAL PRINCIPLES

## A. Standard on a Motion *In Limine*

"The purpose of an <u>in limine</u> motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." <u>Palmieri v. Defaria</u>, 88 F.3d 136, 141 (2d Cir. 1996) (quotation marks omitted); <u>see also</u> <u>Highland Capital Mgmt., L.P., v. Schneider</u>, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008). "The trial court should exclude evidence on a motion <u>in limine</u> only when the evidence is clearly inadmissible on all potential grounds." <u>United States v. Ozsusamlar</u>, 428 F. Supp. 2d 161, 164-65 (S.D.N.Y. 2006) (citations omitted).

A court's ruling on a motion <u>in limine</u> "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [party's] proffer." <u>Luce v. United States</u>, 469 U.S. 38, 41 (1984). <u>In limine</u> rulings occur pre-trial, and that fact has significance. The evidence at trial may come in differently than anticipated, altering the solidity of the proffered basis for a pretrial ruling. The Court therefore invites any party who believes that the factual record as developed at trial supports a revised ruling to bring such an application in a timely manner.

## B. Relevant Evidence

Federal Rule of Evidence 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action." Fed. R.

Evid. 401; <u>see also</u> <u>Old Chief v. United States</u>, 519 U.S. 172, 178 (1997). "The fact to which the evidence is directed need not be in dispute." <u>Id.</u> at 650. To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" <u>McKoy v. North Carolina</u>, 494 U.S. 433, 440 (1990) (quoting <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 345 (1985)); <u>see also</u> <u>United States v. Abu-Jihaad</u>, 630 F.3d 102, 132 (2d Cir. 2010).

Federal Rule of Evidence 402 provides that all relevant evidence is admissible except as otherwise provided by the Constitution, by Act of Congress, or by applicable rule. Fed. R. Evid. 402; <u>see also</u> <u>United States v. Abel</u>, 469 U.S. 45, 51 (1984).

C.    <u>Federal Rule of Evidence 403</u>

Federal Rule of Evidence 403 authorizes the exclusion of relevant and otherwise admissible evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; <u>see also</u> <u>Old Chief</u>, 519 U.S. at 180. "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." <u>Old Chief</u>, 519 U.S. at 184. "If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered

and exclude it if its discounted probative value were substantially outweighed by unfair prejudicial risk." Id. at 182-83 (explaining that this analytical method is preferred over one that weighs only probative value against prejudice). In making this assessment, a court should take into consideration the "offering party's need for evidentiary richness and narrative integrity in presenting a case." Id. at 183. Rule 403 is concerned with "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)).

## II.    THE PENDING MOTIONS IN LIMINE

### A.    Claimants' Motions *In Limine*

Claimants have brought or renewed the following ten motions in limine ("MILs"):[1]

1. Motion for sanctions, including an adverse inference, based on alleged spoliation of evidence (2013 motion in limine 6,[2] ECF No. 715, renewed at ECF No. 1617);

2. Motion to exclude evidence of control over the Foundation by the Bonyad Mostazafan prior to 1990 (2013 motion in limine 7,[3] ECF No. 715, renewed at ECF No. 1617);

---

[1] When discussing Claimants' motions in limine throughout this opinion, the Court often refers to such motions by number. In doing so, the Court refers to the numbers it has assigned to Claimants' motions.

[2] This motion is also referred to as 2013 motion in limine "F."

[3] This motion is also referred to as 2013 motion in limine "G."

3. Motion to exclude evidence regarding transactions by third party Hanif Partnership involving funds received in connection with a settlement of a then-pending litigation with Claimants (2013 motion in limine 9,[4] ECF No. 715, renewed at ECF No. 1617);

4. Motion to preclude witnesses' invocations of their Fifth Amendment right against self-incrimination[5] (2013 motion in limine 2,[6] ECF No. 715, repeated with additional argument as motion in limine 1, ECF No. 1616);

5. Motion to admit evidence of alleged racial and religious bias by case agents (motion in limine 2, ECF No. 1616);

6. Motion to preclude evidence suggesting that the 1989 partnership transaction was an improper or unlawful tax scheme (2013 motion in limine 3,[7] ECF No. 716, repeated with additional argument as motion in limine 3, ECF No. 1616);

7. Motion to preclude statements made by Assa's former President in proffer sessions (2013 motion in limine 5,[8] ECF No. 715, repeated with additional argument as motion in limine 4, ECF No. 1616);

---

[4] This motion is also referred to as 2013 motion in limine "I."

[5] This motion is styled as a "motion to determine the appropriate process for addressing" Fifth Amendment statements of non-parties. (See ECF No. 1617, at 2.) However, it seeks an order from this Court "refus[ing] to admit evidence of these witnesses' invocation" of the Fifth Amendment privilege against self-incrimination (id. at 3), making it clear that this is a motion to preclude.

[6] This motion is also referred to as 2013 motion in limine "B."

[7] This motion is also referred to as 2013 motion in limine "C."

[8] This motion is also referred to as 2013 motion in limine "E."

8. Motion to preclude evidence of control over Alavi by the Government of Iran (motion in limine 5, ECF No. 1616);

9. Motion to preclude evidence relating to why the 1995 Iranian Transaction Regulations were enacted (motion in limine 6, ECF No. 1616);

10. Motion to preclude exhibits as to which the source and custody are unknown (motion in limine 7, ECF No. 1616).

B.     The Government's Motions *In Limine*[9]

The Government has brought or renewed the following eleven MILs:

1. Motion to preclude evidence concerning the Alavi Foundation's charitable gifts, including witnesses who have received grants from Alavi (2013 motion in limine 1, ECF No. 718, renewed as motion in limine 1, ECF No. 1619);

2. Motion to preclude evidence regarding certain purported investigations of Claimants by federal and state agencies (2013 motion in limine 2, ECF No. 718, renewed as motion in limine 2, ECF No. 1619);

3. Motion to preclude Claimants from calling individuals who joined the Alavi Board after 2009 (2013 motion in limine 3, ECF No. 718, renewed as motion in limine 3, ECF No. 1619);

4. Motion to admit witness statements of Mohammad Geramian, Mohammad Deghani Tafti, and Mohammad Seyed Badr Taleh as statements against interest pursuant to Federal Rule of Evidence

---

[9] The Judgment Creditors have joined in the renewal of the Government MILs set forth in numbered paragraphs 1-6 below.  (ECF No. 1625.)

804(b)(3) (2013 motion <u>in limine</u> 4, ECF No. 718, renewed as motion <u>in limine</u> 4, ECF No. 1619);

5. Motion to permit the Government to call witnesses who intend to assert their Fifth Amendment privilege against self-incrimination and allowing an adverse jury instruction (2013 motion <u>in limine</u> 5, ECF No. 718, renewed as motion <u>in limine</u> 5, ECF No. 1619);

6. Motion to admit evidence regarding Farshid Jahedi's destruction of subpoenaed documents (2013 motion <u>in limine</u> 6, ECF No. 718, renewed as motion <u>in limine</u> 6, ECF No. 1619);

7. Motion to preclude Claimants from eliciting substantive testimony from witnesses who asserted their Fifth Amendment rights against self-incrimination during discovery (motion <u>in limine</u> 7, ECF No. 1619)[10];

8. Motion to preclude J. Duross O'Bryan from testifying as an expert witness (motion <u>in limine</u> number 8, ECF No. 1619);

9. Motion to Preclude Miriam R. Albert from testifying as an expert witness (motion <u>in limine</u> number 9, ECF No. 1619)[11];

10. Motion to preclude reference to a lack of criminal IEEPA or money laundering charges brought against Claimants (motion <u>in limine</u> 10, ECF No. 1619); and

---

[10] The Judgment Creditors have joined in this.  (ECF No. 1625).

[11] The Judgment Creditors have filed their own motion to preclude this testimony.  (ECF No. 1612.)

11. Motion to preclude mention of prior employment of counsel for Claimants as a federal judge (motion <u>in limine</u> 11, ECF No. 1619).

III.  DISCUSSION

A.  <u>MILs Concerning the Fifth Amendment</u>

For ease of reference, the Court addresses as a group all of the MILs that seek rulings with regard to a witnesses' invocation of the Fifth Amendment right against self-incrimination.  This includes Claimants' MIL 4 and the Government's MILs 5 and 7.

1.  <u>Hassani and Dabiran</u>

During the years of civil discovery that occurred in this case, a number of witnesses were deposed and asserted their Fifth Amendment right not to incriminate themselves.  Two of these witnesses, Hassan Hassani and Ali Dabiran—former members of the Alavi board of directors—are now available to testify at trial and could be made available in advance of trial for deposition.

The Government has taken the position that allowing these witnesses to retract their earlier invocation of the Fifth would be unfair.  (Memorandum of Law in Support of the Government's Renewed Motions <u>In Limine</u> ("Gov. Mem. in Supp."), ECF No. 1620, at 4.)  According to the Government, this is precisely the sword/shield issue that Second Circuit and other precedent has sought to prevent. <u>See</u> <u>Brink's Inc. v. City of New York</u>, 717 F.2d 700, 710 (2d Cir. 1983); <u>see also</u> <u>Guttierez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 557 (1st Cir. 1989); <u>S.E.C. v. Towers Fin. Corp.</u>, 966 F. Supp. 203, 206 (S.D.N.Y. 1997); <u>United States v. Inc. Vill. of Island Park</u>, 888 F. Supp. 419, 431 (E.D.N.Y. 1995) ("The privilege against self-

incrimination may be invoked . . . during the discovery process . . . . Because of the potential for abuse of the privilege by the defendants who use it to obstruct discovery only to waive it and subject the plaintiff to surprise testimony at trial, the courts recognize [that] a decision to assert the privilege during pre-trial depositions may be valid grounds for precluding a defendant from testifying at trial."); S.E.C. v. Benson, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) (a party has a right to take the Fifth, "[b]ut in a civil case, he cannot have it both ways. By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up the right to prove them"); United States v. Sixty Thousand Dollars ($60,000) in U.S. Currency, 763 F. Supp. 909, 914 (E.D. Mich. 1991) ("Because claimant has asserted a fifth amendment claim in discovery, this court holds that he may not now waive the privilege and testify.").

In Brink's, the Second Circuit held that an employee's (or prior employee's) invocation of the Fifth Amendment right against self-incrimination was, under the facts of that case, admissible and competence evidence. 717 F.2d at 710. The Court explained that admission of such evidence requires an analysis under both Federal Rule of Evidence 401 and Federal Rule of Evidence 403 to ensure that any probative value is not substantially outweighed by the danger of unfair prejudice. Id. In Brink's, the Second Circuit agreed with the district court judge who had stated that evidence that supports a party's position is not the type of prejudicial evidence the rule seeks to preclude; rather, the question is whether the evidence is inflammatory. Id. There, the Second Circuit found that it was not. Id.

On the instant motions, Claimants assert that any prejudice suffered by the Government is of its own making since Claimants notified the Government more than two months ago that they intended to call Hassani and Dabiran to testify substantively at trial. (Alavi Foundation and 650 Fifth Avenue Company's Memorandum of Law in Opposition to the Government's Motions In Limine ("Claimants' Mem. in Opp."), ECF No. 1671, at 2-6.) According to Claimants, the Government could have, but has chosen not to, depose the witnesses. (Id.)

Claimants seek to distinguish the cases cited by the Government on the basis that they relate to situations in which the witnesses at issue were parties to the litigation. In contrast, Claimants argue, the two witnesses here are merely former board members of the in rem party, Alavi. (Id. at 3.)

All parties agree that the testimony of Hassani and Dabiran—two former board members of Alavi—is relevant. The question is whether, at this late date, substantive testimony from these witnesses should be allowed. The answer is no.

Discovery closed in this case long ago. Following the return of this case from the Second Circuit, the Court allowed a very limited reopening of discovery. The parties did not raise depositions of these two witnesses with the Court at that time. Claimants cannot now seek what is really a unilateral reopening of fact discovery by arguing that the Government could have taken the witnesses' depositions over the past two months. As Claimants know, neither party was allowed to reopen discovery without court order. Claimants cannot now succeed in their position,

which would unilaterally require a reopening of discovery for the purpose of having the Government take additional depositions.[12]

Now, on the eve of trial, reopening discovery does prejudice the Government and Judgment Creditors. These parties had every reason to believe that the Court was serious when it stated that it would not allow discovery to be reopened in any general way. Moreover, these parties had the right to rely on the record that they had developed during the discovery period. They did so rely: the final pre-trial order for the 650 case has been submitted; exhibits have been selected and offered to the Court; positions as to objections have been staked out; and deposition testimony has been taken and designated. Substantive testimony from these two witnesses runs precisely into issues of unfair advantage and sword/shield issues discussed in certain of the cases cited above.

Claimants are also incorrect that this situation differs significantly from those in the cases cited by the Government. Former board members of a party—here, Alavi—are sufficiently close to be analogous to the party as a litigant. As a corporate entity, Alavi does not exist outside of its personnel. Both Hassani and Dabiran were high ranking personnel at the relevant period of time. While not personally liable in this action, they are nonetheless directly associated with

---

[12] The Court's determination regarding the reopening of discovery on this issue occurs against the backdrop of what are now a number of separate attempts by new (additional) counsel for Claimants to try to reopen discovery. Such applications have sometimes been accompanied by statements to the effect that as a result of what Claimants view is needed and appropriate discovery, the case cannot possibly be tried on the schedule set by the Court. In all but specified instances resulting from the Second Circuit's decision, the Court has not allowed discovery to be reopened. This case was days away from trial in 2013 and it is ready to be tried and resolved now. Thus, the Court's position on these two depositions occurs against the backdrop of other applications regarding discovery made by Claimants.

Claimants.  See <u>F.D.I.C. v. Fid. & Deposit Co. of Maryland</u>, 45 F.3d 969, 978 (5th Cir. 1995).

   2. <u>Other witnesses who asserted their Fifth Amendment rights against self-incrimination</u>

  In both its recent MIL submission, as well as in its 2013 filing, Claimants have argued that the Government should not be able to introduce the fact that certain former officers and board members of Alavi refused to answer questions based on their Fifth Amendment right against self-incrimination.  (Alavi Foundation's and 650 Fifth Avenue Company's Memorandum of Law in Support of Their Motions <u>In Limine</u> ("Claimants' 2013 Mem. in Supp."), ECF No. 716, at 8; Alavi Foundation and 650 Fifth Avenue Company's Memorandum of Law in Support of Their Motions <u>In Limine</u> ("Claimants' Mem. in Supp."), ECF No. 1617 at 2.)  Claimants assert that the Government made a purposeful and tactical decision to leave a criminal investigation open in order to coerce witnesses into asserting their Fifth Amendment rights.  (Claimants' 2013 Mem. in Supp. at 10-12; Claimants' Mem. in Supp. at 2-9.)  How to handle evidence relating to witnesses who had or would take the Fifth was discussed at the first final pre-trial conference held on September 4, 2013.  (Sep. 4, 2013, Tr. at 45:23-55:04, ECF No. 1046.)  At that time, and in a subsequent order (ECF No. 830), the Court indicated that it would provide further instructions regarding procedures during trial.

  Claimants assert that "more evidence of the Government's coercive tactics with the Fifth Amendment Witnesses is now available" and that it "demonstrates the Government's efforts to interfere with Claimants' ability to present testimony at

trial." (Claimants' Mem. in Supp. at 3.) In this regard, Claimants assert that many witnesses were "cowed" into asserting their Fifth Amendment rights, and others who were prepared to testify had their depositions cancelled. (Id.) As to the latter group, there is plainly no issue before the Court because there is no testimony to suppress.

As alleged "additional" evidence, Claimants have cited documents that were in their possession in 2013—in which, inter alia, FBI agents discussed the investigation. (See id. at 2-9.) Claimants assert that the Government made it appear to all that employees of the entities under investigation were guilty of some crime and any word would land them in jail. According to Claimants, in light of this position, it was unsurprising that so few people testified. (Id.) The facts cited by Claimants are unsupportive of their argument, however.

First, Claimants cherry pick comments taken out of context from emails (for instance, an email in which the phrase "we'll lock you up" was used only between agents and not to a third party). (Id. at 8.) Second, it is neither unusual nor nefarious for FBI agents and others working on an investigation to develop views about the investigation and to state such views candidly in emails between themselves. That does not mean that the investigation was irredeemably tainted. There is not a shred of evidence that suggests that the agents engaged in any unusual or coercive tactics here.

Third, and more importantly, these witnesses faced real criminal exposure at the time. None of the individuals were charged with a crime—but it is wrong to

assume that that ex-post outcome demonstrates a lack of real exposure at the time. Charging decisions are made for a variety of reasons. That the Government chose not to charge individuals or an organization with criminal conduct was its right; it could exercise that right (or not) for any number of reasons. In addition, and as the Government has discussed in its submission, these witnesses were represented by counsel, and often by well-known experts in the area. This adds further weight to the view that the witnesses made a considered decision versus being improperly intimidated by the Government.[13]

The real issue appears to be that there are several instances in which witnesses asserted their Fifth Amendment rights and, as trial approaches, Claimants would now prefer not to have the jury hear that. Unfortunately, the witnesses who asserted the Fifth would have had relevant testimony—the fact that they asserted the Fifth is for the jury to weigh. The Court finds no basis to preclude the evidence on relevance grounds. The record before the Court also does not support concerns regarding the reliability of witnesses' invocation of his/her Fifth Amendment rights.

Having found that the testimony is relevant, the Court examines whether Rule 403 nevertheless provides a basis for exclusion of such testimony. Here, again, the answer is no. There is no doubt that a jury hearing that a witness asserted his

---

[13] In their submission, Claimants dropped a footnote regarding potential lawyer witnesses who would testify regarding the Government's coercive tactics. The Court would not allow this. Claimants have had their opportunity to show that the witnesses took the Fifth on some basis that renders reliance on such assertion inappropriate or unreliable. Based on the record before the Court, the Court has now ruled that the evidence is admissible. The Court will not allow a sideshow into the Government's investigative techniques before the jury.

or her Fifth Amendment right is entitled to (although need not) draw the inference that the testimony would have been inculpatory. This undoubtedly helps the Government's case and not Claimants'. But, as in Brink's, there is a difference between "prejudice" as evidence supporting the Government's position and prejudice as evidence that is otherwise inflammatory. Here, it is the former and not the latter. The Court declines to preclude the fact that these witnesses have asserted their Fifth Amendment rights. The next question is the appropriate form of presentation to the jury.

Claimants have asked that, at the very least, the Court preclude the Government from calling the witnesses live or playing portions of their videotaped depositions to the jury. In considering the question of presentation, the Court considers not only relevance, but also Rule 403 issues. Having carefully considered these issues, the Court will allow the Government either to call the witnesses live or to play their videotaped depositions. The jury is entitled to see a witness who is or has taken the Fifth and to assess his or her demeanor just as they would any other witness. This is particularly important in light of the Court's typical instruction in such situations that the jury may, but need not, draw a negative inference from the invocation of the Fifth Amendment right in a civil case. See 3 Fed. Jury Prac. & Instr. § 104:28 (6th ed. 2016); cf N.Y. Pattern Jury Instr. Civil 1:76.

As is always the case, the Government will need to ensure that the evidence is not overly cumulative in this regard.

Accordingly, Claimants' MIL 4 is DENIED and the Government's MILs 5 and 7 are GRANTED.

B.    Claimants' MIL 1 and the Government's MIL 6: Alleged Spoliation by the Government and Destruction of Documents by Jahedi

1.    Claimants' MIL 1: Spoliation

As part of its 2013 MILs, Claimants sought an adverse inference instruction based on "clear evidence of the Government's spoliation of relevant evidence." (Claimants' 2013 Mem. in Supp. at 27.)  Claimants have not made any new arguments regarding this motion in their recent submissions, but have instead relied on their 2013 papers.  The Government opposed Claimants' motion in 2013 (Memorandum of Law in Opposition to the Alavi Foundation's and 650 Fifth Avenue Company's Motions In Limine ("Gov.'s 2013 Mem. in Opp."), ECF No. 755, at 26-27), and has also not added any new arguments.  The Court ruled on this issue at the first final pretrial conference on September 4, 2013.

In its 2013 ruling, the Court noted that the issue concerned approximately six boxes and certain other files of materials that were apparently once in Special Agent Alexander's possession and then later could not be located.  (Sep. 9, 2013, Tr. at 19:11-20:05.)  It was unknown if some or all of the documents in those boxes had been returned to Alavi with other boxes (e.g. repacked) or had not.  (Id. at 19:05-21:24.)  Claimants argued that Special Agent Jennifer McReynolds had mentioned interview notes that could no longer be located.  (Id. at 23:04-08.)  Claimants did not argue that these notes—which from context appeared to be interview notes taken by the FBI—were in the unlocated boxes.  The Court stated that there was no clear

16

information suggesting any documents had actually been spoliated—and that the Government "says you've got a hundred percent accounted for." (Id. at 24:03-10.)

Based on the record then before the Court (and which has not changed), the Court found: "There hasn't been a showing of spoliation because the first thing you have to do when you show spoliation is show that something's missing. And then you have to show that it was relevant to a claim or defense. And then you have to show that it was done with a culpable state of mind. And none of those items have been met." (Id. at 25:18-23.) "[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation marks omitted).[14]

There is no basis for the Court to alter its prior ruling. Accordingly, Claimants' MIL 1 is DENIED.

---

[14] "If these elements are established, a district court may, at its discretion, grant an adverse inference jury instruction insofar as such a sanction would 'serve [ ] [the] threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.'" Chin v. Port Auth. of N.Y. & New Jersey, 685 F.3d 135, 162 (2d Cir. 2012) (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001)).

2.    The Government's MIL 6: Destruction of documents by Jahedi

In contrast to the nebulous record with regard to spoliation, there is clear evidence that, after being served with a grand jury subpoena to preserve certain documents relating to Assa and the 650 Fifth Avenue Company, the President of Alavi—Jahedi—attempted to destroy documents. These events are part of the story of the investigation into Claimants and are directly relevant to the issues on trial. Jahedi's attempted destruction of evidence relating to Assa is powerful circumstantial evidence that Alavi knew something in 2008 that it was attempting to conceal. Furthermore, the Court does not believe that there is any basis to exclude such evidence under Rule 403.

Accordingly, the Government's MIL 6 is GRANTED.

C.    Claimants' MILs 2 and 8: Control over Alavi by the Bonyad
       Mostazafan prior to 1990 and by the Government of Iran

In their 2013 submission, Claimants argued that the Bonyad Mostazafan's historical control over Alavi was irrelevant. (Claimants' 2013 Mem. in Supp. at 34-35.) They have renewed this motion but have not added to the record on it. Similarly, the Government has opposed this motion on the same basis that it did in 2013. (See Gov.'s 2013 Mem. in Opp. at 29.) The Court addressed this motion at the final pre-trial conference on September 4, 2013. In particular, the Court raised concerns regarding evidence as to historical control coming in from an alleged expert, Mr. Clawson. (Sep. 4, 2013, Tr. at 28:13- 29:01.) The Court precluded certain evidence from him as set forth in the transcript of that proceeding. (Id.) However, the Court further ruled that "to the extent there are people who can talk

about the Bonyad Mostazafan before 1990 and/or other documentary evidence relating to that issue, the Court would find that it is relevant information. Again, it's similar to the 1989 transaction and some of that evidence. It's part of the story relating to the parties here and the relationship between the parties and the alleged theories of control by the Government of Iran. So to the extent that there is a percipient witness and/or documentary evidence as to which an appropriate foundation can be laid, that information would be allowed." (Id.)

The parties have not put forth a reason for the Court to alter its prior ruling. Accordingly, Claimants' MILs number 2 is DENIED.

Claimants MIL 8—which seeks to preclude evidence of control over Alavi by the Government of Iran—appears to have been premised on Claimants' then-understanding of the scope of the upcoming trial. The Court and the parties have since made clear that the upcoming trial will deal with all aspects of Claimants liability. (See ECF Nos. 1621, 1644.) One aspect of the Government's theory is that Alavi was controlled and directed by the Government of Iran and that this is a separate legal basis for forfeiture.

Accordingly, Claimants' MIL number 8 is DENIED as moot.

D.     Claimants' MIL 3: the Hanif Partnership

An entity referred to as the "Hanif Partnership" brought claims against Alavi and Assa; that litigation was settled in a transaction that required the payment of several million dollars. There was interaction between Assa and Alavi regarding the litigation, the settlement, and the payment. Claimants seek to preclude this evidence as irrelevant to the issues now on trial. (Claimants' 2013 Mem. in Supp.

19

at 42-44.)  For its part, the Government contends that the Hanif-related issues have always been a part of this case and are in fact recited in the Amended Complaint at ¶¶ 78-81.  (Gov.'s 2013 Mem. in Opp. at 34-35.)  According to the Government:

> An entity known as the Hanif Partnership sued Assa and Alavi for breach of contract in 2004.  Hossein Mahallati, Hanif's principal and a former Alavi board member, played hardball in the lawsuit, and threatened to reveal in open court what he knew about Assa Corp.'s true ownership.  The Foundation decided to settle the lawsuit for $4 million when Javad Zarif, then-Iranian Ambassador to the United Nations, fearing such disclosure, directed them to settle.  The proceeds of that settlement wound up in the hands of various Iranian officials.

(Id. at 34.)  Based on these allegations, which the Government contends it can prove at trial, the Government asserts that the evidence concerning the Hanif Partnership is directly and plainly relevant to the issues to be tried.   (Id. 34-35.)

The Court addressed this motion at the conference on September 4, 2013. The Court found that, as presented by the Government, the Hanif Partnership and the settlement of litigation relating thereto were probative of the relationship between Alavi and Assa.  (Sep. 4, 2013, Tr. at 30:14-25, 31:1-4.)  No facts have been presented that suggest that this ruling should be altered in any way.

Claimants have also asserted a Rule 403 objection on the basis that the testimony is so tangential as to be confusing.  (Claimants' 2013 Mem. in Supp. at 44.)  As the facts have been described by the Government, the Court strongly disagrees.  If it turns out that Alavi knew of the "hardball" tactics, that is highly relevant and a point which the jury will easily grasp.  The parties need not delve into the merits of the litigation in order to make or defend against that point.  The Court therefore easily finds that the potentially strong probative value outweighs

the danger of confusion. The Court will carefully monitor this evidence as it comes in and if it appears to have less relevance than anticipated or to be confusing in some unanticipated way, the Court will make appropriate additional rulings at that time.

Accordingly, Claimants' MIL 3 is DENIED.

E.     Claimants' MIL 5: Racial and Religious Bias

Claimants assert that they intend to introduce evidence that George Alexander, a non-testifying case agent, had racial and/or religious bias. (Claimants' Mem. in Supp. at 9.) In addition, Claimants seek to introduce evidence that Alexander's co-case agent, George Ennis, tolerated or ignored that bias. (Id. at 10.) Ennis is not himself accused of being biased.

According to Claimants, "The record is replete with evidence that (1) the case agents were overly aggressive, and (2) the Government's prosecution team was wary of the agents'—and particularly Agent Alexander's—conduct in the investigation." (Id. at 11.) Claimants cite a series of emails between and among the assigned AUSA and case agents and argue that they "intend to prove that the U.S. Attorney's Office issues regarding Agent Alexander—which the jury can infer were due to his anti-muslim animus—was significant enough that one of the lead criminal prosecutors asked to be taken off the investigation." (Id. 10.) Claimants assert that the trial will involve testimony from agents regarding facts learned as a result of their biased investigation—and that the jury should hear evidence demonstrating that the investigation was unduly aggressive or biased.

The Court is unconvinced that any evidence of bias of non-testifying Agent Alexander is relevant to any actual issue on trial; and in all events, the Court precludes such evidence under Rule 403. The evidence proffered by Claimants regarding Alexander's alleged bias and Ennis's alleged toleration of it seeks to put the Government's investigation on trial. That is not the purpose of the trial and not a way that this Court will allow the parties to spend their time. Importantly, Claimants have not suggested that a single fact important to the investigation was "created" or rendered infirm or unreliable based on the alleged bias. It is certainly true that facts learned during the investigation will be presented at trial. The witnesses presenting those facts will be subject to appropriate cross-examination. Agent Alexander is not on the Government's witness list and will not testify at trial. The Court has no reason to believe that what he and he alone learned during the investigation will be presented at trial. Thus, any probative value that the alleged bias (or toleration) may have with regard to the issues core to this trial is substantially outweighed by the danger of unfair prejudice; such evidence would also confuse and mislead the jury for largely the same reasons; it would waste time and create a trial within a trial regarding such issues.

Counsel are instructed that they will not be allowed to ask even a single question about this alleged bias of any witness set to testify—the evidence is not going to come in through a "side door."

Accordingly, Claimants' MIL 5 is DENIED.

F.    Claimants' MIL 6: the Alleged 1989 Partnership Tax Scheme

Among the many motions in limine brought in 2013 was one nearly identical to that here: a motion by Claimants seeking to preclude evidence linking the 1989 partnership transaction to possible criminal violations of the tax laws.  The role of the 1989 transaction is central to the Government's case, and has always been so. The Government contends that, specifically to avoid certain tax liability, the Government of Iran either directly or through agents both set up Assa and worked with Alavi to set up the 650 Fifth Avenue Company.  In a series of interwoven steps, Alavi contributed its building at 650 Fifth Avenue to the new partnership; the Government of Iran, through Bank Melli, cancelled an outstanding mortgage for that property; and thereafter Assa (i.e. the Government of Iran) and Alavi owned the Partnership (which owned the Building) 60/40.  This, in turn, assisted in the tax treatment of rental income.

This series of transactions also provides an explanation as to why and how the financial arrangement between the 650 Fifth Avenue Company and Alavi arose; it also provides a key moment when Alavi may have understood that its partner in the Building was the Government of Iran.

In this context, the Government is fully entitled to tell their story of possible tax violations concerning the 1989 partnership transaction—this provides a potential explanation as to why the events unfolded as they did.  But in addition, the fact that there was a subsequent investigation for tax violations is part of the why and how the Government proceeded to monitor these entities.  As the Court ruled in 2013, the Government can and should tell its story without asserting that

23

the partnership transaction was an "unlawful tax scheme." And in addition, the Court would certainly be willing to give a limiting instruction to the jury that no criminal tax charges were ever brought. The Court will not allow either party to go into unnecessary details of the tax laws.

The Court has found that the 1989 tax transaction is highly probative to the Government's case. Under Rule 403, the high probative value of this evidence is not outweighed by any unfair prejudice; and, given the Court's limitations, it will not mislead or confuse the jury.

Accordingly, Claimants' MIL 6 is DENIED.

G. <u>Claimants' MIL 7 and the Government's MIL 4: Statements by Tafti, Germanian, and Taleh</u>

Both Claimants and the Government have brought motions concerning the admissibility of out of court statements made by three "unavailable" witnesses: Mohammad Hassan Tafti (Assa's former President), Mohammed Geramian (former Alavi Foundation President), and Mohammed Seyed Badr Taleh (former Alavi Foundation President).

As set forth below, Claimants' MIL 7 is GRANTED and the Government's MIL 4 is DENIED.

1. <u>Germanian</u>

The Government relies on its position as set forth in its 2013 motions <u>in limine</u>. (<u>See</u> Memorandum of Law in Support of the Government's Motions <u>In Limine</u> ("Gov.'s 2013 Mem. in Supp."), ECF No. 720, at 13-16.) Claimants'

opposition was set forth in its 2013 submission as well. (See Claimant's 2013 Mem. in Opp. at 10-16.) No new facts are offered by either party.

In its original ruling set forth on September 4, 2013, the Court found that "the Geramian statements present issues. He made two statements. The first one, as I understand it, [] was written after the fact by an FBI agent who said he hadn't taken notes and he was doing it from memory. And also it's noted that Geramian, a month after the – or shortly after the initial statement did not actually confirm the statement. He actually said that he didn't make some of the statements that were being attributed to him. Under these circumstances, the Court finds that there are not sufficient indicia of trustworthiness and will preclude the Geramian statements." (Sep. 4, 2017, Tr. at 42:23-43:08.)

As there is no basis for the Court to alter its prior ruling, it declines to do so.

      2.    <u>Tafti</u>

The same filings from 2013 referred to above also contained arguments regarding Tafti. The Tafti statements at issue stem from an interview on May 27, 2008, and an interview on September 17, 2008. (See Declaration of John Gleeson in Support of Claimants' Motions <u>In Limine</u>, ECF No. 1618, Exs. 17, 16.) The statements were memorialized in 302s.

The Court assumes, without knowing, that any real utility in the Tafti 302s comes from the 302 dated May 30, 2008. In that 302, Tafti is reported as having made, <u>inter alia</u>, the following statements:

- Both Assa Corp. and Assa Ltd are owned and controlled by Bank Melli Iran ("BMI").

- Assa and the Alavi Foundation of New York ("AFNY") are partners in the 650 Fifth Avenue Company, the entity that owns the building located at 650 5th Avenue in New York.

- AFNY is controlled by the Mostazafan Foundation in Iran. Tafti, at the direction of BMI, kept Assa's true ownership hidden from U.S. authorities for the benefit of AFNY's tax situation.

- Tafti and BMI Managing Director Amir Aslani had many conversations about Assa Corp. once Tafti took the job. Over the course of these talks, Aslani instructed Tafti to conceal BMI's ownership of Assa Corp. from U.S. authorities because BMI was not allowed to hold assets in the U.S.

- In 2001, Tafti moved from Dubai to Milwaukee, WI to work for Assa Corp. (he had previously worked for Assa in Dubai).

- Shortly after arriving in the U.S., Tafti went to New York and sat down with Mohammad Geramian, the President of AFNY, at AFNY's offices at 500 5th Avenue. Tafti told Geramian he would be representing Assa Corp . . . ."

- When Tafti complained too much, Geramian used his AFNY contacts to put pressure on BMI Overseas Network Supervisory Department (ONSD), the branch running Assa. ONSD then pressured Tafti not to complain.

- Geramian, Alidoost and Firooznia all knew Assa Corp. was affiliated with or indirectly belonged to BMI. This was never openly discussed by understood by all parties.

(Declaration of John Gleeson in Support of Claimants' Motions In Limine, ECF No. 1618, Ex. 17.)

In the Court's September 4, 2013, ruling, it found that Tafti was unavailable[15] and "his statement does meet the threshold necessary for 804(b)(3)" as a statement against interest. (Sep. 4, 2013, Tr. at 43:09-21.) However, that latter part of that finding was based on Assa's position as a party to the litigation. There is no indication, one way or the other, that the Court would have reached the same result if Assa had not been part of the case. That, of course, is the situation now.

Claimants argue that Tafti's statements should be excluded because Assa is no longer part of this case. According to Claimants, the statements are therefore irrelevant. (Claimants' Mem. in Supp. at 22.) The Court disagrees with this argument because, as set forth above, at least several of the statements explain the relationship between Iran and one of Alavi's partners—this has some tendency to be probative of Alavi's knowledge of that relationship. If, for instance, someone who was meeting with Alavi regularly was working for Iran, and there is no evidence of particular secrecy regarding that fact, that is circumstantially probative of Alavi's knowledge.

Claimants also argue that the statements were not statements against interest. Under Rule 804(b)(3), to constitute an admissible statement against interest, the Court must find: "A statement that:

---

[15] Rule 804 applies when a declarant is unavailable. Unavailability includes a situation such as that here where a witness cannot be procured for trial. Fed. R. Evid. 804(a)(5). The Court easily finds that Tafti is unavailable. According to the current information, Tafti is not present in this country and cannot be required by process to attend trial.

> (A) a reasonable person in the declarant's position would have made
> only if the person believed it to be true because, when made, it was
> <u>so contrary to the declarant's proprietary or pecuniary interest or</u>
> <u>had so great a tendency to invalidate the declarant's claim against</u>
> <u>someone else or to expose the declarant to civil or criminal liability</u>;
> and
>
> (B) is supported by corroborating circumstances that clearly indicate its
> trustworthiness, if it is offered in a criminal case as one that tends
> to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3) (emphasis added). As this is a civil case, subsection (B) is inapplicable. The question is thus whether the statements described above (or others like them in the 302s) were so contrary to Tafti's interests that they tended to expose him to civil or criminal liability. While the Court found that the Government had met the initial threshold for such a showing in 2013, the Court now believes that determination was incorrect.

Specifically, Claimants point to the circumstances under which Tafti made these statements to suggest that they are unreliable and not against interest. (See Claimants' 2013 Mem. in Opp. at 11, 14-15.) At a high level, those circumstances are as follows: In 2008, Tafti traveled to New York from overseas and was arrested on a material witness warrant. He was held in custody. During that time, and pursuant to a proffer agreement he entered into with the Government, Tafti spoke with FBI agents. His interviews were recorded in 302s by Special Agents George Alexander and George Ennis.

According to Claimants, these facts and circumstances surrounding when the statements were made (while in custody) demonstrate that they were not "against" Tafti's interests at all—but rather were made in Tafti's interest so as to avoid

prosecution. (Claimants' Mem. in Supp. at 25.) This, according to Claimants, calls the reliability of the statements into question. (Id.) The Government has stated that Tafti proffered pursuant to a standard agreement. That means that statements made by him could not be used by the Government against him in a number of different circumstances. This cuts against Tafti's statements as being made in circumstances suggesting criminal exposure. Indeed, the circumstances suggest that while he was by no means without exposure, the proffer sessions occurred with assurances that statements made would not be used against him (except under certain circumstances). As a result, unless the Government has some factual basis unknown to the Court that supports that when Tafti made these statements he was exposed to liability because of them, they do not meet the basic requirements of Rule 804(b)(3).

Furthermore, as the above statements demonstrate, determining the admissibility of a 302 would, at the very least, require a granular inquiry into a proffered statement and a clear understanding of the purpose for which it is being offered. Here, it is possible that certain statements would not be offered for their truth; but in other instances, it seems that would be the primary use. If offered for their truth, the Court would need to turn to the hearsay rules. It is possible, for instance, that Rule 803(3) would apply to statements as representing existing beliefs by the declarant. However, that exception cannot be used to "prove the fact remembered or believed." Fed. R. Evid. 803(3). A party admission would fall under

Rule 801(d)(2).  Here, it is clear that Assa is no longer a party per se, and its interest has been forfeited to the Government (by this Court's 2013 opinion).

In addition, the Court agrees with Claimants that certain statements appear to be pure speculation—and just as no witness would be allowed to speculate as to what someone else knew or did not know, the fact that Tafti's views are written down into a document does not magically transform them into admissible statements.  Thus, statements as to what Tafti may have thought Geramian knew (or other statements like that) would not be allowed.

### 3. Badr

In the Court's ruling on September 4, 2013, it found that Badr was now available (he had shown up in Court).  (Sep. 4, 2013, Tr. at 44:20-45:22.)  Thus, Rule 804 was not available as to him in any event.  (Id.)  As the parties have not submitted new facts on this issue, the Court does not have a basis to alter its prior ruling.

### H. Claimants' MIL 9: Reasons for Enactment of the ITRs

In their 2013 submission, Claimants argued that the Government should be precluded from referencing diplomatic disputes with Iran.  (Claimants' 2013 Mem. in Supp. at 38.)  In that motion, Claimants acknowledged, however, that "the Government may offer evidence about the Iranian sanctions regime that began to go into effect in 1995 and OFAC's maintenance of a Specially Designated Nationals ('SDN') List of individuals and companies owned or controlled by, or acting on behalf of, targeted countries, including Iran.  But there is not likely to be much dispute about the nature of the sanctions—an issue of law—or Claimants' absence

from the SDN List." (Id. at 38-39.) Claimants continued, the "existence of the sanctions prohibiting services for Iran is what is relevant to the issues raised in this case, not the motivation for or background of the sanctions regime or why the sanctions have been maintained over time." (Id. at 39.) (emphasis omitted.)

In their current submission, Claimants have not purported to renew their 2013 motion in its previous form. Instead, they have taken the same concept and repackaged it as a motion to preclude the Government from attempting to explain or offer evidence regarding the reasons why the 1995 Iranian Transaction Regulations were enacted. (Claimants' Mem. in Supp. at 29) Claimants' 2013 motion and Claimants' instant motion are similar in many respects. The instant motion adds that the "geopolitical events involving Iran and the United States that led to the enactment of the ITRs are not probative in any way of Alavi's knowledge of Assa's ownership or any other issue at trial, and would serve to associate Claimants in the mind of the jury with state-sponsored terrorism and strong negative feelings towards Iran. Such evidence should be excluded under Rules 401 and 403." (Claimants' Mem. in Supp. at 29.)

In 2013, the Government opposed the motion on the basis that it had no intention of making Iran's sponsorship of terrorism a focus of the trial. (See Gov.'s 2013 Mem. in Opp. at 32.) The Government stated: "These are not topics relevant to the issues to be tried." (Id.) However, the Government argued then that to some extent various issues would arise in the ordinary course. For instance, certain investigative agents had been assigned to the Joint Terrorism Task Force and

would mention this; the Iranian Revolution is a topic that is part of the chronology of the story the Government intends to tell. (<u>Id.</u> at 33.) In the Government's instant submission, they now address the ITR issue more directly. (<u>See</u> Gov.'s Mem. in Opp. at 14-15.) The Government notes that while Claimants purport in their new submission to seek clarification with regard to the Court's 2013 ruling, they then proceed to use expansive language seeking preclusion of "any evidence or reference to the ITRs." (<u>Id.</u> at 14 (citing Claimants' Mem. in Supp. at 32-34).)

The Court addressed the 2013 version of this motion at the conference on September 4, 2013. In particular, the Court stated that it would allow "a certain amount of background information relating to the IEEPA and the executive orders related to Iran." (Sep. 4, 2013, Tr. at 29:11-15.) References to current diplomatic disputes between the two countries was likely to be deemed irrelevant. (<u>Id.</u> at 29:24-25, 30:1-3.)

As an initial matter, the Court notes that there are certain ways in which mention of the ITRs will come up at trial—though not the events or rationale that led to them. For instance, testifying FBI agents are likely to mention the nature and scope of their investigation. As Claimants themselves acknowledged in their 2013 submission, "the Government may offer evidence about the Iranian sanctions regime that began to go into effect in 1995 and OFAC's maintenance of a Specially Designated Nationals ("SDN") List of individuals and companies owned or controlled by, or acting on behalf of, targeted countries, including Iran."

(Claimants' 2013 Mem. in Supp. at 39.)  There is no reason to prevent such evidence and the Court will allow it.

In addition, it is common in cases to instruct the jury—in a balanced way—on the intent of the statute or law that forms the basis of the claims on trial.  In its instant opposition to Claimants' motion, the Government cites certain Model Federal Jury Instructions that do just this.  (<u>See</u> Gov.'s Mem. in Opp. at 15.)  This allows the jury to proceed with an understanding of their task and not to operate blindly.  The Court intends to proceed in this ordinary-course manner here.  Rule 403 does not preclude such instruction; there is no risk of confusion—quite the opposite.

The Court is unaware of any evidence that the Government seeks to introduce that would be focused on a more detailed explanation of the historical events that led to the ITRs.  If such a presentation is planned, the Government will need to bring it to the Court's attention.  The Court will then analyze whether such presentation exceeds the bounds of what is allowed.

Accordingly, Claimants' MIL 9 is denied as moot.

I.      <u>Claimants' MIL 10: Custody and Control of Documents</u>

Claimants assert that the Court should preclude the Government from introducing certain documents of unknown provenance.  All parties concede that such documents were produced during discovery—but it appears that the story of how they made their way into the Government's hands has been lost to the sands of time.  The Government argues that it will lay a proper foundation for all documents and that this should resolve Claimants' issue.  The Court agrees.

Whether or not the Government can lay an appropriate foundation for these or any other documents at trial is something the Court cannot determine now. This falls into the bucket of "sufficient unto the day." If a proper foundation can be laid, and there is no other basis to preclude admission, the fact that the "chain of custody" has not been maintained is no impediment in this civil case.

Accordingly, Claimants' MIL 10 is DENIED.

J.      Government's MIL 1: Charitable Donation Recipients

The Government has renewed its 2013 motion to preclude testimony from witnesses who would testify that they were or are recipients of Alavi's charitable activities. (Gov.'s Mem. in Supp. at 1; Gov.'s 2013 Mem. in Supp. at 8-9.) Claimants have renewed the opposition that they submitted in 2013 but have not added additional arguments or facts. (Claimants' Mem. in Opp. at 1, Claimants' 2013 Memo in Opp. at 2-5.)

The Court addressed the 2013 version of this motion at the conference on September 4, 2013. In particular, the Court stated that it would "not preclude such witnesses out of hand." (Sep. 4, 2013, Tr. at 34:25.) In light of the motion practice that has occurred between 2013 and the present, the Court has a much better understanding of the issues to be tried; this includes a better understanding of those issues that are irrelevant. Based on the Court's understanding of the Government's contentions, there is no assertion that any donee had knowledge of who may or may not have controlled Alavi (and what knowledge Alavi may or may not have had of that). Thus, as discussed further below, the Court now alters its prior ruling to preclude all testimony from donees of Alavi unless a particular

showing of relevance is made.  The Court explicitly declines to find relevant that a donee has "no knowledge" of any connection to the Iranian Government, as there is no contention that they would.  If necessary, the Court would provide an instruction that (1) there is no contention in this case that the charitable activities of Alavi are not real, and (2) there is no contention that any donee of such charitable activities had/has any knowledge of any control of Alavi by Iran.

In support of its argument that this evidence is relevant, Claimants argues that as Alavi's activities are being put on trial—including with regard to alleged services provided to Iran—they are entitled to call witnesses to counter that. According to Alavi, "the Foundation expects to offer testimony by witnesses—all of whose testimony will be brief—that they and their organizations have no relationship with the Government of Iran and received charitable support from the Foundation after actively seeking it from the Foundation.  These witnesses include representatives from institutions of higher education, religious organizations and interfaith groups."  (Claimants' 2013 Mem. in Opp. at 2.)   The Government counters—and the Court now agrees—that "Alavi grant recipients have no conceivable connection to the case other than having benefitted from Alavi's charity."  (Gov.'s 2013 Mem. in Supp. at 8.)

As previewed above, it is uncontested that Alavi in fact engages in charitable work.  That is not a contested fact as to which the jury needs to make a determination.  There is also no assertion that grant recipients did not initiate the grant process.  There is no assertion that any grant recipient had any knowledge of

any Iranian involvement.  These are not issues relevant to this trial.  What is relevant is what was happening or not happening behind the scenes of this grant work—something as to which no grant recipient has competent evidence.

Alavi's charitable works are relevant to the following extent:  Iran is alleged to have been (or possibly still involved) in decisions regarding the distribution of charitable funds (or decisions as to which charitable works should be supported).  There is no assertion, however, that any Iranian official met with a donee or otherwise made him or herself known to a donee.  If that were the case, then calling the donee at trial to testify as to such contact would be probative.  But, in the absence of such an allegation, the evidence by donees that Iran was not involved in the Foundations' decisions, so far as they know, is totally irrelevant.  Thus, the Court now easily finds that all such donee witnesses are irrelevant and precludes testimony from them.

But in addition, even if there was some probative value to one or more of such witnesses, that probative value would be substantially outweighed by the danger of unfair prejudice to the Government, misleading the jury, or confusion of issues.

Witnesses as to Alavi's charitable works runs the risk of prejudicing the Government by having the jury consider the impact their verdict might have on such activities.  That is not the proper basis for a verdict in this case.  In addition, such evidence may mislead the jury into viewing the trial as a referendum on those activities, or to deem the absence of the donee's knowledge of Iranian involvement as somehow probative of the issues on trial.  It is not.  Furthermore, such evidence

runs the risk of seeking to try this case on the basis of sympathy rather than on the facts necessary to support a claim or defense. Thus, the Court would preclude this evidence on the under Rule 403 in all events.

Accordingly, the Government's MIL 1 is GRANTED.

Having now received the parties' final pre-trial orders, the Court notes that there are also a number of witnesses on Claimants' witness list who appear to be associated with the realty management company for the 650 Fifth Avenue Company. If the testimony of these individuals would simply be to state that they have no knowledge of any Iranian involvement, similar to the donee witnesses, their testimony is entirely irrelevant. There is no claim in this case—of which the Court is aware—that the management company had such knowledge. The Court would need a very specific proffer as to the type of evidence anticipated from these individuals before it would allow them to testify. Again, the Court will not allow an uncontested absence of knowledge to suggest to the jury that this is probative of what may or may not have gone on behind the scenes. If probative at all, such testimony runs a significant risk of misleading and confusing the jury.

K.     Government's MIL 3: Alavi Board Members after 2009

The Government has renewed its 2013 motion to preclude testimony from members of the Alavi board who do not have percipient knowledge of the issues relevant to the trial. (Gov.'s 2013 Mem. in Supp. at 12.) Claimants have renewed the opposition that they submitted in 2013 but have not added additional arguments or facts. (Clamaints' 2013 Mem. in Opp. at 10.) In that opposition,

Claimants represented that the motion was moot because such board members were not on their witness list. That remains true.

Accordingly, the Government's MIL 3 is DENIED as moot.

L.      Government's MIL 8: Expert Testimony of J. Duross O'Bryan

Back in 2013, Claimants had proffered an expert accountant, David Gannaway. There was motion practice at that time as to whether or not he would be allowed to testify; the Court denied the motion to preclude him. (Sep. 4, 2013, Tr. at 57:24-25.) The Court found that he had relevant expertise that would be helpful to the finder of fact. He was offered as a witness to "trace the money. To explain how it's categorized in the IRS code and on Guidestar, but that's about it." (Id. at 59:1-3.) At the 2013 conference, there was colloquy regarding whether Gannaway would be allowed to testify only as to the numbers on a tax return (i.e., whether a number was a capital expenditure) or would be allowed to "get behind the numbers." (Id. at 59:7-61:01.) Counsel for Alavi stated that it was "never our intent" to do that. (Id. at 60:05.) The Court was very specific that he was entitled to "read the form" and if there was a line item on the form, he could simply explain that to the jury; he was not to go into any opinion as to whether that line item was properly categorized or not. (Id. at 59:7-61:01.)

Now, in 2017, Claimants have altered course. Claimants have stated that Gannaway is no longer available and that they want to call J. Duross O'Bryan in his stead. The Government apparently did not contest Gannaway's unavailability, but they have asserted that the O'Bryan report goes far beyond the scope of Gannaway's proffered testimony. The Government has therefore sought to preclude it.

The Government has contended, and Claimants do not contest, that O'Bryan has added various areas to his report that were not in Gannaway's. (See Gov.'s Mem. in. Supp. at 6-7.) O'Bryan seeks to add testimony regarding: (1) the amount of management fees received by Alavi, and (2) the amount of Alavi's income spent on capital improvements to properties other than the building. The Government contends, and Claimants do not contest, that Gannaway's report did not mention properties other than the building, and to the extent that it mentioned management fees in passing, it is different from what O'Bryan now seeks to offer in that regard.

The Court did not reopen expert discovery. O'Bryan cannot testify to any matters not directly covered by Gannaway. Claimants cannot use the fact that Gannaway is for some reason not available as an opportunity to introduce a new expert with expanded opinions. That is ultimately an end-run around the expert discovery process, which is now closed. Thus, the Court precludes O'Bryan from testifying as to the two new areas.

To the extent that O'Bryan is testifying on the same topic as Gannaway with regard to capital improvements, the Court is concerned about relevance in a way that it was not in 2013. It is not clear to this Court that such testimony—in terms of how much was spent—is relevant to the issues now on trial. The Government is not alleging that Alavi never spent income to improve the building at 650 Fifth Avenue. Thus, as to this opinion, the Court needs to understand the relevance before it will allow O'Bryan to testify with respect to it. If and when the Court has

such an understanding, the other concerns raised by the Government regarding the reliability of the data O'Bryan used can be explored on cross-examination.

Accordingly, the Government's MIL 8 is GRANTED in part—and potentially in its entirety, depending on the relevance proffer.

M.    Government's MIL 9: Expert Testimony Miriam R. Albert

Claimants seek to call an expert witness at trial, Miriam R. Albert, to testify regarding (1) the types of matters that relate to the affairs of a partnership, and (2) what means Alavi had at its disposal to compel Assa to provide additional information regarding its ownership and control.  The Government has moved to preclude this testimony on the grounds that Albert was not timely disclosed under Federal Rule of Civil Procure 26; her opinions improperly invade the province of the finder of fact; her opinions are not supported by reliable principals or methods; and under Rule 403.  (Gov.'s Mem. in Supp. at 8-17.)  The Court agrees with each of the Government's arguments and precludes Albert.

First, the fact that Claimants thought they could unilaterally reopen expert discovery is surprising and will not be condoned.  Claimants did not raise with the Court any purported new need to address partnership issues with an expert witness in the most recent conferences.  Had they, the Court would have told them not to waste their money as the time for expert disclosures had passed and this Court did not intend to reopen it.  As for Claimants' argument that the partnership issue raised by the Government in motion practice following remand from the Second Circuit is somehow new (Claimants' Mem. in Opp. at 15), the Court strongly disagrees.  It cannot be more clear than it is that the fact that Alavi and Assa

40

entered into a partnership has been at the core of this case since the beginning. All that that partnership may or may not entail, factually and as a matter of law, has long been on the table.

But in addition, this Court would nonetheless exclude Albert under the principles articulated by the Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

First, it is not clear what expertise Albert brings to the trier of fact that does not invade the province of the trier of fact. She is a law school professor and Associate Dean at Hofstra University. She states that her "expertise is in business law, including the law of business organizations, i.e., corporate, agency, and partnership law; mergers and acquisitions law; and securities law." (ECF No. 1620-3 at ¶ 1.) She was apparently tasked with evaluating (1) "what types of matters relate to the affairs of a partnership formed under the laws of New York, and in particular, the affairs of the Partnership," and (2) whether "Alavi had any legal or practical ability, or a legal obligation, to force Assa to verify the ultimate ownership and control of its parent company, Assa Ltd. . . . to Alavi's satisfaction." (Id. at ¶¶ 5-6.)

The Court does not find that these questions are necessary or relevant questions for an expert. Moreover, there is no doubt that cloaking such testimony through an "expert" could seriously mislead the jury. As the parties are aware, the Government contends that Alavi always knew who owned and controlled Assa— whether or not it had a "right" to extract that information from Assa as a matter of

U.S. law is not the point. Thus, to have an expert opine that Alavi somehow "could not" have obtained such information from Assa suggests that that is probative of whether Alavi in fact already knew the answer to the question. Moreover, it seeks to cloak Alavi's main defense—that at some point in time it no longer knew that Assa was controlled by Iran—in a lack of legal tools. This is a sideshow. Any remote probative value is substantially outweighed by a very significant danger of confusing the issues, misleading the jury, and wasting time.

In addition, much of Albert's report comprises of an inappropriate factual narrative. As such, it is not proper expert testimony. See Daubert, 509 U.S. at 589; Chin, 685 F.3d at 161 (holding that the district court did not abuse its discretion in finding that the proffered expert testimony was not necessary to help the jury understand the facts and evidence presented).

Albert also purports to make conclusions on ultimate issues for the jury to decide—what the actual affairs of the partnership were. The Government contends that the actual affairs included IEEPA and ITR violations as well as money laundering; Claimants argue that the affairs did not. It is inappropriate for Albert to suggest that the partnership's affairs—as a matter of law—simply could not have extended as far as the Government asserts. That, in substance, invades the province of the jury to make ultimate determinations of fact.

This inappropriate invasion of the province of the jury is further demonstrated by Albert's opinion that "Alavi acted diligently in attempting to learn about Assa Ltd.'s ownership structure and control." (ECF No. 1620-3 at ¶¶ 9, 41.)

This is a factual matter the jury will decide—not something that a law professor may opine on.  Albert's report is replete with additional examples, all of which are inappropriate.

Finally, while Albert may have expertise in law, there is no methodology in her report.  Her report is simply <u>ipse dixit</u> and therefore excludable on that basis alone.  <u>See</u> <u>Daubert</u>, 509 U.S. at 593-94; <u>Chin</u>, 685 F.3d at 161; <u>Nimely v. City of N.Y.</u>, 414 F.3d 381, 399 (2d Cir. 2005).

Accordingly, the Court grants the Government's MIL 9 to preclude the testimony of Albert.

N.  <u>Government's MILs 2 and 10: Prior Investigations and Lack of Criminal Charges</u>

In both its 2013 and current MILs, the Government has sought to preclude evidence that Claimants were subject to various investigations that resulted in no criminal charges.  (Gov.'s 2013 Mem. in Supp. at 11-12; Gov.'s Mem. in Supp. at 18.) Claimants oppose the Government's instant motion on essentially the same grounds that they opposed the Government's 2013 motion: that evidence regarding such investigations, particularly that they did not result in criminal or other charges, is exculpatory and should be allowed.  Claimants' argue that the fact that two federal agencies investigated and found "no evidence of wrongdoing is relevant and exculpatory as to critical issues."  (Claimants' 2013 Mem. in Opp. at 6; <u>see also</u> Claimants' Mem. in Opp. at 21-23.)  The Court easily finds that this evidence is both irrelevant and, in all events, precluded under Rule 403.

First, it is not at all clear that the Government found no wrongdoing in connection with the criminal investigations. What is clear is that no criminal charges were brought. The absence of criminal charges is, however, irrelevant to the issues here on trial. As all parties are aware, criminal charges may be brought or dropped for any number of reasons. The lack of criminal charges is not probative of any of the issues here on trial. Thus, despite the two investigations and the duration of any investigations, the lack of criminal charges is not probative of whether Alavi is controlled by Iran or knew that Assa was.[16]

The Court would also exclude such evidence under Rule 403. To the extent there is any probative value from such evidence, it is substantially outweighed by the danger of misleading the jury into believing that a lack of criminal charges means that there can be no civil liability. This is patently incorrect. It would substantially prejudice the Government to suggest otherwise; create confusion; and mislead the jury. Moreover, it would waste time, as the Government would have to rebut such evidence with a sideshow on why it did or did not bring charges.

Accordingly, the Government's MILs 2 and 10 are GRANTED.

O.    Government's MIL 11: Reference to Claimants' Counsel as a Former Judge

The Government seeks and order precluding any mention of the fact that counsel for Claimants includes a now-retired Federal Judge, John Gleeson.

---

[16] Claimants also argued in 2013 that evidence regarding the Government's prior investigations is relevant to their statute of limitations defense. (Claimants' 2013 Mem. in Opp. at 8-9.) This is not at issue in the upcoming trial; the Court has already granted summary judgment to the Government on this issue (ECF No. 1664).

Claimants have represented that they have no intention of referring to "Mr. Gleeson by his former title and therefore do not oppose this motion." (Claimants' Mem. in Opp. at 2.)

Accordingly, the Government's MIL 11 is DENIED as moot.

IV. CONCLUSION

The Court's rulings on the pending motions <u>in limine</u> are set forth above. The Clerk of Court is directed to terminate the motions at ECF Nos. 1612, 1616, and 1619.

SO ORDERED.

Dated:      New York, New York
            May 17, 2017

_____
            KATHERINE B. FORREST
            United States District Judge