UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: 650 FIFTH AVENUE AND
RELATED PROPERTIES

08 Civ. 10934 (LAP)

OPINION & ORDER

---

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Claimants Alavi Foundation ("Alavi") and the 650 Fifth Avenue Company's ("650 Fifth Ave." and, together with Alavi, "Claimants") motion seeking modification of a pre-judgment protective order entered by this Court on December 12, 2019 (the "Interim Order").[1, 2] Specifically at issue are provisions of the Interim Order that severely restrict Claimants' access to rental income generated by their building located at 650 Fifth Avenue in New York City ("the Building") which could otherwise be employed to fund their legal defense in these

---

[1] (See Claimants' Mem. of Law in Support of Modification of Protective Order ("Mot."), dated January 8, 2020 [dkt. no. 2176]; see also Government's Mem. of Law in Opposition to Modification of Protective Order ("Opp."), dated January 22, 2020 [dkt. no. 2181]; see also Claimants' Reply in Support of Modification of Protective Order ("Reply"), dated January 29, 2020 [dkt. no. 2186].) In addition, various Judgment Creditors filed opposition papers in response to Claimants' motion to modify the Protective Order. (See Judgment Creditors' Opposition to Modification of Protective Order, dated January 22, 2020 [dkt. no. 2179].)

[2] (See Protective Order and Trustee Order ("the Interim Order"), dated December 12, 2019 [dkt. no. 2162].)

1

forfeiture proceedings.  The Claimants have argued that the Government has not demonstrated--and, in fact, has never been required to demonstrate--that probable cause exists for imposing such severe restraints on their property.  The Government, in turn, has argued that no additional showing is required and, in any case, that allowing Claimants to use the restricted assets to fund their legal defense is a path foreclosed by Supreme Court precedent.

Because the Court concludes that Claimants' interest in the rental income derived from the Building is a real property interest subject to certain statutory limitations requiring a hearing in advance of any pretrial seizure of real property, the Claimants' motion to modify the protective order is <u>GRANTED</u>.[3]  As such, rental income generated by the Building must be released to Claimants until either (1) such a hearing can take place and a judicial determination of probable cause can be made or (2) the Government makes an <u>ex parte</u> application demonstrating that probable cause and exigent circumstances exist.[4]

---

[3] On February 13, 2020, the Court notified the parties of its decision through a summary order.  (<u>See</u> Order on Rental Income, dated February 13, 2020 [dkt. no. 2191].)  The Court now writes to explain the reasoning behind that decision.

[4] At oral argument on February 12, 2020, the Government, notwithstanding its substantive arguments on the instant motion, expressed willingness to brief the issue of probable cause and participate in a hearing on that issue.

I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY

The parties are at this juncture (thankfully) well-versed in the tortured history of this litigation, which is now on its second remand from the Court of Appeals and its third district judge. Thus, the Court will only recount the facts essential to the instant motion seeking modification of the Protective Order.

a. Procedural History

This action began with respect to Claimants in November 2009, when the Government filed an amended complaint alleging that Claimants had provided unlawful services to instrumentalities of the Government of Iran in violation of U.S. sanctions on Iran and in violation of the International Emergency Economic Powers Act. The Government accordingly sought forfeiture of certain of Claimants' property interests, including the Building. (See Amended Complaint, dated November 16, 2009 [dkt. no. 51]; see also Mot. at 4.)

In 2013, this Court granted summary judgment to the Government and ordered forfeiture of Claimants' property, finding that the entirety of Alavi's interests in the Building was forfeitable due to its involvement in international money laundering violations. See In re 650 Fifth Ave., No. 08 Civ. 10934(KBF), 2013 WL 5178677 at *36 (S.D.N.Y. Sept. 16, 2013). In granting summary judgment, the Court denied sua sponte Claimants' potential statute of limitations defense, noting that, while Claimants had not raised

it, the Court had "scoured the record" in vain for any triable issue as to the defense. Id. at *36. Claimants timely appealed that ruling.

In 2016, the Court of Appeals for the first time vacated this Court's forfeiture order. The Court remanded the action for further proceedings related to (1) Claimants' putative statute of limitations defense; (2) the potential suppression of certain evidence seized pursuant to what the Court of Appeals concluded was a defective search warrant; and (3) an eventual trial on questions of fact improperly decided on summary judgment. See generally In re 650 Fifth Ave. and Related Properties, 830 F.3d 66 (2d Cir. 2016).

On remand, Claimants sought to compel discovery related to their statute of limitations defense and to suppress evidence seized pursuant to the defective search warrant. As the Court of Appeals later noted, this Court denied both requests. See In re 650 Fifth Ave. and Related Properties, 934 F.3d 147, 156 (2d Cir. 2019). In addition, the Court of Appeals noted that this Court "granted a motion by the Government to preclude two former Alavi board members from testifying at trial, issued orders permitting the Government to play five videotaped depositions of former Alavi board members repeatedly invoking their Fifth Amendment privilege against self-incrimination, and barred the Claimants from presenting certain evidence to rebut the adverse inferences suggested by the

4

videotapes." Id. At trial, the jury returned a verdict for the Government and the Court, after taking care of posttrial housekeeping, ordered the forfeiture of Claimants' property. Claimants timely appealed for a second time. Id.

On August 9, 2019, the Court of Appeals again vacated this Court's forfeiture judgment. Id. The Court of Appeals also reversed this Court's denial of discovery on the statute of limitations defense, vacated this Court's order denying the motion to suppress, reversed the order precluding the Alavi board members from testifying, and remanded the case for further proceedings. Id. at 173-74. In its decision, the Court of Appeals made note of a "troubling pattern of errors on relatively straightforward issues" and emphasized the need for a "fair and adequate process" on remand. Id. at 173. The Court of Appeals issued its mandate on December 12, 2019. (See Mandate of Court of Appeals, dated December 12, 2019 [dkt. no. 2160].)

On the same day that the Court of Appeals transmitted the mandate, the Government submitted to this Court a request for the immediate entry of a new Trustee and Protective Order. (See Letter Motion to Expedite Protective Order, dated December 12, 2019 [dkt. no. 2161].) In that motion, the Government made arguments that largely mirror the arguments that it has presented on the instant motion, namely that Supreme Court precedent essentially demanded the entry of the order in order to prevent the dissipation of

5

assets that would be used to satisfy judgments held against the Government of Iran by victims of Iran's sponsorship of terrorism. (Id. at 3.). The Government also noted that any disputes about the interim order could be resolved by further briefing. (Id. at 5.) The Court entered the Interim Order on the same day that it was submitted. (See Trustee and Protective Order, dated December 12, 2019 [dkt. no. 2161].) Claimants sought modification of that order on January 8, 2020. (See dkt. no. 2179.)

b. The Protective Orders

Throughout the course of these proceedings, the Court has imposed a variety of protective orders to secure, maintain, and preserve Claimants' properties. (Opp. at 3.) Given the parties' demonstrated familiarity with them, there is no need to delve into the minutiae of each of those orders. However, it suffices to say that--outside of the Interim Order--they fall into two broad categories. First, there are those orders that have been entered in the absence of an order of forfeiture. Second, there are those orders that were entered in the wake of judgments entered against Claimants.

Orders in the first category--generally referred to as "the Prior Framework" by Claimants in their papers, nomenclature the Court adopts here--are less restrictive than those in the second. Under the Prior Framework, the parties agreed to appoint former Magistrate Judge Kathleen A. Roberts as a Court-approved monitor

6

to oversee Claimants' operations and its management of the building. Under that agreement, Judge Roberts would "(1) review and approve disbursements, agreements, and other activities of the Fifth Avenue Company in order to preserve the Building's value; (2) review and approve disbursements by Alavi; (3) review and approve any decisions by Alavi pursuant to its obligations as managing partner of the Fifth Avenue Company; and (4) monitor the Fifth Avenue Company and the other Defendant Properties in order to preserve their value." (Mot. at 4.) The Prior framework "has been in place during all phases of this litigation during which the Defendant Properties have not been adjudicated to be subject to forfeiture." (Mot. at 1.)

The Claimants' properties have been subject to more restrictive orders when they have been adjudged subject to forfeiture. In 2013, after Judge Forrest's original grant of summary judgment, the Court modified the Prior Framework to "limit[] Alavi's rights and responsibilities with respect to the Building and to restrict its access to income from the Fifth Avenue Company" but "still allowed the release of funds needed to maintain Alavi's minimal operations and to fund its legal defense." (Mot. at 5.) After the Court of Appeals vacated the Court's grant of summary judgment, Judge Forrest restored the Prior Framework. (Id.) Similarly, after the 2017 jury trial and the return of a forfeiture verdict, Judge Forrest issued more restrictive orders that prohibited

monetary disbursements to Claimants. (Id.) The Interim Order aligns more closely with the more restrictive orders that were entered after adjudications of forfeitability.

II. LEGAL STANDARDS

The procedures governing civil forfeiture proceedings are mapped out across several overlapping statutory provisions in the United States Code. Seeing as civil forfeiture involves the seizure and confiscation of private property, that statutory framework necessarily reflects the bedrock requirements of the Due Process Clause of the Fifth Amendment, which provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." See U.S. Const. amend. V.

As a starting point, Section 981 of Title 18 delineates what property may be subject to civil forfeiture. Under that provision, "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of [Title 18], or any property traceable to such property" may be forfeited. 18 U.S.C. § 981(a)(1)(A). Section 938(j) of Title 18--which supplies general rules that apply to all civil forfeiture proceedings--permits this Court, "upon application of the United States," to take appropriate action, i.e., issue a protective order, to "seize, secure, maintain, or preserve the availability of property subject to civil forfeiture [as defined in Section 981]." See Id. § 983(j)(1). Section 983 explicitly contemplates

the issuance of protective orders prior to a judgment of forfeiture because such an order may be imposed "upon the filing of a civil forfeiture complaint." Id. § 983(j)(1)(A). However, property that has been restrained or seized by the Government must be immediately released if a claimant can make a number of showings, including "substantial hardship to the claimant." See Id. §§ 983(f)(1)(A)-(E).[5]

Section 985 of Title 18 of the United States Code codifies rules specifically applicable to civil forfeiture of "real property and interests in real property." See id. § 985(f)(1). That statute lays out a general rule that "real property that is the subject of

---

[5] Specifically, a claimant is entitled to immediate release of seized property if:

"(A) the claimant has a possessory interest in the property;

(B) the claimant has sufficient ties to the community to provide assurance that the property will be available at the time of the trial;

(C) the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless;

(D) the claimant's likely hardship from the continued possession by the Government of the seized property outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred if it is returned to the claimant during the pendency of the proceeding; and

(E) none of the conditions set forth in [18 U.S.C. § 983(f)(8), which provides various exceptions] appl[y]."

9

a civil forfeiture action shall not be seized before entry of an order of forfeiture." Id. § 985(b)(1)(A). The statute, however, carves out two situations where real property may be seized prior to the entry of an order of forfeiture. First, where the Government has notified the court that it intends to effect a pretrial seizure of real property, a court may "issue[] a notice of application for warrant, cause[] the notice to be served on the property owner and posted on the property, and conduct[] a hearing in which the property owner has a meaningful opportunity to be heard." Id. §§ 985(d)(1)(A)-(B)(i). Second, where the Government has provided the same notice to the court, the court may make an ex parte determination that there is probable cause for forfeiture and that "exigent circumstances . . . permit the Government to seize the property without prior notice and an opportunity for the property owner to be heard." Id. § 985(d)(B)(ii). To oversimplify the issue: if real property is involved, the Government may seize the property before a trial if (1) there is a hearing where property owners may be heard on the issue of probable cause or (2) if there is an emergency justifying an ex parte determination of probable cause for seizure of the property.

III. DISCUSSION

How the Court approaches Claimants' motion to modify the Interim Order hinges at one level on whether Section 985--which governs civil forfeiture of real property and interests in real property-

-applies to the restraints imposed on the Building's rental income. Here, the Court concludes that (1) the rental income generated by the Building is an interest in real property that places it within the ambit of Section 985; (2) the restraints imposed on the use of rental income in the protective order amount to a "seizure" of the Building pursuant to the statute; and (3) exigent circumstances have not been demonstrated to be present that would permit an <u>ex parte</u> judicial determination of probable cause, <u>see</u> 18 U.S.C. §§ 985(d)(1)(B)(i)-(ii). Accordingly, and given the lack of pre-deprivation procedure afforded Claimants to this point, the Court grants Claimants' motion to modify the protective order to require the release of certain rental income generated by the Building to Claimants until a hearing can take place.

First, the Government posits that Section 985 does not apply at all "because Claimants' complaint is about the use of cash, that is, the Building's income, rather than the use of the Building itself." (Opp. at 15.) The Court disagrees. As a practical matter, the plain language of the statute is not so narrowly circumscribed--it applies not only to the real property itself, <u>i.e.</u>, the Building, but also to <u>interests in</u> real property, which may necessarily be a degree removed from the property itself. 18 U.S.C. § 985(f)(1)(emphasis added). Had Congress intended for Section 985 to apply only to real property in and of itself, it would not have employed the conjunctive language that it did.

11

Indeed, such a restrictive interpretation would render Section 985's "interests in real property" language meaningless, and thus runs headlong into the fundamental interpretive canon that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." See <u>Carley v. United States</u>, 556 U.S. 303, 314 (2009) (internal quotation marks and alteration omitted).

The history of this case also demonstrates why the Government's position regarding the applicability of Section 985 is misguided. Rental income undoubtedly has an intimate connection to the Claimants' ownership of the Building, which no one disputes is real property for purposes of Section 985. Though the order has been vacated, Judge Forrest's original summary judgment opinion underscores this connection. There, Judge Forrest explained that "the rents that were transferred abroad were generated by the partnership's management of the Building" and that "<u>without the Building, no rents would have accrued</u>." <u>In re 650 Fifth Ave.</u>, 2013 WL 5178677, at *37 (emphasis added). This may be a basic proposition, but it highlights why the Court believes that rental income is an interest in real property pursuant to Section 985.

The Court also finds that the restraint on the Building's rental income is a seizure of real property under Section 985 and the Due Process Clause. At oral argument, the Government made hay out of the fact that the Building had not been seized because the rental

12

income generated by the Building was not held by the Government in a literal sense. In the Government's telling, the rental income technically remains the property of Claimants, i.e., even though Claimants may not use the money for any purpose, the rental income nonetheless sits in Claimants' coffers and not the Government's. Similarly, the Government suggested in its opposition papers that it has not seized the Building itself because it "does not have custody or possession of the Building" and cannot evict the Building's occupants. (Opp. at 15.)

The Government's limited conception of seizure faces powerful headwinds in the caselaw. While what amounts to a "seizure" of real property for purposes of Section 985 is not specifically defined by the statute, Supreme Court precedent is instructive as to the breadth of the term. The Court has explained that "[a] seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 114 (1984)(internal quotations omitted). And the Supreme Court has been similarly explicit that such interference need not amount to a physical occupation of real property, only to the assertion of control over it. United States v. James Daniel Good Real Property, 510 U.S. 43, 59 (1993).

The Supreme Court's decision in Good Real Property, cited extensively by Claimants, dealt in part with the seizure of rental

13

income.  In that case--decided before the passage of Section 985, which in many ways reflects its holding--the claimant challenged the seizure of his house after a Magistrate Judge made an ex parte determination that the property was subject to forfeiture because it had been used in connection with federal drug offenses.  The Supreme Court, in finding a seizure occurred that required pre-deprivation process, noted that "the seizure gave [the Government] the right to charge rent, to condition occupancy, and even to evict the occupants."  510 U.S. at 49.  However, the Court emphasized that even if "the tangible effect of the seizure was limited to taking [] $900 month [in rental income]," that it "would not render the loss insignificant or unworthy of due process protection."  Id. at 55.  As other Courts have put it, the entire thrust of the Supreme Court's reasoning in Good Real Property was that physical possession is not the sine qua non of real property seizure. See United States v. Property Identified as Lot Numbered 718, 20 F. Supp.2d 27, 36 (D.D.C. 1998)("What is a seizure? In Good Real Property, it was something less than physical eviction — the collection of rent."); see also United States v. 408 Peyton Rd., S.W., Atlanta, Fulton County, GA, 162 F.3d 644, 650 (11th Cir. 1998)("[T]he Supreme Court in Good did not intend for physical control to be of paramount importance when determining whether a constitutionally cognizable 'seizure' of real property has taken place.").

Our own precedent also underscores that physical possession is not required for the Government to effect a seizure of real property. In Pinsky v. Duncan, the Court of Appeals evaluated the constitutionality of a Connecticut statute that authorized prejudgment attachment of real estate without prior notice and opportunity for a hearing and which did not require the person obtaining attachment to post a bond. See 898 F.2d 852, 853 (2d Cir. 1990). The Court of Appeals ostensibly took for granted the fact that prejudgment attachment was a seizure, noting that a threshold question was "whether the 'seizure' at issue . . . depriv[ed] the owner of a significant property interest within the meaning of [the Due Process clause of the Fourteenth Amendment]." Id. at 854. In finding that the lack of pre-deprivation notice ran afoul of the right to due process, the Court of Appeals emphasized that while "attachment of real estate does not deprive the landowner of the use and possession of his property, and thus does not amount to a 'seizure' in a literal sense," it nonetheless "has a significant impact on the owner's ability to exercise the full scope of his property rights." Id. at 854.

Indeed, the Supreme Court affirmed the Court of Appeals' ruling in Pinsky in Connecticut v. Doehr, 501 U.S. 1 (1991). There, the Supreme Court explicitly rejected the notion that only "complete, physical, or permanent deprivation[s] of real property are subject to due process protections. Id. at 12. In doing so,

15

the Supreme Court echoed the Court of Appeals' concerns about the incidental effects of prejudgment attachment on the ability of a property owner to exercise his or her rights in the property. Specifically, the Supreme Court stressed that attachment "ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." Id. at 11. Tellingly, the Court relied heavily on Doehr in its opinion in Good Real Property. See supra at 14.[6]

The restrictions in the Interim Order cause the requisite impact to Claimants' exercise of their property rights such that they amount to a seizure of real property. In Pinsky, the collateral consequences of a prejudgment attachment--the impairment of marketability of the property, the effect on the homeowner's credit rating, and the effect on the owner's ability

---

[6] See 510 U.S. at 54-57. Although the Supreme Court in Doehr did not specifically describe the prejudgment attachment at issue as a "seizure," it cited in a footnote a parallel Connecticut Supreme Court case upholding the same statute in which the state court emphasized that "[t]he statute provides for adequate judicial supervision of the entire process of seizure" and "affords to the defendant whose property has been attached the opportunity to obtain an immediate post-seizure hearing." See Fermont Div., Dynamics Corp. of America, Inc. v. Smith, 423 A.2d 80, 83 (Conn. 1979). The Supreme Court did not in any way dispute that characterization.

16

to use the property as collateral for a loan--were sufficient to transform the prejudgment attachment into a seizure of the property that demanded pre-deprivation process. See 898 F.2d at 854. Here, the Interim Order's interference with Claimants' property interests are at least as direct, if not more so. By restricting the use of Claimants' rental income the Interim Order has functionally limited their ability to use the Building as a rental property at all. For purposes of deciding whether a meaningful interference with property rights has occurred, the Court sees little practical difference between preventing Claimants from generating rental income ex ante and prohibiting them from using rental income generated ex post. Similarly, in Good Real Property, the Supreme Court stressed that seizure of rental income is worthy of due process protection because that money "represent[ed] a significant portion of the exploitable economic value of [claimant's] home." 510 U.S. at 54. Here, the rental income generated by the Building is a prime driver--if not the prime driver--of the Building's value to Claimants. Indeed, the Government acknowledges this, noting that Claimants have "no significant sources of income other than the Building and proceeds derived from the Building's income." (Opp. at 7.) As such, the Court finds that the restraints on rental income clearly amount to a seizure both for purposes of Section 985 and the Due Process clause.

Finally, the Court concludes that the Government has not yet demonstrated that "exigent circumstances" exist here that would allow the Court to make an ex parte determination of probable cause. See 18 U.S.C. § 985(d)(1)(B)(ii). It is generally the Government's burden to demonstrate the existence of exigent circumstances that would obviate the need for a pre-seizure hearing. See, e.g., United States v. One Parcel of Property Located at 194 Quaker Farms Road, Oxford, Conn., 85 F.3d 985, 988 (2d Cir. 1996). Here, the Government has not pursued this issue. The Government's opposition papers contain a single mention of supposedly exigent circumstances, (Opp. at 10), and the Government's attorneys only briefly touched on its belief that exigencies exist at oral argument. This hardly amounts to a convincing showing of exigency that would satisfy the Government's burden, either under Section 985 or under the Constitution.[7]

That the Government is fighting to remunerate victims of Iranian state-sponsored terrorism is, without doubt, commendable. The Government's willingness aggressively to litigate its case through two separate remands from the Court of Appeals demonstrates an admirable dedication to achieving that praiseworthy goal. Good

---

[7] The Court only notes for purposes of this opinion that such a showing had not been made as of February 12, the date of oral argument on the instant motion. To be sure, this says nothing about the Government's ability to make such a showing in the future, as it is permitted to do via an ex parte application under the statute. See 18 U.S.C. § 985(d)(1)(B)(ii).

18

intentions, however, do not grant license to short circuit the requirements of due process. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" See Matthews v. Eldridge, 424 U.S. 319, 333 (1976)(quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). If the Government wishes to restrain Claimants' use of their property in the manner prescribed by the Interim Order in the absence of exigency, at least that much must be allowed for here.

IV. CONCLUSION

For the foregoing reasons, Claimants' motion to modify the protective order (dkt. no. 2175) is GRANTED. The order is modified to allow for rental income generated by the Building from December 12, 2019, the date of the issuance of the Court of Appeals' mandate (dkt. no. 2160), until such time as a hearing can be held, to flow to Claimants. The parties shall confer and propose by letter a briefing schedule for the issues discussed at the February 12 oral argument, including the issue of probable cause for pretrial seizure.

**SO ORDERED.**

Dated: New York, New York
March 2, 2020

*Loretta A. Preska*
_____
LORETTA A. PRESKA
Senior United States District Judge