UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                        :        08 Civ. 10934 (LAP)

In re 650 Fifth Avenue and Related Properties

                        :        ECF Case


                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
## *EX PARTE* APPLICATION FOR A RESTRAINING ORDER


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York


Michael D. Lockard
Martin S. Bell
Daniel M. Tracer
Samuel L. Raymond
Assistant United States Attorneys
    - *Of Counsel -*

**TABLE OF CONTENTS**

                                                                                              **Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 1

I.   Operation of the Building by the Partnership Under the Terms of the
     Monitorship and Trusteeship ...................................................................................... 3

II.  Evidence Establishing Probable Cause Concerning the Forfeitability of the Funds ............... 4

     A. Relevant Facts ...................................................................................................... 7

          1. Origins of the Alavi Foundation and Takeover by the Government of Iran ........... 7

          2. Bank Melli Partners with Alavi to Rescue Alavi from Financial Ruin ................ 9

          3. Bank Melli Takes Further Steps to Conceal Its Ownership of Assa ................... 13

          4. Iran Transfers Control over Alavi from the Bonyad Mostazafan to
             the Iranian Mission to the United Nations ................................................... 14

          5. The Iran Sanctions and Bank Melli's Transfer of Assa to
             New Straw Owners ..................................................................................... 17

          6. Alavi and Bank Melli's Efforts to Transfer Bank Melli's Interest
             in the Partnership ....................................................................................... 18

          7. Civil Lawsuits Against Alavi and Bank Melli's Response ............................. 21

          8. The Iranian Ambassador's Continued Control of Alavi ................................ 23

          9. Alavi's President Destroys Documents Relating to Assa ............................... 24

          10. Alavi's Board of Directors Assert the Fifth Amendment at Depositions ........... 25

          11. Proceeds from the Building and Transactions Involving Proceeds .................. 25

     B. Expenditures of the Partnership's Assets by Claimants ....................................... 25

DISCUSSION ................................................................................................................... 26

I.   Relevant Law ............................................................................................................ 27

A. The International Emergency Economic Powers Act, the ITSRs,
and the WMD Sanctions ............................................................................................ 27

1. The Iranian Transactions and Sanctions Regulations.................…......…...........27

2. The WMD Sanctions.....……...............................................................…..........29

B. Money Laundering............................................................................................... 30

II. The Building, and All Income Derived From It, Is Subject to Forfeiture ............................. 32

A. Proceeds Traceable to IEEPA Violations .................................................. 32

B. Property Involved in Money Laundering................................................... 36

III. Exigent Circumstances Justify Restraint of the Funds ........................................................ 37

A. The Partnership's Income from Operating the Building Is Subject to Forfeiture........38

B. Claimants' Dissipation of Millions of Dollars of the Partnership's Income, and
Intention to Dissipate Future Income, Creates Exigent Circumstances..................39

CONCLUSION.......................................................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974) ............................................................................................ 38, 39

*Havlish v. 650 Fifth Avenue Company,*
    934 F.3d 174 (2d Cir. 2019) ................................................................................... 35

*Stephen M. Flatow v. The Islamic Republic of Iran et al., No. Civ. A. AW-98-4152,*
    67 F. Supp. 2d 535 (D. Md. 1999) ............................................................ 22, 23, 24, 25

*Norman Gabay v. Mostazafan Foundation of Iran et al., No. 92 Civ. 6954*
    (SHS), 968 F. Supp. 895 (SDNY 1997) ................................................................. 22

*In re 650 Fifth Ave.,*
    777 F. Supp. 2d. 529 (S.D.N.Y. 2011) ................................................................... 36

*Kirschenbaum v. Assa Corp.,*
    934 F.3d 191 (2d Cir. 2019) ............................................................................... 18, 35

*United States v. Alvarez-Porras,*
    643 F.2d 54 (2d Cir. 1981) ...................................................................................... 5

*United States v. Banki,*
    685 F.3d at 106-08 ................................................................................................ 29

*United States v. Bornfield,*
    145 F.3d 1123 (10th Cir. 1998) ............................................................................. 38

*United States v. Daccarett,*
    6 F.3d 37 (2d Cir. 1993) ....................................................................................... 38

*United States v. Evanson, No. 05 Cr. 00805,*
    2008 WL 3107332 (D. Utah Aug. 4, 2008) ........................................................... 32

*United States v. Grant, No. S4 05 Cr 1192,*
    2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008) ....................................................... 32

*United States v. Hoffman-Vaile,*
    568 F.3d 1335 (11th Cir. 2009) ............................................................................. 32

*United States v. James Daniel Good Real Prop.,*
    510 U.S. 43 (1993) ...................................................................................... 40, 41-42

*United States v. Ivanchukov,*
    405 F. Supp. 2d 708 (E.D. Va. 2005) .................................................................... 32

*United States v. Monsanto,*
    491 U.S. 600 (1989) ............................................................................................. 38

*United States v. Nicolo,*
    597 F. Supp. 2d 342 (W.D.N.Y. 2009) ........................................................................ 32

*United States v. One Parcel of Prop. Located at 2030-32 Main St., Bridgeport, Conn.,*
    2000 WL 620424 (D. Conn. Apr. 3, 2000) ................................................................. 38

*United States v. Porcelli,*
    865 F.2d 1352 (2d Cir.1989) ....................................................................................... 32

*United States v. Reiner,*
    397 F. Supp. 2d 101 (D. Me. 2005) ............................................................................. 32

**Statutes**

18 U.S.C. § 981 ....................................................................................... 31, 35-36, 38

18 U.S.C. § 983 ..................................................................................................... passim

18 U.S.C. § 985 ..................................................................................................... 1, 2

18 U.S.C. § 1956 ............................................................................... 30, 31, 32, 35

50 U.S.C. § 1701 ............................................................................................. 6, 27

50 U.S.C. § 1702 ..................................................................................................... 27

50 U.S.C. § 1705 ..................................................................................................... 27

**Other**

Exec. Order 13382 § 1(a) ........................................................................................ 29

Exec. Order 13382 § 1(b) ........................................................................................ 30

31 C.F.R. Part 560 ..................................................................................................... 6

31 C.F.R. §§ 560.204 (1999) ................................................................................... 28

31 C.F.R. § 560.304 (1999) ..................................................................................... 28

31 C.F.R. § 560.313 (1999) ................................................................................. 28-29

31 C.F.R. § 560.410 ................................................................................................ 29

59 Fed. Reg. 59099 (Nov. 14, 1994) ....................................................................... 29

60 Fed. Reg. 14,615 (Mar. 15, 1995) ...................................................................... 17

60 Fed. Reg. 24,757 (May 6, 1995) ......................................................................... 17

60 Fed. Reg. 40,881 (Aug. 10, 1995) ............................................................ 17, 18, 29

60 Fed. Reg. 14615 (Mar. 15, 1995) ....................................................................... 27

60 Fed. Reg. 24757 (May 6, 1995) .......................................................................... 27

62 Fed. Reg. 44531 (Aug. 19, 1997) ....................................................................... 27

70 Fed. Reg. 38567 (June 28, 2005) ........................................................................ 29

72 Fed. Reg. 62,520 (Nov. 5, 2007) ................................................................. 18, 30

84 Fed. Reg. 9219 (Mar. 12, 2019) ......................................................................... 27

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law and accompanying declaration in support of its *ex parte* application[1] for a restraining order to prevent the dissipation of funds derived from real property and that are subject to forfeiture. Such a restraining order is necessary and appropriate in order to preserve the availability of the funds, which are property subject to civil forfeiture, under 18 U.S.C. § 983(j). To the extent that the restraint of the funds operates as a partial seizure of the real property itself, that limited seizure is necessary and appropriate pursuant to 18 U.S.C. § 985(d)(1)(B)(ii) in light of Claimants' stated intentions to transfer the funds and render them unavailable for forfeiture. As described in more detail below, there is probable cause to believe that the underlying real property and the income derived from it are subject to civil forfeiture, and that in the absence of a restraining order the funds will be spent by Claimants and unavailable for forfeiture by the time of judgment.

## BACKGROUND

Following the remand of this case from the Second Circuit in August 2019, the Alavi Foundation ("Alavi") and the 650 Fifth Avenue Partnership (the "Partnership," and collectively with Alavi, the "Claimants") have sought to dissipate assets that are subject to forfeiture. In particular, Claimants moved to be permitted to spend the income (the "Funds") generated from a building located at 650 Fifth Avenue (the "Building") in order to fund their legal defense. (Dkt. Nos. 2175, 2176 ("Cl. Mem.")). At the status conference in this matter on February 12, 2020, the Court determined that the continued restraint of the Funds generated by rental income from the

---

[1] This application is made *ex parte* pursuant to the terms of § 985(d)(1)(B)(ii) and this Court's February 13, 2020 Order.

Building operates as a seizure of real property under 18 U.S.C. § 985.[2] On that basis, the Court

granted, in part, the Claimants' motion and permitted the expenditure of the Funds that were

generated from December 12, 2019 to the present. (Dkt. No. 2191). As part of that ruling, the

Court reiterated that it was proceeding under 18 U.S.C. § 985, pertaining to the seizure of real

property, but that it had not received an *ex parte* showing of exigent circumstances by the

Government. (*Id.*). Accordingly, the Government submits this *ex parte* application to request the

restraint of the Funds that will continue to be generated from the Building pursuant to 18 U.S.C.

§ 983(j), or in the alternative, pursuant to 18 U.S.C. § 985(d)(1)(B)(ii). As set forth below, there

is ample probable cause to believe that the Funds generated from the Building are subject to

forfeiture and exigent circumstances exist to restrain the Funds pending a hearing. Even if the

continued restraint of the Funds operates as a seizure of real property, that limited seizure

pending a hearing is authorized based on this application and is necessary to prevent the Funds

from being irretrievably dissipated.

---

[2] As set forth at the conference, the Government contends that the restraint of funds that are generated by the Building does not constitute a seizure of real property within the meaning of 18 U.S.C. § 985, where the claimant continues to own and operate the Building and the Government has no authority, and has taken no action, to bring the Building or its traceable income within the Government's control or dominion. The restraint of rental income is the type of restraining order expressly excluded from the provisions of 18 U.S.C. § 985. *See* 18 U.S.C. 985 (f)(3) ("This section . . . shall not affect the authority of the court to enter a restraining order relating to real property."); 18 U.S.C. 983(j) (authorizing the entry of a restraining order to "seize, secure, maintain, or preserve the availability of property subject to civil forfeiture"); *see also* Rule G(7)(A) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions. This application satisfies both § 983(j) and, in the alternative, § 985(d) by establishing probable cause to believe that the Funds are subject to forfeiture and are at risk of dissipation absent the requested order.

## I.    Operation of the Building by the Partnership Under the Terms of the Monitorship and Trusteeship

The operation of the Building is a complex commercial enterprise. The Building is a mix of retail and office space leased to various tenants pursuant to leases entered into with the Partnership, 650 Fifth Avenue Company.  During the times when the Partnership was subject to a Monitorship,[3] all leases and third-party contracts with the Partnership had to be reviewed by the Monitor and could be entered into only with the Monitor's approval. (*See* Dkt. No. 136 at 5-6). During the period the Partnership has been subject to a Trusteeship, the Trustee has had authority to sign leases and third-party contracts on behalf of the Partnership. (*See, e.g.*, Dkt. No. 1023 at 8-9; Dkt. No. 2162 at 11). Requests for the payment of non-routine business expenses by the Partnership have also been submitted to the Monitor or Trustee for review and approval, as well as authorized distributions of net Partnership revenue to the partners, Alavi and Assa.

Payments to the Partnership by the Building's tenants are made to the Building's property manager, Cushman & Wakefield ("C&W"), pursuant to a property management agreement between C&W and the Partnership. These rental payments are held in a C&W bank account, and in its role as property manager C&W causes the payment of operational and business expenses relating to the Building to be made from this account, subject to the Monitor or Trustee's oversight and approval. As net operating income accumulates in the C&W operating account,

---

[3] Both Alavi and the Partnership have been subject to monitorship and trusteeship provisions at various times during this litigation. Alavi owns a partnership interest in the Partnership but has no direct ownership in the Building, is not a party to any of the leases or contracts involving the Building, and is not entitled to any of the revenues from the Building except to the extent that the Partnership approves discretionary partnership distributions of net income to Alavi and to the Assa partnership interest in a 60/40 proportion. Since December 2008, all distributions to Assa have been held by the U.S. Marshals Service in the Seized Assets Depositary Fund. No other funds from the ongoing operation of the Building have been held by the Government.

they are transferred from time to time to a cash reserves account under the control of the Partnership subject to the provisions of the governing Trusteeship orders.

## II.    Evidence Establishing Probable Cause Concerning the Forfeitability of the Funds

Evidence introduced at the 2017 trial conclusively established that from 1995 through 2008, Alavi and the Partnership unlawfully conspired to provide, and did provide, money and services to Bank Melli Iran and the government of Iran in violation of the ITSRs and IEEPA. Alavi and the Partnership also conspired to launder, and laundered, the proceeds of these offenses.

As described below, this sanctions-violation and money-laundering conspiracy arose out of the Islamic Revolutionary Government's takeover of the Building following the 1979 revolution in Iran. The Building was originally constructed in the 1970s by the Pahlavi Foundation of New York, a private foundation created and controlled by the Shah of Iran, with funding from an Iranian state-owned bank, Bank Melli Iran. Following the overthrow of the Shah and the return of the Ayatollah Khomeini from exile, the new Revolutionary Government appropriated the Shah's properties, including the Building, and continued to control the Building through the Pahlavi Foundation—renamed the Mostazafan Foundation of New York and, later, Alavi.[4] In the late 1980s, in the face of catastrophic financial distress, the government of Iran caused Alavi and Bank Melli to convert Bank Melli's mortgage loan interest in the Building into a partnership with Alavi, with Bank Melli's ownership concealed through Assa Corp. and layers of intermediate corporate shells and straw owners.

---

[4] Alavi was called the Pahlavi Foundation of New York from 1973-1980, the Mostazafan Foundation of New York from 1980-1992, and the Alavi Foundation from 1992 onward. For purposes of this motion, "Alavi" refers to the foundation under its current and prior names.

This arrangement persisted for nearly 20 years, including after the ITSRs were implemented in 1995 in response to the government of Iran's continued hostile and malign activities threatening the United States' national security, and even after Bank Melli Iran was designated in 2007 by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") for supporting proliferators of weapons of mass destruction. The government of Iran continued clandestinely to exercise control over Alavi and the Building through various government intermediaries; and Alavi, Assa, and the Partnership continued to conceal Bank Melli's ownership interest and to transfer tens of millions of dollars in rental income from the Building overseas to Bank Melli through Assa. The scheme was only interrupted when, as a result of an investigation by the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force, the Complaint was filed against Assa's interests in December 2008.

Overwhelming evidence demonstrates that the Building, and by extension all proceeds of the Building including the Funds, are subject to forfeiture as the proceeds of violations of the Iranian sanctions law as well as property involved in money laundering.[5] As set forth in detail

---

[5] Claimants have asserted that in establishing probable cause for the restraint of the Funds, the Government is not permitted to rely on any evidence obtained from the 2008 search of Alavi's offices – which the Second Circuit found to be unlawful – unless and until this Court determines that such evidence would be admissible at trial pursuant to the doctrine of inevitable discovery. *See, e.g.*, Cl. Mem. at 18-19. This is wrong, and the cases cited by Claimants stand only for the proposition that illegally seized evidence may not be used at a forfeiture trial.

The exclusionary rule generally does not apply in pre-trial proceedings, even in the criminal context. *See, e.g., United States v. Alvarez-Porras*, 643 F.2d 54, 67 (2d Cir. 1981) (citing cases and explaining that the exclusionary rule does not apply in grand jury proceedings, preliminary hearings, bail hearings, or sentencings). The exclusionary rule has thus been held not to apply at proceedings that are equally, if not more, critical to a criminal defendant than the instant probable cause hearing, including bail proceedings where the liberty interests of the individual defendant are at issue.

Moreover, *the Partnership* lacks standing to contest the search of *Alavi's* offices, and Alavi is not the owner of the Building entitled to challenge its seizure or the restraint of funds owned by the Partnership. Regardless, evidence obtained from sources other than the search of Alavi's

5

below, this evidence establishes that Alavi and the Partnership provided numerous services to the Government of Iran in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1705, and the Iranian Transactions and Sanctions Regulations ("ITSRs"), 31 C.F.R. Part 560, including (i) concealing Bank Melli Iran's ownership and control of Assa, (ii) causing millions of dollars to be transferred to Assa for the ultimate benefit of Bank Melli Iran and the Government of Iran, (iii) concealing the Government of Iran's supervision and control of Alavi, and (iv) operating the Building and conducting Alavi's affairs at the direction of, and for the benefit of, the Government of Iran. Moreover, Alavi and the Partnership participated in financial transactions to (i) conceal the true nature, ownership and control of the proceeds of these IEEPA offenses and (ii) promote the IEEPA scheme, namely, financial transactions involving the Building's income. These money laundering transactions include the expenditure of funds generated by the Building on the maintenance and improvement of the Building itself through transactions designed to conceal the relationship of the funds to the Government of Iran and to generate additional proceeds from the Building for the Government of Iran.

The Building, the Partnership, Alavi's Partnership interest, and rental income paid to the Partnership by the Building's tenants thus constitute proceeds of the IEEPA offenses and property traceable to such proceeds, and also property involved in, and proceeds traceable to property involved in, money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

---

offices is more than sufficient to establish probable cause in support of the requested restraining order and this application does not rely on the search evidence.

A.    **Relevant Facts**[6]

    1.    **Origins of the Alavi Foundation and Takeover by the Government of Iran**

Alavi was established in 1973 as the Pahlavi Foundation of New York by the Shah of Iran, Mohammad Reza Pahlavi as a branch of the Shah's foundation in Iran, the Pahlavi Foundation. (Hassanein Decl. Exs. 1 & 6; Tr. 767-68 (testimony of former Alavi President Manoucher Shafie)). In 1975, Bank Melli, an Iranian government-owned bank, loaned Alavi approximately $42 million to acquire the land at 650 Fifth Avenue in Manhattan and to construct a 36-story office tower on the property (namely, the Building). (Hassanein Decl. Ex. 3).

    In 1979, the country of Iran underwent a revolution and the Shah was overthrown. (Hassanein Decl. Ex. 2). A new government assumed power, and the leader of that government was the religious figure Ayatollah Ruhollah Khomeini, the Supreme Leader of the Islamic Republic of Iran. (*Id.*). The new government took steps to nationalize foreign businesses operating within Iran and to confiscate all property of the former Shah. To do this, the Ayatollah directed the creation of the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan"), a state-run foundation under the authority of Ayatollah Khomeini. (Tr. 772-74 (Shafie); 1709, 1713-17, 2019, & 2030 (testimony of former Alavi board member and former Bonyad Mostazafan officer Seyed Mojtaba Hesami-Kiche)). Among the properties confiscated and managed by the Bonyad Mostazafan were the Pahlavi family's assets, including the Pahlavi Foundation in Iran and the

---

[6] The evidence described below consists entirely of documentary exhibits introduced at the trial held in this matter between May 30, 2017 and June 29, 2017, Hassanein Decl. ¶ 2, or witness testimony offered at the trial. None of the evidence described below consists of, or was derived from, evidence seized from Alavi's offices in the December 2008 search. "Hassanein Decl." refers to the accompanying Declaration of Sally Hassanein In Support of Application for Temporary Restraining Order in Advance of Probable Cause Hearing, and "Tr." refers to the trial transcript.

Building. (Tr. 771-72 & 774 (Shafie); 1719-21 (Hesami-Kiche)). All of the Pahlavi Foundation's files on Alavi and the Building were centralized in the Bonyad Mostazafan's headquarters. (Tr. 1719-25 (Hestami-Kiche)).

Manoucher Shafie, an Iranian-American businessman and early supporter of the revolution, took over control of Alavi after traveling to Iran to consult with members of the new revolutionary government. (Tr. 771-79 (Shafie)). In 1983, Shafie himself was pushed out of Alavi by a more pro-Ayatollah Khomeini faction of the board, and the Bonyad Mostazafan promptly stacked Alavi's board with a slate of its own officers selected by the head of the Bonyad Mostazafan. (Tr. 838-39, 848-49 (Shafie); 1712-19, 1722-30, 1742-44 (Hesami-Kiche)).

During the 1980s, the Bonyad Mostazafan and other components of the Iranian government repeatedly turned to Alavi to finance the interests of the government of Iran in the United States and Canada, including funding a Shiite Persian studies program at a Canadian university on the instructions of the Iranian Prime Minister. (*See, e.g.*, Hassanein Decl. Exs. 7-T, 8-T, 9-T, 10-T). The head of the Iranian Interest Section (Iran's diplomatic conduit to the United States after formal diplomatic ties were severed as a result of the Iranian hostage crisis) and the Iranian Prime Minister exchanged correspondence about Alavi's funding of pro-regime educational and religious programs. (*Id.* Exs. 11-T, 12-T, 13-T). Moreover, the Bonyad Mostazafan instructed Alavi to provide $150,000 to the Iranian Mission to the United Nations (the "Mission" or "IMUN") (*Id.* Exs. 14, 15, 16, 17-T, 18-T, 19-T, 20-T), and the Bonyad Mostazafan and the Mission instructed Alavi to assist in buying residences for Iranian diplomatic personnel assigned to the Mission, and to acquire property in New York to be used for a Persian school. (*Id.* Ex. 11-T). Alavi purchased land to construct Islamic Education Centers in several states, including land purchased in New York in 1991 and 1997. (*Id.* Exs. 21, 22).

8

### 2. Bank Melli Partners with Alavi to Rescue Alavi from Financial Ruin

In the 1980s, Alavi's income from the Building was not enough to operate the Building, make payments on the Bank Melli loan, and pay its federal tax obligation. Alavi fell behind on its taxes and routinely failed to make payments to Bank Melli; at the instruction of the Central Bank of Iran, Bank Melli was forced to extend Alavi's payment deadlines several times. (Hassanein Decl. Exs. 23-T, 24). Alavi's insolvency not only caused it to default on its loan payments and struggle to meet its tax obligations, but also raised the risk that U.S. authorities would take over the foundation and replace the board, causing Iran to lose control of the Building. (*Id.* Ex. 25-T at 1).

Between approximately 1987 and 1989, the government of Iran explored various options to save Alavi from calamity. In July 1987, the Bonyad Mostazafan's deputy director of finance prepared a draft letter for the signature of the then-head of the Bonyad Mostazafan (also the Deputy Prime Minister of Iran), Tahmasb Mazaheri, addressed to the Prime Minister of Iran summarizing Alavi's condition and solutions explored by the Bonyad. (*Id.*; Tr. 1744, 1803 (Hesami-Kiche)). One proposed solution was to transfer the Building to a holding company, with a part of the company's stock retained by Alavi and the remainder sold to a "European legal entity" so the sale proceeds could be used to pay off the Bank Melli loan. (Hassanein Decl. Ex. 25-T at 2). During this time, the Bonyad Mostazafan operated front companies in Europe, including a German company formed and operated by its officers to conduct procurement for the Bonyad Mostazafan. (Tr. 1751-52 (Hesami-Kiche)). The European entity would be funded by the Bonyad Mostazafan, and the draft letter included a discussion of different ways for the Bonyad Mostazafan to finance the transaction, including with a new loan by the Bonyad Mostazafan or by the Bonyad Mostazafan selling various businesses and assets that it owned.

9

(Hassanein Decl. Ex. 25-T at 3-4). In February 1987, Alavi incorporated a holding company named 650 Fifth Avenue Management Company to allow it to explore this proposal. (*Id.* Ex. 26).

On November 26, 1987, Deputy Prime Minister Mazaheri asked Prime Minister Mousavi for his approval for a plan "to improve the financial problems of the New York Foundation." (*Id.* Ex. 27-T). The Prime Minister's office responded on December 2, 1987, confirming that the Prime Minster was "agreeable" to the suggestions. (*Id.*). Mazaheri forwarded Mousavi's letter to the head of the Central Bank of Iran, Majid Ghasemi, noting the Prime Minister's "order and his agreement with reference to the plan regarding the New York foundation." (*Id.* Ex. 28-T). Mazaheri emphasized that "in all stages of allocation, executive [sic], payment, as well as in all correspondence and discussions, confidentiality is of the utmost importance." (*Id.*).

By 1989, the government of Iran had finalized its solution to Alavi's difficulties. Rather than the Bonyad Mostazafan providing the funds to satisfy the Bank Melli mortgage and partnering with its New York branch through a European shell company, Bank Melli would instead convert its mortgage interest into a partnership interest using shell companies. (*Id.* Ex. 29-T, 30-T, 31-T). After "ample study at the New York Foundation [Alavi], the Central Office of the Foundation [the Bonyad Mostazafan], and Bank Melli in Tehran," this was considered the "last practical plan." (*Id.* Ex. 29-T). Officials from Alavi, the Bonyad Mostazafan, and Bank Melli accordingly met at the Bonyad Mostazafan's offices in Tehran in May 1989 to memorialize their agreement: the attendees included Alavi's then-President, Seyed Mohammad Badr-Taleh ("Badr"); the Bonyad Mostazafan's deputy director for commerce and international affairs, Eisa Khojasteh; and Bank Melli director Mohammad Behdadfar. (*Id.* Ex. 30-T). It was agreed that "Bank Melli Iran will partner with the New York Foundation"; that Bank Melli

10

would create "two partnerships in Jersey Island"; that Bank Melli would "cooperate with the New York Foundation"; and that a Bank Melli representative would "supervise the plan." (*Id.*).

On August 19, 1989, Khojasteh wrote a secret letter to Mohammad Bagherian, who was then the head of the Bonyad Mostazafan, summarizing the "partnership agreement between the Mostazafan Foundation of New York [Alavi] and Bank Melli Iran." (*Id.* Ex. 31-T at 1). Khojasteh asked Bagherian to "endorse the partnership and notify the members of the board of trustees [of Alavi] so they can take action accordingly." (*id.* at 2). Khojasteh recapped that "the partnership seems to be based on prior agreements between the Ministry of Finance and Bank Melli Iran, on one side, and the Islamic Republic of Iran Janbazan [the Bonyad Mostazafan]." (*Id.* at 1). Bagherian hand-endorsed this letter with the instruction: "[c]onsidering the partnership with Bank Melli . . . please continue based on the current agreement. Please note that after several years of efforts put forward by the foundation [the Bonyad Mostazafan], this agreement would be very beneficial, and as a result of not paying taxes it would be possible to provide more services to the wounded warriors, as well as the cultural and educational system." (*Id.* at 2). Khojasteh then forwarded the letter with Bagherian's approval to Badr, Alavi's President. (*Id.*).

Alavi's board formally approved the partnership, and a partnership agreement dated July 31, 1989, between Alavi and Assa Corp. was prepared (*Id.* Ex. 32). After Bagherian's approval, Alavi sought consent from the Charities Bureau of the Office of the New York Attorney General for the transaction. (*Id.* Ex. 33). Pursuant to the proposed partnership agreement, Assa Corp. would contribute $44.8 million to the Partnership and Alavi's and Assa Corp.'s partnership interests would be 65 percent and 35 percent, respectively. (*Id.* Ex. 34). Assa Corp. and its Jersey Islands parent company, Assa Co. Ltd., were financed by Bank Melli which also appointed the company's two directors, Mohammed Behdadfar and Mohsen Kakavand. (*Id.* Exs. 3, 29-T).

11

Over the next few years, Alavi lied to outsiders, including its lawyers and New York state regulators about the true nature of Assa and the Partnership. For example, in connection with the formation of the Partnership, Alavi falsely represented that it was an "arms-length transaction," concealing that it was a transaction between two agencies of the Government of Iran directed by the leadership of that Government and concealing Behdadfar's and Kakavand's leadership positions with Bank Melli. (*Id*. Exs. 35 at 2, 36 at 7). In response to later inquiries by the New York Attorney General's Office in September 1995, Alavi's lawyers falsely represented that Alavi had located its partner Assa "after placing a series of world-wide advertisements seeking co-investors . . . to form the Partnership for the purpose of acquiring the Building. (*Id*. Ex. 37). Alavi's lawyers added that "[n]either the Foundation nor we have any other documentation or information concerning Assa." (*Id*.). Based on Alavi's representations, the New York courts approved the partnership transaction in October 1989. (*Id*. Ex. 34).

While the Partnership transaction helped Alavi avoid significant U.S. income taxes and mortgage payments, it did not resolve Alavi's financial distress. In 1992, Alavi was still insolvent: its monthly income was $375,000, but its monthly expenses totaled $425,000; Alavi needed a $1.7 million loan to pay past-due real estate taxes; and Alavi owed Bank Melli more than $2 million in unpaid partnership distributions. (*Id*. Exs. 38-T, 39-T, 40-T, 41-T). At a meeting in Bank Melli's Tehran headquarters in August 1992, Alavi's then-President, Mohammad Geramian, committed to several senior Bank Melli officers that he would discuss Bank Melli's interests in repayment with the rest of the Alavi board. (*Id*. Ex. 38-T). Alavi was not able to pay Bank Melli, however, and, in August 1994, settled its debt to Bank Melli by transferring an additional five percent interest in the Partnership to Assa. (*Id*. Ex. 42).

### 3.  Bank Melli Takes Further Steps to Conceal Its Ownership of Assa

Bank Melli's ownership and control of Assa underwent several evolutions in response to changes in Bank Melli personnel and in response to Bank Melli's and Alavi's concerns about the legal ramifications of the Iranian bank's involvement, with both partners taking care to conceal Bank Melli's ultimate ownership of Assa. (Hassanein Decl. Ex. 3).

In 1990, after Behdadfar, who had been appointed by Bank Melli, left the bank, Bank Melli transferred legal ownership of Assa to Bank Melli itself; the bank also appointed a new Bank Melli board member, Siavesh Nagshineh,[7] as Assa's director and as director for Harter Holdings, another Jersey Islands company that held Bank Melli's interests in Assa Co. Ltd. (*Id.* Exs. 43-T, 44-52). Bank Melli relied on the fact that "accessing the ownership backgrounds of the companies behind [Assa] is not an easy task for investigators" because of their Jersey Islands registration. (*Id.* Ex. 43-T). Bank Melli also took care that its role was concealed from Assa's American attorneys. (*Id.* Ex. 53-T). Bank Melli's New York agency confirmed that Alavi had no problem with the transfer, namely that Badr, Alavi's President, "doesn't see any problem regarding the transfer of the mother company's ownership . . . his under-standing has always been that the ownership of the mother company was with Bank Melli." (*Id.* Ex. 54-T).

To manage Assa's affairs in New York, Bank Melli appointed Seyed Mohammad Shafa'at, a former bank employee who was then working for a Dubai-based Bank Melli company known as Al Makaaseb, as Assa's authorized representative. (*Id.* Exs. 51, 52, 55-58). Shafa'at fulfilled this role until 1998, when it was assumed by Mohammad Deghani Tafti. (*Id.* Ex. 59). Tafti was instructed by the General Manager of Bank Melli to manage Assa's affairs on

---

[7] Nagshineh was also one of the participants in Alavi's August 1992 meeting at Bank Melli's headquarters in Tehran about Alavi's failure to make payments to Assa Corp. (GX206-T).

Bank Melli's behalf and to keep Bank Melli's interests concealed from U.S. authorities. (Tr. 532-33 (testimony of FBI Special Agent-in-Charge George Ennis)).

In the early 1990s, Bank Melli worried that Nagshineh's affiliation with Bank Melli might be too easily discoverable and set about finding a way to further conceal its ownership of Assa. (Hassanein Decl. Ex. 43-T). In December 1993, Bank Melli asked the head of Bank Melli's New York agency, to research "whether Mr. Nagshineh—the Assa Corp New York Director whose affiliation with the Bank could be easily proven—could be re-placed with another individual whose affiliation with the Bank could not be easily proven," and further asked, "Would this make it possible to maintain the ownership of the building's shares?" (*Id.*). In June 1994, Bank Melli asked Karjooravary about the risk of Assa's assets being seized as a result of their Iranian ownership, noting that "Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies." (*Id.* Ex. 60-T).

### 4. Iran Transfers Control over Alavi from the Bonyad Mostazafan to the Iranian Mission to the United Nations

In the early 1990s, control over Alavi shifted from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations—at that time, Kamal Kharazi—at the direction of the new Supreme Leader of the Islamic Republic, Ayatollah Ali Khamenei. (Hassanein Decl. Ex. 63-T). After Ayatollah Khomeni's death and Khamenei's assumption of the role of Supreme Leader, the office of the Prime Minister was abolished and its historical role in supervising the Bonyad Mostazafan and Alavi ended. (Tr. 2020 (Hesami-Kiche)). After assuming his duties as Ambassador, Kharazi informed Badr, Alavi's president, that Kharazi was the representative of the Ayatollah and that all Iranian entities in the United States were under his control. (*Id.*; Hassanein Decl. Ex. 65-T).

14

The Ambassador eventually demanded Badr's resignation, which was ordered by the Ayatollah and also communicated through the head of the Bonyad Mostazafan. (*Id.*). In a letter dated May 7, 1991, three board members, Badr, Hesami-Kiche, and Houshang Ahmadi Javadi ("Ahmadi"), who had served on the board since 1979, wrote to the Ayatollah that they would resign pursuant to his instructions (*Id.* Ex. 61-T). The board members wrote that, despite the "sensitive" political conditions between the United States and Iran, they had succeeded in "protecting and expanding the Foundation's interests which in truth belongs to the people of Iran." (*Id.*). They further wrote that they were "also able to successfully carry out cultural and Islamic activities in the country of the Great Satan which faced an excessive void in the area of Islamic teachings due to the non-representation[ ] of the Islamic Republic of Iran." (*Id.*).

On or about May 16, 1991, Alavi and government of Iran officials held a meeting in Zurich, Switzerland, to discuss the composition of Alavi's board. (*Id.* Ex. 62-T). Mohsen Rafighdoost, then-head of the Bonyad Mostazafan, attended the meeting along with his deputy and the Bonyad Mostazafan's director of international affairs, Mr. Sobhani. (*Id.*). Rafighdoost confirmed that the changes in board composition were "per the orders given by the Supreme Leader [the Ayatollah]," and instructed several board members to resign. (*Id.*). The meeting minutes show that the attendees also discussed Alavi's charitable activities and payment of partnership distributions to Assa. (*Id.*).

Following the Zurich meeting, Badr described to Sobhani, the Bonyad Mostazafan's director of international affairs, how Ambassador Kharazi summoned him (Badr) and Shafie to Kharazi's office. (*Id.* Ex. 63-T). The Ambassador told Badr and Shafie that he, Kharazi, "am directly responsible for the Foundation and am the Managing Director of the Board of Trustees." Alavi was now "under the oversight of [the Ayatollah], not Mister Rafighdoost . . . [F]rom now

on, the role of the Managing Director and the role of the Board of Directors will be just a formality and he [the Ambassador] will be conducting all of [Alavi's] affairs." (*Id.*). Badr lamented to Sobhani that "Mister Kharrazi's involvement poses a great danger to [Alavi]." (*Id.*). Badr reiterated these concerns in another letter that he wrote directly to the Ayatollah Khamenei on or about May 30, 1991. (*Id.* Ex. 64-T). Badr warned that, although the Ambassador's "appointment to a position of responsibility connected to [Alavi]'s affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader has made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects." (*Id.* at 2).

In or about July 1991, Badr formally resigned his position "based on the order of his Excellency, Supreme Leader." (*Id.* Ex. 66-T). Following Badr's resignation, along with the simultaneous resignations of Bonyad Mostazafan officers Hesami-Kiche and Mohammad Pirayandeh, Geramian took over as Alavi's president. (*Id.* Ex. 67). Geramian was named by Ambassador Kharazi, despite Geramian's having no relevant background. (Tr. 875-77 (Shafie)). Geramian's wife had a significant familial connection to a high-level ayatollah in Iran. (*Id.*). After his nomination, Geramian was Kharazi's "puppet." (Tr. 922 (Shafie)). While transitioning his position over to Geramian, Badr handed over documents about Assa and Bank Melli, and had a conversation with Geramian about Bank Melli and its role with Assa Corporation. (Tr. 1356 (testimony of IRS Supervisory Special Agent Daniel McWilliams)).

In 1992, as control was transferred from the Bonyad Mostazafan to the IMUN Ambassador, Alavi changed its name from the Mostazafan Foundation of New York to the Alavi Foundation. (Hassanein Decl. Ex. 1). And, as discussed above, in August 1992, Alavi President Geramian met senior Bank Melli officials in Bank Melli's headquarters in Tehran to discuss the

16

Partnership's insolvency, its need for a $1.7 million loan to pay past-due taxes and its $2.2 million debt to Assa Corporation. (*Id.* Ex. 38-T). Following this meeting, on August 25, 1992, Bank Melli's chairman of the board, Asadollah Amir Aslani, reported on the meeting to the head of the Bonyad Mostazafan, Rafighdoost. (*Id.* Ex. 40-T). Aslani stated that Alavi was "in partnership" with Bank Melli in their ownership of the Building and reviewed the Partnership's financial troubles; he concluded by stating that he hoped that Rafighdoost's "firm instructions" and the extra attention of Alavi would resolve the Partnership's problems and "help strengthen this partnership for years to come." (*Id.*).

### 5. The Iran Sanctions and Bank Melli's Transfer of Assa to New Straw Owners

On March 15, 1995, the President of the United States found that the actions and policies of the government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States; declared a national emergency to deal with that threat; and prohibited certain petroleum-related transactions involving Iran. See Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995). On May 6, 1995, the President further prohibited, among other things, the exportation from the United States or by a United States person of any goods, technology, or services to Iran or to the government of Iran, and prohibited any transaction having the purpose of evading or avoiding that prohibition. See Exec. Order 12,959, 60 Fed. Reg. 24,757 (May 6, 1995). On June 1, 1995, Bank Melli was identified as part of the government of Iran. *See* Implementation of Executive Order No. 12959 with Respect to Iran, 60 Fed. Reg. 40,881 (Aug. 10, 1995).

On June 5, 1995, Bank Melli began transferring nominal ownership of Assa and Harter Holdings to two Iranian nationals with a shared address in Tehran: Davood Shakeri and Fatemeh Aghamiri. (Hassanein Decl. Ex. 3, 68, 69, 70). On December 18, 1995, Shakeri and Aghamiri

were named directors of Assa in place of Nagshineh. (*Id.* Exs. 71, 59). Shakeri and Aghamiri purportedly bought their shares of Assa for £1 each. (*Id.* Exs. 68, 69, 70). In late 1995, Alavi was applying for a $5 million loan from Chemical Bank, and the bank required the identities of Assa's equity holders. Accordingly, on November 7, 1995, Alavi sent Shafa'at a letter, addressed to Assa's P.O. Box in Dubai, asking for the owners of Assa's shares to provide to the bank. (*Id.* Ex. 72). Shafa'at provided the names of Shakeri and Aghamiri, along with same Dubai P.O. Box that Assa maintained. (*Id.*).

Following Shakeri's and Aghamiri's appointment as Assa's straw owners, Tafti, Bank Melli's local representative for Assa, continued to communicate directly with Bank Melli about managing Assa's affairs. (*See, e.g., id.* Exs. 73, 74-T, 75-T, 76-T, 77-T, 78-T, 79-T, 80-T). As late as July 2005, Tafti emailed Bank Melli director Mohsen Ghadimipour about concerns arising from Shakeri and Aghamiri's Iranian nationality and proposals to replace them. (*Id.* Exs. 76-T, 77-T, 78-T).

On October 25, 2007, Bank Melli was designated by OFAC pursuant to Executive Order 13,382. See Additional Designation of Entities Pursuant to Executive Order 13,382, 72 Fed. Reg. 62,520 (Nov. 5, 2007); *see also* http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20071120.aspx). During the most recent appeal, the Second Circuit confirmed that, at all relevant times, "Assa is both an alter ego and an agency or instrumentality" of the government of Iran. *See Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 200 (2d Cir. 2019).

### 6. Alavi and Bank Melli's Efforts to Transfer Bank Melli's Interest in the Partnership

After the 1995 adoption of the sanctions, Alavi's board members were concerned with the risk of losing any ownership benefit of the Building if U.S. authorities learned that Bank Melli owned an interest in the partnership and that Alavi partnered with Bank Melli to conceal

that interest. For example, in notes found in journals written by Alavi board member Alireza

Ebrahimi dated June 17, 2001, Ebrahimi wrote: "Bank Melli = Conspiracy" and "Problem—

Government separate—Foundation 'Sure death' " (Hassanein Decl. Ex. 82-T); and "Assa

dangerous → Get rid of it → Who is going to buy it." (*Id.* Ex. 83-T).

In the early 2000s, Bank Melli sought to sell Assa's partnership interest to an entity

called the Hanif Partnership. This purchase offer triggered Alavi's right of first refusal under the

partnership agreement (*Id.* Ex. 32 at 27) and led to litigation among Alavi, Assa, and the Hanif

Partnership. Alavi settled the suit by paying Hanif Partnership $4 million, at the instructions of

then-IMUN Ambassador Javad Zarif Konsari. (Tr. 514-16, 529 (Ennis), 1327-29 (McWilliams)).

Ebrahimi's journals further reflect Alavi's knowledge that Bank Melli owned Assa and

its fear of exposure over the ensuring years. For example, notes of a meeting on July 25, 2003

include: "Assa share → Sell it"; "Assa dangerous → Get rid of it → Who is going to buy it"; "To

tell the truth → Lie → Risk"; "You can't → It is illegal → Don't borrow → it is illegal → urgent

situation → talk → Everything → Mafia → Duty . . . ." (Hassanein Decl. Ex. 83-T). Alavi's

board met again on July 27, 2003, at the residence of Javad Zarif, Kharazi's successor as the

Iranian Ambassador to the United Nations. (*Id.*). The board later met on August 10, 2003, and

Ebrahimi's notes continue to reflect considerable concern and anxiety about the risk of Bank

Melli's interest in the Partnership: "I lied"; "The issue of danger for the Board of Trustees";

"Assa → 40% share → August 8 → The amount of 42 million → Reputable company → Half of

the real price"; "Collusion and illegal arrangement"; "Assa Corp → Sale → To take out Assa";

"Everything is revealed"; "Possibility of danger"; "Maneuvering → Assa Corp → selling shares

→ Share → Rights of asset → 'Freez' [sic]"; "Mr. Zarif → Assa → Bank Melli 40% share → I

cannot sleep at night . . . ." (*Id.*).

19

During that same period, Bank Melli engaged in various attempts to sell or transfer Assa's interest in the Partnership to Alavi or a third party. In approximately the late 1990s, Alavi Board member Abbas Mirakhor approached Bank Melli's London branch manager, Ahmad Azizi, in an effort to facilitate Alavi's purchase of Assa. (*Id.* Ex. 87). In the summer of 2003, Azizi was reviewing proposed sale contracts forwarded by Tafti, Assa's representative in New York. (*Id.* Ex. 73). One of Azizi's concerns was securing payment from a U.S. dollar account held outside the United States, to reduce the risk that the payment would be blocked by U.S. sanctions. (*Id.*).

After the Hanif Partnership settlement, Alavi sought to buy Assa's interest but had difficulty setting a price, securing funding, and finding a way to pay Bank Melli. In a consensually recorded conversation in December 2008 between Hamid Firooznia, Alavi's and Assa's accountant from 1984 to 2004, and Hesami-Kiche, Firooznia described his efforts in 2006 to facilitate a sale of Assa's interests to Alavi. (*Id.* Ex. 88). Hesami-Kiche referred to the questions Tafti, Assa's representative, could be asked by U.S. officials: "if you are the owner of 30-40% of a building this huge, what are you doing with the money?" (*Id.* at 4). Firooznia described his conversations with Bank Melli officials—"those that are higher than him"—prior to a 2006 warning that they could lose the interest, and comparing Assa to a recent action against a French bank. (*Id.* at 5-7, 9, 10). Firooznia also described having been summoned to Iran on short notice in 2006, where again he warned that "they [U.S. authorities] are going to take your positions. They even carried out a court order against them in France, which is their friend." He was asked to prepare a report, but no action was taken. (*Id.* at 9-10). The report summarized, among other things, what the problems were and solutions Firooznia proposed, which included how to "sell it to the sixty percent [Alavi]." (*Id.* at 12-13).

In consensually recorded conversations in October 2008, Geramian and Alavi board member Hassan Hassani (2005-2013) discussed the fact that an agreement had been reached on the price of Assa's interest, but that the parties had not solved how to transfer funds from Alavi in the United States to make the payment. (*Id*. Ex. 89). This conversation echoed Bank Melli manager Azizi's concern about how to evade sanctions in order to transfer purchase funds. (*Id*. Ex. 73). Geramian compared the difficulty with his own efforts to transfer a small amount of money to his sick mother in Iran, and extrapolated to the magnitude of the proposed Assa purchase: "Now, you want it with 40%?". (*Id*.). Mazaheri, the former head of the Bonyad Mostazafan, and at this time the Iranian Minister of Finance, had become involved to work out the payment mechanism. (*Id*.).

After efforts to sell or transfer Assa's interest were unsuccessful, Alavi and Assa exchanged several letters about Alavi meeting with Assa's principals. (*Id*. Exs. 90-98). In a January 17, 2006 letter, Alavi's then-President Geramian explained why: "Our general counsel has advised that in order to protect our legal interests such a meeting is necessary." (*Id*. Ex. 90). In other words, Alavi was not genuinely investigating Assa's beneficial ownership, it was following its unwitting American attorneys' advice. Tafti, Bank Melli's representative operating Assa in New York, then made several offers for the Assa board to meet Alavi in New York (*Id*. Exs. 91, 93, 95), resulting in a two or three-hour meeting between Tafti and the Alavi board at the Islamic Education Center operating out of Alavi's Queens property (*Id*. Exs. 98, 99). Alavi's notes of the meeting reference that Shakeri and Aghamiri were the partners in Assa, but little else. (*Id*. Ex. 99).

### 7.  Civil Lawsuits Against Alavi and Bank Melli's Response

Throughout their history, Alavi, Assa, and the Partnership faced a number of lawsuits by judgment creditors of the government of Iran seeking to enforce their judgments against the

Building. One such suit, seeking to enforce damages arising from the Iranian government's alleged expropriation of assets owned by Norman Gabay located in Iran, was dismissed in 1997 when the district court determined that Gabay had failed to show that the Bonyad Mostazafan exercised day-to-day control over Alavi. *See Norman Gabay v. Mostazafan Foundation of Iran et al.*, No. 92 Civ. 6954 (SHS), 968 F. Supp. 895 (SDNY 1997) (Hassanein Decl. Exs. 100 & 101). Another suit, seeking to attach assets to satisfy a judgment against Iran held by Stephen Flatow, was dismissed when the court concluded that Flatow had failed to prove that the government of Iran exercised day-to-day control over Alavi's activities. *See Stephen M. Flatow v. The Islamic Republic of Iran et al.*, No. Civ. A. AW-98-4152, 67 F. Supp. 2d 535 (D. Md. 1999) (Hassanein Decl. Ex. 102). The opinions in the *Gabay* and *Flatow* cases, were based, at least in part, on Alavi's directors falsely denying having taken any instructions from the Ayatollah or the government of Iran, notwithstanding the substantial instructions and communications detailed above.

Bank Melli took note of these lawsuits, and adjusted its operations to further insulate itself from detection. In a letter dated July 21, 1994, the head of Bank Melli's New York agency, Karjooravary, noted that prior to the Gabay lawsuit, Bank Melli's New York agency "had been taking care of [Assa's] affairs," but that precautions had been taken by the bank in the wake of the lawsuit. (*Id.* Ex. 103-T). "Since last year, following a complaint registered by a person named Morad Gaby [sic] against the partnership's partner [Alavi] and one in which the partnership's building had been mentioned, it seems that management has declared that all the partnership's affairs be handled by a different entity other than this Agency." (*Id.*). Bank Melli transferred primary responsibility for managing Assa from New York to London and Tehran.

22

Similarly, on or about June 25, 1994, Bank Melli's Overseas Network Supervisory Department (the "ONSD") wrote to Karjooravary about the risk associated with the Iranian ownership of Assa. (*Id.* Ex. 60-T). In the letter, Bank Melli Iran acknowledged that "Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies." (*Id.*). Bank Melli then asked the New York office to "estimate the percentage of risk of the seizure of these properties in case of the revelation of the ownership by Assa Corporation." (*Id.*).

### 8. The Iranian Ambassador's Continued Control of Alavi

In 1991, in connection with Iran's transfer of control over Alavi from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations, then-Ambassador Kharazi asserted that "the role of the Managing Director and the role of the Board of Directors will be just a formality and he [the Ambassador] will be conducting all of [Alavi's] affairs." (Hassanein Decl. Ex. 63-T; *see also* Exs. 61-T, 64-T, 65-T). Badr's replacement as President, Geramian, was selected by Kharazi and was Kharzi's "puppet." (Tr. 875-77, 922 (Shafie); *see also* Tr. 516, 529 (Ennis)). This board, installed as part of Ayatollah Khamenei's transfer of Alavi from the Bonyad Mostazafan to the IMUN Ambassador, remained largely intact for nearly two decades. (Hassanein Decl. Exs. 104, 105). Khameinei remains the Supreme Leader of Iran, nearly thirty years later. Kharazi's selection for President, Geramian, was forced out by Kharazi's successor, Ambassador Zarif. (Tr. 516, 529 (Shafie)).

Iran's IMUN Ambassadors retained control over Alavi's board and, therefore, ultimate control over its actions, and continuously participated in board meetings and provided input or instructions to the board. The ambassadors regularly emphasized their control over the composition of Alavi's board. As Alavi's corporate secretary, Ali Ebrahimi, recorded in his notes of a board meeting, "I agree with anyone that is recommended by Doctor [Ambassador] Zarif for

23

membership in the Board of Trustees," and "[a]mendment and extension of the Board of

Trustees should be decided by you [Ambassador Zarif] in relation with present members."

(Hassanein Decl. Ex. 86-T). And the ambassadors' ability to exercise control was facilitated by

their routine participation in Alavi board meetings. As Ebrahimi's notes from 2004 also reflect,

"Information—Zarif—should always be in meetings." (*Id*. Ex. 84-T). Alavi board member

Ahmadi (1980-2013) claimed in an FBI interview that Alavi was "independent" of the

government of Iran, but admitted that "indirectly there was pressure from Zarif"; that Zarif

"always wanted to provide guidance," and that at Alavi board meetings, "Geramian would come

in and say this is the way Zarif wants it." (Tr. 515 (Ennis)). Ahmadi admitted that, when

Geramian was not sufficiently responsive to Zarif's wishes, he was replaced as Alavi's President.

(Tr. 516, 529 (Ennis)).

Zarif's replacement, Khazaee, was similarly influential. Shortly after replacing Zarif,

Khazaee, together with the former Iranian cultural ambassador to the U.N., Mehdi Faridzadeh,

led an Alavi board meeting at the Ambassador's Residence. (Hassanein Decl. Ex. 106-T). The

topics of the meeting included, among other things, the Building's economic performance,

profitability, budget and marketing strategy (*id*. at 1-2); Alavi's religious and donor activities (*id.*

at 2 & 3); Bank Melli (*id.* at 2); and Alavi's board membership and number of directors. (*Id*.).

### 9. Alavi's President Destroys Documents Relating to Assa

On December 17, 2008, the Government filed the Complaint in this matter. (Dkt. No. 1).

That same day, Alavi's president Jahedi was served with a grand jury subpoena for testimony

and documents in a grand jury investigation. (Hassanein Decl. Ex. 107). The grand jury

subpoena required that Alavi provide any and all documents relating to Alavi, Assa, and the

Partnership from 1989 onward. (*Id.*).

24

The next day, on December 18, 2008, FBI surveillance saw Jahedi ripping up papers and throwing them in a public trash receptacle. (Tr. 140-142 (testimony of retired FBI Special Agent George Wineriter); Hassanein Decl. Ex. 108). The FBI retrieved those documents and brought them to an FBI forensic facility for reconstruction. (Tr. 142-44 (Wineriter), 161-63 (testimony of FBI forensic document examiner Antoine Frazier); Hassanein Decl. Ex. 109). Some of the reconstructed documents were responsive to the grand jury subpoena, including diagrammatic representations of Assa's ownership structure and relationship to Alavi. (*E.g., id.* at 9, 13-17, 22, 25). On December 19, 2008, Jahedi was charged in a criminal complaint. He was subsequently indicted for obstruction of justice, and on December 30, 2009, he pleaded guilty to this charge. (*Id.* Ex. 110).

### 10. Alavi's Board of Directors Assert the Fifth Amendment at Depositions

Prior to trial, the Government noticed Alavi's board members for depositions. Alavi promptly fired its board and each of the board members invoked their Fifth Amendment right against self-incrimination and refused to answer any questions. (Hassanein Decl. Exs. 111-15).

### 11. Proceeds from the Building and Transactions Involving Proceeds

Between 1996 and 2008, the Partnership received more than $228 million in gross rents from the Building. (Hassanein Decl. Ex. 116). During this time period, the Partnership spent more than $143 million in operating expenses, including the costs of operating, maintaining, and improving the Building. (*Id.* Ex. 117). Between 2000 and 2008, Alavi received more than $36.9 million in income from the Partnership. (*Id.* Ex. 118). Between 1997 and 2008, Assa received more than $26.9 million from the Partnership. (*Id.*).

### B.    Expenditures of the Partnership's Assets by Claimants

Between July 2016 and June 2018, Claimants spent approximately ███████ from the Partnership's income on expenses unrelated to the maintenance, operation, or improvement of

the Building or of the real properties owned by Alavi individually. This sum included

approximately $23,871,823 in legal fees and litigation-related expenses, approximately ███████

for Alavi's administrative expenses (including salaries), and approximately ██████ in funds

given away in the form of charitable donations. (Hassanein Decl. Exs. 119-126). Over the 18-

month period, Claimants' rate of expenditures unrelated to the preservation of assets averaged

approximately ██████ per month.

During this same time frame, total revenue earned by the Partnership were approximately

███████, total operating expenses were approximately ██████, and total capital

expenditures were approximately ██████. (Hassanein Decl. Exs. 119-126). Thus the

Partnership's income, after deducting operating expenses and capital expenditures—but not

accounting for interest, taxes, depreciation, and the like—was approximately ████████

████████████████████████████████. During this same time

period, the Partnership's available cash fell more than ██████, from approximately

██████ to approximately ██████.

**DISCUSSION**

The evidence described above, which is a subset of the evidence introduced at the 2017

trial in this matter, establishes probable cause to believe that the Building and the Funds derived

from it are subject to forfeiture, and should be preserved. There are exigent circumstances

requiring the entry of a pre-hearing restraining order in light of the Claimants' history of

dissipating millions of dollars of funds derived from the Building when able to do so, and their

stated intention to spend future income derived from the Building if permitted to do so.

## I.      Relevant Law

### A.      The International Emergency Economic Powers Act, the ITSRs, and the WMD Sanctions

The International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C.

§§ 1701-1706, confers upon the President certain powers, defined in § 1702, to deal with any

threats with respect to which the President has declared a national emergency. *See* 50 U.S.C.

§ 1701. Section 1705 provides, in relevant part, that "[i]t shall be unlawful for a person to

violate, attempt to violate, conspire to violate, or cause a violation of any license, order,

regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a). Section 1705(c) makes it

a crime for any person to "willfully commit[ ], willfully attempt[ ] to commit, or willfully

conspire[ ] to commit, or aid[ ] or abet[ ] in the commission of" an offense described in

subsection (a).

### 1.      The Iranian Transactions and Sanctions Regulations

In 1995 and 1997, pursuant to the IEEPA, the President declared a national emergency

with respect to the threats posed by the Government of Iran to the United States' national

security, economy, and foreign policy, and directed certain measures to respond to that

emergency. Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order 12959, 60

Fed. Reg. 24757 (May 6, 1995); Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 19, 1997). This

national emergency has remained continuously in force, most recently having been continued on

March 12, 2019. *See* Notice, Continuation of the National Emergency With Respect to Iran, 84

Fed. Reg. 9219 (Mar. 12, 2019). Since the May 6, 1995, Executive Order, the following

transactions have been prohibited, among others: (i) the "exportation from the United States to

Iran, the Government of Iran, or to any entity owned or controlled by the Government of Iran, or

the financing of such exportation, of any goods, technology . . . or services;" (ii) "any new

27

investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran;" and (iii) "any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in" the Executive Order. Exec. Order 12957 § 1(b), (e), (g).

To implement these executive orders, the U.S. Department of the Treasury's ("Treasury") Office of Foreign Assets Control ("OFAC") adopted the Iranian Transactions and Sanctions Regulations ("ITSR"). With limited exceptions, these regulations prohibit the export of goods, services, or technology from the United States or by a United States person, directly or indirectly, to Iran or the Government of Iran unless the transaction has been licensed by OFAC. *See* 31 C.F.R. §§ 560.204 (1999); *see also* 560.205 (1999) (prohibiting the knowing reexportation of goods, technology, or services originally exported from the United States directly or indirectly to Iran or the Government of Iran); 560.207 (1999) (prohibiting new investment by a United States person in property (including entities) owned or controlled by the Government of Iran); 560.203 ("Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.") (1999).

The "Government of Iran" includes "the state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof;" and "[a]ny entity owned or controlled directly or indirectly by" the Government of Iran. 31 C.F.R. § 560.304 (1999). A corporate entity is considered "owned or controlled" by the Government of Iran if the Government of Iran (including its agencies and instrumentalities, and entities owned and controlled by it) owns a majority or controlling interest, or if the entity "is otherwise controlled by that Government." 31

C.F.R. § 560.313 (1999). Bank Melli Iran is an Iranian government-owned bank whose directors

are appointed by the Iranian Ministry of Finance and the Central Bank of Iran (Tr. 1155

(testimony of Mohammad Karjooravary)), and has been identified by OFAC as part of the

Government of Iran since June 1, 1995. *See* Implementation of Executive Order No. 12959 with

Respect to Iran, 60 Fed. Reg. 40,881 (Aug. 10, 1995).

The benefit of services performed anywhere in the world on behalf of the Government of

Iran is presumed to be received in Iran, 31 C.F.R. § 560.410(b), and, thus, and services provided

in the United States for the benefit of or on behalf of the Government of Iran are considered

exported to Iran and the Government of Iran. The term "services" is broad, referring generally to

the performance of anything useful, whether or not the service provider is compensated. *See*

*generally United States* v. *Banki*, 685 F.3d at 106-08 (2d Cir. 2012), *as amended* (Feb. 22, 2012)

(holding that the execution of money transfers from the United States to Iran on behalf of

another, whether or not done for a fee, is a "service").

### 2.  The WMD Sanctions

On November 14, 1994, the President Clinton declared a national emergency pursuant to

the IEEPA and other authorities with respect to the proliferation of weapons of mass destruction

("WMDs") and of the means of delivering such weapons. Exec. Order 12938, 59 Fed. Reg.

59099 (Nov. 14, 1994). On June 28, 2005, the President announced additional steps to address

that national emergency. Exec. Order 13382, 70 Fed. Reg. 38567 (June 28, 2005). Generally, all

property and interests in property of any person determined by the Secretary of Treasury to be a

proliferator of WMDs or to have provided or attempted to provide financial, material,

technological, or other support for the proliferation of WMDs, is blocked. *See* Exec. Order 13382

§ 1(a). Any transaction or dealing in property or interests in blocked property by a United States

person or in the United States is prohibited, including (i) the making of any contribution or

29

provision of funds, goods, or services by, to, or for the benefit of, any person whose property and interests in property are blocked, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person. *See* Exec. Order 13382 § 1(b).

On October 25, 2007, Bank Melli was designated by OFAC as a Specially Designated National pursuant to Executive Order 13382 for providing financing to entities involved in Iran's illicit WMD programs. *See* Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 62,520 (Nov. 5, 2007); *see also* Treasury Designates Iran-Controlled Bank for Proliferation Future Bank Controlled by Iran's Bank Melli (Mar. 12, 2008) ("Bank Melli goes to extraordinary lengths to assist Iran's pursuit of a nuclear capability and ballistic missiles, while also helping other designated entities to dodge sanctions . . . Banks and other entities owned or controlled by Bank Melli pose a serious threat to the integrity of the international financial system."), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp869.aspx). As of that date, not only was providing services to Bank Melli (and any entity owned or controlled by it, including Assa) prohibited, but all of Bank Melli's property (including Assa and Assa's interest in the Partnership) was blocked.

### B.    Money Laundering

The Amended Complaint alleges that Alavi and the Partnership committed three types of money laundering violations: promotion money laundering, concealment money laundering, and international money laundering. In relevant part, 18 U.S.C. § 1956 states:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A) [Promotion] (i) with the intent to promote the carrying on of specified unlawful activity. . . or

> (B) [Concealment] knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
>
> shall be [guilty of an offense.]
>
> (a)(2) [International] Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity; or
>
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
>
> shall be [guilty of an offense].

18 U.S.C. § 1956(a)(1)(A)–(B), (a)(2). Based on the foregoing, there is probable cause to believe that Claimants have engaged in financial transactions using IEEPA proceeds—rental income from the Building, derived from their unlawful services to the Government of Iran—in financial transactions to promote the IEEPA scheme, and in financial transactions that were designed to conceal the nature, ownership, and control of the funds, that is, the fact that the funds were ultimately owned and directed by, and for the benefit of, the Government of Iran. Alavi, Assa, and the Partnership also participated in international funds transfers for Assa, for the ultimate benefit of Bank Melli, that were desnigned to promote the IEEPA scheme and the conceal the nature, ownership, and control of the funds.

31

## II.    The Building, and All Income Derived From It, Is Subject to Forfeiture

Pursuant to 18 U.S.C. § 981, (i) "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" the IEEPA, "or any conspiracy formed to commit such offense," and (ii) "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title, or any property traceable to such property," is subject to forfeiture. 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C). The Building, the Partnership, and all income derived from the Building are forfeitable under both provisions.

### A.    Proceeds Traceable to IEEPA Violations

Courts apply a "but for" test to determine whether property is proceeds of an offense; under this test, the term "proceeds" means any property that a person would not have obtained or retained but for the criminal offense. *United States v. Grant*, No. S4 05 Cr 1192, 2008 WL 4376365, at *2 n. 1 (S.D.N.Y. Sept. 25, 2008); *see also United States v. Nicolo*, 597 F. Supp. 2d 342, 350 (W.D.N.Y. 2009) (applying "but for" test to determine amount of proceeds forfeitable under § 981(a)(1)(C)); *United States v. Porcelli*, 865 F.2d 1352, 1366 (2d Cir.1989) (applying RICO forfeiture statute); *United States v. Reiner*, 397 F. Supp. 2d 101, 106-07 (D. Me. 2005) (same); *United States v. Evanson*, No. 05 Cr. 00805, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008) ("proceeds are property a defendant would not have obtained or retained but for the commission of the criminal offense") *see also, e.g.*, *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344-45 (11th Cir. 2009) (applying "but for" test to determine the amount of "proceeds" forfeitable under the criminal forfeiture statute 18 U.S.C. § 982); *United States v. Ivanchukov*, 405 F. Supp. 2d 708, 712 (E.D. Va. 2005) (same).

Based on the foregoing facts, there is probable cause to believe that the Partnership and the Building are subject to forfeiture as proceeds of IEEPA for any number of reasons. But for

32

Alavi's unlawful Partnership with Bank Melli, Alavi was financially insolvent and could not have maintained control of the Building as an economic or legal matter. When Executive Order 12597 came into force in 1995, Alavi had been part of a secret partnership with Bank Melli for the prior six years, arranged by the Government of Iran both to rescue Alavi from financial disaster and to prevent New York State authorities from taking over control of Alavi and depriving the Government of Iran of its ownership and control of the Building through its control of Alavi and Alavi's board composition. (*Supra* at 9-10; Hassanein Decl. Exs. 23-T, 24, 25-T, 27-T, 28-T, 29-T, 30-T, 31-T). Even with the financial relief provided by the Partnership arrangement—the elimination of Alavi's unrelated business income tax and its mortgage payments to Bank Melli—Alavi still remained in severe financial straits for years, unable to meet its real estate tax obligations, unable to make distributions to Assa, saddled with millions of dollars' of additional debt, and requiring even more loans in order to meet its past-due obligations. (*Supra* at 12, 16-17; Hassanein Decl. Exs. 38-T, 39-T, 40-T, 41-T). In 1994, Alavi had to transfer an additional 5% partnership interest to Bank Melli—nominally valued at $5 million (*id.* Ex. 42), but likely worth much more—to satisfy its overdue financial obligations. In sum, the is probable cause to believe that, without the unlawful Partnership between Alavi and Bank Melli, Alavi was not viable and would not have been able to retain the Building, and the Government of Iran would not have been able to maintain its control over Alavi and the Building.

Alavi and the Partnership's concealment services allowed them to retain the Building in another way. In 2007, Bank Melli was designated as an SDN under Executive Order 13382 for supporting the proliferation of weapons of mass destruction, blocking all of Bank Melli's property—including Assa and Assa's interest in the Partnership. The Executive Order authorizes

33

the designation of any other persons "acting or purporting to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked" and any person who has "provided, or attempted to provide, financial, material, technological or other support for, or goods or services in support of . . . any person whose property and interests in property are blocked pursuant to this order." Exec. Order 13382 § 1(a)(iii), (iv). Alavi and the Partnership, by acting directly or indirectly on behalf of Bank Melli and Assa and by providing financial support for Bank Melli, each were also subject to designation. Being designated under the Executive Order would have blocked all of Alavi's and the Partnership's property interests, including the Building, and would have deprived Claimants of the ability to exercise or benefit from any of their ownership rights. Similarly, because Alavi and the Partnership were owned and controlled by the Government of Iran, any provision of goods or services for Alavi or the Partnership without a license from OFAC was prohibited under the ITSRs. Alavi and the Partnership never obtained any such license. Without Alavi's and the Partnership's concealment services to the Government of Iran, they again would have been deprived of the ability to exercise or benefit from any of their ownership rights over the Building. The value of those ownership rights—that is, the value of the Building and income generated from it—is thus subject to forfeiture.

The unlawful Partnership also concealed the Government of Iran's ultimate ownership and control over the Building, via its control of Bank Melli and Alavi, from private litigants seeking to satisfy their judgments against the Government of Iran for terrorism-related and other injuries. Alavi successfully dismissed lawsuits in 1997 and 1999 seeking the turnover of Alavi's property interests (*supra* at 21-23; *see also* Tr. at 2630-33 (testimony of IRS Special Agent Marc Van Driessche)), by concealing its relationship with the Government of Iran. When the truth about Assa and Alavi was revealed with the filing of the original Complaint in December 2008

34

and the Amended Complaint in 2009, other victims of Iranian state-sponsored terrorism filed

similar actions seeking the turnover of the Building and Alavi, Assa, and the Partnership's other

properties. Those actions already have resulted in a final judgment for the turnover of Assa's

properties, *Kirschenbaum v. Assa Corp.*, 934 F.3d 191 (2d Cir. 2019), and a bench trial judgment

finding that Alavi's and the Partnership's properties also are subject to turnover under § 201 of

the Terrorism Risk Insurance Act. Judgment on the TRIA claim was vacated, solely for the

purpose of permitting Alavi and the Partnership to potentially call two additional witnesses who

previously had invoked their Fifth Amendment rights against self-incrimination. *Havlish v. 650*

*Fifth Avenue Company*, 934 F.3d 174, 182-83 (2d Cir. 2019). The trial record, however, is

sufficient to demonstrate probable cause that the judgment creditors will prevail on their claims,

and thus Alavi and the Partnership have been able to maintain their ownership and control over

the Building only providing the service of concealing the Government of Iran's ownership.

The Building and the proceeds derived from it are also the derived from proceeds

traceable to IEEPA violations because the Building was managed and operated by the

Partnership for the financial benefit of the Government of Iran, and income that management and

operation was reinvested in the Building itself. (*Supra* at 25; Hassanein Decl. Ex. 116 & 117). At

least approximately $143 million in illicit proceeds were spent on maintaining, operating, and

improving the Building from 1996 through 2008. Without this enormous investment of illicit

proceeds, the Building would not have been able to operate, function, or generate any income at

all, and Alavi and the Partnership would not have been able to retain it. The Building,

accordingly, is subject to forfeiture as the proceeds of this investments. At a minimum, the

amount of IEEPA-derived funds re-invested by Claimants into the Building, and any increase in

the Building's value traceable thereto, is subject to forfeiture.

35

### B.    Property Involved in Money Laundering

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, *involved in a transaction or attempted transaction* in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property." 18 U.S.C. §981(a)(1)(A) (emphasis added). Property "involved in" a money laundering offense includes, among other things, any property that facilitates the offense, including any property used to conceal, disguise, or promote the money laundering. Under § 983(c), "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c).

"The term 'involved in' refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense." *In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 563 (S.D.N.Y. 2011) (quoting *United States v. 250 Documents Containing the Forged Hand Writing of President John F. Kennedy and Others,* No. 03–CV–8004, 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008); *see also, e.g., United States v. Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009) (the inventories of two jewelry stores were properly forfeited as facilitating property pursuant to § 981(a)(1)(A)'s criminal analogue, 18 U.S.C. § 982(a)(1) and 31 U.S.C. § 5317, because the inventories made it easier for the defendant to launder drug money by giving customers a variety of jewelry options, and by giving the transactions a facade of legitimacy). Additionally, "[t]he Second Circuit appears to have embraced the 'facilitation' approach," *Id.* (quoting *United States v. Schlesinger,* 396 F.Supp.2d 267, 272 (E.D.N.Y.2005), *aff'd,* 514 F.3d 277 (2d Cir.2008). "Property would facilitate an offense if it makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Seher*, 562 F.3d at 1368. The Second Circuit authorized the forfeiture of property as "involved in" money laundering transactions when it has "'served as a conduit for the proceeds of the illegal transactions.'" *United States*

*v. Schlesinger,* 261 Fed.Appx. 355, 361 (2d Cir. 2008) (quoting *United States v. All Assets of G.P.S. Auto. Corp.,* 66 F.3d 483, 486 (2d Cir. 1995)).

There is probable cause to believe that the Partnership and the Building were "involved in" money laundering. As set forth above, money laundering occurred whenever Alavi, Assa, or the Partnership conducted financial transactions with IEEPA proceeds (that is, rental income generated from the Building) in order to promote their ongoing IEEPA crimes or to conceal the Government of Iran's ultimate ownership and control of the funds. The overriding, fundamental purpose of the Partnership between Alavi and Assa and the use of the corporate formalities of those two entities was to conceal and protect the Government of Iran's ownership and control over the entire structure, and the benefits and services provided to the Government of Iran through that structure. Every time Alavi caused the Partnership to send funds to Assa that were generated from their management of the Building, that was money laundering. When Alavi caused the Partnership to spend funds generated from the Building in order to repair and maintain the Building, it was money laundering. Every time a tenant at the Building paid rental income to the Partnership pursuant to a lease purporting to be between the tenant and the Partnership, when the true landlord was the Government of Iran, it was money laundering. The Building and the Partnership were involved in all of these transactions, served as conduits for the proceeds of the illegal transactions, and gave the transactions a facade of legitimacy; they are subject to forfeiture in whole as property involved in money laundering, and the Building's ongoing rental income is property traceable to property involved in money laundering.

## III.    Exigent Circumstances Justify Restraint of the Funds

The Court should restrain the Funds due to exigent circumstances pending the hearing that the Court has directed to occur.  Exigent circumstances exist where absent the continued seizure or restraint, the property will not be available for forfeiture and less restrictive means are

inadequate to preserve the property. 18 U.S.C. § 983(j)(3) ("Upon application of the United States, the court may enter a restraining order . . . or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture."); § 985(d)(2); *United States v. One Parcel of Prop. Located at 2030-32 Main St., Bridgeport, Conn.*, No. 90 Civ. 544 (EBB), 2000 WL 620424, at *7 (D. Conn. Apr. 3, 2000); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974) (authorizing *ex parte* seizure where property could be "could be removed to another jurisdiction, destroyed, or concealed" pending forfeiture proceedings); *see also United States v. Daccarett*, 6 F.3d 37, 49 (2d Cir. 1993) (recognizing, in the context of a warrantless search, that exigent circumstances existed to hold on to property that was "fungible and capable of rapid motion").

## A.    The Partnership's Income from Operating the Building Is Subject to Forfeiture

As explained above, there is ample probable cause to believe that the Building is forfeitable as property involved in money laundering. Under 18 U.S.C. 981(a)(1)(A) any property that is "tracable to" the Building is therefore itself forfeitable property. *See* 18 U.S.C. 981(a)(1)(A) (subjecting to forfeiture any property involved in money laundering and "any property traceable to such property"). It is well settled that when property involved in money laundering enables the acquisition of additional property, that latter property is subject to forfeiture "as property 'traceable to' the offense." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998); *id.* ("If . . . the defendant purchases a $500,000 item with [property involved in money laundering, the government may seek the item purchased as property 'traceable to' property involved in the money laundering offense.").

Here, the Funds themselves are generated from the Building and are thus acquired only by virtue of property that is involved in money laundering. Accordingly, the Funds themselves

constitute forfeitable property and must, under sections 983(j) and 985(d), be preserved pending a final order of forfeiture. *United States v. Monsanto*, 491 U.S. 600 (1989). If they are spent to expenses or other fees, the Government will irretrievably deprived of substantial sums of forfeitable property. This can only be achieved by preventing the funds from being spent. As is typically the case with cash that can be readily transferred and spent, no other measure short of immediate restraint would ensure that the Funds will be available for forfeiture.

> **B.    Claimants' Dissipation of Millions of Dollars of the Partnership's Income, and Intention to Dissipate Future Income, Creates Exigent Circumstances**

A restraining order, entered prior to the probable cause hearing ordered by the Court, is appropriate and necessary to preserve the availability of the Funds. The Funds at issue not only are fungible and capable of being dissipated, *Calero-Toledo*, 416 U.S. at 679; but Claimants in fact have dissipated millions of dollars of the Partnership's income from the Building whenever permitted to do so, and have explicitly advised the Court and all parties of their intention to promptly dissipate the Funds.

As reported by the Monitor in quarterly reports submitted to the Court, between July 2016 and June 2018, Claimants spent approximately ███████ from the Building's income on expenses unrelated to the maintenance, operation, or improvement of the Building or of the real properties owned by Alavi individually. This sum included approximately $23,871,823 in legal fees and litigation-related expenses, approximately ███████ for Alavi's administrative expenses (including salaries), and approximately ███████ in funds simply given away. (*Supra* at 25-26). These expenditures, which averaged approximately ███████ per month, exceeded the Partnership's other cash flows during the same time period, and caused the Partnershp's available cash to drop by more than ███████. (*Id.*).

In seeking to lift the December 12, 2019 protective order, Claimants expressly stated that they intend to spend the Partnership's cash. (*See, e.g.*, Dkt. No. 2176 at 2 ("The rental income from the Building is Claimants' sole means to pay for this litigation."), 10 (seeking to access rental income "to pay for their basic operations"), 16 (seeking access to rental income "for basic operations and their legal defense.").)

The certain dissipation of the Partnership's assets justifies their restraint. In *United States v. James Daniel Good Real Property*, the Supreme Court held that notice and opportunity to be heard is ordinarily required before seizing real property, because real property "by its very nature, can be neither moved nor concealed." 510 U.S. 43, 53 (1993). However, where a "valid governmental interest is at stake that justifies postponing the hearing until after the event," a seizure or restraint of property prior to notice and a hearing is appropriate. *Id.* (quoting *Boddie v. Connecticut*, 401 U.S. 371 (1971)). In *James Daniel Good*, the Court considered a pre-hearing seizure of the claimant's residence, which at the time was rented to tenants. As part of exercising its right to seize the property, the Government entered into occupancy agreements with the tenants (in lieu of eviction) and collected the rental payments. *Id.* at 47. The Court concluded that the pre-hearing seizure was not justified where "the target of forfeiture is real property" and the "real property cannot abscond." *Id.* at 56. The Court distinguished real property from the movable property at issue in *Calero-Toledo*, "where the Government's interest in immediate seizure of a yacht subject to civil forfeiture justified dispensing with the usual requirement of prior notice and hearing" because "the yacht might have disappeared had the Government given advance warning of the forfeiture action." *Id.*

Here, the Government is not seeking to seize the Building itself prior to the scheduled probable cause hearing, but rather seeks to restrain funds that are in the possession of the

Partnership. Those funds are derived from the Partnership's operation of real property, to be sure, and, as the Court held in *James Daniel Good*, "the right to receive rents" is among the rights of ownership. *Id*. at 54. But this case is governed by *Calero-Toledo* rather than *James Daniel Good* for two reasons: First, in *James Daniel Good*, the Court never considered whether exigent circumstances might apply to the dissipation of the rental income, because only forfeiture of the real property was at issue. Indeed, the forfeiture provision at issue in *James Daniel Good*, 21 U.S.C. § 881(a)(7), applies only to real property and does not provide for forfeiture of traceable proceeds, and the opinion has no discussion of the risk of dissipation of the rental income, but only discussion concerning the real property itself. *See generally id*. at 57-59. Here, in contrast, the Government seeks forfeiture of both the Building *and* all income derived from the Building, because the income is separately and independently forfeitable as property traceable to proceeds of IEEPA offenses and traceable to property involved in money laundering (*i.e.*, both the Building and the Partnership). Like the yacht in *Calero-Toledo*, the Partnership's cash is highly susceptible to dissipation, as shown by Claimants' history of doing just that and their stated intentions to continue doing so.

Second, in *James Daniel Good*, the seizure at issue interfered with the claimant's "right to receive rents," an interference that was part of the Government's broad authority "to prohibit sale, but also the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property." *Id*. at 54. Here, the Government seeks none of those things. Rather, the Government seeks a restraining order applicable to the Partnership's cash that will not interfere with the Partnership's right to receive rents, but will only prohibit the Partnership from taking steps to render that income unavailable for forfeiture. The Partnership will continue to

41

receive rental income, will continue to (subject to the Trustee's oversight) have full authority

over the Building and its operations. The Government has no role, and will continue to have no

role in those matters. Nor will the requested restraining order interfere with the Partnership's

ability to spend funds on expenses relating to the business of the Partnership: the operation,

maintenance, and improvement of the Building. Indeed, *James Daniel Good* itself recognized

that "the Government . . . has various means, short of seizure, to protect its legitimate interests in

real property," citing, among other things, the availability of "an *ex parte* restraining order, or

other appropriate relief, upon a proper showing in district court." *Id.* at 58-59.

In sum, even if the restraint of the Funds amounts to a seizure of real property, the fact

that the Partnership's income is derived from its ownership of real property does not immunize

that income from the ordinary principles that apply to justifiable pre-hearing restraints. Here, the

Government has a "valid governmental interest . . . that justifies postponing the hearing until

after the event," *id.* at 53, based on the certainty of dissipation of property that is subject to

forfeiture and the availability of a means less intrusive than outright seizure to ensure the

continued availability of those funds. Accordingly, pursuant to 18 U.S.C. § 983 or § 985, the

Funds should be restrained pending a hearing on the forfeitability of the Funds. The Government

is prepared to proceed with such a hearing promptly.

## CONCLUSION

For the foregoing reasons, the Court should authorize the immediate restraint of the

Funds by re-entering the December 12, 2019 Protective Order and Trustee Order, pending a

probable-cause hearing and determination.

Dated: February 28, 2020
    New York, New York

> Respectfully submitted,
>
> GEOFFREY S. BERMAN
> United States Attorney for the
> Southern District of New York
>
> By:     /s/
>       Michael D. Lockard / Martin S. Bell /
>       Daniel M. Tracer / Samuel L. Raymond
>       *Assistant United States Attorneys*