UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: 650 FIFTH AVENUE AND
RELATED PROPERTIES

08 Civ. 10934 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Following the Court's Opinion and Order dated March 2, 2020 (dkt. no. 2197) granting 650 Fifth Avenue Partnership ("the Partnership") and Alavi Foundation of New York's ("Alavi", together "Claimants") motion to modify the protective order to allow rental income generated by the Building after December 12, 2019 to flow to Claimants, the Court reviewed correspondence and held a conference with the parties and with the Monitor with respect to precisely how the amount of income released to the Claimants should be calculated. Aside from a minor dispute about whether net income should be calculated on an accrual basis or an actual cash basis,[1] the major disagreement between

---

[1] Calculating the Building's net income on an accrual basis for this time period results in a greater availability of net income than using an actual cash basis, because the Partnership's actual expenses in December exceeded its actual cash receipts, based largely on a property tax payment due that month. The Court finds that using the accrual method is more equitable under the circumstances because it reflects the reality that the Partnership, under the Monitor's supervision, anticipates and makes advance provision for non-monthly expenses like tax payments and will continue to do so.

1

the parties relates to which expenses are properly deducted in determining net income available for distribution to Claimants.  For the reasons set forth below, the Court finds that the capital expenditures made for the Building after December 12, 2019, including base Building improvements and tenant improvements, were necessary to maintain and preserve the Building and thus were appropriately excluded in calculating net income for distribution to Claimants.

I.   FACTUAL BACKGROUND

The expenses deducted from gross income of the Building in December 2019 and January, February, and March (estimated), 2020,[2] include expenses categorized, for accounting purposes, as operating expenses and expenses categorized as investing activities (or capital expenses).

Operating expenses include those expenses required for the mere physical operation of the Building, such as repairs and maintenance, utilities, security services, and the like. Investing activities, or capital expenses, are expenses related to the core business function of the Building: attracting and retaining rent-paying tenants. This category of expenses

---

[2] The precise figures are contained in the parties' sealed submissions.  The Court authorized the filing of that material under seal because it contains confidential business information.

includes leasing commissions paid for the signing of new leases; advertising activities to attract tenants; tenant improvements, which are physical changes to rental space to make it ready for a new tenant to move in or to retain the existing occupant; and Building improvements for things such as necessary infrastructure repairs or to make vacant space that is not subject to a new lease attractive to prospective tenants.  As noted by the Monitor: "These expenses are necessary to operate and maintain the value of the Building . . . ." (Memorandum of Monitor Roberts, Exhibit A to the Government's sealed letter of April 5, 2020 [dkt. no. 2236]).

As set out in the Quarterly Reports of the Monitor, the Building has budgeted for and incurred capital expenses every year of the Monitor's term, including expenses classified as tenant improvement expenses and Building improvements.  These expenses are budgeted on an annual basis based on the professional analysis and advice of the investment and real estate advisors retained by the Monitor with the Court's approval and carried out based on contracts signed by the Partnership with relevant contractors and vendors. Tenant improvements typically are required by lease provisions in order to, as described above, make a particular rental space suitable for the particular tenant. Base Building improvements include work performed on the Building required by Building code or

other law, by operational needs, or by marketing needs to make vacant space ready for prospective tenants (and, in such cases, can reduce the need for tenant improvements when a new lease is signed). Unbudgeted base Building improvement expenses can arise based on unanticipated work required on the Building.

The expenses categorized as base Building expenses for fiscal year 2019, which runs from April 1, 2019 through March 31, 2020, primarily relate to "prebuilt" projects on vacant space in two floors of the Building, which were budgeted at the beginning of the year.  The capital expenses in December, January, and February resulted principally from pre-existing Partnership contractual obligations with contractors and vendors, and the Monitor has estimated the amount expended in March.

II.  DISCUSSION

Claimants concede that the capital expenses made post-December 12, 2019 are appropriately included in the determination of net income but argue that any expenses characterized as either base Building improvements or tenant improvements are (a) for the purpose of improving the Building rather than preserving its value, and (b) the release of net income to Claimants should not be deducted for these past expenses because Claimants did not have input into whether they should have been made.  Essentially, Claimants ask the Court to

4

order that funds be released to them that do not reflect the Building's actual expenses for the time period from December 19, 2019 through March 31, 2020.

As to the capital expenses, including base Building improvements and tenant improvements, the Court does not accept Claimants' attempt to draw a categorical distinction between operating expenses to preserve the value of the Building and capital expenses to improve the value of the Building.  Their complaints are based on a cramped view of the Monitor's mission to "maintain[] and preserve" the value of the Building. It is not sufficient merely to perform that maintenance that will keep the Building standing or keep it compliant with applicable codes.  Rather, the value of the Building is in its ability to attract tenants willing to pay the highest rents reasonably obtainable in a competitive commercial rental market, and the expenditures approved by the Monitor and executed by her agents have demonstrably done that.

As the Monitor explained at the March 24, 2020 teleconference:

> In order for the Building to basically continue to operate, because we have, of course, always a certain amount of turnover, vacancy, etc., there has to be continuing investment in making the space available and attractive to tenants. And so I think this notion that tenant improvements and capital improvements are somehow beyond maintaining the value of the Building is a little bit

5

> more complex than is being presented
> because, essentially, in order to keep the
> revenue at the -- certainly at the level
> that we are currently experiencing, we have
> to anticipate that we will have vacancies
> coming up in the future. In fact, we have
> projections along those lines. And then, in
> order to attract tenants to replace
> departing tenants, a certain amount of work
> has to be done, commissions have to be paid,
> etc.
>
> I think that the notion that somehow
> engaging in tenant improvements and certain
> capital expenditures is beyond the mandate
> of quote/unquote maintaining the value of
> the Building, Judge, simply reflects a
> misunderstanding of how an entity of this
> kind, a class A real estate property,
> continues to be able to operate and to bring
> in the income that is the income that the
> foundation needs to pay its expenses.
>
> \*\*\*
>
> I and whoever has been the nominal
> decision-maker have been able to work
> together and been substantially in agreement
> on what steps ought to be taken to maintain
> the value of the property and to be sure
> that it keeps up with its competition in the
> marketplace, which is, of course, even more
> crucial given the economic situation that we
> are facing at the present time.

(Mar. 24, 2020 Tr. 14-16).

As further described by the Monitor:

> [T]he Building regularly and
> necessarily incurs "capital expenses"
> related to the basic maintenance of the
> Building as well as expenses necessary to
> retain and attract tenants, such as tenant
> improvements and leasing commissions, and

6

> improvements to the Building's common spaces. These expenses are necessary to operate and maintain the value of the Building, but for accounting and tax purposes are categorized as "capital" as opposed to "operating" expenses. To the extent the Building has available financial resources, it may also choose to attract tenants by constructing so- called "pre-built" offices that relieve prospective tenants of the initial financial burden of Building out raw space.

(See Ex. A to the Government's April 5, 2020 letter [dkt. no. 2236]). Accordingly, the Court finds that all of the expenses, including base Building improvements and tenant improvements, were necessary to preserve and maintain the Building and thus were properly deducted in calculating net income.

Claimants also argued that they were not consulted with respect to the post-December 12, 2019 capital expenses. To help decide this issue, the Court asked the Monitor whether the budgets are published and, if so, whether Claimants have disagreed with the proposed expenditures in the past. The Monitor very promptly prepared a letter detailing the budgeting process over time, and the parties were invited to comment. No party did so.

As set out in detail by the Monitor in a Memorandum to the Court on the Building's past budgetary practices,[3] generally

---

[3] A copy of that Memorandum containing minor redactions of personal information is attached to this order.

during those periods when there has not been a judgment outstanding against the Building, "the budgetary process was largely collaborative" and has involved Building "management," Alavi as managing partner of the Partnership that owns the Building, its management and leasing agents, the Monitor, and her asset advisor.[4]  The annual budget is formally approved by Alavi as managing partner, although the Monitor has ultimate decision-making authority.  The Monitor also notes that she "do[es] not recall any significant differences of opinion regarding the capital budget during th[e] time" prior to the entry of summary judgment.  She also notes that after the reversal of summary judgment (when Alavi was reinstated as Building manager), "to my recollection, there were no significant disagreements or objections with respect to decisions regarding operations or capital projects."  After the Court's February 13, 2020 order, Alavi resumed its management role, and "all the members of the 650 management team have worked together cooperatively and to date have had no disagreements regarding the operation of the Building."  The

---

[4] For example, following the entry of summary judgment in 2013, Alavi was removed from any management role; following the reversal of summary judgment in 2016, Alavi was reinstated as Building manager; following the jury verdict in 2017, Alavi was again removed; and following the Court's February 13, 2020 order, Alavi was reinstated.  All these actions were taken pursuant to Court order.

Monitor also notes that "the approved budget is maintained by management (it is a proprietary document that is not distributed to the limited partner or any other entity outside of 650 Fifth Avenue)."

As to the specific capital expenditures that Claimants object to in the December 12, 2019 to March 31, 2020 time period, they were made pursuant to a budget developed and implemented under the authority of the Second Circuit's stay order, which was in effect from January 2018 until December 12, 2019, and is consistent with the systematic, professional approach to budgeting that has been followed for the past ten years. As the Monitor points out, the capital expenses paid since December 12, 2019, "were made pursuant to the approved budget for 2019-2020 and were owing pursuant to contractual commitments made to vendors for approved projects." (See Ex. A).

Thus, to the extent that Alavi complains that it was not consulted regarding the specific capital expenditures post-December 12, 2019, that is because of the posture of the case. As the Monitor points out, "[f]ollowing the jury verdict in June 2017, the Alavi Foundation was again removed by Court order from any role in managing the Building, which became my sole responsibility as Trustee. (During this period the Alavi Foundation was not consulted regarding budgetary matters and did not receive copies of approved budgets.)". That only changed

following the Court's February 13, 2020 order, at which time Alavi reassumed its management role.  Accordingly, Alavi has no cause to complain about its not being consulted with respect to the post-December 12, 2019 capital expenditures because that circumstance was required by order of the Second Circuit.

III. CONCLUSION

For the reasons set out above, the Court concludes that the capital expenditures made for the Building since December 12, 2019, including base Building improvements and tenant improvements, were necessary to maintain and preserve the Building and thus were appropriately excluded in calculating net income for distribution to Claimants.

**SO ORDERED.**

Dated:    New York, New York
          April 29, 2020

_____
LORETTA A. PRESKA
Senior United States District Judge



April 16, 2020

Honorable Loretta A. Preska
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

By email to PreskaNYSDChambers@nysd.uscourts.gov
Corrected version sent April 20, 2020

    Re:  In Re 650 Fifth Avenue and Related Properties, No. 08 Civ. 10934 (LAP)

Dear Judge Preska,

    I am writing in response to the questions you submitted to me by email on April 15, 2020:

    Are the budgets for the building disclosed in advance to Claimants?

    If so, have they ever complained?

    The answers to these questions require an understanding of the budgetary process and the changes in the responsibility for managing 650 Fifth Avenue and the budgetary process over the course of this litigation as a result of court orders.

    First, I assume that your reference to "Claimants" pertains to the Alavi Foundation and 650 Fifth Avenue Company.

    As you know I was appointed as Monitor in April 2010 and have also acted as Interim Trustee and Trustee pursuant to subsequent orders of the District Court and Second Circuit.

    The 650 Fifth Avenue Company fiscal year ends on March 30. Historically, the ownership and its management and leasing agents (currently Cushman & Wakefield) develop a budget for the Building, including capital expenditures, that is finally "approved" by the beginning of the next fiscal year, i.e., April 1. The process consists of a number of meetings and discussions regarding the operational needs of the Building and projections of revenue from existing leases and the likelihood of acquiring new tenants. The discussion of capital expenditures necessary to acquire new tenants necessarily includes consideration of the costs associated with new leases including marketing, leasing commissions, and tenant improvements and rent concessions that are based on market expectations. New tenants may choose to build out their space or contract with the landlord to construct the space to tenant specifications. There

is, of course no way to predict with certainty what options a prospective tenant may choose. Accordingly, during the budget process management attempts to make educated guesses regarding realistic expectations for the costs associated with filling existing vacancies (or expiring leases) based on market information and observed trends regarding what strategies have been successful in attracting tenants. Over the last decade, demand has increased for so-called "pre-built" office space, which allows a tenant to move in without incurring construction costs and delay. The costs associated with designing and prebuilding are advanced by the landlord and recaptured through increased rental rates.

Until the execution of the Master Lease for the retail space in late 2013, 650 did not have sufficient funds to engage in any significant capital programs, but eventually built up capital reserves that allowed the Building to include in its budget the "prebuild" of selected vacant units and eventually entire floors. This strategy has proved remarkably successful in dramatically reducing the vacancy rate of the Building.

Ultimately, the budget for each year is formally approved by management, i.e., the ownership of the Building. "Management" in the context of 650 Fifth Avenue has historically been the Alavi Foundation as managing partner of the partnership that owns the Building. The document that constitutes the approved budget is maintained by management (it is a proprietary document and that is not distributed to the limited partner or any other entity outside 650 Fifth Avenue.) It is used by the managing agent to prepare monthly financial reports that show "variances" in income and expenses from the approved budget, which are reported on a categorical basis (as opposed to project basis), e.g., variance in total leasing commissions tenant improvements, capital expenditures, etc. Variances are reviewed and discussed in bi-weekly meetings attended by management/ownership, the asset advisor and the managing and leasing agent. The capital budget may be revised during the year in response to market conditions and opportunities.

As noted above, participation and decision-making with respect to the budgetary process has varied since my appointment in April 2010, based upon the terms of orders issued by the district court and the Second Circuit. Although as Monitor, I have had ultimate decision-making authority, the budgetary process was largely collaborative prior to the entry of summary judgment in 2013. Houshang Ahmadi, the President of the Alavi Foundation, was responsible for the day-to-day operation of the Building and participated in the budgetary decision-making process along with me, my asset advisor Scopa CRE, and whoever was the managing and leasing agent at the time (initially JLL, which was replaced by CBRE in 2013). I do not recall any significant differences of opinion regarding the capital budget during this time.

As a result of a series of orders entered following the issuance of summary judgment in 2013, the Alavi Foundation was removed from any management role with respect to the Building, which became my sole responsibility. There was no Alavi Foundation representative present at management meetings and the Foundation was not consulted regarding the management of the Building, including budgetary decisions, and had no role in "approving" the 650 budget. During this time, Cushman & Wakefield replaced CBRE as the managing and leasing agent for the Building.

2

Following the reversal of summary judgment in 2016, the Alavi Foundation was reinstated as manager of the Building, subject to my approval of management decisions affecting the value of the Building and a process by which the Court would resolve any disputes between me and the Alavi Foundation. At this point the new President of the Alavi Foundation, Dr. ███████ assumed the role of manager. He was included in all communications regarding the operation of the Building, had full access to the asset management team and management and leasing team, and attended bi-weekly management and leasing meetings held at the Building. He participated actively in all discussions and decision-making regarding the operation of the Building as well as the development of the budget, including capital expenditures. The entire group worked collaboratively and to my recollection, there were no significant disagreements or objections with respect to decisions regarding operations or capital projects.

Following the jury verdict in June 2017, the Alavi Foundation was again removed by Court order from any role in managing the Building, which became my sole responsibility as Trustee. Since that time, I have continued to manage the Building with the assistance of my asset manager and management and leasing agent, including decision-making with respect to capital expenditures. (During this period the Alavi Foundation was not consulted regarding budgetary matters and did not receive copies of approved budgets.) In the fall of 2017, a representative of the United States Marshal's Service, Mitchell Chosak (and on occasion his supervisor, Joanna Summers), began participating more actively in monitoring the operation of the Building (which it had previously been doing by reviewing information regularly submitted to the Government), and began attending the bi-weekly management and leasing meetings held at the Building. During these meetings and through review of documents pertaining to the budget process, Mr. Chosak observed the budgetary process and at times participated in the discussion of budgetary issues, but played no decision-making role and had no decision-making authority with respect to budgetary decisions (he may have received copies of proposed or approved budgets). Following your Honor's February 13, 2020 Order, Mr. Chosak has ceased participating in Building management meetings (although he continues reviewing documents regularly provided to the Government). ███████ has reassumed his management role in anticipation of a revised protective order, including receipt of communications pertaining to the operation of the building and capital expenditures, has attended bi-weekly management and leasing meetings and has participated in operational and budgetary decisions. As in the past, ███ ███ and I and all of the members of the 650 management team have worked together cooperatively and to date have had no disagreements regarding the operation of the Building.

3

Please let me know if you need any additional information. I can be reached by email or at ▮▮▮▮ or ▮▮▮▮.

Respectfully,

*Kathleen A. Roberts*

Kathleen A. Roberts

cc: AUSA Michael Lockard
    Daniel S. Ruzumna, Esq.