UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re 650 Fifth Avenue and Related Properties        :        08 Civ. 10934 (LAP)
                                                              :
                                                              :        ECF Case
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM OF LAW IN SUPPORT OF
### THE GOVERNMENT'S MOTION FOR A STAY PENDING APPEAL


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

Michael D. Lockard
Martin S. Bell
Daniel M. Tracer
Samuel L. Raymond
Assistant United States Attorneys
*- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

Page

Preliminary Statement.................................................................................................1

Procedural History ..................................................................................................... 1

    A.  The Amended Complaint .................................................................... 1

    B.  The Judgment Creditor Claims and Turnover Actions ................................. 3

    C.  Prior Protective Orders ...................................................................... 4

    D.  Post-Trial Stay Litigation................................................................... 6

    E.  The Second Circuit's Stay Pending Appeal......................................... 6

    F.  The Interim Protective Order and Claimants' Motion to Release Funds.................... 8

Discussion ................................................................................................................ 11

    I.  Legal Standard ................................................................................ 11

    II.  Probability of Success on the Merits ................................................. 11

    III. Irreparable Harm ............................................................................. 14

    IV. Injury to other Parties ..................................................................... 15

    V.  The Public Interest .......................................................................... 16

Conclusion ............................................................................................................... 19

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motion for a stay pending appeal of the Court's prior orders directing the release of funds generated from the building at 650 Fifth Avenue (the "Building") from December 12, 2019 until the date of an eventual probable cause hearing. On April 10, 2020, claimants the Alavi Foundation ("Alavi") and the 650 Fifth Avenue Company (the "Partnership" and, together with Alavi, "Claimants") filed a notice of appeal from the Court's orders, in order to seek the release of income generated by the Building since January 2018—approximately ████████ in funds currently restrained in order to be preserved for forfeiture and distribution to victims of terrorism. In light of Claimants' appeal, the Government filed a protective notice of cross-appeal on April 13, 2020, and is seeking authorization to pursue the cross-appeal. *See* Justice Manual § 2-2.121. Accordingly, and for the reasons set forth more fully below, the orders for the release of funds generated since December 12, 2019 should be stayed pending appeal. Claimants have repeatedly advised that they intend to promptly spend those funds by paying them to their attorneys, rendering them unavailable for forfeiture absent the requested stay.

## PROCEDURAL HISTORY

The Court is familiar with the procedural history relevant to this motion. The relevant background is summarized below.

### A.   The Amended Complaint

On November 12, 2009, the United States filed a verified amended complaint (Dkt. No. 51) (the "Amended Complaint" or "Am. Compl.")) alleging that certain properties (the "Defendant Properties") are forfeitable as (a) property constituting or derived from proceeds of violations of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("IEEPA"), and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part

560; and (b) property involved in, or traceable to property involved in, money laundering, in violation of 18 U.S.C. § 1956. *See* 18 U.S.C. § 981(a)(1)(A) & (a)(1)(C). The Defendant Properties include, among others, the building located at 650 Fifth Avenue in Manhattan, New York (the "Building") and all property traceable thereto, including all income generated by the Building; Alavi's partnership interest in the Partnership; properties owned by Alavi in New York, Maryland, Virginia, Texas, and California (the "Alavi Properties"); and the contents of certain bank accounts.

The Building is owned by the Partnership, which in turn is owned by Alavi (60%) and Assa Corp. (40%). Assa Corp. and its offshore parent, Assa Co. Ltd. (collectively, "Assa") were formed by, and have always been owned and controlled by, Bank Melli Iran, an Iranian government-owned bank. *See United States v. Assa Co.*, 934 F.3d 185, 187 n.2 (2d Cir. 2019); *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 197 (2d Cir. 2019) ("Both Assa entities are owned and controlled by Iran."). The Amended Complaint alleges, *inter alia*, that Alavi, Assa, and the Partnership operated the Building for the benefit of the Government of Iran, including departments and agencies of the Government of Iran and Bank Melli Iran; and concealed the Government of Iran's control over Assa, the Building and the Partnership from private litigants and U.S. government authorities. (*See generally* Am. Compl. ¶¶ 19-119). As a result, among other things, the Building generated tens of millions of dollars that were distributed to Assa for Bank Melli Iran's benefit, including after the ITSRs were implemented in 1995 in response to the Government of Iran's continued hostile and malign activities threatening the United States' national security, and even after Bank Melli Iran was designated in 2007 by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") for supporting proliferators of weapons of mass destruction. Furthermore, Alavi and the Government of Iran were able to retain

ownership and control of the Building and its economic value in the face of Alavi's financial unviability absent its ability to enter into and maintain the Partnership, claims by victims of Iran state-sponsored terrorism with unsatisfied judgments against the Government of Iran, and the absence of any licenses from the U.S. Department of the Treasury, Office of Foreign Assets Control authorizing Alavi and the Partnership to operate and maintain the Building.[1]

Claimants filed claims asserting interests in the Defendant Properties, disputing that they are the proceeds of crime or traceable to criminal proceeds and property, and alleging that they are innocent owners. (Dkt. Nos. 54, 56, 167).

### B.    The Judgment Creditor Claims and Turnover Actions

Between January 2009 and March 2010, various judgment creditors of the Government of Iran – victims of Iranian government-sponsored acts of terror who hold unsatisfied judgments for damages against the regime – (the "Judgment Creditors") filed claims asserting interests in the Defendant Properties or in the distribution of the proceeds of those properties (*see* Dkt. Nos. 39-47, 74, 77, 82, 84, 85, 98-101, 110, 122-28, 138, 147 & 248) and filed independent actions for the turnover of the Defendant Properties to satisfy their damages judgments against the Government of Iran.[2] The Government and the Judgment Creditors have entered into a

---

[1] Between 1996 and 2008, the Partnership received more than $228 million in gross rents from the Building. (GX15A). During this time period, the Partnership spent more than $143 million in operating expenses, including the costs of operating, maintaining, and improving the Building. (GX15B). Between 2000 and 2008, Alavi received more than $36.9 million in income from the Partnership. (GX15M). Between 1997 and 2008, Assa received more than $26.9 million from the Partnership. (*Id.*). These all represent money laundering transactions involving the Building and the Partnership. Neither the Partnership, nor Alavi, nor Assa had any significant sources of income other than the Building and proceeds derived from the Building's income. (GX15A-15U). Alavi used its income from the Partnership to pay, among other things, for expenses, repairs, taxes, and improvements for the Alavi Properties. (GX15N-15R). These expenditures of crime proceeds render the Alavi Properties also proceeds, in part, of crime.

[2] *See* Docket Nos. 09 Civ. 165 (LAP), 09 Civ. 166 (LAP), 09 Civ. 553 (LAP), 09 Civ. 564 (LAP), 10 Civ. 1627 (LAP), 10 Civ. 2464 (LAP), 11 Civ. 3761 (LAP), 12 Misc. 19 (LAP), 12

settlement whereby, *inter alia*, the net proceeds of any forfeited property will be distributed to the Judgment Creditors on a *pro rata* basis. (Dkt. Nos. 1122 & 2088).

## C.    Prior Protective Orders

Since shortly after the inception of this action and continuing throughout the recently concluded appellate proceedings, the Court has imposed a series of protective orders to secure, maintain, and preserve the Defendant Properties. In connection with the filing of an initial complaint against Assa's and Bank Melli Iran's property interests in December 2008, the Court issued a Post-Complaint Protective Order pursuant to 18 U.S.C. § 983(j) prohibiting the transfer or encumbrance of the property subject to forfeiture, requiring the preservation of books and records, and requiring the production of records and an accounting from the Partnership and its agents. (Dkt. No. 2).

After the Amended Complaint was filed, the Court appointed former United States Magistrate Judge Kathleen A. Roberts pursuant to § 983(j) to act as monitor for the Partnership, Alavi, and the Defendant Properties. (Dkt. No. 136). Pursuant to that order and subsequent orders, Judge Robert was authorized, among other things, to review and approve any disbursements by Partnership, review and approve any leases or other agreements by the Partnership, oversee operations of the Defendant Properties, review and approve any expenditures by Alavi, and report to the Court. (*Id.*; *see also* Dkt. Nos. 161, 265, 995, 1023, 1408, 1472, 2062 at 16, 2078).[3]

---

Misc. 20 (LAP), 12 Misc. 21 (LAP), 12 Misc. 22 (LAP), 13 Misc. 71 (LAP), 13 Civ. 1825 (LAP), 13 Civ. 1848 (LAP).

[3] Use of the Building's income in order to operate the Building and to maintain the Building and other Defendant Properties has been allowed under every iteration of the Protective Orders.

In an opinion and order dated September 16, 2013, the Court granted the Government's motion for summary judgment as to the forfeitability of Alavi, Assa, and the Partnership's interests in the Building, among other assets. (Dkt. No. 865; *In re 650 Fifth Avenue and Related Properties*, 08 Civ. 10934 (KPF), 2013 WL 5178677 (S.D.N.Y. Sep. 16, 2013)). The Government moved to modify the protective order to prohibit further disbursements of income from the Building except to operate and maintain the Defendant Properties, relying on, *inter alia*, *United States v. Monsanto*, 491 U.S. 600, 612-13 (1989), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989). In an order dated November 22, 2013, the Court found probable cause supporting the seizure and restraint of the Defendant Properties (Dkt. No. 1023 at 4-5) and modified to protective order to prohibit the use of the Building's income for certain purposes, but permitted Claimants to continue to use the Building's income to pay attorneys' fees. (*Id*. at 5-6). On appeal, the order granting summary judgment was vacated and the matter remanded for additional pretrial proceedings, but Claimants did not separately contest the order finding probable cause for seizure. *In re 650 Fifth Avenue and Related Properties*, 830 F.3d 66 (2d Cir. 2016). On remand, the district court amended the protective order to remove certain restrictions on Claimants' use of income generated by the Building pending trial, and returned management authority to Alavi subject to enhanced supervision and approval by the Monitor. (Dkt. Nos. 1408 & 1472).

In June 2017, a jury trial was held on the forfeitability of the Defendant Properties, resulting in a jury verdict finding that Claimants' interests in the Partnership and the Building, as well as funds derived from the Building, were wholly subject to forfeiture as proceeds of IEEPA offenses and as properties involved in or traceable to money laundering, and finding that the Alavi Properties were subject to forfeiture in part as proceeds traceable to IEEPA violations and

5

to properties involved in money laundering. (Dkt. No. 1896). The Court simultaneously
conducted a bench trial, which resulted in findings that the Defendant Properties were subject to
turnover to the Judgment Creditors under the Terrorism Risk Insurance Act and the Foreign
Sovereign Immunities Act. (Dkt. No. 1895).

> **D.**     **Post-Trial Stay Litigation**

On July 27, 2017, Claimants moved to stay the anticipated judgment as well as any
restrictions on the dissipation of assets. (Dkt. No. 1989). In their motion, Claimants argued,
among other things, that "they would cease to be viable as business organizations and would lose
the ability to continue with their legal defense" without the ability to access the proceeds of the
Building. (*Id.* at 6). The Court denied these applications (Dkt. No. 2062) and entered a modified
protective order that, among other things, prohibited the dissipation of forfeitable assets pending
a final judgement of forfeiture. (Dkt. Nos. 2078 & 2089). The pre-judgment protective order
prohibited spending the Building's income on future attorneys' fees.

Between approximately mid-2016 and the effective date of the post-trial stay order, Alavi
and the Partnership expended more than $19 million in forfeitable Building income on legal fees,
expended nearly ▮▮▮▮▮▮ in gifts to third parties, and spent approximately ▮▮▮▮▮▮ on Alavi
operations (principally officer salaries and board member honoraria). Thus, in approximately one
year, more than ▮▮▮▮▮▮ in forfeitable property was dissipated on expenditures unrelated to
the operations and maintaining the value and availability of the Defendant Properties, which will
never be recovered. When, as discussed below, the Second Circuit temporarily lifted restraints on
the use of forfeitable funds, total attorneys' fees expenses grew to nearly $23.9 million.

> **E.**     **The Second Circuit's Stay Pending Appeal**

On or about October 12, 2017, Claimants filed a notice of appeal. During the course of
the appellate proceedings, Claimants petitioned the Court of Appeals three times for permission

to spend income derived from the Building. First, upon filing their notices of appeal, Claimants sought a stay pending appeal and an emergency stay. (2d Cir. Case No. 17-3258, Dkt. No. 13). Claimants requested, among other things, the ability to use income from the Defendant Properties to pay expenses, including legal fees. Claimants represented to the Court of Appeals that, without access to those funds, "Claimants could be precluded from pursuing this appeal at all." (*Id.* at 18 n.1; *see also* 2d Cir. Dkt. No. 70 (Claimants' reply brief) at 19 (preventing Claimants from using income from the Building to fund their defense "would effectively bar Claimants from pursuing this appeal at all")). On November 16, 2017, the Court of Appeals granted Claimants' motion and entered their proposed order. (2d Cir. Dkt. No. 94).

The Government sought reconsideration of that portion of the order permitting the expenditure of the Building's income for purposes other than operating and maintaining the value of the Defendant Properties, including expenditures for legal fees and Alavi's administrative expenses. (2d Cir. Dkt. No. 98). The Government argued that such expenditures are contrary to *Monsanto* and *Caplin & Drysdale*, and should be prohibited. Claimants opposed, repeating their argument that, if denied access to income from the Building, they "would be forced to close [their] doors before [they] even has an opportunity to exercise [their] appellate rights, and would be unable to pursue this appeal." (2d Cir. Dkt. No. 100 at 3). The Court of Appeals rejected Claimants' argument and entered an order pursuant to *Monsanto* and *Caplin & Drysdale* prohibiting further expenditures of funds generated by the Defendant Properties except in order to maintain the Defendant Properties. (2d Cir. Dkt. No. 115).

Claimants moved the Court of Appeals for further reconsideration and to allow the expenditure of the Building's income for expenses and legal fees. Claimants argued that *Monsanto* and *Caplin & Drysdal*e did not apply and asserting once again that Claimants would

be unable to litigate their appeal without access to funds. (2d Cir. Dkt. No. 116). The Court of Appeals denied the motion on February 13, 2018. (2d Cir. Dkt. No. 138). Notwithstanding these repeated representations about being unable to participate further in the appeal without access to the Building's income, Claimants in fact continued to vigorously press their appeals from both the forfeiture and turnover judgments while represented by two international law firms. Claimants – as was their right – filed numerous oversized motions and oversized briefs and participated in an extended oral argument before the Court of Appeals with split argument.

      **F.**     **The Interim Protective Order and Claimants' Motion to Release Funds**

On August 9, 2019, the Court of Appeals vacated the forfeiture judgment and remanded for further proceedings. *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 153 (2d Cir. 2019). On August 30, 2019, Claimants asked the Court of Appeals to modify the stay order to permit the expenditure of the Building's income on legal fees and other expenses. (2d Cir. Dkt. No. 320). Claimants raised the familiar argument that, otherwise, "Claimants will not be able to . . . fund their legal defense." (*Id.* at 4). On December 12, 2019, the Court of Appeals denied that motion without prejudice to addressing the request to this Court. (2d Cir. Dkt. No. 336).

That same day, the Court entered an interim Protective Order on the Government's motion. (Dkt. No. 2162 (the "Interim Protective Order")). The Government's application, which was made with notice to Claimants, requested the immediate entry of the Interim Protective Order in light of the exigent circumstances created by the issuance of the mandate and termination of the Second Circuit's stay order. (*Id.*). The operative terms of the Protective Order mirrored those ordered by the Second Circuit throughout the appellate proceedings, and ensured that the value of the Defendant Properties would be maintained and preserved pending the resolution of disputes regarding the scope of the protective order.

On January 8, 2020, Claimants moved to modify the Interim Protective Order to return to the terms governing prior to the 2017 trial, arguing that the Supreme Court's holdings in *Monsanto* and *Caplin & Drysdale* do not apply in civil forfeiture proceedings, and that the Building's rental income was not subject to forfeiture in any event because the monitor's role in the management of the Building precluded the income from being crime proceeds. (Dkt. Nos. 2175 & 2176). In the alternative, Claimants argued, among other things, that the Interim Order should be vacated in its entirety because restrictions on Claimants' use of income generated by the Building amounted to a seizure of real property without a probable-cause determination and prior notice and opportunity to be heard, in contravention of *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), and 18 U.S.C. § 985(d)(1)(B). Claimants argued that a probable cause determination could not be made until after all outstanding discovery and suppression issues were resolved. The Government opposed Claimants' motion. (Dkt. No. 2181).

In an order dated February 13, 2020, the Court granted Claimants' motion in part, ordering the release of income generated by the Building from the date of the Interim Protective Order until the date of any eventual probable cause determination. (Dkt. No. 2191). In an opinion and order dated March 2, 2020, the Court set forth its legal conclusions. (Dkt. No. 2197 (together, the "Release Orders")).

On February 28, 2020, the Government filed an *ex parte* application to restrain the Partnership's funds, arguing that exigent circumstances created by Claimants' express intentions to dissipate the funds, rendering them unavailable for forfeiture, permitted the Court to make a probable cause finding prior to notice and an opportunity to be heard. (Dkt. Nos. 2196 & 2200 (the "TRO Application")). The Court converted the *ex parte* application into a motion on notice,

with an opportunity for Claimants to be heard. Claimants opposed (Dkt. Nos. 2205 & 2206), and the motion remains pending.

On April 10, 2020, Claimants filed a notice of appeal, and on April 14, 2020, filed their principal brief. Claimants argue that the Court erred in ordering the release of funds only from December 12, 2019 forward. (*See generally* 2d Cir. Case No. 20-1212, Dkt. No. 15). Claimants argue that they are entitled to all funds generated from the operation of the Building since January 5, 2018, the date of the Second Circuit's *Monsanto* order. (*Id.*). The value of those funds is approximately ████████. (*See* Thirty-Eighth Quarterly Report of Monitor Kathleen A. Roberts (Feb. 10, 2020). Claimants assert that they require access to these funds in order to pay attorneys. (*Id.*). On April 23, 2020, Claimants moved for an expedited appeal, which the Second Circuit granted in an order dated April 27, 2020.[4] According to the schedule set by the Second Circuit, briefing will be completed by July 29, 2020 and "[t]he appeal shall be heard as soon as practicable after briefing is completed." (2d Cir. Case No. 20-1212, Dkt. No. 56).

In light of Claimants' appeal and efforts to dissipate approximately ████████ in assets subject to forfeiture, the Government filed a cross appeal to preserve its ability appeal the release of funds since December 12, 2019. (Dkt. No. 2243). As required by the Justice Manual, the Government is seeking authorization from the Solicitor General to pursue the appeal. *See* Justice Manual § 2-2.121; 28 C.F.R. § 0.20(b).

---

[4] Claimants requested that all briefing be completed by May 28, 2020, and that a decision be issued by June 15, 2020. The Government supported the motion to expedite, but requested a less compressed briefing schedule which was adopted by the Court of Appeals. (2d Cir. Case No. 20-1212, Dkt. Nos. 39, 51).

## DISCUSSION

### I.     Legal Standard

In considering a stay pending appeal, a court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). "[W]hen a serious legal question is involved," the movant does not need to show that it is more likely than not to succeed, but rather "the movant need only present a substantial case on the merits . . . and show that the balance of the equities weighs heavily in favor of granting the stay." *LaRouche v. Kezer*, 20 F.3d 68, 72–73 (2d Cir. 1994). "[T]he degree to which a factor must be present varies with the strength of the other factors, meaning that more of one [factor] excuses less of the other." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (internal quotations omitted); *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) ("[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay") (internal quotations omitted). "[T]he public interest in granting the stay depends on the strength of the Government's case." *United States v. $1,399,313.74 in U.S. Currency*, 613 F. Supp. 2d 433, 436 (S.D.N.Y. 2009).

### II.    Probability of Success on the Merits

The cross appeal satisfies the requirement of establishing a probability of success on the merits. As the Government argued in opposing Claimants' motion to modify the Interim Protective Order, the relevant restraining provisions are governed by 18 U.S.C. § 983(j), rather that § 985. Though § 985 governs forfeitures of "real property and interests in real property," 18 U.S.C. § 985(a), (f)(1); the provisions of that section that mandate a probable cause hearing

apply only to pretrial seizures of "real property," and not of "interests in real property." *See* 18

U.S.C. § 985(b)(1), (d)(1). Accordingly, § 985(d)(1) does not apply to seizures of interests in

funds generated by the operation of real property. Section 985 also distinguishes between

"seizures" and restraining orders; the pretrial seizure provisions apply only to "seizures" and not

to restraints. *Compare* § 985(d)(1) (describing when "[r]eal property may be seized"), *with*

§ 985(d)(2) (seizure based on exigent circumstances requires showing that "less restrictive

measures such as . . . a restraining order . . . would not suffice") *and with* § 985(f)(3) (this section

"shall not affect the authority of the court to issue a restraining order relating to real property").

Claimants have not cited, and the Government is not aware, of any case applying § 985(d)(1)

solely to provisions of a restraining order governing funds generated by a business operating real

property. Accordingly, there is a probability of success with respect to the Government's

argument that the Interim Protective Order is governed by 18 U.S.C. § 983(j), which generally

governs restraining orders and other measures, rather than § 985(d)(1).

In addition, in the event that the Second Circuit were to conclude that a prior probable

cause determination was required for the restraining provisions of the Interim Protective Order

and that no such determination was made, the appropriate remedy would not be to release the

funds at issue but to determine whether probable cause exists. *United States v. Cosme*, 796 F.3d

226, 236 (2d Cir. 2015) ("[E]ven when the initial seizure is found to be illegal, the seized

property can still be forfeited.") (quoting *United States v. Daccarett*, 6 F.3d 37, 46 (2d

Cir.1993)). In *Cosme*, the Second Circuit held that funds in certain bank accounts were

improperly restrained without a warrant or judicial finding of probable cause, but rejected the

claimant's argument that the funds should be released. Instead, the Circuit remanded for the

district court to determine whether probable cause existed. 796 F.3d at 236. The Second Circuit

similarly has held that, where property subject to forfeiture is unlawfully seized, the remedy is not to dismiss the forfeiture claims or immunize the property from forfeiture. *Daccarett*, 6 F.3d at 46 (citing *United States v. $37,780 in United States Currency*, 920 F.2d 159, 163 (2d Cir. 1990)); *see also United States v. Parcel of Property*, 337 F.3d 225, 234 (2d Cir. 2003) ("an illegal seizure standing alone did not immunize property from forfeiture") (citing *United States v. Premises and Real Property at 4492 South Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir. 1989)). In the cases from other Circuits that Claimants rely on, directing the return of income generated by unlawfully seized real property, the income was not independently subject to forfeiture; it was seized only by virtue of the unlawful seizure of the real property itself. *United States v. 1461 W. 42nd St., Hialeah, FL*, 251 F.3d 1329, 1335-36 (11th Cir. 2001); *United States v. Marsh*, 105 F.3d 927, 932 (4th Cir. 1997); *United States v. 51 Pieces of Real Property, Roswell, NM*, 17 F.3d 1306, 1315 (10th Cir. 1994). Here, the forfeiture claims encompass all property traceable to the Building, including the rental income generated by the Building. Indeed, a jury has previously found that the Building and the Partnership are subject to forfeiture, as well as funds that Alavi received from the Partnership. (Dkt. No. 1896). Accordingly, there is a probability of success with respect to the Government's argument that the remedy was to determine if probable cause to restrain the funds exists, rather than to release the funds and render them unavailable for forfeiture.

Even if the Court were to disagree that the Government is more likely than not to succeed on the merits, the cross-appeal presents a sufficiently "substantial case on the merits" weighing in favor of a stay pending appeal.  This is especially true where, as further detailed below, the remaining factors and the balance of the equities weigh heavily in favor of a stay.

### III.    Irreparable Harm

The factor of irreparable harm tilts decidedly in favor of a stay pending appeal. Claimants have repeatedly asserted that the purpose of their efforts to lift restraints on the use of the Partnership's funds is to use them to pay attorneys' fees—that is, to dissipate them. Indeed, Claimants have asserted that even with the release of the Building's net income from December 2019 forward, their outstanding attorneys' fees still exceed the amount of available funds. (2d Cir. Case No. 20-1212, Dkt. No. 14 at 9).  Thus, absent a stay, funds subject to forfeiture claims will be dissipated and rendered unavailable for forfeiture.

When the assets that are the subject to a potential judgment litigation are subject to dissipation in the absence of a stay, irreparable harm results. *See Elliott v. Kiesewetter*, 98 F.3d 47, 58 (3d Cir 1996) ("That irreparable harm would occur absent an asset freeze is even more apparent where the very assets subject to a potential judgment will likely be dissipated without entry of the order."). As one district court observed when granting a stay pending appeal from a summary judgment order dismissing forfeiture claims against certain assets (but denying summary judgment with respect to other assets), "[i]f the properties were released to the claimants, they would be dissipated. The result would leave the Government without remedy if it were to prevail on appeal." *United States v. Eleven Vehicles*, Civ. No. 91-6779, 1995 WL 635332, *3 (E.D. Pa. Oct. 24, 1995); *see also United States v. $1,399,313.74 in U.S. Currency*, 613 F. Supp. 2d 433, 435 (S.D.N.Y. 2009) (when, "if a stay is not granted, there would be nothing to stop them from transferring the Defendant Funds out of the country," the irreparable harm factor favored granting a stay pending appeal, but denying a stay on other grounds). The certainty of irreparable harm to the Government is grounds for granting the requested stay even if the Court were less sure of the probability of success – though as set forth above there is a substantial probability of success or, at a minimum, a substantial case on the merits.

14

## IV.     Injury to other Parties

The third factor, injury to other parties, also tilts decidedly in favor of a stay pending appeal. Here, the net proceeds of forfeited assets will be distributed to victims of terrorism. The aggregate amount of the Judgment Creditors' unsatisfied compensatory damages judgments against the Government of Iran exceed the value of the Defendant Properties. Absent the requested stay, these victims will lose out on millions of dollars of potential recovery.

In contrast, there is limited injury to the Claimants from a stay. As the *Eleven Vehicles* court observed, "Claimants will, of course, suffer some harm since they are denied access to their property. However, the stay will be in effect for a relatively short period of time. This factor also favors the issuance of the stay, but does not compel it." 1995 WL 635332, at *3. Here too, the Claimants would be "denied" access to their property only for a relatively short period of time, especially in light of the expedited appeal schedule set by the Circuit. *See supra* at 10. And the extent of that denial is extremely limited: the Partnership will not be denied access to any of the disputed funds for purposes of continuing its business, that is, the operation and maintenance of the Building. Similarly, under the Interim Protective Order, income from the Building could be used for necessary maintenance and repairs at the Alavi Properties. The Claimants will only be precluded from using the funds for other purposes, and neither the Building nor the Partnership as a business enterprise are in any jeopardy.

To the extent that Claimants may assert potential harm from their inability to pay attorneys' fees while the appeal is pending, as they asserted in moving to expedite the appeal (*see* 2d Cir. Case No. 20-1212, Dkt. No. 51), that type harm is of limited weight under the Supreme Court's decisions in *Monsanto* and *Caplin & Drysdale*. Moreover, such harm already is ameliorated by the expedited appeal schedule, and can be further addressed by any schedules set by this Court pending the Circuit's decision. And, finally, it bears noting that, despite Claimants'

15

repeated assertions over the past years that they cannot continue to employ counsel without access to the Building's income, *see supra* at 6-8, they have nonetheless continued to be represented at all times.

This factor significantly distinguishes cases where a stay pending appeal was denied, such as *$1,319,313.74 in U.S. Currency* or *In re All Funds in Accounts in Names Registry Pub., Inc.*, 58 F.3d 855 (2d Cir. 1995). In both of those cases, not only did the courts find little or, at best, marginal merit to the Government's forfeiture claims, *$1,319,313.74 in U.S. Currency*, 613 F. Supp. 2d at 433-34 (application for stay related to appeal from dismissal of forfeiture complaint for failure to support a reasonable belief the funds were forfeitable); *In re All Funds*, 58 F.3d at 856 ("we believe it highly unlikely that all of the funds in question can be traced to [alleged false statements] in view of the fact that the concrete services or items promised by the claimants were actually provided and that the harm appears to have been of an intangible nature"); but in those cases the claimants also faced financial ruin if they continued to be deprived access to the funds at issue. *See $1,319,313.74 in U.S. Currency*, 613 F. Supp. 2d at 435 ("Claimants now need these funds in order to save their family business and their personal lives from financial ruin"); *In re All Funds*, 58 F.3d at 856 ("continued withholding of these funds will end what chance is left for the commercial success of those claimant companies that are not already in bankruptcy proceedings"). Here, in contrast, the Government's forfeiture claims are supported by powerful, diverse, and highly corroborated evidence, and the Partnership and its primary asset, the Building, will continue to operate unimpaired during the course of the expedited appeal.

## V.    The Public Interest

The public interest also weight in favor of a stay pending appeal. As noted above, absent the requested stay, millions of dollars in forfeitable assets will be dissipated and unavailable to

the victims of terror who may ultimately be able to collect from them. Moreover, the

Government's case is extremely strong and seeks to protect vital United States interests. With

respect to the strength of the case, the Government's evidence is outlined in detail in its TRO

Application, and includes, among other things, secret internal Government of Iran

correspondence and memos documenting the conspiracy; insider testimony by former Alavi

board members and Bank Melli Iran officers; internal Alavi letters and board minutes

demonstrating its control by the Iranian Government, including directions from the Iranian

Ambassador to the United Nations and from the Ayatollah himself; admissions by Alavi board

members; Bank Melli Iran correspondence reflecting Alavi's involvement in and knowledge of

Bank Melli's formation and ownership of Assa; and the destruction of documents by Alavi's

President in order to obstruct a grand jury investigation that threatened to reveal the truth. (*See

generally* TRO Application at 4-25). Alavi's partner for nearly 20 years, Assa, has conclusively

been adjudged an arm of the Iranian government. *Kirschenbaum v. Assa Corp.*, 934 F.3d 191,

197 (2d Cir. 2019). In the face of this overwhelming evidence, Alavi has put forth weak and

inconsistent defenses, arguing principally that Alavi somehow believed its partner, Bank Melli

Iran, quietly sold Assa (Dkt. No. 2205 at 15-18) (even though nothing else changed about

Alavi's relationship with Assa, including Alavi's persistent dread about the risk of Bank Melli's

ownership being revealed), or that the illegal conduct had been going on so long that the

Government should have known about it years prior, thereby triggering a statute of limitations

defense (*id.* at 25) (even though it is uncontested that the forfeiture claims arise out of an

investigation that started within the statute period, and even though the Defendant Properties

would be subject to forfeiture in any event based on ongoing criminal conduct within the statute

period). As the Government explained in its TRO Application, these defenses are unsupported and completely at odds with the record in this case. (TRO Application reply at 4-9; 21).

Likewise, this case seeks to protect significant United States interests. For decades, the policies and actions of the Government of Iran have been recognized as posing an unusual and extraordinary threat to the national security, economy, and foreign policy of the United States, including Iran's pursuit of nuclear weapons, and ballistic missiles capable of delivering those weapons throughout the region and around the world; and its financial, logistical, and military support for terrorist organizations and acts of terrorism.[5]  The ITSRs thus serve to enforce national policy aimed at depriving the regime of funding for its malign and destructive policies and actions and deterring those policies and actions, and forfeiting the proceeds and instrumentalities of violations of the sanctions and money laundering laws. *See United States v. Banki*, 685 F.3d 99, 107 (2d Cir. 2012). Accordingly, the public interest weighs in favor of preventing the release of these forfeitable assets by staying the Release Orders pending the ongoing appeal.

---

[5] *See, e.g.*, Executive Order Nos. 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979) (responding to the Embassy hostage crisis); 12613, 52 Fed. Reg. 41,490 (Oct. 29, 1987) (finding that Iran is actively supporting terrorism as an instrument of state policy and conducting unlawful military actions in international waters); 12957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) (declaring a national emergency with respect to the Government of Iran); 12959, 60 Fed. Reg. 24,757 (May 6, 1995) (same); 13059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) (same).

## <u>CONCLUSION</u>

For the foregoing reasons the Court should stay the Release Orders pending appeal.

Dated: April 29, 2020
      New York, New York

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney for the
                            Southern District of New York

By:             */s/*                     
                            Michael D. Lockard / Martin S. Bell /
                            Daniel M. Tracer / Samuel L. Raymond
                            *Assistant United States Attorneys*