# Exhibit 1

**AFFIDAVIT**

I, Caragh Fay, do hereby solemnly swear and affirm under the penalty of perjury that to the best of my knowledge and recollection the below is a true and accurate recitation of facts:

1. I am over the age of eighteen and an adult resident of the State of Maryland.

2. I am a barred attorney in the State of Maryland and the District of Columbia, as well as various federal court and appellate jurisdictions.

3. I have been actively representing the victims of the October 23, 1983 Beirut Bombings for approximately 20 years at the Fay Law Group, P.A.

4. Prior to taking over as the lead attorney for the Beirut Bombing victims, Thomas Fay, my father, was the senior partner and sole owner of The Law Office of Thomas Fortune Fay, P.A. (currently known as the Fay Law Group, P.A. and one time known as Fay Kaplan Law, P.A.) and was lead counsel for those Plaintiffs.

5. I have been deposed and testified in the arbitration proceeding of *Rothenberg, et al. v. Thomas Fortune Fay, et al.* All such testimony was true and accurate to the best of my knowledge and ability.

6. I am now authoring this affidavit in support and/or opposition to various allegations and statements made in collateral motions by Mr. Rothenberg, his counsel, and the Interim Award issued by the Arbitrator.

7. In or about 2015, I reviewed the QSF Peterson Funds with Adam Zimmerman of the Rothenberg Law Firm, at which point he raised issues on behalf the Rothenberg Law Firm with myself over the manner in which the *Peterson* clients' funds were to be shared with families that the Rothenbergs did not represent.

8. After negotiating back and forth, in order to resolve the Rothenbergs' dispute over which families they should receive a percentage of the attorneys' fees from, we agreed to include two additional families to the 101 families that were previously agreed to in a November 27, 2007 letter:

the Holberton and Boyett families. These two families consisted of the addition of 11 clients. We entered into this agreement in reliance that it satisfied the Rothenbergs dispute over which clients they were entitled to recoveries from in the *Clearstream I* matter.

9. Despite this agreement, the Rothenbergs again raised their issues in various ways to the Trustee and Special Master in the Peterson QSF, all of which were rejected. I believed that Rothenbergs' acceptance of the agreement and payment of the attorneys' fees from the Holberton and Boyett families' recoveries had resolved the fee dispute.

10. Allen Rothenberg had suggested to Fay & Perles that all parties hire Cook as collection counsel for the *Peterson* clients and other terrorism clients, and he even took credit during his testimony as being the one who brought Mr. Cook into the action. Mr. Cook failed to perform on the contract and was terminated. Mr. Cook then attempted to seek funds from the *Clearstream I* action. His pleas were rejected by the Special Master and the courts on numerous occasions, and then he decided to file an arbitration against the Fay, Perles, LaSpada and Rothenberg firms.

11. Mr. Rothenberg threatened to file suit against Fay & Perles over this pending fee dispute on the eve of the Cook Arbitration. Doing so would have created a conflict between the parties and would have destroyed the unified defense theory against Mr. Cook. As a result, we were forced to enter into an arbitration agreement over the already resolved fee dispute under duress and in violation of any perceived implied covenant of good faith and fair dealing that the Rothenbergs assert was established in the November 2007 letter.

12. During the arbitration proceedings, Allen Rothenberg testified in response to the question "Well, who had no right to reduce your fee?" that "[t]he clients and the other attorneys who were going to make additional money on it." (Deposition Testimony Transcript at 151:20 – 152:8). Mr. Rothenberg made other statements during his testimony including stating "the clients didn't have the right to reduce my fee." (Deposition Testimony Transcript at 202:25 – 203:6).

13. After hearing such testimony, I contacted Jack Marshall, Esq. Mr. Marshall is an ethics attorney who provides legal ethics advice to attorneys.

14. Mr. Marshall advised me that under the Rules of Professional Conduct I had a duty to inform the clients of this financial conflict of interest and give them enough information to make an informed choice on how they wished to proceed, as well as providing them Mr. Rothenberg's contact information and including him on the letter so that the matter would not be done "clandestinely" and without Mr. Rothenberg's knowledge. Jack Marshall stated that this was a significant matter in the clients' case and should, therefore, be disclosed even if it is in an arbitration and even if there was a protective order. Jack stated and stressed that the duty to the client comes first.

15. In March of 2024, the letter started to be drafted.

16. I followed the advice of Mr. Marshall and sent a letter to the clients and Mr. Rothenberg on April 14 - 16, 2024. The letter was reviewed by Mr. Marshall in order to ensure that it provided the required information to the clients and was consistent with the Rules of Professional Conduct.

17. Both before and after the April 2024 letter was emailed and mailed to all of the 557 clients, all Fay Law Group employees had a lunch meeting with Jack Marshall to review exactly how to answer client questions and how to address their concerns in order to avoid advocating for any position. There was a complete briefing about the "tortious interference" and things employees are not allowed to say. All employees had the ability to contact Mr. Marshall if they had further questions.

18. I then held two zoom meetings with the clients to answer any questions that they had. Two zoom meetings were held to allow for the clients to find a time that worked best for them knowing that it would be difficult to schedule one meeting for all 500+ clients. Still, not all of the clients showed up.

19. During the zoom meetings, Tim Altimus and myself answered the questions that were posed as diplomatically as we could. Questions and answers that were asked consisted of the following to the best of my recollection:

a. Who is Mr. Rothenberg?

    i. Mr. Rothenberg is one of the attorneys who was on the retainer that you and/or your family member signed in 2001. He assisted us at the initial stages of the litigation, but he has also testified that he stopped doing work on behalf of the *Peterson* families in 2007.

b. What do we need to do?

    i. That is a decision that is up to you. It is your right to decide who acts as your attorneys in this matter. You can do nothing if you want, you can fire him if you want, you can fire us if you want. If you want to talk to your own personal counsel about the issue, you are free to do that as well. Regardless of what you do, however, your claims should not be affected in any way.

c. Why are you informing us about this?

    i. As your attorneys, we are required to make you aware of and keep you informed of significant matters in your case. When he offered the testimony that he offered, I was not sure exactly how to handle the issue and so I contacted an ethics lawyer who advised me that I had a duty to provide you with that information. That is why I am providing you with this information.

d. Many clients also asked to be provided a form or language for them to terminate Mr. Rothenberg. I informed them that if they wanted to terminate Mr. Rothenberg that was a decision that they needed to arrive on on their own and that I could not provide them with such a form or any such language.

20. While this is merely a synopsis and paraphrased overview of the communications, Mr. Altimus and myself at no point in time advocated for the termination of Mr. Rothenberg.

21. At the time that I was holding the zoom meetings, I was very tentative and measured in my responses because I was not happy that I had been put in the position that I had been advised by ethics counsel that I had to report such conduct to the clients. I did not want or desire to issue the April 2024 letter nor to hold these zoom meetings, but I knew that my ethical duties required it of me, especially once another ethics attorney advised me of the requirement to do so. I took no pleasure in these actions.

22. If any clients interpreted my hesitancy and measured responses as an indication to terminate Mr. Rothenberg, that was not my intention. My intention was to provide them with the information that I was told constituted a conflict of interest and to answer any questions they had to allow them to make an informed and reason decision on their own.

23. Claimants then filed a motion for sanctions over the April letter and shortly thereafter Order Number 7 was issued.

24. My review and understanding of Order Number 7 was that I was not to deny Mr. Rothenberg access to any potential attorneys' fees that would come in between the date of the order and the issuance of a Final Award and that I was not to object to his recovery of his 1/3 of those fees if they came in during that time period. I had no problem with that as that was how we had been proceeding from day one.

25. After I had concluded the two zoom meetings, in consultation with Mr. Marshall, I understood that my ethical obligations had been fulfilled, and I did not take any further steps to address the matter. As time went on, I did continue to meet with Mr. Marshall to review responses from the clients and I did discuss Order Number 7 with him as I was aware that there could be potential problems associated

with the order once I became aware that some clients did in fact terminate Mr. Rothenberg, but distribution was not immediately available and I was unsure as to how many clients terminated him.

26. In my mind, I had become aware of a conflict of interest, I had sought counsel on what I was required to do under the Rules of Professional Conduct, I took the steps that ethics counsel advised me to take, and I had satisfied my duty to the clients under the Rules of Professional Conduct. I was done with the matter.

27. I did not hear another word nor discuss another word of the conflict until sometime in mid to late November of 2024. At that time, the attorneys working for the clients were focused on the 650 Fifth Avenue case settlement because Judge Preska seemed to be pushing for immediate action, to which I needed to comply.

28. In the November of 2024 time frame, advancements had been made in the 650 Fifth Avenue Collection case, and I also had started to receive word that a USVSST disbursement would be made shortly.

29. As pertains to the 650 Fifth Avenue Collection case, it was incumbent on me to get client consent on a highly complex – and confidential – proposed settlement agreement and structure. Additionally, Judge Preska had placed a due date on 100% client consent to the settlement agreement and regular reporting back to her.

30. As pertains to the USVSST disbursements, having undertaken distributions of such large sums of money in the past, I understood the preparation and amount of front-loaded work that is required to make the ultimate distributions as error-free and efficient as possible.

31. In order to facilitate both the 650 Fifth Avenue Collection action as well as the imminent USVSST disbursement, I started contacting the clients for their consents and to ensure that we had all of the proper information and individuals needed for each clients' distribution form.

32. In the course of going over the distribution forms, clients inquired about "the Rothenberg Issue." I told them the matter was still pending, and several clients volunteered that they had terminated Mr. Rothenberg, both by mail and e-mail.

33. Being informed that they had terminated Mr. Rothenberg, I had to inquire as to when and how. Because I had previously contacted Mr. Mashall about this matter, I consulted with him again, as referenced in paragraph 25 above, and inquired about what he believed my duties were. I also reviewed Order Number 7 and discussed the implications of the terminations with regard to Order Number 7. During the week between Christmas of 2024 and New Years Day of 2025, I had multiple phone calls with Mr. Marhsall on how to handle the issue of being aware that clients had terminated Mr. Rothenberg but Mr. Rothenberg and his attorney refusing to provide to us the names and information of such terminations.

34. With regard to the implications of the terminations with regard to Order Number 7, the consensus opinion that was arrived at was that Mr. Rothenberg had a claim to 1/3 of any attorneys' fees of those clients referenced in the order and that I needed to make sure that that claim was not extinguished and the money was not disturbed until and unless we had confirmation from the clients that they consented to his receipt of it.

35. Mr. Marshall advised me that I had a duty to learn what the clients' decisions were in order to prepare an accurate distribution form. In order to do so, I needed to learn if the clients had not only terminated him, but also if they had objected to him receiving any funds. To that end, in cooperation with Mr. Marshall, I crafted a form that sought an answer to two questions: 1) Have you terminated Mr. Rothenberg, and 2) If so, do you consent to Mr. Rothenberg receiving his percentage of attorneys' fees under the retainer agreement. (This form was subsequently circulated to all parties and the Arbitrator by Mr. Nace and has since been sent to the clients.)

36. In other words, I had two duties placed upon me: 1) I had a duty to facilitate that the funds were kept safe to protect Mr. Rothenberg's claim to the funds and not object to his claim, and 2) I had a duty to the clients to ensure that they consented to Mr. Rothenberg receiving the funds, and if not I had to advise them that he would have a third-party claim and I would need to escrow the funds until they had resolved the dispute.

37. In discussing what an accurate distribution form would be comprised of it was also determined that with regard to any clients that had not terminated Mr. Rothenberg, such a form would indicate that 1/3 of the attorneys' fees would go directly to Mr. Rothenberg but with regard to any clients that had terminated Mr. Rothenberg and indicated that they did not consent to him obtaining any attorneys' fees, we needed to specify on the distribution form that such funds were going to be held in escrow in order to preserve them and to help facilitate any claim that Mr. Rothenberg wanted to make to those funds. NEVER did I have any intent or even consider that such funds would be re-allocated to the Fay Law Group, P.A. and the Perles Law Firm, P.A. on a 50/50 distribution.

38. In order to learn what the clients' positions were on these matters and in order to both keep safe Mr. Rothenberg's claim and to ensure the clients did or did not dispute that claim, I had to ask the clients those questions.

39. Having been kept in the dark by the Rothenbergs and their attorney for several months despite requesting this information on which clients had terminated him, I had my office start to make phone calls to the clients as deadlines started to draw near and distribution forms needed to be created. We had already lost the months of December and January waiting for the Rothenbergs and their lawyers to simply tell us who had fired them and with whom they were asserting their claims against.

40. Understanding that Order Number 7 placed a duty on me to "facilitate" Mr. Rothenberg's claim, I took steps to facilitate his claim by having my office reach out to the clients and inquiring if Mr. Rothenberg still represented them and if not, if they consented to him receiving the fee.

41. Almost all of the clients indicated that they did not want Mr. Rothenberg to represent them but did not know what they needed to do to fire him. In all of these situations, we advised the clients to seek independent counsel.

42. Once the clients advised our office that they were terminating Mr. Rothenberg that intent had been manifested and Mr. Rothenberg no longer represented them; however, I had my office, and/or myself if I had answered the phone, advise the clients that if that was their intent they needed to send him an email and advise him of that and to also provide me a copy of that letter so that I could appropriately account for the escrowing of his claimed recovery.

43. Again, never did I advocate for the termination of Mr. Rothenberg.

44. Never did I contest any claim Mr. Rothenberg had.

45. At all times, my actions were done in both an effort to protect Mr. Rothenberg's claim to the attorneys' fees but also to the clients' rights.

46. With regard to what would happen to any fees that are held in escrow for Mr. Rothenberg: if a dispute is raised and resolves in Mr. Rothenberg not obtaining 100% of those funds, consistent with the email circulated by my attorney, neither myself nor the Fay Law Group, P.A. believes that under the retainer agreements we have a claim to that balance. Any such balance would become the clients' money. To the extent that some argument could be made that we do have a claim to that money or that we could assert a claim to that money under the retainer agreements, I disclaim any such potential claim.

47. I have also reviewed the document titled "Fay Respondents' Reply to Claimants' Omnibus Brief in Opposition to Respondents' Motions to Vacate/Reconsider Order No. 7 and the Interim Award and Request for Punitive Damages and Injunctive Relief." To the best of my knowledge and recollection, the facts as stated therein are true and accurate.

*****SIGNATURE LINE OF FOLLOWING PAGE*****

5/16/2025

DATE

Caragh Fay

PRINTED NAME

DocuSigned by:
Caragh Fay
5D67D45B56EC45A...

SIGNATURE